**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| COBALT INTERNATIONAL ENERGY, INC., *et al.*,[1] | ) | Case No. 17-36709 (MI) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | (Emergency Hearing Requested) |

**DEBTORS' *EMERGENCY* MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) PAY PREPETITION WAGES, SALARIES, OTHER COMPENSATION, AND REIMBURSABLE EXPENSES AND (B) CONTINUE EMPLOYEE BENEFITS PROGRAMS, AND (II) GRANTING RELATED RELIEF**

**THIS MOTION SEEKS ENTRY OF AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

**EMERGENCY RELIEF HAS BEEN REQUESTED. IF THE COURT CONSIDERS THE MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED RELIEF OR IF YOU BELIEVE THAT THE EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE. A HEARING WILL BE HELD ON THIS MATTER ON DECEMBER 14, 2017, AT 3:30 P.M. (CENTRAL TIME) BEFORE THE HONORABLE MARVIN ISGUR, 515 RUSK STREET, COURTROOM 404, HOUSTON, TEXAS 77002.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Cobalt International Energy, Inc. (1169); Cobalt International Energy GP, LLC (7374); Cobalt International Energy, L.P. (2411); Cobalt GOM LLC (7188); Cobalt GOM # 1 LLC (7262); and Cobalt GOM # 2 LLC (7316). The Debtors' service address is: 920 Memorial City Way, Suite 100, Houston, Texas 77024.

The above-captioned debtors and debtors in possession (collectively, the "Debtors") respectfully state as follows in support of this motion.

## Relief Requested

1. The Debtors hereby seek entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, (a) authorizing the Debtors to (i) pay all prepetition and postpetition obligations on account of the Employee Compensation and Benefits (as defined herein) in the ordinary course of business and (ii) continue to administer the Employee Compensation and Benefits, including payment of prepetition obligations related thereto, and (b) granting related relief. In addition, the Debtors request that the court schedule a final hearing to consider approval of this motion on a final basis.

## Jurisdiction and Venue

2. The United States Bankruptcy Court for the Southern District of Texas has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of Texas*, dated May 24, 2012 (the "Amended Standing Order"). The Debtors confirm their consent, pursuant to rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to the entry of a final order by the court in connection with this motion to the extent that it is later determined that the court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory bases for the relief requested herein are sections 105, 363, 503, and 507 of the United States Bankruptcy Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Bankruptcy Rules 6003 and 6004, and rule 9013-1(b) of the Bankruptcy Local Rules for the Southern District of Texas (the "Bankruptcy Local Rules").

## Background

4. The Debtors are a publicly held offshore oil exploration and production company with headquarters in Houston, Texas and operations primarily located off the coast of the United States in the deepwater of the Gulf of Mexico and offshore Angola and Gabon in West Africa. The Debtors have four named discoveries in the Gulf of Mexico, which include North Platte, Shenandoah, Anchor, and Heidelberg. Heidelberg began initial production in January of 2016 while North Platte, Shenandoah, and Anchor have been fully appraised and are now in development. Additionally, the Debtors have made seven aggregate discoveries in offshore Angola and maintain a non-operated interest in offshore Gabon, where the Debtors have one discovery.

5. On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. A detailed description surrounding the facts and circumstances of these chapter 11 cases is set forth in the *Declaration of David D. Powell, Chief Financial Officer of Cobalt International Energy, Inc., in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), filed contemporaneously with this motion.[2]

6. The Debtors continue to operate and manage their businesses as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors have concurrently filed a motion requesting procedural consolidation and joint administration of these chapter 11 cases pursuant to Bankruptcy Rule 1015(b). No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

---

2 Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the First Day Declaration.

**The Debtors' Workforce**

7. The Debtors employ approximately 82 individuals (collectively, the "Employees"). Approximately 77 Employees are salaried, and approximately five Employees are paid on an hourly basis. None of the Employees are represented by a union or collective bargaining unit. The vast majority of the Employees rely exclusively on their compensation and benefits to pay their daily living expenses and support their families. Thus, Employees would be exposed to significant financial hardship if the Debtors were not permitted to continue paying their compensation, providing benefits, and maintaining existing programs. Consequently, the relief requested is necessary and appropriate.

8. The Debtors also supplement their workforce from time to time by relying on approximately 19 independent and small contractors to perform a variety of services that are essential to the Debtors' ongoing operations (the "Independent Contractors"). Oftentimes, the Independent Contractors are highly trained professionals who bring specialized knowledge and skills not otherwise available to the Debtors. The continued use of Independent Contractors is a critical and cost-effective addition to the Debtors' Employee base.

9. In addition, the Debtors also periodically employ temporary workers (the "Temporary Staff") sourced periodically from various staffing agencies (collectively, the "Staffing Agencies") to fulfill certain duties on a short-term basis. As of the Petition Date, the Debtors retain approximately 31 Temporary Staff. The Temporary Staff are an important supplement to the efforts of the Debtors' Employees.

10. The Debtors' Employees, Independent Contractors, and Temporary Staff perform a wide variety of functions critical to the administration of these chapter 11 cases and the Debtors' restructuring. Their skills, knowledge, and understanding of the Debtors' operations and infrastructure are essential to preserving operational stability and efficiency. In many

instances, these individuals are highly trained personnel and have an essential working knowledge of the Debtors' businesses that cannot be easily replaced. Without the continued, uninterrupted services of their Employees, Independent Contractors, and Temporary Staff, the Debtors' restructuring efforts will be halted.

**Employee Compensation and Benefits**

11. The Debtors seek to minimize the personal hardship the Employees would suffer if employee obligations are not paid when due or as expected. Therefore, the Debtors are seeking authority to pay and honor certain prepetition claims relating to, among other things, wages, salaries, and other related obligations and health and welfare benefits that the Debtors have historically provided to their Employees and directors (collectively, the "Employee Compensation and Benefits"). The Debtors also seek to pay all costs incident to the Employee Compensation and Benefits.

12. Subject to the court's approval of the relief requested herein, the Debtors intend to continue their prepetition Employee Compensation and Benefits programs in the ordinary course of business on a postpetition basis and to pay and/or reimburse prepetition amounts (if any) related thereto. To the extent applicable, the Debtors also request authority to modify, change, and discontinue any of their Employee Compensation and Benefits and to implement new programs, policies, and benefits in the ordinary course of business during these chapter 11 cases and without the need for further court approval, subject to applicable law.

13. Pursuant to the interim order, the Debtors seek authority, but not direction, to honor prepetition ordinary course obligations on account of the Employee Compensation and Benefits; *provided* that no individual holder of a priority claim under section 507(a)(4) of the Bankruptcy Code will receive in the aggregate a payment in excess of $12,850 on account of such priority claim. Pursuant to the final order, the Debtors seek authority, but not direction, to

honor prepetition ordinary course obligations on account of the Employee Compensation and Benefits, including amounts owed to individual holders of claims in excess of $12,850, if any.

## I. **Employee Compensation**.

### A. **Employee Compensation**.

14. The Debtors pay their Employees' wage and salary obligations (collectively, the "Employee Compensation") semimonthly on either a salaried or hourly basis. Employee Compensation is paid in arrears for work performed during a given semimonthly period.

15. The Debtors' gross payroll expenses on account of Employee Compensation are approximately $900,000 per pay period. As of the Petition Date, the Debtors do not believe that they owe any amounts on account of prepetition wages, salaries, overtime, and other compensation, excluding reimbursable expenses, paid time off, and amounts related to the Debtors' 401(k) Plan (as defined herein) (collectively, the "Unpaid Wages"). Nevertheless, and out of an abundance of caution, the Debtors request authority to continue paying the Unpaid Compensation in the ordinary course of business on a postpetition basis, including payment of prepetition obligations related thereto, if any.

### B. **Non-Debtor Worker Obligations**.

16. In addition, non-Debtor CIE Angola Block 21 Ltd. employs three individuals (the "Non-Debtor Employees") and one independent contractor in the Republic of Angola (together with the Non-Debtor Employees, collectively, the "Non-Debtor Workers"). The Non-Debtor Workers receive substantially similar compensation and benefit packages as the domestic Employees and Independent Contractors, as applicable. The salaries and benefits paid to the Non-Debtor Workers are ultimately funded by Debtor Cobalt International Energy LP. These payments amount to less than $100,000 per month. By this motion, the Debtors seek authority,

but not direction, to fund all prepetition and postpetition obligations on account of compensation and benefits of the Non-Debtor Workers in the ordinary course of business.[3]

**C. Withholding Obligations**.

17. The Debtors routinely deduct certain amounts from Employees' paychecks during each applicable pay period on account of miscellaneous items, including garnishments, child support and related fees, wage overpayments, certain personal expenses, and pre-tax deductions payable pursuant to certain of the health and welfare programs (collectively, the "Deductions"). Some of these Deductions are forwarded to various third-party recipients. On average, Deductions total approximately $3,000 per month in the aggregate.

18. The Debtors also are required by law to withhold from Employee Compensation amounts related to, among other things, federal, state, and local income taxes, as well as Social Security and Medicare taxes (collectively, the "Employee Payroll Taxes") for remittance to the appropriate federal, state, and local taxing authorities. The Debtors must then match certain of the Employee Payroll Taxes from their own funds and pay, based upon a percentage of gross payroll, additional amounts for state and federal unemployment insurance (the "Employer Payroll Taxes," and together with the Employee Payroll Taxes, the "Payroll Taxes,"). The Payroll Taxes are generally processed and forwarded to the appropriate federal, state, or local taxing authority at the same time the Employees' payroll checks are disbursed.

19. The Deductions and Payroll Taxes (together, the "Withholding Obligations") are both administered by ADP TotalSource ("ADP") and are bundled with the cost of the payroll services provided by ADP. As of the Petition Date, the Debtors do not believe there are any

[3] The Debtors seek authority to transfer funds to CIE Angola Block 21 Ltd. on account of these and certain other ordinary course obligations pursuant to the *Debtors* Emergency *Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Perform Intercompany Transactions, and (II) Granting Related Relief*, filed contemporaneously with this motion.

accrued but unpaid amounts on account of the Withholding Obligations. Nevertheless, and out of an abundance of caution, the Debtors seek authority, but not direction, to transfer any Withholding Obligations to the appropriate recipients in the ordinary course of business and consistent with historical practice and to continue remitting any Withholding Obligations in the ordinary course of business on a postpetition basis.

**D. Payroll Processing.**

20. The Debtors utilize ADP and ADP-EZLM to process payroll disbursements, administer Withholding Obligations, and provide certain related services, including benefit administration and paycheck deductions, among others (together, the "Payroll Processors"). The Debtors have historically paid approximately $300,000 per month to the Payroll Processors on account of such services, which includes amounts on account of the Withholding Obligations. The failure to pay prepetition or postpetition payroll servicing fees may delay employee payroll disbursements or the payment or transfer of Withholding Obligations to the appropriate third-parties to the detriment of their Employees and the Debtors' operations. As of the Petition Date, the Debtors do not believe there are any accrued but unpaid amounts due and owing to the Payroll Processors. By this motion the Debtors seek to continue administering payroll in the ordinary course of business on a postpetition basis (including paying any prepetition or postpetition amounts payable to the Payroll Processors, if any).

**E. Reimbursable Expenses**.

21. In the ordinary course of business, certain Employees and directors are eligible to receive reimbursement for certain reasonable and customary expenses (the "Reimbursable Expenses") incurred on behalf of the Debtors in the scope of their employment. Reimbursable Expenses typically include expenses associated with travel, transportation, lodging, meals, rental cars, personal car use, certain business entertainment, continuing professional education, office

equipment and supplies, and other reasonable business-related expenses. As further set forth below, the Debtors reimburse Employees or directors for Reimbursable Expenses in two ways: through the use of corporate credit and purchasing cards and direct reimbursement of out of pocket expenses. Additionally, the Debtors offer assistance to Employees that need to conduct business internationally by covering certain travel expenditures.

**1. Corporate Cards.**

22. Approximately 50 Employees hold corporate credit and purchasing cards issued by Citibank N.A. ("Citibank") (collectively, the "Corporate Cards"), which are typically used to cover Reimbursable Expenses incurred in the ordinary course of business. Each Corporate Card has a credit limit of approximately $74,000. The Debtors either pay the outstanding balances directly to Citibank or reimburse the Employee, as applicable. The Debtors have historically paid between $50,000 and $100,000 per month on account of the Corporate Cards. As of the Petition Date, the Debtors estimate that approximately $50,000 is accrued and outstanding on account of the Corporate Cards, all of which will become due and owing during the first 21 days of these chapter 11 cases.

**2. Out of Pocket Expenses.**

23. Additionally, the Debtors reimburse certain out of pocket business expenses incurred by the Employees and Parent Debtor Cobalt International Energy, Inc.'s directors (collectively, the "Out of Pocket Expenses"). While Employees are encouraged to use the Corporate Cards for business related expenses, Employees who use their personal credit cards or cash for Reimbursable Expenses incurred in the ordinary course of business are entitled to reimbursement after certain approvals are received, in accordance with internal policies and procedures. Typically, Out of Pocket Expenses are only reimbursed for Employees who are not issued a Corporate Card. In certain rare instances where an Employee is not able to use the

Corporate Cards, that Employee may submit an expense report for any Out of Pocket Expenses incurred on behalf of the Debtors. Similarly, the Debtors will reimburse Out of Pocket Expenses incurred by directors. The Debtors have historically paid approximately $30,000 per month on account of such Out of Pocket Expenses. As of the Petition Date, the Debtors estimate that approximately $29,500 in Out of Pocket Expenses is accrued and outstanding, all of which will become due and owing during the first 21 days of these chapter 11 cases.

**3. International Travel Documentation**.

24. In the ordinary course of business, it may become necessary for certain Employees to travel internationally to conduct business for the Debtors. In such circumstances, the Debtors often cover costs associated with providing passports and any necessary visas to such Employees (the "International Travel Documentation"). Typically, these services are facilitated by Total Visa Solutions. The Debtors have historically paid approximately $5,000 per year on account of such International Travel Documentation. As of the Petition Date, there are no amounts currently outstanding on account of the International Travel Documentation. By this motion, the Debtors seek authority, but not direction, to continue payments on account of the International Travel Documentation in the ordinary course of business on a postpetition basis, consistent with past practice.

**F. Temporary Staff Compensation**.

25. As previously set forth, in order to supplement their workforce, the Debtors' Employees rely on the support of Temporary Staff to fill short-term positions that are not economically feasible to employ on a full- or part-time basis. The Debtors make payments to Staffing Agencies on account of the Temporary Staff (the "Temporary Staff Compensation") for the performance of certain services critical to the Debtors' operations. Specifically, the Temporary Staff are employed to aid with, among other things, administrative services,

consulting, engineer services, financial services, accounting services, human resources, market research, analysts, information technology, office services, and personnel services. The Debtors believe the authority to continue paying the Staffing Agencies is critical to minimize disruption of the Debtors' continued business operations.

26. The Debtors have historically paid approximately $725,000 per month to the Staffing Agencies on account of Temporary Staff Compensation. As of the Petition Date, the Debtors estimate that the aggregate amount of accrued but unpaid Temporary Staff Compensation is approximately $650,000, all of which will become due and owing during the first 21 days of these chapter 11 cases. Therefore, the Debtors seek authority, but not direction, to honor such outstanding prepetition obligations in the ordinary course of business and consistent with historical practice and to continue paying any such obligations related thereto in the ordinary course of business on a postpetition basis.

**G. Independent Contractors.**

27. Through various contracts, approximately 19 Independent Contractors conduct a range of important services for the Debtors, including consulting, geologic modeling, and seismic and well data management, among others. Many of these Independent Contractors work in the Debtors' offices and perform services that could be performed by full-time employees in other circumstances and at other companies. The Debtors typically remit payment for the Independent Contractors' services directly to the Independent Contractors through their accounts payable system. On average, the Debtors pay approximately $210,000 per month on account of compensation owed to the Independent Contractors. As of the Petition Date, the Debtors estimate that approximately $105,000 is accrued and outstanding on account of the Independent Contractors, all of which will become due and owing in the first 21 days of these chapter 11 cases.

**H. Expatriate.**

28. The Debtors employ one individual who was relocated to Angola from the United States (the "Expatriate Employee"). Because the Expatriate Employee would not traditionally pay Angolan taxes, the Debtors have agreed to true up the Expatriate Employee's tax payments in Angola as part of foreign tax equalization (the "Expatriate Employee Obligations"). As of the Petition Date, the Debtors estimate that approximately $15,000 is accrued and outstanding on account of the Expatriate Employee Obligations, none of which will become due and owing in the first 21 days of these chapter 11 cases.

**I. Director Compensation.**

29. Parent Debtor Cobalt International Energy, Inc. maintains a board of directors comprised of one Employee member and eight non-Employee members (each, a "Director"). Directors serve on the audit, compensation, and nominating and corporate governance committees, as well as certain other special committees of the board of directors, as needed.

30. Directors receive an average annual compensation of $275,000 for their service as a Director, exclusive of amounts received for their service on any committees. The chairperson of each committee receives an additional annual retainer as follows: the chairperson of the compensation committee and the chairperson of the audit committee each receives $20,000, the chairperson of the nominating and corporate governance committee receives $5,000, and the chairperson of the Board of Directors receives $150,000. Disinterested Directors are eligible to receive an additional fee at a rate of $500 per hour, up to a daily cap of $4,000, for undertakings outside the normal scope of business ordinarily performed by such Director. Directors are generally paid quarterly in advance (the "Director Compensation").

31. The Debtors do not believe they presently owe any prepetition amounts on account of the Director Compensation. By this motion, the Debtors seek authority, but not

direction, to pay any prepetition amounts solely out of an abundance of caution and to continue to pay the Director Compensation on a postpetition basis in the ordinary course of business and consistent with past practices.

**J. Recruitment Services.**

32. To recruit talented individuals for potential employment, the Debtors utilize services provided by LinkedIn to identify eligible candidates (the "Recruitment Services"). Historically, the Debtors pay approximately $25,000 per year on account of the Recruitment Services. The Debtors pay amounts due and owing in connection with the Recruitment Services quarterly in arrears. As of the Petition Date, there are no amounts accrued and outstanding on account of the Recruitment Services, but the Debtors seek authority to continue making payments on account of the Recruitment Services in the ordinary course of business on a postpetition basis consistent with past practice.

**II. Employee Benefit Programs.**

33. The Debtors offer Employees the opportunity to participate in one or more insurance and benefit programs, including, medical, dental, and vision plans, life insurance, short and long-term disability, 401(k) Plan and other employee benefit plans as described below (collectively, the "Employee Benefit Programs"). By this Motion, the Debtors seek authority to continue the Employee Benefits Programs in the ordinary course and honor any prepetition obligations related thereto.

**A. Health Benefit Programs.**

34. As described below, the Debtors offer all eligible Employees the opportunity to participate in a number of health benefit plans, including medical, dental, and vision plans (collectively, the "Health Benefit Programs"). For eligible Employees, the Debtors pay the Health Benefit Programs monthly in advance.

**1. The Medical Plans.**

35. Eligible Employees are entitled to participate in medical plans (collectively, the "Medical Plans") that are administered by United Healthcare. Approximately 68 Employees are enrolled in the Medical Plans. Under the Medical Plans, participants receive coverage for, among other things, preventive care, doctor visits, hospital care, prescription drugs, and wellness. Monthly health care contributions paid under the Medical Plans vary depending on whether the participant has dependents covered by the applicable plan, among other things. Participating Employees pay semimonthly contributions, which are deducted from their paychecks.

36. The Debtors' monthly cost to provide the Medical Plans on behalf of their Employees is approximately $123,500, of which approximately $105,000 is paid by the Debtors and $18,500 is funded by deductions from participating, eligible Employees, as applicable. As of the Petition Date, there are no amounts currently outstanding on account of the Medical Plans.

**2. The Dental Plan.**

37. The Debtors also offer their eligible Employees dental insurance through a plan administered by Guardian Life Insurance Company (the "Dental Plan"). Approximately 71 Employees are enrolled in the Dental Plan. The Debtors' monthly cost to provide the Dental Plan on behalf of the eligible Employees is approximately $6,200, of which approximately $1,600 is funded by deductions from participating Employees. As of the Petition Date, there are no amounts currently outstanding on account of the Dental Plan.

**3. The Vision Plan.**

38. The Debtors also offer eligible Employees the option of participating in a vision plan administered by VSP (the "Vision Plan"). Approximately 72 Employees are enrolled in the Vision Plan. The Debtors' monthly cost to provide the Vision Plan on behalf of their Employees is approximately $1,200, of which approximately $600 is funded by deductions from

participating Employees. As of the Petition Date, there are no amounts currently outstanding on account of the Vision Plan.

**B. Flexible Spending Accounts.**

39. The Debtors offer eligible Employees the ability to contribute a portion of their pre-tax compensation to flexible spending accounts administered by ADP to pay for certain out-of-pocket health care and dependent care expenses (the "Flexible Spending Program"). Approximately 23 Employees participate in the Flexible Spending Program. At the beginning of each year, participating Employees may elect to contribute up to $2,600 in the healthcare account and up to $5,000 in the dependent care account by deducing such amounts from their paychecks during the course of the year. The Flexible Spending Program is entirely Employee-funded. As a result, the Debtors do not believe that they owe any prepetition amounts on account of the Flexible Spending Program. Nonetheless, the Debtors seek authority, but not direction, to continue the Flexible Spending Program in the ordinary course of business on a postpetition basis.

**C. Health Savings Account.**

40. Employees who participate in certain of the Medical Plans may contribute a portion of their compensation into a health savings account (the "HSA"), administered by ADP. Participating Employees can make before-tax contributions to the HSA through payroll deductions to cover reimbursements under the program up to a maximum amount permitted by the Internal Revenue Service ("IRS"). Approximately 25 Employees participate in the HSA program. The HSA is entirely Employee-funded. As a result, the Debtors do not believe that they owe any prepetition amounts on account of the HSA. Nonetheless, the Debtors seek authority, but not direction to continue the HSA in the ordinary course of business on a postpetition basis.

**D. Employee Assistance Program.**

41. The Debtors provide Employees with the ability to participate at no cost in confidential counseling and referral services that can assist Employees with a range of personal- and health-related problems (the "Employee Assistance Program"). The Employee Assistance Programs are administered by ADP. The cost of the Employee Assistance Program administered through ADP is bundled with the payroll services provided by ADP. Thus, the Debtors do not incur any additional costs in connection with the Employee Assistance Program administered by ADP.

**E. Significant Life Event Program.**

42. The Debtors provide sponsored support to individual Employees who experience a significant life event, including the birth of a child, severe illness of an Employee or an Employee's dependent, or death of an Employee's immediate family member (the "Significant Life Event Program"). Individual expenditures on account of the Significant Life Event Program range from $150 to $300. On average the Debtors pay approximately $1,000 per month on account of the Significant Life Event Program. As of the Petition Date, there are no amounts accrued and outstanding on account of the Significant Life Event Program, but the Debtors seek authority to continue the Significant Life Event Program on a postpetition basis consistent with past practice.

**F. Insurance and Disability Programs.**

**1. Life and AD&D Insurance Programs.**

43. The Debtors provide life and accidental death and dismemberment insurance coverage to all eligible Employees through Aetna, which provides coverage equal to each Employee's base salary, up to $750,000 (the "Basic Life Insurance"). Employees are able to supplement the Basic Life Insurance by buying additional life and accidental death and

dismemberment insurance for themselves or their spouse and children (the "Voluntary Life Insurance," and together with the Basic Life Insurance, the "Life Insurance Programs"). On average, the Debtors' monthly cost to provide the Life Insurance Programs on behalf of their Employees is approximately $2,400. The Debtors pay amounts due and owing under the Life Insurance Programs monthly in advance. As of the Petition Date, there are no outstanding amounts on account of the Life Insurance Programs.

**2. Disability Benefits.**

44. The Debtors provide eligible Employees with long-term disability benefits, administered through Aetna (the "Long-Term Disability Benefits"). The Debtors also provide eligible Employees with short-term disability benefits (the "Short-Term Disability Benefits," and together with the Long-Term Disability Benefits, the "Disability Benefits").

45. For eligible Employees, the Short-Term Disability Benefits kick in on the eighth consecutive day of absence from work due to a non-work related illness or injury, and can continue for up to 13 weeks. The benefit amount is limited to 60 percent of the Employee's base weekly earnings up to a $2,500 weekly maximum. Long-Term Disability Benefits begin, subject to approval, after 90 days of consecutive absence of an Employee from work due to a similar, non-work related illness or injury. The Long-Term Disability Benefits is 60 percent of the Employee's base monthly earnings, up to a maximum of $10,000.

46. On average, the Debtors pay approximately $3,100 per month on account of the Disability Benefits. As of the Petition Date, there are no amounts outstanding on account of the Disability Benefits.

**G. Workers' Compensation Program.**

47. The Debtors maintain workers' compensation insurance for Employees at the levels required by laws in the states in which the Debtors operate (collectively, the "Workers'

Compensation Program"). The Debtors maintain coverage for the Workers' Compensation Program through New Hampshire Insurance Company. The Workers' Compensation Program is administered by ADP. The cost of the Workers' Compensation Program administered through ADP is bundled with the payroll services provided by ADP. Thus, the Debtors do not incur any additional costs in connection with the Workers' Compensation Program.

48. The Debtors must continue the claim assessment, determination, adjudication, and payment process pursuant to the Workers' Compensation Program without regard to whether such liabilities are outstanding before the Petition Date to ensure that the Debtors comply with applicable workers' compensation laws and requirements.[4] As of the Petition Date, there are no open claims under the Workers Compensation Program and the Debtors are not aware of any potential claims against them that have not yet been formally reported. As a result, the Debtors do not believe there is currently any potential exposure of known claims under the Workers' Compensation Program as of the Petition Date.

49. For the claims administration process to operate in an efficient manner and to ensure that the Debtors' comply with their contractual obligations and applicable law, the Debtors must continue to assess, determine, and adjudicate claims brought under the Workers' Compensation Program during these chapter 11 cases. In addition, to the extent any Employees assert claims under the Workers' Compensation Program, the Debtors request that the Court modify the automatic stay under section 362 of the Bankruptcy Code to permit the Employees to proceed with their claims under the Workers' Compensation Program. This required

[4] The Debtors' Workers' Compensation Program may change postpetition in the ordinary course of business due to changes in applicable laws and regulations and the Debtors' ability to meet requirements thereunder. By this motion, the Debtors request authority to continue the Workers' Compensation Program postpetition, including making any changes to current policy and practices that become necessary, subject to applicable law.

modification of the automatic stay pertains solely to claims under the Workers' Compensation Program.

50. Because the Debtors are statutorily and/or contractually obligated to maintain the Workers' Compensation Program, their inability to do so may result in adverse legal consequences that disrupt the reorganization process. Thus, the Debtors request the authority, pursuant to both the interim order and the final order (a) to continue the Workers' Compensation Program in the ordinary course of business on a postpetition basis, and (b) to modify the automatic stay solely to allow Employees to assert claims under the Workers' Compensation Program.

**H. 401(k) Plan.**

51. The Debtors provide Employees with the opportunity to participate in a defined contribution employee retirement program (the "401(k) Plan"). Employees are generally eligible to participate in the 401(k) Plan immediately upon hire. The 401(k) Plan generally provides for pre-tax deductions of compensation up to limits set by the Internal Revenue Code, as well as for certain post-tax deductions. Each participating Employee's 401(k) Plan contributions are automatically deducted from each paycheck and transferred to a trust established under the 401(k) Plan (collectively, the "401(k) Deductions"). Over the last 12 months, the Debtors withheld an average of approximately $155,000 per month on account of the 401(k) Deductions.

52. The Debtors match the Employees' 401(k) Plan contributions on a dollar-for-dollar basis up to the first 6 percent of eligible compensation each pay period the Employees' contribute, subject to the maximum amount permitted by the IRS (the "Matching Contributions"). Over the last 12 months, the Debtors paid an average of approximately $111,000 per month on account of the Matching Contributions.

53. As of the Petition Date, the Debtors estimate that there are no amounts outstanding on account of the 401(k) Plan. By this Motion, the Debtors seek authority, but not direction, to continue the 401(k) Plan in the ordinary course of business on a postpetition basis, consistent with past practice.

**I. Severance Programs**.

54. The Debtors have historically maintained a severance program under which Employees, upon involuntary termination, are entitled to a receive a lump sum cash payment in an amount equal to 24 weeks of base pay (plus an additional three weeks of pay for each year of continued service above four full years of service), subject to a maximum of 42 weeks of base pay and $10,000 to help offset the cost of continuation of healthcare and retain unvested equity and fixed cash that is scheduled to vest within twelve months of the last day on payroll (the "Employee Severance Program"). The Employee Severance Program also includes outplacement support to assist severed Employees in their job search at an average annual cost of $20,000. All full-time and part-time non-executive Employees are eligible to participate in the Employee Severance Program.

55. In addition, the Debtors have historically maintained a severance program for certain officers and management Employees (the "Executive Severance Program"). Upon involuntary termination, Employees that are eligible to participate in the Executive Severance Program are entitled to receive a lump sum cash payment equal to a multiple of base salary plus an additional $2,000 for an applicable period ranging from 12 to 24 months depending on the Employee's job title. Under the Executive Severance Program, Employees are eligible to receive their *pro rata* share of the annual bonus that such Employee would have been entitled to receive for the calendar year in which termination occurs, any unpaid performance bonus earned on

account of the calendar year immediately preceding the date of termination, and any unvested, timed-based equity awards shall become fully vested.

56. The Debtors also have a contractual severance obligation to the chief executive officer (the "CEO Severance Program," and together with the Employee Severance Program and the Executive Severance Program, the "Severance Programs"). Upon involuntary termination, the chief executive officer is entitled to receive a lump sum cash payment equal to a multiple of base salary and up to an additional $72,000 for continuation of healthcare. The chief executive officer is also eligible to receive his *pro rata* share of the annual bonus that he would have been entitled to receive for the calendar year in which termination occurs, any unpaid performance bonus earned in the calendar year immediately preceding the date of termination, and any unvested equity-based compensation awards granted prior to the date of termination (excluding performance awards that are scheduled to become vested during the two-year period following the date of termination, which shall continue to vest on their original schedule).

57. On average, the Debtors pay approximately $4.4 million on account of the Severance Programs on an annual basis. As of the Petition Date, there are no amounts currently outstanding on account of the Severance Programs. The Debtors believe that it is important that they fulfill their obligations under the Severance Programs to reassure all Employees that the Debtors intend to honor their obligations to Employees in the event a reduction in workforce becomes necessary during the pendency of these chapter 11 cases.

58. By this motion, the Debtors seek authority, but not direction, to continue the Severance Programs in the ordinary course of business on a postpetition basis, consistent with past practice. Importantly, by this motion the Debtors do not seek authority to pay any obligations under the Severance Programs to any "insider" (as the term is defined in section

101(3) of the Bankruptcy Code) in excess of the cap in place under section 503(c) of the Bankruptcy Code.

**J. Vacation, Holiday, Sick Time, and Other Leaves of Absence Time**.

59. The Debtors provide vacation time to all Employees who work an average of at least 30 hours per week as a paid time-off ("PTO") benefit (the "Vacation Time"). Length of employment generally determines the amount of Vacation Time available to each eligible Employee. The Debtors also allow eligible Employees to gift their Vacation Time to other eligible Employees who are in need of PTO beyond their allotted time. Employees who do not use their Vacation Time by the end of the calendar year forfeit any remaining balances. In the event of any voluntary or involuntary termination of employment, all unused Vacation Time will be forfeited.

60. Additionally the Debtors provide sick time for all eligible Employees as a PTO benefit (the "Sick Time"). Five days of Sick Time is available to each eligible Employee per year. Employees may not carry over Sick Time from one calendar year to the next; thus, any Sick Time not used by the end of the calendar year is deemed forfeited. In the event of any voluntary or involuntary termination of employment, all unused Sick Time will be forfeited.

61. The Debtors also offer Employees ten holidays throughout the year, which includes two floating holidays in each calendar year (collectively, the "Holidays"). Generally, eligible Employees are not required to work on designated Holidays and are paid for Holiday time at their base rate of pay.

62. The Debtors also offer Employees three days of bereavement leave as a PTO benefit in the event of death of a family member ("Bereavement Leave"). Additionally, the Debtors offer Employees paid leave for jury duty ("Jury Duty Leave," and together with Bereavement Leave, collectively, "Paid Leave").

63. Employees may also take certain other unpaid leaves of absence for personal reasons (collectively, the "Leaves of Absence Time"). Leaves of Absence Time includes family medical leaves, pregnancy, adoption and foster care leaves, military, voting leaves, and other personal leaves. Employees are not entitled to cash payments for unused Leaves of Absence Time. Thus, the Debtors do not believe that there are any obligations owing as of the Petition Date on account of Leaves of Absence Time.

64. The Debtors believe that the continuation of the Vacation Time, Sick Time, Holidays, Paid Leave, and Leaves of Absence Time policies in accordance with prior practice is essential to maintaining Employee morale during these chapter 11 cases. Further, the policies are broad-based programs upon which eligible Employees have come to depend. Therefore, the Debtors seek authority, but not direction, to allow eligible Employees to use their Vacation Time, Sick Time, Holidays, Paid Leave, and Leaves of Absence Time in the ordinary course of business on a postpetition basis.

**III. Employee Incentive Programs**.

65. By this Motion, the Debtors seek authority to continue their ordinary course incentive programs and to honor their obligations to non-insider Employees under the pre-existing programs described below; *provided* that "insiders" (as the term is defined in section 101(31) of the Bankruptcy Code) of the Debtors are excluded from the relief requested herein. To the extent the Debtors propose to make a cash payment to, or implement an incentive plan for, any insiders or senior executives, the Debtors will seek separate approval from the court with respect to such programs.

66. As described more fully below, the Debtors offer certain incentive programs (collectively, the "Employee Incentive Programs") as an additional component of overall Employee Compensation. The Debtors believe the Employee Incentive Programs drive

Employees' performance, align Employees' interests with those of the Debtors generally, and promote the overall efficiency and safety of the Debtors' operations.

**A. Quarterly Incentive Plan.**

67. The Debtors offer its Employees the ability to participate in a quarterly incentive plan (the "Quarterly Incentive Plan"). Under the Quarterly Incentive Plan, Employees can earn cash payments by achieving specific, pre-established company metrics that are established by the compensation committee of the board of directors. These metrics include objective targets such as health and safety, balance sheet management, successful exploration, and operational milestones. The Quarterly Incentive Plan is intended to encourage and reward individual performance and accomplishments for the year. Awards on account of the Quarterly Incentive Plan are not guaranteed, but are set based upon meeting the pre-established metrics. Payments under the Quarterly Incentive Plan are calculated based on an Employee's base salary, the Quarterly Incentive Plan target, and the performance against the company metrics. Payments under the Quarterly Incentive Plan are paid in cash for each Employee, and no such payments are earned until paid to the Employee. The plan is fully discretionary, and the Debtors retain the right to amend, modify, or terminate the Quarterly Incentive Plan at any time.

68. The Debtors believe continuation of the Quarterly Incentive Plan is integral to the operation of the Debtors' business. In particular, the Quarterly Incentive Plan aligns Employees' interests with those of the Debtors generally by linking payments under the Quarterly Incentive Plan to performance and overall efficiency of the Debtors' operations. The Debtors do not have any current obligations to Employees outstanding on account of the Quarterly Incentive Plan. However, if each current non-Insider Employee were to receive his or her target incentive payment for 2017, the Debtors estimate that they would distribute a total of approximately

$900,000 under the Quarterly Incentive Plan.[5] Therefore, the Debtors seek authority, but not direction, to pay any amounts due (whether incurred prepetition or postpetition) on account of the Quarterly Incentive Plan in the ordinary course on a postpetition basis and continue the Quarterly Incentive Plan in the ordinary course of business.

**B. Long-Term Incentive Plans.**

69. The Debtors also maintain certain long-term incentive plans (the "Long-Term Incentive Plans") pursuant to which certain of the Debtors' Employees are eligible to receive cash and non-cash awards, including restricted stock, restricted stock units, cash based awards, or any combination of the foregoing (each an "Award" and together, the "Awards"). The Long-Term Incentive Plans are designed to motivate and reward Employees who are expected to contribute significantly to the success of the Debtors to perform at the highest level and to further the best interests of the Debtors. Awards are granted to Employees on a discretionary basis. Upon an Employee's termination (other than for cause, in which case all Awards are forfeited), all vested Awards remain fully exercisable. Employees who are terminated due to job elimination retain unvested Awards that are scheduled to vest within twelve months of the Employee's last day on payroll. All remaining unvested Awards are forfeited upon termination, other than for death or disability. As of the Petition Date, approximately $116,000 in restricted stock, $202,000 in restricted stock units, and $3.7 million in cash based awards remain outstanding, of which approximately $7,000 in restricted stock will vest on December 29, 2017.[6]

70. When a vesting event occurs, the Debtors pay the associated *de minimis* taxes on behalf of the Employee (the "Equity Taxes"). As of the Petition Date, the Debtors estimate that

5 This estimate includes amounts on account of the Non-Debtor Employees.

6 This estimate is based on established vesting schedules and an estimated stock price of $0.50. If Cobalt International Energy, Inc.'s stock price were to decrease to a price nearer to zero, the Debtors believe that any 2017 equity-based Awards under the Long-Term Incentive Plans would be *de minimis*.

they owe approximately $1,500[7] on account of the Equity Taxes, all of which will become due and owing within the first 21 days of these chapter 11 cases.

71. In addition, the Debtors utilize certain third-party providers to administer the shared based compensation associated with the Long Term Incentive Plans. On average the Debtors pay approximately $45,000 on an annual basis to these third-party providers. As of the Petition Date there are no outstanding amounts owed to to such third-party providers.

72. The Debtors seek authority, but not direction, to (a) honor any amounts that may come due (whether incurred prepetition or postpetition) on account of the Long-Term Incentive Plans, (b) continue the Long-Term Incentive Plans in the ordinary course on a postpetition basis, (c) continue to pay the Equity Taxes associated therewith, and (d) continue to pay any third-party providers that administer the shared based compensation. By this motion the Debtors are not seeking authority to issue additional equity Awards under the Long-Term Incentive Plans.

**C. Recognition Award Program.**

73. The Debtors provide a Recognition Awards Program with an annual budget of $250,000 (the "Recognition Award Program"). Under the Recognition Award Program, any supervisor can nominate an eligible Employee in recognition of outstanding service or an accomplishment that provided value to the Debtors and their operations. Selected Employees are entitled to a one-time cash award ranging anywhere from one percent to 25 percent of their base salary (subject to normal tax deductions). As of the Petition Date, there are no amounts accrued and outstanding on account of the Recognition Award Program, but the Debtors seek authority to continue the Recognition Program on a postpetition basis consistent with past practice.

[7] This estimate is based on a stock price of $0.50.

**D. Leadership Development Program.**

74. In the ordinary course of business the Debtors' also provide a leadership development program pursuant to which the Debtors' executives select Employees to participate in a three to five day program at either the Center for Creative Leadership or Southern Methodist University to receive specialized leadership training (the "Leadership Development Program"). Eligible Employees participate in the Leadership Development Program periodically throughout the year. On average, approximately 10 Employees participate in the Leadership Development Program on an annual basis, at an average cost to the Debtors of approximately $10,000 per Employee for tuition and related travel expenses. As of the Petition Date, there are no amounts accrued and outstanding on account of the Leadership Development Program, but the Debtors seek authority to continue the Leadership Development Program on a postpetition basis consistent with past practice.

## Basis for Relief

### I. Sufficient Cause Exists to Authorize the Debtors to Honor the Employee Compensation and Benefits.

**A. Certain Employee Compensation and Benefits Are Entitled to Priority Treatment.**

75. Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle certain of the Employee Compensation and Benefits owed to the Employees to priority treatment. Section 507(a)(4) of the Bankruptcy Code requires the Debtors to pay wages, salaries, commissions, vacation, severance, and sick leave as administrative priority claims up to a limit of $12,850 per individual. As priority claims, the Debtors are required to pay these claims in full to confirm a chapter 11 plan. *See* 11 U.S.C. § 1129(a)(9)(B) (requiring payment in full of certain allowed unsecured claims for (a) wages, salaries, or commissions, including severance, and sick leave pay earned by an individual, and (b) contributions to an employee benefit plan). Thus,

granting the relief requested herein should only affect the timing of certain payments to the Employees, and should not negatively affect recoveries for general unsecured creditors. Indeed, the Debtors submit that payment of the Employee Compensation and Benefits at this time enhances value for the benefit of all interested parties.

**B. Payment of Certain Employee Compensation and Benefits Is Required by Law.**

76. The Debtors seek authority to pay the Withholding Obligations to the appropriate third-party entities. These amounts principally represent Employee earnings that governments, Employees, and judicial authorities have designated for deduction from the Employees' paychecks. Indeed, certain Withholding Obligations are not property of the Debtors' estates because the Debtors have withheld such amounts from the Employees' paychecks on another party's behalf. *See* 11 U.S.C. §§ 541(b)(1), (d). Furthermore, federal and state laws require the Debtors to withhold certain tax payments from the Employees' paychecks and to pay such amounts to the appropriate taxing authority. 26 U.S.C. §§ 6672, 7501(a); *see also City of Farrell v. Sharon Steel Corp.*, 41 F.3d 92, 95–97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); *In re DuCharmes & Co.*, 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes); *In re Chabrand*, 301 B.R. 468, 475–81 (Bankr. S.D. Tex. 2003) (same). Because the Withholding Obligations may not be property of the Debtors' estates, the Debtors request that the court authorize them to transmit the Withholding Obligations on account of the Employees to the proper parties in the ordinary course of business.

77. Similarly, state laws require the Debtors to maintain the Workers' Compensation Program. If the Debtors fail to maintain the Workers' Compensation Program, state laws may prohibit the Debtors from operating in those states. Payment of all Workers' Compensation Program amounts is therefore crucial to the Debtors' continued operations and the success of the Debtors' restructuring.

## II. Payment of the Employee Compensation and Benefits Is Proper Pursuant to Section 363(b) of the Bankruptcy Code and the Doctrine of Necessity.

78. Section 363 of the Bankruptcy Code provides, in relevant part, that "[t]he [debtor], after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Courts in the Fifth Circuit have granted a debtor's request to use property of the estate outside of the ordinary course of business pursuant to section 363(b) of the Bankruptcy Code upon a finding that such use is supported by sound business reasons. *See, e.g.*, *Inst'l Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) ("[F]or a debtor-in-possession or trustee to satisfy its fiduciary duty to the debtor, creditors and equity holders, there must be some articulated business justification for using, selling, or leasing the property outside the ordinary course of business."); *see also In re Crutcher Res. Corp.*, 72 B.R. 628, 631 (Bankr. N.D. Tex. 1987) ("A Bankruptcy Judge has considerable discretion in approving a § 363(b) sale of property of the estate other than in the ordinary course of business, but the movant must articulate some business justification for the sale."); *In re Terrace Gardens Park P'ship*, 96 B.R. 707, 714 (Bankr. W.D. Tex. 1989).

79. Furthermore, section 105(a) of the Bankruptcy Code provides that a court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of the Bankruptcy Code, pursuant to the "doctrine of necessity." 11 U.S.C. § 105(a). The

"doctrine of necessity" functions in a chapter 11 case as a mechanism by which the bankruptcy court can exercise its equitable power to allow payment of critical prepetition claims not explicitly authorized by the Bankruptcy Code and further supports the relief requested herein. *See In re CoServ, L.L.C.*, 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002) (recognizing the "doctrine of necessity"); *see also In re Lehigh & New Eng. Ry.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that a court may authorize payment of prepetition claims if such payment is essential to debtor's continued operation); *see also In re Just for Feet, Inc.*, 242 B.R. 821, 824–25 (D. Del. 1999) (holding that section 105(a) of the Bankruptcy Code "provides a statutory basis for payment of pre-petition claims" under the doctrine of necessity); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191–92 (Bankr. D. Del. 1994) (explaining that the doctrine of necessity is the standard in the Third Circuit for enabling a court to authorize the payment of prepetition claims prior to confirmation of a reorganization plan).

80. Moreover, the doctrine of necessity is designed to foster a debtor's rehabilitation, which courts have recognized is "the paramount policy and goal of Chapter 11." *Ionosphere Clubs*, 98 B.R. at 176; *see also In re Quality Interiors, Inc.*, 127 B.R. 391, 396 (Bankr. N.D. Ohio 1991) ("[P]ayment by a debtor-in-possession of pre-petition claims outside of a confirmed plan of reorganization is generally prohibited by the Bankruptcy Code," but "[a] general practice has developed . . . where bankruptcy courts permit the payment of certain pre-petition claims, pursuant to 11 U.S.C. § 105, where the debtor will be unable to reorganize without such payment."); *In re Eagle-Picher Indus., Inc.*, 124 B.R. 1021, 1023 (Bankr. S.D. Ohio 1991) (approving payment of prepetition unsecured claims of toolmakers as "necessary to avert a serious threat to the Chapter 11 process"); *Mich. Bureau of Workers' Disability Comp. v.*

*Chateaugay Corp. (In re Chateaugay Corp.)*, 80 B.R. 279, 285–86 (S.D.N.Y. 1987) (approving lower court order authorizing payment of prepetition wages, salaries, expenses, and benefits).

81. Payment of the Employee Compensation and Benefits is warranted under this authority and the facts of these chapter 11 cases. Employees will be exposed to significant financial difficulties if the Debtors are not permitted to honor obligations for unpaid Employee Compensation and Benefits.

82. Moreover, Employees provide the Debtors with services necessary to conduct the Debtors' business, and the Debtors believe that, absent the payment of the Employee Compensation and Benefits owed to the Employees, the Debtors may experience Employee turnover and instability at this critical time in these chapter 11 cases. The Debtors believe that without these payments, the Employees may become demoralized and unproductive because of the potential significant financial strain and other hardships the Employees may face. Such Employees may then elect to seek alternative employment opportunities. Additionally, a significant portion of the value of the Debtors' business is tied to their workforce, which cannot be replaced without significant efforts—which efforts may not be successful given the overhang of these chapter 11 cases. Enterprise value may be materially impaired to the detriment of all stakeholders in such a scenario. The Debtors therefore believe that payment of the prepetition obligations with respect to the Employee Compensation and Benefits is a necessary and critical element of the Debtors' efforts to preserve value and will provide the Debtors the greatest likelihood of retention of their Employees as the Debtors seek to operate their businesses in these chapter 11 cases.

83. Indeed, bankruptcy courts in this district have recognized the importance of satisfying employee obligations in cases requesting relief similar to that requested herein.

*See, e.g.*, *In re Seadrill, Ltd.*, No. 17-60079 (DRJ) (Bankr. S.D. Tex. Sept. 12, 2017); *In re Ameriforge Grp. Inc.*, No. 17-32660 (DRJ) (Bankr. S.D. Tex. May 2, 2017); *In re Goodman Networks, Inc.*, No. 17-31575 (MI) (Bankr. S.D. Tex. Apr. 20, 2017); *In re Midstates Petroleum Co.*, No. 16-32237 (DRJ) (Bankr. S.D. Tex. May 2, 2016); *In re CJ Holding Co.*, No. 16-33590 (DRJ) (Bankr. S.D. Tex. July 21, 2016); *In re Sherwin Alumina Co., LLC*, No. 16-20012 (DRJ) (Bankr. S.D. Tex. Jan. 13, 2016).[8] Accordingly, the Debtors respectfully request that the court authorize the Debtors to pay and continue the Employee Compensation and Benefits in the ordinary course of business and consistent with historical practice.

## III. A Limited Waiver of the Automatic Stay for Workers' Compensation Claims Is Appropriate Here.

84. Section 362(a) of the Bankruptcy Code operates to stay "the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title . . . ." 11 U.S.C. § 362(a)(1).

85. Section 362 of the Bankruptcy Code, however, permits a debtor or other parties in interest to request a modification or termination of the automatic stay for "cause." *Id.* at § 362(d)(1). Cause exists here to modify the automatic stay to permit the Employees to proceed with workers' compensation claims in the appropriate judicial or administrative forum. Staying the workers' compensation claims could have a detrimental effect on the financial well-being and morale of the Employees.

---

[8] Because of the voluminous nature of the orders cited herein, such orders have not been attached to this motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

**IV. Cause Exists to Authorize the Debtors' Financial Institutions to Honor Checks and Electronic Funds Transfer.**

86. The Debtors have sufficient funds to pay the amounts described in this motion in the ordinary course of business by virtue of anticipated access to cash collateral. In addition, under the Debtors' cash management system, the Debtors can readily identify checks or wire transfer requests as relating to an authorized payment in respect of the Employee Compensation and Benefits, as applicable. Accordingly, the Debtors believe there is minimal risk that checks or wire transfer requests the court has not authorized will be made inadvertently. Therefore, the Debtors respectfully request that the court authorize and direct all applicable financial institutions, when requested by the Debtors, to receive, process, honor, and pay any and all checks or wire transfer requests in respect of the relief requested in this motion.

**Emergency Consideration**

87. In accordance with Bankruptcy Local Rule 9013-1(i), the Debtors respectfully request emergency consideration of this motion pursuant to Bankruptcy Rule 6003, which empowers a court to grant relief within the first 21 days after the commencement of a chapter 11 case "to the extent that relief is necessary to avoid immediate and irreparable harm." As set forth in this motion, the Debtors believe an immediate and orderly transition into chapter 11 is critical to the viability of their operations and that any delay in granting the relief requested could hinder the Debtors' operations and cause irreparable harm. Furthermore, the failure to receive the requested relief during the first 21 days of these chapter 11 cases would severely disrupt the Debtors' operations at this critical juncture. Accordingly, the Debtors submit that they have satisfied the "immediate and irreparable harm" standard of Bankruptcy Rule 6003 and, therefore, respectfully request that the court approve the relief requested in this motion on an emergency basis.

**Waiver of Bankruptcy Rule 6004(a) and 6004(h)**

88. To implement the foregoing successfully, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the 14-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

**Reservation of Rights**

89. Nothing contained herein is intended or shall be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against the Debtors under the Bankruptcy Code or other applicable nonbankruptcy law; (b) a waiver of the Debtors' rights to dispute any claim on any grounds; (c) a promise or requirement to pay any prepetition claim; (d) an assumption, adoption, or rejection of any agreement, contract, or lease under section 365 of the Bankruptcy Code; (e) an admission as to the validity, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (f) a waiver of any claims or causes of action which may exist against any entity.

**Notice**

90. The Debtors will provide notice of this motion to: (a) the Office of the U.S. Trustee for the Southern District of Texas; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) the indenture trustee for the Debtors' first lien notes; (d) the indenture trustee for the Debtors' second lien notes; (e) the indenture trustee for the Debtors' 2.625% senior convertible notes; (f) the indenture trustee for the Debtors' 3.125% senior convertible notes; (g) counsel to the parties referenced in clauses (c) to (f); (h) the United States Attorney's Office for the Southern District of Texas; (i) the Internal Revenue Service; (j) the United States Securities and Exchange Commission; (k) the state attorneys general for states in which the Debtors conduct business; and (l) any party that has requested notice pursuant

to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice is required.

**No Prior Request**

91. No prior request for the relief sought in this motion has been made to this or any other court.

[*Remainder of page intentionally left blank.*]

WHEREFORE, the Debtors respectfully request entry of interim and final orders, substantially in the forms attached hereto as **Exhibit A** and **Exhibit B**, granting the relief requested herein and granting such other relief as is just and proper.

Houston, Texas
Dated: December 14, 2017

*/s/ Zack A. Clement*
Zack A. Clement (Texas Bar No. 04361550)
**ZACK A. CLEMENT PLLC**
3753 Drummond Street
Houston, Texas 77025
Telephone: (832) 274-7629

-and-

James H.M. Sprayregen, P.C. (*pro hac vice* admission pending)
Marc Kieselstein, P.C. (*pro hac vice* admission pending)
Chad J. Husnick, P.C. (*pro hac vice* admission pending)
Brad Weiland (*pro hac vice* admission pending)
Laura Krucks (*pro hac vice* admission pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

*Proposed Co-Counsel to the Debtors and Debtors in Possession*

**Certificate of Service**

I certify that on December 14, 2017, I caused a copy of the foregoing document to be served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.

*/s/ Zack A. Clement*
Zack A. Clement