**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

ENTERED
03/08/2018

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| COBALT INTERNATIONAL ENERGY, INC., *et al.*,[1] | ) Case No. 17-36709 (MI) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Re: Docket No. 275** |

**ORDER (I) APPROVING THE ADEQUACY OF
THE DISCLOSURE STATEMENT, (II) APPROVING
THE SOLICITATION AND NOTICE PROCEDURES WITH
RESPECT TO CONFIRMATION OF THE DEBTORS' PROPOSED
JOINT CHAPTER 11 PLAN, (III) APPROVING THE FORMS OF BALLOTS
AND NOTICES IN CONNECTION THEREWITH, (IV) SCHEDULING CERTAIN
DATES WITH RESPECT THERETO, AND (V) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order"), pursuant to sections 105, 363, 1125, 1126, and 1128 of the Bankruptcy Code, Bankruptcy Rules 2002, 3016, 3017, 3018, 3020, and Bankruptcy Local Rules 2002-1 and 3016-1, approving, (a) the adequacy of the *Disclosure Statement for the Fourth Amended Joint Chapter 11 Plan of Cobalt International Energy, Inc. and Its Debtor Affiliates* (the "Disclosure Statement"), (b) the Solicitation and Voting Procedures, (c) the Voting Record Date, (d) the form and manner of the Solicitation Packages and the materials contained therein, (e) the Plan Supplement Notice, (f) the Non-Voting Status Notices, (g) the form of Assumption Notices and Rejection Notices to counterparties to Executory Contracts and Unexpired Leases that will be assumed or rejected

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Cobalt International Energy, Inc. (1169); Cobalt International Energy GP, LLC (7374); Cobalt International Energy, L.P. (2411); Cobalt GOM LLC (7188); Cobalt GOM # 1 LLC (7262); and Cobalt GOM # 2 LLC (7316).  The Debtors' service address is:  920 Memorial City Way, Suite 100, Houston, Texas 77024.

[2]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

pursuant to the Plan, (h) Confirmation Hearing Notice, and (i) certain dates and deadlines related thereto, all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having found that it has jurisdiction over this matter pursuant to 28 U.S.C. § 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that it may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing, if any, before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Motion is granted as provided herein.

**I.      Approval of the Disclosure Statement.**

2.      The Disclosure Statement, attached hereto as Schedule 1, is approved as providing holders of Claims entitled to vote on the Plan with adequate information to make an informed decision as to whether to vote to accept or reject the Plan in accordance with section 1125(a)(1) of the Bankruptcy Code.

3.     The Disclosure Statement (including all applicable exhibits thereto) provides holders of Claims, holders of Interests, and other parties in interest with sufficient notice of the injunction, exculpation, and release provisions contained in Article VIII of the Plan, in satisfaction of the requirements of Bankruptcy Rule 3016(c).

## II.     Approval of the Solicitation and Voting Procedures.

4.     The Debtors are authorized to solicit, receive, and tabulate votes to accept the Plan in accordance with the Solicitation and Voting Procedures attached hereto as Schedule 2, which are hereby approved in their entirety.

## III.     Approval of the Materials and Timeline for Soliciting Votes and the Procedures for Confirming the Plan.

### A.     Approval of Certain Dates and Deadlines with Respect to the Plan and Disclosure Statement.

5.     The following dates are hereby established (subject to modification as necessary) with respect to soliciting votes to accept, and voting, on the Plan and confirming the Plan (all times prevailing Central Time):[3]

| Event | Date |
| --- | --- |
| Voting Record Date | March 5, 2018 |
| Solicitation Deadline | March 12, 2018 |
| Publication Deadline | March 12, 2018 (or as soon as reasonably practicable thereafter) |
| Deadline to File Voting Report | One (1) day prior to the Confirmation Hearing Date, at 12:00 p.m., prevailing Central Time |

---

[3]     The dates established in this Order are in addition to the dates set forth in the *Order Approving Bidding Procedures for the Sale of the Debtors' Assets, (II) Scheduling An Auction, (III) Approving the Form and Manner of Notice Thereof, (V) Scheduling Hearing and Objection Deadlines with Respect to the Debtors' Disclosure Statement, and Plan Confirmation, and (V) Granting Related Relief* [Docket No. 299] and the *Order (I) Continuing the Hearing to Approve the Disclosure Statement, (II) Shortening the Period to File Plan Objections, and (III) Shortening the Notice Requirements Related Thereto* [Docket No. 473].

| Event | Date |
|-------|------|
| Deadline to File Confirmation Brief and Plan Objection Reply | March 28, 2018, at 11:59 p.m., prevailing Central Time |
| Confirmation Hearing (Rescheduled from prior Order) | April 3, 2018 at 8:30 a.m. |

**B.   Approval of the Form of and Distribution of Solicitation Packages to Parties Entitled to Vote on the Plan.**

6.     In addition to the Disclosure Statement and exhibits thereto, including the Plan and this Order (without exhibits, except the Solicitation and Voting Procedures), the Solicitation Packages to be transmitted on or before the Solicitation Deadline to those holders of Claims in the Voting Classes entitled to vote on the Plan as of the Voting Record Date shall include the following, the form of each of which is hereby approved:

a.     an appropriate form of Ballot attached hereto as Schedules 3A, 3B, 3C, 3D, 3E, and 3F, respectively;[4]

b.     the Cover Letter attached hereto as Schedule 7; and

c.     the Confirmation Hearing Notice attached hereto as Schedule 8.

7.     The Solicitation Packages provide the holders of Claims entitled to vote on the Plan with adequate information to make informed decisions with respect to voting on the Plan in accordance with Bankruptcy Rules 2002(b) and 3017(d), the Bankruptcy Code, and the Bankruptcy Local Rules.

8.     The Debtors shall distribute Solicitation Packages to all holders of Claims entitled to vote on the Plan on or before the Solicitation Deadline.   Such service shall satisfy the requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules.

---

[4]   The Debtors will make every reasonable effort to ensure that any holder of a Claim who has filed duplicate Claims against the Debtors (whether against the same or multiple Debtors) that are classified under the Plan in the same Voting Class receives no more than one Solicitation Package (and, therefore, one Ballot) on account of such Claim and with respect to that Class.

4

9.      The Debtors are authorized, but not directed or required, to distribute the Plan, the Disclosure Statement, and this Order to holders of Claims entitled to vote on the Plan in electronic format (i.e., on a CD-ROM or flash drive).  The Ballots as well as the Cover Letter and the Confirmation Hearing Notice will *only* be provided in paper form.  On or before the Solicitation Deadline, the Debtors shall provide (a) complete Solicitation Packages (excluding the Ballots) to the U.S. Trustee, and (b) the Order (in electronic format) and the Confirmation Hearing Notice to all parties on the 2002 List as of the Voting Record Date.

10.     Any party that receives materials in electronic format, but would prefer to receive materials in paper format, may contact the Notice and Claims Agent and request paper copies of the corresponding materials previously received in electronic format (to be provided at the Debtors' expense).

11.     The Notice and Claims Agent is authorized to assist the Debtors in (a) distributing the Solicitation Package, (b) receiving, tabulating, and reporting on Ballots cast to accept or reject the Plan by holders of Claims against the Debtors, (c) responding to inquiries from holders of Claims and Interests and other parties in interest relating to the Disclosure Statement, the Plan, the Ballots, the Solicitation Package, and all other related documents and matters related thereto, including the procedures and requirements for voting to accept or reject the Plan and for objecting to the Plan, (d) soliciting votes on the Plan, and (e) if necessary, contacting creditors regarding the Plan.

12.     As set forth in the Solicitation and Voting Procedures, the Notice and Claims Agent shall be responsible for soliciting votes on the Plan for each voting Class, including Class 4 (Second Lien Notes Secured Claims), Class 5 (Subsidiary General Unsecured Claims), and Class 6 (Cobalt General Unsecured Claims, including 2.625% senior notes claims and 3.125%

5

senior notes claims). Wells Fargo Bank, N.A., as indenture trustee for the 2.625% senior notes and the 3.125% senior notes, shall have no duty to solicit votes on the Plan. U.S. Bank National Association, in its capacity as indenture trustee and collateral agent under the second lien indenture, shall have no duty to solicit votes on the Plan.

13. All votes to accept or reject the Plan must be cast by using the appropriate Ballot. All Ballots must be properly executed, completed, and delivered according to their applicable voting instructions by: (a) first class mail, in the return envelope provided with each Ballot, (b) overnight delivery, (c) personal delivery, or (d) electronic online submission at http://www.kccllc.net/cobalt so that the Ballots are *actually received* by the Notice and Claims Agent no later than the Voting Deadline in accordance with the procedures set forth in the applicable Ballot. Beneficial Holders must properly execute, complete, and deliver Beneficial Holder Ballots to their respective Nominee in sufficient time so that the Nominees may verify, tabulate, and include such Beneficial Holder Ballots in a Master Ballot and return the Master Ballots, so that they are *actually received* by the Notice and Claims Agent no later than the Voting Deadline.

C. **Approval of the Confirmation Hearing Notice.**

14. The Confirmation Hearing Notice, in the form attached hereto as <u>Schedule 8</u> filed by the Debtors and served upon parties in interest in the chapter 11 cases on or before March 12, 2018, constitutes adequate and sufficient notice of the hearing to consider approval of the Plan, the manner in which a copy of the Plan could be obtained, and the time fixed for filing objections thereto, in satisfaction of the requirements of the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Bankruptcy Local Rules. The Debtors shall publish the Confirmation Hearing Notice (in a format modified for publication) one time by the Publication

Deadline on March 12, 2018 (or as soon as reasonably practicable thereafter), in *The New York Times* (national edition) and the *Houston Chronicle*.

**D.      Approval of Notice of Filing of the Plan Supplement.**

15.      The Debtors are authorized to send notice of the filing of the Plan Supplement, which will be filed and served at least seven (7) days prior to the Voting Deadline, substantially in the form attached hereto as Schedule 9, on the date the Plan Supplement is filed pursuant to the terms of the Plan.

**E.      Approval of the Form of Notices to Non-Voting Classes.**

16.      Except to the extent the Debtors determine otherwise, the Debtors are not required to provide Solicitation Packages to holders of Claims or Interests in Non-Voting Classes, as such holders are not entitled to vote on the Plan.  Instead, on or before the Solicitation Deadline, the Notice and Claims Agent shall mail (first-class postage prepaid) a Non-Voting Status Notice and the applicable opt out form in lieu of Solicitation Packages, the forms of which are hereby approved, to those parties, outlined below, who are not entitled to vote on the Plan:

| Class(es) | Status | Treatment |
| --- | --- | --- |
| 1, 2, 3 | Unimpaired—Conclusively Presumed to Accept | Will receive a notice and the applicable opt out form, substantially in the forms attached to the Order as Schedule 4A, Schedule 4B, Schedule 4C, and Schedule 4D, in lieu of a Solicitation Package. |
| 7, 10 | Impaired—Deemed to Reject | Will receive a notice and the applicable opt out form, substantially in the forms attached to the Order as Schedule 5A, Schedule 5B, Schedule 5C, and Schedule 5D, in lieu of a Solicitation Package. |

| Class(es) | Status | Treatment |
|---|---|---|
| N/A | Disputed Claims | Holders of Claims that are subject to a pending objection by the Debtors are not entitled to vote the disputed portion of their claim.  As such, holders of such Claims will receive a notice, substantially in the form attached to the Order as Schedule 6 (which notice shall be served together with such objection). |

17.     The Debtors will not provide the holders of Class 8 (Intercompany Claims), or Class 9 (Intercompany Interests) with a Solicitation Package or any other type of notice in connection with solicitation.

18.     The Debtors are not required to mail Solicitation Packages or other solicitation materials to the following:  (a) holders of Claims that have already been paid in full during the chapter 11 cases or that are authorized to be paid in full in the ordinary course of business pursuant to an order previously entered by this Court, or (b) any party to whom the Disclosure Statement Hearing Notice was sent but was subsequently returned as undeliverable.

**F.     Approval of Notices to Contract and Lease Counterparties.**

19.     The Debtors are authorized to mail an Assumption Notice or Rejection Notice of any Executory Contracts or Unexpired Leases (and any corresponding Cure Claims), in the forms attached hereto as Schedule 10 and Schedule 11, to the applicable counterparties to Executory Contracts and Unexpired Leases that will be assumed or rejected pursuant to the Plan (as the case may be), within the time periods specified in the Plan.

20.     The Debtors are authorized to mail an opt out form, in the form attached hereto as Schedule 12, to parties to Executory Contracts or Unexpired Leases set forth on schedule G of the Schedules filed by the Debtors in the chapter 11 cases.

### G.   Approval of the Procedures for Filing Objections to the Plan.

21.   Objections to the Plan will not be considered by the Court unless such objections are timely filed and properly served in accordance with this Order.  Specifically, all objections to confirmation of the Plan or requests for modifications to the Plan, if any, *must*:  (a) be in writing, (b) conform to the Bankruptcy Rules and the Bankruptcy Local Rules, (c) state, with particularity, the legal and factual basis for the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection, and (d) be filed with the Court (contemporaneously with a proof of service) and served upon the notice parties identified in the Confirmation Hearing Notice.

## IV.   Miscellaneous.

22.   Solely for purposes of electing to opt out of the third-party release in Article VIII.C of the Plan (the "Third-Party Release") in these chapter 11 cases and without prejudice to or impact upon any party's other rights, claims, and/or arguments in relation to the subject matter and pending litigation, including related appeals, styled as *In re Cobalt International Energy, Inc. Securities Litigation*, Civil Action No. H-14-3428 (S.D. Tex.) (the "Securities Litigation"), the plaintiffs in the Securities Litigation (the "Securities Plaintiffs") and their counsel are authorized to opt out of the Third-Party Release on behalf of all members of the class certified in the Securities Litigation (the "Securities Class") by order of the District Court dated June 15, 2017 (the "Class Certification Order").  For the avoidance of doubt, upon such opt-out election, no member of the Securities Class will be a Releasing Party or a Released Party under the Plan, and, as a result, no defendant in the Securities Litigation that otherwise satisfies the definition of "Released Party" will be released from claims asserted in the Securities Litigation that would otherwise be subject to Article VIII.C of the Plan by the members of the Securities Class

pursuant to the Third-Party Release.  No reversal, amendment, vacatur, or other modification of the Class Certification Order shall impact any opt-out election under this paragraph.  This Court reserves exclusive jurisdiction with respect to the interpretation and enforcement of this paragraph.  All parties' rights, claims, defenses, and/or other arguments in relation to the Securities Litigation are otherwise hereby preserved.  Solely for purposes of this paragraph and solely by agreement of the Debtors for such purposes, notice to the Securities Plaintiffs and their counsel shall be deemed adequate and sufficient notice with respect to each member of the Securities Class.

23.     The Debtors or the Plan Administrator, as applicable, reserve the right to modify the Plan without further order of the Court in accordance with Article X of the Plan, including the right to withdraw the Plan as to an individual Debtor at any time before the Confirmation Date.

24.     Nothing in this Order shall be construed as a waiver of the right of the Debtors or any other party in interest, as applicable, to object to a proof of claim after the Voting Record Date.

25.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

26.     Notice of the Motion as provided therein shall be deemed good and sufficient notice of such Motion and the requirements of Bankruptcy Rule 6004(a) and the Bankruptcy Local Rules are satisfied by such notice.

27.     Notwithstanding Bankruptcy Rule 6004(h), the terms and conditions of this Order are immediately effective and enforceable upon its entry.

28.     The Debtors are authorized to take all actions necessary to effectuate the relief granted in this Order in accordance with the Motion.

29.     This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Dated: _3-8_____, 2018
Houston, Texas

_____
THE HONORABLE MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE

11

# SCHEDULE 1

## Disclosure Statement

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| COBALT INTERNATIONAL ENERGY, INC., *et al.*,[1] | ) | Case No. 17-36709 (MI) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**DISCLOSURE STATEMENT FOR THE FOURTH AMENDED JOINT CHAPTER 11 PLAN
OF COBALT INTERNATIONAL ENERGY, INC. AND ITS DEBTOR AFFILIATES**

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Chad J. Husnick, P.C. (admitted *pro hac vice*)
Brad Weiland (admitted *pro hac vice*)
Laura Krucks (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:      (312) 862-2200

Zack A. Clement (Texas Bar No. 04361550)
**ZACK A. CLEMENT PLLC**
3753 Drummond Street
Houston, Texas 77025
Telephone:      (832) 274-7629

*Co-Counsel to the Debtors and Debtors in Possession*

---

**THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Cobalt International Energy, Inc. (1169); Cobalt International Energy GP, LLC (7374); Cobalt International Energy, L.P. (2411); Cobalt GOM LLC (7188); Cobalt GOM # 1 LLC (7262); and Cobalt GOM # 2 LLC (7316). The Debtors' service address is: 920 Memorial City Way, Suite 100, Houston, Texas 77024.

KE 51022346

THE DEBTORS ARE PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS FOR PURPOSES OF SOLICITING VOTES TO ACCEPT OR REJECT THE *JOINT CHAPTER 11 PLAN OF COBALT INTERNATIONAL ENERGY, INC., AND ITS DEBTOR AFFILIATES.* NOTHING IN THIS DISCLOSURE STATEMENT MAY BE RELIED UPON OR USED BY ANY ENTITY FOR ANY OTHER PURPOSE.   BEFORE DECIDING WHETHER TO VOTE FOR OR AGAINST THE PLAN, EACH HOLDER ENTITLED TO VOTE SHOULD CAREFULLY CONSIDER ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE RISK FACTORS DESCRIBED IN ARTICLE IX HEREIN.   IN THE EVENT OF ANY INCONSISTENCY BETWEEN THIS DISCLOSURE STATEMENT AND THE PLAN, THE RELEVANT PROVISIONS OF THE PLAN WILL GOVERN.

THE DEBTORS URGE HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO ACCEPT THE PLAN.   THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.   FURTHERMORE, THE BANKRUPTCY COURT'S APPROVAL OF THE ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE BANKRUPTCY COURT'S APPROVAL OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS, AMONG OTHER THINGS, SUMMARIES OF THE PLAN, CERTAIN STATUTORY PROVISIONS, AND CERTAIN ANTICIPATED EVENTS IN THE DEBTORS' CHAPTER 11 CASES.   ALTHOUGH THE DEBTORS BELIEVE THAT THESE SUMMARIES ARE FAIR AND ACCURATE, THESE SUMMARIES ARE QUALIFIED IN THEIR ENTIRETY TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH ANTICIPATED EVENTS.   IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OR ANY OTHER DOCUMENTS INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS WILL GOVERN FOR ALL PURPOSES.   FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS' MANAGEMENT EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.   THE DEBTORS DO NOT REPRESENT OR WARRANT THAT THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS WITHOUT ANY MATERIAL INACCURACY OR OMISSION.

IN PREPARING THIS DISCLOSURE STATEMENT, THE DEBTORS RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTORS' BOOKS AND RECORDS AND ON VARIOUS ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES.   WHILE THE DEBTORS BELIEVE THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTORS AS OF THE DATE HEREOF AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT REASONABLE BUSINESS JUDGMENTS, NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTORS' BUSINESSES AND THEIR FUTURE RESULTS AND OPERATIONS.   THE DEBTORS EXPRESSLY CAUTION READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD LOOKING STATEMENTS CONTAINED HEREIN.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.   THE DEBTORS OR ANY OTHER AUTHORIZED PARTY IN INTEREST MAY SEEK TO INVESTIGATE, FILE, AND PROSECUTE CLAIMS AND MAY OBJECT TO CLAIMS AFTER THE CONFIRMATION OR EFFECTIVE DATE OF THE PLAN IRRESPECTIVE OF WHETHER THIS DISCLOSURE STATEMENT IDENTIFIES ANY SUCH CLAIMS OR OBJECTIONS TO CLAIMS.

THE DEBTORS ARE MAKING THE STATEMENTS AND PROVIDING THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFICALLY NOTED.   ALTHOUGH THE DEBTORS MAY SUBSEQUENTLY UPDATE THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE DEBTORS HAVE NO AFFIRMATIVE DUTY TO DO SO, AND EXPRESSLY DISCLAIM ANY DUTY TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE. HOLDERS OF CLAIMS OR INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT, AT THE TIME OF THEIR REVIEW, THE FACTS SET FORTH HEREIN HAVE NOT CHANGED SINCE THIS DISCLOSURE STATEMENT WAS FILED.   INFORMATION CONTAINED HEREIN IS SUBJECT TO COMPLETION, MODIFICATION, OR AMENDMENT.   THE DEBTORS RESERVE THE RIGHT TO FILE AN AMENDED OR MODIFIED PLAN AND RELATED DISCLOSURE STATEMENT FROM TIME TO TIME.

THE DEBTORS HAVE NOT AUTHORIZED ANY ENTITY TO GIVE ANY INFORMATION ABOUT OR CONCERNING THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. THE DEBTORS HAVE NOT AUTHORIZED ANY REPRESENTATIONS CONCERNING THE DEBTORS OR THE VALUE OF THEIR PROPERTY OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.

IF THE PLAN IS CONFIRMED BY THE BANKRUPTCY COURT AND THE EFFECTIVE DATE OCCURS, ALL HOLDERS OF CLAIMS AND INTERESTS (INCLUDING THOSE HOLDERS OF CLAIMS OR INTERESTS WHO DO NOT SUBMIT BALLOTS TO ACCEPT OR REJECT THE PLAN, OR WHO ARE NOT ENTITLED TO VOTE ON THE PLAN) WILL BE BOUND BY THE TERMS OF THE PLAN.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO CERTAIN MATERIAL CONDITIONS PRECEDENT DESCRIBED HEREIN AND SET FORTH IN ARTICLE IX OF THE PLAN.  THERE IS NO ASSURANCE THAT THE PLAN WILL BE CONFIRMED, OR IF CONFIRMED, THAT THE CONDITIONS REQUIRED TO BE SATISFIED FOR THE PLAN TO GO EFFECTIVE WILL BE SATISFIED (OR WAIVED).

YOU ARE ENCOURAGED TO READ THE PLAN AND THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING THE SECTION ENTITLED "RISK FACTORS," BEFORE SUBMITTING YOUR BALLOT TO VOTE ON THE PLAN.

THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A GUARANTEE BY THE BANKRUPTCY COURT OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN OR AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE MERITS OF THE PLAN.

THE DEBTORS HAVE SOUGHT TO ENSURE THE ACCURACY OF THE FINANCIAL INFORMATION PROVIDED IN THIS DISCLOSURE STATEMENT; HOWEVER, THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR INCORPORATED HEREIN BY REFERENCE HAS NOT BEEN, AND WILL NOT BE, AUDITED OR REVIEWED BY THE DEBTORS' INDEPENDENT AUDITORS UNLESS EXPLICITLY PROVIDED OTHERWISE.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(B) AND IS NOT NECESSARILY PREPARED IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER SIMILAR LAWS.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY SIMILAR FEDERAL, STATE, LOCAL, OR FOREIGN REGULATORY AGENCY, NOR HAS THE SEC OR ANY OTHER AGENCY PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT OR THE MERITS OF THE PLAN.

THE DEBTORS MAKE STATEMENTS IN THIS DISCLOSURE STATEMENT THAT ARE CONSIDERED FORWARD-LOOKING STATEMENTS UNDER FEDERAL SECURITIES LAWS.  THE DEBTORS CONSIDER ALL STATEMENTS REGARDING ANTICIPATED OR FUTURE MATTERS, TO BE FORWARD-LOOKING STATEMENTS.  FORWARD-LOOKING STATEMENTS MAY INCLUDE STATEMENTS ABOUT THE DEBTORS':

- BUSINESS STRATEGY;

- ESTIMATED FUTURE NET RESERVES AND PRESENT VALUE THEREOF;

- FINANCIAL CONDITION, REVENUES, CASH FLOWS, AND EXPENSES;

- LEVELS OF INDEBTEDNESS, LIQUIDITY, AND COMPLIANCE WITH DEBT COVENANTS;

- FINANCIAL STRATEGY, BUDGET, AND OPERATING RESULTS;

- TIMING AND AMOUNT OF FUTURE PRODUCTION OF OIL AND NATURAL GAS;

- THE AMOUNT, NATURE, AND TIMING OF CAPITAL EXPENDITURES, INCLUDING FUTURE DEVELOPMENT COSTS;

iii

- **DRILLING OF WELLS, INCLUDING THE DEBTORS' IDENTIFIED DRILLING LOCATIONS;**

- **SUCCESSFUL RESULTS FROM THE DEBTORS' IDENTIFIED DRILLING LOCATIONS;**

- **COSTS OF DEVELOPING THE DEBTORS' PROPERTIES AND CONDUCTING OTHER OPERATIONS;**

- **GENERAL ECONOMIC AND BUSINESS CONDITIONS;**

- **COUNTERPARTY CREDIT RISK;**

- **THE OUTCOME OF PENDING AND FUTURE LITIGATION;**

- **GOVERNMENTAL REGULATION AND TAXATION OF THE OIL AND NATURAL GAS INDUSTRY;**

- **UNCERTAINTY REGRADING THE DEBTORS' FUTURE OPERATING RESULTS; AND**

- **PLANS, OBJECTIVES, AND EXPECTATIONS.**

**STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF THE DEBTORS' FUTURE PERFORMANCE, IF ANY.  THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD IMPACT THE DEBTORS' ACTUAL FUTURE PERFORMANCE, IF ANY. THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE:  THE DEBTORS' ABILITY TO CONFIRM AND CONSUMMATE THE PLAN; THE POTENTIAL THAT THE DEBTORS MAY NEED TO PURSUE AN ALTERNATIVE TRANSACTION IF THE PLAN IS NOT CONFIRMED; THE POTENTIAL ADVERSE IMPACT OF THE CHAPTER 11 CASES ON THE DEBTORS' OPERATIONS, MANAGEMENT, AND EMPLOYEES, THE RISKS ASSOCIATED WITH OPERATING THE DEBTORS' BUSINESSES DURING THE CHAPTER 11 CASES; GENERAL ECONOMIC, BUSINESS AND MARKET CONDITIONS; THE DEBTORS' INABILITY TO DISCHARGE OR SETTLE CLAIMS DURING THE CHAPTER 11 CASES; EXPOSURE TO LITIGATION; THE DEBTORS' ABILITY TO DIVEST EXISTING BUSINESSES; ADVERSE TAX CHANGES; LIMITED ACCESS TO CAPITAL RESOURCES; CHANGES IN DOMESTIC AND FOREIGN LAWS AND REGULATIONS; NATURAL DISASTERS; GEOPOLITICAL INSTABILITY; AND THE EFFECTS OF GOVERNMENTAL REGULATION ON THE DEBTORS' BUSINESSES.**

**THIS DISCLOSURE STATEMENT IS SUBJECT TO FURTHER REVISION AND WILL BE AMENDED PRIOR TO THE HEARING TO CONSIDER ADEQUACY OF THIS DISCLOSURE STATEMENT AND THE RELATED SOLICITATION PROCEDURES TO, AMONG OTHER THINGS, TAKE INTO ACCOUNT THE RESULTS OF THE AUCTION, IF ANY, FURTHER SPECIFICS OF ANY RESTRUCTURING TRANSACTION TO BE CONSUMMATED PURSUANT TO THE PLAN, AND TO ACCOMMODATE ADDITIONAL REQUESTS FOR DISCLOSURE.**

## TABLE OF CONTENTS

Page

I. INTRODUCTION ..................................................................................................................1

II. PRELIMINARY STATEMENT ..........................................................................................1

III. QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN .......................................................................................................................4

    A. What is chapter 11? ...............................................................................................4
    B. Why are the Debtors sending me this Disclosure Statement? ...............................4
    C. Am I entitled to vote on the Plan? .........................................................................4
    D. What will I receive from the Debtors if the Plan is consummated? .......................5
    E. What will I receive from the Debtors if I hold an Allowed Administrative Claim or a Priority Tax Claim? ..............................................................................................8
    F. Are any regulatory approvals required to consummate the Plan? ..........................9
    G. What happens to my recovery if the Plan is not confirmed or does not go effective? ......................9
    H. If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan becomes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?" ..............................................................................................9
    I. What are the sources of Cash and other consideration required to fund the Plan? ..........................9
    J. Is there potential litigation related to the Plan? ....................................................9
    K. Will the final amount of Allowed Subsidiary General Unsecured Claims and Allowed Cobalt General Unsecured Claims affect my recovery under the Plan? ........................................10
    L. How will the release of Avoidance Actions affect my recovery under the Plan? ...........................10
    M. Will there be releases and exculpation granted to parties in interest as part of the Plan? ..............11
    N. What is the effect of the Plan on the Debtors' ongoing business? .......................13
    O. Could subsequent events potentially affect recoveries under the Plan? .............13
    P. Do the Debtors recommend voting in favor of the Plan? ....................................13

IV. OVERVIEW OF THE PLAN ............................................................................................13

    A. General Settlement of Claims and Interests .......................................................13
    B. Restructuring Transactions ..................................................................................14
    C. Sale Transactions .................................................................................................14
    D. The Plan Administrator ........................................................................................14
    E. Disputed Claims Reserve .....................................................................................15
    F. Corporate Action ..................................................................................................16
    G. Recoveries to Certain Holders of Claims and Interests .......................................16
    H. Releases ................................................................................................................16

V. VOTING AND CONFIRMATION ....................................................................................20

    A. Class Entitled to Vote on the Plan .......................................................................20
    B. Votes Required for Acceptance by a Class ..........................................................20
    C. Certain Factors to Be Considered Prior to Voting ..............................................20
    D. Solicitation Procedures ........................................................................................21
    E. Voting Procedures ................................................................................................22
    F. Plan Objection Deadline .......................................................................................24
    G. Confirmation Hearing ..........................................................................................24

VI. THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW ...........24

    A. Cobalt's Position in the Oil and Gas Industry .....................................................24
    B. Cobalt's History ...................................................................................................25
    C. Cobalt's Current Assets and Operations ..............................................................26

KE 51022346

D.     Cobalt's Capital Structure ...................................................................................................29

VII.    **EVENTS LEADING TO THE CHAPTER 11 FILINGS**.............................................................**32**

A.     Marketing of Assets ...........................................................................................................32
B.     Attempted Sale of the Angolan Assets and Related Arbitration ........................................33
C.     Ongoing Litigation and the SEC Investigation .................................................................33
D.     Debt Transactions ..............................................................................................................36
E.     2017 Interest Payments ......................................................................................................37
F.     Committee Investigation Regarding Prepetition Debt Transactions ..................................37

VIII.    **EVENTS OF THE CHAPTER 11 CASES**.................................................................................**38**

A.     First and Second Day Relief ..............................................................................................38
B.     Other Procedural and Administrative Motions ..................................................................39
C.     Litigation Matters...............................................................................................................39
D.     Schedules and Statements ..................................................................................................40
E.     Appointment of Official Committee ..................................................................................40
F.     Sales Incentive Plan ..........................................................................................................40
G.     Sonangol Settlement ..........................................................................................................40
H.     Investigation.......................................................................................................................41
I.     First Lien Claim Settlement ...............................................................................................45
J.     Marketing Process and Sale Transaction ..........................................................................46

IX.    **RISK FACTORS** .......................................................................................................................**48**

A.     Bankruptcy Law Considerations .......................................................................................48
B.     Risks Related to the Debtors' Businesses ..........................................................................52

X.    **STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN** .....................**58**

A.     Requirements for Confirmation of the Plan ......................................................................58
B.     Alternative Plans ...............................................................................................................60
C.     Acceptance by Impaired Classes.......................................................................................60
D.     Confirmation Without Acceptance by All Impaired Classes .............................................60

XI.    **CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE
        PLAN** .........................................................................................................................................**62**

A.     Introduction........................................................................................................................62
B.     Certain United States Federal Income Tax Consequences to the Debtors .........................63
C.     Certain United States Federal Income Tax Consequences to U.S. Holders of Allowed
        Claims ................................................................................................................................64
D.     Certain United States Federal Income Tax Consequences to Non-U.S. Holders of Claims ...........66
E.     Information Reporting and Back-Up Withholding .............................................................68

XII.    **RECOMMENDATION** ............................................................................................................**69**

**EXHIBITS**

EXHIBIT A     Chapter 11 Plan

## I.    INTRODUCTION

Cobalt International Energy, Inc. ("Cobalt") and its debtor affiliates, as debtors and debtors in possession (collectively, the "Debtors"), submit this disclosure statement (this "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code to holders of Claims against the Debtors in connection with the solicitation of acceptances with respect to the Debtors' *Joint Chapter 11 Plan of Cobalt International Energy, Inc. and Its Debtor Affiliates* (the "Plan"), dated January 23, 2018.[1]  A copy of the Plan is attached hereto as **Exhibit A** and incorporated herein by reference.  The Plan constitutes a separate chapter 11 plan for Cobalt and each of its five affiliated Debtors.

**THE DEBTORS BELIEVE THAT THE COMPROMISE CONTEMPLATED UNDER THE PLAN IS FAIR AND EQUITABLE, MAXIMIZES THE VALUE OF THE DEBTORS' ESTATES AND PROVIDES THE BEST RECOVERY TO CLAIM HOLDERS.  AT THIS TIME, THE DEBTORS BELIEVE THE PLAN IS THE BEST AVAILABLE ALTERNATIVE FOR COMPLETING THE CHAPTER 11 CASES.  THE DEBTORS STRONGLY RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN.**

## II.    PRELIMINARY STATEMENT

Founded in 2005 and headquartered in Houston, Texas, Cobalt owns valuable offshore oil and gas assets that they have acquired and prepared for development for years.  Unfortunately, a number of factors—such as a failed sale of Cobalt's Angolan assets and related litigation, the prolonged downturn in the exploration and production industry, and nearly $3.0 billion of funded indebtedness—have interfered with Cobalt's efforts to date.  Cobalt intends to use the Chapter 11 Cases to overcome these impediments and drive their sale and restructuring efforts to conclusion with a value-maximizing transaction.  More specifically, the Debtors intend to move these cases toward a successful sale (and distribution of sale proceeds) under an efficient and expeditious chapter 11 schedule and related bidding procedures.

The Debtors have unsuccessfully attempted to sell their assets outside of chapter 11 since 2015, and now time is of the essence.  By June 2018, the Debtors must either commence a unit saving drilling operation at the Debtors' North Platte discovery in order for the Debtors to maintain their interest in their North Platte discovery or obtain a Suspension of Production ("SOP") from the U.S. government.  A sale must therefore be closed with sufficient time for the purchaser to execute such a complex operation.  In addition, because the Debtors are self-financing the Chapter 11 Cases, the Debtors must move swiftly and not exceed their available liquidity.  Recognizing the need to move expeditiously through chapter 11, on December 14, 2017, the Debtors' filed a motion [Docket No. 15] (the "Bid Procedures Motion") seeking Bankruptcy Court approval of certain bidding procedures and a timeline for the sale process.  On January 25, 2018, the Court entered an order [Docket No. 299] granting the relief requested in the Bid Procedures Motion and established (i) 5:00 p.m. (prevailing Central Time) on February 22, 2018 for the final bid deadline for all Sale Transactions, and (ii) 10:00 a.m. (prevailing Central Time) on March 6, 2018 for an Auction, if needed.

Cobalt holds assets in the United States Gulf of Mexico and in the waters off the coasts of the Republic of Angola and the Gabonese Republic in West Africa.  More specifically, the Debtors have four named discoveries in the Gulf of Mexico, which include North Platte, Shenandoah, Anchor, and Heidelberg.  Cobalt is the operator of North Platte and holds a non-operating working interest in Shenandoah, Anchor, and Heidelberg.  Heidelberg began initial production in January 2016 while North

---

[1]    Capitalized terms used but not otherwise defined in this Disclosure Statement will have the meaning ascribed to such terms in the Plan.  The summary of the Plan provided herein is qualified in its entirety by reference to the Plan.  In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.

Platte, Shenandoah, and Anchor have been fully appraised and are now in development.  Additionally, the Debtors have made seven aggregate discoveries in offshore Angola and maintain a non-operating interest in offshore Gabon, where the Debtors have one discovery.  Only one of Cobalt's assets—Heidelberg—is currently producing oil.

Beginning as early as 2015, Cobalt began a strategic review of its asset portfolio.  As a result of the review, Cobalt decided to sell its Angola assets, which sale was ultimately unsuccessful following the termination of the $1.75 billion sale to Sonangol.  Following the failed Angola sale and initial marketing of certain Gulf of Mexico assets, Cobalt determined to pursue a sale of all of its assets.  Cobalt's marketing efforts and discussions with potential buyers for all or substantially all of Cobalt's assets or equity interests remain ongoing and will continue following the Petition Date.

For many months, Cobalt engaged in active negotiations with Sonangol regarding a potential resolution of the parties' disputes.  These settlement discussions culminated on December 19, 2017, with Cobalt and Sonangol successfully reaching agreement on a settlement (subsequently approved by the Bankruptcy Court).[2]  The key terms of the settlement include:  (a) $500 million payment by Sonangol to Cobalt, payable in two installments ($150 million paid by February 23, 2018, and the balance of $350 million paid by July 1, 2018); (b) the resolution of Cobalt's two International Chamber of Commerce arbitrations seated in the United Kingdom and Switzerland (and avoidance or mitigation of potentially substantial costs of continued arbitration); (c) a full release of all disputes, debts, and obligations between the parties (including Sonangol's release of any claim to the $250 million deposit paid in connection with the contemplated sale, which deposit is incremental to the $500 million to be paid by Sonangol to Cobalt); and (d) the transition of ownership of Cobalt's Angolan assets to Sonangol.

Following the settlement with Sonangol, the Debtors continued to focus on selling their Gulf of Mexico assets.  As described in more detail in Article VIII.I of this Disclosure Statement, by the Bid Deadline on February 22, 2018, the Debtors received bids from six different parties for certain of the Debtors' Gulf of Mexico assets.  On March 6, 2018, the Debtors held an auction for all or substantially all of their assets.  Following the auction, the Debtors named four successful bidders for different asset packages:  (a) Navitas Petroleum US, LLC ("Navitas") was declared the successful bidder for the Shenandoah prospect; (b) W&T Offshore, Inc. ("W&T") was declared the successful bidder for the Heidelberg prospect[3]; (c) Total E&P USA, Inc. ("Total E&P") and Statoil Gulf of Mexico LLC ("Statoil") submitted a joint bid and were declared the successful bidder for the North Platte prospect; and (d) Total E&P was declared the successful bidder for the Anchor prospect and certain exploration leases (the "Exploration Leases").  The total aggregate purchase price for the purchased assets is $577.9 million.

The Debtors now seek to confirm the Plan which contemplates closing the Sale Transaction and distributing the Debtors' Net Cash.  Specifically, under the terms of the Plan, holders of Claims and Interests will receive the following treatment in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such holders' Claims and Interests:

- Allowed Priority Tax Claims shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.  In the event an Allowed Priority Tax Claim is

---

[2]   On January 25, 2018, the Bankruptcy Court entered the *Order Approving Debtors' Motion for Entry of an Order (I) Authorizing Performance Under Settlement Agreement, (II) Approving Settlement Agreement, and (III) Granting Related Relief* [Docket No. 300].

[3]   GOM Offshore Holdings LLC ("GOM Offshore Holdings"), an entity formed by a steering committee of holders of the Debtors' Second Lien Notes, was originally declared the successful bidder for the Debtors' Heidelberg assets.  After the auction, the Debtors, GOM Offshore Holdings, and W&T agreed that W&T would be declared the successful bidder, and the Plan provides for a negotiated reduction of $1.9 million to the Allowed amount of the Second Lien Notes Claims.

2

also an Allowed Secured Tax Claim, such Claim shall be treated as an Other Secured Claim if such Claim is not otherwise paid in full; *provided* that to the extent an Allowed Priority Tax Claim has not been satisfied prior to the Effective Date, no Cash payment shall be made on such Allowed Priority Tax Claim until the Allowed First Lien Notes Claims and the Allowed Second Lien Notes Claims have either been paid in full or received such other treatment rendering such Claims Unimpaired, as applicable, except to the extent of any unencumbered assets.

- Allowed Other Priority Claims will be paid in full, in Cash or otherwise provided treatment as to render such Claims unimpaired; *provided* that to the extent an Allowed Other Priority Claim has not been satisfied prior to the Effective Date, no Cash payment shall be made on such Allowed Other Priority Claim until the Allowed First Lien Notes Claims and the Allowed Second Lien Notes Claims have either been paid in full or received such other treatment rendering such Claims Unimpaired, as applicable, except to the extent of any unencumbered assets.

- Holders of Allowed Other Secured Claims will received either (a) payment in full in Cash, (b) reinstatement pursuant to section 1124 of the Bankruptcy Code, or (c) such other recovery necessary to render such Claims unimpaired.

- Holders of Allowed First Lien Notes Claims shall be paid in full in Cash.

- Holders of Allowed Second Lien Notes Secured Claims will receive their Pro Rata share of the Second Lien Recovery up to payment in full of each holder's Allowed Second Lien Notes Secured Claim.

- Holders of Allowed Subsidiary General Unsecured Claims will receive their Pro Rata share of (a) the Debtors' Net Cash in excess of amounts necessary to (i) satisfy all Allowed Administrative Claims, Allowed Fee Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Other Secured Claims, Allowed First Lien Notes Claims, and Allowed Second Lien Notes Secured Claims, in each case in full, in Cash, if any, plus (b) Cash recoveries (if any) on account of unencumbered assets (if any) at the applicable Debtor other than Cobalt not subject to adequate protection claims under the Cash Collateral Order.

- Holders of Allowed Cobalt General Unsecured Claims will receive their Pro Rata share of (a) the Debtors' Net Cash in excess of amounts necessary to (i) satisfy all Allowed Administrative Claims, Allowed Fee Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Other Secured Claims, Allowed First Lien Notes Claims, Allowed Second Lien Notes Secured Claims, and Allowed Subsidiary General Unsecured Claims, in each case in full, in Cash, if any, plus (b) Cash recoveries (if any) on account of unencumbered assets (if any) at Cobalt not subject to adequate protection claims under the Cash Collateral Order.

- Section 510(b) Claims shall be cancelled without any distribution and such holders of Section 510(b) Claims will receive no recovery.

- Allowed Intercompany Claims shall be *pari passu* with General Unsecured Claims against the applicable Debtor and will share in distributions from such Debtor. In lieu of Cash payment to the Debtors holding such Intercompany Claims, the distributions on account of such Intercompany Claims may be made to the creditors of the Debtor holding such Intercompany Claims.

3

- Intercompany Interests may be, at the option of the Debtors, either: (a) Reinstated as of the Effective Date or (b) cancelled, and no distribution shall be made on account of such Interests.

- Interests in Cobalt will be canceled as of Effective Date.

The Debtors believe that the Plan maximizes stakeholder recoveries in these Chapter 11 Cases. The Debtors seek the Bankruptcy Court's approval of the Plan and urge all holders of Claims entitled to vote to accept the Plan by returning their Ballots so that Kurtzman Carson Consultants LLC, the Debtors' solicitation agent (the "Solicitation Agent"), actually receives such Ballots by the Voting Deadline, i.e., March 28, 2018, at 4:00 p.m. prevailing Central Time. Assuming the Plan receives the requisite acceptances the Debtors will seek the Bankruptcy Court's approval of the Plan at the Confirmation Hearing.

## III. QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE PLAN

### A. What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment of creditors and similarly situated equity interest holders, subject to the priority distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtors as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtors may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a chapter 11 plan is the principal objective of a chapter 11 case. A bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B. Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Plan. Before soliciting acceptances of the Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the Plan and to share such disclosure statement will all holders of claims or interest whose votes on the Plan are being solicited. This Disclosure Statement is being submitted in accordance with these requirements.

### C. Am I entitled to vote on the Plan?

Your ability to vote on, and your distribution (if any) under, the Plan depends on what type of Claim or Interest you hold. Each category of holders of Claims or Interests, as set forth in Article III of the Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class." Each Class's respective voting status is set forth below:

4

| Class | Claim/Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | First Lien Notes Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 4 | Second Lien Notes Secured Claims | Impaired | Entitled to Vote |
| 5 | Subsidiary General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Cobalt General Unsecured Claims | Impaired | Entitled to Vote |
| 7 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 8 | Intercompany Claims | Impaired | Shall Not Vote |
| 9 | Intercompany Interests | Unimpaired / Impaired | Not Entitled to Vote (Presumed to Accept / Deemed to Reject) |
| 10 | Interests in Cobalt | Impaired | Not Entitled to Vote (Deemed to Reject) |

**D.      What will I receive from the Debtors if the Plan is consummated?**

The following chart provides a summary of the anticipated recovery to holders of Claims and Interests under the Plan.  Any estimates of Claims and Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court.  Your ability to receive distributions under the Plan depends upon the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Plan.

Each holder of an Allowed Claim or Allowed Interest, as applicable, shall receive under the Plan the treatment described below in full and final satisfaction, compromise, settlement, release, and discharge of, and in exchange for, such holder's Allowed Claim or Allowed Interest, except to the extent different treatment is agreed to by the Debtors and the holder of such Allowed Claim or Allowed Interest, as applicable.  Unless otherwise indicated, the holder of an Allowed Claim or Allowed Interest, as applicable, shall receive such treatment on the later of the Effective Date and the date such holder's Claim or Interest becomes an Allowed Claim or Allowed Interest or as soon as reasonably practicable thereafter.

**THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN.**[4]

---

[4]   The recoveries set forth below may change based upon changes in the amount of Claims that are "Allowed" as well as other factors related to the Debtors' business operations and general economic conditions.  "Allowed" means with respect to any Claim:  (a) a Claim that is scheduled by the Debtors as neither disputed, contingent, nor unliquidated and for which no contrary proof of claim has been filed; (b) a Claim that is not a Disputed Claim or has been allowed by a Final Order; (c) a Claim that is allowed (i) pursuant to the terms of the Plan, (ii) in any stipulation that is approved by the Bankruptcy Court or (iii) pursuant to any contract, instrument, indenture, or other agreement entered into or assumed in connection herewith; or (d) a Claim as to which a Proof of Claim has been timely Filed and as to which no objection has been Filed as of the Claims Objection Deadline.  Except for any Claim that is expressly Allowed pursuant to the Plan, any Claim that has been, or is hereafter, listed in the Schedules as contingent, unliquidated, or disputed and for which no Proof of Claim has been Filed is not considered Allowed and shall be deemed expunged upon entry of the Confirmation Order.

| | | SUMMARY OF EXPECTED RECOVERIES | | |
|---|---|---|---|---|
| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
| 1 | Other Priority Claims | Each holder shall receive payment in full, in Cash, of the unpaid portion of its Allowed Other Priority Claim on the Effective Date or as soon thereafter as reasonably practicable (or, if payment is not then due, shall be paid in accordance with its terms) or pursuant to such other terms as may be agreed to by the holder of an Allowed Other Priority Claim and the Debtors; *provided* that to the extent an Allowed Other Priority Claim has not been satisfied during the Chapter 11 Cases, no Cash payment shall be made on such Allowed Other Priority Claim until the Allowed First Lien Notes Claims and the Allowed Second Lien Notes Claims have either been paid in full or received such other treatment rendering such Claims Unimpaired, as applicable, except to the extent of any unencumbered assets. | $0 | 100% |
| 2 | Other Secured Claims | Each holder shall receive either (i) payment in full in Cash of the unpaid portion of its Allowed Other Secured Claim on the Effective Date or as soon thereafter as reasonably practicable (or if payment is not then due, shall be paid in accordance with its terms), (ii) reinstatement pursuant to section 1124 of the Bankruptcy Code, or (iii) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code. | $0 | 100% |
| 3 | First Lien Notes Claims | On the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a holder of an Allowed First Lien Notes Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed First Lien Notes Claim, each holder of an Allowed First Lien Notes Claim shall receive payment in full in Cash. | $552.6 million[5] | 100% |
| 4 | Second Lien Notes Secured | On the Effective Date, or as soon thereafter as reasonably practicable, except to the | $934,732,000 in principal amount, less $1,900,000 | 52.0%[6] to 87.9%[7] |

---

[5]   This estimated claim amount includes $500 million in principal amount, plus accrued interest and all other fees, costs, expenses, premiums, and other amounts provided for under the First Lien Indenture, less $3.5 million on account of the First Lien Claim Amount Settlement and amounts paid pursuant to the Cash Collateral Order.

| | | | | Projected Recovery Under the Plan |
|---|---|---|---|---|
| **Class** | **Claim/Equity Interest** | **Treatment of Claim/Equity Interest** | **Projected Amount of Claims** | |
| | Claims | extent that a holder of an Allowed Second Lien Notes Secured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Second Lien Notes Secured Claim, each holder of an Allowed Second Lien Notes Secured Claim shall receive its Pro Rata share of the Second Lien Recovery up to payment in full of such holder's Allowed Second Lien Notes Secured Claims. | negotiated in connection with the Sale Transaction for the Heidelberg assets, plus other fees, costs, expenses, premiums, and other amounts provided for under the Second Lien Indenture, in each case to the extent Allowed including under section 506 of the Bankruptcy Code<br><br>(including the Second Lien Notes Deficiency Claims for purposes of this table, notwithstanding that the Second Lien Deficiency Claims are Class 5 Subsidiary General Unsecured Claims and Class 6 Cobalt General Unsecured Claims) | |
| 5 | Subsidiary General Unsecured Claims | Each holder of an Allowed Subsidiary General Unsecured Claim shall receive its Pro Rata share of the Subsidiary General Unsecured Claim Recovery up to payment in full of such holder's Allowed Subsidiary General Unsecured Claim. | $7.8 million[8]<br><br>(excluding Second Lien Notes Deficiency Claims, which Claims are included in the Second Lien Notes Secured Claims' recovery for purposes of this table) | 0.8%[9] to 60.4%[10] |
| 6 | Cobalt General | Each holder of an Allowed Cobalt General | $1.4 billion[11] | 0%[12] |

[6]   Assumes certain intercompany claims are not Allowed pursuant to the Plan, "make-whole" premium on higher end of potential range, nonpayment of remaining amounts due pursuant to the Sonangol settlement, and certain unencumbered exploration leases as asserted by the Committee.

[7]   Assumes certain intercompany claims are Allowed pursuant to the Plan, "make-whole" premium on lower end of potential range, payment of remaining amounts due pursuant to the Sonangol settlement, and no unencumbered exploration leases.

[8]   This projected claim amount does not include amounts on account of the claim that may be asserted by Whitton Petroleum Services Limited pursuant to that certain Overriding Royalty Agreement Relating to Blocks Located Offshore Angola or amounts on account of contract rejection claims.

[9]   Assumes certain intercompany claims are Allowed pursuant to the Plan, "make-whole" premium on higher end of potential range, nonpayment of remaining amounts due pursuant to the Sonangol settlement, and no unencumbered exploration leases.

[10]   Assumes certain intercompany claims are not Allowed pursuant to the Plan, "make-whole" premium on lower end of potential range, payment of remaining amounts due pursuant to the Sonangol settlement, and certain unencumbered exploration leases as asserted by the Committee.

7

| Class | Claim/Equity Interest | Treatment of Claim/Equity Interest | Projected Amount of Claims | Projected Recovery Under the Plan |
|-------|----------------------|-----------------------------------|---------------------------|----------------------------------|
| **SUMMARY OF EXPECTED RECOVERIES** | | | | |
| | Unsecured Claims | Unsecured Claim shall receive its Pro Rata share of the Cobalt General Unsecured Claim Recovery up to payment in full of such holder's Allowed Cobalt General Unsecured Claim. | (excluding Second Lien Notes Deficiency Claims, which Claims are included in the Second Lien Notes Secured Claims' recovery for purposes of this table) | |
| 7 | Section 510(b) Claims | Each Section 510(b) Claim shall be cancelled without any distribution and such holders of Section 510(b) Claims will receive no recovery. | $0 | 0% |
| 8 | Intercompany Claims | Allowed Intercompany Claims shall be *pari passu* with General Unsecured Claims against the applicable Debtor and will share in distributions from such Debtor.  In lieu of Cash payment to the Debtors holding such Intercompany Claims, the distributions on account of such Intercompany Claims may be made to the creditors of the Debtor holding such Intercompany Claims. | N/A | 0% / 100% |
| 9 | Intercompany Interests | Intercompany Interests may be, at the option of the Debtors, either:  (i) Reinstated as of the Effective Date or (ii) cancelled, and no distribution shall be made on account of such Interests. | N/A | 0% / 100% |
| 10 | Interests in Cobalt | Existing Interests in Cobalt shall be deemed canceled and extinguished, and shall be of no further force and effect, whether surrendered for cancelation or otherwise, and there shall be no distribution to holders of Interests in Cobalt on account of such Interests. | $0 | 0% |

E.     **What will I receive from the Debtors if I hold an Allowed Administrative Claim or a Priority Tax Claim?**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.  Administrative Claims will be satisfied as set forth in Article II.A of the Plan, and Priority Tax Claims will be satisfied as set forth in Article II.C of the Plan.

---

11   This projected claim amount does not include amounts on account of contract rejection claims.

12   To the extent that the liens securing the First Lien Notes and Second Lien Notes are avoided (e.g., through the successful challenge by the Committee) and the Intercompany Claims are Allowed, holders of Allowed Cobalt General Unsecured Claims may be entitled to a distribution.  The First Lien Ad Hoc Group and the Second Lien Ad Hoc Group believe there is no viable avoidance claim to be asserted against their liens.

**F.**   **Are any regulatory approvals required to consummate the Plan?**

No.   There are no known regulatory approvals that are required to consummate the Plan. Nonetheless, assignment of any federal leases requires the consent of the United States Department of the Interior or other governmental units.   In addition, certain of the Debtors' operations may require federal approval as further described in Article IX.B of this Disclosure Statement.

**G.**   **What happens to my recovery if the Plan is not confirmed or does not go effective?**

In the event that the Plan is not confirmed or does not go effective, there is no assurance that the Debtors will be able to effectuate the Sale Transaction or restructuring transaction.   It is possible that any alternative, including a potential sale under section 363 of the Bankruptcy Code may provide holders of Claims and Interests with less than they would have received pursuant to the Plan.   For a more detailed description of the consequences of an extended chapter 11 case, or of a liquidation scenario, *see* Article X.A.2 of this Disclosure Statement, entitled "Confirmation of the Plan - Best Interests of Creditors— Liquidation Analysis."

**H.**   **If the Plan provides that I get a distribution, do I get it upon Confirmation or when the Plan becomes effective, and what is meant by "Confirmation," "Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court.   Confirmation of the Plan does not guarantee that you will receive the distribution indicated under the Plan.   After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can go effective.   Initial distributions to holders of Allowed Claims or Interests will only be made on the date the Plan becomes effective—the "Effective Date"—or as soon as practicable thereafter, as specified in the Plan.   See Article X of this Disclosure Statement, entitled "Statutory Requirements for Confirmation of the Plan," for a discussion of the conditions precedent to consummation of the Plan.   "Consummation" refers to "substantial consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, and means (1) the transfer of all or substantially all of the property proposed by the Plan to be transferred; (2) assumption by the Debtors or by the successors to the Debtors under the Plan of the business or of the management of all or substantially all of the property dealt with by the Plan; and (3) commencement of distributions under the Plan.

**I.**   **What are the sources of Cash and other consideration required to fund the Plan?**

The Plan will be funded by Cash on hand, the Sale Transaction Proceeds, and any other Cash received or generated by the Debtors.

**J.**   **Is there potential litigation related to the Plan?**

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan as well, which objections potentially could give rise to litigation.   In the event that it becomes necessary to confirm the Plan over the objection of certain Classes, the Debtors may seek confirmation of the Plan notwithstanding the dissent of such objecting Classes.   The Bankruptcy Court may confirm the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code, which allow the Bankruptcy Court to confirm a plan that has been rejected by an impaired Class if it determines that the plan satisfies section 1129(b) of the Bankruptcy Code.

**K.    Will the final amount of Allowed Subsidiary General Unsecured Claims and Allowed Cobalt General Unsecured Claims affect my recovery under the Plan?**

Each holder of an Allowed Subsidiary General Unsecured Claim shall receive its Pro Rata share of the Subsidiary General Unsecured Claim Recovery on account of such interests.  Similarly, each holder of an Allowed Cobalt General Unsecured Claim shall receive its Pro Rata share of the Cobalt General Unsecured Claim Recovery on account of such interests.  Although the Debtors' estimate of the Subsidiary General Unsecured Claims and the Cobalt General Unsecured Claims is the result of the Debtors' and their advisors' careful analysis of available information, Subsidiary General Unsecured Claims and Cobalt General Unsecured Claims actually asserted against the Debtors may be higher or lower than the Debtors' estimate provided herein, which difference could be material.

The projected amount of Subsidiary General Unsecured Claims and Cobalt General Unsecured Claims set forth herein is subject to change and reflects the Debtors' current view on potential rejection damages.  Any change in the number, identity, or timing of actual rejected Executory Contracts and Unexpired Leases could have a material impact on the amount of General Unsecured Claims.  To the extent that the actual amount of rejection damages Claims changes, the value of recoveries to holders of Allowed Subsidiary General Unsecured Claims and Allowed Cobalt General Unsecured Claims could change as well, and such change could be material.

The recovery of holders of the Subsidiary General Unsecured Claims could be materially altered by the allowance of certain claims.  More specifically, on their schedules of assets and liabilities, the Debtors have scheduled approximately $6 billion of intercompany claims.  If allowed, these intercompany claims would dilute the recovery of holders of Allowed Subsidiary General Unsecured Claims.  Further, the claim that may be asserted by Whitton Petroleum Services Limited ("Whitton") pursuant to that certain Overriding Royalty Agreement Relating to Blocks Located Offshore Angola, dated as of February 13, 2009, if allowed, could be significant (for instance, Whitton has from time to time asserted that a claim may exceed $200 million) and would further dilute the recovery of the holders of Subsidiary General Unsecured Claims.

Further, as of the Petition Date, the Debtors were parties to certain litigation matters and investigations that arose in the ordinary course of operating their business and could become parties to additional litigation in the future as a result of conduct that occurred prior to the Petition Date.  Although the Debtors have disputed, are disputing, or will dispute in the future the amounts asserted by such litigation counterparties, to the extent these parties are ultimately entitled to a higher amount than is reflected in the amounts estimated by the Debtors herein, the value of recoveries to holders of Allowed Subsidiary General Unsecured Claims and Allowed Cobalt General Unsecured Claims could change as well, and such change could be material.

Finally, the Debtors, the Plan Administrator, or the Committee may object to certain proofs of claim, and any such objections ultimately could cause the total amount of Allowed Subsidiary General Unsecured Claims and Allowed Cobalt General Unsecured Claims to change.  These changes could affect recoveries for holders of Allowed Subsidiary General Unsecured Claims and Allowed Cobalt General Unsecured Claims, and such changes could be material.

**L.    How will the release of Avoidance Actions affect my recovery under the Plan?**

In accordance with section 1123(b) of the Bankruptcy Code, on the Effective Date, and except to the extent otherwise reserved in the Plan Supplement, the Debtors, on behalf of themselves and their estates, shall release any and all Avoidance Actions and the Debtors, and any of their successors or

10

assigns and any Entity acting on behalf of the Debtors shall be deemed to have waived the right to pursue any and all Avoidance Actions.  No Avoidance Actions shall revert to creditors of the Debtors.

The Committee asserts that a number of Avoidance Actions being waived constitute payments that might be recoverable under section 547 of the Bankruptcy Code.

**M.     Will there be releases and exculpation granted to parties in interest as part of the Plan?**

Yes, the Plan contains certain releases (as described more fully in Article IV.J of this Disclosure Statement, entitled "Releases"), including mutual releases between (a) the Debtors; (b) the First Lien Noteholders; (c) the First Lien Ad Hoc Group; (d) the Second Lien Noteholders; (e) the Second Lien Ad Hoc Group; (f) the Unsecured Noteholders; (g) the Unsecured Notes Ad Hoc Committee; (h) the First Lien Indenture Trustee; (i) the Second Lien Indenture Trustee; (j) the 2.625% Senior Notes Indenture Trustee; (k) the 3.125% Senior Notes Indenture Trustee; (l) the Committee and its members; and (m) with respect to each of the Debtors and each of the foregoing entities in clauses (a) through (l), such Entity and its current and former Affiliates and subsidiaries, and such Entities' and their current and former Affiliates' and subsidiaries' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals.

The Plan releases, among other claims, the claims in three pending state court derivative actions described in Article VII.C.2 hereof.

The Debtors believe that the Debtors' releases, third-party releases, and exculpation provisions included in the Plan are an integral part of the Restructuring Transactions contemplated by the Plan and the Debtors' overall restructuring efforts.  As discussed more fully in Article VIII.H of this Disclosure Statement, entitled "Investigation," Kirkland & Ellis LLP ("Kirkland"), at the direction of the independent and disinterested directors, conducted an extensive investigation into the potential claims and causes of action held by the Estate.  After reviewing the outcome of the investigation, the independent and disinterested directors and Cobalt's board of directors (the "Board") determined that the releases contained in the Plan are appropriate.  On balance, the value of any potential claim held by the Estate is far outweighed by the cost of prosecuting such a claim.  Indeed, any prosecution of such claims would only further deplete estate resources and reduce creditor recoveries.  Further, the Debtors assert that many of the Released Parties and the Exculpated Parties have made substantial and valuable contributions to the Debtors' restructuring through efforts to negotiate and implement the Plan, which will maximize the value of the Debtors for the benefit of all parties in interest.  Accordingly, for all of these reasons the Debtors believe that each of the Released Parties and the Exculpated Parties warrants the benefit of the release and exculpation provisions.  Based on the foregoing, the Debtors believe that the releases and exculpations in the plan are necessary and appropriate and meet the applicable legal standard.  Moreover, the Debtors will present evidence at the Confirmation Hearing to demonstrate the basis for the propriety of the release and exculpation provisions.

The Committee contends that the Debtors' release of the Released Parties, including without limitation certain of the Debtors' current and former directors and officers named as defendants in the pending derivative actions, is not justified, and intends to object to the Plan on this basis. The Committee contends that such releases are (a) being provided for no consideration, (b) being provided to certain former directors and officers of the Debtors who are no longer serving in such capacities, and therefore

could not have made any contributions to the Debtors' restructuring, (c) are not fair and equitable, and (d) are not in the best interest of the Debtors or creditors.  The Debtors disagree.

The Committee believes that the proposed releases may affect recoveries by holders of Cobalt General Unsecured Claims and Subsidiary General Unsecured Claims.  Cash recoveries from unencumbered assets comprise a portion of the treatment to be provided to holders of Cobalt General Unsecured Claims and Subsidiary General Unsecured Claims under the Plan.  The claims asserted in the derivative actions are subject only to the adequate protection liens securing potential superpriority claims up to the amount of diminution in value of their collateral, if any, as provided in the Cash Collateral Order.  Absent any diminution in value of the prepetition secured lenders' collateral, the claims asserted in the derivative actions would be unencumbered assets, and the proceeds thereof (if any), would be available to general unsecured creditors.  On the other hand, the costs of pursuing any such claims—which the Debtors believe have no merit—could deplete any potential recoveries to creditors.

The Plan also provides that all holders of Claims that (i) vote to accept or are deemed to accept the Plan or (ii) are in a voting Class who abstain from voting on the Plan and do not opt out of the release provisions contained in Article VIII of the Plan will be deemed to have expressly, unconditionally, generally, individually, and collectively released all Claims and Causes of Action against the Debtors and the Released Parties.

**Importantly, all holders of Claims and Interests that are not in voting Classes that do not file an objection with the Bankruptcy Court in the Chapter 11 Cases that expressly objects to the inclusion of such holder as a Releasing Party under the provisions contained in Article VIII.C of the Plan or do not elect to opt out of the provisions contained in Article VIII.C of the Plan using the documents provided, if any, will be deemed to have expressly, unconditionally, generally, individually, and collectively consented to the release of all Claims and Causes of Action against the Debtors and the Released Parties.  By objecting to or electing to opt out of the releases set forth in Article VIII.C of the Plan you will forgo the benefit of obtaining the releases set forth in Article VIII.C of the Plan if you otherwise would be a Released Party thereunder.  The releases are an integral element of the Plan.**

The United States (including any and all of its federal agencies, collectively, the "United States") asserts that non-consensual non-debtor releases, and exculpation of non-debtor parties, are impermissible under 11 U.S.C. § 524(e) and the Fifth Circuit's holding in *In re Pacific Lumber Company*, 584 F.3d 229 (5th Cir. 2009), and the United States objects to any non-debtor releases and exculpation provided for in the Plan.

The Debtors disagree.  The Debtors believe that the releases, exculpations, and injunctions set forth in the Plan are appropriate because, among other things:  (a) the releases, exculpations, and injunctions are specific; (b) the releases provide closure with respect to prepetition Claims and Causes of Action, which the Debtors determined is a valuable component of the overall restructuring under the circumstances and is integral to the Plan; (c) the releases are a necessary part of the Plan; and (d) the value of any potential claim is far outweighed by (and estate resources would be unreasonably depleted by) the cost of prosecuting any such claim.  The Debtors believe that many of the Released Parties and Exculpated Parties have played an integral role in formulating or enabling the Debtors reach a value maximizing Sale Transaction and have expended significant time and resources analyzing and negotiating the issues associated therewith.  The Debtors will be prepared to meet their burden to establish the basis for the releases, exculpations, and injunctions for each Released Party and Exculpated Party as part of Confirmation of the Plan.  The release, exculpation, and injunction provisions that are contained in the Plan are copied in Article IV.J of this Disclosure Statement, entitled "Releases."

12

### N.     What is the effect of the Plan on the Debtors' ongoing business?

The Debtors are selling all or substantially all of their businesses under chapter 11 of the Bankruptcy Code.  As a result, Confirmation means that all or substantially all of the Debtors' assets or equity interests in the Debtors will be sold and the Debtors' remaining assets will be sold.  Following Confirmation, the Plan will be consummated on the Effective Date, which is a date selected by the Debtors that is the first business day after which all conditions to Consummation have been satisfied or waived.  *See* Article IX of the Plan.  On the Effective Date, the Plan Administrator shall be appointed. Among other things, the Plan Administrator shall be responsible for:  (a) winding down the Debtors' businesses and affairs as expeditiously as reasonably possible; (b) resolving Disputed Claims; (c) making all distributions to holders of Allowed Claims in accordance with the Plan; (d) pursuing or otherwise commencing and litigating any Causes of Action (other than those released pursuant to the Plan or pursuant to any prior settlement approved by the Bankruptcy Court), and only to the extent the benefits of such enforcement or prosecution are reasonably believed by the Plan Administrator to outweigh the costs associated therewith; (e) filing appropriate tax returns; (f) appointing new directors and officers of the non-Debtor subsidiaries, if necessary; and (g) administering the Plan.  Additionally, upon the Effective Date, all actions contemplated by the Plan will be deemed authorized and approved.

### O.     Could subsequent events potentially affect recoveries under the Plan?

Potentially, yes.  As described in greater detail below, the Debtors have conducted a marketing and Auction process seeking purchasers for all or substantially all of the Debtors' assets, and held an Auction related to this marketing process on March 6, 2018, in accordance with the Bid Procedures Order.  Further details regarding the Auction are described in Article VIII.I of this Disclosure Statement, entitled "Marketing Process and Sale Transaction."  Failure to close any component of the Sale Transaction could have a material negative effect on the estimated recoveries set forth herein.

Even if the Bankruptcy Court approves any transfer or assignment of the Debtors' record title interests or operating rights interests in any federal oil and gas leases (collectively, the "Federal Leases"), any such contemplated transfer or assignment would still be subject to the approval, or disapproval, of The Bureau of Ocean Energy Management.

### P.     Do the Debtors recommend voting in favor of the Plan?

Yes.  The Debtors believe the Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other available alternative.  The Debtors believe that the Plan is in the best interest of all holders of Claims or Interests, and that any other alternatives (to the extent they exist) fail to realize or recognize the value inherent under the Plan.

## IV.     OVERVIEW OF THE PLAN

The Plan provides for the sale of all or substantially all of the Debtors' business through a Sale Transaction.  The key terms of the Plan are as follows:

### A.     General Settlement of Claims and Interests

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Plan.  The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to

13

Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates.  Distributions made to holders of Allowed Claims in any Class are intended to be final.

### B.      Restructuring Transactions

On the Effective Date or as soon as reasonably practicable thereafter, the Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan (the "Restructuring Transactions"), including: (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (4) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; and (5) subject to the occurrence of the Effective Date, the consummation of the transactions contemplated by the Sale Transaction.

### C.      Sale Transactions

On and after the Confirmation Date, the Debtors shall be authorized to consummate the Sale Transactions pursuant to the terms of the Sale Transaction Documentation, the Plan, and the Confirmation Order.

### D.      The Plan Administrator

#### 1.      Rights and Powers of the Plan Administrator

On the Effective Date, the Plan Administrator shall be appointed by the Debtors, in consultation with the Committee, the Second Lien Ad Hoc Group, and the Second Lien Indenture Trustee.  The Plan Administrator shall act for the Debtors in the same fiduciary capacity as applicable to a board of directors and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same).  On the Effective Date, the authority, power, and incumbency of any and all persons acting as directors and officers (and other employees, as applicable) of the Debtors and directors and officers of the non-Debtor subsidiaries shall be deemed to have been terminated, and a representative of the Plan Administrator shall (a) be appointed as the sole manager and sole officer of the Debtors, (b) succeed to all of the powers of the Debtors' directors and officers under applicable law or otherwise, and (c) appoint new directors and officers of the non-Debtor subsidiaries.

Among other things, the Plan Administrator shall be responsible for:  (a) winding down the Debtors' businesses and affairs as expeditiously as reasonably possible; (b) resolving Disputed Claims; (c) making all distributions to holders of Allowed Claims in accordance with the Plan; (d) pursuing or otherwise commencing and litigating any Causes of Action (other than those released herein or pursuant to any prior settlement approved by the Bankruptcy Court), and only to the extent the benefits of such enforcement or prosecution are reasonably believed by the Plan Administrator to outweigh the costs associated therewith; (e) filing appropriate tax returns; and (f) administering the Plan.  The Plan

14

Administrator shall be deemed to be substituted as the party-in-lieu of the Debtors and the Estates in all matters, including (i) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court and (ii) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.

### 2.      Plan Administrator Assets

On the Effective Date, the Plan Administrator Assets shall vest automatically in the Plan Administrator free and clear of all Liens, claims, encumbrances, and other interests.  The Plan shall be considered a motion pursuant to sections 105, 363, and 365 of the Bankruptcy Code for such relief.  The transfer of the Plan Administrator Assets to the Plan Administrator shall be made for the benefit and on behalf of holders of Claims receiving a distribution from proceeds of the Plan Administrator Assets.  The Plan Administrator shall not be deemed a successor in interest of the Debtors for any purpose other than as specifically set forth herein.  In connection with the transfer of the Plan Administrator Assets, any attorney-client privilege, work product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Plan Administrator will vest in the Plan Administrator and its representatives, and the Debtors and the Plan Administrator are authorized to take all necessary actions to effectuate the transfer of such privileges to the Plan Administrator.

To the extent that the Plan Administrator Assets include the Debtors' record title interests or operating rights interests in the Federal Leases, the United States disputes that such Federal Leases can vest in the Plan Administrator, or in any assignee or transferee, free and clear of Debtors' non-dischargeable decommissioning obligations and/or other regulatory obligations.  Lessees and owners of operating rights, including the Debtors, are jointly and severally responsible for meeting decommissioning obligations for facilities on leases as the obligations accrue and until each obligation is met. *See* 30 C.F.R. § 250.1701.

### 3.      Fees of the Plan Administrator and Expenses Incurred on or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the fees and expenses incurred by the Plan Administrator on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including attorney fees and expenses) made by the Plan Administrator in connection with the Plan Administrator's duties shall be paid on a monthly basis without any further notice to or action, Order, or approval of the Bankruptcy Court, in Cash if such amounts relate to any actions taken hereunder; *provided* that the Plan Administrator will only be reimbursed for its reasonable and documented out-of-pocket costs and expenses in accordance with the Wind Down Budget.

### E.      Disputed Claims Reserve

On the Effective Date (or as soon as thereafter as is reasonably practicable), the Plan Administrator shall deposit in the Disputed Claims Reserve the Disputed Claims Reserve Amount.  For the avoidance of doubt, there shall be no reserve required for Claims against the Debtors, to the extent such Claims are Assumed Liabilities or as released, discharged, or otherwise extinguished pursuant to the Plan, nor shall there by any reserve, holdbacks, escrows, or indemnities arising from the Sale Transaction Documentation or otherwise relating to the Sale Transaction.

The United States disputes that any assignment or transfer of the Federal Leases releases, discharges, or otherwise extinguishes the Debtors' decommissioning or other regulatory obligations owing to the United States regardless of whether the decommissioning and/or other regulatory obligations are "Assumed Liabilities" assumed by any assignee, transferee or purchaser pursuant to any Sale

15

Transaction Documentation. The United States asserts that, to the extent ordered by the United States to perform accrued decommissioning when due, the Debtors and the Plan Administrator should reserve sufficient funds to perform decommissioning.

### F.     Corporate Action

Upon the Effective Date, by virtue of the solicitation of votes in favor of the Plan and entry of the Confirmation Order, all actions contemplated by the Plan (including any action to be undertaken by the Plan Administrator) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by holders of Claims or Interests, the Debtors, or any other Entity or Person. All matters provided for in the Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Debtors or the Debtors' Estates.

The Plan Administrator shall dissolve all of the Debtors, which dissolution shall be effectuated at a time following the Effective Date determined by the Plan Administrator.

On the Effective Date, the terms of all directors, managers, and officers of all Debtors shall be deemed to have expired, all such directors, managers, and officers shall be released of their duties, and all actions solely in furtherance of the Plan shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by the Debtors, holders of Claims or Interests, directors, managers, or officers of the Debtors, or any other Entity or Person, including the transfer of assets of the Debtors to the Plan Administrator and the dissolution or winding up of the Debtors. The directors, managers, and officers of the Debtors and the Plan Administrator, as applicable, shall be authorized to execute, deliver, File, or record such contracts, instruments, release, and other agreements or documents and take such other actions as they may deem in their sole discretion necessary or appropriate to effectuate and implement the provisions of the Plan. The authorizations and approvals contemplated by Article IV.I of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

### G.     Recoveries to Certain Holders of Claims and Interests

The recoveries to holders of Claims and Interests are described in Article III.D of this Disclosure Statement, entitled "What will I receive from the Debtors if the Plan is consummated?"

### H.     Releases

The Plan contains certain releases, as described in Article III.M of this Disclosure Statement entitled "Will there be releases and exculpation granted to parties in interest as part of the Plan?"

The Plan provides that all holders of Claims that (i) vote to accept or are deemed to accept the Plan or (ii) are in voting Classes who abstain from voting on the Plan and do not opt out of the release provisions contained in Article VIII of the Plan will be deemed to have expressly, unconditionally, generally, individually, and collectively released all Claims and Causes of Action against the Debtors and the Released Parties.

**Importantly, all holders of Claims and Interests that are not in voting Classes that do not file an objection with the Bankruptcy Court in the Chapter 11 Cases that expressly objects to the inclusion of such holder as a Releasing Party under the provisions contained in Article VIII.C of the Plan or do not elect to opt out of the provisions contained in Article VIII.C of the Plan using the documents provided, if any, will be deemed to have expressly, unconditionally, generally,**

16

**individually, and collectively consented to the release of all Claims and Causes of Action against the Debtors and the Released Parties. By objecting to or electing to opt out of the releases set forth in Article VIII.C of the Plan you will forgo the benefit of obtaining the releases set forth in Article VIII.C of the Plan if you otherwise would be a Released Party thereunder. The releases are an integral element of the Plan.**

The release, exculpation, and injunction provisions that are contained in the Article VIII of the Plan are copied in pertinent part below. The release and related provisions set forth in Article VIII of the Plan remain the subject of an ongoing independent investigation by the Committee of pending and potential claims and Causes of Action held by the Debtors' Estates, as described in Article VIII.H of this Disclosure Statement.

### 1.    Release of Liens

Except as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised, and the holder of such mortgages, deeds of trust, Liens, pledges, or other security interest shall be authorized to take such actions as may be reasonably requested by the Debtors to evidence such releases.

### 2.    Debtor Release

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtors, that the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Sale Transaction, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Sale Transaction, the Plan, or the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything contained herein to the contrary, the foregoing release does not release any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in Article VIII.B of the Plan by the Debtors, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute its finding that each release described in Article VIII.B of the Plan is: (1) in exchange for the good and valuable consideration provided by the Released Parties,**

17

a good faith settlement and compromise of such Claims; (2) in the best interests of the Debtors and all holders of Interests and Claims; (3) fair, equitable, and reasonable; (4) given and made after due notice and opportunity for hearing; and (5) a bar to any of the Debtors asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

3.      Third Party Release

As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Sale Transaction, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Sale Transaction, the Plan, or the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything contained herein to the contrary, the foregoing release does not release any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in Article VIII.C of the Plan, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute its finding that each release described in Article VIII.C of the Plan is: (1) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such Claims; (2) in the best interests of the Debtors and all holders of Interests and Claims; (3) fair, equitable, and reasonable; (4) given and made after due notice and opportunity for hearing; and (5) a bar to any of the Debtors asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

4.      Exculpation

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the Sale Transaction, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities

18

**pursuant to the Plan. The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

## 5.   Injunction

**Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Exculpated Parties, or the Released Parties:   (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.**

**Upon entry of the Confirmation Order, all holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Each holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in Article VIII.E of the Plan.**

The United States asserts that Debtors' accrued joint and several non-monetary decommissioning obligations shall continue and survive assignment, transfer and/or confirmation until decommissioning is performed, because decommissioning obligations are grounded in statute and regulation, as well as the terms of the Federal Leases. The United States further asserts that the Debtors are not entitled to an impermissible discharge of a liquidating corporate debtor in violation of 11 U.S.C. § 1141(d)(3)(A) by means of this Injunction Provision. The United States also disputes that it could be required to move for relief from the automatic stay prior to the Effective Date to effectuate its setoff and/or recoupment rights. The Debtors reserve their rights to propose or contest any related matter.

The United States asserts that nothing in the Disclosure Statement or the Plan discharges, releases, precludes, or enjoins the United States from exercising its police or regulatory rights, including, but not limited to, ensuring compliance with federal statutes and regulations as to the Debtors' plugging, abandonment, and decommissioning obligations for Federal Leases on the Outer Continental Shelf. The

19

United States further asserts nothing in the Disclosure Statement or the Plan releases the Debtors, or any transferee or assignee of the Federal Leases, from their accrued joint and several liability to perform decommissioning obligations.  The United States asserts nothing in the Disclosure Statement or the Plan shall affect, limit, waive or discharge: (i) any setoff rights of the United States under section 553 of the Bankruptcy Code and applicable non-bankruptcy law; and/or (ii) any recoupment rights of the United States under applicable non-bankruptcy law, all of which are expressly preserved.  The United States asserts that nothing in the Disclosure Statement or Plan shall divest any tribunal of any jurisdiction it may have under police or regulatory law to adjudicate any defense asserted under the Disclosure Statement or the Plan.

#### 6.    SEC Rights Reserved

Nothing in the Plan or the Confirmation Order (i) releases any non-Debtor Entity from any Claim or cause or action of the SEC; or (ii) enjoins, limits, impairs, or delays the SEC from commencing or continuing any Claims, causes of action, proceedings or investigations against any non-Debtor Entity in any forum.

For more detail, see Article VIII of the Plan, entitled "Settlement, Release, Injunction, and Related Provisions," which is incorporated herein by reference.

### V.    VOTING AND CONFIRMATION

#### A.    Class Entitled to Vote on the Plan

As described more fully above, Class 4 (Second Lien Notes Secured Claims), Class 5 (Subsidiary General Unsecured Claims), and Class 6 (Cobalt General Unsecured Claims) are the only classes entitled to vote to accept or reject the Plan (the "Voting Classes").

If your claim or Interest is not included in the Voting Classes, you are not entitled to vote and you will not receive a Solicitation Package or a Ballot.  If your Claim is included in the Voting Classes, you should read your Ballot and carefully follow the instructions set forth therein.  Please use only the Ballot that accompanies this Disclosure Statement or the Ballot that the Debtors, or the Solicitation Agent on behalf of the Debtors, otherwise provide to you.

#### B.    Votes Required for Acceptance by a Class

Under the Bankruptcy Code, acceptance of a plan of reorganization by a class of claims or interests is determined by calculating the amount and, if a class of claims, the number, of claims and interests voting to accept, as a percentage of the allowed claims or interests, as applicable, that have voted.  Each Class of Claims entitled to vote on the Plan will have accepted the Plan if:  (a) the holders of at least two-thirds in dollar amount of the Claims actually voting in each Class vote to accept the Plan; and (b) the holders of more than one-half in number of the Claims actually voting in each Class vote to accept the Plan.

#### C.    Certain Factors to Be Considered Prior to Voting

There are a variety of factors that all holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan.  These factors may impact recoveries under the Plan, including that:

20

- the financial information contained in this Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and this Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan;

- the Debtors may request Confirmation without the acceptance of all Impaired Classes entitled to vote in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims or Professional Compensation Claims.

While these factors could affect distributions available to holders of Allowed Claims under the Plan, the occurrence or impact of such factors will not necessarily affect the validity of the vote of holders within the Voting Classes or necessarily require a re-solicitation of the votes of holders of Claims in such Voting Classes.

For a further discussion of risk factors, please refer to Article IX hereof, entitled "Risk Factors."

### D.    Solicitation Procedures

#### 1.    Solicitation Agent

The Debtors retained Kurtzman Carson Consultants LLC ("KCC") to act, among other things, as the solicitation agent (the "Solicitation Agent") in connection with the solicitation of votes to accept or reject the Plan.

#### 2.    Solicitation Package

Holders of Claims who are entitled to vote to accept or reject the Plan as of March 5, 2018 (the "Voting Record Date"), will receive appropriate solicitation materials (the "Solicitation Package"), which will include, in part, the following:

- the appropriate Ballot(s) and applicable voting instructions, together with a pre-addressed, postage pre-paid return envelope;  and

- this Disclosure Statement, including the Plan as an exhibit thereto.

#### 3.    Distribution of the Solicitation Package and Plan Supplement

The Debtors will cause KCC to distribute the Solicitation Packages to holders of Claims in the Voting Classes on or before **March 12, 2018 (or as soon as practicable thereafter)**, which will be at least **16 days** before the Voting Deadline (i.e., March 28, 2018, at 4:00 p.m., prevailing Central Time).

The Solicitation Package (except for the Ballots) may also be obtained:  (a) from KCC by (i) visiting https://www.kccllc.net/cobalt, (ii) writing to KCC at Cobalt International Energy, Inc., Disclosure Statement / Plan Requests, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245, and/or (iii) emailing cobaltinfo@kccllc.com; or (b) for a fee via PACER at http://www.txs.uscourts.gov.

At least seven (7) days prior to the Voting Deadline, the Debtors intend to file the Plan Supplement.  If the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available at https://www.kccllc.net/cobalt.  The Debtors will not serve paper or CD-ROM copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement: (a) from KCC by (i) visiting https://www.kccllc.net/cobalt, (ii) writing to KCC at Cobalt International Energy, Inc., Disclosure Statement / Plan Requests, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245, and/or (iii) emailing cobaltinfo@kccllc.com; or (b) for a fee via PACER at http://www.txs.uscourts.gov.

As described above, certain holders of Claims may not be entitled to vote because they are Unimpaired or are otherwise presumed to accept the Plan under section 1126(f) of the Bankruptcy Code.  In addition, certain holders of Claims and Interests may be Impaired but are receiving no distribution under the Plan, and are therefore deemed to reject the Plan and are not entitled to vote.  Such holders will receive only the Confirmation Hearing Notice and a non-voting status notice.  The Debtors are only distributing a Solicitation Package, including this Disclosure Statement and a Ballot to be used for voting to accept or reject the Plan, to the holders of Claims or Interests entitled to vote to accept or reject the Plan as of the Voting Record Date.

### E.      Voting Procedures

If, as of the Voting Record Date, you are a holder of a Class 4 Second Lien Notes Secured Claim, Class 5 Subsidiary General Unsecured Claim, or Class 6 Cobalt General Unsecured Claim you may vote to accept or reject the Plan in accordance with the Solicitation Procedures by completing the Ballot and returning it in the envelope provided.  If your Claim or Interest is not included in the Voting Class, then you are not entitled to vote and you will not receive a Solicitation Package.  Except as otherwise set forth herein, the Voting Record Date and all of the Debtors' solicitation and voting procedures shall apply to all of the Debtors' creditors and other parties in interest.

#### 1.      Voting Deadline

The deadline to vote on the Plan is **March 28, 2018, at 4:00 p.m., prevailing Central Time** (the "Voting Deadline").  To be counted as a vote to accept or reject the Plan, a Ballot must be properly executed, completed, and delivered, whether by first class mail, overnight delivery, personal delivery, or electronic online submission so that the Ballot is **actually received** by KCC no later than the Voting Deadline.

#### 2.      Voting Instructions

As described above, the Debtors have retained KCC to serve as the Solicitation Agent for purposes of the Plan.  KCC is available to answer questions, provide additional copies of all materials, oversee the voting process, and process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan.

---

**BALLOTS**

To be counted, all Ballots must be **actually received** by KCC by the Voting Deadline, which is **March 28, 2018, at 4:00 p.m., prevailing Central Time**, at the following address:

Cobalt International Energy, Inc.
Ballot Processing
c/o Kurtzman Carson Consultants LLC
2335 Alaska Avenue
El Segundo, California 90245

If you have any questions on the procedure for voting on the Plan, please call the Debtors' restructuring hotline maintained by KCC at:
(866) 967-1782.

---

More detailed instructions regarding the procedures for voting on the Plan are contained in the Ballots distributed to holders of Claims that are entitled to vote to accept or reject the Plan. All votes to accept or reject the Plan must be cast by using the appropriate Ballot. All Ballots much be properly executed, completed, and delivered according to their applicable voting instructions by: (i) first class mail, in the return envelope provided with each Ballot; (ii) overnight courier; (iii) hand-delivery; (iv) electronic online submission at http://www.kccllc.net/cobalt, so that the Ballots are **actually received** by KCC no later than the Voting Deadline in accordance with the procedures set forth in the applicable Ballot. Any Ballot that is properly executed by the holder of a Claim entitled to vote that does not clearly indicate an acceptance or rejection of the Plan or that indicates both an acceptance and a rejection of the Plan will not be counted.

Each holder of a Claim entitled to vote to accept or reject the Plan may cast only one Ballot for each Claim in a Voting Class held by such holder. By signing and returning a Ballot, each holder of a Claim entitled to vote will certify to the Bankruptcy Court and the Debtors that no other Ballots with respect to such Claim have been cast or, if any other Ballots have been cast with respect to such Claim, such earlier Ballots are superseded and revoked.

All Ballots will be accompanied by postage prepaid return envelopes. It is important to follow the specific instructions provided on each Ballot, as failing to do so may result in your Ballot not being counted.

The Plan also provides that all holders of Claims that (i) vote to accept or are deemed to accept the Plan or (ii) are in a voting Class who abstain from voting on the Plan and do not opt out of the release provisions contained in Article VIII of the Plan will be deemed to have expressly, unconditionally, generally, individually, and collectively released all Claims and Causes of Action against the Debtors and the Released Parties.

**Importantly, all holders of Claims and Interests that are not in voting Classes that do not file an objection with the Bankruptcy Court in the Chapter 11 Cases that expressly objects to the inclusion of such holder as a Releasing Party under the provisions contained in Article VIII.C of the Plan or do not elect to opt out of the provisions contained in Article VIII.C of the Plan using the documents provided, if any, will be deemed to have expressly, unconditionally, generally, individually, and collectively consented to the release of all Claims and Causes of Action against the Debtors and the Released Parties. By objecting to or electing to opt out of the releases set forth in**

23

**Article VIII.C of the Plan you will forgo the benefit of obtaining the releases set forth in Article VIII.C of the Plan if you otherwise would be a Released Party thereunder.  The releases are an integral element of the Plan.**

### 3.    Ballots Not Counted

No Ballot will be counted toward Confirmation if, among other things:  (i) it is illegible or contains insufficient information to permit the identification of the holder of the Claim; (ii) it was transmitted by means other than as specifically set forth in the ballots; (iii) it was cast by an entity that is not entitled to vote on the Plan; (iv) it was cast for a Claim listed in the Debtors' schedules as contingent, unliquidated, or disputed for which the applicable Bar Date has passed and no proof of claim was timely filed; (v) it was cast for a Claim that is subject to an objection pending as of the Voting Record Date (unless temporarily allowed in accordance with the Disclosure Statement Order); (vi) it was sent to any party other the Solicitation Agent; (vii) it is unsigned; or (viii) it is not clearly marked to either accept or reject the Plan or it is marked both to accept and reject the Plan.  **Please refer to the Disclosure Statement Order for additional requirements with respect to voting to accept or reject the Plan**.

### F.    Plan Objection Deadline

Parties must object to Confirmation of the Plan by **March 27, 2018, at 4:00 p.m., prevailing Central Time** (the "Plan Objection Deadline").  All objections to the Plan must be filed with the Bankruptcy Court and served on the Debtors, counsel to the Committee, and certain other parties in interest so that they are **actually received** on or before the Plan Objection Deadline.

### G.    Confirmation Hearing

Assuming the requisite acceptances are obtained for the Plan, the Debtors intend to seek Confirmation of the Plan at the Confirmation Hearing.  The Confirmation Hearing is scheduled to commence on **March 30, 2018, at 9:30 a.m., prevailing Central Time**, before the Honorable Judge Marvin Isgur, in Courtroom 404, 4th floor of the United States Bankruptcy Court for the Southern District of Texas, Houston Division, 515 Rusk Street, Houston, Texas, 77002.  The Confirmation Hearing may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on the entities who have filed objections to the Plan, without further notice to other parties in interest.  The Bankruptcy Court, in its discretion and before the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing.  The Plan may be modified, if necessary, before, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

## VI.    THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

### A.    Cobalt's Position in the Oil and Gas Industry

The oil and gas industry is typically divided into three major sectors: "upstream," "midstream," and "downstream."  E&P businesses that extract oil, gas, and other hydrocarbons—like Cobalt—comprise the upstream sector.  The midstream sector includes companies engaged in gathering, transporting, and storing the (unrefined) hydrocarbons.  The downstream sector is comprised of refiners, distributors, and marketers of (refined) hydrocarbon products.

Cobalt's assets are focused in the Gulf of Mexico deepwater basin, the Kwanza basin offshore Angola, and the Gabon basin.  The Gulf of Mexico's deepwater oil basin is one of the most prolific in the

world and has been a focus for major oil exploration companies for more than three decades. The Kwanza basin and the Gabon basin are located off the coast of West Africa.

Pinpointing the right location to drill and extract oil and gas from a basin can be difficult and often involves specialized techniques and technology. Cobalt, for instance, uses extensive seismic data, among other things, to identify potential drilling targets. Despite the sophisticated nature of this technology (and others like it), predictions are often inexact. Identifying promising drilling targets requires the knowledge and training of experienced geologists, engineers, and other oil and gas experts.

Generally, while rewards can be large, deepwater drilling is significantly more capital intensive than drilling on land. After a company identifies an appropriate target, it usually drills an exploration well to determine whether its initial analysis was accurate and to determine the extent of reservoir volumes.

Once an exploration well is drilled, the company must conduct various analyses to determine whether—and how much—oil and gas can be extracted from the well. A well test measures flow rates, properties of fluid or gas produced, and surface pressures, all of which provide an E&P company with information necessary to better predict the potential of each well. In deepwater development, wells are drilled and typically tied back to a floating platform system (a "FPS") or other production and processing facility. The FPS separates the oil, water, and gas from each other. The oil is pumped into a pipeline and delivered to a receiving terminal onshore. The gas is compressed into a gas pipeline and sold into an onshore distribution system. The water is treated and pumped overboard.

Each of the above steps depends on sophisticated technology and highly skilled personnel, and each carries a different level of uncertainty and risk. At each step, an E&P company must make complicated decisions regarding the viability—both technological and economic—of any given well or reservoir.

## B.    Cobalt's History

Cobalt was founded in November 2005 as a private company in Houston, Texas. On December 15, 2009, Cobalt executed an initial public offering of equity (the "IPO") with an approximately $4.5 billion market capitalization. Net proceeds from the IPO were used to fund capital expenditures, in particular Cobalt's exploration program, and its related operating expenses. Cobalt's common stock traded on the New York Stock Exchange (the "NYSE") under the ticker symbol "CIE" since the IPO until it was notified by the NYSE, on December 13, 2017, that the NYSE would immediately commence delisting proceedings. Cobalt's common stock was officially delisted as of January 16, 2018. Cobalt's common stock began trading on the over the counter market on December 14, 2017.

Since its founding in 2005, Cobalt has had an ongoing focus on deepwater exploration in a limited number of places—the Gulf of Mexico and offshore West Africa. Through strategic acquisitions and exploration discoveries in both locations, Cobalt has historically delivered significant shareholder value. The commodity downturn and lack of capital resources, however, made developing the assets impossible. Thus, Cobalt started exploring asset sales.

### 1.    Subsalt and Pre-Salt Focus

Cobalt focuses on deepwater offshore areas where geology exhibits the potential for subsalt or pre-salt discoveries. Subsalt exploration refers to the identification of oil deposits below impermeable layers of salt that have deformed and moved vertically from their original position. These layers of salt and their position relative to the surrounding and underlying rocks is a principal control on hydrocarbon accumulations, especially in the Gulf of Mexico. To be successful, Cobalt must rely upon individuals

25

who have both an advanced understanding of these complex systems and the capability to utilize advanced seismic imaging technologies.

Pre-salt exploration, on the other hand, refers to the identification and discovery of oil accumulations trapped in formations that are beneath, and older, than the original in-place salt layer. These pre-salt layers were formed more than 100 million years ago.  In pre-salt areas, exploration is focused on potential reservoirs that were deposited prior to salt formation.

Advanced seismic imaging, integrated regional geologic interpretation, and a focus on the fundamentals of petroleum geology are keys to success in subsalt and pre-salt exploration.  Consequently, Cobalt has spent over $400 million since its inception to acquire and process the highest quality seismic data and technology.   This investment in seismic data and its utilization by Cobalt's experienced workforce has been essential to Cobalt's success in identifying prospects, acquiring leases related thereto, and successfully drilling discoveries in the Gulf of Mexico and West Africa.  As a result of these efforts, Cobalt owns a significant amount of seismic data, as follows:

- West Africa:  approximately 6,950 square miles of three dimensional ("3-D") seismic data and approximately 125,000 linear miles of two dimensional ("2-D") seismic data.

- Gulf of Mexico:  (a) approximately 32,400 square miles of 3-D depth-migrated seismic data, (b) approximately 8,500 square miles of wide-azimuth 3-D depth data, (c) proprietary reprocessing of approximately 7,600 square miles of 3-D seismic data, and (d) approximately 115,000 linear miles of 2-D pre-stack, depth-migrated seismic data.

Cobalt's investment in seismic data, technology, and its workforce has significantly enhanced its ability to quickly identify the geological and geophysical characteristics of the subsalt and pre-salt formations.  This has directly led to Cobalt's early access to leading positions in both the Gulf of Mexico and West Africa.

### C.    Cobalt's Current Assets and Operations

As of the Petition Date, the Debtors employed approximately 82 full-time employees, none of which are represented by a collective bargaining agreement.  In addition, certain of Cobalt's non-Debtor affiliates collectively employ approximately three full time employees in Angola.   Cobalt is headquartered in Houston, Texas and holds interests in the Gulf of Mexico and West Africa.  A corporate organizational chart is set forth below.



### 1. Gulf of Mexico Assets

Cobalt holds an ownership interest in approximately 121 blocks in the Gulf of Mexico, representing approximately 368,532 net acres leased. Cobalt's Gulf of Mexico assets include four major discoveries: (a) North Platte, (b) Shenandoah, (c) Anchor, and (d) Heidelberg fields.

### i. North Platte

The North Platte field is located approximately 190 miles south of Port Fourchon off the Louisiana coast in 4,500 feet of water in the "Garden Banks" area. North Platte is the only field in which the Debtors serve as operator. In 2012, the Debtors announced the North Platte discovery well, and subsequently drilled five additional penetration wells to appraise the field. On December 15, 2017, the Debtors submitted a SOP to the Bureau of Safety and Environmental Enforcement ("BSEE") for approval. The SOP provides a schedule of key deliverables to develop the North Platte unit. The SOP suspends the requirement of the operator to conduct further unit saving drilling operations under the terms of the applicable Leases. In the event the SOP is not approved by BSEE, a unit saving drilling operation will need to commence by June 2018. Therefore, as a contingency, the operator is in the planning stages of an additional well—North Platte #5—as a unit saving operation. The Debtors own a 60-percent working interest in the North Platte unit, with the remaining 40-percent held by Total E&P as a non-operating party. The estimated gross recoverable resource range for North Platte is 500 to 650 million barrels of oil equivalent.

The Debtors have already committed to pay a gross total of approximately $166 million pursuant to outstanding authorizations for expenditures (each, an "AFE") in connection with developing the North Platte unit and drilling the North Platte #5 well as part of a unit saving operation in the event an SOP is not approved by BSEE. If the BSEE does not approve an SOP, failure to drill a well will result in automatic termination of the Leases and the elimination of the Debtors' Working Interests therein. The Debtors' net share of these committed expenditures is approximately $111 million, with the balance to be reimbursed by Total E&P on account of joint interest billings if Total E&P elects to participate.

The Debtors also expect to incur additional expenditures required to fulfill the commitments outlined in the SOP. Failure to authorize these expenditures will likely result in BSEE not approving the SOP, thereby triggering the requirement that the Operator drill North Platte #5 as a unit saving operation. The Debtors' net share of these uncommitted expenditures is approximately $41 million, with the balance to be reimbursed by Total E&P on account of joint interest billings. Failure to make these payments will result in economic losses to the Debtors and their bankruptcy estates by diminishing the value of the Debtors' interests in their Leases to the detriment of all parties in interest, including potential purchasers.

### ii.     Shenandoah

The Shenandoah field is located approximately 170 miles south of Port Fourchon off the Louisiana coast in 5,800 feet of water in the "Walker Ridge" area. The Debtors own a 20-percent working interest in Shenandoah as a non-operating party. In 2009 the Shenandoah discovery well was drilled and subsequently seven additional penetration wells were completed to appraise the field, with the most recent in April 2017. The estimated gross recoverable resource range for Shenandoah is 165 to 300 million barrels of oil equivalent.

Historically, the Debtors have paid approximately $3.5 million in joint interest billings on a monthly basis in connection with Shenandoah. The Debtors may incur additional expenditures at or exceeding the historical monthly average with respect to Shenandoah in the twelve months following the Petition Date. Specifically, expenditures may include studies, surveys, integrated project teams, long leads, and drilling expenses, among others. Failure to participate in any well AFE for the construction, fabrication, or acquisition of a well to produce hydrocarbons (a "Fabrication AFE") will force the Debtors to forfeit their share of production from that well. Further, failure to participate in any other AFEs will result in the imposition of underinvestment penalties under the Shenandoah Joint Operating Agreement.

### iii.     Anchor

The Anchor field is located approximately 150 miles south of Port Fourchon off the Louisiana coast in 5,183 feet of water in the "Green Canyon" area. Chevron is the operator, and the Debtors own a 20-percent working interest as a non-operating party. The initial discovery well was drilled in 2014, with three additional penetration wells completed in 2015 and 2016 to appraise the field. Currently, there are no plans to drill a well at Anchor in 2018. The estimated gross recoverable resource range for Anchor under depletion is 330 to 600 million barrels of oil equivalent, while the estimated gross recoverable resource range with water injection support is 600 to 900 million barrels of oil equivalent, based on preliminary reservoir simulation modeling results.

Historically, the Debtors have paid approximately $2.6 million in joint interest billings on a monthly basis in connection with Anchor. The Debtors have already committed approximately $19 million under existing AFEs relating to Anchor. The Debtors also expect to incur additional expenditures with respect to Anchor in the twelve months following the Petition Date that are not currently committed through an AFE. Specifically, the Debtors anticipate that expenditures may include studies, surveys, integrated project teams, and long leads, among others. Failing to participate in any AFEs in connection with Anchor will result in the imposition of underinvestment penalties under the Anchor UOA.

### iv.      Heidelberg

The Heidelberg field is located approximately 140 miles south of Port Fourchon off the Louisiana coast in 5,300 feet of water in the "Green Canyon" area.  Anadarko Petroleum Corporation ("Anadarko") is the operator, and the Debtors own a 9.375-percent working interest as a non-operating party.  The Heidelberg field began initial production in early 2016.  Heidelberg is currently producing approximately 36,000 barrel of oil equivalents per day (gross) from five wells (the fifth production well was completed in early 2017).  Of the leases in which the Debtors hold a working interest, Heidelberg is the only one currently producing oil and gas.  Anadarko plans to drill an additional production well in 2018.

Historically, the Debtors have paid approximately $1.9 million in joint interest billings on a monthly basis in connection with Heidelberg.  The Debtors also make approximately $515,000 in royalty payments and approximately $635,000 in production sale expenditures each month in connection with Heidelberg.  The Debtors expect to incur additional expenditures with respect to Heidelberg in the twelve months following the Petition Date that are not currently committed through an AFE.  In particular, the Debtors anticipate that it will be economically beneficial to drill a well and perform subsurface studies, among other expenditures, in order to maximize the value of their Heidelberg Leases.  Failure to make these payments will likely result in severe economic losses to the Debtors and their bankruptcy estates by diminishing the value of the Debtors' interests in their Leases, to the detriment of all parties in interest, including potential purchasers.  Specifically, failure to participate in any Fabrication AFEs in connection with Heidelberg will force the Debtors to forfeit their share of production from that well.  Further, failure to participate in any other AFEs will result in the imposition of underinvestment penalties under the Heidelberg UOA.

### 2.      West Africa Assets

Through non-Debtor affiliates, Cobalt holds an ownership interest in three blocks in West Africa, representing approximately 4.6 million gross acres leased.  Cobalt is the operator of, and holds a 40-percent working interest in, two of these three blocks (Block 20 and Block 21), which are located off the coast of Angola and collectively represent 2.4 million of the total 4.6 million gross acres.  As discussed below, Block 20 and Block 21 are the subject of ongoing arbitration due to a failed asset purchase agreement.  In addition to its interests in Blocks 20 and 21, Cobalt holds a 21.25-percent interest in the Diaba license, which is located off the coast of Gabon.  The Diaba license is operated by Total Gabon and represents the remaining 2.2 million of the Cobalt's total 4.6 million gross acres.  As described below, as part of the settlement with Sonangol, the Debtors will be transferring their Angolan assets to Sonangol.

### D.      Cobalt's Capital Structure

The Debtors have approximately $2.8 billion in total funded debt.  The following table depicts the Debtors' prepetition capital structure:

| Long Term Debt Obligations | Outstanding Principal |
|---|---|
| 10.75% first lien notes due 2021 | $500.0 million |
| 7.75% second lien notes due 2023 | $934.7 million |
| 2.625% senior unsecured notes due 2019 | $619.2 million |
| 3.125% senior unsecured notes due 2024 | $786.9 million |
| **Total** | $2.8 billion |

### 1.    First Lien Notes

The Debtors have approximately $500.0 million principal amount of outstanding 10.75% first lien secured notes due 2021, issued under that certain Senior Secured Notes Indenture dated as of December 6, 2016, by and among Cobalt, as issuer, the remaining Debtors, as guarantors,[13] and Wilmington Trust, National Association, as the trustee and collateral agent.  The first lien notes mature in 2021 and require semiannual coupon payments at an interest rate of 10.75 percent per year.  The first lien notes are secured by first-priority liens on substantially all of the assets of Cobalt and the guarantors, including, among other assets, 65 percent of Cobalt International, L.P.'s ownership interests in non-debtor Cobalt International Energy Overseas, Ltd.[14]

### 2.    Second Lien Notes

The Debtors have approximately $934.7 million principal amount of outstanding 7.75% second lien secured notes due 2023 issued under that certain Senior Secured Notes Indenture dated as of December 6, 2016,[15] by and among Cobalt, as issuer, the guarantors, and U.S. Bank National Association, as trustee and collateral agent.  The second lien notes mature in 2023 and require semiannual coupon payments at an interest rate of 7.75 percent per year.  The second lien notes are secured by second-priority liens on the same collateral securing the first lien notes.  Cobalt, the guarantors, Wilmington Trust, National Association, as trustee and collateral agent for the first lien notes, and U.S. Bank National Association, as trustee and collateral agent for the second lien notes are parties to an intercreditor agreement, dated as of December 6, 2016, that governs the relative rights of the parties thereto and provides other protections for the benefit of such parties.

### 3.    2.625% Senior Unsecured Notes

The Debtors have approximately $619.2 million principal amount of outstanding 2.625% convertible senior unsecured notes due 2019, issued pursuant to that certain Senior Indenture dated as of December 17, 2012,[16] by and among Cobalt, as issuer, and Wells Fargo Bank, National Association, as trustee.  The 2.625% unsecured notes mature in 2019 and require semiannual coupon payments at an interest rate of 2.625 percent per year.  The 2.625% unsecured notes are of equal priority of payment to the obligations under the 3.125% unsecured notes.  Under the indenture, the 2.625% unsecured notes are convertible before maturity at the option of the holder to approximately 28.02 shares of common stock per $1,000 in principal amount, before giving effect to the one-for-fifteen reverse stock split of Cobalt's common stock and subject to certain other adjustments.  On June 19, 2017, at the time of the one-for-fifteen reverse stock split, the conversion rate for the 2.625% unsecured notes was adjusted to approximately 1.87 shares of common stock per $1,000 in principal amount.

---

[13]    The guarantors are Cobalt International Energy GP, LLC; Cobalt International Energy, L.P.; Cobalt GOM LLC; Cobalt GOM #1 LLC; and Cobalt GOM #2 LLC.

[14]    Cobalt International Energy Overseas, Ltd. has indirect ownership interests in certain non-debtors conducting oil and gas exploration and production operations in the coastal waters off of Angola and the Gabonese Republic.

[15]    The Senior Secured Notes Indenture dated as of December 6, 2016 for the second lien notes was amended and supplemented by the First Supplemental Indenture dated as of January 30, 2017, the Second Supplemental Indenture dated as of April 24, 2017, and the Third Supplemental Indenture dated as of May 18, 2017.

[16]    The Senior Indenture dated as of December 17, 2012 was amended and supplemented pursuant to the First Supplemental Indenture dated as of December 17, 2012.

### 4. 3.125% Senior Unsecured Notes

The Debtors have approximately $786.9 million principal amount of outstanding 3.125% convertible senior unsecured notes due 2024, issued pursuant to that certain Senior Indenture dated as of December 17, 2012,[17] by and among Cobalt, as issuer, and Wells Fargo Bank, National Association, as trustee. The 3.125% unsecured notes mature in 2024 and require semiannual coupon payments at an interest rate of 3.125 percent per year. The 3.125% unsecured notes are of equal priority of payment to the obligations under the 2.625% unsecured notes. Under the indenture, the 3.125% unsecured notes are convertible before maturity at the option of the holder to approximately 43.36 shares of common stock per $1,000 in principal amount, before giving effect to the one-for-fifteen reverse stock split of Cobalt's common stock and subject to certain other adjustments. On June 19, 2017, at the time of the one-for-fifteen reverse stock split, the conversion rate for the 3.125% unsecured notes was adjusted to approximately 2.89 shares of common stock per $1,000 in principal amount.

### 5. Common Stock

As of November 30, 2017, Cobalt had approximately 29.9 million shares of common stock, par value $0.01 per share, issued and outstanding. Cobalt has 133.3 million shares of authorized common stock. Cobalt's common stock traded on the NYSE under the ticker symbol "CIE," after its IPO in 2009, until it was notified by the NYSE, on December 13, 2017, that the NYSE would immediately commence delisting proceedings. Cobalt's common stock was officially delisted on January 16, 2018. Cobalt's common stock began trading on the over the counter market on December 14, 2017.

### 6. Make-Whole Provisions Under the First Lien Indenture and the Second Lien Indenture

The First Lien Indenture and the Second Lien Indenture each set forth a so-called "make-whole" provision which, if enforceable, could result in an obligation to pay a premium pursuant to the First Lien Indenture or the Second Lien Indenture. In particular, upon a bankruptcy filing, the First Lien Indenture and the Second Lien Indenture provide for automatic acceleration and trigger a "make-whole" premium. A "make-whole" premium is intended to compensate a noteholder for lost future interest in the event of early redemption or acceleration. As is typical, the First Lien Indenture and the Second Lien Indenture each set forth a formula to calculate the "make-whole" premium upon acceleration. Potential liability for any such "make-whole" premium and the amount thereof is further described in Article IX.A hereof.

### 7. Intercompany Claims

The majority of the Intercompany Claims are on account of downstream funding of the proceeds of parent Debtor Cobalt's financing transactions to Debtor and non-Debtor subsidiaries. The Intercompany Claims have generally been recorded as unsecured liabilities. The Debtors have disclosed the amount and priority of Intercompany Claims in their respective Schedules, including schedules E/F or A/B.77 thereof. The Plan provides that Allowed Intercompany Claims shall be *pari passu* with General Unsecured Claims against the applicable Debtor and will share in distributions from such Debtor. In lieu of Cash payment to the Debtors holding such Intercompany Claims, the distributions on account of such Intercompany Claims may be made to the creditors of the Debtor holding such Intercompany Claim. For instance, the Intercompany Claims are subject to the security interests of the First Lien Noteholders and the Second Lien Noteholders and, therefore, could increase their recoveries. No Cash would be distributed to a Debtor on account of Intercompany Claims under the Plan. Certain parties in interest may

---

[17]   The Senior Indenture dated as of December 17, 2012 was amended and supplemented pursuant to the Second Supplemental Indenture dated as of May 13, 2014.

object to the Intercompany Claims or their proposed treatment under the Plan. More specifically, the Committee has indicated that it is investigating and potentially may object to the allowance of the Intercompany Claims. Nothing in this Disclosure Statement or the Plan prevents any creditor or party in interest from objecting to the allowance of any Intercompany Claim or seeking to recharacterize or equitably subordinate any such Intercompany Claims.

The Debtors estimate that the non-Debtor subsidiaries have no material, undisclosed assets other than the received and anticipated proceeds of the Sonangol settlement. See Article VIII.G of this Disclosure Statement, entitled "Sonangol Settlement," for a discussion of the terms of the settlement with Sonangol. The Sonangol settlement provides for mutual releases; after giving effect to the releases thereunder, the Debtors do not believe that non-Debtor subsidiaries will have any significant liabilities. If the Sonangol settlement is not consummated, however, the non-Debtor subsidiaries will not benefit from such releases, and Sonangol and/or certain related parties may assert material claims against such non-Debtor subsidiaries.

## VII.  EVENTS LEADING TO THE CHAPTER 11 FILINGS

Approximately three years ago, the oil and gas industry entered what has become a sustained downward cycle that was brought on by low commodities prices. This severe downturn has had a significant adverse effect on Cobalt's businesses, development capital and timing, and the price of its common stock. Historically, prices for oil and natural gas have been volatile. West Texas Intermediate ("WTI") oil prices peaked in mid-2014 at more than $115 per barrel before declining to approximately $35 per barrel by early 2016. WTI prices have gradually risen to the current price of approximately $64 per barrel.

These declines materially reduced Cobalt's asset values and made it significantly less economical to drill deepwater wells. Offshore drilling requires a higher initial capital expenditure than onshore projects generally, but correspondingly can have a comparable return on investment over a longer relative period of time.

Facing deteriorating market conditions, significant debt obligations, and ongoing capital and operating expenditures that vastly exceeded revenue, Cobalt faced immediate challenges. Cobalt took aggressive and proactive steps to address these challenges by immediately implementing significant cost-cutting measures (including a significant reduction in work force and performance improvement initiatives) and exploring potential strategic select asset sales and an in-depth review of all assets and operations. In addition, Cobalt hired Kirkland and Lazard Frères & Co. LLC in August 2016 and Goldman, Sachs & Co. in September 2016 to assist with exploring restructuring alternatives. In September 2017, Cobalt retained Houlihan Lokey Capital, Inc. to assist with potential out-of-court sales, chapter 11 sales, and/or restructuring alternatives. Houlihan Lokey Capital, Inc. is Cobalt's sole M&A and financial restructuring advisor, as both Lazard Frères & Co. LLC and Goldman, Sachs & Co. are no longer retained by Cobalt.

Starting as early as 2015, Cobalt began working in earnest to consider alternatives to enhance liquidity and address its capital structure. To achieve an orderly restructuring and maximize the value of Cobalt's business, the Debtors and their advisors took a series of coordinated steps leading up to the filing of these chapter 11 cases.

### A.  Marketing of Assets

Beginning as early as 2015, Cobalt began a strategic review of its portfolio. As a result of the review, Cobalt decided to sell its Angola assets, which was ultimately unsuccessful following the termination of the $1.75 billion sale to Sonangol. Following the failed Angola sale and initial marketing

of certain Gulf of Mexico assets, Cobalt determined to pursue a sale of all of its assets. Cobalt's marketing efforts and discussions with potential buyers for all or substantially all of Cobalt's assets remain ongoing and will continue following the Petition Date. Based on discussions with potential buyers, Cobalt believes that effecting these asset sales through an expedient chapter 11 process will maximize ultimate realized value for its stakeholders. Accordingly, the sale of all or substantially all of Cobalt's assets is the primary focused outcome of this chapter 11 process, as evidenced by the first day filing of a bid procedures and plan confirmation scheduling motion.

### B.  Attempted Sale of the Angolan Assets and Related Arbitration

On August 22, 2015, Cobalt's non-Debtor subsidiary that holds the Angolan assets entered into a Purchase and Sale Agreement (the "Angola SPA") to sell to an Angolan quasi-governmental entity, Sonangol, the entire issued and outstanding share capital of Cobalt's indirect, wholly-owned subsidiaries, CIE Angola Block 20 Ltd. and CIE Angola Block 21 Ltd. for $1.75 billion. CIE Angola Block 20 Ltd. and CIE Angola Block 21 Ltd. respectively hold Cobalt's 40 percent working interest in each of Block 20 and Block 21 offshore Angola. Pursuant to the Angola SPA, Sonangol made a $250 million initial payment to Cobalt. Cobalt currently holds the $250 million initial payment that Sonangol made under the Angola SPA. These amounts are comingled in Cobalt's general operating account and are not held in escrow. The requisite Angolan government approvals were not received within one year from the execution date and the Angola SPA terminated pursuant to its terms in August 2016. Under the Angola SPA, Cobalt is entitled to be put back in its original position as if no agreement had been entered into.

On March 8, 2017, Cobalt's non-Debtor subsidiary submitted a Notice of Dispute to Sonangol pursuant to the Angola SPA, and subsequently, on May 3, 2017, filed a Request for Arbitration ("RFA") with the International Chamber of Commerce ("ICC") against Sonangol for breach of the Angola SPA. Through this arbitration proceeding, Cobalt sought an award against Sonangol in excess of $2 billion, plus applicable interest and costs. Sonangol filed a counterclaim against Cobalt's non-Debtor subsidiary seeking the repayment of the $250 million initial payment, plus interest and costs. The arbitral tribunal was constituted, and the parties agreed upon the Terms of Reference and the procedural timetable. The final hearing was scheduled for October 2019. In connection with the Sonangol settlement, discussed below, the parties agreed to stay the arbitral proceedings until February 23, 2018. If Sonangol makes payment of $150 million payment by February 23, 2018, the parties have agreed that the procedural timetable in that arbitration will be extended by an additional four months. On February 21, 2018, Sonangol made the initial payment of $150 million. If the remaining conditions for the settlement are fully met, the Parties have agreed that the arbitral proceedings will be terminated.

CIE Angola Block 21 Ltd, another non-Debtor subsidiary, also filed a separate RFA with the ICC against Sonangol Pesquisa e Produção, S.A ("Sonangol P&P") seeking recovery of over $162 million in unpaid cash calls, plus applicable interest and costs, representing the joint interest receivable owed to Cobalt for operations on Block 21 offshore Angola. The arbitral tribunal has been constituted, and the parties have agreed upon the Terms of Reference. The final hearing was initially scheduled for December 2018, but the parties have now agreed to a two-month stay in light of the settlement. This stay will likely affect the hearing date should the arbitration not be terminated in any case as a result of the settlement. If Sonangol makes the $150 million payment by February 23, 2018, the parties have agreed to terminate such arbitration.

### C.  Ongoing Litigation and the SEC Investigation

Cobalt is currently a defendant in four material legal proceedings, together with former and current officers and directors and equity sponsors, namely: (a) *In re Cobalt International Energy, Inc. Securities Litigation*, No. 14-3428 (S.D. Tex. 2014); (b) *Gaines v. Bryant*, No. 2016-29850, District Court 295, Harris County, Texas, May 2016; (c) *McDonaugh v. Bryant*, No. 2016-82186, District Court 80,

Harris County, Texas, November 2016; and (d) *Hafkey v. Bryant*, No. 2017-23329, District Court 295, Harris County, Texas, April 2017.

### 1.    Securities Action

The securities action is comprised of two since-consolidated proceedings filed in the United States District Court for the Southern District of Texas against Cobalt, certain officers, directors, underwriters, and equity sponsors (the "Securities Action"). In both proceedings, the plaintiffs alleged two factually distinct groups of claims, one focused on potential violations of the United States Foreign Corrupt Practices Act ("FCPA") based on the relationship between Cobalt, Nazaki Oil and Gas, and senior Angolan officials, and a second focused on the performance of certain wells offshore Angola. The District Court entered an order [Docket No. 67] consolidating the two cases in March 2015. The consolidated amended complaint relies on the same underlying alleged misconduct and asserts violations of federal securities laws based on alleged misrepresentations and omission in Securities and Exchange Commission filings and other public disclosures, primarily regarding compliance with the FCPA with respect to Cobalt's Angolan operations and the performance of certain wells offshore Angola. In January 2016, the District Court denied Cobalt's motion to dismiss the Securities Action [Docket No. 108]. Thereafter, the plaintiffs to the Securities Action filed a motion for class certification [Docket No. 163], which the District Court granted in June 2017 [Docket No. 244]. On August 4, 2017, the United States Court of Appeals for the Fifth Circuit granted Cobalt permission to file an interlocutory appeal challenging the class certification order. On August 23, 2017, the District Court entered an order denying the defendants' motion for reconsideration of its order granting class certification [Docket No. 251]. Cobalt subsequently filed its appeal of the class certification order on October 10, 2017, the briefing for which is now complete. On December 14, 2017, Cobalt filed (i) a notice of suggestion of pendency of bankruptcy and (ii) an adversary proceeding and a motion seeking an order extending the automatic stay to or, in the alternative, enjoining the continued prosecution of the Securities Action against, the non-Debtor defendants in the Securities Action (the "Injunction Motion") [Adv. Pro. No. 17-03457, Docket No. 2]. The District Court stayed the Securities Action the following day. The plaintiffs in the Securities Action opposed the Injunction Motion, and at a hearing held January 4, 2018, ultimately agreed to a one-time temporary stay of the Securities Action against the non-Debtor defendants until April 20, 2018. The agreed-upon temporary stay is not subject to further extension by the Debtors, who confirmed on the record that the Securities Action may continue against the non-Debtor defendants after April 20, 2018. On December 22, 2017, the plaintiffs moved to dismiss Cobalt from the Securities Action. The District Court denied the motion without prejudice on January 24, 2018, holding that the plaintiffs could reargue their motion 31 days after providing notice and an opportunity to object to class members via publication in Business Wire.

### 2.    Derivative Actions

**The Gaines Lawsuit**. The Gaines lawsuit is a shareholder derivative action against Cobalt, as a nominal defendant, certain current and former officers and directors, and equity sponsors. The Gaines plaintiffs allege that, among other things: (a) the officers and directors breached their fiduciary duties by making, and permitting Cobalt to make, alleged misrepresentations about the commercial viability of two of Cobalt's exploration wells offshore Angola; (b) certain officers received performance-based compensation in excess of that to which they were entitled absent the alleged wrongdoing; and (c) the equity sponsors owed a fiduciary duty to Cobalt as controlling stockholders and breached that duty by engaging in insider trading. The plaintiffs seek damages in the amount sustained by Cobalt as a result of the alleged breach of fiduciary duties and disgorgement of any performance-based compensation that would not have otherwise been received absent the alleged wrongdoing. In July 2016, Cobalt and its officers and directors filed their answer and special exceptions challenging the plaintiff's standing to bring such claims against them. The District Court heard arguments on the special exceptions in

34

December 2016.  The equity sponsors also filed their special exceptions challenging, among other things, the plaintiff's standing to bring such claims against them.  By order dated March 17, 2017, the court overruled the equity sponsors' special exceptions.  On December 14, 2017, Cobalt filed a notice of suggestion on pendency of bankruptcy.

**The McDonaugh Lawsuit**.  The McDonaugh lawsuit is a shareholder derivative action against Cobalt, as a nominal defendant, and certain current and former officers and directors.  The McDonaugh plaintiffs allege that, among other things:  (a) the defendants breached their fiduciary duties by failing to maintain adequate internal controls and by causing or failing to prevent alleged misrepresentations and omissions in Cobalt's SEC filings and other public disclosures, including in relation to compliance with the FCPA with regard to Cobalt's Angolan operations and the performance of certain wells offshore Angola; (b) the defendants received compensation or other benefits in excess of that to which they were entitled absent the alleged wrongdoing; and (c) certain officers and directors engaged in unlawful trading and misappropriation of information.  The plaintiffs seek damages in the amount sustained by Cobalt as a result of the alleged breach of fiduciary duties and disgorgement of any performance-based compensation that would not have otherwise been received absent the alleged wrongdoing.  In January 2017, the defendants to the McDonaugh lawsuit filed their answer and special exceptions challenging the plaintiff's standing to bring such claims.  On December 14, 2017, Cobalt filed a notice of suggestion on pendency of bankruptcy.

**The Hafkey Lawsuit**.  The Hafkey lawsuit is a shareholder derivative action against Cobalt, as a nominal defendant, and certain current and former officers and directors.  The Hafkey plaintiffs allege that, among other things:  (a) current and former officers and directors breached their fiduciary duties by making, and permitting Cobalt to make, alleged misrepresentations about two of the exploratory wells offshore Angola; (b) certain officers received performance-based compensation in excess of that to which they were entitled absent the alleged wrongdoing; and (c) certain directors caused Cobalt to waste corporate assets by approving the payment of that allegedly inflated compensation.  The plaintiffs seek damages in the amount sustained by Cobalt as a result of the alleged breach of fiduciary duties and disgorgement of any performance-based compensation that would not have otherwise been received absent the alleged wrongdoing.  The defendants filed their answer and special exceptions challenging the plaintiff's standing to bring such claims against Cobalt in June 2017.  On December 14, 2017, Cobalt filed a notice of suggestion on pendency of bankruptcy.

**Committee Investigation Regarding Derivative Actions**.  The Debtors propose to release claims asserted in the derivative actions, including claims against the Debtors' current and former directors and officers.  The Committee has reviewed the derivative actions summarized above, including the special exceptions pleadings, court rulings and applicable law governing the cases.  Based upon its review, the Committee believes the derivative actions assert viable Causes of Action and should not be released.  The Debtors disagree.  Notably, the court overruled the equity sponsors' challenge to the Gaines plaintiff's standing to bring suit in the Gaines lawsuit.  It also overruled the equity sponsors' argument that the Gaines lawsuit failed to state a claim for insider trading.  In January 2016, the District Court in the Securities Action denied the defendants' motion to dismiss the petitioner's amended complaint, which asserts violations of federal securities laws based on alleged misrepresentations and omissions in SEC filings and other disclosures relating to Cobalt's Angolan operations.  The allegations made in the Securities Action arise from certain of the same facts underlying the allegations in the derivative actions.  The Debtors dispute the claims asserted in the derivative actions and the Securities Action.

### 3.    Insurance Coverage Litigation

On May 13, 2016, Debtor Cobalt International Energy, Inc. filed suit against XL Specialty Insurance Company ("XL") in the 125th Judicial District Court of Harris County, Texas asserting that XL

35

improperly denied coverage for certain insurance claims arising out of government investigations into and shareholder demands and claims in litigation alleging an improper relationship between Cobalt International Energy, Inc., Nazaki Oil and Gas, and senior Angolan government officials.  In December 2016, Debtor Cobalt International Energy, Inc. amended the petition to add Axis Insurance Company ("Axis"), which is the first excess carrier to XL in the 2010-2011 policy year.  Also in December 2016, Debtor Cobalt International Energy, Inc. amended the petition to add Illinois National Insurance Company, an AIG subsidiary ("AIG").  AIG is Debtor Cobalt International Energy, Inc.'s primary carrier for the 2013-2014 policy year.  Debtor Cobalt International Energy, Inc. alleges that AIG has improperly denied coverage for certain shareholder demands and claims in litigation based on alleged misstatements and omissions regarding two wells offshore of Angola.  In September 2016, Cobalt International Energy, Inc. and certain current and former officers and directors settled claims against XL pursuant to which XL paid $11.5 million.  In October 2017, the Debtors and certain current and former officers and directors settled claims against Axis pursuant to which Axis paid $6.65 million.  A portion of the proceeds from both of the settlements have been placed into escrow accounts.  Debtor Cobalt International Energy, Inc. continues to pursue claims against AIG.

### 4.    The SEC Investigation

In March 2017, the SEC informed Cobalt that it had initiated an informal inquiry regarding the Sonangol Research and Technology Center (the "SRTC").  As background, in December 2011, Cobalt executed the Block 20 Production Sharing Contract under which Cobalt and BP Exploration Angola (Kwanza Benguela) Limited are required to make certain social contributions to Sonangol, including for the SRTC.  In March 2017, Cobalt also received from the SEC a voluntary request for information regarding such inquiry.  Cobalt cooperated with the SEC, providing requested information regarding the SRTC.  The SEC also asked for, and Cobalt provided, information regarding other aspects of its Angolan operations, including two of its wells offshore Angola.  On January 29, 2018, the SEC formally concluded its investigation of, among other things, potential violations of the anti-bribery and antifraud provisions of the federal securities laws, including the Foreign Corrupt Practices Act, and advised that the SEC staff did not intend to recommend any enforcement action by the SEC against Cobalt.

## D.    Debt Transactions

### 1.    2016 Debt Exchange and Financing Transaction

The terms of Cobalt's unsecured debt largely allow Cobalt to exchange such unsecured debt for secured debt and common stock.  On December 6, 2016, Cobalt entered into a purchase and exchange agreement with certain holders of its unsecured notes that provided Cobalt with incremental liquidity while significantly extending its debt maturity profile.  Under the terms of the purchase and exchange agreement, Cobalt issued $500.0 million of the first lien notes for cash at a price of 98 percent of par and issued approximately $584.7 million of the second lien notes and 30.0 million shares of common stock in exchange for:  (a) $616.6 million aggregate principal amount of the 2.625% unsecured notes, and (b) $95.9 million aggregate principal amount of the 3.125% unsecured notes.  Overall, the exchange increased Cobalt's liquidity by $490.0 million and decreased the principal amount of outstanding notes with a 2019 maturity by nearly half.

### 2.    2017 Debt Exchanges

During the first half of 2017, Cobalt effectuated three additional debt exchanges.  On January 30, 2017, Cobalt issued approximately $139.2 million of additional second lien notes in exchange for: (a) $137.8 million of the 2.625% unsecured notes, and (b) $60.0 million of the 3.125% unsecured notes.  On April 24, 2017, Cobalt issued approximately $178.6 million of additional second lien notes in exchange for:  (a) $6.4 million of the 2.625% unsecured notes, and (b) $296.3 million of the 3.125%

unsecured notes.  On May 18, 2017, Cobalt issued approximately $32.1 million of additional second lien notes in exchange for $60.9 million of the 3.125% unsecured notes.

Collectively, the three 2017 transactions completely utilized the availability under the first lien notes indenture and the second lien notes indenture to issue additional second lien notes.  The debt exchanges collectively resulted in an aggregate reduction in principal face amount outstanding under Cobalt's long-term indebtedness by approximately $339.2 million and pushed out a significant amount of Cobalt's maturities from 2019 to 2023.

### E.      2017 Interest Payments

For all the reasons discussed herein, despite Cobalt's thoughtful attention to judiciously spending capital in order to maximize liquidity and value, its liquidity position nevertheless deteriorated. Considering its diminishing liquidity position, Cobalt critically analyzed and considered the implications of making the $12.3 million interest payment due on November 15, 2017 under the 3.125% unsecured notes indenture.  The Board, in consultation with its advisors, carefully balanced the Company's need for short term liquidity with Cobalt's long-term prospects, and ultimately decided to defer making the November 2017 interest payment and entered into the 30-day grace period.

Shortly thereafter, the Board once again reviewed the Debtors' liquidity position as it examined the upcoming interest payments due on December 1, 2017 under the first lien indenture, the second lien indenture, and the 2.625% unsecured notes indenture.  The Board, in consultation with its advisors, decided to pay the interest payments due under the first lien indenture and second line indenture, but deferred making the $8.1 million interest payment due under the 2.625% unsecured notes indenture. Cobalt's decision to forgo the November 2017 interest payment and the December 2017 2.625% unsecured notes interest payment preserved liquidity.

### F.      Committee Investigation Regarding Prepetition Debt Transactions

The Committee is investigating (i) the validity, enforceability, priority and the extent of the Debtors' prepetition secured obligations and (ii) potential Causes of Action held by the Estates that may be asserted against the Debtors' prepetition secured lenders, including with respect to the foregoing debt exchanges and financing transactions.  The Committee is reviewing documents and other information provided by the Debtors both on an informal basis and in response to formal discovery in order to obtain the information necessary to complete its investigation before March 21, 2018, which is the deadline under the Cash Collateral Order for the Committee to commence an adversary proceeding to (i) challenge the First Lien Note Claims and the Second Lien Note Claims, and (ii) assert Causes of Action against the First Lien Noteholders and Second Lien Noteholders (the "Investigation Termination Date"), in each case as and to the extent set forth in the Cash Collateral Order.

The Debtors have conducted their own investigation regarding the perfection, validity, enforceability, priority and extent of their prepetition secured obligations and potential Causes of Action held by the Estates that may be asserted against their prepetition secured lenders (and their respective agents, members, advisors, counsel and other representatives), including with respect to the debt exchanges, financing transactions, and other matters relating in any way to the prepetition secured loan documents and the obligations thereunder.  The process and conclusions of such investigation are described in Article VIII.H hereof.  In short, the Debtors do not believe that such potential claims and Causes of Action have any merit and even if they did, the costs of pursuing such claims and Causes of Action could deplete stakeholder recoveries.

The Cash Collateral Order provides that any admission, acknowledgment, agreement, or stipulation in respect of such obligations and granting of releases constitutes a compromise between the

37

Debtors and their prepetition secured lenders, and such provisions shall be ineffective unless and until the Court approves such compromise by further order.  A hearing on the compromising is scheduled for March 22, 2018, at 9:30 a.m.

The Debtors' stipulations, admissions and releases likewise are not immediately binding on the Committee.  The Committee, or another party in interest, with proper standing (which has been granted by order of the Court or another court of competent jurisdiction) may challenge the validity, enforceability, priority or extent of the First Lien Notes and the Second Lien Notes, or otherwise file a Cause of Action against the First Lien Noteholders and Second Lien Noteholders, provided that the Committee timely files an adversary proceeding by March 21, 2018 (provided, such date shall be tolled if the Committee files a motion seeking standing to make a challenge on or prior to March 21, 2018.)  However, if no such adversary proceeding is commenced by March 21, 2018 or the Investigation Termination Date is not tolled, the releases, admissions and stipulations in the Cash Collateral Order will be binding on the Committee and all parties in interest at that time.  The Committee's investigation of these matters is ongoing.

## VIII.    EVENTS OF THE CHAPTER 11 CASES

### A.    First and Second Day Relief

On the Petition Date, along with their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petitions"), the Debtors filed several motions (the "First Day Motions") designed to facilitate the administration of the Chapter 11 Cases and minimize disruption to the Debtors' operations, by, among other things, easing the strain on the Debtors' relationships with employees and vendors following the commencement of the Chapter 11 Cases.  A brief description of each of the First Day Motions and the evidence in support thereof is set forth in the *Declaration of David D. Powell, Chief Financial Officer of Cobalt International Energy, Inc. In Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration") [Docket No. 16], filed on December 14, 2017.

On January 11, 2018, the Debtors held their second day hearing before the Bankruptcy Court.  At the second day hearing, the Bankruptcy Court granted certain of the first day relief on a final basis, including authority to continue to pay employee wages and benefits [Docket No. 195], insurance premiums [Docket No. 199], and taxes in the ordinary course of business [Docket No. 198].  In addition, the Bankruptcy Court entered a second interim order with regard to the Debtors' cash management motion [Docket No. 197].  A final hearing with respect to the Debtors' cash management motion shall be set at a later date.  The Bankruptcy Court also granted orders establishing procedures for interim compensation and reimbursement of expenses for retained professionals [Docket No. 204] and procedures regarding the transfer of the Debtors' common stock [Docket No. 196].  Lastly, the Bankruptcy Court granted the Debtors' application to employ and retain KCC as the Claims, Noticing, and Solicitation Agent [Docket No. 203].

The Debtors continued the final hearing with respect to the Debtors' cash collateral motion, Sonangal settlement motion, sales incentive plan motion, severance motion, bidding procedures motion, and motion to pay certain oil and gas expenditures to January 25 and 26, 2018.  On January 25, 2018, the Court entered the final cash collateral order [Docket No. 301], an order approving the Sonangol settlement [Docket No. 300], an order approving the bidding procedures [Docket No. 299], and an order approving the motion to pay certain oil and gas expenditures [Docket No. 298].  On January 26, 2018, the Court entered an order approving the sale incentive plan [Docket No. 307] and an order approving the severance motion [Docket No. 306].

The final cash collateral order provides for an event of default thereunder if, by March 25, 2018, the Debtors have not filed a chapter 11 plan and related disclosure statement, each in form and substance

38

reasonably acceptable to the First Lien Indenture Trustee and counsel to the First Lien Ad Hoc Group. Subject to notice requirements set forth in the final cash collateral order, upon an event of default, counsel to the First Lien Ad Hoc Group may revoke applicable consents to the Debtors' use of cash collateral. The First Lien Ad Hoc Group has contended that, by filing the Plan, the Debtors created material defaults under the final cash collateral order. [*See* Docket No. 525.]  The Debtors disagree.  In addition, the First Lien Ad Hoc Group has indicated that, if the Debtors commence solicitation of votes on the Plan, it will seek to enforce its rights and claims against the Debtors under the final cash collateral order.  The Debtors reserve all rights.

The First Day Motions, the First Day Declaration, and all orders for relief granted in the Chapter 11 Cases, can be viewed free of charge at https://www.kccllc.net/cobalt.

### B.    Other Procedural and Administrative Motions

The Debtors also filed several other motions subsequent to the Petition Date to further facilitate the smooth and efficient administration of the Chapter 11 Cases and reduce the administrative burdens associated therewith, including motions and applications to retain professionals pursuant to sections 327 and 328 of the Bankruptcy Code, including Kirkland [Docket No. 121] and Zack A. Clement PLLC [Docket No. 122] as the Debtors' legal counsel, and Houlihan Lokey Capital, Inc. as the Debtors' financial advisor and investment banker to the Debtors [Docket No. 124], which applications were all approved by the Bankruptcy Court on January 11, 2018.  The Debtors also filed a number of additional retention applications, including an application to retain Baker Botts L.L.P. [Docket No. 181] as the Debtors' special litigation counsel, an application to retain Ernst & Young LLP [Docket No. 215] as auditor for the Debtors, and an application to retain Susman Godfrey LLP as the Debtors' special litigation counsel [Docket No. 217], which applications were all approved by the Bankruptcy Court on February 8, 2018.  The foregoing professionals are, in part, responsible for the administration of the Chapter 11 Case.  The postpetition compensation of all of the Debtors' professionals retained pursuant to sections 327 and 328 of the Bankruptcy Code is subject to the approval of the Bankruptcy Court.

### C.    Litigation Matters

In the ordinary course of business, the Debtors are parties to certain legal proceedings.  With certain exceptions, the filing of the Chapter 11 Cases operates as a stay with respect to the commencement or continuation of litigation against the Debtors that was or could have been commenced before the commencement of the Chapter 11 Cases.  In addition, the Debtors' liability with respect to litigation stayed by the confirmation of a plan under chapter 11, with certain exceptions.  Therefore certain litigation Claims against the Debtors may be subject to discharge in connection with the Chapter 11 Cases.

On the Petition Date, the Debtors commenced an adversary proceeding  (the "Adversary Proceeding") seeking to extend the automatic stay to non-Debtor parties in the Securities Action in the United States District Court for the Southern District of Texas (Case No. 4:14-cv-03428).  On the Petition Date, the Debtors also filed the *Debtors' Motion to Stay or, In the Alternative, for Injunctive Relief Enjoining, Prosecution of Certain Pending Litigation Against Non-Debtor Defendants and Memorandum of Law in Support Thereof* (the "Stay Motion") [Adversary Proceeding Docket No. 2].  On January 4, 2018, the Court held a hearing on the Debtors' Stay Motion and issued an order holding that the automatic stay would remain in full force and effect through 11:59 p.m. (prevailing Central Time) on April 20, 2018 even if the Debtors are dismissed from the Securities Action [Adversary Proceeding Docket No. 58].

**D.      Schedules and Statements**

On January 29, 2018, the Debtors filed their Schedules of Assets and Liabilities and Statements of Financial Affairs.

**E.      Appointment of Official Committee**

On December 21, 2017, the U.S. Trustee filed the *Notice of Appointment of Committee of Unsecured Creditors* [Docket No. 117], notifying parties in interest that the U.S. Trustee had appointed a statutory committee of unsecured creditors (the "Committee") in the Chapter 11 Cases.  The Committee is currently composed of the following members:  Wells Fargo Bank, National Association; Baker Hughes, a GE Company; and Schlumberger Technology Corporation.  The Committee has retained Pachulski Stang Ziehl & Jones LLP and Snow Spence Green LLP as its legal counsel and Conway MacKenzie, Inc. as its financial advisor.

**F.      Sales Incentive Plan**

To incentivize their senior management team to deliver maximum value for the Debtors' stakeholders, on November 13, 2017, the Debtors' Board of directors adopted a sales incentive plan (the "Sales Incentive Plan").  Pursuant to the Sales Incentive Plan, the Debtors' senior management is eligible to share in a multi-tiered bonus pool that increases in value based on the total enterprise value of a Sale Transaction.  On December 21, 2017, the Debtors filed a motion to approve the Sales Incentive Plan [Docket No. 136].  Following negotiations with the Committee and the Unsecured Notes Ad Hoc Committee, the Debtors agreed to, among other things, increased the Threshold (as defined in the Sales Incentive Plan) from $1.25 billion to $1.5 billion.  On January 26, 2018, the Court approved the Sales Incentive Plan [Docket No. 307].

**G.      Sonangol Settlement**

In August 2015, Cobalt's non-Debtor subsidiary that holds the Angola assets entered into an agreement to sell those assets to Sonangol for $1.75 billion.  Through the proposed Angola sale, Cobalt hoped to de-risk its balance sheet and focus its business efforts on its core Gulf of Mexico assets.  Sonangol paid an initial deposit of $250 million but failed to obtain Angolan government approvals required to close the deal, and, as a result, the purchase and sale agreement automatically terminated in August 2016.  Cobalt (through non-Debtor subsidiaries) subsequently commenced arbitration regarding the transaction and Sonangol's breach of contract.  In addition, CIE Angola Block 21 Ltd., another non-Debtor subsidiary, commenced a parallel arbitration against Sonangol P&P for non-payment of past costs owed to Cobalt for operations related to the Angola assets.

Cobalt engaged with Sonangol regarding a potential resolution of the parties' disputes for many months of active negotiations.  Following recent political changes in Angola (including the election of the first new president of the country in over 30 years) and a resulting leadership change at Sonangol, these settlement discussions took on a renewed focus and culminated, on December 19, 2017, with Cobalt and Sonangol successfully reaching agreement on a global settlement (subject to Bankruptcy Court approval).

The key terms of the settlement include:

- $500 million payment by Sonangol to Cobalt, payable in two installments ($150 million paid by February 23, 2018, and the balance of $350 million paid by July 1, 2018);

40

- the resolution of Cobalt's two International Chamber of Commerce ("ICC") arbitrations seated in the United Kingdom and Switzerland (and avoidance or mitigation of potentially substantial costs of continued arbitration);

- a full release of all disputes, debts, and obligations between the parties (including Sonangol's release of any claim to the $250 million deposit paid in connection with the contemplated sale, which deposit is incremental to the $500 million to be paid by Sonangol to Cobalt); and

- the transition of ownership of Cobalt's Angola assets to Sonangol.

On December 21, 2017, the Debtors filed a motion seeking to approve the Sonangol settlement [Docket No. 127]. On January 18, 2018, Sonangol and Sonangol P&P filed a limited objection to the Debtors' motion [Docket No. 234] seeking to clarify the numerous prerequisites that must be met before the settlement agreement could be fully realized, including, among others, approval by the Ministry of Petroleum of the Republic of Angola. On January 25, 2018, the Court entered an order approving the Debtors' entry into the Sonangol settlement (the "Settlement Order") [Docket No. 300]. The Settlement Order requires the Debtors "to cause the $500 million settlement payment or any portion thereof actually received from Sonangol to be deposited into a segregated depository account located in the United States established and maintained by the [non-Debtor] Angolan Subsidiaries." The Settlement Order also provides that settlement proceeds shall not be distributed without further order from the Court. Various parties in interest, including creditors asserting claims against the Angolan Subsidiaries, have asserted or may assert claims against or interests in the settlement proceeds. Such rights and arguments are preserved under the Settlement Order and the Plan. On February 21, 2018, Sonangol made the initial installment payment of $150 million.

### H.    Investigation

Beginning prepetition and continuing postpetition, independent and disinterested Board members investigated certain potential claims and causes of action held by the Debtors' Estates, including (1) potential claims regarding the 2016 and 2017 debt exchange transactions; (2) potential claims regarding the Debtors' Angolan operations alleged in the three shareholder derivative actions *Gaines v. Bryant*, No. 2016-29850, 295th District Court of Harris County, Texas, filed May 2016; *McDonaugh v. Bryant*, No. 2016-82186, 80th District Court of Harris County, Texas, filed November 2016; and *Hafkey v. Bryant*, No. 2017-23329, 295th District Court of Harris County, Texas, filed April 2017; and (3) certain other fiduciary-duty claims that the Committee has suggested it may seek to pursue.

In connection with the investigation, Kirkland, at the direction of the independent and disinterested directors, reviewed over 13,500 documents, including, but not limited to:  transaction agreements, closing books, and related documents; Board and Board committee minutes, pre-reads, and presentations; financial statements and projections; Debtor and third-party memoranda, evaluations, opinions, and valuations relating to the matters being investigated, including reports by Vinson & Elkins LLP and O'Melveny & Myers LLP, Control Risks Group, and Navigant; the *Gaines*, *McDonaugh*, and *Hafkey* demands and related correspondence, petitions, special exceptions, and related briefing and rulings; the Report of the Special Litigation Committee to the Board regarding the *Gaines* and *McDonaugh* demands; certain documents produced to and correspondence with the SEC and the United States Department of Justice; the results of targeted email searches; pleadings, briefing, orders, and certain discovery in *In re Cobalt International Energy, Inc. Securities Litigation* (Lead Case No. 4:14-cv-3248, S.D. Tex.), including deposition testimony; formation and governance documents for Cobalt; certain of the Debtors' contracts; and other publicly available materials. In addition, Kirkland conducted interviews, including of Chief Executive Officer Timothy J. Cutt, Chief Financial Officer David D. Powell, and Senior Vice President of Strategy and Business Development Richard A. Smith.

Kirkland reported to the independent and disinterested directors on its assessments of the claims and the costs and benefits of pursuing the fiduciary-breach claims and of releasing the exchange-transaction claims in a compromise reflected in the Cash Collateral Order. For certain issues, where only one director was disinterested, Kirkland presented to that director only; on the other issues, Kirkland presented to two disinterested directors. After receiving presentations from Kirkland, reviewing evidence, and deliberating on the claims, one or both disinterested directors (depending on the claim) voted that it is not in the best interest of the Debtors' Estates for either the Debtors or the Committee to pursue the claims asserted in the three pending state-court derivative lawsuits; to reject the Committee's February 7, 2018 demand letter; to reaffirm the Board's prior judgment to grant to secured lenders a release of claims regarding the "Exchange Transactions" in the Cash Collateral Order; and to approve a Plan containing releases granted to current and former directors and officers associated with the investigated claims, including for claims associated with Cobalt's decisions not to pay for and enter the Optional Exploration Phase pursuant to the Production Sharing Contract on Block 20, executed in December 2011, and to proceed with the 2016 and 2017 Exchange Transactions.

**Derivative Lawsuits and Related Claims**. At the direction of the disinterested directors, Kirkland investigated claims alleged in the three state-court derivative lawsuits and related claims. These claims include allegations of fiduciary breach for putative misstatements regarding the Lontra and Loengo wells offshore Angola, and purported violations of the Foreign Corrupt Practices Act; insider trading by certain directors and equity sponsors; misappropriation of information by certain directors; unjust enrichment by certain directors and officers; corporate waste by certain directors; fiduciary breach for failure to maintain internal controls; and abuse of control by certain directors and officers.

No court or finder of fact has evaluated the evidence related to these allegations or made any findings on their merits. The entities that have evaluated the available evidence have found that it does not support these claims. For example, beginning in 2015, a Special Committee of the Board of Directors, aided by Sidley Austin LLP, spent approximately ten months investigating the claims raised by Plaintiffs Gaines and McDonaugh in their demand letters, which are now alleged in their state-court derivative petitions. The Special Committee concluded that these claims had no merit and no action should be taken with respect to them.[18] Similarly, the SEC and the DOJ, between 2011 and 2018, conducted three investigations into potential FCPA violations related to Cobalt's operations in Angola, and during the most recent investigation (2017-2018), the SEC investigated potential violations of the antifraud provisions of the federal securities laws with respect to Cobalt's public statements concerning the Lontra and Loengo wells. Those government agencies terminated each investigation without recommending or bringing any enforcement action against Cobalt or its current or former officers and directors.

Kirkland's recent assessments are consistent with these earlier conclusions. In particular, Kirkland examined information that Cobalt had available and/or presented to its Board of Directors when the statements at issue in the derivative lawsuits were made and/or allegedly made. Kirkland found no persuasive evidence that any officer or director knew that any alleged public statement about Lontra, Loengo, or Cobalt's FCPA compliance was incorrect or that any statement was incorrect.

With respect to the Lontra and Loengo wells, the available evidence supports that many of the statements at issue in the derivative lawsuits predicting performance of those wells were made before the Lontra well was spud in 2013 or the Loengo well was spud in 2014, and were based on Cobalt's and its

---

[18] Plaintiff Hafkey's July 11, 2016 demand—which followed the Special Committee's final report and conclusions by approximately two weeks, and Cobalt's responses to Plaintiffs Gaines and McDonaugh rejecting their demands by four days—repeated the allegations about the Lontra and Loengo wells and FCPA compliance raised by Plaintiffs Gaines and McDonaugh in their demand letters. Thus, based on the Special Committee's work, Cobalt declined to pursue the claims alleged in Plaintiff Hafkey's demand, as well.

advisors' interpretation of pre-drilling data. The available evidence also shows that Cobalt invested hundreds of millions of dollars to drill and test these wells, that its public statements were consistent with its most current drilling and testing data, and that, after drilling the wells, concluding testing, and assessing those test results, Cobalt made timely public disclosures, including that the Lontra well contained more gas than pre-drill estimates and that Loengo was drilled to total depth and did not encounter commercial hydrocarbons.

With respect to FCPA compliance, the available evidence supports that Cobalt had reasonable factual bases for each statement at issue in the derivative lawsuits, and that Cobalt appropriately relied on the advice of outside advisors (including three separate, sophisticated law firms) with respect to FCPA compliance as it conducted its operations in Angola.

Kirkland thus assessed that the Debtors' public statements on the Lontra and Loengo wells and Cobalt's FCPA compliance were consistent with information that Cobalt considered and presented internally. For these and other reasons, Kirkland found that the available evidence did not support that any director, officer, or equity sponsor possessed non-public information about Lontra, Loengo, or Cobalt's FCPA compliance or knowingly traded on such information, or that any director misappropriated such information. For similar reasons, Kirkland found that there was no merit to the derivative lawsuits' related claims of unjust enrichment, corporate waste, fiduciary breach for failure to maintain internal controls, or abuse of control (which is also not a cause of action under Delaware law).

Kirkland also investigated a potential claim for fiduciary breach related to the Optional Exploration Phase defined and as set forth in the Production Sharing Contract on Block 20, executed in December 2011, which the Committee informally raised as one that it would potentially seek standing to pursue. Kirkland found that the decision not to pay to enter the Optional Exploration Phase was consistent with the directors' and officers' duties of loyalty and care and was a valid exercise of business judgment. Among other reasons, entering the Optional Exploration Phase would have cost the Block 20 contractor group approximately $190 million, at a time when Cobalt was seeking to enforce the restoration of its original deadlines under the Production Sharing Contract on Block 20 in light of the breach of the August 22, 2015 Purchase and Sale Agreement between certain of Cobalt's subsidiaries and Sonangol. Thus, Kirkland found that Cobalt's directors and officers did not breach their fiduciary duties by declining to expend such significant resources on an extension with Sonangol.

In addition to examining the evidence relating to the derivative lawsuits and other claims, Kirkland also advised the disinterested directors on the costs and benefits to the Debtors' Estates should they choose to pursue these claims or to cede standing to assert those claims to the Committee. In doing so, Kirkland considered information related to the damages theories advanced in the derivative lawsuits, including the costs incurred defending against *In re Cobalt International Energy, Inc. Securities Litigation* and the SEC and DOJ investigations; the amounts theoretically recoverable as disgorgement of compensation paid to certain directors; and the amounts theoretically recoverable from disgorgement of putative insider-trading profits from the directors and officers who allegedly sold stock. Kirkland also considered the amount of its secured lenders' adequate protection liens on the litigation proceeds and the fact that, to date, only the Committee has expressed an interest in pursuing these claims. Kirkland found that even if there were merit to these potential claims—and, in its view, there is not—the cost to the Debtors' Estates to pursue these claims, and the potential recoveries available to unsecured lenders if successful, would not support authorizing their prosecution.

The independent and disinterested directors agreed with Kirkland's assessments. Both concluded that it was not in the best interests of the Debtors' Estates for either the Debtors or the Committee to pursue the claims alleged in the three derivative lawsuits, to approve a Plan including releases associated with any such claims, and to reject the Committee's February 7, 2018 demand for standing. The one disinterested director further concluded to grant releases the putative breach of fiduciary duty claim

43

related to the Optional Exploration Phase. They voted to deny the Committee standing to pursue those claims, as well as to include release for such claims in the Plan.

**Exchange Transactions and Liens**. In addition, at the direction of the one disinterested director, Kirkland investigated potential claims regarding certain "Exchange Transactions" between December 2016 and May 2017 by which the Debtors: exchanged convertible, unsecured notes for secured notes at a discount; issued First Lien Notes, generating $500 million in cash; extended the maturity date for certain notes by four years, from 2019 to 2023; and guaranteed the notes and granted liens in their assets. In particular, Kirkland investigated potential claims of constructive fraudulent transfer, intentional fraudulent transfer, and breach of fiduciary duties concerning the Exchange Transactions.

Kirkland assessed that a number of legal defenses would preclude claims for constructive fraudulent transfer related to the Exchange Transactions. The statutory safe harbor under section 546(e) of the Bankruptcy Code bars claims in connection a "securities contract" where the transfer is made to or for the benefit of a "financial participant." 11 U.S.C. § 546(e). Any transfer that might be challenged in connection with the Exchange Transactions (a) was made in connection with a securities contract since notes, which constitute securities, were exchanged, and (b) was with or for the benefit of a note holder that qualifies as a "financial participant." Moreover, ample caselaw establishes as a matter of law no claim for constructive fraudulent transfer could arise from the Exchange Transactions simply because the Debtors granted a security interest for antecedent debt, preferred some creditors over others, or assumed new debt.

In investigating the Exchange Transactions, Kirkland also found ample evidence to conclude that the Debtors operate as a single enterprise. As a result, Kirkland found that reasonably equivalent value would be assessed on an enterprise-wide basis. Further, in the Exchange Transactions, the Debtors received at least equivalent value, including obtaining approximately $500 million in liquidity, discounting existing debt, and extending the maturity date for certain of the 2019 debt. Kirkland also found that, even considering claims for constructive fraudulent transfer on a subsidiary-by-subsidiary basis, it would be difficult to show that any subsidiary did not receive reasonably equivalent value because any direct benefit to one Cobalt entity would at least indirectly benefit the others. Further, each subsidiary that provided a guarantee as part of the Exchange Transactions also received direct benefits, including access to liquidity that allowed drilling and development, which prevented leases from expiring, obtained data for a potential sale process, and avoided early bankruptcy and a fire sale of assets.

Kirkland did not find any evidence of intentional fraudulent transfer. The documents reviewed and interviews conducted made clear that the purpose of the Exchange Transactions was not "to hinder, delay or defraud" but instead: (1) to provide liquidity needed to allow a runway to maximize asset value for a potential sale; (2) to reduce debt load, which was would make the company more attractive for purchase; and (3) to address the maturity of a portion of the convertible notes that would mature in 2019.

Kirkland also assessed there was no basis for a claim for breach of fiduciary duty in relation to the Exchange Transactions. To start, as discussed, the Exchange Transactions provided meaningful, and reasonably equivalent, value. Moreover, there is no breach of the duty of loyalty since none of the directors had a personal interest (much less a conflicting interest) in the outcome of the Exchange Transactions. With respect to the duty of care, the Board members met and deliberated repeatedly regarding the Exchange Transactions and obtained advice throughout from financial and legal advisors. Further, an exculpatory provision in Cobalt's certificate of incorporation, including as amended and restated, would apply against a duty of care claim.

Kirkland also investigated and advised the disinterested director on the costs and benefits to the Debtors' Estates of settling potential fraudulent transfer claims with the secured lenders as part of the Cash Collateral Order and of pursuing the related fiduciary-breach claim. In connection, Kirkland also

44

considered the amount of its secured lenders' adequate protection liens on the litigation proceeds. The disinterested director voted to reaffirm the Board's prior judgment to grant secured lenders a release of claims regarding the Exchange Transactions as part of the compromise reflected in the Cash Collateral Order, and to grant releases of such claims to the secured lenders as part of a Plan. The disinterested director also voted to grant releases as part of a Plan to current and former directors and officers for claims associated with Cobalt's decision to proceed with the 2016 and 2017 Exchange Transactions.

In addition, the Debtors reviewed the liens and security interests granted to the prepetition secured lenders and concluded that there was no reason to doubt that such liens and security interests had been properly perfected. Kirkland presented to the full Board on this issue and full Board voted to approve the Plan, including releases for secured lenders and targets of derivative lawsuits.

Kirkland conferred with the independent and disinterested directors of the Board about the investigation on multiple occasions. After completing its work concerning those potential claims, Kirkland presented the results of the investigation and bases therefor three times to the independent and disinterested directors before the independent and disinterested directors voted regarding those claims. The independent and disinterested directors agreed with Kirkland's conclusions, and, as set forth above, the independent and disinterested directors voted: (i) to reapprove the compromise the Debtors reached with their prepetition secured lenders, as reflected in the Cash Collateral Order, to release potential constructive or intentional fraudulent transfer claims concerning the debt exchange transactions; (ii) to deny the Committee's February 7, 2018 letter demanding standing to pursue derivative claims against former officers, current and former directors, and equity sponsors; and (iii) to release certain other potential fiduciary-breach claims against current and former directors that the Committee has suggested it may seek standing to pursue.

After the independent and disinterested directors voted, Kirkland presented to the entire Board the disinterested directors' conclusions, and Kirkland's assessments regarding the lien perfection analysis. The full Board then (i) voted to approve the Plan; (ii) reaffirmed its decision to grant the secured noteholders a release of claims regarding the Exchange Transactions as set forth in the Cash Collateral Order; and (iii) authorized and directed the Debtors to take any further action as necessary to effectuate these decisions.

Kirkland has also engaged constructively with the Committee to facilitate its investigation, providing the Committee with documents relied on in the investigation, as well as those requested pursuant to the Committee's 88 Requests for Production, made pursuant to Bankruptcy Rule 2004. In particular, by February 16, 2018, the Debtors produced 6,779 documents totaling 54,434 pages that they had collected, plus another 37,244 documents (326,446 pages) of discovery from *In re Cobalt International Energy, Inc. Securities Litigation*.

The Debtors reserve the right to investigate other potential claims that the Committee or others may request that the Debtors consider, or if new information becomes available to the Debtors concerning potential claims of the Estates, whether or not previously investigated. Likewise, the Debtors reserve the right to amend the release provisions in the Plan, and reserve all rights, including in the event new information becomes available.

## I.      First Lien Claim Settlement

On March 8, 2018, the Debtors and the First Lien Ad Hoc Group reached agreement on the allowance of the total Allowed First Lien Notes Claim (the "First Lien Claim Amount Settlement"). The First Lien Indenture Trustee supports the First Lien Claim Amount Settlement. The Plan comprises the First Lien Claim Amount Settlement, and, upon Confirmation of the Plan and the Effective Date, the Allowed First Lien Notes Claim shall be deemed to include $500 million in principal amount, plus

accrued interest and all other fees, costs, expenses, premiums, and other amounts provided for under the First Lien Indenture, less $3.5 million.  For illustrative purposes only, pursuant to the First Lien Claim Amount Settlement, the First Lien Notes Claim is estimated to be $552.6 million as of April 30, 2018.  The following chart sets forth for illustrative purposes only, examples of the Allowed amount of the First Lien Notes Claim as of certain potential Effective Dates and the related calculations.

| Claim Components | Effective Date | | |
|---|---|---|---|
| | April 1, 2018 | April 30, 2018 | June 29, 2018 |
| Principal | $500,000,000 | $500,000,000 | $500,000,000 |
| Accrued and Unpaid Interest at Filing | $1,940,972 | $1,940,972 | $1,940,972 |
| Applicable Premium | $49,187,703 | $49,187,703 | $49,187,703 |
| Post-Petition Interest on Principal | $17,461,806 | $22,194,444 | $31,822,918 |
| Post-Petition Interest on Applicable Premium | $1,717,812 | $2,183,387 | $3,130,592 |
| Total Claim | $570,308,293 | $575,506,507 | $586,082,185 |
| Less: Settlement Amount | $(3,500,000) | $(3,500,000) | $(3,500,000) |
| Less: Interest Paid Pursuant to the Cash Collateral Order | $(19,402,778) | $(19,402,778) | $(29,194,444) |
| Total Projected Allowed First Lien Notes Claim | $547,405,515 | $552,603,729 | $553,387,741 |

### J.    Marketing Process and Sale Transaction

Beginning in early 2017, the Debtors and their advisors engaged in arm's-length, good faith negotiations with interested parties regarding a potential sale of all or substantially all of the assets of the Debtors' Estate.  During these negotiations, the Debtors and their advisors contacted potential buyers, executed nondisclosure agreements, and received indications of interest from certain bidders.  On the Petition Date, the Debtors filed the Bid Procedures Motion, which, among other things, established dates and deadlines for the bidding procedures hearing, bid deadline, auction, and sale hearing.

Pursuant to the order approving the Bid Procedures Motion, the final bid deadline for all Sale Transactions was February 22, 2018, at 5:00 p.m. (prevailing Central Time).  Following the bid deadline, the Debtors received bids from six different parties for certain of the Debtors' Gulf of Mexico assets.  On March 6, 2018, the Debtors held an auction for all or substantially all of their assets.  Following the auction, the Debtors named four successful bidders for different asset packages: (a) Navitas was declared the successful bidder for the Shenandoah prospect; (b) W&T was declared the successful bidder for the Heidelberg prospect; (c) Total E&P and Statoil submitted a joint bid and were declared the successful bidder for the North Platte prospect; and (d) Total E&P was declared the successful bidder for the Anchor prospect and the Exploration Leases.  The total aggregate purchase price for the purchased assets is $577.9 million.  Each asset sale is discussed individually below.

### 1.      Shenandoah

Navitas was declared the successful bidder for the Shenandoah prospect for an aggregate purchase price of $1.8 million in cash and the assumption of certain liabilities.  The liabilities Navitas is assuming in connection with the purchase of the Shenandoah prospect include, among others, any related cure costs, to the extent there are any, and any plugging and abandonment obligations the Debtors may have in relation to the Shenandoah prospect.  As and to the extent set forth in the applicable asset purchase agreement, the Debtors intend to assume and assign certain contracts related to the Shenandoah prospect, including the Shenandoah joint operating agreement, pursuant to section 365 of the Bankruptcy Code.  The applicable asset purchase agreement contemplates a closing date of April 6, 2018.

### 2.      Heidelberg

W&T was declared the successful bidder for the Heidelberg prospect for an aggregate purchase price of $31.1 million in cash and the assumption of certain liabilities.  GOM Offshore Holdings, an entity formed by a steering committee of holders of the Debtors' Second Lien Notes, was originally declared the successful bidder for the Debtors' Heidelberg assets.  After the auction, the Debtors, GOM Offshore Holdings, and W&T agreed that W&T would be declared the successful bidder, and the Plan provides for a negotiated reduction of $1.9 million to the Allowed amount of the Second Lien Notes Claims.  The liabilities W&T is assuming in connection with the purchase of the Heidelberg prospect include, among others, any related cure costs, to the extent there are any, and any plugging and abandonment obligations the Debtors may have in relation to the Heidelberg prospect.

### 3.      North Platte

Total E&P and Statoil submitted a joint bid and were declared the successful bidder for the North Platte prospect for an aggregate purchase price of $339.0 million and the assumption of certain liabilities. The assumed liabilities include, among other, any related cure costs, to the extent there are any, and any plugging and abandonment obligations the Debtors may have in relation to the North Platte prospect. GOM Offshore Holdings was named the backup bidder for the North Platte prospect.  GOM Offshore Holdings' backup bid is comprised of a credit bid.

### 4.      Anchor

Total E&P was declared the successful bidder for the Anchor prospect for an aggregate purchase price of $181.0 million and the assumption of certain liabilities.  The assumed liabilities include, among other, any related cure costs, to the extent there are any, and any plugging and abandonment obligations the Debtors may have in relation to the Anchor prospect.  GOM Offshore Holdings was named the backup bidder for the Anchor prospect.  GOM Offshore Holdings' backup bid is comprised of a credit bid.

### 5.      Exploratory Leases

Total E&P was declared the successful bidder for the Exploratory Leases for an aggregate purchase price of $25.0 million and the assumption of certain liabilities.  The assumed liabilities include, among other, any related cure costs, to the extent there are any, and any plugging and abandonment obligations the Debtors may have in relation to the Exploratory Leases.  GOM Offshore Holdings was named the backup bidder for the Exploratory Leases.  GOM Offshore Holdings' backup bid is comprised of a credit bid.

47

**6.** **Ad Hoc Committee of Unsecured Noteholders' Objection**

On March 7, 2018, the ad hoc committee of unsecured noteholders filed a combined objection and motion which expresses concerns regarding the results of the Auction [Docket No. 544]. The ad hoc committee asserts that the Debtors' marketing process failed to encourage competitive bidding for the Debtors' assets. The Debtors disagree. As stated above, the Debtors engaged in a robust marketing process and conducted arm's-length, good-faith negotiations with interested parties regarding the sale of the Debtors' assets. As a result of this marketing process, the Debtors received multiple bids and conducted a competitive auction.

In the motion, the ad hoc committee also requests that, if the Court approves the Debtors' proposed solicitation procedures, the Court also enter an order establishing an expedited discovery schedule. To that end, the ad hoc committee served discovery requests on the Debtors, Statoil, and Total [Docket Nos. 545, 546, and 547], in conjunction with filing the combined objection and motion. The discovery requests include demands for production of all documents related to, and communications between the Debtors, Statoil, and Total regarding, the auction and the value of the Debtors' North Platte and Anchor prospects.

## IX. RISK FACTORS

Holders of Claims should read and consider carefully the risk factors set forth below before voting to accept or reject the Plan. Although there are many risk factors discussed below, these factors should not be regarded as constituting the only risks present in connection with the Debtors' businesses or the Plan and its implementation.

### A. Bankruptcy Law Considerations

The occurrence or non-occurrence of any or all of the following contingencies, and any others, could affect distributions available to holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of holders of Claims in such Impaired Classes.

#### 1. Parties in Interest May Object to the Plan's Classification of Claims and Interests

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims or Interests, as applicable, in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

#### 2. The Conditions Precedent to the Effective Date of the Plan May Not Occur

As more fully set forth in Article IX of the Plan, the Effective Date is subject to a number of conditions precedent. If such conditions precedent are not met or waived, the Effective Date will not take place.

48

### 3.       The Debtors May Fail to Satisfy Vote Requirements

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek, as promptly as practicable thereafter, Confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may seek to confirm an alternative chapter 11 plan or transaction.  There can be no assurance that the terms of any such alternative chapter 11 plan or other transaction would be similar or as favorable to the holders of Interest and Allowed Claims as those proposed in the Plan and the Debtors do not believe that any such transaction exists or is likely to exist that would be more beneficial to the Estates than the Plan.

### 4.       The Debtors May Not Be Able to Secure Confirmation of the Plan

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the Bankruptcy Court that:  (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial reorganization unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the debtors were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received.  Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan.  A non-accepting holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and voting results are appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation are not met.  If a chapter 11 plan of reorganization is not confirmed by the Bankruptcy Court, it is unclear whether the Debtors will be able to reorganize their business and what, if anything, holders of Interests and Allowed Claims against them would ultimately receive.

The Debtors reserve the right to modify the terms and conditions of the Plan as necessary for Confirmation.  Any such modifications could result in less favorable treatment of any non-accepting Class of Claims or Interests, as well as any Class junior to such non-accepting Class, than the treatment currently provided in the Plan.  Such a less favorable treatment could include a distribution of property with a lesser value than currently provided in the Plan or no distribution whatsoever under the Plan.

### 5.       Nonconsensual Confirmation

In the event that any impaired class of claims or interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm a plan at the proponents' request if at least one impaired class (as defined under section 1124 of the Bankruptcy Code) has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired class(es).  The Debtors believe that the Plan satisfies these requirements, and the Debtors may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code.  Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion.  In addition, the pursuit of nonconsensual Confirmation or Consummation of the Plan may result in, among other things, increased expenses relating to professional compensation.

### 6.        Continued Risk upon Confirmation

Even if the Plan is consummated, the Debtors will continue to face a number of risks, including certain risks that are beyond their control, such as further industry deterioration or other changes in economic conditions, potential revaluing of their assets due to chapter 11 proceedings, and increasing expenses.  Some of these concerns and effects typically become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed.  As a result of these risks and others, there is no guarantee that a chapter 11 plan of reorganization reflecting the Plan will achieve the Debtors' stated goals.

In addition, at the outset of the Chapter 11 Cases, the Bankruptcy Code gave the Debtors the exclusive right to propose a chapter 11 plan and prohibited creditors and others from proposing a plan. The Debtors will have retained the exclusive right to propose and solicit votes on the Plan upon filing their Petitions.  If the Bankruptcy Court terminates that right, however, or the exclusivity period expires, there could be a material adverse effect on the Debtors' ability to achieve confirmation of the Plan in order to achieve the Debtors' stated goals.

Furthermore, even if the Debtors' debts are reduced and/or discharged through the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund the Debtors' business after the completion of the proceedings related to the Chapter 11 Cases.  Adequate funds may not be available when needed or may not be available on favorable terms.

### 7.        The Chapter 11 Cases May Be Converted to Cases Under Chapter 7 of the Bankruptcy Code

If the Bankruptcy Court finds that it would be in the best interest of creditors and/or the debtor in a chapter 11 case, the Bankruptcy Court may convert a chapter 11 bankruptcy case to a case under chapter 7 of the Bankruptcy Code.  In such event, a chapter 7 trustee would be appointed or elected to liquidate the debtor's assets for distribution in accordance with the priorities established by the Bankruptcy Code. The Debtors believe that liquidation under chapter 7 would result in significantly smaller distributions being made to creditors than those provided for in a chapter 11 plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time rather than selling in a controlled manner affecting the business as a going concern, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation, and including Claims resulting from the rejection of Unexpired Leases and other Executory Contracts in connection with cessation of operations.

### 8.        The Debtors May Object to the Amount or Classification of a Claim

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim under the Plan.  The estimates set forth in this Disclosure Statement cannot be relied upon by any holder of a Claim where such Claim is subject to an objection.  Any holder of a Claim that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

### 9.        Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur.

50

### 10. Risks Related to the Cobalt's Settlement with Sonangol

As described above, in December 2017, the Debtors entered into a global settlement agreement with Sonangol which contemplates, among other things, certain payments by Sonangol to Cobalt, the transfer of ownership of Cobalt's Angola assets to Sonangol, and the resolution of Cobalt's arbitrations against Sonangol before the ICC. On February 21, 2018, Sonangol made the first installment payment of $150 million. The settlement remains subject to a number of prerequisites including, among others, the approval by the Ministry of Petroleum of the Republic of Angola. Although the Debtors believe that both parties will work diligently to consummate the settlement agreement, the parties may not be able to satisfy the necessary prerequisites or obtain the appropriate governmental approvals in order to consummate the settlement. If the settlement is not consummated, the Debtors will resume the arbitration proceedings against Sonangol and Sonangol P&P. Failure to consummate the settlement may have a material impact on recoveries under the Plan and the Debtors' business operations.

### 11. Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan

The distributions available to holders of Allowed Claims under the Plan can be affected by a variety of contingencies, including, without limitation, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies, which could affect distributions available to holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

The estimated Claims and creditor recoveries set forth in this Disclosure Statement are based on various assumptions, and the actual Allowed amounts of Claims may significantly differ from the estimates. Should one or more of the underlying assumptions ultimately prove to be incorrect, the actual Allowed amounts of Claims may vary from the estimated Claims contained in this Disclosure Statement. Moreover, the Debtors cannot determine with any certainty at this time, the number or amount of Claims that will ultimately be Allowed. Such differences may materially and adversely affect, among other things, the percentage recoveries to holders of Allowed Claims under the Plan.

### 12. Releases, Injunctions, and Exculpations Provisions May Not Be Approved

Article VIII of the Plan provides for certain releases, injunctions, and exculpations, including a release of liens and third-party releases that may otherwise be asserted against the Debtors or Released Parties, as applicable. The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved. If the releases are not approved, certain Released Parties may withdraw their support for the Plan, and the Debtors may not be able to obtain Confirmation of the Plan.

The United States asserts that non-consensual non-debtor releases and/or exculpations are impermissible under 11 U.S.C. § 524(e) and the Fifth Circuit's holding in *In re Pacific Lumber Company*, 584 F.3d 229 (5th Cir. 2009), and the United States objects to any non-debtor releases and/or exculpations provided for in the Plan.

### 13. Risks Related to the First Lien Claim Amount Settlement

The First Lien Claim Amount Settlement is subject to Bankruptcy Court approval in connection with Confirmation. The Bankruptcy Court might not approve the First Lien Claim Amount Settlement. To the extent the Bankruptcy Court does not approve the First Lien Claim Amount Settlement, the

Allowed amount of the First Lien Notes Claims could be materially higher or lower, which would affect recoveries of other creditors.

### 14. The Total Amount of Allowed Subsidiary General Unsecured Claims and Allowed Cobalt General Unsecured Claims May Be Higher than Anticipated by the Debtors

With respect to holders of Allowed Subsidiary General Unsecured Claims and Allowed Cobalt General Unsecured Claims, the claims filed against the Debtors' estates may be materially higher than the Debtors have estimated. As holders of Allowed Subsidiary General Unsecured Claims and Allowed Cobalt General Unsecured Claims receive a Pro Rata distribution, additional claims could reduce the recovery.

More specifically, on their schedules of assets and liabilities, the Debtors have scheduled approximately $6 billion of intercompany claims. If allowed, these intercompany claims would dilute the recovery of holders of Allowed Subsidiary General Unsecured Claims. Further, the claim that may be asserted by Whitton pursuant to that certain Overriding Royalty Agreement Relating to Blocks Located Offshore Angola, if allowed, could be significant (for instance, Whitton has from time to time asserted that a claim may exceed $200 million) and would further dilute the recovery of the holders of Subsidiary General Unsecured Claims.

### 15. Consequences of Successful Challenge of Secured Notes Claims

To the extent that the liens securing the First Lien Notes and Second Lien Notes are avoided (e.g., through the successful challenge by the Committee) and the Intercompany Claims are Allowed, holders of Allowed Cobalt General Unsecured Claims may be entitled to a distribution. The First Lien Ad Hoc Group and the Second Lien Ad Hoc Group believe there is no viable avoidance claim to be asserted against their liens.

### 16. Certain Tax Implications of the Plan

Holders of Allowed Claims should carefully review Article XI of this Disclosure Statement entitled "Certain United States Federal Income Tax Consequences of the Plan," to determine how tax implications of the Plan and the Chapter 11 Cases may adversely affect the holders of Claims.

### B. Risks Related to the Debtors' Businesses

#### 1. The Debtors May Not Be Able to Generate or Obtain Sufficient Cash to Service All of Their Indebtedness

The Debtors' ability to make scheduled payments on, or refinance their debt obligations depends on the Debtors' financial condition and operating performance, which are subject to prevailing economic, industry, and competitive conditions and to certain financial, business, legislative, regulatory, and other factors beyond the Debtors' control. The Debtors may be unable to generate sufficient cash flows from operations or to obtain alternative sources of financing in an amount sufficient to fund the Debtors liquidity needs. The Debtors' operating cash inflows are typically used for capital expenditures, operating expenses, debt service costs, and working capital needs.

## 2.  The Debtors Will Be Subject to the Risks and Uncertainties Associated with the Chapter 11 Cases

For the duration of the Chapter 11 Cases, the Debtors' ability to operate, develop, and execute a business plan, and continue as a going concern, will be subject to the risks and uncertainties associated with bankruptcy. These risks include: (a) ability to develop, confirm, and consummate the Sale Transaction specified in the Plan; (b) ability to obtain Bankruptcy Court approval with respect to motions filed in the Chapter 11 Cases from time to time; (c) ability to maintain relationship with suppliers, vendors, service providers, contract counterparties, employees, and other third parties; (d) ability to maintain contracts that are critical to the Debtors' operations; (e) ability of third parties to seek and obtain Bankruptcy Court approval to terminate contracts and other agreements with the Debtors; (f) ability of third parties to seek and obtain Bankruptcy Court approval to terminate or shorten the exclusivity period for the Debtors to propose and confirm a chapter 11 plan, to appoint a chapter 11 trustee, or to convert the Chapter 11 Cases to chapter 7 proceedings; and (g) the actions and decisions of the Debtors' creditors and other third parties who have interest in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with suppliers, service providers, contract counterparties, employees, and other third parties, which in turn could adversely affect the Debtors' operations and financial condition. Also, the Debtors will need the prior approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit the Debtors' ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot accurately predict or quantify the ultimate impact of events that occur during the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

## 3.  Operating in Bankruptcy for a Long Period of Time May Harm the Debtors' Businesses

A long period of operations under Bankruptcy Court protection could have a material adverse effect on the Debtors' businesses, financial condition, results of operations, and liquidity. So long as the proceedings related to the Chapter 11 Cases continue, senior management will be required to spend a significant amount of time and effort dealing with the Sale Transaction instead of focusing exclusively on business operations. A prolonged period of operating under Bankruptcy Court protection also may make it more difficult to retain management and other key personnel necessary to the success of the Debtors' businesses. In addition, the longer the proceedings related the Chapter 11 Cases continue, the more likely it is that suppliers and potential purchasers will lose confidence in the Debtors' ability to sell their businesses and may seek to establish alternative commercial relationships.

So long as the proceedings related to the Chapter 11 Cases continue, the Debtors will be required to incur substantial costs for professional fees and other expenses associated with the administration of the Chapter 11 Cases. As of the date hereof, the chapter 11 proceedings are being funded through a consensual cash collateral agreement with the Debtors' lenders. If the Chapter 11 Cases continue for a prolonged period of time, it may be necessary for the Debtors to seek debtor-in-possession financing to fund their operations. If the Debtors are forced to seek debtor-in-possession financing, the likelihood that the Debtors will instead be required to liquidate may be increased, and, as a result, creditor recoveries may be significantly impaired.

### 4. The Debtors' Substantial Liquidity Needs May Impact Revenue

The Debtors operate in a capital-intensive industry. The Debtors' principal sources of liquidity historically have been borrowings under various bank-funded facilities, issuances of bonds, issuances of equity securities, asset sales, and cash flow from operations. Offshore drilling requires a higher initial capital expenditure than onshore projects generally, but correspondingly can have a comparable return on investment over a longer relative period of time. If the Debtors' operating expenditures continue to vastly exceed revenues, however, the Debtors may not have the ability to expend the capital necessary to improve or maintain their current operations.

The Debtors face uncertainty regarding the adequacy of their liquidity and capital resources and have extremely limited, if any, access to additional financing. In addition to the cash necessary to fund ongoing operations, the Debtors have incurred professional fees and other costs in connection with preparing for the Chapter 11 Cases and expect to continue to incur additional costs throughout the Chapter 11 Cases. The Debtors cannot guarantee that cash on hand will be sufficient to continue to fund their operations and allow the Debtors to satisfy obligations related to the Chapter 11 Cases until the Debtors are able to emerge from bankruptcy protection.

The Debtors' liquidity, including the ability to meet ongoing operational obligations, will be dependent upon, among other things: (a) their ability to comply with the terms and condition of any cash collateral order entered by the Bankruptcy Court in connection with the Chapter 11 Cases; (b) their ability to maintain adequate cash on hand; (c) their ability to generate cash flow from operations; (d) their ability to develop, confirm, and consummate a chapter 11 plan or other alternative restructuring transaction; and (e) the cost, duration, and outcome of the Chapter 11 Cases. The Debtors' ability to maintain adequate liquidity depends, in part, upon industry conditions and general economic, financial, competitive, regulatory, and other factors beyond the Debtors' control. In the event that cash on hand is not sufficient to meet the Debtors' liquidity needs, the Debtors may be required to seek additional financing. The Debtors can provide no assurance that additional financing would be available or, if available, offered to the Debtors on acceptable terms. The Debtors' access to additional financing is, and for the foreseeable future likely will continue to be, extremely limited if it is available at all. The Debtors' long-term liquidity requirements and the adequacy of their capital resources are difficult to predict at this time.

### 5. Under the Terms of the Debtors' Various License Agreements, the Debtors Are Required to Drill Wells and Conduct Certain Development Activities in Order to Retain Exploration and Production Rights

In order to protect their exploration and production rights in their license areas, the Debtors must meet various drilling and declaration requirements. In general, unless the Debtors make and declare discoveries within certain time periods specified in the applicable license agreements and leases, the interests in the undeveloped parts of the Debtors' license (as is the case in Angola and Gabon) or the whole block (as is the case in the deepwater Gulf of Mexico) may lapse and the Debtors may be subject to significant penalties or be required to make additional payments in order to maintain such licenses.

In addition, most of the Debtors' deepwater Gulf of Mexico blocks have a 10 year primary term, expiring between 2017 and 2025. Generally, the Debtors are required to commence exploration activities or successfully exploit the properties during the primary lease term in order for these leases to extend beyond the primary lease term. A portion of the leases covering the Debtors' North Platte, Shenandoah and Anchor discoveries are beyond their primary term, and the operator must conduct continuous operations or obtain a SOP in order to maintain such leases. In addition, certain of the Debtors' targeted exploration prospects have leases that expire within the next 12 months and even if the Debtors were to commence exploration activities prior to lease expiration, the Debtors could be required to conduct continuous operations on those prospects if the initial exploration activities were to be successful. This

54

requirement to conduct continuous drilling operations may cause the Debtors to relinquish such leases despite the fact that an exploration well on such leases was successful.  Accordingly, the Debtors and their partners may not be able to drill all of the prospects identified on the leases or licenses prior to the expiration of their respective terms.  Failure to maintain the Debtors' leases could materially adversely affect the Debtors' businesses, results of operations, financial condition, and recoveries under the Plan.

6.     **Offshore Drilling Is a High Risk Activity with Many Uncertainties that Could Materially Adversely Affect the Debtors' Businesses, Results of Operations, and Financial Condition**

The Debtors' operations are subject to many risks, including the risk that the Debtors will not discover commercially productive reservoirs.  Drilling for oil and natural gas can be unprofitable, not only from dry holes, but from productive wells that do not produce sufficient revenue to return a profit. The Debtors' decisions to purchase, explore, develop, or otherwise exploit prospects or properties will depend in part on the evaluation of data obtained through geophysical and geological analyses, as well as production data and engineering studies, the results of which are often inconclusive or subject to varying interpretations.  In addition, the results of the Debtors' exploratory drilling in new or emerging areas are more uncertain than drilling results in areas that are developed and have established production, and the Debtors' operations may involve the use of recently-developed drilling and completion techniques.  The Debtors' cost of drilling, completing, equipping, and operating wells is often uncertain before drilling commences.  Declines in commodity prices and overruns in budgeted expenditures are common risks that can make a particular project uneconomic or less economic than forecasted.  Further, many factors may curtail, delay, or cancel drilling and completion projects, including the following:

- delays or restrictions imposed by or resulting from compliance with regulatory and contractual requirements;

- delays in receiving governmental permits, orders, or approvals;

- differing pressure than anticipated or irregularities in geological formations;

- equipment failures or accidents;

- adverse weather conditions;

- loss of title or other title related issues; and

- shortages or delays in the availability of, increases in the cost of, or increased competition for, drilling rigs and crews and equipment, pipe, chemicals, and supplies.

The occurrence of certain of these events, particularly equipment failures or accidents, could impact third parties, including the Debtors' employees and employees of the Debtors' contractors, leading to possible injuries, death, or significant property damage.  As a result, the Debtors face the possibility of liabilities from these events that could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

7.     **The Debtors' Business Is Subject to Complex Laws and Regulations that Can Adversely Affect the Cost, Manner, or Feasibility of Doing Business**

The Debtors' operations are subject to extensive laws and regulations, including complex environmental laws and occupational health and safety laws, particularly in respect to the following matters:

55

- licenses and leases for drilling operations;

- foreign exchange and banking;

- royalty increases, including retroactive claims;

- drilling and development bonds and social payment obligations;

- reporting concerning operations;

- the spacing of wells;

- unitization of oil accumulations;

- environmental remediation or investigation; and

- taxation.

Under these and other laws and regulations, the Debtors could be liable for personal injuries, property damage, and other types of damages for which the Debtors may not maintain, or otherwise be protected by, insurance coverage.  In the event of environmental violations, the Debtors may be charged with remedial costs and third party claims.  Laws and regulations protecting the environment have become more stringent in recent years, and may, in some circumstances, result in liability for environmental damage, regardless of negligence or fault.  In addition, pollution and similar environmental risks generally are not fully insurable.  The Debtors' operations create the risk of environmental liabilities to governments or third parties.  Failure to comply with these laws and regulations also may result in the suspension or termination of the Debtors' operations and subject the Debtors to administrative, civil, and criminal penalties.  Moreover, these laws and regulations could change in ways that could substantially increase our costs.  Any such liabilities, penalties, suspensions, terminations, or regulatory changes could have a material adverse effect on the Debtors' business, financial condition, results of operations, and cash flows and could potentially effect recoveries under the Plan.

Federal leases on the Outer Continental Shelf require compliance with federal statutes, regulations, and lease contracts.  These regulatory and lease obligations include, but are not limited to: (i) the performance of maintenance and monitoring obligations as required by applicable federal regulations, (ii) decommissioning of all facilities when due; (iii) maintenance of an adequate Oil Spill Response Plan; (iv) maintenance of an adequate Safety and Environmental Management Systems plan; (v) meeting all financial assurance and bonding obligations as required by BOEM; and (vi) correction of any outstanding incidents of non-compliance.  These regulatory requirements arise under laws designed to protect public health and safety, and cannot be abandoned, rejected, or sold free and clear of these obligations.  For the avoidance of doubt, the United States asserts that no due or overdue decommissioning obligation under any of the Debtor's Federal Lease interests should be deemed a Claim dischargeable in bankruptcy.

### 8. The Debtors' Operations Are Subject to Hazards Inherent in the Offshore Exploration and Production of Oil and Natural Gas

Risks inherent in the offshore drilling industry, such as equipment defects, accidents, and explosions, can cause personal injury, loss of life, suspension of operations, damage to formations, damage to facilities, business interruption and damage to, or destruction of property, equipment and the environment.  These risks could expose the Debtors to substantial liability for personal injury, wrongful death, property damage, loss of oil and natural gas production, pollution and other environmental damages, and could result in a variety of claims, losses and remedial obligations that could have an adverse effect on the Debtors' business and results of operations.  The existence, frequency and severity

56

of such incidents will affect operating costs, insurability, and relationships with customers, employees and regulators.

Furthermore, the marketability of expected production from the Debtors' prospects will also be affected by numerous factors. These factors include market fluctuations of oil and natural gas prices, proximity, capacity and availability of pipelines, the availability of processing facilities, equipment availability and government regulations (including, without limitation, regulations relating to prices, taxes, royalties, allowable production, importing and exporting of hydrocarbons, environmental, safety, health and climate change). The effect of these factors, individually or jointly, may have a material adverse effect on the business, financial condition, results of operations, and cash flows of the Debtors and could potentially effect recoveries under the Plan.

In addition, offshore operations are subject to a variety of operating risks specific to the marine environment, such as capsizing, collisions and damage or loss from hurricanes or other adverse weather conditions. These conditions can cause substantial damage to facilities and interrupt the Debtors' operations. As a result, the Debtors could incur substantial expenses that could reduce or eliminate capital and funds available for exploration, development or leasehold acquisitions, or result in loss of equipment and properties.

Deepwater exploration generally involves greater operational and financial risks than onshore exploration or exploration in shallow waters. Deepwater drilling generally requires more time and more advanced drilling technologies, involving a higher risk of technological failure and usually higher drilling costs. In addition, deepwater operations in the U.S. Gulf of Mexico generally lack the physical and oilfield service infrastructure present in shallower waters. As a result, a significant amount of time may elapse between a deepwater discovery and the marketing of the associated hydrocarbons, increasing both the financial and operational risk involved with these operations. Because of the lack and high cost of this infrastructure, oil and natural gas discoveries in the deepwater may never be economically producible.

In addition, in the event of a well control incident, containment and, potentially, cleanup activities for offshore drilling are costly. The resulting regulatory costs or penalties, and the results of third party lawsuits, as well as associated legal and support expenses, including costs to address negative publicity, could well exceed the actual costs of containment and cleanup. As a result, a well control incident could result in substantial liabilities for the Debtors, and have material adverse effect on the Debtors' business, financial condition, results of operations, and cash flows and could potentially effect recoveries under the Plan.

### 9.    The Geographic Concentration of the Debtors' Operations Subjects Them to an Increased Risk from Factors Affecting Those Areas

The Debtors' operations are concentrated in the deepwater U.S. Gulf of Mexico and offshore West Africa. Some or all of these properties could be affected should such regions experience:

- severe weather or natural disasters;

- moratoria on drilling or permitting delays;

- delays in or the inability to obtain regulatory approvals;

- delays or decreases in production;

- delays or decreases in the availability of drilling rigs and related equipment, facilities, personnel or services;

57

- delays or decreases in the availability of capacity to transport, gather or process production; and/or

- changes in the regulatory, political and fiscal environment.

Due to the concentrated nature of the Debtors' portfolio of properties, a number of properties could experience any of the same conditions at the same time, resulting in a significant impact on the Debtors' results of operations.

### 10.   The Loss of Key Personnel Could Adversely Affect the Debtors' Operations

The Debtors' operations are dependent on a relatively small group of key management personnel and a skilled employee base.  The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees.  As a result, the Debtors have experienced and may continue to experience increased levels of employee attrition.  The Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses.

## X.   STATUTORY REQUIREMENTS FOR CONFIRMATION OF THE PLAN

### A.   Requirements for Confirmation of the Plan

Among the requirements for Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code are:  (1) the Plan is accepted by all Impaired Classes of Claims or Interests, or if rejected by an Impaired Class, the Plan "does not discriminate unfairly" and is "fair and equitable" as to the rejecting Impaired Class; (2) the Plan is feasible; and (3) the Plan is in the "best interests" of holders of Claims and Interests.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies all of the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that:  (1) the Plan satisfies, or will satisfy, all of the necessary statutory requirements of chapter 11 for plan confirmation; (2) the Debtors have complied, or will have complied, with all of the necessary requirements of chapter 11; and (3) the Plan has been proposed in good faith.

### 1.   Feasibility

The Bankruptcy Code requires that to confirm a chapter 11 plan, the Bankruptcy Court must find that confirmation of such plan is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor(s) unless contemplated by the plan.

The Plan provides for the sale of the Debtors' businesses.  Accordingly, the Debtors believe that all Plan obligations will be satisfied without the need for further reorganization of the Debtors.

### 2.   Best Interests of Creditors—Liquidation Analysis

Notwithstanding acceptance of the Plan by a voting Impaired Class, to confirm the Plan, the Bankruptcy Court must still independently determine that the Plan is in the best interests of each holder of a Claim or Interest in any such Impaired Class that has not voted to accept the Plan, meaning that the Plan provides each such holder with a recovery that has a value at least equal to the value of the recovery that each such holder would receive if the debtor was liquidated under chapter 7 of the Bankruptcy Code beginning on what would have been the Effective Date.  Accordingly, if an Impaired Class does not unanimously vote to accept the Plan, the best interests test requires the Bankruptcy Court to find that the

Plan provides to each member of such Impaired Class a recovery on account of the Class member's Claim or Interest that has a value, as of the Effective Date, at least equal to the value of the recovery that each such Class member would receive if the Debtors were liquidated under chapter 7 beginning on the Effective Date.

The Debtors believe that the Plan will satisfy the best interests test because, among other things, the recoveries expected to be available to holders of Allowed Claims under the Plan will be greater than the recoveries expected to be available in a chapter 7 liquidation, as discussed more fully below.

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets and to make distributions to creditors in accordance with the priorities established in the Bankruptcy Code. Generally, secured creditors are paid first from the proceeds of sales of their collateral. If any assets remain in the bankruptcy estate after satisfaction of secured creditors' claims from their collateral, administrative expenses are next to be paid. After accounting for administrative expenses, unsecured creditors (including any secured creditor deficiency claims) are paid from the sale proceeds of any unencumbered assets and any remaining sale proceeds of encumbered assets in excess of any secured claims, according to their respective priorities. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority. Finally, interest holders receive the balance that remains, if any, after all creditors are paid.

All or substantially all of the assets of the Debtors' business will be liquidated through the Sale Transaction and the Plan effects a liquidation of the Debtors' remaining assets. Although a chapter 7 liquidation would achieve the same goal, the Debtors believe that the Plan provides a greater recovery to holders of Allowed Second Lien Notes Claims and Allowed Subsidiary General Unsecured Claims than would a chapter 7 liquidation. Liquidating the Debtors' Estate under the Plan likely provides holders of Second Lien Notes Claims and Allowed Subsidiary General Unsecured Claims with a larger, more timely recovery primarily due to expected materially lower realized sale proceeds in chapter 7.

A chapter 7 liquidation beginning on what would have been the Effective Date would provide less recovery for creditors than the Plan. The delay of the chapter 7 trustee becoming familiar with the assets could easily cause bids already obtained to be lost, and the chapter 7 trustee will not have the technical expertise and knowledge of the Debtors' business that the Debtors had when they proposed to sell their assets pursuant to the Plan. Moreover, the distributable proceeds under a chapter 7 liquidation will be lower because of the chapter 7 trustee's fees and expenses.

Sale proceeds in chapter 7 would likely be significantly lower particularly in light of the highly technical nature of the Debtor's assets, the time delay associated with the chapter 7 trustee's learning curve for these assets, and the pending lease expirations associated with the Debtors' North Platte and Shenandoah fields, which expiration would result in the lease and all associated value returning to the BOEM. In addition to the expected material reduction in sale proceeds, recoveries would be further reduced (in comparison with the Plan) due to the expenses that would be incurred in a chapter 7 liquidation, including added expenses for wind down costs and costs incurred by the chapter 7 trustee and any retained professionals in familiarizing themselves with the Debtors' highly technical assets, and these specific Chapter 11 Cases, in order to complete the administration of the Estate. *See, e.g.*, 11 U.S.C. § 326(a) (providing for compensation of a chapter 7 trustee up to three percent of the value of the assets); 11 U.S.C. 503(b)(2) (providing administrative expense status for compensation and expenses of a chapter 7 trustee and such trustee's professionals).

The Estate would continue to be obligated to pay all unpaid expenses incurred by the Debtors during the Chapter 11 Cases (such as compensation for Professionals), which may constitute Allowed Claims in any chapter 11 case. Moreover, the conversion to chapter 7 would also require entry of a new

59

bar date for filing claims that would be more than 90 days following conversion of the case to chapter 7. See Fed. R. Bankr. P. 1019(2); 3002(c). Thus, the amount of Claims ultimately filed and Allowed against the Debtors could materially increase, thereby further reducing creditor recoveries versus those available under the Plan.

In light of the foregoing, the Debtors submit that a chapter 7 liquidation would result in materially reduced sale proceeds, increased expenses, delayed distributions, and the prospect of additional claims that were not asserted in the Chapter 11 Cases. Accordingly, the Debtors believe that the Plan provides an opportunity to bring the highest return for creditors.

### B.    Alternative Plans

The Debtors do not believe that there are any alternative plans for the reorganization or liquidation of the Debtors' Estates. The Debtors believe that the Plan, as described herein, enables holders of Claims and Interests to realize the greatest possible value under the circumstances and that, compared to any alternative plan, the Plan has the greatest chance to be confirmed and consummated.

### C.    Acceptance by Impaired Classes

The Bankruptcy Code requires, as a condition to Confirmation that, except as described in the following section, each class of claims or equity interests that is impaired under a plan accept the plan. A class that is not "impaired" under a plan is presumed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. Pursuant to section 1124 of the Bankruptcy Code, a class is "impaired" unless the plan: (1) leaves unaltered the legal, equitable, and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (2) cures any default, reinstates the original terms of such obligation, and compensates the applicable party in question; or (3) provides that, on the consummation date, the holder of such claim or equity interest receives cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired creditors as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject a plan. Votes that have been "designated" under section 1126(e) of the Bankruptcy Code are not included in the calculation of acceptance by a class of claims. Thus, a Class of creditor Claims will have voted to accept the Plan only if two-thirds in amount and a majority in number actually voting cast their Ballots in favor of acceptance, subject to Article III of the Plan. Only holders of Claims in the Voting Class will be entitled to vote on the Plan.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of interests as acceptance by holders of at least two-thirds in dollar amount of those interests who actually vote to accept or reject a plan. Votes that have been "designated" under section 1126(e) of the Bankruptcy Code are not included in the calculation of acceptance by a class of interests. Thus, a Class of Interests will have voted to accept the Plan only if two-thirds in amount actually voting cast their Ballots in favor of acceptance, not counting designated votes, subject to Article III of the Plan. No Class including holders of Interests is entitled to vote on the Plan.

### D.    Confirmation Without Acceptance by All Impaired Classes

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if Impaired Classes entitled to vote on the plan have not accepted it or if an Impaired Class is deemed to

reject the Plan; provided that the plan is accepted by at least one Impaired Class.  Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or deemed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

### 1.      No Unfair Discrimination

This test applies to Classes of Claims or Interests that are of equal priority and are receiving different treatment under the Plan.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."  In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of Classes of Claims of equal rank (e.g., classes of the same legal character).  The Debtors do not believe the Plan discriminates unfairly against any Impaired Class of Claims or Interests. The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests satisfy the foregoing requirements for nonconsensual Confirmation.

### 2.      Fair and Equitable Test

This test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in such class.  As to the non-accepting class, the test sets different standards depending on the type of claims or interests in such class.  As set forth below, the Debtors believe that the Plan satisfies the "fair and equitable" requirement because, for each applicable Class, there is no Class of equal priority receiving more favorable treatment and no Class that is junior to such dissenting Class that will receive or retain any property on account of the Claims or Interests in such Class.

#### i.      Secured Claims

The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that:  (i) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (ii) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

#### ii.     Unsecured Claims

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims requires that either:  (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior equity interest any property.

#### iii.    Equity Interests

The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirements that either:  (i) the plan provides that each holder of an equity interest in that class receives or retains under the plan on account of that equity interest property of a value, as of the effective date of the plan, equal to the greater of:  (A) the allowed amount of any fixed liquidation preference to which such holder is entitled; (B) any fixed redemption price to which such holder is

entitled; or (C) the value of such interest; or (ii) if the class does not receive the amount as required under (i) hereof, no class of equity interests junior to the non-accepting class may receive a distribution under the plan.

## XI.      CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

### A.      Introduction

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of the Plan to the Debtors and to certain U.S. Holders (each a "Holder," and as defined below) of Claims.  The following summary does not address the U.S. federal income tax consequences to Holders of Claims who are Unimpaired or otherwise entitled to payment in full in Cash under the Plan. This summary is based on the Internal Revenue Code of 1986, as amended (the "IRC"), the U.S. Treasury Regulations promulgated thereunder, judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "IRS") and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below.  The discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

Except as specifically set forth below, this summary does not address foreign, state, or local tax consequences of the Plan, nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as Persons who are related to the Debtors within the meaning of the Tax Code, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax exempt organizations, governmental authorities or agencies, pass-through entities, beneficial owners of pass-through entities, subchapter S corporations, employees or persons who received their Claims pursuant to the exercise of an employee stock option or otherwise as compensation, persons who hold Claims, persons using a mark-to-market method of accounting, and holders of Claims who are themselves in bankruptcy), unless otherwise specifically stated herein.  Furthermore, this summary assumes that a Holder holds only Claims in a single Class and holds a Claim only as a "capital asset" (within the meaning of section 1221 of the Tax Code).  This summary also assumes that the various debt and other arrangements to which any of the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form. This summary does not discuss differences in tax consequences to a Holder that acts or receives consideration in a capacity other than as a Holder of a Claim of the same Class, and the tax consequences for such Holders may differ materially from that described below.

For purposes of this discussion, a "U.S. Holder" is a holder of a Claim that is: (1) an individual citizen or resident of the United States for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (4) a trust (A) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons have authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. For purposes of this discussion, a "Non-U.S. Holder" is any Holder of a Claim that is not a

U.S. Holder other than any partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the entity.  Partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders should consult their respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY, ONLY ADDRESSES CERTAIN CONSIDERATIONS WITH RESPECT TO THE U.S. TAX TREATMENT OF THE DEBTORS AND U.S. HOLDERS, AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM.  ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE FEDERAL, STATE, LOCAL, AND NON-U.S. INCOME, ESTATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.

B.      Certain United States Federal Income Tax Consequences to the Debtors

The Debtors anticipate that the Sale Transactions may give rise to significant taxable income if they are structured as a sale of the Debtors' assets.  Although the Debtors currently believe that they have sufficient tax attributes, including net operating losses ("NOLs"), to avoid having a material cash liability for federal income taxes, that cannot be guaranteed and will depend, in significant part, on the sale price of the Debtors' assets in any Sale Transaction, the tax treatment of the settlement with Sonangol, whether the Debtors have undergone (or subsequently undergo) an "ownership change" under Section 382 of the IRC prior to the consummation of the Sale Transactions, and other factors.  To the extent any cash federal income tax liability arises in connection with the Sale Transactions, recoveries to Holders of Claims could be reduced.

Under the IRC, a taxpayer generally recognizes cancellation of debt income ("CODI") to the extent that indebtedness of the taxpayer is cancelled for less than the amount owed by the taxpayer, subject to certain judicial or statutory exceptions.  The most significant of these exceptions with respect to the Debtors is that taxpayers who are operating under the jurisdiction of a federal bankruptcy court are not required to recognize such income.  In that case, however, the taxpayer must reduce its tax attributes, such as its net operating losses, general business credits, capital loss carryforwards, and tax basis in assets, by the amount of the CODI avoided.  In this case, the Debtors expect that they may recognize significant CODI from the implementation of the Plan, regardless of how the Sale Transactions are structured, and this CODI would result in a reduction in the Debtors' tax attributes.  Because the total amount of CODI cannot be determined with certainty until the Plan is implemented, the Debtors are not able to project the extent to which their tax attributes would survive CODI recognized as a result of the implementation of the Plan.  In the event the Sale Transactions are structured as a sale of the Debtors' assets and the Debtors liquidate following the consummation of such transactions, any remaining tax attributes would be eliminated as a result of such liquidation.  In the event the Sale Transactions are structured as an acquisition of the stock of CIE, then any remaining tax attributes would be subject to significant limitation under Section 382 of the IRC, particularly because it is highly unlikely that Section 382(l)(5) would be applicable in connection with any acquisition of CIE's stock pursuant to a Sale Transaction.

63

C.      **Certain United States Federal Income Tax Consequences to U.S. Holders of Allowed Claims**

1.      **Consequences to Holders of Allowed Other Priority Claims, Other Secured Claims, First Lien Notes Claims, Second Lien Notes Claims, Allowed Subsidiary General Unsecured Claims, and Allowed Cobalt General Unsecured Claims**

Pursuant to the Plan, in full satisfaction of their claims, Holders of Allowed Other Priority Claims, Other Secured Claims and Allowed First Lien Notes Claims will exchange such Claims for payment in full or receive such other treatment under the Plan as to render such Claims Unimpaired in accordance with section 1124 of the Bankruptcy Code, as applicable, and Holders of Allowed Second Lien Notes Claims, Allowed Subsidiary General Unsecured Claims, and Allowed Cobalt General Unsecured Claims will exchange such Claims for their Pro Rata share of Cash from the Plan Administrator Assets available to satisfy such Claims in accordance with their relative priority.

A U.S. Holder of Allowed Other Priority Claims, Other Secured Claims, First Lien Notes Claims, and Second Lien Notes Claims, Allowed Subsidiary General Unsecured Claims, and Allowed Cobalt General Unsecured Claims that receives Cash will be treated as receiving its distributions under the Plan in a taxable exchange under section 1001 of the IRC. Other than with respect to any amounts received that are attributable to accrued but untaxed interest (or original issue discount), each U.S. Holder of such Claims should recognize gain or loss equal to the difference between the (a) sum of the Cash received in exchange for the Claim, and (b) such U.S. Holder's adjusted basis, if any, in such Claim. A U.S. Holder's ability to deduct any loss recognized on the exchange of its Claims will depend on such U.S. Holder's own circumstances and may be restricted under the IRC.

In the event any Claim is reinstated under the Plan, the Debtors do not anticipate that such reinstatement would result in any material U.S. federal income tax consequences; payments made pursuant to such Claim going forward would be subject to the tax treatment that applied to payments on such debt instrument prior to the commencement of the chapter 11 proceedings.

**HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF GAIN OR LOSS, FOR FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR CLAIMS.**

2.      **Accrued Interest and OID**

A portion of the consideration received by Holders of Allowed Claims may be attributable to accrued interest or original issue discount ("OID") on such Claims. Such amount should be taxable to that U.S. Holder as interest income if such accrued interest or OID has not been previously included in the Holder's gross income for United States federal income tax purposes. Conversely, U.S. Holders of Claims may be able to recognize a deductible loss to the extent any accrued interest or OID on the Claims was previously included in the U.S. Holder's gross income but was not paid in full by the Debtors.

If the fair value of the consideration is not sufficient to fully satisfy all principal and interest or OID on Allowed Claims, the extent to which such consideration will be attributable to accrued interest or OID is unclear. Under the Plan, the aggregate consideration to be distributed to Holders of Allowed Claims in each Class will be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest or OID that accrued on such Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan is binding for United States federal income tax purposes, while certain Treasury Regulations generally treat payments as allocated first to any accrued but unpaid interest or OID and then as a

64

payment of principal.  The IRS could take the position that the consideration received by the U.S. Holder should be allocated in some way other than as provided in the Plan.

**HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED INTEREST.**

### 3.    Market Discount

Under the "market discount" provisions of the IRC, some or all of any gain realized by a U.S. Holder of a Claim who exchanges the Claim for an amount may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim.  In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its U.S. Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with original issue discount, its adjusted issue price, in each case, by at least a *de minimis* amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a U.S. Holder on the taxable disposition of Allowed Claims (determined as described above) that were acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Allowed Claims were considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).

### 4.    Matters Related to the Disputed Claims Reserve

The Debtors intend to create a Disputed Claims Reserve to hold the Disputed Claims Reserve Amount.  The Debtors intend to (i) treat the Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections) and (ii) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.  In general, property that is subject to disputed ownership fund treatment is subject to taxation within the fund (either at C-corporation or trust rates, depending on the nature of the assets held by the fund).  Unlike a grantor trust, items of taxable income, gain, loss, and deduction do not flow up from such fund to the parties that may be entitled to assert a claim against such fund.  Under disputed ownership fund treatment, a separate federal income tax return shall be filed with the IRS for the Disputed Claims Reserve with respect to any income attributable to the account, and any taxes imposed on the Disputed Claims Reserve or its assets shall be paid out of the assets of the Disputed Claims Reserve.

Although not free from doubt, U.S. Holders should not recognize any gain or loss on the date that the Disputed Claims Reserve Amount is transferred by the Debtors to the Disputed Claims Reserve, but should recognize gain or loss in an amount equal to: (i) the amount of Cash actually distributed to such U.S. Holder from the Disputed Claims Reserve, less (ii) the U.S. Holder's adjusted tax basis of its Claim when and to the extent Cash is actually distributed to such U.S. Holder.  The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Claim in such U.S. Holder's hands, whether the Claim was purchased at a discount, and whether and to what extent the U.S. Holder previously has claimed a bad debt deduction with respect to its Claim.

To the extent that a U.S. Holder of a Disputed Claim receives distributions of cash with respect to such Claim subsequent to the Effective Date, such Holder may recognize additional gain (if such Holder is in a gain position) and a portion of such cash may be treated as imputed interest income.  In addition, it

65

is possible that the recognition of any loss realized by a U.S. Holder may be deferred until all payments have been made out of the Disputed Claims Reserve to all Holders of Disputed Claims. U.S. Holders are urged to consult their tax advisors regarding the possible application (and the ability to elect out) of the "installment method" of reporting any gain that may be recognized by such Holders in respect of their Claims due to the receipt of cash in a taxable year subsequent to the taxable year in which the Effective Date occurs. The discussion herein assumes that the installment method does not apply.

The timing of the inclusion of income may be subject to alteration for accrual method U.S. Holders that prepare "applicable financial statements" (as defined in Section 451 of the IRC), which may require the inclusion of income no later than the time such amounts are reflected on such financial statement.

### D.       Certain United States Federal Income Tax Consequences to Non-U.S. Holders of Claims

#### 1.       Consequences to Non-U.S. Holders of Allowed Other Priority Claims, Other Secured Claims, First Lien Notes Claims, Second Lien Notes Claims, Allowed Subsidiary General Unsecured Claims, and Allowed Cobalt General Unsecured Claims

The following discussion includes only certain U.S. federal income tax consequences of the Restructuring Transactions to Non-U.S. Holders. The discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Each Non-U.S. Holder should consult its own tax advisor regarding the U.S. federal, state, and local and the foreign tax consequences of the consummation of the Plan to such Non-U.S. Holder.

Whether a Non-U.S. Holder realizes gain or loss on the exchange and the amount of such gain or loss is generally determined in the same manner as set forth above in connection with U.S. Holders.

#### i.   Gain Recognition

Any gain realized by a Non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (i) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met, (ii) such gain is effectively connected with the conduct by such non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States), or (iii) any gain is subject to taxation under FIRPTA (as defined and discussed below).

If the first exception applies, to the extent that any gain is taxable, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange if such gain is effectively connected with the Non-U.S. Holder's conduct of a trade or business in the United States in the same manner as a U.S. Holder. In order to claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

66

### ii.      Accrued Interest

Payments to a Non-U.S. Holder that are attributable to accrued but untaxed interest generally will not be subject to U.S. federal income or withholding tax, provided that the withholding agent has received or receives, prior to payment, appropriate documentation (generally, IRS Form W-8BEN or W-8BEN-E) establishing that the Non-U.S. Holder is not a U.S. person, unless:

(a)      the Non-U.S. Holder actually or constructively owns 10 percent or more of the total combined voting power of all classes of the Debtors' stock entitled to vote;

(b)      the Non-U.S. Holder is a "controlled foreign corporation" that is a "related person" with respect to the Debtors (each, within the meaning of the Tax Code);

(c)      the Non-U.S. Holder is not a bank receiving interest described in Section 881(c)(3)(A) of the Tax Code; or

(d)      such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (in which case, provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty)).

A Non-U.S. Holder that does not qualify for exemption from withholding tax with respect to accrued but untaxed interest that is not effectively connected income generally will be subject to withholding of U.S. federal income tax at a 30 percent rate (or at a reduced rate or exemption from tax under an applicable income tax treaty) on payments that are attributable to accrued but untaxed interest. For purposes of providing a properly executed IRS Form W-8BEN or W-BEN-E, special procedures are provided under applicable Treasury Regulations for payments through qualified foreign intermediaries or certain financial institutions that hold customers' securities in the ordinary course of their trade or business.

### iii.      FIRPTA

Non-U.S. Holders and, in particular, holders of the Debtors' convertible debt instruments, should discuss the potential substantive taxation and withholding implications of the Plan in connection with the Foreign Investment in Real Property Tax Act of 1980, as amended ("FIRPTA"), with their own tax advisors. Although not free from doubt, in light of the status of the Debtors' non-Gulf of Mexico Assets, it is likely that Cobalt is currently a U.S. real property holding company ("USRPHC") under FIRPTA. The Debtors have not yet made any determinations with respect to whether FIRPTA withholding will be necessary in connection with distributions to any Non-U.S. Holders of Claims, and the question of whether recoveries under the Plan may be subject to substantive taxation under FIRPTA is not free from doubt with respect to certain categories of Claims. In the event FIRPTA withholding is ultimately determined to be necessary, a Non-U.S. Holder may be entitled to a refund of amounts withheld depending upon such Non-U.S. Holder's tax basis in its Claim, the amount of any distribution to such Non-U.S. Holder, and whether substantive FIRPTA taxation in fact applies to recoveries under the Plan.

67

U.S. Holders may be required to supply certain non-foreign withholding certificates to avoid FIRPTA withholding in the event the Debtors conclude that FIRPTA withholding is necessary with respect to any particular category of Claims.

### iv.    FATCA

Under the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account Holders and investors or be subject to withholding on the receipt of "withholdable payments."  For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income, and also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends.  FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding tax.

As currently proposed, FATCA withholding rules would apply to payments of gross proceeds from the sale or other disposition of property of a type which can produce U.S. source interest or dividends that occurs after December 31, 2018.

### E.    Information Reporting and Back-Up Withholding

In general, information reporting requirements may apply to distributions or payments under the Plan.  Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding (currently at a rate of 24%) with respect to distributions or payments made pursuant to the Plan unless that Holder:   (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption)).  Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; *provided* that the required information is timely provided to the IRS.

The Debtors, or the applicable agent, will withhold all amounts required by law to be withheld from payments of interest and comply with all applicable information reporting requirements.

**THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTION CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## XII.    RECOMMENDATION

In the opinion of the Debtors, the Plan is preferable to all other available alternatives and provides for a larger distribution to the Debtors' creditors than would otherwise result in any other scenario. Accordingly, the Debtors recommend that holders of Claims entitled to vote on the Plan vote to accept the Plan and support Confirmation of the Plan.

Dated:  March 8, 2018

Respectfully submitted,

Cobalt International Energy, Inc.,
on behalf of itself and each of the other Debtors

By:    */s/ David D. Powell*

Name: David D. Powell
Title:  Chief Financial Officer

## Exhibit A

## Chapter 11 Plan

# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| COBALT INTERNATIONAL ENERGY, INC., *et al.*,[1] | ) | Case No. 17-36709 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## FOURTH AMENDED JOINT CHAPTER 11 PLAN OF COBALT
## INTERNATIONAL ENERGY, INC. AND ITS DEBTOR AFFILIATES

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Chad J. Husnick, P.C. (admitted *pro hac vice*)
Brad Weiland (admitted *pro hac vice*)
Laura Krucks (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle
Chicago, Illinois 60654
Telephone:      (312) 862-2000
Facsimile:      (312) 862-2200

Zack A. Clement (Texas Bar No. 04361550)
**ZACK A. CLEMENT PLLC**
3753 Drummond Street
Houston, Texas 77025
Telephone:      (832) 274-7629

*Co-Counsel to the Debtors and Debtors in Possession*

---

**THIS IS NOT A SOLICITATION OF AN ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.   THIS DRAFT PLAN HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT.**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Cobalt International Energy, Inc. (1169); Cobalt International Energy GP, LLC (7374); Cobalt International Energy, L.P. (2411); Cobalt GOM LLC (7188); Cobalt GOM # 1 LLC (7262); and Cobalt GOM # 2 LLC (7316). The Debtors' service address is: 920 Memorial City Way, Suite 100, Houston, Texas 77024.

KE 39239946

TABLE OF CONTENTS

**ARTICLE I. DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW**..........................................................................................................**4**
    A.        Defined Terms ................................................................ 4
    B.        Rules of Interpretation ................................................................. 15
    C.        Computation of Time.................................................................. 15
    D.        Governing Law ......................................................................... 15
    E.        Reference to Monetary Figures.................................................. 16
    F.        Controlling Document ............................................................... 16

**ARTICLE II. ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS** ......................................**16**
    A.        Administrative Claims ............................................................... 16
    B.        Professional Compensation......................................................... 16
    C.        Priority Tax Claims.................................................................... 17
    D.        Statutory Fees ........................................................................... 17

**ARTICLE III. CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**............................**18**
    A.        Summary of Classification.......................................................... 18
    B.        Treatment of Claims and Interests ............................................. 18
    C.        Special Provision Governing Unimpaired Claims ......................... 21
    D.        Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code....................................................................... 22
    E.        Controversy Concerning Impairment .......................................... 22
    F.        Elimination of Vacant Classes.................................................... 22
    G.        Voting Classes; Presumed Acceptance by Non-Voting Classes ...................................... 22
    H.        Presumed Acceptance and Rejection of the Plan.......................... 22
    I.        Intercompany Interests............................................................... 22
    J.        Subordinated Claims.................................................................. 22

**ARTICLE IV. MEANS FOR IMPLEMENTATION OF THE PLAN** ....................................................**22**
    A.        General Settlement of Claims .................................................... 22
    B.        Restructuring Transactions ........................................................ 23
    C.        Sale Transactions....................................................................... 23
    D.        The Plan Administrator.............................................................. 23
    E.        Sources of Consideration for Plan Distributions........................... 24
    F.        Disputed Claims Reserve........................................................... 24
    G.        Release of Liens........................................................................ 24
    H.        Preservation of Causes of Action................................................ 24
    I.        Cancellation of Notes, Instruments, Certificates, and Other Documents......................... 25
    J.        Corporate Action ...................................................................... 26
    K.        Effectuating Documents; Further Transactions ........................... 26
    L.        Exemption from Certain Taxes and Fees..................................... 26
    M.        Release of Avoidance Actions .................................................... 27
    N.        Director and Officer Liability Insurance...................................... 27
    O.        Compensation and Benefits Programs ........................................ 27
    P.        Closing the Chapter 11 Cases .................................................... 27

**ARTICLE V. TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES** ......................**27**
    A.        Assumption and Rejection of Executory Contracts and Unexpired Leases ..................... 27
    B.        Claims Based on Rejection of Executory Contracts or Unexpired Leases ....................... 28
    C.        Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.................... 28
    D.        Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases.................................................................... 28

i

| | E. | Sale Transaction Documentation; Assumed Contracts | 29 |
| | F. | Modifications, Amendments, Supplements, Restatements, or Other Agreements | 29 |
| | G. | Reservation of Rights | 29 |
| | H. | Nonoccurrence of Effective Date | 29 |

**ARTICLE VI. PROVISIONS GOVERNING DISTRIBUTIONS** ... **29**
| | A. | Timing and Calculation of Amounts to Be Distributed | 29 |
| | B. | Distributions by the Plan Administrator | 30 |
| | C. | Distributions on Account of Claims Allowed After the Effective Date | 30 |
| | D. | Delivery of Distributions and Undeliverable or Unclaimed Distributions | 30 |
| | E. | Compliance with Tax Requirements | 32 |
| | F. | Allocations | 33 |
| | G. | No Postpetition Interest on Claims | 33 |
| | H. | Setoffs and Recoupment | 33 |
| | I. | Claims Paid or Payable by Third Parties | 33 |
| | J. | Distributions on Account of Subordinated Claims | 34 |

**ARTICLE VII. PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS** ... **34**
| | A. | Allowance of Claims | 34 |
| | B. | Claims and Interests Administration Responsibilities | 34 |
| | C. | Estimation of Claims | 34 |
| | D. | Adjustment to Claims Without Objection | 35 |
| | E. | Time to File Objections to Claims | 35 |
| | F. | Disallowance of Claims | 35 |
| | G. | Amendments to Claims | 36 |
| | H. | No Distributions Pending Allowance | 36 |
| | I. | Distributions After Allowance | 36 |
| | J. | Single Satisfaction of Claims | 36 |

**ARTICLE VIII. SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS** ... **36**
| | A. | Settlement, Compromise, and Release of Claims and Interests | 36 |
| | B. | **Debtor Release** | 37 |
| | C. | **Third Party Release** | 37 |
| | D. | **Exculpation** | 38 |
| | E. | **Injunction** | 38 |
| | F. | Recoupment | 39 |
| | G. | Subordination Rights | 39 |
| | H. | Reimbursement of Contribution | 39 |
| | I. | SEC Rights Reserved | 39 |
| | J. | Special Provision Governing Fee Claims and Final Fee Applications | 39 |

**ARTICLE IX. CONDITIONS PRECEDENT TO CONFIRMATION AND CONSUMMATION OF THE PLAN** ... **39**
| | A. | Conditions Precedent to the Effective Date | 39 |
| | B. | Waiver of Conditions | 40 |
| | C. | Substantial Consummation | 40 |
| | D. | Effect of Non-Occurrence of Conditions to the Effective Date | 40 |

**ARTICLE X. MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN** ... **40**
| | A. | Modification and Amendments | 40 |
| | B. | Effect of Confirmation on Modifications | 41 |
| | C. | Revocation or Withdrawal of the Plan | 41 |

**ARTICLE XI. RETENTION OF JURISDICTION** ... **41**

**ARTICLE XII. MISCELLANEOUS PROVISIONS** ...................................................................................**43**
    A.    Immediate Binding Effect..............................................................................43
    B.    Additional Documents ....................................................................................43
    C.    Dissolution of the Committee ........................................................................43
    D.    First Lien Indenture Trustee Fees and Expenses............................................43
    E.    Reservation of Rights ....................................................................................43
    F.    Successors and Assigns ..................................................................................43
    G.    Service of Documents.....................................................................................44
    H.    Term of Injunctions or Stays .........................................................................45
    I.    Entire Agreement...........................................................................................45
    J.    Exhibits..........................................................................................................45
    K.    Nonseverability of Plan Provisions................................................................45
    L.    Waiver or Estoppel ........................................................................................46
    M.    Enforcement of the Confirmation Order........................................................46
    N.    Votes Solicited in Good Faith........................................................................46

**INTRODUCTION**

Cobalt International Energy, Inc. and its debtor affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases propose this joint plan pursuant to chapter 11 of the Bankruptcy Code (together with the documents comprising the Plan Supplement, the "Plan").  The chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to an order of the Bankruptcy Court.  This Plan constitutes a separate chapter 11 plan for each Debtor and, unless otherwise set forth herein, the classification and treatment of Claims and Interests apply to each individual Debtor.  Capitalized terms used and not otherwise defined shall have the meanings ascribed to such terms in Article I.A hereof.  Holders of Claims and Interests should refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of the Plan.  Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code.

ALL HOLDERS OF CLAIMS AND INTERESTS, TO THE EXTENT APPLICABLE, ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

**ARTICLE I.**
**DEFINED TERMS, RULES OF INTERPRETATION,**
**COMPUTATION OF TIME, AND GOVERNING LAW**

A.      *Defined Terms*

As used in this Plan, capitalized terms have the meanings set forth below.

1.      "*2.625% Senior Notes*" means those certain 2.625% senior convertible notes due 2019, issued by Cobalt pursuant to the 2.625% Senior Notes Indenture.

2.      "*3.125% Senior Notes*" means those certain 3.125% senior convertible notes due 2024, issued by Cobalt pursuant to the 3.125% Senior Notes Indenture.

3.      "*2.625% Senior Notes Claims*" means any Claim arising under, derived from, or based upon the 2.625% Senior Notes and the 2.625% Senior Notes Indenture.

4.      "*3.125% Senior Notes Claims*" means any Claim arising under, derived from, or based upon the 3.125% Senior Notes and the 3.125% Senior Notes Indenture.

5.      "*2.625% Senior Notes Indenture*" means that certain Indenture, dated as of December 17, 2012, as amended, modified, or supplemented from time to time, by and between Cobalt, as issuer, and the 2.625% Senior Notes Indenture Trustee.

6.      "*3.125% Senior Notes Indenture*" means that certain Indenture, dated as of December 17, 2012, as amended, modified, or supplemented from time to time, by and between Cobalt, as issuer, and the 3.125% Senior Notes Indenture Trustee.

7.      "*2.625% Senior Notes Indenture Trustee*" means Wells Fargo Bank, National Association, in its capacity as indenture trustee and in other capacities under or in connection with the 2.625% Senior Notes Indenture, and any successor thereto.

8.      "*3.125% Senior Notes Indenture Trustee*" means Wells Fargo Bank, National Association, in its capacity as indenture trustee and in other capacities under or in connection with the 3.125% Senior Notes Indenture, and any successor thereto.

9.      "*Accrued Professional Compensation*" means, at any given moment, all Claims for accrued fees and expenses (including success fees) for services rendered by a Professional through and including the

Confirmation Date, to the extent such fees and expenses have not been previously paid pursuant to the Interim Compensation Order or any other order of the Bankruptcy Court and regardless of whether a fee application has been Filed for such fees and expenses.  To the extent the Bankruptcy Court denies or reduces by a Final Order any amount of a Professional's fees or expenses, then the amount by which such fees or expenses are reduced or denied shall reduce the applicable Allowed Fee Claims.

10.     "*Administrative Claim*" means a Claim for costs and expenses of administration of the Debtors' Estates pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including:  (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the businesses of the Debtors; (b) Allowed Fee Claims; (c) any adequate protection claims as provided for in the Cash Collateral Order; and (d) all Allowed requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code.

11.     "*Administrative Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Claims, which:  (a) with respect to Administrative Claims other than Fee Claims, shall be the first Business Day that is 30 days following the Effective Date; and (b) with respect to Fee Claims, shall be the first Business Day that is 45 days following the Effective Date.

12.     "*Administrative Claims Objection Bar Date*" means the first Business Day that is 150 days following the Effective Date, except as specifically set forth in the Plan or a Final Order, including the Claims Bar Date Order.

13.     "*Affiliate*" shall have the meaning set forth in section 101(2) of the Bankruptcy Code.

14.     "*Allowed*" means with respect to any Claim: (a) a Claim that is evidenced by a Proof of Claim Filed by the Claims Bar Date (or for which Claim under the Plan, the Bankruptcy Code, or a Final Order of the Bankruptcy Court a Proof of Claim is not or shall not be required to be Filed); (b) a Claim that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim, as applicable, has been timely Filed; or (c) a Claim Allowed pursuant to the Plan or a Final Order of the Bankruptcy Court; *provided* that with respect to a Claim described in clauses (a) and (b) above, such Claim shall be considered Allowed only if and to the extent that with respect to such Claim no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or such an objection is so interposed and the Claim, as applicable, shall have been Allowed by a Final Order. Any Claim that has been or is hereafter listed in the Schedules as contingent, unliquidated, or disputed, and for which no Proof of Claim is or has been timely Filed, is not considered Allowed and shall be expunged without further action by the Debtors and without further notice to any party or action, approval, or order of the Bankruptcy Court.

15.     "*Assumed Liabilities*" means the liability of any Debtor assumed by the Purchaser pursuant to the Sale Transaction Documentation.

16.     "*Auction*" means the auction, if any, for some or all of the Debtors' assets, conducted in accordance with the Bidding Procedures.

17.     "*Avoidance Actions*" means any and all actual or potential Claims and Causes of Action to avoid a transfer of property or an obligation incurred by the Debtors arising under chapter 5 of the Bankruptcy Code, including sections 544, 545, 547, 548, 549, 550, 551, and 553(b) of the Bankruptcy Code.

18.     "*Bankruptcy Code*" means title 11 of the United States Code, as amended and in effect during the pendency of the Chapter 11 Cases.

19.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of Texas having jurisdiction over the Chapter 11 Cases, and, to the extent of the withdrawal of any reference under 28 U.S.C.

§ 157 and/or the General Order of the District Court pursuant to section 151 of title 28 of the United States Code, the United States District Court for the Southern District of Texas.

20.      "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Cases, promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court.

21.      "*Bidding Procedures*" means the procedures governing the Auction and sale of any or all of the Debtors' assets, as approved by the Bankruptcy Court and as may be amended from time to time in accordance with its terms.

22.      "*Business Day*" means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

23.      "*Cash*" means the legal tender of the United States of America or the equivalent thereof.

24.      "*Cash Collateral Order*" means the *Interim Order (I) Authorizing Postpetition Use of Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief* entered by the Bankruptcy Court on December 14, 2017 [Docket No. 57] and the *Final Order (I) Authorizing Postpetition Use of Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Parties, (III) Modifying the Automatic Stay, and (IV) Granting Related Relief* entered by the Bankruptcy Court on January 25, 2018 [Docket No. 301].

25.      "*Causes of Action*" means any Claim, cause of action (including Avoidance Actions), controversy, right of setoff, cross claim, counterclaim, or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity, demand, right, action, Lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, power, privilege, license, and franchise of any kind or character whatsoever, known, unknown, fixed or contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law, which was not specifically conveyed to the Purchaser in the Sale Transaction Documentation and which was property of the Debtors or in which the Debtors held rights as of the Effective Date.

26.      "*Chapter 11 Cases*" means the jointly administered chapter 11 cases of the Debtors pending before the Bankruptcy Court under the lead case of *Cobalt International Energy*, *Inc., et al.*, No. 17-36709 (MI) (Bankr. S.D. Tex.).

27.      "*Claim*" shall have the meaning set forth in section 101(5) of the Bankruptcy Code.

28.      "*Claims Bar Date*" means the date established by the Bankruptcy Court in the Claims Bar Date Order by which Proofs of Claim must be Filed.

29.      "*Claims Bar Date Order*" means that certain order entered by the Bankruptcy Court establishing the Claims Bar Date.

30.      "*Claims Objection Deadline*" means, except as otherwise provided in an order of the Bankruptcy Court, for each Claim, the later of (a) 365 days after the Effective Date and (b) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for objecting to such Claims, as the same may be modified or extended from time to time by the Bankruptcy Court or on motion of a party in interest approved by the Bankruptcy Court.

31.      "*Claims Register*" means the official register of Claims maintained by the Notice and Claims Agent.

6

32. "*Class*" means a category of holders of Claims or Interests as set forth in Article III hereof pursuant to section 1122(a) of the Bankruptcy Code.

33. "*Cobalt*" means Cobalt International Energy, Inc.

34. "*Cobalt General Unsecured Claim*" means any Claim against Cobalt, including an Unsecured Notes Claim and a Second Lien Notes Deficiency Claim, that is not otherwise paid in full during the Chapter 11 Cases pursuant to an order of the Bankruptcy Court and is not: (a) an Administrative Claim; (b) a Priority Tax Claim; (c) an Other Priority Claim; (d) an Other Secured Claim; (e) a First Lien Notes Claim; (f) a Second Lien Notes Secured Claim; (g) an Intercompany Claim; (h) a Subsidiary General Unsecured Claim; or (i) a Section 510(b) Claim.

35. "*Cobalt General Unsecured Claims Recovery*" means (a) any Net Cash in excess of amounts necessary to (i) satisfy all Allowed Administrative Claims, Allowed Fee Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Other Secured Claims, Allowed First Lien Notes Claims, Allowed Second Lien Notes Secured Claims, and Allowed Subsidiary General Unsecured Claims, in each case in full, in Cash, as provided herein, if any, plus (b) Cash recoveries (if any) on account of unencumbered assets (if any) at Cobalt not subject to adequate protection claims under the Cash Collateral Order.

36. "*Committee*" means the official committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102(a) of the Bankruptcy Code.

37. "*Compensation and Benefits Programs*" means all employment and severance policies, all compensation, and any other employee benefit plans, policies, and programs and other arrangements (and all amendments and modifications thereto), in each case in place as of the Petition Date, applicable to the Debtors' and non-Debtor subsidiaries' respective employees, former employees, retirees, and non-employee directors and employees, former employees, and retirees of their subsidiaries, including all savings plans, retirements plans (whether or not such plans are intended to be qualified), health and/or welfare plans, disability plans, severance benefit plans, including the Executive Severance Plan, incentive plans, including the Sales Incentive Plan, and life, accidental death, and dismemberment insurance plans, or other similar plans.

38. "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

39. "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

40. "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

41. "*Confirmation Order*" means the order approving the Sale Transaction and confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

42. "*Consummation*" means the occurrence of the Effective Date.

43. "*Cure Claim*" means all amounts (or such lesser amount as may be agreed upon by the parties under an Executory Contract or Unexpired Lease) required to cure any monetary defaults and other obligations required to cure any non-monetary defaults (the performance required to cure such non-monetary defaults and the timing of such performance will be described in reasonable detail in a notice of proposed assumption and assignment) under any Executory Contract or Unexpired Lease that is to be assumed or assumed and assigned by the Debtors pursuant to sections 365 or 1123 of the Bankruptcy Code.

44. "*Cure Notice*" means a notice of a proposed amount to be paid on account of a Cure Claim in connection with an Executory Contract or Unexpired Lease to be assumed or assumed and assigned under the Plan pursuant to section 365 of the Bankruptcy Code, which notice shall include (a) procedures for objecting to proposed

7

assumptions or assumptions and assignments of Executory Contracts and Unexpired Leases, (b) Cure Claims to be paid in connection therewith, and (c) procedures for resolution by the Bankruptcy Court of any related disputes.

45.     "*D&O Liability Insurance Policies*" means all insurance policies (including any runoff or "tail" policy) that has been issued at any time to or provides coverage to any of the Debtors for current or former directors', managers', and officers' liability.

46.     "*Debtors*" means, collectively:   Cobalt; Cobalt International Energy GP, LLC; Cobalt International Energy, L.P.; Cobalt GOM LLC; Cobalt GOM # 1 LLC; and Cobalt GOM # 2 LLC, the debtors and debtors in possession in the Chapter 11 Cases.

47.     "*Disallowed*" means, with respect to any Claim, a Claim or any portion thereof that (a) has been disallowed by a Final Order, (b) is set forth on the applicable Schedule or Schedules as zero or as contingent, disputed, or unliquidated and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law or this Plan, (c) is not set forth on the applicable Schedule or Schedules and as to which no Proof of Claim or request for payment of an Administrative Claim has been timely filed or deemed timely filed with the Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court or otherwise deemed timely filed under applicable law or this Plan, (d) has been waived or withdrawn by agreement of the applicable Debtor and the holder thereof, or (e) has been waived or withdrawn by the holder thereof.

48.     "*Disclosure Statement*" means the *Disclosure Statement for the Joint Chapter 11 Plan of Cobalt International Energy, Inc. and its Debtor Affiliates*, dated as of January 23, 2018, as may be amended, modified, or supplemented from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules, and any other applicable law.

49.     "*Disputed*" means a Claim that is not yet Allowed.

50.     "*Disputed Claims Reserve*" means an appropriate reserve, to be determined by the Debtors in consultation with the First Lien Ad Hoc Group, the First Lien Indenture Trustee, the Second Lien Ad Hoc Group, the Second Lien Indenture Trustee, the Unsecured Notes Ad Hoc Committee, and the Committee, unless otherwise ordered by the Bankruptcy Court, for distribution on account of Disputed Claims that are not Assumed Liabilities and that are subsequently Allowed after the Effective Date.

51.     "*Disputed Claims Reserve Amount*" means the amount of assets determined by the Debtors that would likely have been distributed to the holders of all applicable Disputed Claims as if such Disputed Claims had been Allowed Claims on the Effective Date, with the amount of such Allowed Claims to be determined, solely for the purposes of establishing reserves and for maximum distribution purposes, to be (a) the lesser of (i) the asserted amount of each Disputed Claim against the Debtors as set forth on the applicable Schedule or Schedules or, if and solely to the extent a non-duplicative Proof of Claim was filed in an asserted amount greater than the scheduled amount, the asserted amount filed with the Bankruptcy Court as set forth in such non-duplicative Proof of Claim or as provided by the parties to the Debtors as further information with respect to the Proof of Claim, and (ii) the amount, if any, estimated by the Bankruptcy Court pursuant to section 502(c) of the Bankruptcy Code or ordered by other order of the Bankruptcy Court, or (b) the amount otherwise agreed to by Debtors and the holder of such Disputed or unliquidated Claim for reserve purposes.

52.     "*Distribution Record Date*" means the date for determining which holders of Claims or Interests are eligible to receive distributions hereunder and shall be the Confirmation Date or such other date as designated in a Final Order of the Bankruptcy Court; *provided* that the distribution record date for (a) the First Lien Notes Claims shall be a date agreed upon by the Debtors, counsel to the First Lien Ad Hoc Group, and the First Lien Indenture Trustee, (b) the Second Liens Notes Claims shall be a date agreed upon by the Debtors, counsel to the Second Lien Ad Hoc Group, and the Second Lien Indenture Trustee, and (c) the Unsecured Notes Claims shall be a date agreed upon by the Debtors, counsel to the Unsecured Notes Ad Hoc Committee, the 3.125% Senior Notes Indenture Trustee, and the 2.625% Senior Notes Indenture Trustee, as applicable.

53. "*DTC*" means Depository Trust Company.

54. "*Effective Date*" means the date that is the first Business Day after the Confirmation Date on which (a) no stay of the Confirmation Order is in effect; (b) all conditions precedent specified in Article IX.A have been satisfied or waived (in accordance with Article IX.B); and (c) the Plan is declared effective.

55. "*Entity*" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

56. "*Estate*" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

57. "*Excluded Assets*" means any asset of the Debtors that is not acquired by the Purchaser pursuant to the Sale Transaction Documentation.

58. "*Exculpated Parties*" means, collectively, and in each case in its capacity as such: (a) the Debtors; (b) the Plan Administrator; (c) the Committee and any other official committees appointed in the Chapter 11 Cases and each of their respective members; and (d) with respect to each of the foregoing, such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

59. "*Executive Severance Plan*" means the *Cobalt International Energy, Inc. Amended and Restated Executive Severance and Change in Control Benefit Plan*, dated as of July 28, 2016.

60. "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

61. "*Federal Judgment Rate*" means the federal judgment rate in effect as of the Petition Date, compounded annually.

62. "*Fee Claim*" means a Claim for Accrued Professional Compensation.

63. "*File*," "*Filed*," or "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or, with respect to the filing of a Proof of Claim or Proof of Interest, the Notice and Claims Agent.

64. "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be Filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought; *provided* that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, shall not cause an order not to be a Final Order.

65. "*First Lien Ad Hoc Group*" means the ad hoc group of First Lien Noteholders represented by Weil, Gotshal & Manges LLP and PJT Partners Inc.

66. "*First Lien Indenture*" means that certain Indenture, dated as of December 6, 2016, as amended, modified, or supplemented from time to time, by and between Cobalt, as issuer, the First Lien Indenture Trustee, and certain of the Debtors, as guarantors.

67. "*First Lien Indenture Trustee*" means Wilmington Trust, National Association, in its capacity as indenture trustee and collateral agent under the First Lien Indenture, and any successor thereto.

9

68.     "*First Lien Noteholders*" means holders of the First Lien Notes.

69.     "*First Lien Notes*" means those certain 10.75% first lien senior secured notes due 2021, issued by Cobalt pursuant to the First Lien Indenture.

70.     "*First Lien Notes Claims*" means any Claim arising under, derived from, or based upon the First Lien Notes and the First Lien Indenture, and the Cash Collateral Order.

71.     "*General Unsecured Claims*" means, collectively, the Subsidiary General Unsecured Claims and the Cobalt General Unsecured Claims.

72.     "*Governmental Bar Date*" means the date established by the Bankruptcy Court by which Proofs of Claim of Governmental Units must be Filed.

73.     "*Governmental Unit*" shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

74.     "*Impaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Unimpaired.

75.     "*Intercompany Claim*" means any Claim against a Debtor held by another Debtor or a non-Debtor subsidiary.

76.     "*Intercompany Interest*" means, other than an Interest in Cobalt, an Interest in one Debtor held by another Debtor or a Debtor's Affiliate.

77.     "*Intercreditor Agreement*" means that certain Intercreditor Agreement, dated as of December 6, 2016, by and among Wilmington Trust, National Association, as collateral agent, the First Lien Indenture Trustee, the Second Lien Indenture Trustee, Cobalt, and each of the Debtor guarantors party thereto, as amended, restated, or otherwise supplemented from time to time.

78.     "*Interests*" means any interest, equity, or share in the Debtors, including all options, warrants, or other rights to obtain such an interest or share in such Debtor, whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security, including any Claim subject to subordination under section 510(b) of the Bankruptcy Code arising therefrom.

79.     "*Interim Compensation Order*" means that certain order entered by the Bankruptcy Court establishing procedures for the compensation of Professionals.

80.     "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001.

81.     "*Lien*" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

82.     "*Net Cash*" means the Debtors' Cash or Cash equivalents on hand (including any Cash, securities, other Sale Transaction Proceeds, any Cash proceeds of the collateral of the First Lien Noteholders and Second Lien Noteholders, or any Cash proceeds from the Sonangol Settlement ultimately received by the Debtors) less any Cash or Cash equivalents to be paid or reserved pursuant to and in accordance with the Plan on account of the Wind Down Budget or otherwise, but excluding Cash recoveries (if any) on account of unencumbered assets (if any) not subject to adequate protection claims (if any) under the Cash Collateral Order.

83.     "*Notice and Claims Agent*" means Kurtzman Carson Consultants LLC.

84.     *"Order"* means an order of the Bankruptcy Court.

10

85.     "*Ordinary Course Professionals*" shall mean the various attorneys, accountants, auditors, and other professionals the Debtors employ in the ordinary course of their business and retained by the Debtors pursuant to the Ordinary Course Professionals Order.

86.     "*Ordinary Course Professionals Order*" shall mean that certain order entered by the Bankruptcy Court establishing the procedures for retaining the Ordinary Course Professionals.

87.     "*Other Priority Claim*" means any allowed Claim against any Debtor entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, other than:  (a) an Administrative Claim; or (b) a Priority Tax Claim, to the extent such Claim has not already been paid during the Chapter 11 Cases.

88.     "*Other Secured Claim*" means any Secured Claim against any Debtor that is not a First Lien Notes Claim or a Second Lien Notes Secured Claim.

89.     "*Person*" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

90.     "*Petition Date*" means December 14, 2017, the date on which the Debtors commenced the Chapter 11 Cases.

91.     "*Plan*" shall have the meaning set forth in the preamble.

92.     "*Plan Administrator*" means the Entity selected by the Debtors, in consultation with the Committee, the Second Lien Ad Hoc Group, and the Second Lien Indenture Trustee.  For the avoidance of doubt, all costs, liabilities, and expenses reasonably incurred by the Plan Administrator, and any personnel employed by the Plan Administrator in the performance of the Plan Administrator's duties, shall be paid from the Plan Administrator Assets.

93.     "*Plan Administrator Assets*" means, on the Effective Date, all assets of the Estates, including interests in non-Debtor subsidiaries, vested in the Plan Administrator, and, thereafter, all assets held from time to time by the Plan Administrator.

94.     "*Plan Supplement*" means the compilation of documents and forms of documents, schedules, and exhibits to the Plan, to be Filed at least seven (7) days prior to the Voting Deadline, as amended, supplemented, or otherwise modified from time to time in accordance with the terms hereof, the Bankruptcy Code, and the Bankruptcy Rules, including:  (a) a list of Executory Contracts and Unexpired Leases to be assumed or assumed and assigned pursuant to the Plan, and as may be amended by the Debtors in accordance with the Plan prior to the Effective Date; (b) a schedule of the Retained Causes of Action; (c) identification and compensation of the Plan Administrator; (d) the amount of the Disputed Claims Reserve Amount; and (e) a summary of the Wind Down Budget, subject to appropriate confidentiality protections.

95.     "*Priority Claims*" means Priority Tax Claims and Other Priority Claims.

96.     "*Priority Tax Claim*" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

97.     "*Pro Rata*" means the proportion that an Allowed Claim or Allowed Interest in a particular Class bears to the aggregate amount of Allowed Claims or Allowed Interests in that respective Class, or the proportion that Allowed Claims or Allowed Interests in a particular Class bear to the aggregate amount of Allowed Claims or Allowed Interests in a particular Class and other Classes entitled to share in the same recovery as such Allowed Claim or Allowed interests under the Plan.

98.     "*Professional*" means an Entity employed pursuant to a Bankruptcy Court order in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Confirmation Date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code.

11

99.     "*Professional Fee Escrow*" means an interest-bearing escrow account to hold an amount of Cash equal to the Professional Fee Escrow Amount funded by the Debtors as soon as reasonably practicable after the Confirmation Date and no later than the Effective Date solely for the purpose of paying all remaining Allowed and unpaid Fee Claims.  Such Cash shall remain subject to the jurisdiction of the Bankruptcy Court.

100.     "*Professional Fee Escrow Amount*" means the aggregate unpaid Fee Claims through the Confirmation Date as estimated in accordance with Article II.B.

101.     "*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

102.     "*Proof of Interest*" means a proof of Interest Filed against any of the Debtors in the Chapter 11 Cases.

103.     "*Purchaser*" means one or more Entities in its or their respective capacities as a purchaser or purchasers under the Sale Transaction Documentation.

104.     "*Reinstated*" or "*Reinstatement*" means, with respect to Claims and Interests, the treatment provided for in section 1124 of the Bankruptcy Code.

105.     "*Released Party*" means each of the following, solely in its capacity as such:  (a) the First Lien Noteholders; (b) the First Lien Ad Hoc Group; (c) the Second Lien Noteholders; (d) the Second Lien Ad Hoc Group; (e) the Unsecured Noteholders; (f) the Unsecured Notes Ad Hoc Committee; (g) the First Lien Indenture Trustee; (h) the Second Lien Indenture Trustee; (i) the 2.625% Senior Notes Indenture Trustee; (j) the 3.125% Senior Notes Indenture Trustee; (k) the Committee and its members; and (l) with respect to each of the Debtors and each of the foregoing entities in clauses (a) through (k), such Entity and its current and former Affiliates and subsidiaries, and such Entities' and their current and former Affiliates' and subsidiaries' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; *provided* that any holder of a Claim or Interest that opts out or otherwise objects to the releases in the Plan shall not be a "Released Party."

106.     "*Releasing Party*" means each of the following, solely in its capacity as such:  (a) the First Lien Noteholders; (b) the First Lien Ad Hoc Group; (c) the Second Lien Noteholders; (d) the Second Lien Ad Hoc Group; (e) the Unsecured Noteholders; (f) the Unsecured Notes Ad Hoc Committee; (g) the First Lien Indenture Trustee; (h) the Second Lien Indenture Trustee; (i) the 2.625% Senior Notes Indenture Trustee; (j) the 3.125% Senior Notes Indenture Trustee; (k) the Committee and its members; (l) all holders of Claims, (m) all holders of Interests, and (n) with respect to each of the Debtors and each of the foregoing entities in clauses (a) through (m), such Entity and its current and former Affiliates and subsidiaries, and such Entities' and their current and former Affiliates' and subsidiaries' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; *provided* that any holder of a Claim or Interest that opts out or otherwise objects to the releases in the Plan shall not be a "Releasing Party."

107.     "*Restructuring Transactions*" shall have the meaning set forth in Article IV.B.

108.     "*Retained Causes of Action*" means all claims and Causes of Action of the Debtors identified in the Plan Supplement.

109.     "*Sales Incentive Plan*" means the *Cobalt International Energy, Inc. Sales Incentive Plan*, dated as of November 13, 2017.

110.    "*Sale Transaction*" means, collectively, one or more sales of any or all of the Debtors' assets or equity interests in the Debtors or one or more of its direct and indirect subsidiaries (or any successor entities thereof) pursuant to this Plan.

111.    "*Sale Transaction Documentation*" means one or more asset purchase agreements and related documents, pursuant to which the Debtors will effectuate the Sale Transaction (if any).

112.    "*Sale Transaction Proceeds*" means any Cash, Cash equivalents, or securities that are proceeds from a Sale Transaction.

113.    "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial accordance with the Official Bankruptcy Forms, as the same may have been amended, modified, or supplemented from time to time.

114.    "*SEC*" means the United States Securities and Exchange Commission.

115.    "*Second Lien Ad Hoc Group*" means the ad hoc group of Second Lien Noteholders represented by Akin Gump Strauss Hauer & Feld LLP.

116.    "*Second Lien Indenture*" means that certain Indenture, dated as of December 6, 2016, as amended, modified, or supplemented from time to time, by and between Cobalt, as issuer, the Second Lien Indenture Trustee, and certain of the Debtors, as guarantors.

117.    "*Second Lien Indenture Trustee*" means U.S. Bank National Association, in its capacity as indenture trustee, collateral agent, registrar, paying agent, transfer agent, and custodian under the Second Lien Indenture, and any successor thereto.

118.    "*Second Lien Noteholders*" means holders of Second Lien Notes.

119.    "*Second Lien Notes*" means those certain 7.75% second lien notes due 2023, issued by Cobalt pursuant to the Second Lien Indenture.

120.    "*Second Lien Notes Claims*" means any Claim arising under, derived from, or based upon the Second Lien Notes and the Second Lien Indenture, which shall be Allowed in the amount of $934,732,000.00 less $1,900,000.00 negotiated in connection with the Sale Transaction for the Debtors' Heidelberg assets, plus accrued interest and all other fees, costs, expenses, premiums, and other amounts provided for under the Second Lien Indenture, in each case to the extent Allowed, including under section 506 of the Bankruptcy Code.

121.    "*Second Lien Notes Deficiency Claim*" means the portion of the Second Lien Notes Claim constituting a general unsecured claim under section 506(a) of the Bankruptcy Code.

122.    "*Second Lien Notes Secured Claims*" means any Second Lien Notes Claim that is Secured.

123.    "*Second Lien Recovery*" means any Net Cash (including proceeds of any Sale Transaction) in excess of amounts necessary to satisfy all Allowed Administrative Claims, Allowed Fee Claims, and Allowed First Lien Notes Claims, in each case in full, in Cash, as provided herein.

124.    "*Section 510(b) Claims*" means any Claim against any Debtor arising from rescission of a purchase or sale of a security of any Debtor or an Affiliate of any Debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.  For the avoidance of doubt, any Claim or Interest derived from, based upon, relating to, or arising under the subject matter of that certain securities litigation styled as *In re Cobalt International Energy, Inc. Securities Litigation*, Civil Action No. H-14-3428 (S.D. Tex.) shall be a Section 510(b) Claim.

13

125.    "*Secured*" means when referring to a Claim, a Claim: (a) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or that is subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in such Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code; or (b) otherwise Allowed pursuant to the Plan as a Secured Claim.

126.    "*Secured Tax Claims*" means any Secured Claim against any Debtor that, absent its secured status, would be entitled to priority in right of payment under section 507(a)(8) of the Bankruptcy Code (determined irrespective of time limitations), including any related Secured Claim for penalties.

127.    "*Security*" shall have the meaning set forth in section 101(49) of the Bankruptcy Code.

128.    "*Sonangol Settlement*" means the settlement between certain non-Debtor subsidiaries, Sociedade Nacional de Combustíveis de Angola—Empresa Pública, and Sonangol Pesquisa e Produção, S.A as set forth in Exhibit A to the *Order Approving Debtors' Motion for Entry of an Order (I) Authorizing Performance Under Settlement Agreement, (II) Approving Settlement Agreement, and (III) Granting Related Relief* [Docket No. 300].

129.    "*Subordinated Claim*" means any Claim that is subject to subordination, including any Claims arising from rescission of a purchase or sale of a Security of any Debtor or an Affiliate of any Debtor, which Security is not an Interest, for damages arising from the purchase or sale of such a Security, or for reimbursement or contribution allowed under Section 502 of the Bankruptcy Code on account of such Claim.

130.    "*Subsidiary General Unsecured Claim*" means any Claim against any Debtor other than Cobalt, including a Second Lien Notes Deficiency Claim, that is not otherwise paid in full during the Chapter 11 Cases pursuant to an order of the Bankruptcy Court and is not: (a) an Administrative Claim; (b) a Priority Tax Claim; (c) an Other Priority Claim; (d) an Other Secured Claim; (e) a First Lien Notes Claim; (f) a Second Lien Notes Secured Claim; (g) an Intercompany Claim; (h) a Cobalt General Unsecured Claim; or (i) a Section 510(b) Claim.

131.    "*Subsidiary General Unsecured Claims Recovery*" means (a) any Net Cash (including proceeds of any Sale Transaction) in excess of amounts necessary to (i) satisfy all Allowed Administrative Claims, Allowed Fee Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, Allowed Other Secured Claims, Allowed First Lien Notes Claims, and Allowed Second Lien Notes Secured Claims, in each case in full, in Cash, as provided herein, if any, plus (b) Cash recoveries (if any) on account of unencumbered assets (if any) at the applicable Debtor other than Cobalt not subject to adequate protection claims under the Cash Collateral Order.

132.    "*Successful Bidder*" means an Entity whose bid for some or all of the Debtors' assets, which for the avoidance of doubt may include the transaction contemplated under the Plan, is selected by the Debtors and approved by the Bankruptcy Court as the highest and otherwise best bid pursuant to the Bidding Procedures.

133.    "*U.S. Trustee*" means the Office of the United States Trustee for the Southern District of Texas.

134.    "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

135.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Claim or an Interest that is unimpaired within the meaning of section 1124 of the Bankruptcy Code, including through payment in full in cash.

136.    "*Unsecured Notes Ad Hoc Committee*" means the ad hoc committee of Unsecured Noteholders represented by Milbank, Tweed, Hadley &McCloy LLP.

137.    "*Unsecured Notes Claim*" means any Claim derived from or based upon the Unsecured Notes or the Unsecured Notes Indentures.

138.    "*Unsecured Notes*" means, collectively, the 2.625% Senior Notes and the 3.125% Senior Notes.

14

139.     "*Unsecured Noteholders*" means the holders of the Unsecured Notes.

140.     "*Unsecured Notes Indentures*" means, collectively, the 2.625% Senior Notes Indenture and the 3.125% Senior Notes Indenture.

141.     "*Voting Deadline*" means March 28, 2018 at 4:00 p.m., prevailing Central Time.

142.     "*Wind Down Budget*" means the budget for the reasonable activities and expenses to be incurred in winding down the Chapter 11 Cases and administering the Excluded Assets, which shall be subject to appropriate confidentiality protections.

B.     *Rules of Interpretation*

For purposes herein:  (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) except as otherwise provided, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (3) except as otherwise provided, any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified in accordance with the terms of the Plan; (4) unless otherwise specified, all references herein to "Articles" are references to Articles of the Plan or hereto; (5) unless otherwise stated, the words "herein," "hereof," and ''hereto'' refer to the Plan in its entirety rather than to a particular portion of the Plan; (6) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (7) the words "include" and "including," and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation;" (8) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (9) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (10) any docket number references in the Plan shall refer to the docket number of any document Filed with the Bankruptcy Court in the Chapter 11 Cases; (11) references to "Proofs of Claim," "Holders of Claims," "Disputed Claims," and the like shall include "Proofs of Interest," "Holders of Interests," "Disputed Interests," and the like, as applicable; (12) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (13) any effectuating provisions may be interpreted by the Debtors in such a manner that is consistent with the overall purpose and intent of the Plan all without further notice to or action, Order, or approval of the Bankruptcy Court or any other Entity; (14) except as otherwise provided, any references to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter; and (15) references to docket numbers are references to the docket numbers of documents filed in the Chapter 11 Cases under the Bankruptcy Court's CM/ECF system.

C.     *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to the Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

D.     *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control).

15

E.    *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.

F.    *Controlling Document*

In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects.  In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the Plan shall control.  In the event of an inconsistency between the Confirmation Order and the Plan, the Confirmation Order shall control.

**ARTICLE II.**
**ADMINISTRATIVE CLAIMS AND PRIORITY CLAIMS**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III hereof.

A.    *Administrative Claims*

Except with respect to Administrative Claims that are Fee Claims and except to the extent that an Administrative Claim has already been paid during the Chapter 11 Cases or a holder of an Allowed Administrative Claim and the applicable Debtor(s) agree to less favorable treatment, each holder of an Allowed Administrative Claim shall be paid in full in Cash on the unpaid portion of its Allowed Administrative Claim on the latest of:  (a) on or as soon as reasonably practicable after the Effective Date if such Administrative Claim is Allowed as of the Effective Date; (b) on or as soon as reasonably practicable after the date such Administrative Claim is Allowed; and (c) the date such Allowed Administrative Claim becomes due and payable, or as soon thereafter as is reasonably practicable; *provided* that Allowed Administrative Claims that arise in the ordinary course of the Debtors' businesses, including Claims held by Governmental Units for taxes incurred by the Debtors following the Petition Date (in accordance with section 503(b)(1)(D) of the Bankruptcy Code), shall be paid in the ordinary course of business in accordance with applicable law and the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions; *provided* that any Administrative Claim that has been assumed by the Purchaser pursuant to the Sale Transaction Documentation shall not be an obligation of the Debtors.  Notwithstanding the foregoing, no request for payment of an Administrative Claim need be Filed with respect to an Administrative Claim previously Allowed by Final Order.

Except as otherwise provided in this Article II.A and except with respect to Administrative Claims that are Fee Claims, requests for payment of Allowed Administrative Claims must be Filed and served on the Debtors pursuant to the procedures specified in the Confirmation Order and the notice of entry of the Confirmation Order no later than the Administrative Claims Bar Date.  Holders of Administrative Claims that are required to, but do not, File and serve a request for payment of such Administrative Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Claims against the Debtors or their property and such Administrative Claims shall be deemed discharged as of the Effective Date.  Objections to such requests, if any, must be Filed and served on the requesting party by the Administrative Claims Objection Bar Date.

B.    *Professional Compensation*

1.    Professional Fee Escrow

As soon as reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall establish the Professional Fee Escrow.  The Debtors shall fund the Professional Fee Escrow with Cash equal to the Professional Fee Escrow Amount.  The Professional Fee Escrow shall be funded no later than the Effective Date and maintained in trust for the Professionals and shall not be considered property of the Debtors' Estates or the Plan Administrator; *provided* that the Estates shall have a reversionary interest in the excess amount, if

16

any, remaining in the Professional Fee Escrow Account when all such Allowed amounts owing to Professionals have been paid in full, and any remaining amount in the Professional Fee Escrow Account shall promptly be transferred to the Estates and shall be distributed by the Plan Administrator in accordance with the Plan without any further action or order of the Bankruptcy Court.

2.  Final Fee Applications and Payment of Fee Claims

All final requests for payment of Fee Claims incurred during the period from the Petition Date through the Confirmation Date, shall be Filed no later than the first Business Day that is 45 days following the Effective Date. All Entities' respective rights (if any) to object to allowance or payment of all or any portion of any Fee Claims shall be preserved.  After notice and a hearing in accordance with the procedures established by the Bankruptcy Code, Bankruptcy Rules and prior Bankruptcy Court orders, the Allowed amounts of such Fee Claims shall be determined by the Bankruptcy Court.  The amount of Fee Claims owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow when such Claims are Allowed by a Final Order.  To the extent that funds held in the Professional Fee Escrow are unable to satisfy the Allowed amount of Fee Claims owing to the Professionals, such Professionals shall have an Allowed Administrative Claim for any such deficiency, which shall be satisfied in accordance with Article II.A of the Plan.

3.  Estimation of Fees and Expenses

To receive payment for unbilled fees and expenses incurred through the Confirmation Date, the Professionals shall estimate their Fee Claims before and as of the Confirmation Date and shall deliver such estimate to the Debtors no later than 10 days prior to the Effective Date; *provided* that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional and such Professionals are not bound to any extent by the estimates.  If a Professional does not provide an estimate, the Debtors may estimate the unbilled fees and expenses of such Professional.  The total amount so estimated shall be utilized by the Debtors to determine the Professional Fee Escrow Amount.

4.  Post-Confirmation Date Fees and Expenses

Upon the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code or the Interim Compensation Order in seeking retention or compensation for services rendered after such date shall terminate, and the Debtors may employ and pay any Professional or Ordinary Course Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

C.  *Priority Tax Claims*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each holder of such Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.  In the event an Allowed Priority Tax Claim is also a Secured Tax Claim, such Claim shall, to the extent it is Allowed, be treated as an Other Secured Claim if such Claim is not otherwise paid in full; *provided* that to the extent an Allowed Priority Tax Claim has not been satisfied prior to the Effective Date, no Cash payment shall be made on such Allowed Priority Tax Claim until the Allowed First Lien Notes Claims and the Allowed Second Lien Notes Claims have either been paid in full or received such other treatment rendering such Claims Unimpaired, as applicable, except to the extent of any unencumbered assets.

D.  *Statutory Fees*

All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code prior to the Effective Date shall be paid by the Debtors.  From and after the Effective Date, the Debtors and the Plan Administrator shall be jointly liable for and shall pay the fees assessed against the Estates under 28 U.S.C. § 1930 until the Chapter 11 Cases are converted, dismissed or closed, whichever occurs first.  In addition, the Debtors and/or the Plan Administrator shall file any pre-confirmation monthly operating reports not filed as of the Confirmation Hearing, in

conformity with the U.S. Trustee guidelines.  The U.S. Trustee shall not be required to file a request for payment of its quarterly fees, which shall be deemed an Administrative Claim against the Debtors and their Estates.

**ARTICLE III.**
**CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS**

A.      *Summary of Classification*

Claims and Interests, except for Administrative Claims, Fee Claims, and Priority Tax Claims, are classified in the Classes set forth in this Article III.  A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes.  A Claim is also classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

1.      Class Identification

The classification of Claims and Interests against each Debtor (as applicable) pursuant to the Plan is as follows:

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 2 | Other Secured Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 3 | First Lien Notes Claims | Unimpaired | Not Entitled to Vote (Presumed to Accept) |
| 4 | Second Lien Notes Secured Claims | Impaired | Entitled to Vote |
| 5 | Subsidiary General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Cobalt General Unsecured Claims | Impaired | Entitled to Vote |
| 7 | Section 510(b) Claims | Impaired | Not Entitled to Vote (Deemed to Reject) |
| 8 | Intercompany Claims | Impaired | Shall Not Vote |
| 9 | Intercompany Interests | Unimpaired/Impaired | Not Entitled to Vote (Presumed to Accept/Deemed to Reject) |
| 10 | Interests in Cobalt | Impaired | Not Entitled to Vote (Deemed to Reject) |

B.      *Treatment of Claims and Interests*

1.      Class 1 – Other Priority Claims

     a.      *Classification*:  Class 1 consists of all Allowed Other Priority Claims.

     b.      *Treatment*:  Except to the extent that a holder of an Allowed Other Priority Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Other Priority Claim, each such holder shall receive payment in full, in Cash, of the unpaid portion of its Allowed Other Priority Claim on the Effective Date or as soon thereafter as reasonably practicable (or, if payment is not then due, shall be paid in accordance with its terms) or pursuant to such other terms as may be agreed to by the holder of an Allowed Other Priority Claim and the Debtors; *provided* that to the extent an Allowed Other Priority Claim has not been satisfied prior to the Effective Date, no Cash payment shall be made on such Allowed Other Priority Claim until the Allowed First Lien Notes Claims and the Allowed Second Lien Notes Claims have either been paid in full or received such other treatment

18

rendering such Claims Unimpaired, as applicable, except to the extent of any unencumbered assets.

    c.    *Voting*:  Class 1 is Unimpaired under the Plan.  Each holder of an Allowed Other Priority Claim will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, each holder of an Allowed Other Priority Claim will not be entitled to vote to accept or reject the Plan.

2.    <u>Class 2 – Other Secured Claims</u>

    a.    *Classification*:  Class 2 consists of all Allowed Other Secured Claims.

    b.    *Treatment*:  On the Effective Date, except to the extent that a holder of an Allowed Other Secured Claim agrees to a less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Other Secured Claim, each such holder shall receive either (i) payment in full in Cash of the unpaid portion of its Allowed Other Secured Claim on the Effective Date or as soon thereafter as reasonably practicable (or if payment is not then due, shall be paid in accordance with its terms), (ii) reinstatement pursuant to section 1124 of the Bankruptcy Code, or (iii) such other recovery necessary to satisfy section 1129 of the Bankruptcy Code.

    c.    *Voting*:  Class 2 is Unimpaired under the Plan.  Each holder of an Allowed Other Secured Claim will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, each holder of an Allowed Other Secured Claim will not be entitled to vote to accept or reject the Plan.

3.    <u>Class 3 – First Lien Notes Claims</u>

    a.    *Classification*:  Class 3 consists of all Allowed First Lien Notes Claims.

    b.    *Allowance*:  The First Lien Notes Claims shall be Allowed in the amount of $500,000,000.00, plus accrued interest and all other fees, costs, expenses, premiums, and other amounts provided for under the First Lien Indenture, and under section 506 of the Bankruptcy Code, less $3,500,000, which amount is estimated to be $552.6 million as of April 30, 2018.

    c.    *Treatment*:  On the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a holder of an Allowed First Lien Notes Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed First Lien Notes Claim, each holder of an Allowed First Lien Notes Claim shall receive payment in full in Cash.

    d.    *Voting*:  Class 3 is Unimpaired under the Plan.  Each holder of an Allowed First Lien Notes Claim will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, each holder of an Allowed First Lien Notes Claim will not be entitled to vote to accept or reject the Plan.

4.    <u>Class 4 – Second Lien Notes Secured Claims</u>

    a.    *Classification*:  Class 4 consists of all Allowed Second Lien Notes Secured Claims.

    b.    *Treatment*:  On the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a holder of an Allowed Second Lien Notes Secured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Second Lien Notes Secured Claim, each

19

holder of an Allowed Second Lien Notes Secured Claim shall receive its Pro Rata share of the Second Lien Recovery  up to payment in full of such holder's Allowed Second Lien Notes Secured Claim.

c.   *Voting*:  Class 4 is either Unimpaired under the Plan as set forth above, in which case Class 4 and each holder of a Second Lien Notes Secured Claim will be conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or Class 4 is Impaired under the Plan, in which case each holder of an Allowed Second Lien Notes Secured Claim will be entitled to vote to accept or reject the Plan.

5.   Class 5 – Subsidiary General Unsecured Claims

a.   *Classification*:  Class 5 consists of all Allowed Subsidiary General Unsecured Claims.

b.   *Treatment*:  On the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a holder of an Allowed Subsidiary General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Subsidiary General Unsecured Claim, each holder of an Allowed Subsidiary General Unsecured Claim shall receive its Pro Rata share of the Subsidiary General Unsecured Claim Recovery up to payment in full of such holder's Allowed Subsidiary General Unsecured Claim.

c.   *Voting*:  Class 5 is Impaired under the Plan.  Each holder of a Subsidiary General Unsecured Claim will be entitled to vote to accept or reject the Plan.

6.   Class 6 – Cobalt General Unsecured Claims

a.   *Classification*:  Class 6 consists of all Allowed Cobalt General Unsecured Claims.

b.   *Allowance of Unsecured Notes Claims*: The Unsecured Notes Claims shall be allowed (i) in respect of the 2.625% Senior Notes, in the amount of $619,167,000.00 plus accrued interest and all other fees, costs, expenses, premiums, and other amounts provided for under the 2.625% Senior Notes Indenture, in each case to the extent Allowed and (ii) in respect of the 3.125% Senior Notes, in the amount of $786,895,000 plus accrued interest and all other fees, costs, expenses, premiums, and other amounts provided for under the 3.125% Senior Notes Indenture, in each case to the extent Allowed.

c.   *Treatment*:  On the Effective Date, or as soon thereafter as reasonably practicable, except to the extent that a holder of an Allowed Cobalt General Unsecured Claim agrees to less favorable treatment, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for each Allowed Cobalt General Unsecured Claim, each holder of an Allowed Cobalt General Unsecured Claim shall receive its Pro Rata share of the Cobalt General Unsecured Claim Recovery up to payment in full of such holder's Allowed Cobalt General Unsecured Claim.

d.   *Voting*:  Class 6 is Impaired under the Plan. Each holder of a Cobalt General Unsecured Claim will be entitled to vote to accept or reject the Plan.

7.   Class 7 – Section 510(b) Claims

a.   *Classification*:  Class 7 consists of all Section 510(b) Claims.

b.   *Treatment*:  On the Effective Date, each Section 510(b) Claim shall be cancelled without any distribution and such holders of Section 510(b) Claims will receive no recovery.

20

c.     *Voting*:  Class 7 is Impaired under the Plan.  Each holder of a 510(b) Claim will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, each holder of a 510(b) Claim will not be entitled to vote to accept or reject the Plan.

8.     Class 8 – Intercompany Claims

a.     *Classification*:  Class 8 consists of all Intercompany Claims.

b.     *Treatment*:  Allowed Intercompany Claims shall be treated *pari passu* with General Unsecured Claims against the applicable Debtor and will share in distributions from such Debtor.  In lieu of Cash payment to the Debtors holding such Intercompany Claims, the distributions on account of such Intercompany Claims may be made to the creditors of the Debtor holding such Intercompany Claims.

c.     *Voting*:  Class 8 is Impaired under the Plan.  Notwithstanding such Impairment, holders of Intercompany Claims will not vote to accept or reject the Plan.

9.     Class 9 – Intercompany Interests

a.     *Classification*:  Class 9 consists of all Intercompany Interests.

b.     *Treatment*:  Intercompany Interests may be, at the option of the Debtors, either: (i) Reinstated as of the Effective Date or (ii) cancelled, and no distribution shall be made on account of such Interests.

c.     *Voting*:  Holders of Intercompany Interests are either Unimpaired, and such holders of Intercompany Interests conclusively are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, or Impaired, and such holders of Intercompany Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, each holder of an Intercompany Interest will not be entitled to vote to accept or reject the Plan.

10.    Class 10 – Interests in Cobalt

a.     *Classification*:  Class 10 consists of all Interests in the Cobalt.

b.     *Treatment*:  On the Effective Date, existing Interests in Cobalt shall be deemed canceled and extinguished, and shall be of no further force and effect, whether surrendered for cancelation or otherwise, and there shall be no distribution to holders of Interests in Cobalt on account of such Interests.

c.     *Voting*:  Class 10 is Impaired under the Plan.  Each holder of an Interest in Cobalt will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, each holder of an Interest in Cobalt will not be entitled to vote to accept or reject the Plan.

C.     *Special Provision Governing Unimpaired Claims*

Nothing under the Plan shall affect the Debtors' rights in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupment against any such Unimpaired Claims.

D.		*Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

The Debtors reserve the right to seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

E.		*Controversy Concerning Impairment*

If a controversy arises as to whether any Claim or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

F.		*Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

G.		*Voting Classes; Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims eligible to vote and no holders of Claims eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by the holders of such Claims in such Class.

H.		*Presumed Acceptance and Rejection of the Plan*

To the extent the Class of Intercompany Interests is cancelled, each holder of an Interest in such Class is deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and is not entitled to vote to accept or reject the Plan.  The Class of Intercompany Claims and, to the extent it is Reinstated, the Class Intercompany Interests, each holder of a Claim or Interest in such Classes is presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and is not entitled to vote to accept or reject the Plan.

I.		*Intercompany Interests*

To the extent Reinstated under the Plan, distributions on account of Intercompany Interests are not being received by holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience.

J.		*Subordinated Claims*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise, including, without limitation, the Intercreditor Agreement. Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**ARTICLE IV.**
**MEANS FOR IMPLEMENTATION OF THE PLAN**

A.		*General Settlement of Claims*

As discussed further in the Disclosure Statement and as otherwise provided herein, pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall

22

constitute a good-faith compromise and settlement of all Claims, Interests, Causes of Action, and controversies released, settled, compromised, discharged, or otherwise resolved pursuant to the Plan. The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromise and settlement under section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such settlement and compromise is fair, equitable, reasonable, and in the best interests of the Debtors and their Estates. Distributions made to holders of Allowed Claims in any Class are intended to be final.

B.      *Restructuring Transactions*

On the Effective Date, or as soon as reasonably practicable thereafter, the Debtors may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan (the "Restructuring Transactions"), including: (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable parties agree; (3) rejection or assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (4) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; and (5) subject to the occurrence of the Effective Date, the consummation of the transactions contemplated by the Sale Transaction.

C.      *Sale Transactions*

On and after the Confirmation Date, the Debtors shall be authorized to consummate the Sale Transaction pursuant to the terms of the Sale Transaction Documentation, the Plan, and the Confirmation Order.

D.      *The Plan Administrator*

1.      Rights and Powers of the Plan Administrator

On the Effective Date, the Plan Administrator shall be appointed. The Plan Administrator shall act for the Debtors in the same fiduciary capacity as applicable to a board of directors and officers, subject to the provisions hereof (and all certificates of formation, membership agreements, and related documents are deemed amended by the Plan to permit and authorize the same). On the Effective Date, the authority, power, and incumbency of any and all persons acting as directors and officers (and other employees, as applicable) of the Debtors and directors and officers of the non-Debtor subsidiaries shall be deemed to have been terminated, and a representative of the Plan Administrator shall (a) be appointed as the sole manager and sole officer of the Debtors, (b) succeed to all of the powers of the Debtors' directors and officers under applicable law or otherwise, and (c) appoint new directors and officers of the non-Debtor subsidiaries.

Among other things, the Plan Administrator shall be responsible for: (a) winding down the Debtors' businesses and affairs as expeditiously as reasonably possible; (b) resolving Disputed Claims; (c) making all distributions to holders of Allowed Claims in accordance with the Plan; (d) pursuing or otherwise commencing and litigating any Causes of Action (other than those released herein or pursuant to any prior settlement approved by the Bankruptcy Court), and only to the extent the benefits of such enforcement or prosecution are reasonably believed by the Plan Administrator to outweigh the costs associated therewith; (e) filing appropriate tax returns; and (f) administering the Plan in an efficacious manner. The Plan Administrator shall be deemed to be substituted as the party-in-lieu of the Debtors and the Estates in all matters, including (i) motions, contested matters, and adversary proceedings pending in the Bankruptcy Court, and (ii) all matters pending in any courts, tribunals, forums, or administrative proceedings outside of the Bankruptcy Court, in each case without the need or requirement for the Plan Administrator to file motions or substitutions of parties or counsel in each such matter.

23

2.        Plan Administrator Assets

On the Effective Date, the Plan Administrator Assets shall vest automatically in the Plan Administrator free and clear of all Liens, claims, encumbrances, and other interests.  The Plan shall be considered a motion pursuant to sections 105, 363, and 365 of the Bankruptcy Code for such relief.  The transfer of the Plan Administrator Assets to the Plan Administrator shall be made for the benefit and on behalf of holders of Claims receiving a distribution from proceeds of the Plan Administrator Assets.  The Plan Administrator shall not be deemed a successor in interest of the Debtors for any purpose other than as specifically set forth herein.  In connection with the transfer of the Plan Administrator Assets, any attorney-client privilege, work product privilege, or other privilege or immunity attaching to any documents or communications (whether written or oral) transferred to the Plan Administrator will vest in the Plan Administrator and its representatives, and the Debtors and the Plan Administrator are authorized to take all necessary actions to effectuate the transfer of such privileges to the Plan Administrator.

3.        Fees of the Plan Administrator and Expenses Incurred on or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the fees and expenses incurred by the Plan Administrator on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including attorney fees and expenses) made by the Plan Administrator in connection with the Plan Administrator's duties shall be paid on a monthly basis without any further notice to or action, Order, or approval of the Bankruptcy Court, in Cash if such amounts relate to any actions taken hereunder; *provided* that the Plan Administrator will only be reimbursed for its reasonable and documented out-of-pocket costs and expenses in accordance with the Wind Down Budget.

E.        *Sources of Consideration for Plan Distributions*

The Debtors Cash on hand, the Sale Transaction Proceeds, and any other Cash received or generated by the Debtors shall be used to fund the distributions to holders of Allowed Claims against the Debtors in accordance with the treatment of such Claims and subject to the terms provided herein.

F.        *Disputed Claims Reserve*

On the Effective Date (or as soon thereafter as is reasonably practicable), the Plan Administrator shall deposit in the Disputed Claims Reserve the Disputed Claims Reserve Amount.  For the avoidance of doubt, there shall be no reserve required for Claims against the Debtors, to the extent such Claims are Assumed Liabilities or are released, discharged, or otherwise extinguished pursuant to the Plan, nor shall there be any reserves, holdbacks, escrows, or indemnities arising from the Sale Transaction Documentation or otherwise relating to the Sale Transaction.

G.        *Release of Liens*

Except as otherwise provided herein or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date and concurrently with the applicable distributions made pursuant to the Plan and, in the case of a Secured Claim, satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, settled, and compromised, and the holder of such mortgages, deeds of trust, Liens, pledges, or other security interest shall be authorized to take such actions as may be reasonably requested by the Debtors to evidence such releases.

H.        *Preservation of Causes of Action*

Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Debtors shall convey to the Plan Administrator all rights to commence, prosecute or settle, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, which shall vest in the Plan Administrator pursuant to the terms of the Plan.  The Plan Administrator may enforce all rights to commence, prosecute, or settle, as appropriate, any and all such Causes of Action, whether arising before or after the Petition Date, and the Plan

24

Administrator's rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Plan Administrator may, in its reasonable business judgment, pursue such Causes of Action and may retain and compensate professionals in the analysis or pursuit of such Causes of Action to the extent the Plan Administrator deems appropriate, including on a contingency fee basis. No Entity may rely on the absence of a specific reference in the Plan or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Plan Administrator will not pursue any and all available Causes of Action against them. The Debtors and the Plan Administrator expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan; *provided* that the Debtors before the Effective Date or the Plan Administrator after the Effective Date may prosecute any such Cause of Action against any party only in connection with their objection to and resolution of any Claim asserted by such party. Unless any Cause of Action against an Entity is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order, the Plan Administrator expressly reserves all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. The Plan Administrator reserves and shall retain the foregoing Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. The Plan Administrator shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

I.      *Cancellation of Notes, Instruments, Certificates, and Other Documents*

On the Effective Date, except as otherwise specifically provided for in the Plan and, in the case of a Secured Claim, upon satisfaction in full of the portion of the Secured Claim that is Allowed as of the Effective Date: (1) the obligations of any Debtor under any certificate, share, note, bond, indenture, purchase right, or other instrument or document, directly or indirectly evidencing or creating any indebtedness or obligation of or ownership interest, equity, or portfolio interest in the Debtors or any warrants, options, or other securities exercisable or exchangeable for, or convertible into, debt, equity, ownership, or profits interests in the Debtors giving rise to any Claim or Interest shall be cancelled and deemed surrendered as to the Debtors and shall not have any continuing obligations thereunder, and the 2.625% Senior Notes Indenture Trustee and the 3.125% Senior Notes Indenture Trustee shall be released from all duties thereunder; provided, however, that notwithstanding Confirmation or Consummation, any such indenture or agreement that governs the rights of the holder of a Claim shall continue in effect solely for purposes of (a) allowing Unsecured Noteholders to receive distributions under the Plan; (b) allowing the 2.625% Senior Notes Indenture Trustee and the 3.125% Senior Notes Indenture Trustee to make the distributions in accordance with the Plan (if any); and (c) preserving any rights of the 2.625% Senior Notes Indenture Trustee and the 3.125% Senior Notes Indenture Trustee to payment of fees, expenses, and indemnification obligations as against any money or property distributable to holders under the Unsecured Notes Indentures, including any rights to priority of payment and/or to exercise charging liens; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificates or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, indenture, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of the Debtors shall be fully released, settled, and compromised; *provided* that notwithstanding anything to the contrary contained herein, any indenture or agreement that governs the rights of the First Lien Indenture Trustee, the First Lien Noteholders, the Second Lien Indenture Trustee, or the Second Lien Noteholders shall continue in effect to allow the First Lien Indenture Trustee or the Second Lien Indenture Trustee, as applicable, to (A) enforce the rights, Claims and interests of the First Lien Indenture Trustee or the Second Lien Indenture Trustee and any predecessor thereto vis-à-vis the First Lien Noteholders or the Second Lien Noteholders and any parties other than the Debtors, (B) receive distributions under the Plan and to distribute them to the First Lien Noteholders or the Second Lien Noteholders in accordance with the terms of the First Lien Indenture or the Second Lien Indenture (C) exercise its charging lien for the payment of its fees and expenses and for indemnification as provided in the First Lien Indenture or the Second Lien Indenture, if not otherwise paid hereunder or in the Chapter 11 Cases, and (D) appear and be heard in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court, including to enforce any obligation owed to the First Lien Indenture Trustee, the First Lien Noteholders, the Second Lien Indenture Trustee, or the Second Lien Noteholders under the Plan. Except as provided in the Plan, on the Effective Date, the First Lien Indenture Trustee shall be automatically and fully discharged of all its duties and obligations associated with the

25

First Lien Notes, the First Lien Indenture, and all related agreements, and the Second Lien Indenture Trustee shall be automatically and fully discharged of all its duties and obligations associated with the Second Lien Notes, the Second Lien Indenture, and all related agreements.

If the record holder of the First Lien Notes is DTC or its nominee or another securities depository or custodian thereof, and such First Lien Notes are represented by a global security held by or on behalf of DTC or such other securities depository or custodian, then, upon satisfaction in full of the First Lien Notes Claims, each such holder of the First Lien Notes shall be deemed to have surrendered such holder's note, debenture or other evidence of indebtedness upon surrender of such global security by DTC or such other securities depository or custodian thereof.

J.       *Corporate Action*

Upon the Effective Date, by virtue of the solicitation of votes in favor of the Plan and entry of the Confirmation Order, all actions contemplated by the Plan (including any action to be undertaken by the Plan Administrator) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by holders of Claims or Interests, the Debtors, or any other Entity or Person.  All matters provided for in the Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Debtors or the Debtors' Estates.

The Plan Administrator shall dissolve all of the Debtors, which dissolution shall be effectuated at a time following the Effective Date determined by the Plan Administrator.

On the Effective Date, the terms of all directors, managers, and officers of all Debtors shall be deemed to have expired, all such directors, managers, and officers shall be released of their duties, and all actions solely in furtherance of the Plan shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by the Debtors, holders of Claims or Interests, directors, managers, or officers of the Debtors, or any other Entity or Person, including the transfer of assets of the Debtors to the Plan Administrator and the dissolution or winding up of the Debtors.  The directors, managers, and officers of the Debtors and the Plan Administrator, as applicable, shall be authorized to execute, deliver, File, or record such contracts, instruments, release, and other agreements or documents and take such other actions as they may deem in their sole discretion necessary or appropriate to effectuate and implement the provisions of the Plan.  The authorizations and approvals contemplated by this Article IV.J shall be effective notwithstanding any requirements under non-bankruptcy law.

K.       *Effectuating Documents; Further Transactions*

Prior to the Effective Date, the Debtors are, and on and after the Effective Date, the Plan Administrator, and the officers and members thereof are authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

L.       *Exemption from Certain Taxes and Fees*

Any post-Confirmation transfer from any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to: (1) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors; or (2) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, or other similar tax or governmental assessment, in each case to the extent permitted by applicable bankruptcy law, and the appropriate state or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

26

M.      *Release of Avoidance Actions*

On the Effective Date, and except to the extent otherwise reserved in the Plan Supplement, the Debtors, on behalf of themselves and their estates, shall release any and all Avoidance Actions and the Debtors, and any of their successors or assigns and any Entity acting on behalf of the Debtors shall be deemed to have waived the right to pursue any and all Avoidance Actions.  No Avoidance Actions shall revert to creditors of the Debtors.

N.      *Director and Officer Liability Insurance*

The Debtors shall be deemed to have assumed all of the Debtors' D&O Liability Insurance Policies pursuant to section 365(a) of the Bankruptcy Code effective as of the Effective Date, and coverage for defense and indemnity under any of the D&O Liability Insurance Policies shall remain available to all individuals within the definition of "Insured" in any of the D&O Liability Insurance Policies.  Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Debtors' foregoing assumption of each of the unexpired D&O Liability Insurance Policies.  Notwithstanding anything to the contrary contained in the Plan, and except as otherwise may be provided in an Order from the Bankruptcy Court, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Debtors under the Plan as to which no Proof of Claim need be filed.  Provided, however, that the holder(s) of a Claim for an indemnity obligation will look only to the D&O Liability Insurance Policies for recovery and not the Estates.

O.      *Compensation and Benefits Programs*

On the Effective Date, the Debtors or the Plan Administrator, as applicable, shall honor and satisfy any and all remaining obligations under the Compensation and Benefit Programs.

P.      *Closing the Chapter 11 Cases*

Upon the occurrence of the Effective Date, the Plan Administrator shall be permitted to close all of the Chapter 11 Cases except for the Chapter 11 Case of Cobalt, and all contested matters relating to each of the Debtors, including objections to Claims, shall be administered and heard in the Chapter 11 Case of Cobalt.

When all Disputed Claims have become Allowed or Disallowed and all remaining Cash has been distributed in accordance with the Plan, the Plan Administrator shall seek authority from the Bankruptcy Court to close the Chapter 11 Case of Cobalt in accordance with the Bankruptcy Code and the Bankruptcy Rules.

**ARTICLE V.**
**TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

A.      *Assumption and Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided herein, each Executory Contract and Unexpired Lease not previously rejected, assumed, or assumed and assigned, including, without limitation, any employee benefit plans, severance plans, and other Executory Contracts under which employee obligations arise, shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease:  (1) is specifically described in the Plan as to be assumed in connection with confirmation of the Plan, or is specifically scheduled to be assumed or assumed and assigned pursuant to the Plan or the Plan Supplement; (2) is subject to a pending motion to assume such Unexpired Lease or Executory Contract as of the Effective Date; (3) is to be assumed or assumed and assigned to the Purchaser or another third party, as applicable, in connection with a Sale Transaction; (4) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; or (5) is a D&O Liability Insurance Policy.  Entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of such assumptions, assignments, and rejections, including the assumption of the Executory Contracts or Unexpired Leases as provided in the Plan Supplement, pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated, assumptions

27

or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan or the Sale Transaction Documentation are effective as of the Effective Date. Any motions to assume Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by a Final Order of the Bankruptcy Court on or after the Effective Date.

B.      *Claims Based on Rejection of Executory Contracts or Unexpired Leases*

Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be Filed with the Bankruptcy Court by the later of: (1) the Claims Bar Date, Administrative Claims Bar Date, or the Governmental Bar Date, as applicable; and (2) 4:00 p.m., prevailing Central Time, on the date that is thirty (30) days following the entry of an Order of the Bankruptcy Court (including the Confirmation Order) approving such rejection. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed within such time shall be automatically Disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, their Estates, the Plan Administrator, and/or the Purchaser, or property of the foregoing parties, without the need for any objection by the Debtors, their Estates, the Plan Administrator, and/or the Purchaser and without the need for any further notice to, or action, order, or approval of the Bankruptcy Court. Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims and shall be treated in accordance with Article III of the Plan, as applicable.

C.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Any Cure Claims under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure Claim in Cash on the Effective Date or as soon as reasonably practicable thereafter, subject to the limitations described below, by the Debtors as an Administrative Claim or by the Purchaser in accordance with the Sale Transaction Documentation, as applicable, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute regarding (1) the amount of the Cure Claim, (2) the ability of the Debtors' Estates or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (3) any other matter pertaining to assumption, the Cure Claims required by section 365(b)(1) of the Bankruptcy Code shall be satisfied following the entry of a Final Order or Orders resolving the dispute and approving the assumption.

Unless otherwise provided by an Order of the Bankruptcy Court, at least seven (7) days before the Voting Deadline, the Debtors shall cause notice of proposed assumption and proposed Cure Claims to be sent to applicable counterparties. Any objection by such counterparty must be Filed, served, and actually received by the Debtors not later than seven days after service of notice of the Debtors' proposed assumption and associated Cure Claims. Any counterparty to an Executory Contract or Unexpired Lease that fails to object timely to the proposed assumption or cure amount will be deemed to have assented to such assumption or Cure Claim.

Assumption (or assumption and assignment) of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, subject to satisfaction of the Cure Claims, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the effective date of assumption and/or assignment. **Any liabilities reflected in the Schedules and any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed and assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity.**

D.      *Preexisting Obligations to the Debtors Under Executory Contracts and Unexpired Leases*

Rejection or repudiation of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of preexisting obligations owed to the Debtors under such contracts or leases as modified, amended, supplemented, or restated. In particular, notwithstanding any non-bankruptcy law to the contrary, the Plan Administrator expressly reserves and does not waive any right to receive, or any continuing obligation of a counterparty to provide, warranties or continued maintenance obligations on goods previously

28

purchased, or services previously received, by the contracting Debtors from counterparties to rejected or repudiated Executory Contracts or Unexpired Leases.

E.     *Sale Transaction Documentation; Assumed Contracts*

The Debtors' assumption or rejection of any Executory Contract or Unexpired Lease pursuant to the Plan shall be subject in all respects to any Purchaser's rights and obligations, including any Cure Claims assumed by the Purchaser in accordance with the Sale Transaction Documentation, with respect to any such Executory Contracts or Unexpired Leases that are assumed by the Purchaser pursuant Sale Transaction Documentation.

F.     *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith, absent a Bankruptcy Court order to the contrary.

G.     *Reservation of Rights*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the list of Executory Contracts and Unexpired Leases to be assumed pursuant to the Plan contained in the Plan Supplement, nor anything else in the Plan or the Sale Transaction Documentation, shall constitute an admission by the Debtors or any other Entity, as applicable, that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that either any Debtor or any other Entity, as applicable, has any liability thereunder.

H.     *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code.

**ARTICLE VI.**
**PROVISIONS GOVERNING DISTRIBUTIONS**

A.     *Timing and Calculation of Amounts to Be Distributed*

Except as otherwise provided in the Plan, on the Effective Date (or if a Claim or Interest is not an Allowed Claim or Allowed Interest on the Effective Date, on the date that such a Claim or Interest becomes an Allowed Claim or Allowed Interest, or as soon as reasonably practicable thereafter), each holder of an Allowed Claim against or Allowed Interest in the Debtors shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Allowed Interests in the applicable Class from the Plan Administrator, on behalf of the Debtors, as applicable; *provided* that the Plan Administrator will use reasonable commercial efforts to make distributions to holders of General Unsecured Claims that are Allowed as of the Effective Date within sixty (60) days of the Effective Date.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims or Disputed Interests, distributions on account of any such Disputed Claims or Disputed Interests shall be made pursuant to the provisions set forth in Article VII of the Plan.  Except as otherwise

29

provided in the Plan, holders of Claims or Interests shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.  Notwithstanding anything to the contrary herein, no holder of an Allowed Claim or Allowed Interest shall, on account of such Allowed Claim or Allowed Interest, receive a distribution in excess of the Allowed amount of such Claim or Interest plus any postpetition interest on such Claim or Interest payable in accordance with the Plan or other Final Order of the Bankruptcy Court, including the Cash Collateral Order.  For the avoidance of doubt unless expressly provided to the contrary in this Plan or the Confirmation Order, postpetition interest shall be paid on account of the First Lien Notes Claims as contemplated in the Cash Collateral Order, and the Second Lien Notes Claims shall be entitled to postpetition interest only to the extent the Allowed Second Lien Notes Claims are secured by collateral in excess of the amount of such Allowed Second Lien Claims on the Effective Date.

B.      *Distributions by the Plan Administrator*

All distributions under the Plan shall be made by the Plan Administrator.  The Plan Administrator shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Plan Administrator is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Plan Administrator.

Subject to the terms of the Plan, the Plan Administrator shall be empowered to:  (1) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (2) make all distributions contemplated under the Plan; (3) employ professionals to represent it with respect to its responsibilities; (4) object to, Allow, or otherwise resolve any General Unsecured Claim, Priority Claim, or Other Secured Claim, subject to the terms hereof; and (5) exercise such other powers as may be vested in the Plan Administrator by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Plan Administrator to be necessary and proper to implement the provisions of the Plan.

C.      *Distributions on Account of Claims Allowed After the Effective Date*

1.      Payments and Distributions on Disputed Claims

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

2.      Special Rules for Distributions to Holders of Disputed Claims

Notwithstanding any provision otherwise in the Plan and except as may be agreed to by the Debtors or the Plan Administrator, on the one hand, and the holder of a Disputed Claim, on the other hand, no partial payments and no partial distributions shall be made with respect to any Disputed Claim until all Disputed Claims held by the holder of such Disputed Claim have become Allowed Claims or have otherwise been resolved by settlement or Final Order.

D.      *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

1.      Record Date for Distribution

On the Distribution Record Date, the Claims Register shall be closed and the Debtors, the Plan Administrator, or any other party responsible for making distributions shall instead be authorized and entitled to recognize only those record holders listed on the Claims Register as of the close of business on the Distribution Record Date.

2.      Delivery of Distributions

a.      Delivery of Distributions to the First Lien Indenture Trustee

30

Except as otherwise provided in the Plan or reasonably requested by the First Lien Indenture Trustee, all distributions to holders of First Lien Notes Claims shall be deemed completed when made to (or at the direction of) the First Lien Indenture Trustee, which shall be deemed to be the holder of all First Lien Notes Claims for purposes of distributions to be made hereunder; *provided* that any non-Cash consideration shall not be distributed in the name of the First Lien Indenture Trustee. The First Lien Indenture Trustee shall hold or direct such distributions for the benefit of the holders of Allowed First Lien Notes Claims, as applicable. As soon as practicable in accordance with the requirements set forth in this Article VI, the First Lien Indenture Trustee shall arrange to deliver such distributions to or on behalf of such holders of Allowed First Lien Notes Claims in accordance with the First Lien Indenture and subject to the rights of the First Lien Indenture Trustee to assert its charging lien. If the First Lien Indenture Trustee is unable to make, or consents to the Plan Administrator making such distributions, the Plan Administrator, with the First Lien Indenture Trustee's cooperation, shall make such distributions to the extent practicable to do so (provided that until such distributions are made, the First Lien Indenture Trustee's charging lien shall attach to the property to be distributed in the same manner as if such distributions were made through the First Lien Indenture Trustee). The First Lien Indenture Trustee shall have no duties or responsibility relating to any form of distribution that is not DTC eligible and the Debtors or the Plan Administrator, as applicable, shall seek the cooperation of DTC so that any distribution on account of a First Lien Notes Claim that is held in the name of, or by a nominee of, DTC, shall be made through the facilities of DTC on the Effective Date or as soon as practicable thereafter. The Debtors shall reimburse the First Lien Indenture Trustee for any reasonable and documented fees and expenses incurred after the Effective Date solely in connection with making distributions pursuant to and in accordance with the Plan.

b.       Delivery of Distributions to the Second Lien Indenture Trustee

Except as otherwise provided in the Plan or reasonably requested by the Second Lien Indenture Trustee, all distributions to holders of Second Lien Notes Claims shall be deemed completed when made to the Second Lien Indenture Trustee, which shall be deemed to be the holder of all Second Lien Notes Claims for purposes of distributions to be made hereunder. The Second Lien Indenture Trustee shall hold or direct such distributions for the benefit of the holders of Allowed Second Lien Notes Claims, as applicable. As soon as practicable in accordance with the requirements set forth in this Article VI, the Second Lien Indenture Trustee shall arrange to deliver such distributions to or on behalf of such holders of Allowed Second Lien Notes Claims. The Second Lien Indenture Trustee may transfer or direct the transfer of such distributions directly through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise) and will be entitled to recognize and deal for all purposes under the Plan with holders of Allowed Second Lien Notes Claims to the extent consistent with the customary practices of DTC. Such distributions shall be subject in all respects to the right of the Second Lien Indenture Trustee to assert its applicable charging liens against such distributions. All distributions made to holders of Allowed Second Lien Notes Claims shall be eligible to be distributed through the facilities of DTC and as provided for under the Second Lien Indenture.

c.       Delivery of Distributions to the 2.625% Senior Notes Indenture Trustee

Except as otherwise provided in the Plan or reasonably requested by the 2.625% Senior Notes Indenture Trustee, all distributions to holders of 2.625% Senior Notes Claims shall be deemed completed when made to the 2.625% Senior Notes Indenture Trustee, which shall be deemed to be the holder of all 2.625% Senior Notes Claims for purposes of distributions to be made hereunder. The 2.625% Senior Notes Indenture Trustee shall hold or direct such distributions for the benefit of the holders of Allowed 2.625% Senior Notes Claims, as applicable. As soon as practicable in accordance with the requirements set forth in this Article VI, the 2.625% Senior Notes Indenture Trustee shall arrange to deliver such distributions to or on behalf of such holders of Allowed 2.625% Senior Notes Claims. The 2.625% Senior Notes Indenture Trustee may transfer or direct the transfer of such distributions directly through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise) and will be entitled to recognize and deal for all purposes under the Plan with holders of Allowed 2.625% Senior Notes Claims to the extent consistent with the customary practices of DTC. Such distributions shall be subject in all respects to the right of the 2.625% Senior Notes Indenture Trustee to assert its applicable charging liens against such distributions. All distributions made to holders of Allowed 2.625% Senior Notes Claims shall be eligible to be distributed through the facilities of DTC and as provided for under the 2.625% Senior Notes Indenture.

31

        d.        Delivery of Distributions to the 3.125% Senior Notes Indenture Trustee

Except as otherwise provided in the Plan or reasonably requested by the 3.125% Senior Notes Indenture Trustee, all distributions to holders of 3.125% Senior Notes Claims shall be deemed completed when made to the 3.125% Senior Notes Indenture Trustee, which shall be deemed to be the holder of all 3.125% Senior Notes Claims for purposes of distributions to be made hereunder. The 3.125% Senior Notes Indenture Trustee shall hold or direct such distributions for the benefit of the holders of Allowed 3.125% Senior Notes Claims, as applicable. As soon as practicable in accordance with the requirements set forth in this Article VI, the 3.125% Senior Notes Indenture Trustee shall arrange to deliver such distributions to or on behalf of such holders of Allowed 3.125% Senior Notes Claims. The 3.125% Senior Notes Indenture Trustee may transfer or direct the transfer of such distributions directly through the facilities of DTC (whether by means of book-entry exchange, free delivery, or otherwise) and will be entitled to recognize and deal for all purposes under the Plan with holders of Allowed 3.125% Senior Notes Claims to the extent consistent with the customary practices of DTC. Such distributions shall be subject in all respects to the right of the 3.125% Senior Notes Indenture Trustee to assert its applicable charging liens against such distributions. All distributions made to holders of Allowed 3.125% Senior Notes Claims shall be eligible to be distributed through the facilities of DTC and as provided for under the 3.125% Senior Notes Indenture.

        e.        Delivery of Distributions in General

Except as otherwise provided herein, the Debtors or the Plan Administrator, as applicable, shall make distributions to holders of Allowed Claims and Allowed Interests at the address set forth in any Proof of Claim Filed by that holder; *provided* that the manner of such distributions shall be determined at the discretion of the Debtors or the Plan Administrator, as applicable. If a holder holds more than one Claim in any one Class, all Claims of the holder will be aggregated into one Claim and one distribution will be made with respect to the aggregated Claim.

        3.        <u>Minimum Distributions</u>

Notwithstanding anything herein to the contrary, neither the Debtors nor the Plan Administrator, as applicable, shall be required to make distributions or payments of less than $250.00; *provided* that the Plan Administrator may establish an alternative minimum in its reasonable discretion and upon notice to the Bankruptcy Court.

        4.        <u>Undeliverable Distributions and Unclaimed Property</u>

In the event that any notice or distribution to any holder is returned as undeliverable, no such notice of distribution to such holder shall be made unless and until the Plan Administrator has determined the then current address of such holder, at which time such notice or distribution shall be made to such holder without interest; *provided* that such notice or distribution shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six (6) months from the date of the attempted distribution to the holder. After such date, all unclaimed property or interests in property shall revert to the Plan Administrator for the benefit of other Allowed Claims in accordance with the terms of the Plan, and the Claim of any holder to such property or interest in property shall be released, settled, compromised, and forever barred.

        5.        <u>Manner of Payment</u>

Any payment in Cash to be made pursuant to the Plan shall be made at the election of the Plan Administrator by check or by wire transfer, at the sole and exclusive discretion of the Plan Administrator.

E.        *Compliance with Tax Requirements*

In connection with the Plan, to the extent applicable, the Plan Administrator shall comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all distributions pursuant hereto shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Plan Administrator shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made

under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.

F.      *Allocations*

Distributions in respect of Allowed Claims shall be allocated first to the principal amount of such Claims (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest (or, for federal income tax purposes, original issue discount) as Allowed herein.

G.      *No Postpetition Interest on Claims*

Unless otherwise specifically provided for in an order of the Bankruptcy Court (including the Cash Collateral Order), the Plan, the Confirmation Order, or documents executed as required by this Plan, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims or Interests and no holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any such Claim. For the avoidance of doubt unless expressly provided to the contrary in this Plan or the Confirmation Order, postpetition interest shall be paid on account of the First Lien Notes Claims as contemplated in the Cash Collateral Order and on account of the Second Lien Notes Claims to the extent the Second Lien Notes Claims are secured by collateral in excess of the amount of Allowed Second Lien Notes Claims on the Effective Date.

H.      *Setoffs and Recoupment*

Except as otherwise expressly provided herein, the Debtors may, but shall not be required to, setoff against or recoup from any Claims of any nature whatsoever that the Debtors may have against the claimant, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Debtors of any such Claim it may have against the holder of such Claim.

I.      *Claims Paid or Payable by Third Parties*

1.      Claims Paid by Third Parties

The Debtors or the Plan Administrator, as applicable, shall be authorized to reduce in full a Claim, and such Claim shall be Disallowed without a Claims objection having to be Filed and without any further notice to or action, Order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor, as applicable, including on account of recourse to collateral held by third parties that secure such Claim. To the extent a holder of a Claim receives a distribution on account of such Claim and receives payment from a party that is not a Debtor or the Plan Administrator on account of such Claim, such holder shall, within 14 days of receipt thereof, repay or return the distribution to the applicable Debtor or the Plan Administrator (or such other entity designated by the Plan Administrator), to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan. The failure of such holder to timely repay or return such distribution shall result in the holder owing the applicable Debtor annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

2.      Claims Payable by Third Parties

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies, surety agreements, other non-Debtor payment agreements, or collateral held by a third party, until the holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy, surety agreement, other non-Debtor payment agreement, or collateral, as applicable. To the extent that one or more of the Debtors' insurers, sureties, or non-Debtor payors pays or satisfies a Claim in full or in part (if and to the extent adjudicated by a court of competent jurisdiction), or such collateral or proceeds from such collateral is

33

used to satisfy such Claim, then immediately upon such payment, the applicable portion of such Claim shall be expunged without a Claim objection having to be Filed and without any further notice to or action, Order, or approval of the Bankruptcy Court.

3.      Applicability of Insurance Contracts

Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any other Entity, including insurers under any insurance policy, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

J.      *Distributions on Account of Subordinated Claims*

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions on account thereof take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to re-classify any Allowed Claim in accordance with any contractual, legal, or equitable subordination relating thereto. Notwithstanding the foregoing, the Plan shall be without prejudice to the contractual, legal, or equitable subordination rights (if any) in favor of any holder of any Allowed Claim, and any holder of any Allowed Claim (if any) subject to any such contractual, legal, or equitable subordination shall remit any distribution on account of such Claim to which such holder's Claim is subordinated in accordance with and to the extent required under any applicable contractual, legal, or equitable subordination obligation.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED, AND DISPUTED CLAIMS**

A.      *Allowance of Claims*

The Debtors and the Plan Administrator, as applicable, shall have and shall retain any and all rights and defenses that the Debtors had with respect to any Claim immediately before the Effective Date.  Except as expressly provided in the Plan or in any Order entered in the Chapter 11 Cases prior to the Effective Date (including the Confirmation Order), no Claim or Interest shall become an Allowed Claim or Allowed Interest unless and until such Claim or Interest is deemed Allowed pursuant to the Plan or a Final Order, including the Confirmation Order (when it becomes a Final Order), allowing such Claim.

B.      *Claims and Interests Administration Responsibilities*

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, on and after the Effective Date, the Plan Administrator shall have the sole authority: (1) to File, withdraw, or litigate to judgment objections to Claims or Interests; (2) to settle or compromise any Disputed Claim or Disputed Interest without any further notice to or action, Order, or approval by the Bankruptcy Court; and (3) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, Order, or approval by the Bankruptcy Court.

C.      *Estimation of Claims*

Prior to and on the Effective Date, the Debtors, and, after the Effective Date, the Plan Administrator, may, at any time, request that the Bankruptcy Court estimate: (1) any Disputed Claim or Disputed Interest pursuant to applicable law; and (2) any contingent or unliquidated Claim pursuant to applicable law, including, without limitation, section 502(c) of the Bankruptcy Code, regardless of whether any party previously has objected to such Claim or Interest, or whether the Bankruptcy Court has ruled on any such objection, the Bankruptcy Court shall

34

retain jurisdiction to estimate any such Claim or Interest, including during the litigation of any objection to any Claim or Interest or during the appeal relating to such objection.  Notwithstanding any provision otherwise in the Plan, a Claim that has been expunged from the Claims Register but that is subject to appeal or has not been the subject of a Final Order, shall be deemed to be estimated at zero dollars, unless otherwise ordered by the Bankruptcy Court.  In the event that the Bankruptcy Court estimates any Claim or Interest, that estimated amount shall constitute either the Allowed amount of such Claim or Interest or a maximum limitation on such Claim or Interest for all purposes under the Plan, including for purposes of distributions, and the Debtors or the Plan Administrator, as applicable, may elect to pursue additional objections to the ultimate distribution on such Claim or Interest.  If the estimated amount constitutes a maximum limitation on such Claim or Interest, the Debtors or the Plan Administrator, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate distribution on account of such Claim or Interest.  Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has Filed a motion requesting the right to seek such reconsideration on or before seven (7) days after the date on which such Claim is estimated.  All of the aforementioned Claims and Interests and objection, estimation, and resolution procedures are cumulative and not exclusive of one another.  Claims and Interests may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D.      *Adjustment to Claims Without Objection*

Any Claim or Interest that has been paid or satisfied, or any Claim or Interest that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Plan Administrator without a Claims objection having to be Filed and without any further notice to or action, Order, or approval of the Bankruptcy Court.

E.      *Time to File Objections to Claims*

Any objections to Claims or Interests shall be Filed on or before the Claims Objection Deadline, as such date may be extended pursuant to the Plan.

F.      *Disallowance of Claims*

Any Claims or Interests held by Entities from which property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code, or that are a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code, shall be deemed disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims or Interests may not receive any distributions on account of such Claims or Interests until such time as such Causes of Action against that Entity have been settled or a Bankruptcy Court Order with respect thereto has been entered and all sums due, if any, to the Debtors or the Plan Administrator, as applicable, by that Entity have been turned over or paid to the Debtors or the Plan Administrator.

**Except as provided herein or otherwise agreed, any and all Proofs of Claim filed after the Claims Bar Date shall be deemed disallowed and expunged as of the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court, and holders of such Claims may not receive any distributions on account of such Claims, unless on or before the Confirmation Hearing such late Claim has been deemed timely filed by a Final Order.**

G.       *Amendments to Claims*

On or after the Effective Date, except as otherwise provided herein, a Claim or Interest may not be Filed or amended without the prior authorization of the Debtors or the Plan Administrator, as applicable, and any such new or amended Claim or Interest Filed shall be deemed disallowed and expunged without any further notice to or action, Order, or approval of the Bankruptcy Court.

H.       *No Distributions Pending Allowance*

If an objection to a Claim or Interest or portion thereof is Filed as set forth in Article VII of the Plan, or if such Claim or Interest is scheduled as Disputed, no payment or distribution provided under the Plan shall be made on account of such Claim or Interest or portion thereof unless and until such Disputed Claim or Disputed Interest becomes an Allowed Claim or Allowed Interest; however, at the sole discretion of the Debtors or the Plan Administrator, as applicable, payment may be made on any undisputed portion of such Claim or Interest.

I.       *Distributions After Allowance*

To the extent that a Disputed Claim or Disputed Interest ultimately becomes an Allowed Claim or Allowed Interest, distributions (if any) shall be made to the holder of such Allowed Claim or Allowed Interest in accordance with the provisions of the Plan.  As soon as practicable after the date that the Order of the Bankruptcy Court allowing any Disputed Claim or Disputed Interest becomes a Final Order, the Plan Administrator shall provide to the holder of such Claim or Interest the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, less any previous distribution (if any) that was made on account of the undisputed portion of such Claim or Interest, without any interest, dividends, or accruals to be paid on account of such Claim or Interest unless required under applicable bankruptcy law or as otherwise provided in Article III.B of the Plan.  For the avoidance of doubt unless expressly provided to the contrary in this Plan or the Confirmation Order, postpetition interest shall be paid on account of the First Lien Notes Claims as contemplated in the Cash Collateral Order and the Second Lien Notes Claims to the extent the Second Lien Notes Claims are secured by collateral in excess of the amount of Allowed Second Lien Notes Claims on the Effective Date.

J.       *Single Satisfaction of Claims*

Holders of Allowed Claims and Allowed Interests may assert such Claims against or Interests in the Debtor(s) obligated with respect to such Claims or Interests, and such Claims or Interests shall be entitled to share in the recovery provided for the applicable Class of Claims or Interests against the Debtors based upon the full Allowed amount of such Claims or Interests.  Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim or Allowed Interest exceed 100 percent (100%) of the underlying Allowed Claim or Allowed Interest plus applicable interest, if any.

**ARTICLE VIII.**
**SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS**

A.       *Settlement, Compromise, and Release of Claims and Interests*

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, and except as otherwise specifically provided in the Plan or in any contract, instrument, or other agreement or document created pursuant to the Plan, the distribution, rights, and treatment that are provided in the Plan shall be in complete settlement, compromise, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Debtors), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities, of Liens on, obligations of, rights against, and Interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any liability (including withdrawal liability) to the extent such Claims or Interests related to service performed by employees of the Debtors before the Effective Date and that

36

arise from a termination of employment, any contingent or non-contingent liability on account of representation or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim or Proof of Interest based upon such debt, right, or Interest is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the holder of such Claim or Interest has accepted the Plan.  Any default by the Debtors or their Affiliates with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured on the Effective Date.  The Confirmation Order shall be a judicial determination of the settlement, compromise, and release of all Claims and Interests subject to the Effective Date occurring.

B.      *Debtor Release*

**Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtors, that the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Sale Transaction, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Sale Transaction, the Plan, or the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything contained herein to the contrary, the foregoing release does not release any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.B by the Debtors, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute its finding that each release described in this Article VIII.B is:  (1) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such Claims; (2) in the best interests of the Debtors and all holders of Interests and Claims; (3) fair, equitable, and reasonable; (4) given and made after due notice and opportunity for hearing; and (5) a bar to any of the Debtors asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.**

C.      *Third Party Release*

**As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Sale Transaction, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Sale Transaction, the Plan, or the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the**

37

distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything contained herein to the contrary, the foregoing release does not release any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.C, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute its finding that each release described in this Article VIII.C is:  (1) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such Claims; (2) in the best interests of the Debtors and all holders of Interests and Claims; (3) fair, equitable, and reasonable; (4) given and made after due notice and opportunity for hearing; and (5) a bar to any of the Debtors asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

D.      *Exculpation*

Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the Sale Transaction, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

E.      *Injunction*

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Exculpated Parties, or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

38

**Upon entry of the Confirmation Order, all holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan. Each holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article VIII.E of the Plan.**

F.      *Recoupment*

In no event shall any holder of Claims or Interests be entitled to recoup any Claim, right, or Cause of Action of the Debtors, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

G.      *Subordination Rights*

Any distributions under the Plan to holders shall be received and retained free from any obligations to hold or transfer the same to any other holder and shall not be subject to levy, garnishment, attachment, or other legal process by any holder by reason of claimed contractual subordination rights. Any such subordination rights shall be waived, and the Confirmation Order shall constitute an injunction enjoining any Entity from enforcing or attempting to enforce any contractual, legal, or equitable subordination rights to property distributed under the Plan, in each case other than as provided in the Plan.

H.      *Reimbursement of Contribution*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of allowance or disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless before the Confirmation Date:  (1) such Claim has been adjudicated as non-contingent; or (2) the holder of such Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered before the Confirmation Date determining such Claim as no longer contingent.

I.      *SEC Rights Reserved*

Nothing in the Plan or the Confirmation Order (1) releases any non-Debtor Entity from any Claim or cause of action of the SEC; or (2) enjoins, limits, impairs, or delays the SEC from commencing or continuing any Claims, causes of action, proceedings or investigations against any non-Debtor Entity in any forum.

J.      *Special Provision Governing Fee Claims and Final Fee Applications*

For the avoidance of doubt, the provisions in Article VIII hereof shall not waive, affect, limit, restrict, or otherwise modify the right of any party in interest to object to any Fee Claim or final fee application Filed by any Professional in these Chapter 11 Cases.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONFIRMATION
## AND CONSUMMATION OF THE PLAN

A.      *Conditions Precedent to the Effective Date*

It shall be a condition to Consummation of the Plan that the following conditions shall have been satisfied (or waived pursuant to the provisions of Article IX.B  hereof):

1.      The Bankruptcy Court shall have entered the Confirmation Order;

39

2.        the Sale Transaction shall have closed or shall close contemporaneously with the Effective Date;

3.        the Disputed Claims Reserve shall have been established and funded;

4.        funds sufficient to satisfy the Wind Down Budget shall have been appropriately reserved;

5.        all documents and agreements necessary to implement the Plan shall have (a) been tendered for delivery and (b) been effected or executed by all Entities party thereto, and all conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms of such documents or agreements; and

6.        all Allowed Fee Claims approved by the Bankruptcy Court shall have been paid in full and amounts sufficient to pay all Fee Claims that become Allowed after the Effective Date, shall have been placed in the Professional Fee Escrow pending approval of the Fee Claims by the Bankruptcy Court.

On the Effective Date, the Plan shall be deemed substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

B.        *Waiver of Conditions*

The conditions to Confirmation of the Plan and to the Effective Date of the Plan set forth in Article IX.A of the Plan may be waived by consent of the Debtors without notice, leave, or Order of the Bankruptcy Court or any formal action other than proceedings to confirm or consummate the Plan.

C.        *Substantial Consummation*

"Substantial consummation" of the Plan, as defined in 11 U.S.C. § 1101(2), shall be deemed to occur on the Effective Date.

D.        *Effect of Non-Occurrence of Conditions to the Effective Date*

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall:  (1) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors, any holders of a Claim or Interest or any other Entity; or (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any holders, or any other Entity in any respect.

**ARTICLE X.**
**MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN**

A.        *Modification and Amendments*

Subject to the limitations contained in the Plan, the Debtors or the Plan Administrator, as applicable, reserve the right to modify the Plan as to material terms and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Debtors and the Plan Administrator, as applicable, expressly reserve their rights to alter, amend, or modify materially the Plan with respect to the Debtors, one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan, or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.  Any such modification or supplement shall be considered a modification of the Plan and shall be made in accordance with Article X hereof.

B.      *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of the Plan*

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date.  If the Debtors revoke or withdraw the Plan, or if Confirmation and Consummation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall:  (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of the Debtors or any other Entity, including the holders of Claims or the non-Debtor subsidiaries; or (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity.

### ARTICLE XI.
### RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases and all matters, arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or unsecured status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the Secured or unsecured status, priority, amount, or allowance of Claims or Interests;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to:  (a) the assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable in any manner and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims related to the rejection of an Executory Contract or Unexpired Lease, Cure Claims pursuant to section 365 of the Bankruptcy Code, or any other matter related to such Executory Contract or Unexpired Lease; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; (c) the Debtors or the Plan Administrator amending, modifying, or supplementing, after the Effective Date, pursuant to the Plan, any Executory Contracts or Unexpired Leases set forth on the list of Executory Contracts and Unexpired Leases to be assumed and assigned or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired;

4.      determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

5.      ensure that distributions to holders of Allowed Claims and Interests are accomplished pursuant to the provisions of the Plan;

6.      adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving or commenced by a Debtor, the Estates, or the Plan Administrator that may be pending on or after the Effective Date;

41

7.      adjudicate, decide, or resolve any and all matters related to Causes of Action;

8.      adjudicate, decide, or resolve any and all matters related to section 1141 of the Bankruptcy Code;

9.      enter and implement such Orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

10.     enter and enforce any order for the sale of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

11.     issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

12.     resolve any cases, controversies, suits, disputes, or causes of action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan, including obligations of the Plan Administrator;

13.     resolve any cases, controversies, suits, disputes, or causes of action with respect to the settlements, compromises, releases, injunctions, exculpations, and other provisions contained in Article VIII hereof and enter such Orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

14.     resolve any cases, controversies, suits, disputes, or causes of action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely repaid pursuant to Article VI hereof;

15.     enter and implement such Orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

16.     adjudicate any and all disputes arising from or relating to distributions under the Plan or any transactions contemplated therein;

17.     hear and determine disputes arising in connection with the interpretation, implementation, modification, or enforcement of the Plan, or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

18.     hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

19.     hear and determine disputes arising in connection with the Sale Transaction, including the interpretation, implementation, modification, or the Sale Transaction Documentation;

20.     enforce all Orders previously entered by the Bankruptcy Court;

21.     hear any other matter not inconsistent with the Bankruptcy Code;

22.     enforce the injunction, release, and exculpation provisions set forth in Article VIII hereof; and

23.     enter an Order concluding or closing the Chapter 11 Cases.

42

**ARTICLE XII.**
**MISCELLANEOUS PROVISIONS**

A.      *Immediate Binding Effect*

Subject to the terms hereof and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors, the Debtors' Estates, the Plan Administrator, and any and all holders of Claims or Interests (regardless of whether such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, or injunctions described in the Plan, each Entity acquiring property under the Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims and debts shall be as fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any holder of a Claim or debt has voted on the Plan.

B.      *Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors and all holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.      *Dissolution of the Committee*

On the Effective Date, any statutory committee appointed in the Chapter 11 Cases shall dissolve and members thereof shall be released and discharged from all rights and duties from or related to the Chapter 11 Cases on the Effective Date.  The Debtors and the Plan Administrator shall no longer be responsible for paying any fees or expenses incurred by the members of or advisors to the Committee after the Effective Date.  Upon the dissolution of the Committee, the current and former members of the Committee, and their officers, employees, counsel, advisors, and agents, shall be released and discharged of and from all further authority, duties, responsibilities, and obligations related to and arising from and in connection with the Chapter 11 Cases, and the retention or employment of the Committee's respective attorneys, accountants, and other agents shall terminate, except that the Committee and its professionals shall have the right to pursue, review, and object to any applications for compensation and reimbursement of expenses filed in accordance with Article II.B. hereof.

D.      *First Lien Indenture Trustee Fees and Expenses*

The reasonable and documented unpaid fees and out-of-pocket expenses of the First Lien Indenture Trustee and its counsel shall be paid in Cash to the extent not otherwise paid in accordance with the Cash Collateral Order.

E.      *Reservation of Rights*

Prior to the Effective Date, neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests.

F.      *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

43

G. *Service of Documents*

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors shall be served on:

the Debtors:     Cobalt International Energy, Inc.
           920 Memorial City Way, Suite 100
           Houston, Texas 77024
           Attn.:  Jeffrey A. Starzec

           with copies to:

           Kirkland & Ellis LLP
           Kirkland & Ellis International LLP
           300 North LaSalle
           Chicago, Illinois 60654
           Attn.:  Chad J. Husnick, P.C., and Brad Weiland

the First Lien Indenture Trustee:

           Wilmer Cutler Pickering Hale and Dorr LLP
           7 World Trade Center
           250 Greenwich Street
           New York, New York 10007
           Attn: Andrew N. Goldman

the First Lien Ad Hoc Group:

           Weil, Gotshal & Manges LLP
           767 5th Avenue
           New York, New York 10153
           Attn.: Matt Barr and Alexander Welch

           - and -

           Weil, Gotshal & Manges LLP
           700 Louisiana Street, Suite 1700
           Houston, Texas 77002
           Attn.:  Alfredo Perez and Chris Lopez

the Second Lien Ad Hoc Group:

           Akin Gump Strauss Hauer & Feld LLP
           1333 New Hampshire Avenue, N.W.
           Washington, D.C. 20036
           Attn.:  James Savin and Kate Doorley

the Unsecured Notes Ad Hoc Committee:

           Milbank, Tweed, Hadley & McCloy LLP
           28 Liberty Street
           New York, New York 10005
           Attn.:  Gerard Uzzi and Eric Stodola

the Committee:

Pachulski Stang Ziehl & Jones LLP
780 Third Avenue
34th Floor
New York, New York 10017
Attn.: Robert Feinstein

- and -

Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Boulevard
13th Floor
Los Angeles, California 90067
Attn.: Ira Kharasch

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Plan Administrator or, *after the Effective Date*, the Debtors, shall be served on the Plan Administrator, as set forth in the Plan Supplement.

After the Effective Date, the Debtors or the Plan Administrator, as applicable, have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entity must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After the Effective Date, the Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities who have Filed such renewed request.

H.      *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

I.      *Entire Agreement*

Except as otherwise indicated, the Plan, the Confirmation Order, and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

J.      *Exhibits*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at http://www.kccllc.net/cobalt or the Bankruptcy Court's website at http://www.txs.uscourts.gov. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Court, the non-exhibit or non-document portion of the Plan shall control.

K.      *Nonseverability of Plan Provisions*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall not alter or interpret such term or provision to make it valid or enforceable; *provided* that at the request of the Debtors (in their sole discretion), the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such terms or provision shall then be applicable as altered or interpreted *provided* that any such alteration or

45

interpretation shall be acceptable to the Debtors.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the consent of the Debtors; and (3) nonseverable and mutually dependent.

L.      *Waiver or Estoppel*

Each holder of a Claim or an Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, Secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court before the Confirmation Date.

M.      *Enforcement of the Confirmation Order*

On and after the Effective Date, the Debtors, the Purchaser, and the Plan Administrator, as applicable, shall be entitled to enforce the terms of the Confirmation Order and the Plan.

N.      *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities offered and sold under the Plan and any previous plan, and, therefore, neither any of such parties or individuals will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities offered and sold under the Plan and any previous plan.

*[Remainder of Page Intentionally Left Blank]*

46

Dated:  March 8, 2018

Respectfully submitted,

Cobalt International Energy, Inc.,
on behalf of itself and each of the other Debtors

By:    */s/ David D. Powell*
  Name: David D. Powell
  Title:  Chief Financial Officer

## SCHEDULE 2

**Form of Solicitation and Voting Procedures**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| COBALT INTERNATIONAL ENERGY, INC., *et al.*,[1] | ) | Case No. 17-36709 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**SOLICITATION AND VOTING PROCEDURES**

**PLEASE TAKE NOTICE THAT** on March 8, 2018, the United States Bankruptcy Court for the Southern District of Texas entered an order (the "Disclosure Statement Order"): (a) authorizing Cobalt International Energy, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors") to solicit votes on the *Fourth Amended Joint Chapter 11 Plan of Cobalt International Energy, Inc. and Its Debtor Affiliates* (as modified, amended, or supplemented from time to time, the "Plan"),[2] (b) approving the *Disclosure Statement for the Fourth Amended Joint Chapter 11 Plan of Cobalt International Energy, Inc. and Its Debtor Affiliates* (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code, (c) approving the solicitation materials and documents to be included in the solicitation packages (the "Solicitation Packages"), and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

**A.      The Voting Record Date.**

The Court has established **March 5, 2018**, as the record date for purposes of determining which holders of Claims in Class 4 (Second Lien Notes Secured Claims), Class 5 (Subsidiary General Unsecured Claims), and Class 6 (Cobalt General Unsecured Claims) are entitled to vote on the Plan (the "Voting Record Date").

**B.      The Voting Deadline.**

The Court has established **March 28, 2018, at 4:00 p.m.**, prevailing Central Time as the voting deadline (the "Voting Deadline") for the Plan.  The Debtors may extend the Voting Deadline, in their discretion, without further order of the Court.  To be counted as votes to accept or reject the Plan, all ballots (the "Ballots") must be properly executed, completed, and delivered

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Cobalt International Energy, Inc. (1169); Cobalt International Energy GP, LLC (7374); Cobalt International Energy, L.P. (2411); Cobalt GOM LLC (7188); Cobalt GOM # 1 LLC (7262); and Cobalt GOM # 2 LLC (7316).  The Debtors' service address is:  920 Memorial City Way, Suite 100, Houston, Texas 77024.

[2]     Capitalized terms not otherwise defined herein shall have the same meaning as set forth in the Plan, the Disclosure Statement, or the Disclosure Statement Order.

by: (1) first class mail (using the reply envelope provided in the Solicitation Package or otherwise), (2) overnight courier, (3) personal delivery, or (4) electronic online submission at http://www.kccllc.net/cobalt so that they are *actually received*, in any case, no later than the Voting Deadline by the Notice and Claims Agent. The Ballots will clearly indicate the appropriate return address, or, in the case of Beneficial Holder Ballots (as defined herein), such Beneficial Holders (as defined herein) will be instructed to comply with the return instructions provided by the Nominee (as defined herein).

### C.      Form, Content, and Manner of Notices.

### 1.      The Solicitation Package.

The following materials shall constitute the solicitation package (the "Solicitation Package"):

   a.   a copy of these Solicitation and Voting Procedures;

   b.   the *Notice of Hearing to Consider Confirmation of the Chapter 11 Plan Filed By the Debtors and Related Voting and Objection Procedures*, in substantially the form annexed as Schedule 8 to the Disclosure Statement Order (the "Confirmation Hearing Notice");

   c.   a cover letter, in substantially the form annexed as Schedule 7 to the Disclosure Statement Order describing the contents of the Solicitation Package and urging the holders of Claims in each of the Voting Classes to vote to accept the Plan;

   d.   the applicable form of Ballot, in substantially the form of the Ballots annexed as Schedule 3 to the Disclosure Statement Order, as applicable;

   e.   the approved Disclosure Statement annexed as Schedule 1 to the Disclosure Statement Order (and exhibits thereto, including the Plan);

   f.   a pre-addressed, postage pre-paid reply envelope; and

   g.   any additional documents that the Court has ordered to be made available.

### 2.      Distribution of the Solicitation Package.

The Solicitation Package shall provide the Plan, the Disclosure Statement, and the Disclosure Statement Order (without exhibits except the Solicitation and Voting Procedures) in electronic format (i.e., CD-ROM or flash drive format), and all other contents of the Solicitation Package, including Ballots, shall be provided in paper format. Any party that receives the materials in electronic format, but would prefer paper format may contact Kurtzman Carson Consultants LLC (the "Notice and Claims Agent") by: (a) calling the Notice and Claims Agent at (866) 967-1782 (toll free) or (310) 751-2682 (international); (b) visiting the Debtors' restructuring website at: https://www.kccllc.net/cobalt; (c) writing to the Notice and Claims Agent at Cobalt Ballot Processing, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue,

2

El Segundo, California 90245; and/or (d) emailing CobaltInfo@kccllc.com and request paper copies of the corresponding materials previously received in electronic format (to be provided at the Debtors' expense).

The Debtors shall serve or cause to be served all of the materials in the Solicitation Package (excluding the Ballots) on the U.S. Trustee and all parties who have requested service of papers in this case pursuant to Bankruptcy Rule 2002 as of the Voting Record Date. In addition, the Debtors shall mail or cause to be mailed the Solicitation Package to all holders of Claims in the Voting Classes on or before March 12, 2018, who are entitled to vote, as described in section D below.[3]

To avoid duplication and reduce expenses, the Debtors will make every reasonable effort to ensure that any holder of a Claim who has filed or purchased duplicative Claims against a Debtor (whether against the same or multiple Debtors) that are classified under the Plan in the same Voting Class receives no more than one Solicitation Package (and, therefore, one Ballot) on account of such Claim and with respect to that Class as against that Debtor.

**3.**      **Resolution of Disputed Claims for Voting Purposes; Resolution Event.**

a.      Absent a further order of the Court, the holder of a Claim in a Voting Class that is the subject of a pending objection on a "reduce and allow" basis shall be entitled to vote such Claim in the reduced amount contained in such objection.

b.      If a Claim in a Voting Class is subject to an objection other than a "reduce and allow" objection that is filed with the Court on or prior to six (6) days before the Voting Deadline: (i) the Debtors shall cause the applicable holder to be served with a Disputed Claim Notice substantially in the form annexed as Schedule 6 to the Disclosure Statement Order (which notice shall be served together with such objection); and (ii) the applicable holder shall not be entitled to vote to accept or reject the Plan on account of such claim unless a Resolution Event (as defined herein) occurs as provided herein.

c.      If a Claim in a Voting Class is subject to an objection other than a "reduce and allow" objection that is filed with the Court less than six (6) days prior to the Voting Deadline, the applicable Claim shall be deemed temporarily allowed for voting purposes only, without further action by the holder of such Claim and without further order of the Court, unless the Court orders otherwise.

d.      A "Resolution Event" means the occurrence of one or more of the following events no later than the date of the Confirmation Hearing:

---

[3]      Master Ballots will be distributed to Nominees approximately seven (7) days after the initial solicitation mailing in accordance with customary solicitation procedures.

      i.        an order of the Court is entered allowing such Claim pursuant to section 502(b) of the Bankruptcy Code, after notice and a hearing;

      ii.      an order of the Court is entered temporarily allowing such Claim for voting purposes only pursuant to Bankruptcy Rule 3018(a), after notice and a hearing;

      iii.    a stipulation or other agreement is executed between the holder of such Claim and the Debtors resolving the objection and allowing such Claim in an agreed upon amount; or

      iv.    the pending objection is voluntarily withdrawn by the objecting party.

e.      If a Resolution Event occurs no later than two (2) business days prior to the Voting Deadline, then no later than one (1) business day after the Resolution Event, the Debtors shall cause the Notice and Claims Agent to distribute via email, hand delivery, or overnight courier service a Solicitation Package and a pre-addressed, postage pre-paid envelope to the relevant holder to the extent such holder has not already received a Solicitation Package containing a Ballot.

**4.**      **<u>Non-Voting Status Notices for Unimpaired Classes and Classes Deemed to Reject the Plan</u>.**

Certain holders of Claims and Interests that are not classified in accordance with section 1123(a)(1) of the Bankruptcy Code or who are not entitled to vote because they are Unimpaired or otherwise presumed to accept the Plan under section 1126(f) of the Bankruptcy Code will receive only the *Non-Voting Status Notice for Unimpaired Claims Conclusively Presumed to Accept the Plan* and the applicable opt out form, substantially in the forms annexed as <u>Schedule 4A</u>, <u>Schedule 4B</u>, <u>Schedule 4C</u>, and <u>Schedule 4D</u> to the Disclosure Statement Order. Such notice will instruct these holders as to how they may obtain copies of the documents contained in the Solicitation Package (excluding Ballots). Certain holders of Claims and Interests who are not entitled to vote because they are deemed to reject the Plan under section 1126(g) of the Bankruptcy Code will receive only the *Non-Voting Status Notice to Holders of Impaired Claims and Equity Interests Deemed to Reject the Plan* and the applicable opt out form, substantially in the forms annexed as <u>Schedule 5A</u>, <u>Schedule 5B</u>, <u>Schedule 5C</u>, and <u>Schedule 5D</u> to the Disclosure Statement Order. Such notice will instruct these holders as to how they may obtain copies of the documents contained in the Solicitation Package (excluding Ballots). In addition, holders of Claims and Interests in the classes deemed to reject the Plan will also receive the Disclosure Statement (together with the Plan attached as **Exhibit A** thereto).

**5.**      **<u>Notices in Respect of Executory Contracts and Unexpired Leases</u>.**

Counterparties to Executory Contracts and Unexpired Leases that receive a notice of assumption or notice of rejection, substantially in the forms attached as <u>Schedule 10</u> and <u>Schedule 11</u> to the Disclosure Statement Order, respectively, may file an objection to the

Debtors' proposed assumption, rejection, and/or cure amount, as applicable.  Such objections must be *actually received* as set forth in the notice of assumption or notice of rejection.

Counterparties to Executory Contracts and Unexpired Leases set forth in schedule G of the Debtors' Schedules will receive an opt out form, substantially in the form annexed as Schedule 12 to the Disclosure Statement Order.

**D.      Voting and Tabulation Procedures.**

**1.      Holders of Claims Entitled to Vote.**

Only the following holders of Claims in the Voting Classes shall be entitled to vote with regard to such Claims:

a.      Holders of Claims who, on or before the Voting Record Date, have timely filed a Proof of Claim that (i) has not been expunged, disallowed, disqualified, withdrawn, or superseded prior to the Voting Record Date, and (ii) is not the subject of a pending objection, other than a "reduce and allow" objection, filed with the Court at least six (6) days prior to the Voting Deadline, pending a Resolution Event as provided herein; *provided* that a holder of a Claim that is the subject of a pending objection on a "reduce and allow" basis shall receive a Solicitation Package and be entitled to vote such Claim in the reduced amount contained in such objection absent a further order of the Court;

b.      Holders of Claims who, after the Voting Record Date, but prior to March 19, 2018, have filed a Proof of Claim (i) regarding a Claim that is not listed in the Schedules or is scheduled as contingent, unliquidated, or disputed, and (ii) that has not been expunged, disallowed, disqualified, withdrawn, or superseded prior to March 19, 2018;

c.      Holders of Claims that are listed in the Schedules; *provided* that Claims that are scheduled as contingent, unliquidated, or disputed (excluding such scheduled disputed, contingent, or unliquidated Claims that have been paid or superseded by a timely filed Proof of Claim) shall be allowed to vote only in the amounts forth in section D.2(d) of these Solicitation and Voting Procedures;

d.      Holders whose Claims arise (i) pursuant to an agreement or settlement with the Debtors, as reflected in a document filed with the Court, (ii) in an order entered by the Court, or (iii) in a document executed by the Debtors pursuant to authority granted by the Court, in each case regardless of whether a Proof of Claim has been filed;

e.      Holders of any Disputed Claim that has been temporarily allowed to vote on the Plan pursuant to Bankruptcy Rule 3018;

5

f.     the assignee of any Claim that was transferred on or before the Voting Record Date by any Entity described in subparagraphs (a) through (d) above; *provided* that such transfer or assignment has been fully effectuated pursuant to the procedures set forth in Bankruptcy Rule 3001(e) and such transfer is reflected on the Claims Register on the Voting Record Date;

g.     any holders of Claims who have filed or purchased duplicate Claims within the same Voting Class shall be provided with only one Solicitation Package and one ballot for voting a single Claim in such Class, regardless of whether the Debtors have objected to such duplicate Claims; and

h.     holders of Claims filed in an amount of $0.00 are not entitled to vote.

2.     **Establishing Claim Amounts for Voting Purposes.**

- **Class 4 Claims**.

  - The Claims amount of Class 4 Claims based on Second Lien Notes Secured Claims of directly registered and Beneficial Holders[4] for voting purposes only will be established through the indenture trustee or applicable Nominees, as the case may be, in the amount of the applicable positions held as of the Voting Record Date, by such holder as evidenced by records of the indenture trustee or by the applicable Nominees in Class 4 as evidenced by the securities position report(s) from The Depository Trust Company.

- **Class 5 Claims**.

  - The Claims amount, for voting purposes only, of Class 5 Claims based on Subsidiary General Unsecured Claims, other than Second Lien Notes Deficiency Claims, will be established based on the amount of the applicable positions held by such Class 5 Claim holder as of the Voting Record Date, as evidenced by (a) the Debtors' applicable books and records, or (b) the claims register maintained in the chapter 11 cases.

  - The Claims amount, for voting purposes only, of Class 5 Claims based on Subsidiary General Unsecured Claims that are Second Lien Notes Deficiency Claims will be established based on the standard set forth in sections 506(a)(1) or 502(c) of the Bankruptcy Code or otherwise in accordance with these procedures.

- **Class 6 Claims**.

---

[4]   A "Beneficial Holder" means a beneficial owner of publicly-traded securities whose claims have not been satisfied prior to the Voting Record Date (as defined herein) pursuant to Court order or otherwise, as reflected in the records maintained by the Nominees holding through an indenture trustee or as evidenced by the securities position report from The Depository Trust Company.

6

- The Claims amount, for voting purposes only, of Class 6 Claims based on Unsecured Notes Claims of directly registered and Beneficial Holders will be established through the indenture trustee or applicable Nominees, as the case may be, in the amount of the applicable positions held as of the Voting Record Date, by such holder as evidenced by records of the indenture trustee or by the applicable Nominees in Class 6 as evidenced by the securities position report(s) from The Depository Trust Company.

- The Claims amount, for voting purposes only, of Class 6 Claims not based on Unsecured Notes Claims or Second Lien Notes Deficiency Claims will be established based on the amount of the applicable positions held by such Class 6 Claim holder as of the Voting Record Date, as evidenced by (a) the Debtors' applicable books and records, or (b) the claims register maintained in the chapter 11 cases.

- The Claims amount, for voting purposes only, of Class 6 Claims based on Cobalt General Unsecured Claims that are Second Lien Notes Deficiency Claims will be established based on the standard set forth in sections 506(a)(1) or 502(c) of the Bankruptcy Code or otherwise in accordance with these procedures.

**Filed and Scheduled Claims**.  The Claim amount established herein shall control for voting purposes only and shall not constitute the Allowed amount of any Claim.  Moreover, any amounts filled in on Ballots by the Debtors through the Notice and Claims Agent, as applicable, are not binding for purposes of allowance and distribution.  In tabulating votes, the following hierarchy shall be used to determine the amount of the Claim associated with each claimant's vote:

a.   the Claim amount (i) settled and/or agreed upon by the Debtors, as reflected in a document filed with the Court, (ii) set forth in an order of the Court, or (iii) set forth in a document executed by the Debtors pursuant to authority granted by the Court;

b.   the Claim amount Allowed (temporarily or otherwise) pursuant to a Resolution Event pursuant to these Solicitation and Voting Procedures;

c.   the Claim amount contained in a Proof of Claim that has been timely filed by the applicable Claims Bar Date (or deemed timely filed by the Court under applicable law), except for any amounts asserted on account of any interest accrued after the Petition Date; *provided* that any Ballot cast by a holder of a Claim who timely files a Proof of Claim in respect of (i) a contingent Claim or a Claim in a wholly-unliquidated or unknown amount (based on a reasonable review by the Debtors and/or the Notice and Claims Agent) that is not the subject of an objection will count toward satisfying the numerosity requirement of section 1126(c) of the Bankruptcy Code and will count as a Ballot for a Claim in the amount of $1.00 solely for the purposes of satisfying the dollar amount provisions of

7

section 1126(c) of the Bankruptcy Code, and (ii) a partially liquidated and partially unliquidated Claim, which Claim will be Allowed for voting purposes only in the liquidated amount; *provided further* that to the extent the Claim amount contained in the Proof of Claim is different from the Claim amount set forth in a document filed with the Court as referenced in subparagraph (a) above, the Claim amount in the document filed with the Court shall supersede the Claim amount set forth on the respective Proof of Claim for voting purposes;

d.    the Claim amount listed in the Schedules (to the extent such Claim is not superseded by a timely filed Proof of Claim); *provided* that such Claim is not scheduled as contingent, disputed, or unliquidated and/or has not been paid; *provided* that if the applicable Claims Bar Date has not expired prior to the Voting Record Date, a Claim listed in the Schedules as contingent, disputed, or unliquidated shall vote at $1.00; and

e.    in the absence of any of the foregoing, such Claim shall be disallowed for voting purposes.

3.    **Voting and Ballot Tabulation Procedures.**

The following voting procedures and standard assumptions shall be used in tabulating Ballots, subject to the Debtors' right to waive any of the below specified requirements for completion and submission of Ballots so long as such requirement is not otherwise required by the Bankruptcy Code, Bankruptcy Rules, or Bankruptcy Local Rules:

a.    except as otherwise provided in the Solicitation and Voting Procedures, unless the Ballot being furnished is timely submitted on or prior to the Voting Deadline (as the same may be extended by the Debtors), the Debtors shall reject such Ballot as invalid and, therefore, shall not count it in connection with confirmation of the Plan;

b.    the Debtors will file with the Court by no later than one (1) day before the Confirmation Hearing, a voting report (the "Voting Report"). The Voting Report shall, among other things, delineate every Ballot that does not conform to the voting instructions or that contains any form of irregularity including, but not limited to, those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or lacking necessary information, received via facsimile or damaged (collectively, in each case, the "Irregular Ballots"). The Voting Report shall indicate the Debtors' intentions with regard to each Irregular Ballot;

c.    the method of delivery of Ballots to be sent to the Notice and Claims Agent is at the election and risk of each holder, and except as otherwise provided, a Ballot will be deemed delivered only when the Notice and Claims Agent actually receives the executed Ballot;

8

d. an executed Ballot is required to be submitted by the Entity submitting such Ballot (except with respect to Master Ballots (as defined herein) submitted by Nominees) by either mail, overnight courier, hand delivery, or electronic, online transmission at the website created for the Debtors' chapter 11 cases by the Notice and Claims Agent, http://www.kccllc.net/cobalt, so that it is actually received no later than March 28, 2018, at 4:00 p.m., prevailing Central Time. Parties entitled to vote shall be authorized in their sole discretion to complete an electronic Ballot and electronically sign and submit the Ballot to the Notice and Claims Agent. Other than Master Ballots submitted by Nominees, Ballots transmitted by facsimile or electronic mail will not be counted[5];

e. no Ballot should be sent to the Debtors, the Debtors' agents (other than the Notice and Claims Agent), or the Debtors' financial or legal advisors, and, if so sent, will not be counted;

f. if multiple Ballots are received from the same holder with respect to the same Claim prior to the Voting Deadline, the last properly executed Ballot timely received will be deemed to reflect that voter's intent and will supersede and revoke any prior received Ballot;

g. Holders must vote all of their Claims within a particular Class either to accept or reject the Plan and may not split any votes. Accordingly, a Ballot that partially rejects and partially accepts the Plan will not be counted. Further, to the extent there are multiple Claims within the same Class, the applicable Debtor may, in its discretion, aggregate the Claims of any particular holder within a Class for the purpose of counting votes;

h. a person signing a Ballot in its capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity of a holder of Claims must indicate such capacity when signing;

i. the Debtors, subject to a contrary order of the Court, may waive any defects or irregularities as to any particular Irregular Ballot at any time, either before or after the close of voting, and any such waivers will be documented in the Voting Report;

j. neither the Debtors nor any other Entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report nor will any of them incur any liability for failure to provide such notification;

---

[5] For the avoidance of doubt, a Ballot may be submitted, solely by a Nominee, via electronic mail to the Notice and Claims Agent at cobaltballots@kccllc.com.

k.      unless waived or as ordered by the Court, any defects or irregularities in connection with deliveries of Ballots must be cured prior to the Voting Deadline or such Ballots will not be counted;

l.      in the event a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected;

m.      subject to any order of the Court, the Debtors reserve the right to reject any and all Ballots not in proper form, the acceptance of which, in the opinion of the Debtors, would not be in accordance with the provisions of the Bankruptcy Code or the Bankruptcy Rules; *provided* that any such rejections will be documented in the Voting Report;

n.      if a Claim has been estimated or otherwise Allowed only for voting purposes by order of the Court, such Claim shall be temporarily Allowed in the amount so estimated or Allowed by the Court for voting purposes only, and not for purposes of allowance or distribution;

o.      if an objection to a Claim is filed, such Claim shall be treated in accordance with the procedures set forth herein;

p.      the following Ballots shall not be counted in determining the acceptance or rejection of the Plan:  (i) any Ballot that is illegible or contains insufficient information to permit the identification of the holder of such Claim; (ii) any Ballot cast by any Entity that does not hold a Claim in a Voting Class; (iii) any Ballot cast for a Claim scheduled as unliquidated, contingent, or disputed for which no Proof of Claim was timely filed pursuant to the procedures set forth herein (unless the applicable bar date has not yet passed, in which case such Claim shall be entitled to vote in the amount of $1.00); (iv) any unsigned Ballot or Ballot lacking an original signature; (v) any Ballot not marked to accept or reject the Plan or marked both to accept and reject the Plan; and (vi) any Ballot submitted by any Entity not entitled to vote pursuant to the procedures described herein;

q.      after the Voting Deadline, no Ballot may be withdrawn or modified without the prior written consent of the Debtors;

r.      the Debtors are authorized to enter into stipulations with the holder of any Claim agreeing to the amount of a Claim for voting purposes; and

s.      where any portion of a single Claim has been transferred to a transferee, all holders of any portion of such single Claim will be (a) treated as a single creditor for purposes of the numerosity requirements in section 1126(c) of the Bankruptcy Code (and for the other solicitation and voting

10

procedures set forth herein), and (b) required to vote every portion of such Claim collectively to accept or reject the Plan.  In the event that (a) a Ballot, (b) a group of Ballots within a Voting Class received from a single creditor, or (c) a group of Ballots received from the various holders of multiple portions of a single Claim partially reject and partially accept the Plan, such Ballots shall not be counted.

**4.**      **Master Ballot Voting and Tabulation Procedures.**

In addition to the foregoing generally applicable voting and ballot tabulation procedures, the following procedures shall apply to holders of Second Lien Notes Secured Claims, Subsidiary General Unsecured Claims, and Cobalt General Unsecured Claims who hold their position through a broker, bank, or other nominee or an agent of a broker, bank, or other nominee (each of the foregoing, a "Nominee"):

a.      the Notice and Claims Agent shall distribute or cause to be distributed the appropriate number of copies of beneficial holder ballots (a "Beneficial Holder Ballot") to each Beneficial Holder of a Class 4 Second Lien Notes Secured Claim, Class 5 Subsidiary General Unsecured Claim, and Class 6 Cobalt General Unsecured Claim as of the Voting Record Date;

b.      Nominees identified by the Notice and Claims Agent as Entities through which Beneficial Holders hold their Claims will be provided with (i) Solicitation Packages for each Beneficial Holder represented by the Nominee as of the Voting Record Date, which will contain a Beneficial Holder Ballot for each Beneficial Holder, and (ii) a master ballot (the "Master Ballot");

c.      any Nominee that is a holder of record with respect to Class 4 Second Lien Notes Secured Claims, Class 5 Subsidiary General Unsecured Claims, or Class 6 Cobalt General Unsecured Claims shall vote on behalf of Beneficial Holders of such Claims by:  (i) immediately, and in any event within five (5) Business Days after its receipt of the Solicitation Packages, distributing the Solicitation Packages, including Beneficial Holder Ballots, it receives from the Notice and Claims Agent to all such Beneficial Holders;[6] (ii) providing such Beneficial Holders with a return address to send the completed Beneficial Holder Ballots; (iii) compiling and validating the votes and other relevant information of all such Beneficial

---

[6]    Solicitation Packages may be sent in paper format or via electronic transmission in accordance with the customary requirements of each Nominee.  Each Nominee will then distribute the Solicitation Packages, as appropriate, in accordance with their customary practices and obtain votes to accept or to reject the Plan also in accordance with their customary practices.  If it is the Nominee's customary and accepted practice to submit a "voting instruction form" to the Beneficial Holders for the purpose of recording the Beneficial Holder's vote, the Nominee will be authorized to send the voting instruction form in lieu of, or in addition to, a Beneficial Holder Ballot.

11

Holders on the Master Ballot; and (iv) transmitting the Master Ballot to the Notice and Claims Agent on or before the Voting Deadline;

d.      any Beneficial Holder holding Class 4 Second Lien Notes Secured Claims, Class 5 Subsidiary General Unsecured Claims, or Class 6 Cobalt General Unsecured Claims as a record holder in its own name shall vote on the Plan by completing and signing a Ballot and returning it directly to the Notice and Claims Agent on or before the Voting Deadline;

e.      any Beneficial Holder Ballot returned to a Nominee by a Beneficial Holder shall not be counted for purposes of accepting or rejecting the Plan until such Nominee properly completes and delivers to the Notice and Claims Agent a Master Ballot that reflects the vote of such Beneficial Holders on or before the Voting Deadline or otherwise validates the Beneficial Holder Ballot in a manner acceptable to the Notice and Claims Agent.  Nominees shall retain all Beneficial Holder Ballots returned by Beneficial Holders for a period of one (1) year after the Effective Date of the Plan;

f.      if a Beneficial Holder holds Class 4 Second Lien Notes Secured Claims, Class 5 Subsidiary General Unsecured Claims, or Class 6 Cobalt General Unsecured Claims through more than one Nominee or through multiple accounts, such Beneficial Holder may receive more than one Beneficial Holder Ballot and each such Beneficial Holder should execute a separate Beneficial Holder Ballot for each block of Class 4 Second Lien Notes Secured Claims, Class 5 Subsidiary General Unsecured Claims, or Class 6 Cobalt General Unsecured Claims that it holds through any Nominee and must return each such Beneficial Holder Ballot to the appropriate Nominee;

g.      if a Beneficial Holder holds a portion of its Class 4 Second Lien Notes Secured Claims, Class 5 Subsidiary General Unsecured Claims, or Class 6 Cobalt General Unsecured Claims through a Nominee or Nominees and another portion in its own name as the record holder, such Beneficial Holder should follow the procedures described in section B herein to vote the portion held in its own name and the procedures described in section D.4. herein to vote the portion held by the Nominee(s);

h.      votes cast by Beneficial Holders through Nominees will be applied to the applicable positions held by such Nominees in Class 4, Class 5, or Class 6, as applicable, as of the Voting Record Date, as evidenced by the applicable securities position report(s) obtained from The Depository Trust Company.  Votes submitted by a Nominee pursuant to a Master Ballot will not be counted in excess of the amount of such Claims held by such Nominee as of the Voting Record Date;

12

i.      if conflicting votes or "over-votes" are submitted by a Nominee pursuant to a Master Ballot, the Debtors will use reasonable efforts to reconcile discrepancies with the Nominees.  If over-votes on a Master Ballot are not reconciled prior to the preparation of the Voting Report, the Debtors shall apply the votes to accept and to reject the Plan in the same proportion, by voting Class, as the votes to accept and to reject the Plan submitted on the Master Ballot that contained the over-vote, but only to the extent of the Nominee's position in Class 4, Class 5, or Class 6, as applicable;

j.      for purposes of tabulating votes, each Nominee or Beneficial Holder will be deemed to have voted the principal amount of its Claims in Class 4, Class 5, and Class 6, although any principal amounts may be adjusted by the Notice and Claims Agent to reflect the amount of the Claim actually voted, including prepetition interest;

k.      a single Nominee may complete and deliver to the Notice and Claims Agent multiple Master Ballots.  Votes reflected on multiple Master Ballots will be counted, except to the extent that they are duplicative of other Master Ballots.  If two or more Master Ballots are inconsistent, the latest received valid Master Ballot received prior to the Voting Deadline will, to the extent of such inconsistency, supersede and revoke any prior received Master Ballot.  Likewise, if a Beneficial Holder submits more than one Beneficial Holder Ballot to its Nominee, (i) the latest received Beneficial Holder Ballot received before the submission deadline imposed by the Nominee shall be deemed to supersede any prior Beneficial Holder Ballot submitted by the Beneficial Holder, and (ii) the Nominee shall complete the Master Ballot accordingly; and

l.      the Debtors will, upon written request, reimburse Nominees for customary mailing and handling expenses incurred by them in forwarding the Beneficial Holder Ballot and other enclosed materials to the Beneficial Holders for which they are the Nominee.  No fees or commissions or other remuneration will be payable to any broker, dealer, or other person for soliciting Beneficial Holder Ballot with respect to the Plan.

## E.      Amendments to the Plan and Solicitation and Voting Procedures.

The Debtors reserve the right to make non-substantive or immaterial changes to the Disclosure Statement, Plan, Ballots, Confirmation Hearing Notice, and related documents without further order of the Court, including, without limitation, changes to correct typographical and grammatical errors, if any, and to make conforming changes among the Disclosure Statement, the Plan, and any other materials in the Solicitation Package before their distribution.

*      *      *      *      *

13

## SCHEDULE 3A

**Form of Class 4, Class 5, and Class 6 Master Ballot (Second Lien Notes Claims)**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) ) | Chapter 11 |
| COBALT INTERNATIONAL ENERGY, INC., *et al.*,[1] | ) ) ) | Case No. 17-36709 (MI) |
| Debtors. | ) ) ) | (Jointly Administered) |

## MASTER BALLOT FOR VOTING TO ACCEPT OR REJECT
## THE FOURTH AMENDED JOINT CHAPTER 11 PLAN OF COBALT
## INTERNATIONAL ENERGY, INC. AND ITS DEBTOR AFFILIATES

**CLASS 4, CLASS 5, AND, CLASS 6 HOLDERS OF SECOND LIEN NOTES CLAIMS**

> **PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS CAREFULLY *BEFORE* COMPLETING THIS BALLOT.**
>
> **IN ORDER FOR YOUR VOTE TO BE COUNTED, THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE *ACTUALLY RECEIVED* BY THE NOTICE AND CLAIMS AGENT BY MARCH 28, 2018, AT 4:00 P.M., PREVAILING CENTRAL TIME (THE "VOTING DEADLINE") IN ACCORDANCE WITH THE FOLLOWING:**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") are soliciting votes with respect to the *Fourth Amended Joint Chapter 11 Plan of Cobalt International Energy, Inc. and Its Debtor Affiliates* (as may be amended from time to time, the "Plan") as set forth in the *Disclosure Statement for the Fourth Amended Joint Chapter 11 Plan of Cobalt International Energy, Inc. and Its Debtor Affiliates* (as may be amended from time to time, the "Disclosure Statement").  The Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") has approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code by entry of an order on March 8, 2018 (the "Disclosure Statement Order").  Bankruptcy Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court.  Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

You are receiving this master ballot (the "Master Ballot") because you are the Nominee (as defined below) of a Beneficial Holder[2] of Class 4, Class 5, and Class 6 Second Lien Notes Claims (the "Second Lien Notes Claims") as of March 5, 2018 (the "Voting Record Date").

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Cobalt International Energy, Inc. (1169); Cobalt International Energy GP, LLC (7374); Cobalt International Energy, L.P. (2411); Cobalt GOM LLC (7188); Cobalt GOM # 1 LLC (7262); and Cobalt GOM # 2 LLC (7316).  The Debtors' service address is:  920 Memorial City Way, Suite 100, Houston, Texas 77024.

[2] A "Beneficial Holder" means a beneficial owner of publicly-traded securities whose claims have not been satisfied prior to the Voting Record Date (as defined herein) pursuant to Bankruptcy Court order or otherwise, (a) as reflected in the records maintained by the Nominees holding through the Second Lien Indenture Trustee,

**This Master Ballot is to be used by you as a broker, bank, or other nominee; or as the agent of a broker, bank, or other nominee (each of the foregoing, a "Nominee"); or as the proxy holder of a Nominee for certain Beneficial Holders' Class, 4, Class 5, and Class 6 Second Lien Notes Claims, to transmit to the Notice and Claims Agent (as defined below) the votes of such Beneficial Holders in respect of their Second Lien Notes Claims to accept or reject the Plan.** This ballot may not be used for any purpose other than for submitting votes with respect to the Plan.

The rights and treatment for each Class are described in the Disclosure Statement, which was included in the package (the "Solicitation Package") you are receiving with this Master Ballot (as well as the Plan, Disclosure Statement Order, and certain other materials). If you received Solicitation Package materials in electronic format and desire paper copies, or if you need to obtain additional Solicitation Packages, you may obtain them from (a) Kurtzman Carson Consultants LLC (the "Notice and Claims Agent") at no charge by: (i) accessing the Debtors' restructuring website at https://www.kccllc.net/cobalt; (ii) writing to the Notice and Claims Agent at Cobalt Ballot Processing, c/o Kurtzman Carson Consultants, LLC, 2335 Alaska Avenue, El Segundo, California 90245; (iii) calling the Notice and Claims Agent at (877) 833-4150 (toll free) or (917) 281-4800 (international); or (iv) emailing CobaltInfo@kccllc.com; or (b) for a fee via PACER at http://ecf.txsb.uscourts.gov.

This Master Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan. If you believe you have received this Master Ballot in error, please contact the Notice and Claims Agent *immediately* at the address, telephone number, or email address set forth above.

**YOUR VOTE ON THIS MASTER BALLOT FOR CERTAIN BENEFICIAL HOLDERS OF CLASS 4. CLASS 5, AND CLASS 6 SECOND LIEN NOTES CLAIMS SHALL BE APPLIED TO EACH DEBTOR AGAINST WHOM SUCH BENEFICIAL HOLDERS HAVE A CLASS 4, CLASS 5, OR CLASS 6 SECOND LIEN NOTES CLAIM, AS APPLICABLE.**

You are authorized to collect votes to accept or to reject the Plan from Beneficial Holders in accordance with your customary practices, including the use of a "voting instruction form" in lieu of (or in addition to) a Beneficial Holder Ballot (as defined herein), and the collection of votes from Beneficial Holders through online voting, by phone, facsimile, or other electronic means.

The Bankruptcy Court may confirm the Plan and thereby bind all holders of Claims and Interests. To have the votes of your Beneficial Holders count as either an acceptance or rejection of the Plan, you must complete and return this Master Ballot so that the Notice and Claims Agent *actually receives* it on or before the Voting Deadline.

**THE VOTING DEADLINE IS ON MARCH 28, 2018, AT 4:00 P.M., PREVAILING CENTRAL TIME.**

**Item 1.  Certification of Authority to Vote.**

The undersigned certifies that, as of the Voting Record Date, the undersigned (please check the applicable box):

☐   Is a broker, bank, or other nominee for the Beneficial Holders of the aggregate principal amount of the Second Lien Notes Claims listed in Item 2 below and is the record holder of such bonds, or

☐   Is acting under a power of attorney and/or agency (a copy of which will be provided upon request) granted by a broker, bank, or other nominee that is the registered holder of the aggregate principal amount of Second Lien Notes Claims listed in Item 2 below, or

---

or (b) as evidenced by the securities position report from The Depository Trust Company as of the Voting Record Date.

[CUSIP]

2

☐   Has been granted a proxy (an original of which is attached hereto) from a broker, bank, or other nominee, or a beneficial owner, that is the registered holder of the aggregate principal amount of Second Lien Notes Claims listed in Item 2 below,

and, accordingly, has full power and authority to vote to accept or reject the Plan on behalf of the Beneficial Holders of the Second Lien Notes Claims described in Item 2.

**Item 2.  Vote on Plan.  PLEASE SUBMIT A VOTE IN EACH CLASS.**

The undersigned transmits the following votes of Beneficial Holders of Second Lien Notes Claims and certifies that the following Beneficial Holders of Second Lien Notes Claims, as identified by their respective customer account numbers set forth below, are the Beneficial Holders of such Claims as of the Voting Record Date and have delivered to the undersigned, as Nominee, ballots (the "Beneficial Holder Ballots") casting such votes.

Indicate in the appropriate column below the aggregate principal amount voted for each account or attach such information to this Master Ballot in the form of the following table.  Please note that each holder must vote all such Beneficial Holder's Class 4, Class 5, and Class 6 Second Lien Notes Claims—within the respective Class—to accept or reject the Plan and may not split such vote within the respective Class.  Any Beneficial Holder Ballot executed by the Beneficial Holder that does not indicate an acceptance or rejection of the Plan for a particular Class or that indicates both an acceptance and a rejection of the Plan for a particular Class will not be counted with respect to such Class.  If the Beneficial Holder has checked the box regarding Class 4, Class 5, or Class 6 on Item 3 of the Beneficial Holder Ballot pertaining to releases by holders of Claims, as detailed in Article VIII of the Plan, please place an X in the Item 3 column below for each Class regarding which the Beneficial Holder has checked the box.

| Your Customer Account Number for Each Beneficial Holder of Second Lien Notes Claims | Principal Amount Held as of Voting Record Date | Item 2:  Class 4 Indicate the Class 4 vote cast on the Beneficial Holder Ballot by checking the appropriate box below. | | Item 2:  Class 5 Indicate the Class 5 vote cast on the Beneficial Holder Ballot by checking the appropriate box below. | | Item 2:  Class 6 Indicate the Class 6 vote cast on the Beneficial Holder Ballot by checking the appropriate box below. | | Item 3 If the box in Item 3 of the Beneficial Holder Ballot was completed, check the box in the column below  OPT OUT of the Third Party Release |
|---|---|---|---|---|---|---|---|---|
| | | Accept the Plan | Reject the Plan | Accept the Plan | Reject the Plan | Accept the Plan | Reject the Plan | |
| 1 | $ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 2 | $ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 3 | $ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 4 | $ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 5 | $ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 6 | $ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| **TOTALS** | $ | | | | | | | |

[CUSIP]

3

**Item 3.  Other Combined Class 4, Class 5, and Class 6 Ballots Submitted by Beneficial Holders.**  The undersigned certifies that it has transcribed in the following table the information, if any, provided by the Beneficial Holders in Item 4 of the Beneficial Holder Ballot:

| YOUR customer account number and/or customer name for each Beneficial Holder who completed Item 4 of the Beneficial Holder Ballot. | Transcribe from Item 4 of the Beneficial Holder Ballot | | | |
| --- | --- | --- | --- | --- |
| | Account Number | Name of Registered Holder or Nominee | Principal Amount of other Second Lien Notes Claims | CUSIP of other Second Lien Notes Claims Voted |
| 1. | | | $ | |
| 2. | | | $ | |
| 3. | | | $ | |
| 4. | | | $ | |
| 5. | | | $ | |

**Item 4.  Important information regarding the Third Party Release.**

**Article VIII.C of the Plan contains the following Third Party Release:**

**As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Sale Transaction, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Sale Transaction, the Plan, or the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything contained herein to the contrary, the foregoing release does not release any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.C, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute its finding that each release described in this Article VIII.C is:  (1) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such Claims; (2) in the best interests of the Debtors and all holders of Interests and Claims; (3) fair, equitable, and reasonable; (4) given and made after due notice and opportunity for hearing; and (5) a bar to any of the Debtors asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.**

*       *       *

UNDER THE PLAN, "RELEASING PARTY" MEANS COLLECTIVELY:   (A) THE FIRST LIEN NOTEHOLDERS; (B) THE FIRST LIEN AD HOC GROUP; (C) THE SECOND LIEN NOTEHOLDERS; (D) THE SECOND LIEN AD HOC GROUP; (E) THE UNSECURED NOTEHOLDERS; (F) THE UNSECURED

[CUSIP]

NOTES AD HOC COMMITTEE; (G) THE FIRST LIEN INDENTURE TRUSTEE; (H) THE SECOND LIEN INDENTURE TRUSTEE; (I) THE 2.625% SENIOR NOTES INDENTURE TRUSTEE; (J) THE 3.125% SENIOR NOTES INDENTURE TRUSTEE; (K) THE COMMITTEE AND ITS MEMBERS; (L) ALL HOLDERS OF CLAIMS, (M) ALL HOLDERS OF INTERESTS, AND (N) WITH RESPECT TO EACH OF THE DEBTORS AND EACH OF THE FOREGOING ENTITIES IN CLAUSES (A) THROUGH (M), SUCH ENTITY AND ITS CURRENT AND FORMER AFFILIATES AND SUBSIDIARIES, AND SUCH ENTITIES' AND THEIR CURRENT AND FORMER AFFILIATES' AND SUBSIDIARIES' CURRENT AND FORMER DIRECTORS, MANAGERS, OFFICERS, EQUITY HOLDERS (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), PREDECESSORS, SUCCESSORS, AND ASSIGNS, SUBSIDIARIES, AND EACH OF THEIR RESPECTIVE CURRENT AND FORMER EQUITY HOLDERS, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS, MEMBERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITY AS SUCH COLLECTIVELY; *PROVIDED* THAT ANY HOLDER OF A CLAIM OR INTEREST THAT OPTS OUT OR OTHERWISE OBJECTS TO THE RELEASES IN THE PLAN SHALL NOT BE A "RELEASING PARTY."

AS A "RELEASING PARTY" UNDER THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE VIII.C OF THE PLAN, AS SET FORTH ABOVE. YOU MAY ELECT NOT TO GRANT THE RELEASE CONTAINED IN ARTICLE VIII.C OF THE PLAN ONLY IF YOU CHECK THE BOX BELOW AND (A) SUBMIT THE BALLOT BUT ABSTAIN FROM VOTING TO ACCEPT OR REJECT THE PLAN OR (B) VOTE TO REJECT THE PLAN. IF YOU (A) VOTE TO ACCEPT THE PLAN, (B) FAIL TO SUBMIT A BALLOT BY THE VOTING DEADLINE, (C) SUBMIT THE BALLOT BUT ABSTAIN FROM VOTING TO ACCEPT OR REJECT THE PLAN WITHOUT CHECKING THE BOX BELOW, OR (D) VOTE TO REJECT THE PLAN WITHOUT CHECKING THE BOX BELOW, IN EACH CASE YOU WILL BE DEEMED TO CONSENT TO THE RELEASES SET FORTH IN ARTICLE VIII.C OF THE PLAN. THE ELECTION TO WITHHOLD CONSENT TO GRANT SUCH RELEASE IS AT YOUR OPTION. BY OPTING OUT OF THE RELEASES SET FORTH IN ARTICLE VIII.C OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE VIII OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.

**Item 5.  Certifications.**

Upon execution of this Master Ballot, the undersigned certifies:

(a)     it has received a copy of the Disclosure Statement, the Plan, the Master Ballots, the Beneficial Holder Ballots, and the remainder of the Solicitation Package and has delivered the same to the Beneficial Holders of the Second Lien Notes Claims listed in Item 2 above;

(b)     it has received a completed and signed Beneficial Holder Ballot from each Beneficial Holder listed in Item 2 of this Master Ballot;

(c)     it is the registered holder of all Second Lien Notes Claims listed in Item 2 above being voted, or

(d)     it has been authorized by each Beneficial Holder of Second Lien Notes Claims listed in Item 2 above to vote on the Plan;

(e)     no other Master Ballots with respect to the same Second Lien Notes Claims identified in Item 2 have been cast or, if any other Master Ballots have been cast with respect to such Claims, then any such earlier Master Ballots are hereby revoked;

(f)     it has properly disclosed:  (a) the number of Beneficial Holders of Second Lien Notes Claims who completed the Beneficial Holder Ballots; (b) the respective amounts of the Second Lien Notes Claims owned, as the case may be, by each Beneficial Holder of Second Lien Notes Claims who completed a Beneficial Holder Ballot; (c) each such Beneficial Holder of Second Lien Notes

[CUSIP]

5

Claims' respective Class 4, Class 5, and Class 6 vote concerning the Plan; (e) each such Beneficial Holder of Second Lien Notes Claims' certification as to other Second Lien Notes Claims voted; and (f) the customer account or other identification number for each such Beneficial Holder of Second Lien Notes Claims; and

(g)     it will maintain ballots and evidence of separate transactions returned by Beneficial Holder of Second Lien Notes Claims (whether properly completed or defective) for at least one (1) year after the Effective Date of the Plan and disclose all such information to the Bankruptcy Court or the Debtors, if so ordered.

Name of Nominee:     _____
(Print or Type)

Participant Number:

_____

Name of Proxy Holder or Agent for Nominee (if applicable):

_____
(Print or Type)

_____

Signature:     _____

Name of Signatory:     _____

Title:     _____

Address:     _____

_____

_____

Date Completed:     _____

Email Address:     _____

**PLEASE COMPLETE, SIGN, AND DATE THIS MASTER BALLOT AND
RETURN IT (WITH AN ORIGINAL SIGNATURE) *PROMPTLY* IN THE ENVELOPE PROVIDED VIA
FIRST CLASS MAIL, OVERNIGHT COURIER, HAND DELIVERY, OR VIA ELECTRONIC MAIL
SERVICE TO:**

**Cobalt Ballot Processing
c/o Kurtzman Carson Consultants LLC
1290 Avenue of the Americas, 9th Floor,
New York, New York 10104
cobaltballots@kccllc.com**

IF THE NOTICE AND CLAIMS AGENT DOES NOT *ACTUALLY RECEIVE*
THIS CLASS 4, CLASS 5, AND CLASS 6 MASTER BALLOT **ON OR BEFORE MARCH 28, 2018, AT 4:00
P.M.**, PREVAILING CENTRAL TIME, (AND IF THE VOTING DEADLINE IS NOT EXTENDED), THE
VOTES TRANSMITTED
BY THIS CLASS 4, CLASS 5, AND CLASS 6 MASTER BALLOT MAY BE COUNTED TOWARD
CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE DEBTORS.

[CUSIP]

| Class 4, Class 5, and Class 6— Second Lien Notes Claims |
|---|

## INSTRUCTIONS FOR COMPLETING THIS MASTER BALLOT

1.  The Debtors are soliciting the votes of holders of Claims with respect to the Plan attached as **Exhibit A** to the Disclosure Statement.  Capitalized terms used in the Master Ballot or in these instructions (the "Ballot Instructions"), but not otherwise defined therein or herein, shall have the meaning set forth in the Plan, a copy of which also accompanies the Master Ballot.  **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS MASTER BALLOT.**

2.  The Plan can be confirmed by the Bankruptcy Court and thereby made binding upon the holders if it is accepted by the holders of at least two-thirds in amount and more than one-half in number of Claims in at least one class of creditors that votes on the Plan and if the Plan otherwise satisfies the requirements for confirmation provided by section 1129(a) of the Bankruptcy Code.  Please review the Disclosure Statement for more information.

3.  You should immediately distribute the Beneficial Holder Ballots and the Solicitation Package to all Beneficial Holders of Second Lien Notes Claims and take any action required to enable each such Beneficial Holder to vote timely the Claims that it holds.  You may distribute the Solicitation Packages to Beneficial Holders, as appropriate, in accordance with your customary practices.  You are authorized to collect votes to accept or to reject the Plan from Beneficial Holders in accordance with your customary practices, including the use of a "voting instruction form" in lieu of (or in addition to) a Beneficial Holder Ballot, and the collection of votes from Beneficial Holders through online voting, by phone, facsimile, or other electronic means.  Any Beneficial Holder Ballot returned to you by a Beneficial Holder of a Second Lien Notes Claim shall not be counted for purposes of accepting or rejecting the Plan until you properly complete and deliver, to the Notice and Claims Agent, a Master Ballot that reflects the vote of such Beneficial Holders by **March 28, 2018, at 4:00 p.m.**, prevailing Central Time or otherwise validate the Master Ballot in a manner acceptable to the Notice and Claims Agent.

4.  If you are transmitting the votes of any Beneficial Holder of Second Lien Notes Claims other than yourself, you may either:

    (a) "Pre-validate" the individual Class 4, Class 5, and Class 6 Beneficial Holder Ballot contained in the Solicitation Package and then forward the Solicitation Package to the Beneficial Holder of the Second Lien Notes Claim for voting within five (5) Business Days after the receipt by such Nominee of the Solicitation Package, with the Beneficial Holder then returning the individual Beneficial Holder Ballot directly to the Notice and Claims Agent in the return envelope to be provided in the Solicitation Package.  A Nominee "pre-validates" a Beneficial Holder's Ballot by signing the Beneficial Holder Ballot and including their Depository Trust Company participant number; indicating the account number of the Beneficial Holder and the principal amount of the Second Lien Notes Claim held by the Nominee for such Beneficial Holder; and then forwarding the Beneficial Holder Ballot together with the Solicitation Package to the Beneficial Holder.  The Beneficial Holder then completes the information requested on the Beneficial Holder Ballot and returns the Beneficial Holder Ballot directly to the Notice and Claims Agent.  A list of the Beneficial Holders to whom "pre-validated" Beneficial Holder Ballots were delivered should be maintained by Nominees for inspection for at least one (1) year from the Effective Date; OR

    (b) Within five (5) Business Days after receipt by such Nominee of the Solicitation Package, forward the Solicitation Package to the Beneficial Holder of the Second Lien Notes Claim for voting along with a return envelope provided by and addressed to the Nominee, with the Beneficial Holder then returning the individual Beneficial Holder Ballot to the Nominee.  In such case, the Nominee will tabulate the votes of its respective owners on a Master Ballot that will be provided to the Nominee separately by the Notice and Claims Agent, in accordance with any instructions set forth in the instructions to the Master Ballot, and then return the Master Ballot to the Notice and Claims Agent.  The Nominee should advise the Beneficial Holder to return their individual Beneficial Holder Ballots to the Nominee by a date calculated by the Nominee to allow it to prepare and return the Master Ballot to the Notice and

[CUSIP]

7

Claims Agent so that the Master Ballot is ***actually received*** by the Notice and Claims Agent on or before the Voting Deadline.

5.  With regard to any Beneficial Holder Ballots returned to you by a Beneficial Holder, you must: (a) compile and validate the votes and other relevant information of each such Beneficial Holder on the Master Ballot using the customer name or account number assigned by you to each such Beneficial Holder; (b) execute the Master Ballot; (c) transmit such Master Ballot to the Notice and Claims Agent by the Voting Deadline; and (d) retain such Beneficial Holder Ballots from Beneficial Holders, whether in hard copy or by electronic direction, in your files for a period of one (1) year after the Effective Date of the Plan. You may be ordered to produce the Beneficial Holder Ballots to the Debtors or the Bankruptcy Court.

6.  The Master Ballot ***must*** be returned to the Notice and Claims Agent so as to be ***actually received*** by the Notice and Claims Agent on or before the Voting Deadline. **The Voting Deadline is March 28, 2018, at 4:00 p.m.**, prevailing Central Time.

7.  If a Master Ballot is received ***after*** the Voting Deadline and if the Voting Deadline is not extended, it may be counted only in the discretion of the Debtors. Additionally, **the following Master Ballots will *not* be counted**:

    (a) any Master Ballot that is illegible or contains insufficient information to permit the identification of the holder of the Claim;
    (b) any Master Ballot cast by a party that does not hold a Claim in a Class that is entitled to vote on the Plan;
    (c) any Master Ballot sent by facsimile or any electronic means other than electronic mail;
    (d) any unsigned Master Ballot;
    (e) any Master Ballot that does not contain an original signature; *provided* that any Master Ballot submitted via electronic mail shall be deemed to contain an original signature;
    (f) any Master Ballot not marked to accept or reject the Plan; and
    (g) any Master Ballot submitted by any party not entitled to cast a vote with respect to the Plan.

8.  The method of delivery of Master Ballots to the Notice and Claims Agent is at the election and risk of each Nominee of Second Lien Notes Claims. Except as otherwise provided herein, such delivery will be deemed made only when the Notice and Claims Agent ***actually receives*** the originally executed Master Ballot. In all cases, Beneficial Holders and Nominees should allow sufficient time to assure timely delivery.

9.  If a Beneficial Holder or Nominee holds a Claim in a voting class against multiple Debtors, a vote on their Ballot will apply to all Debtors against whom such Beneficial Holder or Nominee has a Claim, as applicable, in that voting class.

10. If multiple Master Ballots are received from the same Nominee with respect to the same Beneficial Holder Ballot belonging to a Beneficial Holder of a Claim prior to the Voting Deadline, the last, timely received, and properly completed Master Ballot will supersede and revoke any earlier received Master Ballots.

11. The Master Ballot does ***not*** constitute, and shall not be deemed to be, (a) a Proof of Claim or (b) an assertion or admission of a Claim.

12. **Please be sure to sign and date the Master Ballot**. You should indicate that you are signing a Master Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity and, if required or requested by the Notice and Claims Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Beneficial Holder. In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Master Ballot.

13. If you are both the Nominee and the Beneficial Holder of any Second Lien Notes Claims and you wish to vote such Second Lien Notes Claims, you may return a Beneficial Holder Ballot or Master Ballot for such Second Lien Notes Claims and you must vote your Second Lien Notes Claims within a particular Class to either accept

[CUSIP]

8

or reject the Plan and may not split your vote within a particular Class. Accordingly, a Beneficial Holder Ballot, other than a Master Ballot with the votes of multiple Beneficial Holders, that partially rejects and partially accepts the Plan will not be counted.

14. For purposes of the numerosity requirement of section 1126(c) of the Bankruptcy Code, separate Claims held by a single creditor in a particular Class will be aggregated and treated as if such creditor held one Claim in such Class, and all votes related to such Claim will be treated as a single vote to accept or reject the Plan; *provided* that if separate affiliated entities hold Claims in a particular Class, these Claims will not be aggregated and will not be treated as if such creditor held one Claim in such Class, and the vote of each affiliated entity will be counted separately as a vote to accept or reject the Plan.

15. The following additional rules shall apply to Master Ballots:

   (a) Votes cast by Beneficial Holders through a Nominee will be applied against the positions held by such entities in the Second Lien Notes Claims as of the Voting Record Date, as evidenced by the record and depository listings;

   (b) Votes submitted by a Nominee, whether pursuant to a Master Ballot or pre-validated Beneficial Holder Ballots, will not be counted in excess of the record amount of the Second Lien Notes Claims held by such Nominee;

   (c) To the extent that conflicting votes or "over-votes" are submitted by a Nominee, whether pursuant to a Master Ballot or pre-validated Beneficial Holder Ballots, the Notice and Claims Agent will attempt to reconcile discrepancies with the Nominee;

   (d) To the extent that over-votes on a Master Ballot or pre-validated Beneficial Holder Ballots are not reconcilable prior to the preparation of the vote certification, the Notice and Claims Agent will apply the votes to accept and reject the Plan, per Class of Claims voted, in the same proportion as the votes to accept and reject the Plan submitted, per Class of Claims voted, on the Master Ballot or pre-validated Beneficial Holder Ballots that contained the over-vote, but only to the extent of the Nominee's position in Second Lien Notes Claims; and

   (e) For purposes of tabulating votes, each holder holding through a particular account will be deemed to have voted the principal amount relating to its holding in that particular account, although the Notice and Claims Agent may be asked to adjust such principal amount to reflect the claim amount.

**PLEASE MAIL YOUR MASTER BALLOT PROMPTLY**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS MASTER BALLOT, THESE VOTING INSTRUCTIONS, OR THE PROCEDURES FOR VOTING, PLEASE CALL THE NOTICE AND CLAIMS AGENT AT: (877) 833-4150 (TOLL FREE) OR (917) 281-4800 (INTERNATIONAL) OR EMAIL COBALTINFO@KCCLLC.COM.**

**IF THE NOTICE AND CLAIMS AGENT DOES NOT *ACTUALLY RECEIVE* THIS MASTER BALLOT ON OR BEFORE THE VOTING DEADLINE, WHICH IS MARCH 28, 2018, AT 4:00 P.M. PREVAILING CENTRAL TIME, (AND IF THE VOTING DEADLINE IS NOT EXTENDED), THE VOTES TRANSMITTED HEREBY MAY BE COUNTED ONLY IN THE DISCRETION OF THE DEBTORS.**

[CUSIP]

## SCHEDULE 3B

**Form of Class 4, Class 5, and Class 6 Beneficial Holder Ballot (Second Lien Notes Claims)**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|                                                      |   |                        |
|------------------------------------------------------|---|------------------------|
| In re:                                               | ) | Chapter 11             |
|                                                      | ) |                        |
| COBALT INTERNATIONAL ENERGY, INC., *et al.*,[1]      | ) | Case No. 17-36709 (MI) |
|                                                      | ) |                        |
| Debtors.                                             | ) | (Jointly Administered) |
|                                                      | ) |                        |

BENEFICIAL HOLDER BALLOT FOR VOTING TO ACCEPT OR
REJECT THE FOURTH AMENDED JOINT CHAPTER 11 PLAN OF
COBALT INTERNATIONAL ENERGY, INC. AND ITS DEBTOR AFFILIATES

CLASS 4, CLASS 5, AND CLASS 6 BALLOT FOR
BENEFICIAL HOLDERS OF SECOND LIEN NOTES CLAIMS

---

**PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS CAREFULLY *BEFORE* COMPLETING THIS BALLOT.**

**IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE *ACTUALLY RECEIVED* BY THE NOTICE AND CLAIMS AGENT BY MARCH 28, 2018, AT 4:00 P.M., PREVAILING CENTRAL TIME (THE "VOTING DEADLINE").  IF, HOWEVER, YOU RECEIVED A RETURN ENVELOPE ADDRESSED TO YOUR NOMINEE, YOU MUST FOLLOW THE DIRECTIONS OF YOUR NOMINEE TO CAST YOUR VOTE AND ALLOW SUFFICIENT TIME FOR YOUR NOMINEE TO RECEIVE YOUR VOTE AND TRANSMIT SUCH VOTE ON A MASTER BALLOT, WHICH MASTER BALLOT MUST BE RETURNED TO THE NOTICE AND CLAIMS AGENT BY THE VOTING DEADLINE IN ORDER FOR YOUR VOTE TO BE COUNTED.**

---

The above-captioned debtors and debtors in possession (collectively, the "Debtors") are soliciting votes with respect to the *Fourth Amended Joint Chapter 11 Plan of Cobalt International Energy, Inc. and Its Debtor Affiliates* (as may be amended from time to time, the "Plan") as set forth in the *Disclosure Statement for the Fourth Amended Joint Chapter 11 Plan of Cobalt International Energy, Inc. and Its Debtor Affiliates* (as may be amended from time to time, the "Disclosure Statement").  The Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") has approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code by entry of an order on March 8, 2018 (the "Disclosure Statement Order").  Bankruptcy Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court.  Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

You are receiving this Class 4, Class 5, and Class 6 ballot for Beneficial Holders[2] (the "Class 4–6 Beneficial Holder Ballot") because you are a Beneficial Holder of a Second Lien Notes Claim in Class 4, Class 5, and Class 6 (the

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Cobalt International Energy, Inc. (1169); Cobalt International Energy GP, LLC (7374); Cobalt International Energy, L.P. (2411); Cobalt GOM LLC (7188); Cobalt GOM # 1 LLC (7262); and Cobalt GOM # 2 LLC (7316).  The Debtors' service address is:  920 Memorial City Way, Suite 100, Houston, Texas 77024.

"Second Lien Notes Claims") as of March 5, 2018 (the "Voting Record Date").  Accordingly, you have a right to vote to accept or reject the Plan.  You can cast your vote through this Class 4–6 Beneficial Holder Ballot and return it to your broker, bank, or other nominee, or the agent of a broker, bank, or other nominee (each of the foregoing, a "Nominee"), in accordance with the instructions provided by your Nominee, who will then submit a master ballot (the "Master Ballot") on behalf of the Beneficial Holders of Class 4, Class 5, and Class 6 Second Lien Notes Claims.

Your rights are described in the Disclosure Statement, which was included in the package (the "Solicitation Package") you are receiving with this Class 4–6 Beneficial Holder Ballot (as well as the Plan, Disclosure Statement Order, and certain other materials).  If you received Solicitation Package materials in electronic format and desire paper copies, or if you need to obtain additional Solicitation Packages, you may obtain them from (a) Kurtzman Carson Consultants LLC (the "Notice and Claims Agent") at no charge by:  (i) accessing the Debtors' restructuring website at https://www.kccllc.net/cobalt; (ii) writing to the Notice and Claims Agent at Cobalt Ballot Processing, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245; (iii) calling the Notice and Claims Agent at (866) 967-1782 (toll free) or (310) 751-2682 (international); or (iv) emailing CobaltInfo@kccllc.com; or (b) for a fee via PACER at http://ecf.txsb.uscourts.gov.

This Class 4–6 Beneficial Holder Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan.  If you believe you have received this Class 4–6 Beneficial Holder Ballot in error, or if you believe that you have received the wrong ballot, please contact the Notice and Claims Agent *immediately* at the address, telephone number, or email address set forth above.

You should review the Disclosure Statement and the Plan before you vote.  You may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Claim.  Under the Plan, your Second Lien Secured Claim has been placed in Class 4, Second Lien Notes Secured Claims, your Second Lien Notes Deficiency Claim has been placed in Class 5, Subsidiary General Unsecured Claims and Class 6, Cobalt General Unsecured Claims.  If you hold Claims in any other Class, you will receive a ballot for each additional Class in which you are entitled to vote.

In order for your vote to count, your Nominee must receive this Class 4–6 Beneficial Holder Ballot in sufficient time for your Nominee to include your vote on a Master Ballot that must be received by the Notice and Claims Agent on or before the Voting Deadline, which is **March 28, 2018, at 4:00 p.m.**, prevailing Central Time.  Please allow sufficient time for your vote to be included on the Master Ballot completed by your Nominee.  If a Master Ballot recording your vote is not received by the Voting Deadline, and if the Voting Deadline is not extended, your vote will not count.

**Item 1.  Amount of Claim.**

The undersigned hereby certifies that, as of the Voting Record Date, the undersigned was the Beneficial Holder of Second Lien Notes Claims, in the following aggregate unpaid principal amount (insert amount in box below, unless otherwise completed by your Nominee):

| |
|---|
| Second Lien Notes Secured Claim:  $_____ |

---

2   A "Beneficial Holder" means a beneficial owner of publicly-traded securities whose claims have not been satisfied prior to the Voting Record Date (as defined herein) pursuant to Bankruptcy Court order or otherwise, (a) as reflected in the records maintained by the Nominees holding through the Second Lien Indenture Trustee, or (b) as evidenced by the securities position report from The Depository Trust Company as of the Voting Record Date.

[CUSIP]

2

```
Second Lien Notes Deficiency
Claim  $_____
```

**Item 2.   Vote on Plan.**

The Beneficial Holder of the Class 4 Second Lien Notes Secured Claim against the Debtors set forth in Item 1 votes to (please check <u>one</u>):

☐    **ACCEPT** (vote FOR) the Plan              ☐    **REJECT** (vote AGAINST) the Plan

The Beneficial Holder of the Class 5 Second Lien Notes Deficiency Claims against the Debtors, other than Cobalt International Energy, Inc., set forth in Item 1 votes to (please check <u>one</u>):

☐    **ACCEPT** (vote FOR) the Plan              ☐    **REJECT** (vote AGAINST) the Plan

The Beneficial Holder of the Class 6 Second Lien Notes Deficiency Claims against Debtor Cobalt International Energy, Inc., set forth in Item 1 votes to (please check <u>one</u>):

☐    **ACCEPT** (vote FOR) the Plan              ☐    **REJECT** (vote AGAINST) the Plan

**<u>Your vote on the Plan will be applied to each applicable Debtor, per voting Class, in the same manner and in the same amount as indicated in Item 1 and Item 2 above.</u>**

**Item 3.   Important information regarding the Third Party Release.**

**<u>Article VIII.C of the Plan contains the following provision</u>:**

**As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Sale Transaction, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Sale Transaction, the Plan, or the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything contained herein to the contrary, the foregoing release does not release any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan.**

[CUSIP]

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.C, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute its finding that each release described in this Article VIII.C is: (1) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such Claims; (2) in the best interests of the Debtors and all holders of Interests and Claims; (3) fair, equitable, and reasonable; (4) given and made after due notice and opportunity for hearing; and (5) a bar to any of the Debtors asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.**

\*       \*       \*

UNDER THE PLAN, "RELEASING PARTY" MEANS COLLECTIVELY:  (A) THE FIRST LIEN NOTEHOLDERS; (B) THE FIRST LIEN AD HOC GROUP; (C) THE SECOND LIEN NOTEHOLDERS; (D) THE SECOND LIEN AD HOC GROUP; (E) THE UNSECURED NOTEHOLDERS; (F) THE UNSECURED NOTES AD HOC COMMITTEE; (G) THE FIRST LIEN INDENTURE TRUSTEE; (H) THE SECOND LIEN INDENTURE TRUSTEE; (I) THE 2.625% SENIOR NOTES INDENTURE TRUSTEE; (J) THE 3.125% SENIOR NOTES INDENTURE TRUSTEE; (K) THE COMMITTEE AND ITS MEMBERS; (L) ALL HOLDERS OF CLAIMS, (M) ALL HOLDERS OF INTERESTS, AND (N) WITH RESPECT TO EACH OF THE DEBTORS AND EACH OF THE FOREGOING ENTITIES IN CLAUSES (A) THROUGH (M), SUCH ENTITY AND ITS CURRENT AND FORMER AFFILIATES AND SUBSIDIARIES, AND SUCH ENTITIES' AND THEIR CURRENT AND FORMER AFFILIATES' AND SUBSIDIARIES' CURRENT AND FORMER DIRECTORS, MANAGERS, OFFICERS, EQUITY HOLDERS (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), PREDECESSORS, SUCCESSORS, AND ASSIGNS, SUBSIDIARIES, AND EACH OF THEIR RESPECTIVE CURRENT AND FORMER EQUITY HOLDERS, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS, MEMBERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITY AS SUCH COLLECTIVELY; *PROVIDED* THAT ANY HOLDER OF A CLAIM OR INTEREST THAT OPTS OUT OR OTHERWISE OBJECTS TO THE RELEASES IN THE PLAN SHALL NOT BE A "RELEASING PARTY."

AS A "RELEASING PARTY" UNDER THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE VIII.C OF THE PLAN, AS SET FORTH ABOVE.  YOU MAY ELECT NOT TO GRANT THE RELEASE CONTAINED IN ARTICLE VIII.C OF THE PLAN ONLY <u>ONLY IF</u> YOU CHECK THE BOX BELOW AND (A) SUBMIT THE BALLOT BUT ABSTAIN FROM VOTING TO ACCEPT OR REJECT THE PLAN OR (B) VOTE TO REJECT THE PLAN.  IF YOU (A) VOTE TO ACCEPT THE PLAN, (B) FAIL TO SUBMIT A BALLOT BY THE VOTING DEADLINE, (C) SUBMIT THE BALLOT BUT ABSTAIN FROM VOTING TO ACCEPT OR REJECT THE PLAN WITHOUT CHECKING THE BOX BELOW, OR (D) VOTE TO REJECT THE PLAN WITHOUT CHECKING THE BOX BELOW, IN EACH CASE YOU WILL BE DEEMED TO CONSENT TO THE RELEASES SET FORTH IN ARTICLE VIII.C OF THE PLAN.  THE ELECTION TO WITHHOLD CONSENT TO GRANT SUCH RELEASE IS AT YOUR OPTION.  BY OPTING OUT OF THE RELEASES SET FORTH IN ARTICLE VIII.C OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE VIII OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.

**The Beneficial Holder of the Class 4, Class 5, and Class 6 Beneficial Holder Claim set forth in Item 1 elects to:**

☐**OPT OUT** of the Third Party Release

**Item 4.   Other Class 4–6 Beneficial Holder Ballots Submitted.**  By returning this Class 4–6 Beneficial Holder Ballot, the Holder of the Second Lien Notes Claims identified in Item 1 certifies that (a) no other Class 4–6 Beneficial Holder Ballots with respect to the amount of the Second Lien Notes Claims identified in Item 1 have been cast, except as identified in the following table, and (b) *all* Class 4–6 Beneficial Holder Ballots submitted by the

[CUSIP]

4

holder indicate the same vote to accept or reject the Plan, per voting Class, that the holder has indicated in Item 2 of this Class 4 Beneficial Holder Ballot (please use additional sheets of paper if necessary):

[CUSIP]

**ONLY COMPLETE THIS TABLE IF YOU HAVE VOTED <u>OTHER</u>
CLASS 4–6 SECOND LIEN NOTES CLAIMS ON OTHER 4–6 BENEFICIAL HOLDER BALLOTS**

| Account Number | Name of Registered Holder or Nominee | Principal Amount of Other Second Lien Notes Claims | CUSIP of Other Second Lien Notes Claims |
|---|---|---|---|
|  |  | $ |  |
|  |  | $ |  |
|  |  | $ |  |
|  |  | $ |  |

**Item 5.  Certifications.**

By signing this Class 4–6 Beneficial Holder Ballot, the undersigned certifies:

(a)   that, as of the Voting Record Date, either:  (i) the Entity is the holder of the Second Lien Notes Claims being voted; or (ii) the Entity is an authorized signatory for an Entity that is a holder of the Second Lien Notes Claims being voted;

(b)   that the Entity (or, in the case of an authorized signatory, the holder) has received a copy of the Disclosure Statement and the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

(c)   that the Entity has cast the same vote with respect to all Second Lien Notes Claims in a single Class; and

(d)   that no other Class 4–6 Beneficial Holder Ballots with respect to the amount of the Second Lien Notes Claims identified in Item 1 have been cast or, if any other Class 4–6 Beneficial Holder Ballots have been cast with respect to such Second Lien Notes Claims, then any such earlier Class 4–6 Beneficial Holder Ballots are hereby revoked.

[CUSIP]

6

| | |
|---|---|
| Name of Holder: | |
| | (Print or Type) |
| Signature: | |
| Name of Signatory: | |
| | (If other than holder) |
| Title: | |
| Address: | |
| | |
| | |
| Telephone Number: | |
| Email: | |
| Date Completed: | |
| | |

**PLEASE COMPLETE, SIGN, AND DATE THIS BALLOT AND
RETURN IT (WITH AN ORIGINAL SIGNATURE) *PROMPTLY* IN THE ENVELOPE PROVIDED OR
OTHERWISE IN ACCORDANCE WITH THE INSTRUCTIONS PROVIDED BY YOUR NOMINEE.**

IF THE NOTICE AND CLAIMS AGENT DOES
NOT *ACTUALLY RECEIVE* THE MASTER BALLOT SUBMITTED ON
YOUR BEHALF WHICH REFLECTS YOUR VOTE **ON OR BEFORE MARCH 28, 2018, AT 4:00 P.M.
PREVAILING CENTRAL TIME**, (AND IF THE VOTING DEADLINE IS NOT EXTENDED), YOUR VOTE
TRANSMITTED BY THIS CLASS 4–6 BENEFICIAL HOLDER BALLOT MAY BE
COUNTED TOWARD CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE DEBTORS.

[CUSIP]

| Class 4, Class 5, and Class 6 — Second Lien Notes Claims |
|---|

## INSTRUCTIONS FOR COMPLETING THIS CLASS 4–6 BENEFICIAL HOLDER BALLOT

1.  The Debtors are soliciting the votes of holders of Claims with respect to the Plan attached as **Exhibit A** to the Disclosure Statement.  Capitalized terms used in the Class 4–6 Beneficial Holder Ballot or in these instructions (the "Ballot Instructions"), but not otherwise defined therein or herein, shall have the meaning set forth in the Plan, a copy of which also accompanies the Class 4–6 Beneficial Holder Ballot.  **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.**

2.  The Plan can be confirmed by the Bankruptcy Court and thereby made binding upon you if it is accepted by the holders of at least two-thirds in amount and more than one-half in number of Claims in at least one class of creditors that votes on the Plan and if the Plan otherwise satisfies the requirements for confirmation provided by section 1129(a) of the Bankruptcy Code.  Please review the Disclosure Statement for more information.

3.  To ensure that your vote is counted, you must (a) complete the Class 4–6 Beneficial Holder Ballot; (b) indicate your decision either to accept or reject the Plan in the boxes provided in Item 2 of the Class 4–6 Beneficial Holder Ballot; and (c) sign and return the Class 4–6 Beneficial Holder Ballot in accordance with the instructions received and in the envelope, so that this Class 4–6 Beneficial Holder Ballot or the Master Ballot case on your behalf is actually received by the Notice and Claims Agent by **March 28, 2018, at 4:00 p.m.**, prevailing Central Time.  If you are returning your Class 4–6 Beneficial Holder Ballot to the Nominee that provided you with this Class 4–6 Beneficial Holder Ballot, your completed Class 4–6 Beneficial Holder Ballot must be sent to your Nominee, allowing sufficient time for your Nominee to receive your Class 4–6 Beneficial Holder Ballot, complete a Master ballot, and transmit the Master Ballot to the Notice and Claims Agent so that it is actually received on or before the Voting Deadline.

4.  **The following Class 4–6 Beneficial Holder Ballots submitted to your Nominee will *not* be counted**:

    (a)  any Class 4–6 Beneficial Holder Ballot that partially rejects and partially accepts the Plan in a single Class;
    (b)  any Class 4–6 Beneficial Holder Ballot sent to the Debtors, the Debtors' agents, any indenture trustee, or the Debtors' financial or legal advisors;
    (c)  any Class 4–6 Beneficial Holder Ballot sent by facsimile or any electronic means other than in accordance with the instructions of your Nominee;
    (d)  any Class 4–6 Beneficial Holder Ballot that is illegible or contains insufficient information to permit the identification of the holder of the Claim;
    (e)  any Class 4–6 Beneficial Holder Ballot cast by an Entity that does not hold a Claim in Class 4, Class 5, and Class 6;
    (f)  any unsigned Class 4–6 Beneficial Holder Ballot;
    (g)  any Class 4–6 Beneficial Holder Ballot submitted by a holder not entitled to vote pursuant to the Plan;
    (h)  any non-original Class 4–6 Beneficial Holder Ballot; and/or
    (i)  any Class 4–6 Beneficial Holder Ballot not marked to accept or reject the Plan or any Class 4–6 Beneficial Holder Ballot marked both to accept and reject the Plan.

5.  If your Class 4–6 Beneficial Holder Ballot is not received by your Nominee in sufficient time to be included on a timely submitted Master Ballot, it will not be counted unless the Debtors determine otherwise.  In all cases, Beneficial Holders should allow sufficient time to assure timely delivery of your Class 4–6 Beneficial Holder Ballot to your Nominee.  No Class 4–6 Beneficial Holder Ballot should be sent to any of the Debtors, the Debtors' agents, the Debtors' financial or legal advisors and, if so sent, will not be counted.

6.  If you deliver multiple Class 4–6 Beneficial Holder Ballots to the Nominee with respect to the same Claim prior to the Voting Deadline, the last received valid Class 4–6 Beneficial Holder Ballot timely received will supersede and revoke any earlier received Class 4–6 Beneficial Holder Ballots.

[CUSIP]

8

7. You must vote all of your Second Lien Notes Secured Claims within Class 4, all of your Second Lien Notes Deficiency Claims within Class 5, and all of your Second Lien Notes Deficiency Claims within Class 6 either to accept or reject the Plan and may **not** split your vote within any such Class.  Further, if a holder has multiple Claims within Class 4, Class 5, and Class 6, the Debtors may, in their discretion, aggregate the Claims of any particular holder with multiple Claims within the same Class for the purpose of counting votes.

8. This Class 4–6 Beneficial Holder Ballot does *not* constitute, and shall not be deemed to be, (a) a Proof of Claim or (b) an assertion or admission of a Claim.

9. **Please be sure to sign and date your Class 4–6 Beneficial Holder Ballot**.  If you are signing a Class 4–6 Beneficial Holder Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Notice and Claims Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such holder.  In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Class 4–6 Beneficial Holder Ballot.

10. If you hold Claims in other Classes under the Plan, you may receive additional ballots coded for each different Class.  Each ballot votes *only* your Claims indicated on that ballot, so please complete and return each ballot that you receive.

11. The Class 4–6 Beneficial Holder Ballot is not a letter of transmittal and may not be used for any purpose other than to vote to accept or reject the Plan.  Accordingly, at this time, holders of Claims should not surrender certificates or instruments representing or evidencing their Claims, and neither the Debtors nor the Notice and Claims Agent will accept delivery of any such certificates or instruments surrendered together with a ballot.

<u>PLEASE MAIL YOUR CLASS 4–6 BENEFICIAL HOLDER BALLOT PROMPTLY</u>

**IF YOU HAVE ANY QUESTIONS REGARDING THIS CLASS 4–6 BENEFICIAL HOLDER BALLOT, THESE VOTING INSTRUCTIONS, OR THE PROCEDURES FOR VOTING, PLEASE CALL THE NOTICE AND CLAIMS AGENT AT:  (866) 967-1782 (TOLL FREE) OR (310) 751-2682 (INTERNATIONAL) OR EMAIL COBALTINFO@KCCLLC.COM.**

---

**IF THE NOTICE AND CLAIMS AGENT DOES NOT *ACTUALLY RECEIVE* THE MASTER BALLOT FILED ON YOUR BEHALF ON OR BEFORE MARCH 28, 2018, AT 4:00 P.M., PREVAILING CENTRAL TIME, AND IF THE VOTING DEADLINE IS NOT EXTENDED, YOUR VOTE TRANSMITTED BY THIS CLASS 4–6 BENEFICIAL HOLDER BALLOT MAY BE COUNTED TOWARD CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE DEBTORS.**

---

[CUSIP]

## SCHEDULE 3C

### Form of Class 5 Ballot

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
|  | ) |  |
| In re: | ) | Chapter 11 |
|  | ) |  |
| COBALT INTERNATIONAL ENERGY, INC., *et al.*,[1] | ) | Case No. 17-36709 (MI) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**BALLOT FOR VOTING TO ACCEPT OR REJECT
THE FOURTH AMENDED JOINT CHAPTER 11 PLAN OF COBALT
INTERNATIONAL ENERGY, INC. AND ITS DEBTOR AFFILIATES**

**CLASS 5 BALLOT FOR HOLDERS OF SUBSIDIARY GENERAL UNSECURED CLAIMS**

**(SUBSIDIARY GENERAL UNSECURED CLAIMS)**

> **PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS
> CAREFULLY *BEFORE* COMPLETING THIS BALLOT.**
>
> **IN ORDER FOR YOUR VOTE TO BE COUNTED, THIS BALLOT
> MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE
> *ACTUALLY RECEIVED*
> BY THE NOTICE AND CLAIMS AGENT BY MARCH 28, 2018, AT 4:00 P.M., PREVAILING CENTRAL
> TIME (THE "<u>VOTING DEADLINE</u>") IN ACCORDANCE WITH THE FOLLOWING:**

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>") are soliciting votes with respect to the *Fourth Amended Joint Chapter 11 Plan of Cobalt International Energy, Inc. and Its Debtor Affiliates* (as may be amended from time to time, the "<u>Plan</u>") as set forth in the *Disclosure Statement for the Fourth Amended Joint Chapter 11 Plan of Cobalt International Energy, Inc. and Its Debtor Affiliates* (as may be amended from time to time, the "<u>Disclosure Statement</u>").  The Bankruptcy Court for the Southern District of Texas (the "<u>Bankruptcy Court</u>") has approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code by entry of an order on March 8, 2018 (the "<u>Disclosure Statement Order</u>").  Bankruptcy Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court.  Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

You are receiving this Class 5 ballot (this "<u>Class 5 Subsidiary GUC Ballot</u>") because you are a holder of a Class 5 Subsidiary General Unsecured Claim in Class 5 (the "<u>Class 5 Subsidiary General Unsecured Claim</u>") as of March 5, 2018 (the "<u>Voting Record Date</u>").  Class 5 Subsidiary General Unsecured Claims include any Claim against any Debtor, other than Cobalt International Energy, Inc., that is not otherwise paid in full during the chapter 11 cases pursuant to an order of the Bankruptcy Court and is not:  (a) an Administrative Claim; (b) a Priority Tax Claim; (c) an Other Priority Claim; (d) an Other Secured Claim; (e) a First Lien Notes Claim; (f) a Second Lien Notes Claim;

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Cobalt International Energy, Inc. (1169); Cobalt International Energy GP, LLC (7374); Cobalt International Energy, L.P. (2411); Cobalt GOM LLC (7188); Cobalt GOM # 1 LLC (7262); and Cobalt GOM # 2 LLC (7316).  The Debtors' service address is:  920 Memorial City Way, Suite 100, Houston, Texas 77024.

(g) an Intercompany Claim; (h) a Cobalt General Unsecured Claim, or (i) a Section 510(b) Claim. Accordingly, you have a right to vote to accept or reject the Plan.

Your rights are described in the Disclosure Statement, which was included in the package (the "Solicitation Package") you are receiving with this Class 5 Subsidiary GUC Ballot (as well as the Plan, Disclosure Statement Order, and certain other materials). If you received Solicitation Package materials in electronic format and desire paper copies, or if you need to obtain additional Solicitation Packages, you may obtain them from (a) Kurtzman Carson Consultants LLC (the "Notice and Claims Agent") at no charge by: (i) accessing the Debtors' restructuring website at https://www.kccllc.net/cobalt; (ii) writing to the Notice and Claims Agent at Cobalt Ballot Processing, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245; (iii) calling the Notice and Claims Agent at (866) 967-1782 (toll free) or (310) 751-2682 (international); or (iv) emailing CobaltInfo@kccllc.com; or (b) for a fee via PACER at http://ecf.txsb.uscourts.gov.

This Class 5 Subsidiary GUC Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan. If you believe you have received this Class 5 Subsidiary GUC Ballot in error, or if you believe that you have received the wrong ballot, please contact the Notice and Claims Agent *immediately* at the address, telephone number, or email address set forth above.

You should review the Disclosure Statement and the Plan before you vote. You may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Claim. Your Claim has been placed in Class 5, Subsidiary General Unsecured Claims, under the Plan. If you hold Claims in more than one Class, you will receive a ballot for each Class in which you are entitled to vote.

**Item 1. Amount of Claim.**

The undersigned hereby certifies that, as of the Voting Record Date, the undersigned was the holder of a Class 5 Subsidiary General Unsecured Claim in the following aggregate unpaid amount (insert amount in box below):

$_____

Debtor: _____

**Item 2. Vote on Plan.**

The holder of the Class 5 Subsidiary General Unsecured Claim against the Debtors set forth in Item 1 votes to (please check <u>one</u>):

☐   **ACCEPT** (vote FOR) the Plan          ☐   **REJECT** (vote AGAINST) the Plan

**Item 3. Important information regarding the Third Party Release.**

**Article VIII.C of the Plan contains the following Third Party Release:**

**As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Sale Transaction, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring**

2

**Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Sale Transaction, the Plan, or the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything contained herein to the contrary, the foregoing release does not release any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.C, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute its finding that each release described in this Article VIII.C is: (1) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such Claims; (2) in the best interests of the Debtors and all holders of Interests and Claims; (3) fair, equitable, and reasonable; (4) given and made after due notice and opportunity for hearing; and (5) a bar to any of the Debtors asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.**

\* \* \*

UNDER THE PLAN, "RELEASING PARTY" MEANS COLLECTIVELY: (A) THE FIRST LIEN NOTEHOLDERS; (B) THE FIRST LIEN AD HOC GROUP; (C) THE SECOND LIEN NOTEHOLDERS; (D) THE SECOND LIEN AD HOC GROUP; (E) THE UNSECURED NOTEHOLDERS; (F) THE UNSECURED NOTES AD HOC COMMITTEE; (G) THE FIRST LIEN INDENTURE TRUSTEE; (H) THE SECOND LIEN INDENTURE TRUSTEE; (I) THE 2.625% SENIOR NOTES INDENTURE TRUSTEE; (J) THE 3.125% SENIOR NOTES INDENTURE TRUSTEE; (K) THE COMMITTEE AND ITS MEMBERS; (L) ALL HOLDERS OF CLAIMS, (M) ALL HOLDERS OF INTERESTS, AND (N) WITH RESPECT TO EACH OF THE DEBTORS AND EACH OF THE FOREGOING ENTITIES IN CLAUSES (A) THROUGH (M), SUCH ENTITY AND ITS CURRENT AND FORMER AFFILIATES AND SUBSIDIARIES, AND SUCH ENTITIES' AND THEIR CURRENT AND FORMER AFFILIATES' AND SUBSIDIARIES' CURRENT AND FORMER DIRECTORS, MANAGERS, OFFICERS, EQUITY HOLDERS (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), PREDECESSORS, SUCCESSORS, AND ASSIGNS, SUBSIDIARIES, AND EACH OF THEIR RESPECTIVE CURRENT AND FORMER EQUITY HOLDERS, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS, MEMBERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITY AS SUCH COLLECTIVELY; *PROVIDED* THAT ANY HOLDER OF A CLAIM OR INTEREST THAT OPTS OUT OR OTHERWISE OBJECTS TO THE RELEASES IN THE PLAN SHALL NOT BE A "RELEASING PARTY."

AS A "RELEASING PARTY" UNDER THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE VIII.C OF THE PLAN, AS SET FORTH ABOVE. YOU MAY ELECT NOT TO GRANT THE RELEASE CONTAINED IN ARTICLE VIII.C OF THE PLAN ONLY IF YOU CHECK THE BOX BELOW AND (A) SUBMIT THE BALLOT BUT ABSTAIN FROM VOTING TO ACCEPT OR REJECT THE PLAN OR (B) VOTE TO REJECT THE PLAN. IF YOU (A) VOTE TO ACCEPT THE PLAN, (B) FAIL TO SUBMIT A BALLOT BY THE VOTING DEADLINE, (C) SUBMIT THE BALLOT BUT ABSTAIN FROM VOTING TO ACCEPT OR REJECT THE PLAN WITHOUT CHECKING THE BOX BELOW, OR (D) VOTE TO REJECT THE PLAN WITHOUT CHECKING THE BOX BELOW, IN EACH CASE YOU WILL BE DEEMED TO CONSENT TO THE RELEASES SET FORTH IN ARTICLE VIII.C OF THE PLAN. THE ELECTION TO WITHHOLD CONSENT TO GRANT SUCH RELEASE IS AT YOUR OPTION. BY OPTING OUT OF THE RELEASES SET FORTH IN ARTICLE VIII.C OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE VIII OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.

3

**The Holder of the Class 5 Subsidiary General Unsecured Claim set forth in Item 1 elects to:**

☐ **OPT OUT** of the Third Party Release

**Item 4.  Certifications.**

By signing this Class 5 Subsidiary GUC Ballot, the undersigned certifies:

(a)  that, as of the Voting Record Date, either:  (i) the Entity is the holder of the Class 5 Subsidiary General Unsecured Claims being voted; or (ii) the Entity is an authorized signatory for an Entity that is a holder of the Class 5 Subsidiary General Unsecured Claims being voted;

(b)  that the Entity (or, in the case of an authorized signatory, the holder) has received a copy of the Disclosure Statement and the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

(c)  that the Entity has cast the same vote with respect to all Class 5 Subsidiary General Unsecured Claims; and

(d)  that no other Class 5 Subsidiary GUC Ballots with respect to the amount of the Class 5 Subsidiary General Unsecured Claims identified in Item 1 have been cast or, if any other Class 5 Subsidiary GUC Ballots have been cast with respect to such Class 5 Subsidiary General Unsecured Claims, then any such earlier Class 5 Subsidiary GUC Ballots are hereby revoked.

4

| Name of Holder: | |
| --- | --- |
| | (Print or Type) |
| Signature: | |
| Name of Signatory: | |
| | (If other than holder) |
| Title: | |
| Address: | |
| | |
| | |
| Telephone Number: | |
| Email: | |
| Date Completed: | |

**IN ORDER FOR YOUR BALLOT TO COUNT, YOU MUST EITHER (1) COMPLETE AN ELECTRONIC BALLOT AT HTTP://WWW.KCCLLC.NET/COBALT OR (2) COMPLETE, SIGN, AND DATE THIS BALLOT AND RETURN IT (WITH AN ORIGINAL SIGNATURE) *PROMPTLY* VIA FIRST CLASS MAIL (OR IN THE ENCLOSED REPLY ENVELOPE PROVIDED), OVERNIGHT COURIER, OR HAND DELIVERY TO:**

**Cobalt Ballot Processing**
**c/o Kurtzman Carson Consultants LLC**
**2335 Alaska Avenue,**
**El Segundo, California 90245**

IF THE NOTICE AND CLAIMS AGENT DOES NOT *ACTUALLY RECEIVE* THIS CLASS 5 SUBSIDIARY GUC BALLOT **ON OR BEFORE MARCH 28, 2018, AT 4:00 P.M.**, PREVAILING CENTRAL TIME, (AND IF THE VOTING DEADLINE IS NOT EXTENDED), YOUR VOTE TRANSMITTED BY THIS CLASS 5 SUBSIDIARY GUC BALLOT MAY BE COUNTED TOWARD CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE DEBTORS.

| Class 5 — Subsidiary General Unsecured Claims |
|---|

### INSTRUCTIONS FOR COMPLETING THIS CLASS 5 SUBSIDIARY GUC BALLOT

1.  The Debtors are soliciting the votes of holders of Claims with respect to the Plan attached as Exhibit A to the Disclosure Statement.  Capitalized terms used in the Class 5 Subsidiary GUC Ballot or in these instructions (the "Ballot Instructions"), but not otherwise defined therein or herein, shall have the meaning set forth in the Plan, a copy of which also accompanies the Class 5 Subsidiary GUC Ballot.  **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.**

2.  The Plan can be confirmed by the Bankruptcy Court and thereby made binding upon you if it is accepted by the holders of at least two-thirds in amount and more than one-half in number of Claims in at least one class of creditors that votes on the Plan and if the Plan otherwise satisfies the requirements for confirmation provided by section 1129(a) of the Bankruptcy Code.  Please review the Disclosure Statement for more information.

3.  To ensure that your Class 5 Subsidiary GUC Ballot is counted, you *must* either complete and submit this hard copy Class 5 Subsidiary GUC Ballot via U.S. Mail or hand-delivery or complete an electronic ballot at http://www.kccllc.net/cobalt.

4.  To ensure that your hard copy Class 5 Subsidiary GUC Ballot is counted, you must:  (a) complete your Class 5 Subsidiary GUC Ballot in accordance with these instructions; (b) clearly indicate your decision either to accept or reject the Plan in the boxes provided in Item 2 of the Class 5 Subsidiary GUC Ballot; and (c) clearly sign and return your original Class 5 Subsidiary GUC Ballot in the enclosed pre-addressed, pre-paid envelope or via first class mail, overnight courier, or hand delivery to Cobalt Ballot Processing, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245.

5.  Your Class 5 Subsidiary GUC Ballot *must* be returned to the Notice and Claims Agent so as to be *actually received* by the Notice and Claims Agent on or before the Voting Deadline.  **The Voting Deadline is March 28, 2018, at 4:00 p.m.**, prevailing Central Time.

6.  If a Class 5 Subsidiary GUC Ballot is received *after* the Voting Deadline and if the Voting Deadline is not extended, it may be counted only in the discretion of the Debtors.  Additionally**, the following Class 5 Subsidiary GUC Ballots will *not* be counted**:

    (a)  any Class 5 Subsidiary GUC Ballot that partially rejects and partially accepts the Plan;
    (b)  any Class 5 Subsidiary GUC Ballot sent to the Debtors, the Debtors' agents (other than the Notice and Claims Agent), any indenture trustee, or the Debtors' financial or legal advisors;
    (c)  any Class 5 Subsidiary GUC Ballot sent by facsimile or any electronic means;
    (d)  any Class 5 Subsidiary GUC Ballot that is illegible or contains insufficient information to permit the identification of the holder of the Claim;
    (e)  any Class 5 Subsidiary GUC Ballot cast by an Entity that does not hold a Claim in Class 5;
    (f)  any Class 5 Subsidiary GUC Ballot submitted by a holder not entitled to vote pursuant to the Plan;
    (g)  any unsigned Class 5 Subsidiary GUC Ballot;
    (h)  any non-original Class 5 Subsidiary GUC Ballot; and/or
    (i)  any Class 5 Subsidiary GUC Ballot not marked to accept or reject the Plan or any Class 5 Subsidiary GUC Ballot marked both to accept and reject the Plan.

7.  The method of delivery of Class 5 Subsidiary GUC Ballots to the Notice and Claims Agent is at the election and risk of each holder of a Class 5 Subsidiary General Unsecured Claim.  Except as otherwise provided herein, such delivery will be deemed made only when the Notice and Claims Agent *actually receives* the originally executed Class 5 Subsidiary GUC Ballot.  In all cases, holders should allow sufficient time to assure timely delivery.

8.  If multiple Class 5 Subsidiary GUC Ballots are received from the same holder of a Class 5 Subsidiary General Unsecured Claim with respect to the same Class 5 Subsidiary Unsecured Claim prior to the Voting Deadline,

6

the last, timely received, and properly completed Class 5 Subsidiary GUC Ballot will supersede and revoke any earlier received Class 5 Subsidiary GUC Ballots.

9.  You must vote all of your Class 5 Subsidiary General Unsecured Claims either to accept or reject the Plan and may *not* split your vote.  Further, if a holder has multiple Class 5 Subsidiary General Unsecured Claims, the Debtors may aggregate the Claims of any particular holder with multiple Class 5 Subsidiary General Unsecured Claims for the purpose of counting votes.

10. This Class 5 Subsidiary GUC Ballot does *not* constitute, and shall not be deemed to be, (a) a Proof of Claim or (b) an assertion or admission of a Claim.

11. **Please be sure to sign and date your Class 5 Subsidiary GUC Ballot**.  If you are signing a Class 5 Subsidiary GUC Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Notice and Claims Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such holder.  In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Class 5 Subsidiary GUC Ballot.

12. If you hold Claims in more than one Class under the Plan you may receive more than one ballot coded for each different Class.  Each ballot votes *only* your Claims indicated on that ballot, so please complete and return each ballot that you received.

**PLEASE MAIL YOUR CLASS 5 SUBSIDIARY GUC BALLOT PROMPTLY**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS CLASS 5 SUBSIDIARY GUC BALLOT, THESE VOTING INSTRUCTIONS, OR THE PROCEDURES FOR VOTING, PLEASE CALL THE NOTICE AND CLAIMS AGENT AT:  (866) 967-1782 (TOLL FREE) OR (310) 751-2682 (INTERNATIONAL) OR EMAIL COBALTINFO@KCCLLC.COM.**

---

**IF THE NOTICE AND CLAIMS AGENT DOES NOT *ACTUALLY RECEIVE* THIS CLASS 5 SUBSIDIARY GUC BALLOT ON OR BEFORE THE VOTING DEADLINE, WHICH IS MARCH 28, 2018, AT 4:00 P.M. PREVAILING CENTRAL TIME, (AND IF THE VOTING DEADLINE IS NOT EXTENDED), YOUR VOTE TRANSMITTED HEREBY MAY BE COUNTED ONLY IN THE DISCRETION OF THE DEBTORS.**

---

7

## SCHEDULE 3D

## Form of Class 6 Ballot

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| COBALT INTERNATIONAL ENERGY, INC., *et al.*,[1] | ) | Case No. 17-36709 (MI) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

BALLOT FOR VOTING TO ACCEPT OR REJECT
THE FOURTH AMENDED JOINT CHAPTER 11 PLAN OF COBALT
INTERNATIONAL ENERGY, INC. AND ITS DEBTOR AFFILIATES

CLASS 6 BALLOT FOR HOLDERS OF COBALT GENERAL UNSECURED CLAIMS

(UNSECURED NON-NOTES CLAIMS)

PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS
CAREFULLY *BEFORE* COMPLETING THIS BALLOT.

IN ORDER FOR YOUR VOTE TO BE COUNTED, THIS BALLOT
MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE
*ACTUALLY RECEIVED*
BY THE NOTICE AND CLAIMS AGENT BY MARCH 28, 2018, AT 4:00 P.M., PREVAILING CENTRAL
TIME (THE "VOTING DEADLINE") IN ACCORDANCE WITH THE FOLLOWING:

The above-captioned debtors and debtors in possession (collectively, the "Debtors") are soliciting votes with respect to the *Fourth Amended Joint Chapter 11 Plan of Cobalt International Energy, Inc. and Its Debtor Affiliates* (as may be amended from time to time, the "Plan") as set forth in the *Disclosure Statement for the Fourth Amended Joint Chapter 11 Plan of Cobalt International Energy, Inc. and Its Debtor Affiliates* (as may be amended from time to time, the "Disclosure Statement").  The Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") has approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code by entry of an order on March 8, 2018 (the "Disclosure Statement Order").  Bankruptcy Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court.  Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

You are receiving this Class 6 ballot (this "Class 6 Cobalt Non-Notes GUC Ballot") because you are a holder of a Class 6 Cobalt General Unsecured Claim that is not an Unsecured Notes Claim (the "Class 6 Unsecured Non-Notes Claim") as of March 5, 2018 (the "Voting Record Date").  Class 6 Cobalt General Unsecured Claims include any Claim against Cobalt International Energy, Inc. that is not otherwise paid in full during the chapter 11 cases pursuant to an order of the Bankruptcy Court and is not:  (a) an Administrative Claim; (b) a Priority Tax Claim; (c) an Other Priority Claim; (d) an Other Secured Claim; (e) a First Lien Notes Claim; (f) a Second Lien Notes Claim; (g) an

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Cobalt International Energy, Inc. (1169); Cobalt International Energy GP, LLC (7374); Cobalt International Energy, L.P. (2411); Cobalt GOM LLC (7188); Cobalt GOM # 1 LLC (7262); and Cobalt GOM # 2 LLC (7316).  The Debtors' service address is:  920 Memorial City Way, Suite 100, Houston, Texas 77024.

Intercompany Claim; (h) a Class 5 Subsidiary General Unsecured Claim, or (i) a Section 510(b) Claim. Accordingly, you have a right to vote to accept or reject the Plan.

Your rights are described in the Disclosure Statement, which was included in the package (the "Solicitation Package") you are receiving with this Class 6 Cobalt Non-Notes GUC Ballot (as well as the Plan, Disclosure Statement Order, and certain other materials).  If you received Solicitation Package materials in electronic format and desire paper copies, or if you need to obtain additional Solicitation Packages, you may obtain them from (a) Kurtzman Carson Consultants LLC (the "Notice and Claims Agent") at no charge by:  (i) accessing the Debtors' restructuring website at https://www.kccllc.net/cobalt; (ii) writing to the Notice and Claims Agent at Cobalt Ballot Processing, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245; (iii) calling the Notice and Claims Agent at (866) 967-1782 (toll free) or (310) 751-2682 (international); or (iv) emailing CobaltInfo@kccllc.com; or (b) for a fee via PACER at http://ecf.txsb.uscourts.gov.

This Class 6 Cobalt Non-Notes GUC Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan.  If you believe you have received this Class 6 Cobalt Non-Notes GUC Ballot in error, or if you believe that you have received the wrong ballot, please contact the Notice and Claims Agent *immediately* at the address, telephone number, or email address set forth above.

You should review the Disclosure Statement and the Plan before you vote.  You may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Claim.  Your Claim has been placed in Class 6, Cobalt General Unsecured Claims, under the Plan.  If you hold Claims in more than one Class, you will receive a ballot for each Class in which you are entitled to vote.

**Item 1.  Amount of Claim.**

The undersigned hereby certifies that, as of the Voting Record Date, the undersigned was the holder of Class 6 Unsecured Non-Notes Claims, in the following aggregate unpaid amount (insert amount in box below):

$\\_\\_\\_\\_\\_\\_\\_\\_\\_\\_\\_\\_\\_

Debtor: \\_\\_\\_\\_\\_\\_\\_\\_\\_\\_\\_

**Item 2.  Vote on Plan.**

The holder of the Cobalt General Unsecured Claims in Class 6, specifically Class 6 Unsecured Non-Notes Claims, against the Debtors set forth in Item 1 votes to (please check one):

☐    **ACCEPT** (vote FOR) the Plan                    ☐    **REJECT** (vote AGAINST) the Plan

**Item 3.  Important information regarding the Third Party Release.**

**Article VIII.C of the Plan contains the following Third Party Release:**

**As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Sale**

2

Transaction, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Sale Transaction, the Plan, or the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything contained herein to the contrary, the foregoing release does not release any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.C, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute its finding that each release described in this Article VIII.C is:  (1) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such Claims; (2) in the best interests of the Debtors and all holders of Interests and Claims; (3) fair, equitable, and reasonable; (4) given and made after due notice and opportunity for hearing; and (5) a bar to any of the Debtors asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

\* \* \*

UNDER THE PLAN, "RELEASING PARTY" MEANS COLLECTIVELY:  (A) THE FIRST LIEN NOTEHOLDERS; (B) THE FIRST LIEN AD HOC GROUP; (C) THE SECOND LIEN NOTEHOLDERS; (D) THE SECOND LIEN AD HOC GROUP; (E) THE UNSECURED NOTEHOLDERS; (F) THE UNSECURED NOTES AD HOC COMMITTEE; (G) THE FIRST LIEN INDENTURE TRUSTEE; (H) THE SECOND LIEN INDENTURE TRUSTEE; (I) THE 2.625% SENIOR NOTES INDENTURE TRUSTEE; (J) THE 3.125% SENIOR NOTES INDENTURE TRUSTEE; (K) THE COMMITTEE AND ITS MEMBERS; (L) ALL HOLDERS OF CLAIMS, (M) ALL HOLDERS OF INTERESTS, AND (N) WITH RESPECT TO EACH OF THE DEBTORS AND EACH OF THE FOREGOING ENTITIES IN CLAUSES (A) THROUGH (M), SUCH ENTITY AND ITS CURRENT AND FORMER AFFILIATES AND SUBSIDIARIES, AND SUCH ENTITIES' AND THEIR CURRENT AND FORMER AFFILIATES' AND SUBSIDIARIES' CURRENT AND FORMER DIRECTORS, MANAGERS, OFFICERS, EQUITY HOLDERS (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), PREDECESSORS, SUCCESSORS, AND ASSIGNS, SUBSIDIARIES, AND EACH OF THEIR RESPECTIVE CURRENT AND FORMER EQUITY HOLDERS, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS, MEMBERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITY AS SUCH COLLECTIVELY; *PROVIDED* THAT ANY HOLDER OF A CLAIM OR INTEREST THAT OPTS OUT OR OTHERWISE OBJECTS TO THE RELEASES IN THE PLAN SHALL NOT BE A "RELEASING PARTY."

AS A "RELEASING PARTY" UNDER THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE VIII.C OF THE PLAN, AS SET FORTH ABOVE.  YOU MAY ELECT NOT TO GRANT THE RELEASE CONTAINED IN ARTICLE VIII.C OF THE PLAN ONLY IF YOU CHECK THE BOX BELOW AND (A) SUBMIT THE BALLOT BUT ABSTAIN FROM VOTING TO ACCEPT OR REJECT THE PLAN OR (B) VOTE TO REJECT THE PLAN.  IF YOU (A) VOTE TO ACCEPT THE PLAN, (B) FAIL TO SUBMIT A BALLOT BY THE VOTING DEADLINE, (C) SUBMIT THE BALLOT BUT ABSTAIN FROM VOTING TO ACCEPT OR REJECT THE PLAN WITHOUT CHECKING THE BOX BELOW, OR (D) VOTE TO REJECT THE PLAN WITHOUT CHECKING THE BOX BELOW, IN EACH CASE YOU WILL BE DEEMED TO CONSENT TO THE RELEASES SET FORTH IN ARTICLE VIII.C OF THE PLAN.  THE ELECTION TO WITHHOLD CONSENT TO GRANT SUCH RELEASE IS AT YOUR OPTION.  BY OPTING OUT OF THE RELEASES SET FORTH IN ARTICLE VIII.C OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE VIII OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.

3

**The Holder of the Class 6 Unsecured Non-Notes Claim set forth in Item 1 elects to:**

☐ **OPT OUT** of the Third Party Release

**Item 4.  Certifications.**

By signing this Class 6 Cobalt Non-Notes GUC Ballot, the undersigned certifies:

(a)  that, as of the Voting Record Date, either:  (i) the Entity is the holder of the Class 6 Unsecured Non-Notes Claims being voted; or (ii) the Entity is an authorized signatory for an Entity that is a holder of the Class 6 Unsecured Non-Notes Claims being voted;

(b)  that the Entity (or, in the case of an authorized signatory, the holder) has received a copy of the Disclosure Statement and the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

(c)  that the Entity has cast the same vote with respect to all Claims in a single Class; and

(d)  that no other Class 6 Cobalt Non-Notes GUC Ballots with respect to the amount of the Class 6 Unsecured Non-Notes Claims identified in Item 1 have been cast or, if any other Class 6 Cobalt Non-Notes GUC Ballots have been cast with respect to such Claims, then any such earlier Class 6 Cobalt Non-Notes GUC Ballots are hereby revoked.

4

| | |
|---|---|
| Name of Holder: | |
| | (Print or Type) |
| Signature: | |
| Name of Signatory: | |
| | (If other than holder) |
| Title: | |
| Address: | |
| | |
| | |
| Telephone Number: | |
| Email: | |
| Date Completed: | |

**IN ORDER FOR YOUR BALLOT TO COUNT, YOU MUST EITHER (1) COMPLETE AN ELECTRONIC BALLOT AT HTTP://WWW.KCCLLC.NET/COBALT OR (2) COMPLETE, SIGN, AND DATE THIS BALLOT AND RETURN IT (WITH AN ORIGINAL SIGNATURE) *PROMPTLY* VIA FIRST CLASS MAIL (OR IN THE ENCLOSED REPLY ENVELOPE PROVIDED), OVERNIGHT COURIER, OR HAND DELIVERY TO:**

**Cobalt Ballot Processing**
**c/o Kurtzman Carson Consultants LLC**
**2335 Alaska Avenue,**
**El Segundo, California 90245**

IF THE NOTICE AND CLAIMS AGENT DOES NOT *ACTUALLY RECEIVE* THIS CLASS 6 COBALT NON-NOTES GUC BALLOT **ON OR BEFORE MARCH 28, 2018, AT 4:00 P.M.**, PREVAILING CENTRAL TIME, (AND IF THE VOTING DEADLINE IS NOT EXTENDED), YOUR VOTE TRANSMITTED BY THIS CLASS 6 COBALT NON-NOTES GUC BALLOT MAY BE COUNTED TOWARD CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE DEBTORS.

| Class 6 — Cobalt General Unsecured Claims |
|---|

## INSTRUCTIONS FOR COMPLETING THIS CLASS 6 COBALT NON-NOTES GUC BALLOT

1. The Debtors are soliciting the votes of holders of Claims with respect to the Plan attached as <u>Exhibit A</u> to the Disclosure Statement. Capitalized terms used in the Class 6 Cobalt Non-Notes GUC Ballot or in these instructions (the "<u>Ballot Instructions</u>"), but not otherwise defined therein or herein, shall have the meaning set forth in the Plan, a copy of which also accompanies the Class 6 Cobalt Non-Notes GUC Ballot. **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.**

2. The Plan can be confirmed by the Bankruptcy Court and thereby made binding upon you if it is accepted by the holders of at least two-thirds in amount and more than one-half in number of Claims in at least one class of creditors that votes on the Plan and if the Plan otherwise satisfies the requirements for confirmation provided by section 1129(a) of the Bankruptcy Code. Please review the Disclosure Statement for more information.

3. To ensure that your Class 6 Cobalt Non-Notes GUC Ballot is counted, you *must* either complete and submit this hard copy Class 6 Cobalt Non-Notes GUC Ballot via U.S. Mail or hand-delivery or complete an electronic ballot at http://www.kccllc.net/cobalt.

4. To ensure that your hard copy Class 6 Cobalt Non-Notes GUC Ballot is counted, you must: (a) complete your Class 6 Cobalt Non-Notes GUC Ballot in accordance with these instructions; (b) clearly indicate your decision either to accept or reject the Plan in the boxes provided in Item 2 of the Class 6 Cobalt Non-Notes GUC Ballot; and (c) clearly sign and return your original Class 6 Cobalt Non-Notes GUC Ballot in the enclosed pre-addressed, pre-paid envelope or via first class mail, overnight courier, or hand delivery to Cobalt Ballot Processing, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245.

5. Your Class 6 Cobalt Non-Notes GUC Ballot *must* be returned to the Notice and Claims Agent so as to be *actually received* by the Notice and Claims Agent on or before the Voting Deadline. **The Voting Deadline is March 28, 2018, at 4:00 p.m.,** prevailing Central Time.

6. If a Class 6 Cobalt Non-Notes GUC Ballot is received *after* the Voting Deadline and if the Voting Deadline is not extended, it may be counted only in the discretion of the Debtors. Additionally**, the following Class 6 Cobalt Non-Notes GUC Ballots will *not* be counted**:

    (a) any Class 6 Cobalt Non-Notes GUC Ballot that partially rejects and partially accepts the Plan;
    (b) any Class 6 Cobalt Non-Notes GUC Ballot sent to the Debtors, the Debtors' agents (other than the Notice and Claims Agent), any indenture trustee, or the Debtors' financial or legal advisors;
    (c) any Class 6 Cobalt Non-Notes GUC Ballot sent by facsimile or any electronic means;
    (d) any Class 6 Cobalt Non-Notes GUC Ballot that is illegible or contains insufficient information to permit the identification of the holder of the Claim;
    (e) any Class 6 Cobalt Non-Notes GUC Ballot cast by an Entity that does not hold a Claim in Class 6;
    (f) any Class 6 Cobalt Non-Notes GUC Ballot submitted by a holder not entitled to vote pursuant on the Plan;
    (g) any unsigned Class 6 Cobalt Non-Notes GUC Ballot;
    (h) any non-original Class 6 Cobalt Non-Notes GUC Ballot; and/or
    (i) any Class 6 Cobalt Non-Notes GUC Ballot not marked to accept or reject the Plan or any Class 6 Cobalt Non-Notes GUC Ballot marked both to accept and reject the Plan.

7. The method of delivery of Class 6 Cobalt Non-Notes GUC Ballots to the Notice and Claims Agent is at the election and risk of each holder of a Class 6 Unsecured Non-Notes Claim. Except as otherwise provided herein, such delivery will be deemed made only when the Notice and Claims Agent *actually receives* the originally executed Class 6 Cobalt Non-Notes GUC Ballot. In all cases, holders should allow sufficient time to assure timely delivery.

6

8.   If multiple Class 6 Cobalt Non-Notes GUC Ballots are received from the same holder of a Cobalt General Unsecured Claim with respect to the same Class 6 Unsecured Non-Notes Claim prior to the Voting Deadline, the last, timely received, and properly completed Class 6 Cobalt Non-Notes GUC Ballot will supersede and revoke any earlier received Class 6 Cobalt Non-Notes GUC Ballots.

9.   You must vote all of your Cobalt General Unsecured Claims within Class 6 either to accept or reject the Plan and may *not* split your vote.  Further, if a holder has multiple Cobalt General Unsecured Claims within Class 6, including Unsecured Non-Notes Claims and Unsecured Notes Claims, the Debtors may aggregate the Claims of any particular holder with multiple Cobalt General Unsecured Claims within Class 6 for the purpose of counting votes.

10.  This Class 6 Cobalt Non-Notes GUC Ballot does *not* constitute, and shall not be deemed to be, (a) a Proof of Claim or (b) an assertion or admission of a Claim.

11.  **Please be sure to sign and date your Class 6 Cobalt Non-Notes GUC Ballot**.  If you are signing a Class 6 Cobalt Non-Notes GUC Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Notice and Claims Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such holder.  In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Class 6 Cobalt Non-Notes GUC Ballot.

12.  If you hold Claims in more than one Class under the Plan you may receive more than one ballot coded for each different Class.  Each ballot votes *only* your Claims indicated on that ballot, so please complete and return each ballot that you received.

<u>PLEASE MAIL YOUR CLASS 6 COBALT NON-NOTES GUC BALLOT PROMPTLY</u>

**IF YOU HAVE ANY QUESTIONS REGARDING THIS CLASS 6 COBALT NON-NOTES GUC BALLOT, THESE VOTING INSTRUCTIONS, OR THE PROCEDURES FOR VOTING, PLEASE CALL THE NOTICE AND CLAIMS AGENT AT:  (866) 967-1782 (TOLL FREE) OR (310) 751-2682 (INTERNATIONAL) OR EMAIL COBALTINFO@KCCLLC.COM.**

---

**IF THE NOTICE AND CLAIMS AGENT DOES NOT *ACTUALLY RECEIVE* THIS CLASS 6 COBALT NON-NOTES GUC BALLOT ON OR BEFORE THE VOTING DEADLINE, WHICH IS MARCH 28, 2018, AT 4:00 P.M., PREVAILING CENTRAL TIME, (AND IF THE VOTING DEADLINE IS NOT EXTENDED), YOUR VOTE TRANSMITTED HEREBY MAY BE COUNTED ONLY IN THE DISCRETION OF THE DEBTORS.**

---

## SCHEDULE 3E

**Form of Class 6 Master Ballot**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| COBALT INTERNATIONAL ENERGY, INC., *et al.*,[1] | ) | Case No. 17-36709 (MI) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

MASTER BALLOT FOR VOTING TO ACCEPT OR REJECT
THE FOURTH AMENDED JOINT CHAPTER 11 PLAN OF COBALT
INTERNATIONAL ENERGY, INC. AND ITS DEBTOR AFFILIATES

CLASS 6 HOLDERS OF COBALT GENERAL UNSECURED CLAIMS

(UNSECURED NOTES CLAIMS)

---

**PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS CAREFULLY *BEFORE* COMPLETING THIS BALLOT.**

**IN ORDER FOR YOUR VOTE TO BE COUNTED, THIS BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE *ACTUALLY RECEIVED* BY THE NOTICE AND CLAIMS AGENT BY MARCH 28, 2018, AT 4:00 P.M., PREVAILING CENTRAL TIME (THE "VOTING DEADLINE") IN ACCORDANCE WITH THE FOLLOWING:**

---

The above-captioned debtors and debtors in possession (collectively, the "Debtors") are soliciting votes with respect to the *Fourth Amended Joint Chapter 11 Plan of Cobalt International Energy, Inc. and Its Debtor Affiliates* (as may be amended from time to time, the "Plan") as set forth in the *Disclosure Statement for the Fourth Amended Joint Chapter 11 Plan of Cobalt International Energy, Inc. and Its Debtor Affiliates* (as may be amended from time to time, the "Disclosure Statement"). The Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") has approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code by entry of an order on March 8, 2018 (the "Disclosure Statement Order"). Bankruptcy Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court. Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

You are receiving this master ballot (the "Master Ballot") because you are the Nominee (as defined below) of a Beneficial Holder[2] of Class 6 Cobalt General Unsecured Claims, specifically Unsecured Notes Claims (the "Class 6 Unsecured Notes Claims"), as of March 5, 2018 (the "Voting Record Date").

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Cobalt International Energy, Inc. (1169); Cobalt International Energy GP, LLC (7374); Cobalt International Energy, L.P. (2411); Cobalt GOM LLC (7188); Cobalt GOM # 1 LLC (7262); and Cobalt GOM # 2 LLC (7316). The Debtors' service address is: 920 Memorial City Way, Suite 100, Houston, Texas 77024.

**This Master Ballot is to be used by you as a broker, bank, or other nominee; or as the agent of a broker, bank, or other nominee (each of the foregoing, a "Nominee"); or as the proxy holder of a Nominee for certain Beneficial Holders' Class 6 Unsecured Notes Claims, to transmit to the Notice and Claims Agent (as defined below) the votes of such Beneficial Holders in respect of their Class 6 Unsecured Notes Claims to accept or reject the Plan.** This ballot may not be used for any purpose other than for submitting votes with respect to the Plan.

The rights and treatment for each Class are described in the Disclosure Statement, which was included in the package (the "Solicitation Package") you are receiving with this Master Ballot (as well as the Plan, Disclosure Statement Order, and certain other materials). If you received Solicitation Package materials in electronic format and desire paper copies, or if you need to obtain additional Solicitation Packages, you may obtain them from (a) Kurtzman Carson Consultants LLC (the "Notice and Claims Agent") at no charge by: (i) accessing the Debtors' restructuring website at https://www.kccllc.net/cobalt; (ii) writing to the Notice and Claims Agent at Cobalt Ballot Processing, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245; (iii) calling the Notice and Claims Agent at (877) 833-4150 (toll free) or (917) 281-4800 (international); or (iv) emailing CobaltInfo@kccllc.com or (b) for a fee via PACER at http://ecf.txsb.uscourts.gov.

This Master Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan. If you believe you have received this Master Ballot in error, please contact the Notice and Claims Agent *immediately* at the address, telephone number, or email address set forth above.

**YOUR VOTE ON THIS MASTER BALLOT FOR CERTAIN BENEFICIAL HOLDERS OF CLASS 6 UNSECURED NOTES CLAIMS SHALL BE APPLIED TO EACH DEBTOR AGAINST WHOM SUCH BENEFICIAL HOLDERS HAVE A CLASS 6 UNSECURED NOTES CLAIM.**

You are authorized to collect votes to accept or to reject the Plan from Beneficial Holders in accordance with your customary practices, including the use of a "voting instruction form" in lieu of (or in addition to) a Beneficial Holder Ballot (as defined herein), and the collection of votes from Beneficial Holders through online voting, by phone, facsimile, or other electronic means.

The Bankruptcy Court may confirm the Plan and thereby bind all holders of Claims and Interests. To have the votes of your Beneficial Holders count as either an acceptance or rejection of the Plan, you must complete and return this Master Ballot so that the Notice and Claims Agent *actually receives* it on or before the Voting Deadline.

**THE VOTING DEADLINE IS ON MARCH 28, 2018, AT 4:00 P.M., PREVAILING CENTRAL TIME.**

---

2   A "Beneficial Holder" means a beneficial owner of publicly-traded securities whose claims have not been satisfied prior to the Voting Record Date (as defined herein) pursuant to Bankruptcy Court order or otherwise, (a) as reflected in the records maintained by the Nominees holding through the indenture trustees under the Unsecured Notes Indentures, or (b) as evidenced by the securities position report from The Depository Trust Company as of the Voting Record Date.

[CUSIP]

2

**Item 1**.  **Certification of Authority to Vote.**

The undersigned certifies that, as of the Voting Record Date, the undersigned (please check the applicable box):

☐   Is a broker, bank, or other nominee for the Beneficial Holders of the aggregate principal amount of the Class 6 Unsecured Notes Claims listed in Item 2 below and is the record holder of such bonds, or

☐   Is acting under a power of attorney and/or agency (a copy of which will be provided upon request) granted by a broker, bank, or other nominee that is the registered holder of the aggregate principal amount of Class 6 Unsecured Notes Claims listed in Item 2 below, or

☐   Has been granted a proxy (an original of which is attached hereto) from a broker, bank, or other nominee, or a beneficial owner, that is the registered holder of the aggregate principal amount of Class 6 Unsecured Notes Claims listed in Item 2 below,

and, accordingly, has full power and authority to vote to accept or reject the Plan on behalf of the Beneficial Holders of the Class 6 Unsecured Notes Claims described in Item 2.

**Item 2**.  **Class 6 Unsecured Notes Claims Vote on Plan**

The undersigned transmits the following votes of Beneficial Holders of Class 6 Unsecured Notes Claims and certifies that the following Beneficial Holders of Class 6 Unsecured Notes Claims, as identified by their respective customer account numbers set forth below, are the Beneficial Holders of such Claims as of the Voting Record Date and have delivered to the undersigned, as Nominee, ballots (the "Beneficial Holder Ballots") casting such votes.

Indicate in the appropriate column below the aggregate principal amount voted for each account or attach such information to this Master Ballot in the form of the following table.  Please note that each holder must vote all such Beneficial Holder's Class 6 Unsecured Notes Claims to accept or reject the Plan and may not split such vote.  Any Beneficial Holder Ballot executed by the Beneficial Holder that does not indicate an acceptance or rejection of the Plan or that indicates both an acceptance and a rejection of the Plan will not be counted.  If the Beneficial Holder has checked the box on Item 3 of the Beneficial Holder Ballot pertaining to releases by holders of Claims, as detailed in Article VIII of the Plan, please place an X in the Item 3 column below.

[CUSIP]

3

| Your Customer Account Number for Each Beneficial Holder of Class 6 Unsecured Notes Claims | Principal Amount Held as of Voting Record Date | Item 2<br><br>Indicate the vote cast on the Beneficial Holder Ballot by checking the appropriate box below. | | | Item 3<br><br>If the box in Item 3 of the Beneficial Holder Ballot was completed, check the box in the column below<br><br>OPT OUT of the Third Party Release |
|---|---|---|---|---|---|
| | | Accept the Plan | or | Reject the Plan | |
| 1 | $ | ☐ | | ☐ | ☐ |
| 2 | $ | ☐ | | ☐ | ☐ |
| 3 | $ | ☐ | | ☐ | ☐ |
| 4 | $ | ☐ | | ☐ | ☐ |
| 5 | $ | ☐ | | ☐ | ☐ |
| 6 | $ | ☐ | | ☐ | ☐ |
| **TOTALS** | $ | | | | |

**Item 3.  Other Class 6 Ballots Submitted by Beneficial Holders.**  The undersigned certifies that it has transcribed in the following table the information, if any, provided by the Beneficial Holders in Item 4 of the Beneficial Holder Ballot:

| YOUR customer account number and/or customer name for each Beneficial Holder who completed Item 4 of the Beneficial Holder Ballot. | Transcribe from Item 4 of the Beneficial Holder Ballot | | | |
|---|---|---|---|---|
| | Account Number | Name of Registered Holder or Nominee | Principal Amount of other Class 6 Unsecured Notes Claims | CUSIP of other Class 6 Unsecured Notes Claims Voted |
| 1. | | | $ | |
| 2. | | | $ | |
| 3. | | | $ | |
| 4. | | | $ | |
| 5. | | | $ | |

[CUSIP]

4

**Item 4.  Important information regarding the Third Party Release.**

**Article VIII.C of the Plan contains the following Third Party Release:**

**As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Sale Transaction, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Sale Transaction, the Plan, or the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything contained herein to the contrary, the foregoing release does not release any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.C, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute its finding that each release described in this Article VIII.C is:  (1) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such Claims; (2) in the best interests of the Debtors and all holders of Interests and Claims; (3) fair, equitable, and reasonable; (4) given and made after due notice and opportunity for hearing; and (5) a bar to any of the Debtors asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.**

\*     \*     \*

UNDER THE PLAN, "RELEASING PARTY" MEANS COLLECTIVELY:  (A) THE FIRST LIEN NOTEHOLDERS; (B) THE FIRST LIEN AD HOC GROUP; (C) THE SECOND LIEN NOTEHOLDERS; (D) THE SECOND LIEN AD HOC GROUP; (E) THE UNSECURED NOTEHOLDERS; (F) THE UNSECURED NOTES AD HOC COMMITTEE; (G) THE FIRST LIEN INDENTURE TRUSTEE; (H) THE SECOND LIEN INDENTURE TRUSTEE; (I) THE 2.625% SENIOR NOTES INDENTURE TRUSTEE; (J) THE 3.125% SENIOR NOTES INDENTURE TRUSTEE; (K) THE COMMITTEE AND ITS MEMBERS; (L) ALL HOLDERS OF CLAIMS, (M) ALL HOLDERS OF INTERESTS, AND (N) WITH RESPECT TO EACH OF THE DEBTORS AND EACH OF THE FOREGOING ENTITIES IN CLAUSES (A) THROUGH (M), SUCH ENTITY AND ITS CURRENT AND FORMER AFFILIATES AND SUBSIDIARIES, AND SUCH ENTITIES' AND THEIR CURRENT AND FORMER AFFILIATES' AND SUBSIDIARIES' CURRENT AND FORMER DIRECTORS, MANAGERS, OFFICERS, EQUITY HOLDERS (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), PREDECESSORS, SUCCESSORS, AND ASSIGNS, SUBSIDIARIES, AND EACH OF THEIR RESPECTIVE CURRENT AND FORMER EQUITY HOLDERS, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS, MEMBERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITY AS SUCH COLLECTIVELY; *PROVIDED* THAT ANY HOLDER OF A CLAIM OR INTEREST THAT OPTS OUT OR OTHERWISE OBJECTS TO THE RELEASES IN THE PLAN SHALL NOT BE A "RELEASING PARTY."

AS A "RELEASING PARTY" UNDER THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE VIII.C OF THE PLAN, AS SET FORTH ABOVE.  YOU MAY ELECT NOT TO

[CUSIP]

5

GRANT THE RELEASE CONTAINED IN ARTICLE VIII.C OF THE PLAN <u>ONLY IF</u> YOU CHECK THE BOX BELOW AND (A) SUBMIT THE BALLOT BUT ABSTAIN FROM VOTING TO ACCEPT OR REJECT THE PLAN OR (B) VOTE TO REJECT THE PLAN.  IF YOU (A) VOTE TO ACCEPT THE PLAN, (B) FAIL TO SUBMIT A BALLOT BY THE VOTING DEADLINE, (C) SUBMIT THE BALLOT BUT ABSTAIN FROM VOTING TO ACCEPT OR REJECT THE PLAN WITHOUT CHECKING THE BOX BELOW, OR (D) VOTE TO REJECT THE PLAN WITHOUT CHECKING THE BOX BELOW, IN EACH CASE YOU WILL BE DEEMED TO CONSENT TO THE RELEASES SET FORTH IN ARTICLE VIII.C OF THE PLAN.  THE ELECTION TO WITHHOLD CONSENT TO GRANT SUCH RELEASE IS AT YOUR OPTION.  BY OPTING OUT OF THE RELEASES SET FORTH IN ARTICLE VIII.C OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE VIII OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.

**<u>Item 5</u>.  Certifications.**

Upon execution of this Master Ballot, the undersigned certifies:

(a)    it has received a copy of the Disclosure Statement, the Plan, the Master Ballots, the Beneficial Holder Ballots, and the remainder of the Solicitation Package and has delivered the same to the Beneficial Holders of the Class 6 Unsecured Notes Claims listed in Item 2 above;

(b)    it has received a completed and signed Beneficial Holder Ballot from each Beneficial Holder listed in Item 2 of this Master Ballot;

(c)    it is the registered holder of all Class 6 Unsecured Notes Claims listed in Item 2 above being voted, or

(d)    it has been authorized by each Beneficial Holder of Class 6 Unsecured Notes Claims listed in Item 2 above to vote on the Plan;

(e)    no other Master Ballots with respect to the same Class 6 Unsecured Notes Claims identified in Item 2 have been cast or, if any other Master Ballots have been cast with respect to such Claims, then any such earlier Master Ballots are hereby revoked;

(f)    it has properly disclosed:  (a) the number of Beneficial Holders of Class 6 Unsecured Notes Claims who completed the Beneficial Holder Ballots; (b) the respective amounts of the Class 6 Unsecured Notes Claims owned, as the case may be, by each Beneficial Holder of Class 6 Unsecured Notes Claims who completed a Beneficial Holder Ballot; (c) each such Beneficial Holder of Class 6 Unsecured Notes Claims' respective vote concerning the Plan; (e) each such Beneficial Holder of Class 6 Unsecured Notes Claims' certification as to other Class 6 Notes Claims voted; and (f) the customer account or other identification number for each such Beneficial Holder of Class 6 Unsecured Notes Claims; and

(g)    it will maintain ballots and evidence of separate transactions returned by Beneficial Holder of Class 6 Unsecured Notes Claims (whether properly completed or defective) for at least one (1) year after the Effective Date of the Plan and disclose all such information to the Bankruptcy Court or the Debtors, if so ordered.

[CUSIP]

Name of Nominee: _____
(Print or Type)

Participant Number:

 _____

 Name of Proxy Holder or Agent for Nominee (if applicable):

 _____
(Print or Type)

 _____

Signature: _____

Name of Signatory: _____

Title: _____

Address: _____

 _____

 _____

Date Completed: _____

Email Address: _____


**PLEASE COMPLETE, SIGN, AND DATE THIS MASTER BALLOT AND
RETURN IT (WITH AN ORIGINAL SIGNATURE) *PROMPTLY* IN THE ENVELOPE PROVIDED VIA
FIRST CLASS MAIL, OVERNIGHT COURIER, HAND DELIVERY, OR VIA ELECTRONIC MAIL
SERVICE TO:**


**Cobalt Ballot Processing
c/o Kurtzman Carson Consultants LLC
1290 Avenue of the Americas, 9th Floor,
New York, New York 10104
cobaltballots@kccllc.com**


IF THE NOTICE AND CLAIMS AGENT DOES NOT *ACTUALLY RECEIVE*
THIS CLASS 6 MASTER BALLOT **ON OR BEFORE MARCH 28, 2018, AT 4:00 P.M.,** PREVAILING
CENTRAL TIME, (AND IF THE VOTING DEADLINE IS NOT EXTENDED), THE VOTES TRANSMITTED
BY THIS CLASS 6 MASTER BALLOT MAY BE COUNTED TOWARD CONFIRMATION
OF THE PLAN ONLY IN THE DISCRETION OF THE DEBTORS.

[CUSIP]

| Class 6 — Cobalt Unsecured Claims — Unsecured Notes Claims |
|---|

## INSTRUCTIONS FOR COMPLETING THIS MASTER BALLOT

1.  The Debtors are soliciting the votes of holders of Claims with respect to the Plan attached as **Exhibit A** to the Disclosure Statement.  Capitalized terms used in the Master Ballot or in these instructions (the "Ballot Instructions"), but not otherwise defined therein or herein, shall have the meaning set forth in the Plan, a copy of which also accompanies the Master Ballot.  **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS MASTER BALLOT.**

2.  The Plan can be confirmed by the Bankruptcy Court and thereby made binding upon the holders if it is accepted by the holders of at least two-thirds in amount and more than one-half in number of Claims in at least one class of creditors that votes on the Plan and if the Plan otherwise satisfies the requirements for confirmation provided by section 1129(a) of the Bankruptcy Code.  Please review the Disclosure Statement for more information.

3.  You should immediately distribute the Beneficial Holder Ballots and the Solicitation Package to all Beneficial Holders of Class 6 Unsecured Notes Claims and take any action required to enable each such Beneficial Holder to vote timely the Claims that it holds.  You may distribute the Solicitation Packages to Beneficial Holders, as appropriate, in accordance with your customary practices.  You are authorized to collect votes to accept or to reject the Plan from Beneficial Holders in accordance with your customary practices, including the use of a "voting instruction form" in lieu of (or in addition to) a Beneficial Holder Ballot, and collecting votes from Beneficial Holders through online voting, by phone, facsimile, or other electronic means.  Any Beneficial Holder Ballot returned to you by a Beneficial Holder of a Class 6 Unsecured Notes Claim shall not be counted for purposes of accepting or rejecting the Plan until you properly complete and deliver, to the Notice and Claims Agent, a Master Ballot that reflects the vote of such Beneficial Holders by **March 28, 2018, at 4:00 p.m.**, prevailing Central Time or otherwise validate the Master Ballot in a manner acceptable to the Notice and Claims Agent.

4.  If you are transmitting the votes of any Beneficial Holder of Class 6 Unsecured Notes Claims other than yourself, you may either:

    (a) "Pre-validate" the individual Class 6 Beneficial Holder Ballot contained in the Solicitation Package and then forward the Solicitation Package to the Beneficial Holder of the Class 6 Unsecured Notes Claim for voting within five (5) Business Days after the receipt by such Nominee of the Solicitation Package, with the Beneficial Holder then returning the individual Beneficial Holder Ballot directly to the Notice and Claims Agent in the return envelope to be provided in the Solicitation Package.  A Nominee "pre-validates" a Beneficial Holder's Ballot by signing the Beneficial Holder Ballot and including their Depository Trust Company participant number; indicating the account number of the Beneficial Holder and the principal amount of the Class 6 Unsecured Notes Claims held by the Nominee for such Beneficial Holder; and then forwarding the Beneficial Holder Ballot together with the Solicitation Package to the Beneficial Holder.  The Beneficial Holder then completes the information requested on the Beneficial Holder Ballot and returns the Beneficial Holder Ballot directly to the Notice and Claims Agent.  A list of the Beneficial Holders to whom "pre-validated" Beneficial Holder Ballots were delivered should be maintained by Nominees for inspection for at least one (1) year from the Effective Date; OR

    (b) Within five (5) Business Days after receipt by such Nominee of the Solicitation Package, forward the Solicitation Package to the Beneficial Holder of the Class 6 Unsecured Notes Claim for voting along with a return envelope provided by and addressed to the Nominee, with the Beneficial Holder then returning the individual Beneficial Holder Ballot to the Nominee.  In such case, the Nominee will tabulate the votes of its respective owners on a Master Ballot that will be provided to the Nominee separately by the Notice and Claims Agent, in accordance with any instructions set forth in the instructions to the Master Ballot, and then return the Master Ballot to the Notice and Claims Agent. The Nominee should advise the Beneficial Holder to return their individual Beneficial Holder Ballots to the Nominee by a date calculated by the Nominee to allow it to prepare and return the Master Ballot

[CUSIP]

8

to the Notice and Claims Agent so that the Master Ballot is *actually received* by the Notice and Claims Agent on or before the Voting Deadline.

5.  With regard to any Beneficial Holder Ballots returned to you by a Beneficial Holder, you must:  (a) compile and validate the votes and other relevant information of each such Beneficial Holder on the Master Ballot using the customer name or account number assigned by you to each such Beneficial Holder; (b) execute the Master Ballot; (c) transmit such Master Ballot to the Notice and Claims Agent by the Voting Deadline; and (d) retain such Beneficial Holder Ballots from Beneficial Holders, whether in hard copy or by electronic direction, in your files for a period of one (1) year after the Effective Date of the Plan.  You may be ordered to produce the Beneficial Holder Ballots to the Debtors or the Bankruptcy Court.

6.  The Master Ballot *must* be returned to the Notice and Claims Agent so as to be *actually received* by the Notice and Claims Agent on or before the Voting Deadline.  **The Voting Deadline is March 28, 2018, at 4:00 p.m.**, prevailing Central Time.

7.  If a Master Ballot is received *after* the Voting Deadline and if the Voting Deadline is not extended, it may be counted only in the discretion of the Debtors.  Additionally, **the following Master Ballots will *not* be counted**:

    (a) any Master Ballot that is illegible or contains insufficient information to permit the identification of the holder of the Claim;
    (b) any Master Ballot cast by a party that does not hold a Claim in a Class that is entitled to vote on the Plan;
    (c) any Master Ballot sent by facsimile or any electronic means other than electronic mail;
    (d) any unsigned Master Ballot;
    (e) any Master Ballot that does not contain an original signature; *provided* that any Master Ballot submitted via electronic mail shall be deemed to contain an original signature;
    (f) any Master Ballot not marked to accept or reject the Plan; and
    (g) any Master Ballot submitted by any party not entitled to cast a vote with respect to the Plan.

8.  The method of delivery of Master Ballots to the Notice and Claims Agent is at the election and risk of each Nominee of Class 6 Unsecured Notes Claims.  Except as otherwise provided herein, such delivery will be deemed made only when the Notice and Claims Agent *actually receives* the originally executed Master Ballot. In all cases, Beneficial Holders and Nominees should allow sufficient time to assure timely delivery.

9.  If a Beneficial Holder or Nominee holds a Claim in a voting class against multiple Debtors, a vote on their Ballot will apply to all Debtors against whom such Beneficial Holder or Nominee has a Claim, as applicable, in that voting class.

10. If multiple Master Ballots are received from the same Nominee with respect to the same Beneficial Holder Ballot belonging to a Beneficial Holder of a Claim prior to the Voting Deadline, the last, timely received, and properly completed Master Ballot will supersede and revoke any earlier received Master Ballots.

11. The Master Ballot does *not* constitute, and shall not be deemed to be, (a) a Proof of Claim or (b) an assertion or admission of a Claim.

12. **Please be sure to sign and date the Master Ballot**.  You should indicate that you are signing a Master Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity and, if required or requested by the Notice and Claims Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such Beneficial Holder.  In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Master Ballot.

13. If you are both the Nominee and the Beneficial Holder of any of the Class 6 Unsecured Notes Claims and you wish to vote such Class 6 Unsecured Notes Claims, you may return a Beneficial Holder Ballot or Master Ballot for such Class 6 Unsecured Notes Claims and you must vote your entire Class 6 Unsecured Notes Claims to

[CUSIP]

9

either accept or reject the Plan and may not split your vote.  Accordingly, a Beneficial Holder Ballot, other than a Master Ballot with the votes of multiple Beneficial Holders, that partially rejects and partially accepts the Plan will not be counted.

14. For purposes of the numerosity requirement of section 1126(c) of the Bankruptcy Code, separate Claims held by a single creditor in a particular Class will be aggregated and treated as if such creditor held one Claim in such Class, and all votes related to such Claim will be treated as a single vote to accept or reject the Plan; *provided* that if separate affiliated entities hold Claims in a particular Class, these Claims will not be aggregated and will not be treated as if such creditor held one Claim in such Class, and the vote of each affiliated entity will be counted separately as a vote to accept or reject the Plan.

15. The following additional rules shall apply to Master Ballots:

(a) Votes cast by Beneficial Holders through a Nominee will be applied against the positions held by such entities in the Class 6 Unsecured Notes Claims as of the Voting Record Date, as evidenced by the record and depository listings;

(b) Votes submitted by a Nominee, whether pursuant to a Master Ballot or pre-validated Beneficial Holder Ballots, will not be counted in excess of the record amount of the Class 6 Unsecured Notes Claims held by such Nominee;

(c) To the extent that conflicting votes or "over-votes" are submitted by a Nominee, whether pursuant to a Master Ballot or pre-validated Beneficial Holder Ballots, the Notice and Claims Agent will attempt to reconcile discrepancies with the Nominee;

(d) To the extent that over-votes on a Master Ballot or pre-validated Beneficial Holder Ballots are not reconcilable prior to the preparation of the vote certification, the Notice and Claims Agent will apply the votes to accept and reject the Plan in the same proportion as the votes to accept and reject the Plan submitted on the Master Ballot or pre-validated Beneficial Holder Ballots that contained the over-vote, but only to the extent of the Nominee's position in Class 6 Unsecured Notes Claims; and

(e) For purposes of tabulating votes, each holder holding through a particular account will be deemed to have voted the principal amount relating to its holding in that particular account, although the Notice and Claims Agent may be asked to adjust such principal amount to reflect the claim amount.

**PLEASE MAIL YOUR MASTER BALLOT PROMPTLY**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS MASTER BALLOT, THESE VOTING INSTRUCTIONS, OR THE PROCEDURES FOR VOTING, PLEASE CALL THE NOTICE AND CLAIMS AGENT AT:  (877) 833-4150 (TOLL FREE) OR (917) 281-4800 (INTERNATIONAL) OR EMAIL COBALTINFO@KCCLLC.COM.**

**IF THE NOTICE AND CLAIMS AGENT DOES NOT *ACTUALLY RECEIVE* THIS MASTER BALLOT ON OR BEFORE THE VOTING DEADLINE, WHICH IS MARCH 28, 2018, AT 4:00 P.M., PREVAILING CENTRAL TIME, (AND IF THE VOTING DEADLINE IS NOT EXTENDED), THE VOTES TRANSMITTED HEREBY MAY BE COUNTED ONLY IN THE DISCRETION OF THE DEBTORS.**

[CUSIP]

## SCHEDULE 3F

**Form of Class 6 Beneficial Holder Ballot**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| COBALT INTERNATIONAL ENERGY, INC., *et al.*,[1] | ) | Case No. 17-36709 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**BENEFICIAL HOLDER BALLOT FOR VOTING TO ACCEPT OR**
**REJECT THE FOURTH AMENDED JOINT CHAPTER 11 PLAN OF**
**COBALT INTERNATIONAL ENERGY, INC. AND ITS DEBTOR AFFILIATES**

**CLASS 6 BALLOT FOR BENEFICIAL HOLDERS OF COBALT GENERAL UNSECURED CLAIMS**

**(UNSECURED NOTES CLAIMS)**

> **PLEASE READ AND FOLLOW THE ENCLOSED INSTRUCTIONS FOR COMPLETING BALLOTS CAREFULLY *BEFORE* COMPLETING THIS BALLOT.**
>
> **IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE COMPLETED, EXECUTED, AND RETURNED SO AS TO BE *ACTUALLY RECEIVED* BY THE NOTICE AND CLAIMS AGENT BY MARCH 28, 2018, AT 4:00 P.M., PREVAILING CENTRAL TIME (THE "VOTING DEADLINE").  IF, HOWEVER, YOU RECEIVED A RETURN ENVELOPE ADDRESSED TO YOUR NOMINEE, YOU MUST FOLLOW THE DIRECTIONS OF YOUR NOMINEE TO CAST YOUR VOTE AND ALLOW SUFFICIENT TIME FOR YOUR NOMINEE TO RECEIVE YOUR VOTE AND TRANSMIT SUCH VOTE ON A MASTER BALLOT, WHICH MASTER BALLOT MUST BE RETURNED TO THE NOTICE AND CLAIMS AGENT BY THE VOTING DEADLINE IN ORDER FOR YOUR VOTE TO BE COUNTED.**

The above-captioned debtors and debtors in possession (collectively, the "Debtors") are soliciting votes with respect to the *Fourth Amended Joint Chapter 11 Plan of Cobalt International Energy, Inc. and Its Debtor Affiliates* (as may be amended from time to time, the "Plan") as set forth in the *Disclosure Statement for the Fourth Amended Joint Chapter 11 Plan of Cobalt International Energy, Inc. and Its Debtor Affiliates* (as may be amended from time to time, the "Disclosure Statement").  The Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court") has approved the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code by entry of an order on March 8, 2018 (the "Disclosure Statement Order").  Bankruptcy Court approval of the Disclosure Statement does not indicate approval of the Plan by the Bankruptcy Court.  Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Plan.

You are receiving this Class 6 ballot for Beneficial Holders[2] (the "Class 6 Beneficial Holder Ballot") because you are a Beneficial Holder of a Cobalt General Unsecured Claim in Class 6, specifically an Unsecured Notes Claim (a

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Cobalt International Energy, Inc. (1169); Cobalt International Energy GP, LLC (7374); Cobalt International Energy, L.P. (2411); Cobalt GOM LLC (7188); Cobalt GOM # 1 LLC (7262); and Cobalt GOM # 2 LLC (7316).  The Debtors' service address is:  920 Memorial City Way, Suite 100, Houston, Texas 77024.

"Class 6 Unsecured Notes Claim"), as of March 5, 2018 (the "Voting Record Date").  Accordingly, you have a right to vote to accept or reject the Plan.  You can cast your vote through this Class 6 Beneficial Holder Ballot and return it to your broker, bank, or other nominee, or the agent of a broker, bank, or other nominee (each of the foregoing, a "Nominee"), in accordance with the instructions provided by your Nominee, who will then submit a master ballot (the "Master Ballot") on behalf of the Beneficial Holders of Class 6 Unsecured Notes Claims.

Your rights are described in the Disclosure Statement, which was included in the package (the "Solicitation Package") you are receiving with this Class 6 Beneficial Holder Ballot (as well as the Plan, Disclosure Statement Order, and certain other materials).  If you received Solicitation Package materials in electronic format and desire paper copies, or if you need to obtain additional Solicitation Packages, you may obtain them from (a) Kurtzman Carson Consultants LLC (the "Notice and Claims Agent") at no charge by:  (i) accessing the Debtors' restructuring website at https://www.kccllc.net/cobalt; (ii) writing to the Notice and Claims Agent at Cobalt Ballot Processing, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245; (iii) calling the Notice and Claims Agent at (866) 967-1782 (toll free) or (310) 751-2682 (international); or (iv) emailing CobaltInfo@kccllc.com; or (b) for a fee via PACER at http://ecf.txsb.uscourts.gov.

This Class 6 Beneficial Holder Ballot may not be used for any purpose other than for casting votes to accept or reject the Plan and making certain certifications with respect to the Plan.  If you believe you have received this Class 6 Beneficial Holder Ballot in error, or if you believe that you have received the wrong ballot, please contact the Notice and Claims Agent *immediately* at the address, telephone number, or email address set forth above.

You should review the Disclosure Statement and the Plan before you vote.  You may wish to seek legal advice concerning the Plan and the Plan's classification and treatment of your Claim.  Your Claim has been placed in Class 6, Cobalt General Unsecured Claims, under the Plan.  If you hold Claims in more than one Class, you will receive a ballot for each Class in which you are entitled to vote.

In order for your vote to count, your Nominee must receive this Class 6 Beneficial Holder Ballot in sufficient time for your Nominee to include your vote on a Master Ballot that must be received by the Notice and Claims Agent on or before the Voting Deadline, which is **March 28, 2018, at 4:00 p.m.**, prevailing Central Time.  Please allow sufficient time for your vote to be included on the Master Ballot completed by your Nominee.  If a Master Ballot recording your vote is not received by the Voting Deadline, and if the Voting Deadline is not extended, your vote will not count.

**Item 1**.  **Amount of Claim.**

The undersigned hereby certifies that, as of the Voting Record Date, the undersigned was the Beneficial Holder of Cobalt General Unsecured Claims in Class 6, specifically Class 6 Unsecured Notes Claims, in the following aggregate unpaid principal amount (insert amount in box below, unless otherwise completed by your Nominee):



$_____

---

[2]   A "Beneficial Holder" means a beneficial owner of publicly-traded securities whose claims have not been satisfied prior to the Voting Record Date (as defined herein) pursuant to Bankruptcy Court order or otherwise, (a) as reflected in the records maintained by the Nominees holding through the indenture trustees under the Unsecured Notes Indentures, or (b) as evidenced by the securities position report from The Depository Trust Company as of the Voting Record Date.

[CUSIP]

2

**Item 2.  Vote on Plan.**

The Beneficial Holder of the Class 6 Unsecured Notes Claim against the Debtors set forth in Item 1 votes to (please check <u>one</u>):

☐      **ACCEPT** (vote FOR) the Plan              ☐      **REJECT** (vote AGAINST) the Plan

**Your vote on the Plan will be applied to each applicable Debtor in the same manner and in the same amount as indicated in Item 1 and Item 2 above.**

**Item 3.  Important information regarding the Third Party Release.**

**Article VIII.C of the Plan contains the following provision:**

**As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Sale Transaction, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Sale Transaction, the Plan, or the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything contained herein to the contrary, the foregoing release does not release any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.C, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute its finding that each release described in this Article VIII.C is:  (1) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such Claims; (2) in the best interests of the Debtors and all holders of Interests and Claims; (3) fair, equitable, and reasonable; (4) given and made after due notice and opportunity for hearing; and (5) a bar to any of the Debtors asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.**

\*      \*      \*

UNDER THE PLAN, "RELEASING PARTY" MEANS COLLECTIVELY:   (A) THE FIRST LIEN NOTEHOLDERS; (B) THE FIRST LIEN AD HOC GROUP; (C) THE SECOND LIEN NOTEHOLDERS; (D) THE SECOND LIEN AD HOC GROUP; (E) THE UNSECURED NOTEHOLDERS; (F) THE UNSECURED NOTES AD HOC COMMITTEE; (G) THE FIRST LIEN INDENTURE TRUSTEE; (H) THE SECOND LIEN INDENTURE TRUSTEE; (I) THE 2.625% SENIOR NOTES INDENTURE TRUSTEE; (J) THE 3.125% SENIOR NOTES INDENTURE TRUSTEE; (K) THE COMMITTEE AND ITS MEMBERS; (L) ALL HOLDERS OF CLAIMS, (M) ALL HOLDERS OF INTERESTS, AND (N) WITH RESPECT TO EACH OF THE DEBTORS AND EACH OF THE FOREGOING ENTITIES IN CLAUSES (A) THROUGH (M), SUCH ENTITY AND ITS CURRENT AND FORMER AFFILIATES AND SUBSIDIARIES, AND SUCH ENTITIES' AND THEIR CURRENT AND FORMER AFFILIATES' AND SUBSIDIARIES' CURRENT AND FORMER DIRECTORS, MANAGERS, OFFICERS, EQUITY HOLDERS (REGARDLESS OF WHETHER SUCH INTERESTS ARE

[CUSIP]

3

HELD DIRECTLY OR INDIRECTLY), PREDECESSORS, SUCCESSORS, AND ASSIGNS, SUBSIDIARIES, AND EACH OF THEIR RESPECTIVE CURRENT AND FORMER EQUITY HOLDERS, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS, MEMBERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITY AS SUCH COLLECTIVELY; *PROVIDED* THAT ANY HOLDER OF A CLAIM OR INTEREST THAT OPTS OUT OR OTHERWISE OBJECTS TO THE RELEASES IN THE PLAN SHALL NOT BE A "RELEASING PARTY."

AS A "RELEASING PARTY" UNDER THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE VIII.C OF THE PLAN, AS SET FORTH ABOVE.  YOU MAY ELECT NOT TO GRANT THE RELEASE CONTAINED IN ARTICLE VIII.C OF THE PLAN ONLY IF YOU CHECK THE BOX BELOW AND (A) SUBMIT THE BALLOT BUT ABSTAIN FROM VOTING TO ACCEPT OR REJECT THE PLAN OR (B) VOTE TO REJECT THE PLAN.  IF YOU (A) VOTE TO ACCEPT THE PLAN, (B) FAIL TO SUBMIT A BALLOT BY THE VOTING DEADLINE, (C) SUBMIT THE BALLOT BUT ABSTAIN FROM VOTING TO ACCEPT OR REJECT THE PLAN WITHOUT CHECKING THE BOX BELOW, OR (D) VOTE TO REJECT THE PLAN WITHOUT CHECKING THE BOX BELOW, IN EACH CASE YOU WILL BE DEEMED TO CONSENT TO THE RELEASES SET FORTH IN ARTICLE VIII.C OF THE PLAN.  THE ELECTION TO WITHHOLD CONSENT TO GRANT SUCH RELEASE IS AT YOUR OPTION.  BY OPTING OUT OF THE RELEASES SET FORTH IN ARTICLE VIII.C OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE VIII OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.

**The Beneficial Holder of the Class 6 Unsecured Notes Claim set forth in Item 1 elects to:**

☐ **OPT OUT** of the Third Party Release.

**Item 4.  Other Class 6 Beneficial Holder Ballots Submitted.**  By returning this Class 6 Beneficial Holder Ballot, the Holder of the Class 6 Unsecured Notes Claims identified in Item 1 certifies that (a) this Class 6 Beneficial Holder Ballot is the only Class 6 Beneficial Holder Ballot submitted for Class 6 Unsecured Notes Claims owned by such holder, except as identified in the following table, and (b) *all* Class 6 Beneficial Holder Ballots submitted by the holder indicate the same vote to accept or reject the Plan that the holder has indicated in Item 2 of this Class 6 Beneficial Holder Ballot (please use additional sheets of paper if necessary):

**ONLY COMPLETE THIS TABLE IF YOU HAVE VOTED OTHER
CLASS 6 UNSECURED NOTES CLAIMS ON OTHER CLASS 6 BENEFICIAL HOLDER BALLOTS**

| Account Number | Name of Registered Holder or Nominee | Principal Amount of Other Class 6 Unsecured Notes Claims | CUSIP of Other Class 6 Unsecured Notes Claims Voted |
|---|---|---|---|
| | | $ | |
| | | $ | |
| | | $ | |
| | | $ | |

**Item 5.  Certifications.**

By signing this Class 6 Beneficial Holder Ballot, the undersigned certifies:

(a) that, as of the Voting Record Date, either:  (i) the Entity is the holder of the Class 6 Unsecured Notes Claims being voted; or (ii) the Entity is an authorized signatory for an Entity that is a holder of the Class 6 Unsecured Notes Claims being voted;

[CUSIP]

4

(b) that the Entity (or, in the case of an authorized signatory, the holder) has received a copy of the Disclosure Statement and the Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

(c) that the Entity has cast the same vote with respect to all Class 6 Unsecured Notes Claims in a single Class; and

(d) that no other Class 6 Beneficial Holder Ballots with respect to the amount of the Class 6 Unsecured Notes Claims identified in Item 1 have been cast or, if any other Class 6 Beneficial Holder Ballots have been cast with respect to such Class 6 Unsecured Notes Claims, then any such earlier Class 6 Beneficial Holder Ballots are hereby revoked.

| | |
|---|---|
| Name of Holder: | |
| | (Print or Type) |
| Signature: | |
| Name of Signatory: | |
| | (If other than holder) |
| Title: | |
| Address: | |
| | |
| | |
| Telephone Number: | |
| Email: | |
| Date Completed: | |

**PLEASE COMPLETE, SIGN, AND DATE THIS BALLOT AND
RETURN IT (WITH AN ORIGINAL SIGNATURE) *PROMPTLY* IN THE ENVELOPE PROVIDED OR
OTHERWISE IN ACCORDANCE WITH THE INSTRUCTIONS PROVIDED BY YOUR NOMINEE.**

IF THE NOTICE AND CLAIMS AGENT DOES
NOT *ACTUALLY RECEIVE* THE CLASS 6 MASTER BALLOT SUBMITTED ON
YOUR BEHALF WHICH REFLECTS YOUR VOTE **ON OR BEFORE MARCH 28, 2018, AT 4:00 P.M.,**
PREVAILING CENTRAL TIME, (AND IF THE VOTING DEADLINE IS NOT EXTENDED),
YOUR VOTE TRANSMITTED BY THIS CLASS 6 BENEFICIAL HOLDER BALLOT MAY BE
COUNTED TOWARD CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE DEBTORS.

[CUSIP]

| Class 6 — Cobalt General Unsecured Claims — Unsecured Notes Claims |
|---|

### INSTRUCTIONS FOR COMPLETING THIS CLASS 6 BENEFICIAL HOLDER BALLOT

1. The Debtors are soliciting the votes of holders of Claims with respect to the Plan attached as **Exhibit A** to the Disclosure Statement. Capitalized terms used in the Class 6 Beneficial Holder Ballot or in these instructions (the "Ballot Instructions"), but not otherwise defined therein or herein, shall have the meaning set forth in the Plan, a copy of which also accompanies the Class 6 Beneficial Holder Ballot. **PLEASE READ THE PLAN AND DISCLOSURE STATEMENT CAREFULLY BEFORE COMPLETING THIS BALLOT.**

2. The Plan can be confirmed by the Bankruptcy Court and thereby made binding upon you if it is accepted by the holders of at least two-thirds in amount and more than one-half in number of Claims in at least one class of creditors that votes on the Plan and if the Plan otherwise satisfies the requirements for confirmation provided by section 1129(a) of the Bankruptcy Code. Please review the Disclosure Statement for more information.

3. To ensure that your vote is counted, you must (a) complete the Class 6 Beneficial Holder Ballot; (b) indicate your decision either to accept or reject the Plan in Item 2 of the Class 6 Beneficial Holder Ballot; and (c) sign and return the Class 6 Beneficial Holder Ballot in accordance with the instructions received and in the envelope, so that this Class 6 Beneficial Holder Ballot or the Master Ballot case on your behalf is actually received by the Notice and Claims Agent by **March 28, 2018, at 4:00 p.m.**, prevailing Central Time. If you are returning your Class 6 Beneficial Holder Ballot to the Nominee that provided you with this Class 6 Beneficial Holder Ballot, your completed Class 6 Beneficial Holder Ballot must be sent to your Nominee, allowing sufficient time for your Nominee to receive your Class 6 Beneficial Holder Ballot, complete a Master ballot, and transmit the Master Ballot to the Notice and Claims Agent so that it is actually received on or before the Voting Deadline.

4. **The following Class 6 Beneficial Holder Ballots submitted to your Nominee will *not* be counted**:

   (a) any Class 6 Beneficial Holder Ballot that partially rejects and partially accepts the Plan;
   (b) any Class 6 Beneficial Holder Ballot sent to the Debtors, the Debtors' agents, any indenture trustee, or the Debtors' financial or legal advisors;
   (c) any Class 6 Beneficial Holder Ballot sent by facsimile or any electronic means other than in accordance with the instructions of your Nominee;
   (d) any Class 6 Beneficial Holder Ballot that is illegible or contains insufficient information to permit the identification of the holder of the Claim;
   (e) any Class 6 Beneficial Holder Ballot cast by an Entity that does not hold a Claim in Class 6;
   (f) any unsigned Class 6 Beneficial Holder Ballot;
   (g) any Class 6 Beneficial Holder Ballot submitted by a holder not entitled to vote pursuant to the Plan;
   (h) any non-original Class 6 Beneficial Holder Ballot; and/or
   (i) any Class 6 Beneficial Holder Ballot not marked to accept or reject the Plan or any Class 6 Beneficial Holder Ballot marked both to accept and reject the Plan.

5. If your Class 6 Beneficial Holder Ballot is not received by your Nominee in sufficient time to be included on a timely submitted Master Ballot, it will not be counted unless the Debtors determine otherwise. In all cases, Beneficial Holders should allow sufficient time to assure timely delivery of your Class 6 Beneficial Holder Ballot to your Nominee. No Class 6 Beneficial Holder Ballot should be sent to any of the Debtors, the Debtors' agents, the Debtors' financial or legal advisors and, if so sent, will not be counted.

6. If you deliver multiple Class 6 Beneficial Holder Ballots to the Nominee with respect to the same Claim prior to the Voting Deadline, the last received valid Class 6 Beneficial Holder Ballot timely received will supersede and revoke any earlier received Class 6 Beneficial Holder Ballots.

[CUSIP]

6

7.  You must vote all of your Claims within Class 6 either to accept or reject the Plan and may **not** split your vote. Further, if a holder has multiple Claims within Class 6, the Debtors may, in their discretion, aggregate the Claims of any particular holder with multiple Claims within Class 6 for the purpose of counting votes.

8.  This Class 6 Beneficial Holder Ballot does *not* constitute, and shall not be deemed to be, (a) a Proof of Claim or (b) an assertion or admission of a Claim.

9.  **Please be sure to sign and date your Class 6 Beneficial Holder Ballot**.  If you are signing a Class 6 Beneficial Holder Ballot in your capacity as a trustee, executor, administrator, guardian, attorney in fact, officer of a corporation, or otherwise acting in a fiduciary or representative capacity, you must indicate such capacity when signing and, if required or requested by the Notice and Claims Agent, the Debtors, or the Bankruptcy Court, must submit proper evidence to the requesting party to so act on behalf of such holder.  In addition, please provide your name and mailing address if it is different from that set forth on the attached mailing label or if no such mailing label is attached to the Class 6 Beneficial Holder Ballot.

10. If you hold Claims in more than one Class under the Plan you may receive more than one ballot coded for each different Class.  Each ballot votes *only* your Claims indicated on that ballot, so please complete and return each ballot that you receive.

11. The Class 6 Beneficial Holder Ballot is not a letter of transmittal and may not be used for any purpose other than to vote to accept or reject the Plan.  Accordingly, at this time, holders of Claims should not surrender certificates or instruments representing or evidencing their Claims, and neither the Debtors nor the Notice and Claims Agent will accept delivery of any such certificates or instruments surrendered together with a ballot.

**PLEASE MAIL YOUR CLASS 6 BENEFICIAL HOLDER BALLOT PROMPTLY**

**IF YOU HAVE ANY QUESTIONS REGARDING THIS CLASS 6 BENEFICIAL HOLDER BALLOT, THESE VOTING INSTRUCTIONS, OR THE PROCEDURES FOR VOTING, PLEASE CALL THE NOTICE AND CLAIMS AGENT AT:  (866) 967-1782 (TOLL FREE) OR (310) 751-2682 (INTERNATIONAL) OR EMAIL COBALTINFO@KCCLLC.COM.**

---

**IF THE NOTICE AND CLAIMS AGENT DOES NOT *ACTUALLY RECEIVE* THE CLASS 6 MASTER BALLOT FILED ON YOUR BEHALF ON OR BEFORE MARCH 28, 2018, AT 4:00 P.M., PREVAILING CENTRAL TIME, (AND IF THE VOTING DEADLINE IS NOT EXTENDED), YOUR VOTE TRANSMITTED BY THIS CLASS 6 BENEFICIAL HOLDER BALLOT MAY BE COUNTED TOWARD CONFIRMATION OF THE PLAN ONLY IN THE DISCRETION OF THE DEBTORS.**

---

[CUSIP]

7

## SCHEDULE 4A

**Form of Non-Impaired Non-Voting Status Notice**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|   |   |   |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| COBALT INTERNATIONAL ENERGY, INC., *et al.*,[1] | ) | Case No. 17-36709 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**NOTICE OF NON-VOTING STATUS TO HOLDERS OF
UNIMPAIRED CLAIMS CONCLUSIVELY PRESUMED TO ACCEPT THE PLAN**

**PLEASE TAKE NOTICE THAT** on March 8, 2018, the United States Bankruptcy Court for the Southern District of Texas entered an order [Docket No.[●]] (the "Disclosure Statement Order"):  (a) authorizing Cobalt International Energy, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors") to solicit acceptances for the *Fourth Amended Joint Chapter 11 Plan of Cobalt International Energy, Inc. and Its Debtor Affiliates* (as modified, amended, or supplemented from time to time, the "Plan"),[2]  (b) approving the *Disclosure Statement for the Fourth Amended Joint Chapter 11 Plan of Cobalt International Energy, Inc. and Its Debtor Affiliates* (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code, (c) approving the solicitation materials and documents to be included in the solicitation packages, and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** because of the nature and treatment of your Claim under the Plan, ***you are not entitled to vote on the Plan***.  Specifically, under the terms of the Plan, as a holder of a Claim (as currently asserted against the Debtors) that is not Impaired and conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code, you are ***not*** entitled to vote on the Plan.

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Cobalt International Energy, Inc. (1169); Cobalt International Energy GP, LLC (7374); Cobalt International Energy, L.P. (2411); Cobalt GOM LLC (7188); Cobalt GOM # 1 LLC (7262); and Cobalt GOM # 2 LLC (7316).  The Debtors' service address is:  920 Memorial City Way, Suite 100, Houston, Texas 77024.

[2]  Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider confirmation of the Plan (the "Confirmation Hearing") will commence on **April 3, 2018, at 8:30 a.m.**, prevailing Central Time, before the Honorable Marvin Isgur, in the United States Bankruptcy Court for the Southern District of Texas, located at 515 Rusk Street Houston, Texas 77002.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the Plan is **March 27, 2018, at 4:00 p.m.**, prevailing Central Time (the "Plan Objection Deadline"). Any objection to the Plan *must*:  (a) be in writing, (b) conform to the Bankruptcy Rules, the Bankruptcy Local Rules, and any orders of the Court, (c) state, with particularity, the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection, and (d) be filed with the Court (contemporaneously with a proof of service).

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you should contact Kurtzman Carson Consultants LLC, the notice and claims agent retained by the Debtors in the chapter 11 cases (the "Notice and Claims Agent"), by:  (a) calling the Debtors' restructuring hotline at (866) 967-1782 (toll free) or (310) 751-2682 (international), (b) visiting the Debtors' restructuring website at:  https://www.kccllc.net/cobalt, (c) writing to Notice and Claims Agent at Cobalt Ballot Processing, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245, and/or (d) emailing CobaltInfo@kccllc.com.  You may also obtain copies of any pleadings filed in the chapter 11 cases for a fee via PACER at: http://ecf.txsb.uscourts.gov.

---

ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND **ARTICLE VIII.C CONTAINS A THIRD-PARTY RELEASE**.  PURSUANT TO THE PLAN YOU ARE DEEMED TO ACCEPT THE PLAN AND THEREFORE ARE DEEMED TO HAVE CONSENTED TO THE RELEASES SET FORTH IN ARTICLE VIII.C.  THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

**ALL HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS THAT DO NOT FILE AN OBJECTION WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES THAT EXPRESSLY OBJECTS TO THE INCLUSION OF SUCH HOLDER AS A RELEASING PARTY UNDER THE PROVISIONS CONTAINED IN ARTICLE VIII.C OF THE PLAN OR DO NOT ELECT TO OPT OUT OF THE PROVISIONS CONTAINED IN ARTICLE VIII.C OF THE PLAN USING THE ENCLOSED OPT OUT FORM WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES.  BY OBJECTING TO OR ELECTING TO OPT OUT OF THE RELEASES SET FORTH IN ARTICLE VIII.C OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE VIII.C OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.**

2

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE NOTICE AND CLAIMS AGENT.**

## RELEASES, EXCULPATIONS, AND INJUNCTIONS

Please be advised that the Plan contains certain releases, exculpation provisions, and injunctions, as set forth in the Plan and below:

### Relevant Definitions

"*Exculpated Parties*" means, collectively, and in each case in its capacity as such:  (a) the Debtors; (b) the Plan Administrator; (c) the Committee and any other official committees appointed in the Chapter 11 Cases and each of their respective members; and (d) with respect to each of the foregoing, such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

"*Released Parties*" means each of the following, solely in its capacity as such:  (a) the First Lien Noteholders; (b) the First Lien Ad Hoc Group; (c) the Second Lien Noteholders; (d) the Second Lien Ad Hoc Group; (e) the Unsecured Noteholders; (f) the Unsecured Notes Ad Hoc Committee; (g) the First Lien Indenture Trustee; (h) the Second Lien Indenture Trustee; (i) the 2.625% Senior Notes Indenture Trustee; (j) the 3.125% Senior Notes Indenture Trustee; (k) the Committee and its members; and (l) with respect to each of the Debtors and each of the foregoing entities in clauses (a) through (k), such Entity and its current and former Affiliates and subsidiaries, and such Entities' and their current and former Affiliates' and subsidiaries' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; *provided* that any holder of a Claim or Interest that opts out or otherwise objects to the releases in the Plan shall not be a "Released Party."

"*Releasing Party*" means collectively:  (a) the First Lien Noteholders; (b) the First Lien Ad Hoc Group; (c) the Second Lien Noteholders; (d) the Second Lien Ad Hoc Group; (e) the Unsecured Noteholders; (f) the Unsecured Notes Ad Hoc Committee; (g) the First Lien Indenture Trustee; (h) the Second Lien Indenture Trustee; (i) the 2.625% Senior Notes Indenture Trustee; (j) the 3.125% Senior Notes Indenture Trustee; (k) the Committee and its members; (l) all holders of Claims, (m) all holders of Interests, and (n) with respect to each of the Debtors and each of the foregoing entities in clauses (a) through (m), such Entity and its current and former Affiliates and subsidiaries, and such Entities' and their current and former Affiliates' and subsidiaries' current and former directors, managers, officers, equity holders (regardless of whether such interests are

3

held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such collectively; *provided* that any holder of a Claim or Interest that opts out or otherwise objects to the releases in the Plan shall not be a "Releasing Party."

**DEBTOR RELEASE. Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtors, that the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Sale Transaction, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Sale Transaction, the Plan, or the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything contained herein to the contrary, the foregoing release does not release any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.B by the Debtors, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute its finding that each release described in this Article VIII.B is: (1) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such Claims; (2) in the best interests of the Debtors and all holders of Interests and Claims; (3) fair, equitable, and reasonable; (4) given and made after due notice and opportunity for hearing; and (5) a bar to any of the Debtors asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.**

**THIRD PARTY RELEASE. As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of**

4

**the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Sale Transaction, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Sale Transaction, the Plan, or the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything contained herein to the contrary, the foregoing release does not release any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.C, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute its finding that each release described in this Article VIII.C is: (1) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such Claims; (2) in the best interests of the Debtors and all holders of Interests and Claims; (3) fair, equitable, and reasonable; (4) given and made after due notice and opportunity for hearing; and (5) a bar to any of the Debtors asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.**

**<u>EXCULPATION</u>.  Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the Sale Transaction, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or**

**regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.**

**INJUNCTION.   Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Exculpated Parties, or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.**

**Upon entry of the Confirmation Order, all holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Each holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article VIII.E of the Plan.**

## ADDITIONAL INFORMATION

**Obtaining Solicitation Materials.**   The materials in the Solicitation Package are intended to be self-explanatory.  If you should have any questions or if you would like to obtain additional solicitation materials (or paper copies of solicitation materials if you received a CD-ROM), please contact the Debtors' Notice and Claims Agent, by:  (a) calling the Notice and Claims Agent at (866) 967-1782 (toll free) or (310) 751-2682 (international), (b) visiting the Debtors' restructuring website at: https://www.kccllc.net/cobalt, (c) writing to the Notice and Claims Agent at Cobalt Ballot Processing, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245, and/or (d) emailing CobaltInfo@kccllc.com.  You may also obtain copies of any pleadings filed in the chapter 11 cases for a fee via PACER at: http://www.ecf.txsb.uscourts.gov.   Please be advised that the Notice and Claims Agent is

6

authorized to answer questions about, and provide additional copies of, solicitation materials, but may *not* advise you as to whether you should vote to accept or reject the Plan.

**The Plan Supplement.**  The Debtors will file the Plan Supplement (as defined in the Plan) pursuant to the terms of the Plan, and will serve notice on all holders of Claims entitled to vote on the Plan, which will:  (a) inform parties that the Debtors filed the Plan Supplement, (b) list the information contained in the Plan Supplement, and (c) explain how parties may obtain copies of the Plan Supplement.

Houston, Texas
Dated: _____, 2018         */s/*  _____

                              Zack A. Clement (Texas Bar No. 04361550)
                              **ZACK A. CLEMENT PLLC**
                              3753 Drummond Street
                              Houston, Texas 77025
                              Telephone: (832) 274-7629

                              -and-

                              James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
                              Marc Kieselstein, P.C. (admitted *pro hac vice*)
                              Chad J. Husnick, P.C. (admitted *pro hac vice*)
                              Brad Weiland (admitted *pro hac vice*)
                              W. Benjamin Winger (admitted *pro hac vice*)
                              Laura Krucks (admitted *pro hac vice*)
                              **KIRKLAND & ELLIS LLP**
                              **KIRKLAND & ELLIS INTERNATIONAL LLP**
                              300 North LaSalle Street
                              Chicago, Illinois 60654
                              Telephone:    (312) 862-2000
                              Facsimile:    (312) 862-2200

                              *Co-Counsel to the Debtors and Debtors in Possession*

## SCHEDULE 4B

**Form of Class 3 Master Opt Out Form**

**OPTIONAL: RELEASE OPT OUT FORM**

You are receiving this master opt out form (the "Master Opt Out Form") because you are the Nominee (as defined below) of a Beneficial Holder[1] of Class 3 First Lien Notes Claims (the "Class 3 First Lien Notes Claims") as of March 5, 2018 (the "Voting Record Date").

**This Master Opt Out Form is to be used by you as a broker, bank, or other nominee; or as the agent of a broker, bank, or other nominee (each of the foregoing, a "Nominee"); or as the proxy holder of a Nominee for certain Beneficial Holders' Class 3 First Lien Notes Claims, to transmit to Kurtzman Carson Consultants LLC (the "Notice and Claims Agent") the elections of such Beneficial Holders to opt out of the releases contained in Article VIII.C of the *Fourth Amended Joint Chapter 11 Plan of Cobalt International Energy, Inc. and Its Debtor Affiliates* (as may be amended from time to time, the "Plan").**

**THIS MASTER OPT OUT FORM MUST BE ACTUALLY RECEIVED BY THE NOTICE AND CLAIMS AGENT BY MARCH 28, 2018, AT 4:00 P.M., PREVAILING CENTRAL TIME (THE "VOTING DEADLINE").**

**Item 1. Certification of Authority to Opt Out.**

The undersigned certifies that, as of the Voting Record Date, the undersigned (please check the applicable box):

☐ Is a broker, bank, or other nominee for the Beneficial Holders of the aggregate principal amount of the Class 3 First Lien Notes Claims listed in Item 2 below and is the record holder of such bonds, or

☐ Is acting under a power of attorney and/or agency (a copy of which will be provided upon request) granted by a broker, bank, or other nominee that is the registered holder of the aggregate principal amount of Class 3 First Lien Notes Claims listed in Item 2 below, or

☐ Has been granted a proxy (an original of which is attached hereto) from a broker, bank, or other nominee, or a beneficial owner, that is the registered holder of the aggregate principal amount of Class 3 First Lien Notes Claims listed in Item 2 below,

and, accordingly, has full power and authority to elect to opt out of the releases contained in Article VIII.C of the Plan on behalf of the Beneficial Holders of the Class 3 First Lien Notes Claims described in Item 2.

**Item 2. Important Information Regarding the Third Party Release**

**Article VIII.C of the Plan contains the following Third Party Release:**

**As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Sale Transaction, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring**

---

[1] A "Beneficial Holder" means a beneficial owner of publicly-traded securities whose claims or interests have not been satisfied prior to the Voting Record Date (as defined herein) pursuant to Bankruptcy Court order or otherwise, (a) as reflected in the records maintained by the Nominees holding through the First Lien Indenture Trustee, or (b) as evidenced by the securities position report from The Depository Trust Company as of the Voting Record Date.

1

Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Sale Transaction, the Plan, or the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything contained herein to the contrary, the foregoing release does not release any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.C, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute its finding that each release described in this Article VIII.C is:  (1) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such Claims; (2) in the best interests of the Debtors and all holders of Interests and Claims; (3) fair, equitable, and reasonable; (4) given and made after due notice and opportunity for hearing; and (5) a bar to any of the Debtors asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

*     *     *

UNDER THE PLAN, "RELEASING PARTY" MEANS COLLECTIVELY:  (A) THE FIRST LIEN NOTEHOLDERS; (B) THE FIRST LIEN AD HOC GROUP; (C) THE SECOND LIEN NOTEHOLDERS; (D) THE SECOND LIEN AD HOC GROUP; (E) THE UNSECURED NOTEHOLDERS; (F) THE UNSECURED NOTES AD HOC COMMITTEE; (G) THE FIRST LIEN INDENTURE TRUSTEE; (H) THE SECOND LIEN INDENTURE TRUSTEE; (I) THE 2.625% SENIOR NOTES INDENTURE TRUSTEE; (J) THE 3.125% SENIOR NOTES INDENTURE TRUSTEE; (K) THE COMMITTEE AND ITS MEMBERS; (L) ALL HOLDERS OF CLAIMS, (M) ALL HOLDERS OF INTERESTS, AND (N) WITH RESPECT TO EACH OF THE DEBTORS AND EACH OF THE FOREGOING ENTITIES IN CLAUSES (A) THROUGH (M), SUCH ENTITY AND ITS CURRENT AND FORMER AFFILIATES AND SUBSIDIARIES, AND SUCH ENTITIES' AND THEIR CURRENT AND FORMER AFFILIATES' AND SUBSIDIARIES' CURRENT AND FORMER DIRECTORS, MANAGERS, OFFICERS, EQUITY HOLDERS (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), PREDECESSORS, SUCCESSORS, AND ASSIGNS, SUBSIDIARIES, AND EACH OF THEIR RESPECTIVE CURRENT AND FORMER EQUITY HOLDERS, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS, MEMBERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITY AS SUCH COLLECTIVELY; *PROVIDED* THAT ANY HOLDER OF A CLAIM OR INTEREST THAT OPTS OUT OR OTHERWISE OBJECTS TO THE RELEASES IN THE PLAN SHALL NOT BE A "RELEASING PARTY."

AS A "RELEASING PARTY" UNDER THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE VIII.C OF THE PLAN, AS SET FORTH ABOVE.  YOU MAY ELECT NOT TO GRANT THE RELEASE CONTAINED IN ARTICLE VIII.C OF THE PLAN ONLY IF YOU CHECK THE BOX BELOW.  THE ELECTION TO WITHHOLD CONSENT TO GRANT SUCH RELEASE IS AT YOUR OPTION. BY OPTING OUT OF THE RELEASES SET FORTH IN ARTICLE VIII.C OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE VIII OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.

2

The undersigned transmits the following elections of Beneficial Holders of Class 3 First Lien Notes Claims and certifies that the following Beneficial Holders of Class 3 First Lien Notes Claims, as identified by their respective customer account numbers set forth below, are the Beneficial Holders of such Claims as of the Voting Record Date and have delivered to the undersigned, as Nominee, forms (the "Beneficial Holder Opt Out Forms") casting such elections.

If the Beneficial Holder has checked the box on Item 2 of the Beneficial Holder Opt Out Form pertaining to releases by holders of Claims, as detailed in Article VIII of the Plan, please place an X in the Item 2 column below and indicate in the appropriate column the aggregate principal amount for each such account or attach such information to this Master Opt Out Form in the form of the following table.

| Your Customer Account Number for Each Beneficial Holder of Class 3 First Lien Notes Claims | Principal Amount Held as of Voting Record Date | **Item 2**<br><br>**If the box in Item 2 of the Beneficial Holder Opt Out Form was completed, check the box in the column below**<br><br>**OPT OUT of the Third Party Release** |
|---|---|---|
| 1 | $ | ☐ |
| 2 | $ | ☐ |
| 3 | $ | ☐ |
| 4 | $ | ☐ |
| 5 | $ | ☐ |
| 6 | $ | ☐ |
| **TOTALS** | $ | |

3

**Item 3.  Certifications.**

Upon execution of this Master Opt Out Form, the undersigned certifies:

(a)   it has received a copy of the Master Opt Out Form and the Beneficial Opt Out Form, and has delivered the same to the Beneficial Holders of the Class 3 First Lien Notes Claims listed in Item 2 above;

(b)   it has received a completed and signed Beneficial Holder Opt Out Form from each Beneficial Holder listed in Item 2 of this Master Opt Out Form;

(c)   it is the registered holder of all Class 3 First Lien Notes Claims listed in Item 2 above, or

(d)   it has been authorized by each Beneficial Holder of Class 3 First Lien Notes Claims listed in Item 2 above to elect to opt out of the releases contained in Article VIII.C of the Plan;

(e)   no other Master Opt Out Forms with respect to the same Class 3 First Lien Notes Claims identified in Item 2 have been submitted or, if any other Master Opt Out Forms have been submitted with respect to such Claims, then any such earlier Master Opt Out Forms are hereby revoked;

(f)   it has properly disclosed:  (a) the number of Beneficial Holders of Class 3 First Lien Notes Claims who completed the Beneficial Holder Opt Out Form; (b) the respective amounts of the Class 3 First Lien Notes Claims owned, as the case may be, by each Beneficial Holder of Class 3 First Lien Notes Claims who completed a Beneficial Holder Opt Out Form; (c) each such Beneficial Holder of Class 3 First Lien Notes Claims' respective election concerning the releases; and (e) the customer account or other identification number for each such Beneficial Holder of Class 3 First Lien Notes Claims; and

(g)   it will maintain forms returned by Beneficial Holder of Class 3 First Lien Notes Claims (whether properly completed or defective) for at least one (1) year after the Effective Date of the Plan and disclose all such information to the Bankruptcy Court or the Debtors, if so ordered.

Name of Nominee:   _____
                                                        (Print or Type)

Participant Number:

                                      _____

Name of Proxy Holder or Agent for Nominee (if applicable):

                                      _____
                                                        (Print or Type)

                                      _____

Signature:                     _____

Name of Signatory:      _____

Title:                            _____

Address:                       _____

                                      _____

                                      _____

4

5

Date Completed:     _____

Email Address:     _____

**PLEASE COMPLETE, SIGN, AND DATE THIS MASTER OPT OUT FORM AND
RETURN IT (WITH AN ORIGINAL SIGNATURE) *PROMPTLY* IN THE ENVELOPE PROVIDED VIA
FIRST CLASS MAIL, OVERNIGHT COURIER, HAND DELIVERY, OR VIA ELECTRONIC MAIL
SERVICE TO:**

**Cobalt Ballot Processing
c/o Kurtzman Carson Consultants LLC
1290 Avenue of the Americas, 9th Floor,
New York, New York 10104
cobaltballots@kccllc.com**

## SCHEDULE 4C

**Form of Class 3 Beneficial Holder Opt Out Form**

**OPTIONAL: RELEASE OPT OUT FORM**

You are receiving this Class 3 opt out form for Beneficial Holders[1] (the "Beneficial Holder Opt Out Form") because you are a Beneficial Holder of a First Lien Notes Claim in Class 3 (the "Class 3 First Lien Notes Claims") as of March 5, 2018 (the "Voting Record Date"). Accordingly, you have a right to opt out of the releases contained in Article VIII.C of the *Fourth Amended Joint Chapter 11 Plan of Cobalt International Energy, Inc. and Its Debtor Affiliates* (as may be amended from time to time, the "Plan").

You can elect to opt out of the release contained in Article VIII.C of the Plan through this Beneficial Holder Opt Out Form and return it to your broker, bank, or other nominee, or the agent of a broker, bank, or other nominee (each of the foregoing, a "Nominee"), who will then submit a master opt out form (the "Master Opt Out Form") on behalf of the Beneficial Holders of Class 3 Fist Lien Notes Claims.

In order to opt out of the releases contained in Article VIII.C of the Plan, your Nominee must receive this Beneficial Holder Opt Out Form in sufficient time for your Nominee to include your election on a Master Opt Out Form that must be received by the Notice and Claims Agent on or before the Voting Deadline, which is **March 28, 2018, at 4:00 p.m.**, prevailing Central Time. Please allow sufficient time for your election to be included on the Master Opt Out Form completed by your Nominee. If a Master Opt Out Form recording your vote is not received by the Voting Deadline, and if the Voting Deadline is not extended, your election will not count.

**Item 1. Amount of Claim.**

The undersigned hereby certifies that, as of the Voting Record Date, the undersigned was the Beneficial Holder of Class 3 First Lien Notes Claims, in the following aggregate unpaid principal amount (insert amount in box below, unless otherwise completed by your Nominee):

> $_____

**Item 2. Important information regarding the Third Party Release.**

**Article VIII.C of the Plan contains the following Third Party Release:**

**As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Sale Transaction, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Sale Transaction, the Plan, or the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything contained herein to the contrary, the foregoing release does not release any**

---

[1]    A "Beneficial Holder" means a beneficial owner of publicly-traded securities whose claims have not been satisfied prior to the Voting Record Date (as defined herein) pursuant to Bankruptcy Court order or otherwise, (a) as reflected in the records maintained by the Nominees holding through the First Lien Indenture Trustee, or (b) as evidenced by the securities position report from The Depository Trust Company as of the Voting Record Date.

1

obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.C, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute its finding that each release described in this Article VIII.C is:  (1) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such Claims; (2) in the best interests of the Debtors and all holders of Interests and Claims; (3) fair, equitable, and reasonable; (4) given and made after due notice and opportunity for hearing; and (5) a bar to any of the Debtors asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

*     *     *

UNDER THE PLAN, "RELEASING PARTY" MEANS COLLECTIVELY:  (A) THE FIRST LIEN NOTEHOLDERS; (B) THE FIRST LIEN AD HOC GROUP; (C) THE SECOND LIEN NOTEHOLDERS; (D) THE SECOND LIEN AD HOC GROUP; (E) THE UNSECURED NOTEHOLDERS; (F) THE UNSECURED NOTES AD HOC COMMITTEE; (G) THE FIRST LIEN INDENTURE TRUSTEE; (H) THE SECOND LIEN INDENTURE TRUSTEE; (I) THE 2.625% SENIOR NOTES INDENTURE TRUSTEE; (J) THE 3.125% SENIOR NOTES INDENTURE TRUSTEE; (K) THE COMMITTEE AND ITS MEMBERS; (L) ALL HOLDERS OF CLAIMS, (M) ALL HOLDERS OF INTERESTS, AND (N) WITH RESPECT TO EACH OF THE DEBTORS AND EACH OF THE FOREGOING ENTITIES IN CLAUSES (A) THROUGH (M), SUCH ENTITY AND ITS CURRENT AND FORMER AFFILIATES AND SUBSIDIARIES, AND SUCH ENTITIES' AND THEIR CURRENT AND FORMER AFFILIATES' AND SUBSIDIARIES' CURRENT AND FORMER DIRECTORS, MANAGERS, OFFICERS, EQUITY HOLDERS (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), PREDECESSORS, SUCCESSORS, AND ASSIGNS, SUBSIDIARIES, AND EACH OF THEIR RESPECTIVE CURRENT AND FORMER EQUITY HOLDERS, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS, MEMBERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITY AS SUCH COLLECTIVELY; *PROVIDED* THAT ANY HOLDER OF A CLAIM OR INTEREST THAT OPTS OUT OR OTHERWISE OBJECTS TO THE RELEASES IN THE PLAN SHALL NOT BE A "RELEASING PARTY."

AS A "RELEASING PARTY" UNDER THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE VIII.C OF THE PLAN, AS SET FORTH ABOVE.  YOU MAY ELECT NOT TO GRANT THE RELEASE CONTAINED IN ARTICLE VIII.C OF THE PLAN ONLY IF YOU CHECK THE BOX BELOW.  THE ELECTION TO WITHHOLD CONSENT TO GRANT SUCH RELEASE IS AT YOUR OPTION. BY OPTING OUT OF THE RELEASES SET FORTH IN ARTICLE VIII.C OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE VIII OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.

**The Beneficial Holder of the Class 3 Beneficial Holder Claim set forth in Item 1 elects to:**

☐ **OPT OUT** of the Third Party Release

**Item 3.**  **Certifications.**

By signing this Beneficial Holder Opt Out Form, the undersigned certifies:

(a)  that, as of the Voting Record Date, either:  (i) the Entity is the holder of the Class 3 First Lien Notes Claims; or (ii) the Entity is an authorized signatory for an Entity that is a holder of the Class 3 First Lien Notes Claims;

2

(b) that the holder has received a copy of the Notice of Non-Voting Status to Holders of Unimpaired Claims Conclusively Presumed to Accept the Plan and that this Beneficial Opt Out Form is made pursuant to the terms and conditions set forth therein;

(c) **that the holder has submitted the same respective election concerning the releases with respect to the Class 3 First Lien Notes Claims identified in Item 1; and**

(d) **that no other Beneficial Holder Opt Out Forms with respect to the amount of the Class 3 First Lien Notes Claims identified in Item 1 have been submitted or, if any other Beneficial Holder Opt Out Forms have been submitted with respect to such Class 3 First Lien Notes Claims, then any such earlier Beneficial Holder Opt Out Forms are hereby revoked.**

| | |
|---|---|
| Name of Holder: | |
| | (Print or Type) |
| Signature: | |
| Name of Signatory: | |
| | (If other than holder) |
| Title: | |
| Address: | |
| | |
| | |
| Telephone Number: | |
| Email: | |
| Date Completed: | |

**PLEASE COMPLETE, SIGN, AND DATE THIS BENEFICIAL HOLDER OPT OUT FORM AND RETURN IT (WITH AN ORIGINAL SIGNATURE) *PROMPTLY* IN THE ENVELOPE PROVIDED OR OTHERWISE IN ACCORDANCE WITH THE INSTRUCTIONS PROVIDED BY YOUR NOMINEE.**

## <u>SCHEDULE 4D</u>

**Form of Class 1 Opt Out Form and Class 2 Opt Out Form**

**OPTIONAL: RELEASE OPT OUT FORM**

You are receiving this opt out form (the "Opt Out Form") because you are a holder of a Claim that is not entitled to vote on the *Fourth Amended Joint Chapter 11 Plan of Cobalt International Energy, Inc. and Its Debtor Affiliates* (as may be amended from time to time, the "Plan"). If you choose to opt out of the releases set forth in Article VIII.C of the Plan, either (1) complete an electronic Opt Out Form at http://www.kccllc.net/cobalt or (2) complete, sign, and date this Opt Out Form and return it promptly via first class mail (or in the enclosed reply envelope provided), overnight courier, or hand delivery to Kurtzman Carson Consultants LLC (the "Notice and Claims Agent") at the address set forth below:

**Cobalt Ballot Processing**
**c/o Kurtzman Carson Consultants LLC**
**2335 Alaska Avenue,**
**El Segundo, California 90245**

**THIS OPT OUT FORM MUST BE ACTUALLY RECEIVED BY THE NOTICE AND CLAIMS AGENT BY MARCH 28, 2018, AT 4:00 P.M. PREVAILING CENTRAL TIME (THE "VOTING DEADLINE"). IF THE OPT OUT FORM IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED.**

**Item 1. Amount of Claim.**

The undersigned hereby certifies that, as of the Voting Record Date, the undersigned was the holder of either (1) Class 1 Allowed Other Priority Claims or (2) Class 2 Other Secured Claims in the following aggregate amount (insert amount in box below):

> Class 1 Allowed Other Priority Claims Amount $ _____
>
> OR
>
> Class 2 Other Secured Claims Amount $ _____

**Item 2. Important information regarding the Third Party Release.**

**Article VIII.C of the Plan contains the following Third Party Release:**

**As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Sale Transaction, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Sale Transaction, the Plan, or the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything contained herein to the contrary, the foregoing release does not release any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan.**

1

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.C, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute its finding that each release described in this Article VIII.C is: (1) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such Claims; (2) in the best interests of the Debtors and all holders of Interests and Claims; (3) fair, equitable, and reasonable; (4) given and made after due notice and opportunity for hearing; and (5) a bar to any of the Debtors asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.**

\* \* \*

UNDER THE PLAN, "RELEASING PARTY" MEANS COLLECTIVELY: (A) THE FIRST LIEN NOTEHOLDERS; (B) THE FIRST LIEN AD HOC GROUP; (C) THE SECOND LIEN NOTEHOLDERS; (D) THE SECOND LIEN AD HOC GROUP; (E) THE UNSECURED NOTEHOLDERS; (F) THE UNSECURED NOTES AD HOC COMMITTEE; (G) THE FIRST LIEN INDENTURE TRUSTEE; (H) THE SECOND LIEN INDENTURE TRUSTEE; (I) THE 2.625% SENIOR NOTES INDENTURE TRUSTEE; (J) THE 3.125% SENIOR NOTES INDENTURE TRUSTEE; (K) THE COMMITTEE AND ITS MEMBERS; (L) ALL HOLDERS OF CLAIMS, (M) ALL HOLDERS OF INTERESTS, AND (N) WITH RESPECT TO EACH OF THE DEBTORS AND EACH OF THE FOREGOING ENTITIES IN CLAUSES (A) THROUGH (M), SUCH ENTITY AND ITS CURRENT AND FORMER AFFILIATES AND SUBSIDIARIES, AND SUCH ENTITIES' AND THEIR CURRENT AND FORMER AFFILIATES' AND SUBSIDIARIES' CURRENT AND FORMER DIRECTORS, MANAGERS, OFFICERS, EQUITY HOLDERS (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), PREDECESSORS, SUCCESSORS, AND ASSIGNS, SUBSIDIARIES, AND EACH OF THEIR RESPECTIVE CURRENT AND FORMER EQUITY HOLDERS, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS, MEMBERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITY AS SUCH COLLECTIVELY; *PROVIDED* THAT ANY HOLDER OF A CLAIM OR INTEREST THAT OPTS OUT OR OTHERWISE OBJECTS TO THE RELEASES IN THE PLAN SHALL NOT BE A "RELEASING PARTY."

AS A "RELEASING PARTY" UNDER THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE VIII.C OF THE PLAN, AS SET FORTH ABOVE. YOU MAY ELECT NOT TO GRANT THE RELEASE CONTAINED IN ARTICLE VIII.C OF THE PLAN ONLY IF YOU CHECK THE BOX BELOW. THE ELECTION TO WITHHOLD CONSENT TO GRANT SUCH RELEASE IS AT YOUR OPTION. BY OPTING OUT OF THE RELEASES SET FORTH IN ARTICLE VIII.C OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE VIII OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.

2

**The Holder of the Claim set forth in Item 1 elects to:**

☐ **OPT OUT** of the Third Party Release

**Item 3.  Certifications.**

By signing this Opt Out Form, the undersigned certifies:

(a)  that, as of the Voting Record Date, either:  (i) the Entity is the holder of the Claim set forth in Item 1; or (ii) the Entity is an authorized signatory for an Entity that is a holder of a Claim set forth in Item 1;

(b)  that the holder has received a copy of the **Notice of Non-Voting Status to Holders of Unimpaired Claims Conclusively Presumed to Accept the Plan** and that this Opt Out Form is made pursuant to the terms and conditions set forth therein;

(c)  that the Entity has submitted the same respective election concerning the releases with respect to all Claims in a single Class set forth in Item 1; and

(d)  that no other Opt Out Form with respect to the amount(s) of Claims identified in Item 1 have been submitted or, if any other Opt Out Forms have been submitted with respect to such Claims, then any such earlier Opt Out Forms are hereby revoked.

| | |
|---|---|
| Name of Holder: | |
| | (Print or Type) |
| Signature: | |
| Name of Signatory: | |
| | (If other than holder) |
| Title: | |
| Address: | |
| | |
| | |
| Telephone Number: | |
| Email: | |
| Date Completed: | |

3

**PLEASE EITHER (1) COMPLETE AN ELECTRONIC OPT OUT FORM AT HTTP://WWW.KCCLLC.NET/COBALT OR (2) COMPLETE, SIGN, AND DATE THIS OPT OUT FORM AND RETURN IT PROMPTLY VIA FIRST CLASS MAIL (OR IN THE ENCLOSED REPLY ENVELOPE PROVIDED), OVERNIGHT COURIER, OR HAND DELIVERY TO:**

**Cobalt Ballot Processing**
**c/o Kurtzman Carson Consultants LLC**
**2335 Alaska Avenue,**
**El Segundo, California 90245**

4

## SCHEDULE 5A

**Form of Impaired Non-Voting Status Notice**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| COBALT INTERNATIONAL ENERGY, INC., *et al.*,[1] | ) | Case No. 17-36709 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**NOTICE OF NON-VOTING STATUS TO HOLDERS OF
IMPAIRED CLAIMS AND EQUITY INTERESTS DEEMED TO REJECT THE PLAN**

**PLEASE TAKE NOTICE THAT** on March 8, 2018, the United States Bankruptcy Court for the Southern District of Texas entered an order [Docket No. [●]] (the "Disclosure Statement Order"):  (a) authorizing Cobalt International Energy, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors") to solicit acceptances for the *Fourth Amended Joint Chapter 11 Plan of Cobalt International Energy, Inc. and Its Debtor Affiliates* (as modified, amended, or supplemented from time to time, the "Plan"),[2] (b) approving the *Disclosure Statement for the Fourth Amended Joint Chapter 11 Plan of Cobalt International Energy, Inc. and Its Debtor Affiliates* (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code, (c) approving the solicitation materials and documents to be included in the solicitation packages, and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** because of the nature and treatment of your Claim or Interest under the Plan, *you are not entitled to vote on the Plan*.  Specifically, under the terms of the Plan, as a holder of a Claim or Interest (as currently asserted against the Debtors) that is receiving no distribution under the Plan, you are deemed to reject the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote on the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider confirmation of the Plan (the "Confirmation Hearing") will commence on **April 3, 2018, at 8:30 a.m.**, prevailing Central Time, before the Honorable Marvin Isgur, in the United States Bankruptcy Court for the Southern District of Texas, located at 515 Rusk Street Houston, Texas 77002.

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Cobalt International Energy, Inc. (1169); Cobalt International Energy GP, LLC (7374); Cobalt International Energy, L.P. (2411); Cobalt GOM LLC (7188); Cobalt GOM # 1 LLC (7262); and Cobalt GOM # 2 LLC (7316).  The Debtors' service address is:  920 Memorial City Way, Suite 100, Houston, Texas 77024.

[2]   Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan.

1

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the Plan is **March 27, 2018, at 4:00 p.m.**, prevailing Central Time (the "Plan Objection Deadline"). Any objection to the Plan *must*:  (a) be in writing, (b) conform to the Bankruptcy Rules, the Bankruptcy Local Rules, and any orders of the Court, (c) state, with particularity, the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection, and (d) be filed with the Court (contemporaneously with a proof of service).

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you should contact Kurtzman Carson Consultants LLC, the notice and claims agent retained by the Debtors in the chapter 11 cases (the "Notice and Claims Agent"), by:  (a) calling the Notice and Claims Agent at (866) 967-1782 (toll free) or (310) 751-2682 (international), (b) visiting the Debtors' restructuring website at: https://www.kccllc.net/cobalt, (c) writing to the Notice and Claims Agent at Cobalt Ballot Processing, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245, and/or (d) emailing CobaltInfo@kccllc.com.  You may also obtain copies of any pleadings filed in the chapter 11 cases for a fee via PACER at: http://www.ecf.txsb.uscourts.gov.

---

ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND **ARTICLE VIII.C CONTAINS A THIRD-PARTY RELEASE**.  THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

**ALL HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS THAT DO NOT FILE AN OBJECTION WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES THAT EXPRESSLY OBJECTS TO THE INCLUSION OF SUCH HOLDER AS A RELEASING PARTY UNDER THE PROVISIONS CONTAINED IN ARTICLE VIII.C OF THE PLAN OR DO NOT ELECT TO OPT OUT OF THE PROVISIONS CONTAINED IN ARTICLE VIII.C OF THE PLAN USING THE ENCLOSED OPT OUT FORM WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES.  BY OBJECTING TO THE RELEASES SET FORTH IN ARTICLE VIII.C OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE VIII.C OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.**

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE NOTICE AND CLAIMS AGENT.**

## RELEASES, EXCULPATIONS, AND INJUNCTIONS

Please be advised that the Plan contains certain releases, exculpation provisions, and injunctions, as set forth in the Plan and below:

### Relevant Definitions

"*Exculpated Parties*" means, collectively, and in each case in its capacity as such:  (a) the Debtors; (b) the Plan Administrator; (c) the Committee and any other official committees appointed in the Chapter 11 Cases and each of their respective members; and (d) with respect to each of the foregoing, such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

"*Released Parties*" means each of the following, solely in its capacity as such:  (a) the First Lien Noteholders; (b) the First Lien Ad Hoc Group; (c) the Second Lien Noteholders; (d) the Second Lien Ad Hoc Group; (e) the Unsecured Noteholders; (f) the Unsecured Notes Ad Hoc Committee; (g) the First Lien Indenture Trustee; (h) the Second Lien Indenture Trustee; (i) the 2.625% Senior Notes Indenture Trustee; (j) the 3.125% Senior Notes Indenture Trustee; (k) the Committee and its members; and (l) with respect to each of the Debtors and each of the foregoing entities in clauses (a) through (k), such Entity and its current and former Affiliates and subsidiaries, and such Entities' and their current and former Affiliates' and subsidiaries' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; *provided* that any holder of a Claim or Interest that opts out or otherwise objects to the releases in the Plan shall not be a "Released Party."

"*Releasing Party*" means collectively:  (a) the First Lien Noteholders; (b) the First Lien Ad Hoc Group; (c) the Second Lien Noteholders; (d) the Second Lien Ad Hoc Group; (e) the Unsecured Noteholders; (f) the Unsecured Notes Ad Hoc Committee; (g) the First Lien Indenture Trustee; (h) the Second Lien Indenture Trustee; (i) the 2.625% Senior Notes Indenture Trustee; (j) the 3.125% Senior Notes Indenture Trustee; (k) the Committee and its members; (l) all holders of Claims, (m) all holders of Interests, and (n) with respect to each of the Debtors and each of the foregoing entities in clauses (a) through (m), such Entity and its current and former Affiliates and subsidiaries, and such Entities' and their current and former Affiliates' and subsidiaries' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such collectively; *provided* that any holder of a Claim or Interest that opts out or otherwise objects to the releases in the Plan shall not be a "Releasing Party."

3

**DEBTOR RELEASE.**  Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtors, that the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Sale Transaction, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Sale Transaction, the Plan, or the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything contained herein to the contrary, the foregoing release does not release any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.B by the Debtors, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute its finding that each release described in this Article VIII.B is:  (1) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such Claims; (2) in the best interests of the Debtors and all holders of Interests and Claims; (3) fair, equitable, and reasonable; (4) given and made after due notice and opportunity for hearing; and (5) a bar to any of the Debtors asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

**THIRD PARTY RELEASE.**  As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Sale Transaction, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring

4

Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Sale Transaction, the Plan, or the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything contained herein to the contrary, the foregoing release does not release any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.C, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute its finding that each release described in this Article VIII.C is: (1) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such Claims; (2) in the best interests of the Debtors and all holders of Interests and Claims; (3) fair, equitable, and reasonable; (4) given and made after due notice and opportunity for hearing; and (5) a bar to any of the Debtors asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

EXCULPATION.  Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the Sale Transaction, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

INJUNCTION.  Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, discharged,

5

or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Exculpated Parties, or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

Upon entry of the Confirmation Order, all holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Each holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article VIII.E of the Plan.

Houston, Texas
Dated: _____, 2018

/s/ _____

Zack A. Clement (Texas Bar No. 04361550)
**ZACK A. CLEMENT PLLC**
3753 Drummond Street
Houston, Texas 77025
Telephone: (832) 274-7629

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Chad J. Husnick, P.C. (admitted *pro hac vice*)
Brad Weiland (admitted *pro hac vice*)
W. Benjamin Winger (admitted *pro hac vice*)
Laura Krucks (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Co-Counsel to the Debtors and Debtors in Possession*

## SCHEDULE 5B

**Form of Class 10 Master Opt Out Form**

**OPTIONAL: RELEASE OPT OUT FORM**

You are receiving this master opt out form (the "Master Opt Out Form") because you are the Nominee (as defined below) of a Beneficial Holder[1] of Class 10 Interests in Cobalt (the "Class 10 Interests") as of March 5, 2018 (the "Voting Record Date").

**This Master Opt Out Form is to be used by you as a broker, bank, or other nominee; or as the agent of a broker, bank, or other nominee (each of the foregoing, a "Nominee"); or as the proxy holder of a Nominee for certain Beneficial Holders' Class 10 Interests, to transmit to Kurtzman Carson Consultants LLC (the "Notice and Claims Agent") the election of such Beneficial Holders to opt out of the releases contained in Article VIII.C of the** *Fourth Amended Joint Chapter 11 Plan of Cobalt International Energy, Inc. and Its Debtor Affiliates* **(as may be amended from time to time, the "Plan").**

**THIS MASTER OPT OUT FORM MUST BE ACTUALLY RECEIVED BY THE NOTICE AND CLAIMS AGENT BY MARCH 28, 2018, AT 4:00 P.M., PREVAILING CENTRAL TIME (THE "VOTING DEADLINE").**

**Item 1. Certification of Authority to Opt Out.**

The undersigned certifies that, as of the Voting Record Date, the undersigned (please check the applicable box):

☐ Is a broker, bank, or other nominee for the Beneficial Holders of the Class 10 Interests in Cobalt listed in Item 2 below and is the record holder of such publicly-traded securities, or

☐ Is acting under a power of attorney and/or agency (a copy of which will be provided upon request) granted by a broker, bank, or other nominee that is the registered holder of the Class 10 Interests in Cobalt listed in Item 2 below, or

☐ Has been granted a proxy (an original of which is attached hereto) from a broker, bank, or other nominee, or a beneficial owner, that is the registered holder of the Class 10 Interests in Cobalt listed in Item 2 below,

and, accordingly, has full power and authority to elect to opt out of the releases contained in Article VIII.C of the Plan on behalf of the Beneficial Holders of the Class 10 Interests in Cobalt described in Item 2.

**Item 2. Important Information Regarding the Third Party Release**

**Article VIII.C of the Plan contains the following Third Party Release:**

**As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Sale Transaction, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Sale Transaction, the Plan, or the filing of the Chapter 11**

---

[1] A "Beneficial Holder" means a beneficial owner of publicly-traded securities whose claims or interests have not been satisfied prior to the Voting Record Date (as defined herein) pursuant to Bankruptcy Court order or otherwise, as evidenced by the securities position report from The Depository Trust Company as of the Voting Record Date.

1

**Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything contained herein to the contrary, the foregoing release does not release any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.C, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute its finding that each release described in this Article VIII.C is:  (1) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such Claims; (2) in the best interests of the Debtors and all holders of Interests and Claims; (3) fair, equitable, and reasonable; (4) given and made after due notice and opportunity for hearing; and (5) a bar to any of the Debtors asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.**

\*        \*        \*

UNDER THE PLAN, "RELEASING PARTY" MEANS COLLECTIVELY:  (A) THE FIRST LIEN NOTEHOLDERS; (B) THE FIRST LIEN AD HOC GROUP; (C) THE SECOND LIEN NOTEHOLDERS; (D) THE SECOND LIEN AD HOC GROUP; (E) THE UNSECURED NOTEHOLDERS; (F) THE UNSECURED NOTES AD HOC COMMITTEE; (G) THE FIRST LIEN INDENTURE TRUSTEE; (H) THE SECOND LIEN INDENTURE TRUSTEE; (I) THE 2.625% SENIOR NOTES INDENTURE TRUSTEE; (J) THE 3.125% SENIOR NOTES INDENTURE TRUSTEE; (K) THE COMMITTEE AND ITS MEMBERS; (L) ALL HOLDERS OF CLAIMS, (M) ALL HOLDERS OF INTERESTS, AND (N) WITH RESPECT TO EACH OF THE DEBTORS AND EACH OF THE FOREGOING ENTITIES IN CLAUSES (A) THROUGH (M), SUCH ENTITY AND ITS CURRENT AND FORMER AFFILIATES AND SUBSIDIARIES, AND SUCH ENTITIES' AND THEIR CURRENT AND FORMER AFFILIATES' AND SUBSIDIARIES' CURRENT AND FORMER DIRECTORS, MANAGERS, OFFICERS, EQUITY HOLDERS (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), PREDECESSORS, SUCCESSORS, AND ASSIGNS, SUBSIDIARIES, AND EACH OF THEIR RESPECTIVE CURRENT AND FORMER EQUITY HOLDERS, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS, MEMBERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITY AS SUCH COLLECTIVELY; *PROVIDED* THAT ANY HOLDER OF A CLAIM OR INTEREST THAT OPTS OUT OR OTHERWISE OBJECTS TO THE RELEASES IN THE PLAN SHALL NOT BE A "RELEASING PARTY."

AS A "RELEASING PARTY" UNDER THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE VIII.C OF THE PLAN, AS SET FORTH ABOVE.  YOU MAY ELECT NOT TO GRANT THE RELEASE CONTAINED IN ARTICLE VIII.C OF THE PLAN ONLY IF YOU CHECK THE BOX BELOW.  THE ELECTION TO WITHHOLD CONSENT TO GRANT SUCH RELEASE IS AT YOUR OPTION. BY OPTING OUT OF THE RELEASES SET FORTH IN ARTICLE VIII.C OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE VIII OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.

2

The undersigned transmits the following elections of Beneficial Holders of Class 10 Interests In Cobalt and certifies that the following Beneficial Holders of Class 10 Interests in Cobalt, as identified by their respective customer account numbers set forth below, are the Beneficial Holders of such Interests as of the Voting Record Date and have delivered to the undersigned, as Nominee, forms (the "Beneficial Holder Opt Out Forms") casting such elections.

If the Beneficial Holder has checked the box on Item 2 of the Beneficial Holder Opt Out Form pertaining to releases by holders of Interests, as detailed in Article VIII of the Plan, please place an X in the Item 2 column below and indicate in the appropriate column the amount of Class 10 Interests held for each such account or attach such information to this Master Opt Out Form in the form of the following table.

| Your Customer Account Number for Each Beneficial Holder of Class 10 Interests in Cobalt | Amount of Class 10 Interests Held as of Voting Record Date | **Item 2**<br><br>If the box in Item 2 of the Beneficial Holder Opt Out Form was completed, check the box in the column below<br><br>OPT OUT of the Third Party Release |
|---|---|---|
| 1 | | ☐ |
| 2 | | ☐ |
| 3 | | ☐ |
| 4 | | ☐ |
| 5 | | ☐ |
| 6 | | ☐ |
| **TOTALS** | | |

3

**Item 3. Certifications.**

Upon execution of this Master Opt Out Form, the undersigned certifies:

(a)     it has received a copy of the Master Opt Out Form and the Beneficial Opt Out Form, and has delivered the same to the Beneficial Holders of the Class 10 Interests in Cobalt listed in Item 2 above;

(b)     it has received a completed and signed Beneficial Holder Opt Out Form from each Beneficial Holder listed in Item 2 of this Master Opt Out Form;

(c)     it is the registered holder of all Class 10 Interests in Cobalt listed in Item 2 above, or

(d)     it has been authorized by each Beneficial Holder of Class 10 Interests in Cobalt listed in Item 2 above to elect to opt out of the releases contained in Article VIII.C of the Plan;

(e)     no other Master Opt Out Forms with respect to the same Class 10 Interests in Cobalt identified in Item 2 have been submitted or, if any other Master Opt Out Forms have been submitted with respect to such Claims, then any such earlier Master Opt Out Forms are hereby revoked;

(f)     it has properly disclosed:  (a) the number of Beneficial Holders of Class 10 Interests in Cobalt who completed the Beneficial Holder Opt Out Form; (b) the respective amount  of the Class 10 Interests in Cobalt owned, as the case may be, by each Beneficial Holder of Class 10 Interests in Cobalt who completed a Beneficial Holder Opt Out Form; (c) each such Beneficial Holder of Class 10 Interests in Cobalts' respective election concerning the releases; and (e) the customer account or other identification number for each such Beneficial Holder of Class 10 Interests in Cobalt; and

(g)     it will maintain forms returned by Beneficial Holder of Class 10 Interests in Cobalt (whether properly completed or defective) for at least one (1) year after the Effective Date of the Plan and disclose all such information to the Bankruptcy Court or the Debtors, if so ordered.

Name of Nominee:     _____
                                         (Print or Type)

Participant Number:

                     _____

 Name of Proxy Holder or Agent for Nominee (if applicable):


                     _____
                                         (Print or Type)

                     _____
Signature:           _____
Name of Signatory:   _____

Title:               _____
Address:             _____

                     _____

                     _____
Date Completed:      _____

4

Email Address: _____

**PLEASE COMPLETE, SIGN, AND DATE THIS MASTER OPT OUT FORM AND
RETURN IT (WITH AN ORIGINAL SIGNATURE) *PROMPTLY* IN THE ENVELOPE PROVIDED VIA
FIRST CLASS MAIL, OVERNIGHT COURIER, HAND DELIVERY, OR VIA ELECTRONIC MAIL
SERVICE TO:**

**Cobalt Ballot Processing
c/o Kurtzman Carson Consultants LLC
1290 Avenue of the Americas, 9th Floor,
New York, New York 10104
cobaltballots@kccllc.com**

## SCHEDULE 5C

### Form of Class 10 Beneficial Holder Opt Out Form

**OPTIONAL: RELEASE OPT OUT FORM**

You are receiving this Class 10 opt out form for Beneficial Holders[1] (the "Beneficial Holder Opt Out Form") because you are a Beneficial Holder of an Interest in Cobalt in Class 10 (the "Class 10 Interests in Cobalt") as of March 5, 2018 (the "Voting Record Date"). Accordingly, you have a right to opt out of the releases contained in Article VIII.C of the *Fourth Amended Joint Chapter 11 Plan of Cobalt International Energy, Inc. and Its Debtor Affiliates* (as may be amended from time to time, the "Plan").

You can elect to opt out of the release contained in Article VIII.C of the Plan through this Beneficial Holder Opt Out Form and return it to your broker, bank, or other nominee, or the agent of a broker, bank, or other nominee (each of the foregoing, a "Nominee"), who will then submit a master opt out form (the "Master Opt Out Form") on behalf of the Beneficial Holders of Class 10 Interests in Cobalt.

In order to opt out of the releases contained in Article VIII.C of the Plan, your Nominee must receive this Beneficial Holder Opt Out Form in sufficient time for your Nominee to include your election on a Master Opt Out Form that must be received by the Kurtzman Carson Consultants LLC (the "Notice and Claims Agent") before the Voting Deadline, which is **March 28, 2018, at 4:00 p.m.**, prevailing Central Time. Please allow sufficient time for your election to be included on the Master Opt Out Form completed by your Nominee. If a Master Opt Out Form recording your vote is not received by the Voting Deadline, and if the Voting Deadline is not extended, your election will not count.

**Item 1. Amount of Interest.**

The undersigned hereby certifies that, as of the Voting Record Date, the undersigned was the Beneficial Holder of Class 10 Interests in Cobalt, in the following amount (insert amount in box below, unless otherwise completed by your Nominee):



_____ shares

**Item 2. Important information regarding the Third Party Release.**

**Article VIII.C of the Plan contains the following Third Party Release:**

**As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Sale Transaction, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Sale Transaction, the Plan, or the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything contained herein to the contrary, the foregoing release does not release any**

---

[1] A "Beneficial Holder" means a beneficial owner of publicly-traded securities whose claims have not been satisfied prior to the Voting Record Date (as defined herein) pursuant to Bankruptcy Court order or otherwise, as evidenced by the securities position report from The Depository Trust Company as of the Voting Record Date.

obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.C, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute its finding that each release described in this Article VIII.C is: (1) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such Claims; (2) in the best interests of the Debtors and all holders of Interests and Claims; (3) fair, equitable, and reasonable; (4) given and made after due notice and opportunity for hearing; and (5) a bar to any of the Debtors asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

\* \* \*

UNDER THE PLAN, "RELEASING PARTY" MEANS COLLECTIVELY: (A) THE FIRST LIEN NOTEHOLDERS; (B) THE FIRST LIEN AD HOC GROUP; (C) THE SECOND LIEN NOTEHOLDERS; (D) THE SECOND LIEN AD HOC GROUP; (E) THE UNSECURED NOTEHOLDERS; (F) THE UNSECURED NOTES AD HOC COMMITTEE; (G) THE FIRST LIEN INDENTURE TRUSTEE; (H) THE SECOND LIEN INDENTURE TRUSTEE; (I) THE 2.625% SENIOR NOTES INDENTURE TRUSTEE; (J) THE 3.125% SENIOR NOTES INDENTURE TRUSTEE; (K) THE COMMITTEE AND ITS MEMBERS; (L) ALL HOLDERS OF CLAIMS, (M) ALL HOLDERS OF INTERESTS, AND (N) WITH RESPECT TO EACH OF THE DEBTORS AND EACH OF THE FOREGOING ENTITIES IN CLAUSES (A) THROUGH (M), SUCH ENTITY AND ITS CURRENT AND FORMER AFFILIATES AND SUBSIDIARIES, AND SUCH ENTITIES' AND THEIR CURRENT AND FORMER AFFILIATES' AND SUBSIDIARIES' CURRENT AND FORMER DIRECTORS, MANAGERS, OFFICERS, EQUITY HOLDERS (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), PREDECESSORS, SUCCESSORS, AND ASSIGNS, SUBSIDIARIES, AND EACH OF THEIR RESPECTIVE CURRENT AND FORMER EQUITY HOLDERS, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS, MEMBERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITY AS SUCH COLLECTIVELY; *PROVIDED* THAT ANY HOLDER OF A CLAIM OR INTEREST THAT OPTS OUT OR OTHERWISE OBJECTS TO THE RELEASES IN THE PLAN SHALL NOT BE A "RELEASING PARTY."

AS A "RELEASING PARTY" UNDER THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE VIII.C OF THE PLAN, AS SET FORTH ABOVE. YOU MAY ELECT NOT TO GRANT THE RELEASE CONTAINED IN ARTICLE VIII.C OF THE PLAN ONLY IF YOU CHECK THE BOX BELOW. THE ELECTION TO WITHHOLD CONSENT TO GRANT SUCH RELEASE IS AT YOUR OPTION. BY OPTING OUT OF THE RELEASES SET FORTH IN ARTICLE VIII.C OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE VIII OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.

### The Beneficial Holder of the Class 10 Interests in Cobalt set forth in Item 1 elects to:

☐ **OPT OUT** of the Third Party Release

**Item 3.** **Certifications.**

By signing this Beneficial Holder Opt Out Form, the undersigned certifies:

(a) that, as of the Voting Record Date, either: (i) the Entity is the holder of the Class 10 Interests in Cobalt; or (ii) the Entity is an authorized signatory for an Entity that is a holder of the Class 10 Interests;

2

(b)   that the holder has received a copy of the Notice of Non-Voting Status to Holders of Impaired Claims and Equity Interests Deemed to Reject the Plan and that this Beneficial Holder Opt Out Form is made pursuant to the terms and conditions set forth therein;

(c)   that the holder has submitted the same respective election concerning the releases with respect to all Class 10 Interests in Cobalt identified in Item 1; and

(d)   that no other Beneficial Holder Opt Out Forms with respect to the amount of the Class 10 Interests in Cobalt identified in Item 1 have been submitted or, if any other Beneficial Holder Opt Out Forms have been submitted with respect to such Class 10 Interests in Cobalt, then any such earlier Beneficial Holder Opt Out Forms are hereby revoked.

| | |
|---|---|
| Name of Holder: | |
| | (Print or Type) |
| Signature: | |
| Name of Signatory: | |
| | (If other than holder) |
| Title: | |
| Address: | |
| | |
| | |
| Telephone Number: | |
| Email: | |
| Date Completed: | |

**PLEASE COMPLETE, SIGN, AND DATE THIS BENEFICIAL HOLDER OPT OUT FORM AND RETURN IT (WITH AN ORIGINAL SIGNATURE) *PROMPTLY* IN THE ENVELOPE PROVIDED OR OTHERWISE IN ACCORDANCE WITH THE INSTRUCTIONS PROVIDED BY YOUR NOMINEE.**

<u>**SCHEDULE 5D**</u>

**Form of Class 7 Opt Out Form and Class 10 (for Registered Holders) Opt Out Form**

**OPTIONAL: RELEASE OPT OUT FORM**

You are receiving this opt out form (the "Opt Out Form") because you are a holder of a Claim or Interest that is not entitled to vote on the *Fourth Amended Joint Chapter 11 Plan of Cobalt International Energy, Inc. and Its Debtor Affiliates* (as may be amended from time to time, the "Plan").  If you choose to opt out of the releases set forth in Article VIII.C of the Plan, either (1) complete an electronic Opt Out Form at http://www.kccllc.net/cobalt or (2) complete, sign, and date this Opt Out Form and return it promptly via first class mail (or in the enclosed reply envelope provided), overnight courier, or hand delivery to Kurtzman Carson Consultants LLC (the "Notice and Claims Agent") at the address set forth below:

**Cobalt Ballot Processing**
**c/o Kurtzman Carson Consultants LLC**
**2335 Alaska Avenue,**
**El Segundo, California 90245**

**THIS OPT OUT FORM MUST BE ACTUALLY RECEIVED BY THE NOTICE AND CLAIMS AGENT BY MARCH 28, 2018, AT 4:00 P.M. PREVAILING CENTRAL TIME (THE "VOTING DEADLINE").  IF THE OPT OUT FORM IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED.**

**Item 1**.  **Amount of Claim or Interest.**

The undersigned hereby certifies that, as of the Voting Record Date, the undersigned was the holder of either (1) a Class 7 Section 510(b) Claim in the following aggregate amount(s) or (2) a registered holder of  Class 10 Interests in Cobalt in the following  (insert amount in box below):

| |
|---|
| Section 510(b) Amount $_____ |
| Class 10 Interests in Cobalt  _____ (shares) |

**Item 2**.  **Important information regarding the Third Party Release.**

**Article VIII.C of the Plan contains the following Third Party Release:**

**As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Sale Transaction, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Sale Transaction, the Plan, or the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything contained herein to the contrary, the foregoing release does not release any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.C, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute its finding that each release**

1

described in this Article VIII.C is:  (1) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such Claims; (2) in the best interests of the Debtors and all holders of Interests and Claims; (3) fair, equitable, and reasonable; (4) given and made after due notice and opportunity for hearing; and (5) a bar to any of the Debtors asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

\*     \*     \*

UNDER THE PLAN, "RELEASING PARTY" MEANS COLLECTIVELY:  (A) THE FIRST LIEN NOTEHOLDERS; (B) THE FIRST LIEN AD HOC GROUP; (C) THE SECOND LIEN NOTEHOLDERS; (D) THE SECOND LIEN AD HOC GROUP; (E) THE UNSECURED NOTEHOLDERS; (F) THE UNSECURED NOTES AD HOC COMMITTEE; (G) THE FIRST LIEN INDENTURE TRUSTEE; (H) THE SECOND LIEN INDENTURE TRUSTEE; (I) THE 2.625% SENIOR NOTES INDENTURE TRUSTEE; (J) THE 3.125% SENIOR NOTES INDENTURE TRUSTEE; (K) THE COMMITTEE AND ITS MEMBERS; (L) ALL HOLDERS OF CLAIMS, (M) ALL HOLDERS OF INTERESTS, AND (N) WITH RESPECT TO EACH OF THE DEBTORS AND EACH OF THE FOREGOING ENTITIES IN CLAUSES (A) THROUGH (M), SUCH ENTITY AND ITS CURRENT AND FORMER AFFILIATES AND SUBSIDIARIES, AND SUCH ENTITIES' AND THEIR CURRENT AND FORMER AFFILIATES' AND SUBSIDIARIES' CURRENT AND FORMER DIRECTORS, MANAGERS, OFFICERS, EQUITY HOLDERS (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), PREDECESSORS, SUCCESSORS, AND ASSIGNS, SUBSIDIARIES, AND EACH OF THEIR RESPECTIVE CURRENT AND FORMER EQUITY HOLDERS, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS, MEMBERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITY AS SUCH COLLECTIVELY; *PROVIDED* THAT ANY HOLDER OF A CLAIM OR INTEREST THAT OPTS OUT OR OTHERWISE OBJECTS TO THE RELEASES IN THE PLAN SHALL NOT BE A "RELEASING PARTY."

AS A "RELEASING PARTY" UNDER THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE VIII.C OF THE PLAN, AS SET FORTH ABOVE.  YOU MAY ELECT NOT TO GRANT THE RELEASE CONTAINED IN ARTICLE VIII.C OF THE PLAN ONLY IF YOU CHECK THE BOX BELOW.  THE ELECTION TO WITHHOLD CONSENT TO GRANT SUCH RELEASE IS AT YOUR OPTION. BY OPTING OUT OF THE RELEASES SET FORTH IN ARTICLE VIII.C OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE VIII OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.

2

**The Holder of the Claim or Interest set forth in Item 1 elects to:**

☐ **OPT OUT** of the Third Party Release

**Item 3.  Certifications.**

By signing this Opt Out Form, the undersigned certifies:

(a)   that, as of the Voting Record Date, either:  (i) the Entity is the holder of the Claim or Interest set forth in Item 1; or (ii) the Entity is an authorized signatory for an Entity that is a holder of a Claim or Interest set forth in Item 1;

(b)   that the holder has received a copy of the Notice of Non-Voting Status to Holders of Impaired Claims and Equity Interests Deemed to Reject the Plan and that this Opt Out Form is made pursuant to the terms and conditions set forth therein;

(c)   that the Entity has submitted the same respective election concerning the releases with respect to all Claims or Interests in a single Class set forth in Item 1; and

(d)   that no other Opt Out Form with respect to the amount(s) of Claims or Interests identified in Item 1 have been submitted or, if any other Opt Out Forms have been submitted with respect to such Claims or Interests, then any such earlier Opt Out Forms are hereby revoked.

| | |
|---|---|
| Name of Holder: | |
| | (Print or Type) |
| Signature: | |
| Name of Signatory: | |
| | (If other than holder) |
| Title: | |
| Address: | |
| | |
| | |
| Telephone Number: | |
| Email: | |
| Date Completed: | |

**PLEASE EITHER (1) COMPLETE AN ELECTRONIC OPT OUT FORM AT HTTP://WWW.KCCLLC.NET/COBALT OR (2) COMPLETE, SIGN, AND DATE THIS OPT OUT FORM AND RETURN IT PROMPTLY VIA FIRST CLASS MAIL (OR IN THE ENCLOSED REPLY ENVELOPE PROVIDED), OVERNIGHT COURIER, OR HAND DELIVERY TO:**

**Cobalt Ballot Processing**
**c/o Kurtzman Carson Consultants LLC**
**2335 Alaska Avenue,**
**El Segundo, California 90245**

3

## SCHEDULE 6

### Form of Notice to Disputed Claim Holders

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| COBALT INTERNATIONAL ENERGY, INC., *et al.*,[1] | ) | Case No. 17-36709 (MI) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

### NOTICE OF NON-VOTING STATUS WITH RESPECT TO DISPUTED CLAIMS

**PLEASE TAKE NOTICE THAT** on March 8, 2018, the United States Bankruptcy Court for the Southern District of Texas entered an order [Docket No. [●]] (the "Disclosure Statement Order"): (a) authorizing Cobalt International Energy, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors") to solicit acceptances for the *Fourth Amended Joint Chapter 11 Plan of Cobalt International Energy, Inc. and Its Debtor Affiliates* (as modified, amended, or supplemented from time to time, the "Plan"),[2] (b) approving the *Disclosure Statement for the Fourth Amended Joint Chapter 11 Plan of Cobalt International Energy, Inc. and Its Debtor Affiliates* (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code, (c) approving the solicitation materials and documents to be included in the solicitation packages, and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** you are receiving this notice because you are the holder of a Claim that is subject to a pending objection by the Debtors. **You are not entitled to vote any disputed portion of your Claim on the Plan unless one or more of the following events have taken place on prior to the date of the Confirmation Hearing** (each, a "Resolution Event"):

1. an order of the Court is entered allowing such Claim pursuant to section 502(b) of the Bankruptcy Code, after notice and a hearing;

2. an order of the Court is entered temporarily allowing such Claim for voting purposes only pursuant to Bankruptcy Rule 3018(a), after notice and a hearing;

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Cobalt International Energy, Inc. (1169); Cobalt International Energy GP, LLC (7374); Cobalt International Energy, L.P. (2411); Cobalt GOM LLC (7188); Cobalt GOM # 1 LLC (7262); and Cobalt GOM # 2 LLC (7316).  The Debtors' service address is: 920 Memorial City Way, Suite 100, Houston, Texas 77024.

[2]   Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan.

1

3.      a stipulation or other agreement is executed between the holder of such Claim and the Debtors temporarily allowing the holder of such Claim to vote its Claim in an agreed upon amount; or

4.      the pending objection to such Claim is voluntarily withdrawn by the objecting party.

Accordingly, this notice is being sent to you for informational purposes only.

**PLEASE TAKE FURTHER NOTICE THAT** the Disclosure Statement, Disclosure Statement Order, the Plan, and other documents and materials included in the Solicitation Package, except ballots, may be obtained at no charge from Kurtzman Carson Consultants LLC, the notice and claims agent retained by the Debtors in the chapter 11 cases (the "Notice and Claims Agent") by:  (a) calling the Notice and Claims Agent at (866) 967-1782 (toll free) or (310) 751-2682 (international), (b) visiting the Debtors' restructuring website at: https://www.kccllc.net/cobalt, (c) writing to the Notice and Claims Agent at Cobalt Ballot Processing, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245, and/or (d) emailing CobaltInfo@kccllc.com.  You may also obtain copies of any pleadings filed in the chapter 11 cases for a fee via PACER at:  http://ecf.txsb.uscourts.gov.

**PLEASE TAKE FURTHER NOTICE THAT** if a Resolution Event occurs at least two (2) business days prior to the Voting Deadline, then no later than one (1) business day after a Resolution Event, the Notice and Claims Agent shall distribute a ballot, and a pre-addressed, postage pre-paid envelope to you, which must be returned to the Notice and Claims Agent no later than the Voting Deadline, which is on **March 28, 2018, at 4:00 p.m.**, prevailing Central Time.

**PLEASE TAKE FURTHER NOTICE THAT** if you have any questions about the status of any of your Claims, you should contact the Notice and Claims Agent in accordance with the instructions provided above.

2

ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND **ARTICLE VIII.C CONTAINS A THIRD-PARTY RELEASE**.  THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

**ALL HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS THAT DO NOT FILE AN OBJECTION WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES THAT EXPRESSLY OBJECTS TO THE INCLUSION OF SUCH HOLDER AS A RELEASING PARTY UNDER THE PROVISIONS CONTAINED IN ARTICLE VIII.C OF THE PLAN OR DO NOT ELECT TO OPT OUT OF THE PROVISIONS CONTAINED IN ARTICLE VIII.C OF THE PLAN USING THE DOCUMENTS PROVIDED, IF ANY, WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES.  BY OBJECTING TO THE RELEASES SET FORTH IN ARTICLE VIII.C OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE VIII.C. OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.**

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE NOTICE AND CLAIMS AGENT.**

## RELEASES, EXCULPATIONS, AND INJUNCTIONS

Please be advised that the Plan contains certain releases, injunctions, and exculpation provisions, as set forth in the Plan and below:

**Relevant Definitions**

"*Exculpated Parties*" means, collectively, and in each case in its capacity as such:  (a) the Debtors; (b) the Plan Administrator; (c) the Committee and any other official committees appointed in the Chapter 11 Cases and each of their respective members; and (d) with respect to each of the foregoing, such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

"*Released Parties*" means each of the following, solely in its capacity as such:  (a) the First Lien Noteholders; (b) the First Lien Ad Hoc Group; (c) the Second Lien Noteholders; (d) the Second Lien Ad Hoc Group; (e) the Unsecured Noteholders; (f) the Unsecured Notes Ad Hoc Committee; (g) the First Lien Indenture Trustee; (h) the Second Lien Indenture Trustee; (i) the 2.625% Senior Notes Indenture Trustee; (j) the 3.125% Senior Notes Indenture Trustee; (k) the Committee and its members; and (l) with respect to each of the Debtors and each of the

3

foregoing entities in clauses (a) through (k), such Entity and its current and former Affiliates and subsidiaries, and such Entities' and their current and former Affiliates' and subsidiaries' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; *provided* that any holder of a Claim or Interest that opts out or otherwise objects to the releases in the Plan shall not be a "Released Party."

"*Releasing Party*" means collectively:  (a) the First Lien Noteholders; (b) the First Lien Ad Hoc Group; (c) the Second Lien Noteholders; (d) the Second Lien Ad Hoc Group; (e) the Unsecured Noteholders; (f) the Unsecured Notes Ad Hoc Committee; (g) the First Lien Indenture Trustee; (h) the Second Lien Indenture Trustee; (i) the 2.625% Senior Notes Indenture Trustee; (j) the 3.125% Senior Notes Indenture Trustee; (k) the Committee and its members; (l) all holders of Claims, (m) all holders of Interests, and (n) with respect to each of the Debtors and each of the foregoing entities in clauses (a) through (m), such Entity and its current and former Affiliates and subsidiaries, and such Entities' and their current and former Affiliates' and subsidiaries' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such collectively; *provided* that any holder of a Claim or Interest that opts out or otherwise objects to the releases in the Plan shall not be a "Releasing Party."

**DEBTOR RELEASE.  Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtors, that the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Sale Transaction, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Sale Transaction, the Plan, or the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or**

4

other occurrence taking place on or before the Effective Date.  Notwithstanding anything contained herein to the contrary, the foregoing release does not release any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.B by the Debtors, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute its finding that each release described in this Article VIII.B is:  (1) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such Claims; (2) in the best interests of the Debtors and all holders of Interests and Claims; (3) fair, equitable, and reasonable; (4) given and made after due notice and opportunity for hearing; and (5) a bar to any of the Debtors asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

**THIRD PARTY RELEASE**.  As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Sale Transaction, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Sale Transaction, the Plan, or the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything contained herein to the contrary, the foregoing release does not release any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.C, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute its finding that each release described in this Article VIII.C is: (1) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such Claims; (2) in the best interests of the Debtors and all holders of Interests and Claims; (3) fair, equitable, and reasonable; (4) given and made after due notice and opportunity for hearing; and (5) a bar to any of the Debtors asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

5

**EXCULPATION.**  Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the Sale Transaction, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

**INJUNCTION.**  Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Exculpated Parties, or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

Upon entry of the Confirmation Order, all holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct

6

**and indirect affiliates shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.  Each holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article VIII.E of the Plan.**

Houston, Texas
Dated: _____, 2018          */s/*  _____
                                   Zack A. Clement (Texas Bar No. 04361550)
                                   **ZACK A. CLEMENT PLLC**
                                   3753 Drummond Street
                                   Houston, Texas 77025
                                   Telephone: (832) 274-7629

                                   -and-

                                   James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
                                   Marc Kieselstein, P.C. (admitted *pro hac vice*)
                                   Chad J. Husnick, P.C. (admitted *pro hac vice*)
                                   Brad Weiland (admitted *pro hac vice*)
                                   W. Benjamin Winger (admitted *pro hac vice*)
                                   Laura Krucks (admitted *pro hac vice*)
                                   **KIRKLAND & ELLIS LLP**
                                   **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                   300 North LaSalle Street
                                   Chicago, Illinois 60654
                                   Telephone:    (312) 862-2000
                                   Facsimile:    (312) 862-2200

                                   *Co-Counsel to the Debtors and Debtors in Possession*

## SCHEDULE 7

**Form of Cover Letter**



_____, 2018

<u>Via First Class Mail</u>

**RE**:    **In re Cobalt International Energy, Inc.,** *et al.***,**
       **Chapter 11 Case No. 17-36709 (MI) (Jointly Administered)**

TO ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN:

Cobalt International Energy, Inc. and its affiliated debtors and debtors in possession (collectively, the "<u>Debtors</u>")[1] each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of Texas on December 14, 2017.

You have received this letter and the enclosed materials because you are entitled to vote on the *Fourth Amended Joint Chapter 11 Plan of Cobalt International Energy, Inc. and Its Debtor Affiliates* (as modified, amended, or supplemented from time to time, the "<u>Plan</u>").[2]  On March 8, 2018, the Court entered an order (the "<u>Disclosure Statement Order</u>"):  (a) authorizing the Debtors to solicit acceptances for the Plan, (b) approving the *Disclosure Statement for the Fourth Amended Joint Chapter 11 Plan of Cobalt International Energy, Inc. and Its Debtor Affiliates* (the "<u>Disclosure Statement</u>") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code, (c) approving the solicitation materials and documents to be included in the solicitation packages (the "<u>Solicitation Package</u>"), and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan, and for filing objections to the Plan.

> YOU ARE RECEIVING THIS LETTER BECAUSE YOU ARE ENTITLED TO VOTE ON THE PLAN.  THEREFORE, YOU SHOULD READ THIS LETTER CAREFULLY AND DISCUSS IT WITH YOUR ATTORNEY.  IF YOU DO NOT HAVE AN ATTORNEY, YOU MAY WISH TO CONSULT ONE.

In addition to this cover letter, the enclosed materials comprise your Solicitation Package, and were approved by the Court for distribution to holders of Claims in connection with the solicitation of votes to accept the Plan.  The Solicitation Package consists of the following:

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Cobalt International Energy, Inc. (1169); Cobalt International Energy GP, LLC (7374); Cobalt International Energy, L.P. (2411); Cobalt GOM LLC (7188); Cobalt GOM # 1 LLC (7262); and Cobalt GOM # 2 LLC (7316).  The Debtors' service address is:  920 Memorial City Way, Suite 100, Houston, Texas 77024.

[2]    Capitalized terms used but not otherwise defined herein have the meanings as set forth in the Plan.

1

a. a copy of the Solicitation and Voting Procedures in electronic format;

b. a ballot, together with detailed voting instructions and a pre-addressed, postage prepaid return envelope;

c. this letter;

d. the Disclosure Statement, as approved by the Bankruptcy Court (and exhibits thereto, including the Plan) in electronic format;

e. the Disclosure Statement Order (excluding the exhibits thereto, except the Solicitation and Voting Procedures) in electronic format;

f. the notice of the hearing to consider confirmation of the Plan; and

g. such other materials as the Court may direct.

Cobalt International Energy, Inc. (on behalf of itself and each of the other Debtors) has approved the filing of the Plan and the solicitation of votes to accept the Plan. The Debtors believe that the acceptance of the Plan is in the best interests of their estates, holders of Claims, and all other parties in interest. Moreover, the Debtors believe that any alternative other than confirmation of the Plan could result in extensive delays and increased administrative expenses, which, in turn, likely would result in smaller distributions (or no distributions) on account of Claims asserted in the chapter 11 cases.

---

**THE DEBTORS STRONGLY URGE YOU TO PROPERLY AND TIMELY SUBMIT YOUR BALLOT CASTING A VOTE TO ACCEPT THE PLAN. BALLOTS SHOULD BE SUBMITTED IN ACCORDANCE WITH THE INSTRUCTIONS INDICATED ON YOUR BALLOT.**

**THE VOTING DEADLINE IS MARCH 28, 2018, AT 4:00 P.M., PREVAILING CENTRAL TIME.**

---

The materials in the Solicitation Package are intended to be self-explanatory. If you should have any questions, however, please contact Kurtzman Carson Consultants LLC, the notice and claims agent retained by the Debtors in the chapter 11 cases (the "Notice and Claims Agent"), by: (a) calling the Notice and Claims Agent at (866) 967-1782 (toll free) or (310) 751-2682 (international), (b) visiting the Debtors' restructuring website at: https://www.kccllc.net/cobalt, (c) writing to the Notice and Claims Agent at Cobalt Ballot Processing, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245, and/or (d) emailing CobaltInfo@kccllc.com. You may also obtain copies of any pleadings filed in the chapter 11 cases for a fee via PACER at: http://ecf.txsb.uscourts.gov. Please be advised that the Notice and Claims Agent is authorized to answer questions about and provide additional copies of the solicitation materials, but may *not* advise you as to whether you should vote to accept or reject the Plan.

3

Sincerely,

_____

Cobalt International Energy, Inc. on its own behalf and for each of the Debtors

4

## **SCHEDULE 8**

**Form of Confirmation Hearing Notice**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| COBALT INTERNATIONAL ENERGY, INC., *et al.*,[1] | ) | Case No. 17-36709 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**NOTICE OF HEARING TO CONSIDER
CONFIRMATION OF THE CHAPTER 11 PLAN FILED BY THE
DEBTORS AND RELATED VOTING AND OBJECTION DEADLINES**

**PLEASE TAKE NOTICE THAT** on March 8, 2018, the United States Bankruptcy Court for the Southern District of Texas entered an order [Docket No. [●]] (the "Disclosure Statement Order"):  (a) authorizing Cobalt International Energy, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors"), to solicit acceptances for the *Fourth Amended Joint Chapter 11 Plan of Cobalt International Energy, Inc. and Its Debtor Affiliates* (as modified, amended, or supplemented from time to time, the "Plan"),[2] (b) approving the *Disclosure Statement for the Fourth Amended Joint Chapter 11 Plan of Cobalt International Energy, Inc. and Its Debtor Affiliates* (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code, (c) approving the solicitation materials and documents to be included in the solicitation packages (the "Solicitation Packages"), and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider confirmation of the Plan (the "Confirmation Hearing") will commence on **April 3, 2018, at 8:30 a.m.**, prevailing Central Time, before the Honorable Judge Marvin Isgur, in the United States Bankruptcy Court for the Southern District of Texas, located at 515 Rusk Street Houston, Texas 77002.

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Cobalt International Energy, Inc. (1169); Cobalt International Energy GP, LLC (7374); Cobalt International Energy, L.P. (2411); Cobalt GOM LLC (7188); Cobalt GOM # 1 LLC (7262); and Cobalt GOM # 2 LLC (7316).  The Debtors' service address is:  920 Memorial City Way, Suite 100, Houston, Texas 77024.

[2]   Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan.

1

**PLEASE BE ADVISED**:  THE CONFIRMATION HEARING MAY BE CONTINUED FROM TIME TO TIME BY THE COURT OR THE DEBTORS **WITHOUT FURTHER NOTICE** OTHER THAN BY SUCH ADJOURNMENT BEING ANNOUNCED IN OPEN COURT OR BY A NOTICE OF ADJOURNMENT FILED WITH THE COURT AND SERVED ON ALL PARTIES ENTITLED TO NOTICE.

### CRITICAL INFORMATION REGARDING VOTING ON THE PLAN

**Voting Record Date**.  The voting record date is **March 5, 2018**, which is the date for determining which holders of Claims in Classes 4, 5, and 6 are entitled to vote on the Plan.

**Voting Deadline**.  The deadline for voting on the Plan is on **March 28, 2018, at 4:00 p.m.**, prevailing Central Time (the "Voting Deadline").  If you received a Solicitation Package, including a Ballot, and intend to vote on the Plan, you *must*: (a) follow the instructions carefully, (b) complete *all* of the required information on the ballot, and (c) either electronically submit the ballot online or execute and return your completed Ballot according to and as set forth in detail in the voting instructions so that it is *actually received* by the Debtors' notice and claims agent, Kurtzman Carson Consultants LLC (the "Notice and Claims Agent") on or before the Voting Deadline.  You may be eligible to submit a Ballot electronically. If you wish to do so, please visit the following web address and follow the instructions on that web address: http://www.kccllc.net/cobalt.  The Solicitation and Voting Procedures for the tabulation of the votes are included in the Solicitation Package.  *A failure to follow such instructions may disqualify your vote*.

### CRITICAL INFORMATION REGARDING OBJECTING TO THE PLAN

ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND **ARTICLE VIII.C CONTAINS A THIRD-PARTY RELEASE**.  THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

2

**ALL HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS THAT DO NOT FILE AN OBJECTION WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES THAT EXPRESSLY OBJECTS TO THE INCLUSION OF SUCH HOLDER AS A RELEASING PARTY UNDER THE PROVISIONS CONTAINED IN ARTICLE VIII.C OF THE PLAN OR DO NOT ELECT TO OPT OUT OF THE PROVISIONS CONTAINED IN ARTICLE VIII.C OF THE PLAN USING THE DOCUMENTS PROVIDED, IF ANY, WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES.  BY OBJECTING TO THE RELEASES SET FORTH IN ARTICLE VIII.C OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE VIII.C OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.**

**Plan Objection Deadline**.  The deadline for filing objections to the Plan is **March 27, 2018, at 4:00 p.m.**, prevailing Central Time (the "Plan Objection Deadline").  All objections to the relief sought at the Confirmation Hearing ***must***:  (a) be in writing, (b) conform to the Bankruptcy Rules, the Bankruptcy Local Rules, and any orders of the Court, (c) state, with particularity, the legal and factual basis for the objection and, if practicable, a proposed modification to the Plan (or related materials) that would resolve such objection, ***and*** (d) be filed with the Court (contemporaneously with a proof of service).

## RELEASES, EXCULPATIONS, AND INJUNCTIONS

Please be advised that the Plan contains certain releases, injunctions, and exculpation provisions, as set forth in the Plan and below:

## Relevant Definitions

"***Exculpated Parties***" means, collectively, and in each case in its capacity as such:  (a) the Debtors; (b) the Plan Administrator; (c) the Committee and any other official committees appointed in the Chapter 11 Cases and each of their respective members; and (d) with respect to each of the foregoing, such Entity and its current and former Affiliates, and such Entity's and its current and former Affiliates' current and former equity holders, subsidiaries, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such.

"***Released Parties***" means each of the following, solely in its capacity as such:  (a) the First Lien Noteholders; (b) the First Lien Ad Hoc Group; (c) the Second Lien Noteholders; (d) the Second Lien Ad Hoc Group; (e) the Unsecured Noteholders; (f) the Unsecured Notes Ad Hoc Committee; (g) the First Lien Indenture Trustee; (h) the Second Lien Indenture Trustee; (i) the 2.625% Senior Notes Indenture Trustee; (j) the 3.125% Senior Notes Indenture Trustee; (k) the Committee and its members; and (l) with respect to each of the Debtors and each of the foregoing entities in clauses (a) through (k), such Entity and its current and former Affiliates and subsidiaries, and such Entities' and their current and former Affiliates' and subsidiaries' current

3

and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals; *provided* that any holder of a Claim or Interest that opts out or otherwise objects to the releases in the Plan shall not be a "Released Party."

"***Releasing Party***" means collectively:  (a) the First Lien Noteholders; (b) the First Lien Ad Hoc Group; (c) the Second Lien Noteholders; (d) the Second Lien Ad Hoc Group; (e) the Unsecured Noteholders; (f) the Unsecured Notes Ad Hoc Committee; (g) the First Lien Indenture Trustee; (h) the Second Lien Indenture Trustee; (i) the 2.625% Senior Notes Indenture Trustee; (j) the 3.125% Senior Notes Indenture Trustee; (k) the Committee and its members; (l) all holders of Claims, (m) all holders of Interests, and (n) with respect to each of the Debtors and each of the foregoing entities in clauses (a) through (m), such Entity and its current and former Affiliates and subsidiaries, and such Entities' and their current and former Affiliates' and subsidiaries' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals, each in their capacity as such collectively; *provided* that any holder of a Claim or Interest that opts out or otherwise objects to the releases in the Plan shall not be a "Releasing Party."

**DEBTOR RELEASE.**  **Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, each Released Party is deemed released and discharged by the Debtors and their Estates, in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other entities who may purport to assert any Cause of Action, directly or derivatively, by, through, for, or because of the foregoing entities, from any and all Causes of Action, including any derivative claims, asserted on behalf of the Debtors, that the Debtors or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Sale Transaction, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Sale Transaction, the Plan, or the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything contained herein to the contrary, the foregoing release does not release any obligations of**

4

any party under the Plan or any document, instrument, or agreement executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.B by the Debtors, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute its finding that each release described in this Article VIII.B is:  (1) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such Claims; (2) in the best interests of the Debtors and all holders of Interests and Claims; (3) fair, equitable, and reasonable; (4) given and made after due notice and opportunity for hearing; and (5) a bar to any of the Debtors asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

**THIRD PARTY RELEASE**.  As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Sale Transaction, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Sale Transaction, the Plan, or the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date.  Notwithstanding anything contained herein to the contrary, the foregoing release does not release any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.C, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute its finding that each release described in this Article VIII.C is: (1) in exchange for the good and valuable consideration provided by the Released Parties, a good faith settlement and compromise of such Claims; (2) in the best interests of the Debtors and all holders of Interests and Claims; (3) fair, equitable, and reasonable; (4) given and made after due notice and opportunity for hearing; and (5) a bar to any of the Debtors asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.

5

**EXCULPATION.**   Except as otherwise specifically provided in the Plan, no Exculpated Party shall have or incur, and each Exculpated Party is released and exculpated from any Cause of Action for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Plan, the Sale Transaction, or any Restructuring Transaction, contract, instrument, release or other agreement or document created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a Final Order to have constituted actual fraud or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.   The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

**INJUNCTION.**   Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released, discharged, or are subject to exculpation are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Exculpated Parties, or the Released Parties:  (1) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (2) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (3) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (4) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such holder has Filed a motion requesting the right to perform such setoff on or before the Effective Date, and notwithstanding an indication of a Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (5) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.

Upon entry of the Confirmation Order, all holders of Claims and Interests and their respective current and former employees, agents, officers, directors, principals, and direct and indirect affiliates shall be enjoined from taking any actions to interfere with the

**implementation or Consummation of the Plan. Each holder of an Allowed Claim or Allowed Interest, as applicable, by accepting, or being eligible to accept, distributions under or Reinstatement of such Claim or Interest, as applicable, pursuant to the Plan, shall be deemed to have consented to the injunction provisions set forth in this Article VIII.E of the Plan.**

## ADDITIONAL INFORMATION

**Obtaining Solicitation Materials**. The materials in the Solicitation Package are intended to be self-explanatory. If you should have any questions or if you would like to obtain additional solicitation materials (or paper copies of solicitation materials if you received a CD-ROM), please contact the Debtors' Notice and Claims Agent, by: (a) calling the Notice and Claims Agent at (866) 967-1782 (toll free) or (310) 751-2682 (international), (b) visiting the Debtors' restructuring website at: https://www.kccllc.net/cobalt, (c) writing to the Notice and Claims Agent at Cobalt Ballot Processing, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245, and/or (d) emailing CobaltInfo@kccllc.com. You may also obtain copies of any pleadings filed in the chapter 11 cases for a fee via PACER at: http://www.ecf.txsb.uscourts.gov. Please be advised that the Notice and Claims Agent is authorized to answer questions about, and provide additional copies of, solicitation materials, but may *not* advise you as to whether you should vote to accept or reject the Plan.

**The Plan Supplement**. The Debtors will file the Plan Supplement (as defined in the Plan) pursuant to the terms of the Plan, and will serve notice on all holders of Claims entitled to vote on the Plan, which will: (a) inform parties that the Debtors filed the Plan Supplement, (b) list the information contained in the Plan Supplement, and (c) explain how parties may obtain copies of the Plan Supplement.

---

**BINDING NATURE OF THE PLAN**:

**IF CONFIRMED, THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS AND INTERESTS TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, WHETHER OR NOT SUCH HOLDER WILL RECEIVE OR RETAIN ANY PROPERTY OR INTEREST IN PROPERTY UNDER THE PLAN, HAS FILED A PROOF OF CLAIM IN THE CHAPTER 11 CASES, OR FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTED TO REJECT THE PLAN.**

---

Houston, Texas
Dated: _____, 2018

*/s/* _____

Zack A. Clement (Texas Bar No. 04361550)
**ZACK A. CLEMENT PLLC**
3753 Drummond Street
Houston, Texas 77025
Telephone: (832) 274-7629

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Chad J. Husnick, P.C. (admitted *pro hac vice*)
Brad Weiland (admitted *pro hac vice*)
W. Benjamin Winger (admitted *pro hac vice*)
Laura Krucks (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:     (312) 862-2000
Facsimile:     (312) 862-2200

*Co-Counsel to the Debtors and Debtors in Possession*

## SCHEDULE 9

**Form of Plan Supplement Notice**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| COBALT INTERNATIONAL ENERGY, INC., *et al.*,[1] | ) Case No. 17-36709 (MI) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |

**NOTICE OF FILING OF PLAN SUPPLEMENT**

PLEASE TAKE NOTICE THAT on March 8, 2018, United States Bankruptcy Court for the Southern District of Texas entered an order [Docket No. [●]] (the "Disclosure Statement Order"): (a) authorizing Cobalt International Energy, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors"), to solicit acceptances for the *Fourth Amended Joint Chapter 11 Plan of Cobalt International Energy, Inc. and Its Debtor Affiliates* (as may be modified, amended, or supplemented from time to time, the "Plan"),[2] (b) approving the *Disclosure Statement for the Fourth Amended Joint Chapter 11 Plan of Cobalt International Energy, Inc. and Its Debtor Affiliates* (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code, (c) approving the solicitation materials and documents to be included in the solicitation packages, and (e) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

PLEASE TAKE FURTHER NOTICE THAT as contemplated by the Plan and the Disclosure Statement Order, the Debtors filed the Plan Supplement with the Court on [●], 2018 [Docket No. [●]].  The Plan Supplement contains the following documents (each as defined in the Plan): (a) a list of Executory Contracts and Unexpired Leases to be assumed or assumed and assigned pursuant to the Plan, and as may be amended by the Debtors in accordance with the Plan prior to the Effective Date, (b) a schedule of the Retained Causes of Action, (c) identification and compensation of the Plan Administrator, (d) the amount of the Disputed Claims Reserve Amount, (e) a summary of the Wind Down Budget, subject to appropriate confidentiality protections, and (f) any and all other documentation necessary to effectuate the Restructuring Transactions contemplated by the Plan.

PLEASE TAKE FURTHER NOTICE THAT the hearing at which the Court will consider confirmation of the Plan (the "Confirmation Hearing") will commence on **April 3, 2018, at 8:30 a.m.**, prevailing Central Time, before the Honorable Marvin Isgur, in the United

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Cobalt International Energy, Inc. (1169); Cobalt International Energy GP, LLC (7374); Cobalt International Energy, L.P. (2411); Cobalt GOM LLC (7188); Cobalt GOM # 1 LLC (7262); and Cobalt GOM # 2 LLC (7316).  The Debtors' service address is:  920 Memorial City Way, Suite 100, Houston, Texas 77024.

[2]   Capitalized terms not otherwise defined herein shall have the same meanings as set forth in the Plan.

1

States Bankruptcy Court for the Southern District of Texas, located at 515 Rusk Street Houston, Texas 77002.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the Plan is **March 27, 2018, at 4:00 p.m.**, prevailing Central Time (the "Plan Objection Deadline"). Any objection to the Plan *must*: (a) be in writing, (b) conform to the Bankruptcy Rules, the Bankruptcy Local Rules, and any orders of the Court, (c) state, with particularity, the basis and nature of any objection to the Plan and, if practicable, a proposed modification to the Plan that would resolve such objection, and (d) be filed with the Court (contemporaneously with a proof of service).

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you should contact Kurtzman Carson Consultants LLC, the notice and claims agent retained by the Debtors in the chapter 11 cases (the "Notice and Claims Agent"), by: (a) calling the Notice and Claims Agent at (866) 967-1782 (toll free) or (310) 751-2682 (international), (b) visiting the Debtors' restructuring website at: https://www.kccllc.net/cobalt, (c) writing to the Notice and Claims Agent at Cobalt Ballot Processing, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245, and/or (d) emailing CobaltInfo@kccllc.com. You may also obtain copies of any pleadings filed in the chapter 11 cases for a fee via PACER at: http://ecf.txsb.uscourts.gov.

---

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE NOTICE AND CLAIMS AGENT.**

---

Houston, Texas
Dated: _____, 2018

*/s/* _____
Zack A. Clement (Texas Bar No. 04361550)
**ZACK A. CLEMENT PLLC**
3753 Drummond Street
Houston, Texas 77025
Telephone: (832) 274-7629

-and-

James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
Marc Kieselstein, P.C. (admitted *pro hac vice*)
Chad J. Husnick, P.C. (admitted *pro hac vice*)
Brad Weiland (admitted *pro hac vice*)
W. Benjamin Winger (admitted *pro hac vice*)
Laura Krucks (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

*Co-Counsel to the Debtors and Debtors in Possession*

3

## SCHEDULE 10

**Form of Notice of Assumption of Executory Contracts and Unexpired Leases**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| COBALT INTERNATIONAL ENERGY, INC., *et al.*,[1] | ) | Case No. 17-36709 (MI) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**NOTICE OF (A) EXECUTORY CONTRACTS AND UNEXPIRED
LEASES TO BE ASSUMED OR ASSUMED AND ASSIGNED BY
THE DEBTORS PURSUANT TO THE PLAN, (B) CURE AMOUNTS,
IF ANY, AND (C) RELATED PROCEDURES IN CONNECTION THEREWITH**

**PLEASE TAKE NOTICE THAT** on March 8, 2018, United States Bankruptcy Court for the Southern District of Texas entered an order [Docket No. [●]] (the "Disclosure Statement Order"): (a) authorizing Cobalt International Energy, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors"), to solicit acceptances for the *Fourth Amended Joint Chapter 11 Plan of Cobalt International Energy, Inc. and Its Debtor Affiliates* (as may be modified, amended, or supplemented from time to time, the "Plan"),[2] (b) approving the *Disclosure Statement for the Fourth Amended Joint Chapter 11 Plan of Cobalt International Energy, Inc. and Its Debtor Affiliates* (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code, (c) approving the solicitation materials and documents to be included in the solicitation packages, and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the Debtors filed the *Assumed or Assumed and Assigned Executory Contract and Unexpired Lease List* [Docket No. [●]] (the "Assumption and Assignment Schedule") with the Court on [●], 2018 as contemplated under the Plan. The determination to assume or assume and assign the agreements identified on the Assumption and Assignment Schedule is subject to revision.

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider confirmation of the Plan (the "Confirmation Hearing") will commence on **April 3, 2018, at 8:30 a.m.**, prevailing Central Time, before the Honorable Marvin Isgur, in the United

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Cobalt International Energy, Inc. (1169); Cobalt International Energy GP, LLC (7374); Cobalt International Energy, L.P. (2411); Cobalt GOM LLC (7188); Cobalt GOM # 1 LLC (7262); and Cobalt GOM # 2 LLC (7316). The Debtors' service address is: 920 Memorial City Way, Suite 100, Houston, Texas 77024.

[2] Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan.

2

States Bankruptcy Court for the Southern District of Texas, located at 515 Rusk Street Houston, Texas 77002.

**PLEASE TAKE FURTHER NOTICE THAT** you are receiving this notice because the Debtors' records reflect that you are a party to a contract that is listed on the Assumption and Assignment Schedule. Therefore, you are advised to review carefully the information contained in this notice and the related provisions of the Plan, including the Assumption and Assignment Schedule.

**PLEASE TAKE FURTHER NOTICE** that the Debtors are proposing to (a) assume, or (b) assume and assign the Executory Contract(s) and Unexpired Lease(s) listed in **Exhibit A** attached hereto to which you are a party in connection with the Sale Transaction.[3]

**PLEASE TAKE FURTHER NOTICE THAT** section 365(b)(1) of the Bankruptcy Code requires a chapter 11 debtor to cure, or provide adequate assurance that it will promptly cure, any defaults under Executory Contracts and Unexpired Leases at the time of assumption or assumption and assignment. Accordingly, the Debtors have conducted a thorough review of their books and records and have determined the amounts required to cure defaults, if any, under the Executory Contract(s) and Unexpired Lease(s), which amounts are listed in the table identified above. Please note that if no amount is stated for a particular Executory Contract or Unexpired Lease, the Debtors believe that there is no cure amount outstanding for such contract or lease.

**PLEASE TAKE FURTHER NOTICE THAT** absent any pending dispute, the monetary amounts required to cure any existing defaults arising under the Executory Contract(s) and Unexpired Lease(s) identified above will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, in Cash on the Effective Date on as soon as reasonably practicable thereafter, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. In the event of a dispute, however, payment of the cure amount would be made following the entry of a final order(s) resolving the dispute and approving the assumption or assumption and assignment. If an objection to the proposed assumption, assumption and assignment, or related cure amount is sustained by the Court, however, the Debtors may elect to reject such Executory Contract or Unexpired Lease in lieu of assuming or assuming and assigning it.

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the proposed cure amount, the assumption, or assumption and assignment of an Executory Contract

---

3   Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Assumption and Assignment Schedule, nor anything contained in the Plan or each Debtor's schedule of assets and liabilities, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease capable of assumption or assumption and assignment, that any Debtor(s) has any liability thereunder, or that such Executory Contract or Unexpired Lease is necessarily a binding and enforceable agreement. Further, the Debtors expressly reserve the right to (a) remove any Executory Contract or Unexpired Lease from the Assumption and Assignment Schedule and reject such Executory Contract or Unexpired Lease pursuant to the terms of the Plan, up until the Effective Date and (b) contest any Claim (or cure amount) asserted in connection with assumption or assumption and assignment of any Executory Contract or Unexpired Lease.

3

or Unexpired Lease is not later than seven (7) days after service of this notice (the "Contract Assumption Objection Deadline").  Any such objection *must*: (a) be in writing; (b) conform to the Bankruptcy Rules, the Local Bankruptcy Rules and any orders of the Court; (c) state, with particularity, the basis and nature of any objection to the proposed cure amount, assumption, or assumption and assignment of such Executory Contract or Unexpired Lease; and (d) be filed with the Court (contemporaneously with a proof of service) and served so as to be *actually received* on or before the Contract Assumption Objection Deadline:

**PLEASE TAKE FURTHER NOTICE THAT** any objections to the Plan in connection with the assumption or assumption and assignment of the Executory Contract(s) and Unexpired Lease(s) identified above and/or related cure or adequate assurances proposed in connection with the Plan that remain unresolved as of the Confirmation Hearing will be heard at the Confirmation Hearing (or such other date as fixed by the Court).

> **PLEASE TAKE FURTHER NOTICE THAT ANY COUNTERPARTY TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT FAILS TO OBJECT TIMELY TO THE PROPOSED ASSUMPTION, ASSUMPTION AND ASSIGNMENT, OR CURE AMOUNT WILL BE DEEMED TO HAVE ASSENTED TO SUCH (A) ASSUMPTION OR ASSUMPTION AND ASSIGNMENT, AND (B) CURE AMOUNT.**

**PLEASE TAKE FURTHER NOTICE THAT ASSUMPTION OR ASSUMPTION AND ASSIGNMENT OF ANY EXECUTORY CONTRACT OR UNEXPIRED LEASE PURSUANT TO THE PLAN OR OTHERWISE SHALL RESULT IN THE FULL RELEASE AND SATISFACTION OF ANY CLAIMS OR DEFAULTS, WHETHER MONETARY OR NONMONETARY, INCLUDING DEFAULTS OF PROVISIONS RESTRICTING THE CHANGE IN CONTROL OR OWNERSHIP INTEREST COMPOSITION OR OTHER BANKRUPTCY-RELATED DEFAULTS, ARISING UNDER ANY ASSUMED OR ASSUMED AND ASSIGNED EXECUTORY CONTRACT OR UNEXPIRED LEASE AT ANY TIME BEFORE THE DATE OF THE DEBTORS ASSUME OR ASSUME AND ASSIGN SUCH EXECUTORY CONTRACT OR UNEXPIRED LEASE.  ANY PROOFS OF CLAIM FILED WITH RESPECT TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT HAS BEEN ASSUMED OR ASSUMED AND ASSIGNED SHALL BE DEEMED DISALLOWED AND EXPUNGED, WITHOUT FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT.**

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you should contact Kurtzman Carson Consultants LLC, the notice and claims agent retained by the Debtors in the chapter 11 cases (the "Notice and Claims Agent"), by:  (a) calling the Notice and Claims Agent at (866) 967-1782 (toll free) or (310) 751-2682 (international), (b) visiting the Debtors' restructuring website at: https://www.kccllc.net/cobalt, (c) writing to the Notice and Claims Agent at Cobalt Ballot Processing, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245, and/or (d) emailing CobaltInfo@kccllc.com.  You may also obtain copies of any pleadings filed in the chapter 11 cases for a fee via PACER at: http://ecf.txsb.uscourts.gov.

4

5

ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND **ARTICLE VIII.C CONTAINS A THIRD-PARTY RELEASE**.  THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

**ALL HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS THAT DO NOT FILE AN OBJECTION WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES THAT EXPRESSLY OBJECTS TO THE INCLUSION OF SUCH HOLDER AS A RELEASING PARTY UNDER THE PROVISIONS CONTAINED IN ARTICLE VIII.C OF THE PLAN OR DO NOT ELECT TO OPT OUT OF THE PROVISIONS CONTAINED IN ARTICLE VIII.C OF THE PLAN USING THE DOCUMENTS PROVIDED, IF ANY, WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES.  BY OBJECTING TO THE RELEASES SET FORTH IN ARTICLE VIII.C OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE VIII.C OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.**

**THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE NOTICE AND CLAIMS AGENT.**

6

Houston, Texas
Dated: _____, 2018          */s/*
          _____

          Zack A. Clement (Texas Bar No. 04361550)
          **ZACK A. CLEMENT PLLC**
          3753 Drummond Street
          Houston, Texas 77025
          Telephone: (832) 274-7629

          -and-

          James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
          Marc Kieselstein, P.C. (admitted *pro hac vice*)
          Chad J. Husnick, P.C. (admitted *pro hac vice*)
          Brad Weiland (admitted *pro hac vice*)
          W. Benjamin Winger (admitted *pro hac vice*)
          Laura Krucks (admitted *pro hac vice*)
          **KIRKLAND & ELLIS LLP**
          **KIRKLAND & ELLIS INTERNATIONAL LLP**
          300 North LaSalle Street
          Chicago, Illinois 60654
          Telephone:    (312) 862-2000
          Facsimile:    (312) 862-2200

          *Co-Counsel to the Debtors and Debtors in Possession*

**Exhibit A**

**Schedule of Contracts and Leases and Proposed Cure Cost**

| Debtor | Counterparty | Description of Assumed or Assumed and Assigned Contracts or Leases | Cure Cost |
|--------|--------------|------------------------------------------------------------------|-----------|
|        |              |                                                                  |           |

## SCHEDULE 11

**Form of Notice of Rejection of Executory Contracts and Unexpired Leases**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| COBALT INTERNATIONAL ENERGY, INC., *et al.*,[1] | ) | Case No. 17-36709 (MI) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**NOTICE REGARDING EXECUTORY CONTRACTS
AND UNEXPIRED LEASES TO BE REJECTED PURSUANT TO THE PLAN**

**PLEASE TAKE NOTICE THAT** on March 8, 2018, United States Bankruptcy Court for the Southern District of Texas entered an order [Docket No. [●]] (the "Disclosure Statement Order"):  (a) authorizing Cobalt International Energy, Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors"), to solicit acceptances for the *Fourth Amended Joint Chapter 11 Plan of Cobalt International Energy, Inc. and Its Debtor Affiliates* (as may be modified, amended, or supplemented from time to time, the "Plan"),[2] (b) approving the *Disclosure Statement for the Fourth Amended Joint Chapter 11 Plan of Cobalt International Energy, Inc. and Its Debtor Affiliates* (the "Disclosure Statement") as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code, (c) approving the solicitation materials and documents to be included in the solicitation packages, and (d) approving procedures for soliciting, receiving, and tabulating votes on the Plan and for filing objections to the Plan.

**PLEASE TAKE FURTHER NOTICE THAT** the Debtors filed the *Rejected Executory Contract and Unexpired Lease List* [Docket No. [●]] (the "Rejection Schedule") with the Court as part of the Plan Supplement on [●], 2018, as contemplated under the Plan.  The determination to reject the agreements identified on the Rejection Schedule is subject to revision.

---

[1]   The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Cobalt International Energy, Inc. (1169); Cobalt International Energy GP, LLC (7374); Cobalt International Energy, L.P. (2411); Cobalt GOM LLC (7188); Cobalt GOM # 1 LLC (7262); and Cobalt GOM # 2 LLC (7316).  The Debtors' service address is:  920 Memorial City Way, Suite 100, Houston, Texas 77024.

[2]   Capitalized terms not otherwise defined herein have the same meanings as set forth in the Plan.

PLEASE TAKE FURTHER NOTICE THAT YOU ARE RECEIVING THIS NOTICE BECAUSE THE DEBTORS' RECORDS REFLECT THAT YOU ARE A PARTY TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE THAT WILL BE REJECTED PURSUANT TO THE PLAN.  THEREFORE, YOU ARE ADVISED TO REVIEW CAREFULLY THE INFORMATION CONTAINED IN THIS NOTICE AND THE RELATED PROVISIONS OF THE PLAN.[3]

**PLEASE TAKE FURTHER NOTICE THAT** the hearing at which the Court will consider confirmation of the Plan (the "Confirmation Hearing") will commence on **April 3, 2018, at 8:30 a.m.**, prevailing Central Time, before the Honorable Marvin Isgur, in the United States Bankruptcy Court for the Southern District of Texas, located at 515 Rusk Street Houston, Texas 77002.

**PLEASE TAKE FURTHER NOTICE THAT** all proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Bankruptcy Court by the later of:  (a) the Claims Bar Date, Administrative Claims Bar Date, or the Governmental Bar Date, as applicable, and (b) 4:00 p.m., prevailing Central Time, on the date that is thirty (30) days following the entry of an Order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.  **Any Claims arising from the rejection of an executory contract or unexpired lease not Filed within such time shall be automatically Disallowed, forever barred from assertion, and shall not be enforceable against, as applicable, the Debtors, their estates, the plan administrator, and/or the purchaser, or property of the foregoing parties, without the need for any objection by the Debtors, their estates, the plan administrator, and/or the purchaser and without the need for any further notice to, or action, order, or approval of the Bankruptcy Court.**

**PLEASE TAKE FURTHER NOTICE THAT** the deadline for filing objections to the proposed rejection of an Executory Contract or Unexpired Lease is the **March 26, 2018, at 4:00 p.m.**, prevailing Central Time.  Any such objection *must*: (a) be in writing; (b) conform to the Bankruptcy Rules, the Local Bankruptcy Rules, and any orders of the Court; (c) state, with particularity, the basis and nature of any objection to the proposed rejection of such Executory Contract or Unexpired Lease; and (d) be filed with the Court (contemporaneously with a proof of service).

**PLEASE TAKE FURTHER NOTICE THAT** any objections to Plan in connection with the rejection of the Executory Contract(s) and Unexpired Lease(s) identified above and/or related rejection damages proposed in connection with the Plan that remain unresolved as of the Confirmation Hearing will be heard at the Confirmation Hearing (or such other date as fixed by the Court).

---

[3]   Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Rejected Executory Contract and Unexpired Lease List nor anything contained in the Plan shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor or Plan Administrator has any liability thereunder.  Further, the Debtors expressly reserve the right to (a) remove any Executory Contract or Unexpired Lease from the Rejection Schedule and assume such Executory Contract or Unexpired Lease, pursuant to the terms of the Plan, up until the Effective Date and (b) contest any Claim asserted in connection with rejection of any Executory Contract or Unexpired Lease.

2

**PLEASE TAKE FURTHER NOTICE THAT** if you would like to obtain a copy of the Disclosure Statement, the Plan, the Plan Supplement, or related documents, you should contact Kurtzman Carson Consultants LLC, the notice and claims agent retained by the Debtors in the chapter 11 cases (the "Notice and Claims Agent"), by:  (a) calling the Notice and Claims Agent at (866) 967-1782 (toll free) or (310) 751-2682 (international), (b) visiting the Debtors' restructuring website at:  https://www.kccllc.net/cobalt, (c) writing to the Notice and Claims Agent at Cobalt Ballot Processing, c/o Kurtzman Carson Consultants LLC, 2335 Alaska Avenue, El Segundo, California 90245, and/or (d) emailing CobaltInfo@kccllc.com.  You may also obtain copies of any pleadings filed in the chapter 11 cases for a fee via PACER at: http://www.ecf.txsb.uscourts.gov.

ARTICLE VIII OF THE PLAN CONTAINS RELEASE, EXCULPATION, AND INJUNCTION PROVISIONS, AND **ARTICLE VIII.C CONTAINS A THIRD-PARTY RELEASE**.  THUS, YOU ARE ADVISED TO REVIEW AND CONSIDER THE PLAN CAREFULLY BECAUSE YOUR RIGHTS MIGHT BE AFFECTED THEREUNDER.

**ALL HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTORS THAT DO NOT FILE AN OBJECTION WITH THE BANKRUPTCY COURT IN THE CHAPTER 11 CASES THAT EXPRESSLY OBJECTS TO THE INCLUSION OF SUCH HOLDER AS A RELEASING PARTY UNDER THE PROVISIONS CONTAINED IN ARTICLE VIII.C OF THE PLAN OR DO NOT ELECT TO OPT OUT OF THE PROVISIONS CONTAINED IN ARTICLE VIII.C OF THE PLAN USING THE DOCUMENTS PROVIDED, IF ANY, WILL BE DEEMED TO HAVE EXPRESSLY, UNCONDITIONALLY, GENERALLY, INDIVIDUALLY, AND COLLECTIVELY CONSENTED TO THE RELEASE AND DISCHARGE OF ALL CLAIMS AND CAUSES OF ACTION AGAINST THE DEBTORS AND THE RELEASED PARTIES.  BY OBJECTING TO THE RELEASES SET FORTH IN ARTICLE VIII.C OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE VIII.C OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.**

THIS NOTICE IS BEING SENT TO YOU FOR INFORMATIONAL PURPOSES ONLY. IF YOU HAVE QUESTIONS WITH RESPECT TO YOUR RIGHTS UNDER THE PLAN OR ABOUT ANYTHING STATED HEREIN OR IF YOU WOULD LIKE TO OBTAIN ADDITIONAL INFORMATION, CONTACT THE NOTICE AND CLAIMS AGENT.

3

Houston, Texas
Dated: _____, 2018          */s/*_____
                                 Zack A. Clement (Texas Bar No. 04361550)
                                 **ZACK A. CLEMENT PLLC**
                                 3753 Drummond Street
                                 Houston, Texas 77025
                                 Telephone: (832) 274-7629

                                 -and-

                                 James H.M. Sprayregen, P.C. (admitted *pro hac vice*)
                                 Marc Kieselstein, P.C. (admitted *pro hac vice*)
                                 Chad J. Husnick, P.C. (admitted *pro hac vice*)
                                 Brad Weiland (admitted *pro hac vice*)
                                 W. Benjamin Winger (admitted *pro hac vice*)
                                 Laura Krucks (admitted *pro hac vice*)
                                 **KIRKLAND & ELLIS LLP**
                                 **KIRKLAND & ELLIS INTERNATIONAL LLP**
                                 300 North LaSalle Street
                                 Chicago, Illinois 60654
                                 Telephone:     (312) 862-2000
                                 Facsimile:     (312) 862-2200

                                 *Co-Counsel to the Debtors and Debtors in Possession*

4

# SCHEDULE 12

**Form of Generic Opt Out For Executory Contract and Unexpired Lease Counterparties**

**OPTIONAL: RELEASE OPT OUT FORM**

You are receiving this opt out form (the "Opt Out Form") because you are (a) a party to an Executory Contract or Unexpired Lease with certain of the Debtors pursuant to schedule G of the Schedules filed by the Debtors in the chapter 11 cases, and (b) not presently entitled to vote on the *Fourth Amended Joint Chapter 11 Plan of Cobalt International Energy, Inc. and Its Debtor Affiliates* (as may be amended from time to time, the "Plan"), solely as a party listed on schedule G.  If you choose to opt out of the releases set forth in Article VIII.C of the Plan; complete, sign, and date this Opt Out Form; and return it promptly via first class mail (or in the enclosed reply envelope provided), overnight courier, or hand delivery to Kurtzman Carson Consultants LLC (the "Notice and Claims Agent") at the address set forth below:

**Cobalt Ballot Processing**
**c/o Kurtzman Carson Consultants LLC**
**2335 Alaska Avenue,**
**El Segundo, California 90245**

**THIS OPT OUT FORM MUST BE ACTUALLY RECEIVED BY THE NOTICE AND CLAIMS AGENT BY MARCH 28, 2018, AT 4:00 P.M. PREVAILING CENTRAL TIME (THE "VOTING DEADLINE").  IF THE OPT OUT FORM IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED.**

**Item 1.   Certification of Party to an Executory Contract or Unexpired Lease.**

The undersigned hereby certifies that, as of the Voting Record Date, the undersigned is party to an Executory Contract or Unexpired Lease as listed on schedule G:



☐          Party to an Executory Contract or Unexpired Lease

**Item 2.   Important information regarding the Third Party Release.**

**Article VIII.C of the Plan contains the following Third Party Release:**

**As of the Effective Date, each Releasing Party is deemed to have released and discharged each Debtor and Released Party from any and all Causes of Action, whether known or unknown, including any derivative claims, asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or filing of the Disclosure Statement, the Sale Transaction, the Plan (including, for the avoidance of doubt, the Plan Supplement), or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Disclosure Statement, the Sale Transaction, the Plan, or the filing of the Chapter 11 Cases, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement, or upon any other related act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date. Notwithstanding anything contained herein to the contrary, the foregoing release does not release any obligations of any party under the Plan or any document, instrument, or agreement executed to implement the Plan.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases described in this Article VIII.C, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute its finding that each release described in this Article VIII.C is:  (1) in exchange for the good and valuable consideration provided by the**

1

**Released Parties, a good faith settlement and compromise of such Claims; (2) in the best interests of the Debtors and all holders of Interests and Claims; (3) fair, equitable, and reasonable; (4) given and made after due notice and opportunity for hearing; and (5) a bar to any of the Debtors asserting any claim, Cause of Action, or liability related thereto, of any kind whatsoever, against any of the Released Parties or their property.**

*     *     *

UNDER THE PLAN, "RELEASING PARTY" MEANS COLLECTIVELY:  (A) THE FIRST LIEN NOTEHOLDERS; (B) THE FIRST LIEN AD HOC GROUP; (C) THE SECOND LIEN NOTEHOLDERS; (D) THE SECOND LIEN AD HOC GROUP; (E) THE UNSECURED NOTEHOLDERS; (F) THE UNSECURED NOTES AD HOC COMMITTEE; (G) THE FIRST LIEN INDENTURE TRUSTEE; (H) THE SECOND LIEN INDENTURE TRUSTEE; (I) THE 2.625% SENIOR NOTES INDENTURE TRUSTEE; (J) THE 3.125% SENIOR NOTES INDENTURE TRUSTEE; (K) THE COMMITTEE AND ITS MEMBERS; (L) ALL HOLDERS OF CLAIMS, (M) ALL HOLDERS OF INTERESTS, AND (N) WITH RESPECT TO EACH OF THE DEBTORS AND EACH OF THE FOREGOING ENTITIES IN CLAUSES (A) THROUGH (M), SUCH ENTITY AND ITS CURRENT AND FORMER AFFILIATES AND SUBSIDIARIES, AND SUCH ENTITIES' AND THEIR CURRENT AND FORMER AFFILIATES' AND SUBSIDIARIES' CURRENT AND FORMER DIRECTORS, MANAGERS, OFFICERS, EQUITY HOLDERS (REGARDLESS OF WHETHER SUCH INTERESTS ARE HELD DIRECTLY OR INDIRECTLY), PREDECESSORS, SUCCESSORS, AND ASSIGNS, SUBSIDIARIES, AND EACH OF THEIR RESPECTIVE CURRENT AND FORMER EQUITY HOLDERS, OFFICERS, DIRECTORS, MANAGERS, PRINCIPALS, MEMBERS, EMPLOYEES, AGENTS, ADVISORY BOARD MEMBERS, FINANCIAL ADVISORS, PARTNERS, ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, CONSULTANTS, REPRESENTATIVES, AND OTHER PROFESSIONALS, EACH IN THEIR CAPACITY AS SUCH COLLECTIVELY; *PROVIDED* THAT ANY HOLDER OF A CLAIM OR INTEREST THAT OPTS OUT OR OTHERWISE OBJECTS TO THE RELEASES IN THE PLAN SHALL NOT BE A "RELEASING PARTY."

AS A "RELEASING PARTY" UNDER THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASES CONTAINED IN ARTICLE VIII.C OF THE PLAN, AS SET FORTH ABOVE.  YOU MAY ELECT NOT TO GRANT THE RELEASE CONTAINED IN ARTICLE VIII.C OF THE PLAN ONLY IF YOU CHECK THE BOX BELOW.  THE ELECTION TO WITHHOLD CONSENT TO GRANT SUCH RELEASE IS AT YOUR OPTION. BY OPTING OUT OF THE RELEASES SET FORTH IN ARTICLE VIII.C OF THE PLAN, YOU WILL FOREGO THE BENEFIT OF OBTAINING THE RELEASES SET FORTH IN ARTICLE VIII OF THE PLAN IF YOU ARE A RELEASED PARTY IN CONNECTION THEREWITH.

2

**The Entity set forth in Item 1 elects to:**

☐ **OPT OUT** of the Third Party Release

**Item 3. Certifications.**

By signing this Opt Out Form, the undersigned certifies:

(a) that, as of the Voting Record Date, either:  (i) the Entity is party to an Executory Contract or Unexpired Lease with certain of the Debtors as certified in Item 1; or (ii) the Entity is an authorized signatory for such Entity that is a party to an Executory Contract or Unexpired Lease;

(b) that the Entity has submitted the same respective election concerning the releases with respect to all Executory Contracts and Unexpired Leases certified in Item 1; and

(c) that no other Opt Out Form with respect to the Executory Contracts and Unexpired Leases certified in Item 1 have been submitted or, if any other Opt Out Forms have been submitted with respect to such Executory Contracts and Unexpired Leases, then any such earlier Opt Out Forms are hereby revoked.

| | |
|---|---|
| Name of Counterparty: | |
| | (Print or Type) |
| Signature: | |
| Name of Signatory: | |
| | (If other than the counterparty) |
| Title: | |
| Address: | |
| | |
| | |
| Telephone Number: | |
| Email: | |
| Date Completed: | |

**PLEASE COMPLETE, SIGN, AND DATE THIS OPT OUT FORM AND RETURN IT PROMPTLY VIA FIRST CLASS MAIL (OR IN THE ENCLOSED REPLY ENVELOPE PROVIDED), OVERNIGHT COURIER, OR HAND DELIVERY TO:**

**Cobalt Ballot Processing**
**c/o Kurtzman Carson Consultants LLC**
**2335 Alaska Avenue,**
**El Segundo, California 90245**

3