IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 17-36709-H1-11 |
| | § | |
| COBALT INTERNATIONAL | § | HOUSTON, TEXAS |
| ENERGY, INC., AND COBALT | § | |
| INTERNATIONAL ENERGY GP, LLC, | § | WEDNESDAY, |
| | § | APRIL 4, 2018 |
| DEBTORS. | § | 9:14 A.M. TO 7:00 P.M. |

CONFIRMATION HEARING (CONTINUED)

BEFORE THE HONORABLE MARVIN ISGUR
UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:                    SEE NEXT PAGE

CASE MANAGER:                   KIM PICOTA

COURT RECORDER:                 DESIREE SILLAS


TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 ELDRIDGE ROAD, #144
SUGAR LAND, TEXAS 77478
Tel: 281-277-5325 ▼ Fax: 281-277-0946
www.judicialtranscribers.com


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

APPEARANCES:


FOR COBALT ENERGY:                    ZACK CLEMENT, ESQ.
                                      ZACK A. CLEMENT, PLLC
                                      3753 DRUMMOND
                                      HOUSTON, TEXAS  77025
                                      832-274-7629

                                      CHAD J. HUSNICK, ESQ.
                                      BRAD WEILAND, ESQ.
                                      BEN WINGER, ESQ.
                                      LAURA KRUCKS, ESQ.
                                      GABOR BALASSA, ESQ.
                                      STACY PEPPER, ESQ.
                                      KIRKLAND & ELLIS, LLP
                                      300 NORTH LASALLE
                                      CHICAGO, IL  60654
                                      312-862-2000

                                      JAIME AYCOCK, ESQ.
                                      RACHAEL MORGAN, ESQ.
                                      KIRKLAND & ELLIS, LLP
                                      609 MAIN
                                      HOUSTON, TEXAS  77002
                                      713-835-3600


FOR OFFICIAL COMMITTEE OF
UNSECURED CREDITORS:                  ROBERT J. FEINSTEIN, ESQ.
                                      PACHULSKI STANG, ET AL
                                      780 THIRD AVE., 34TH FL.
                                      NEW YORK, NY  10017
                                      212-561-7700


FOR WELLS FARGO BANK,
NATIONAL ASSOCIATION:                 RACHEL I. THOMPSON, ESQ.
                                      REED SMITH, LLP
                                      811 MAIN STREET, STE. 1700
                                      HOUSTON, TX  77002
                                      713-469-3652


FOR THE AD HOC GROUP:                 MICHAEL D. WARNER, ESQ.
                                      COLE SCHOTZ, P.C.
                                      301 COMMERCE ST., STE 1700
                                      FORT WORTH, TEXAS  76102
                                      817-810-5250

(APPEARANCES CONTINUED):

FOR THE AD HOC GROUP:            JAMES W. WALKER, ESQ.
                                 COLE SCHOTZ, P.C.
                                 2515 MCKINNEY AVE., STE 1350
                                 DALLAS, TEXAS  75201
                                 469-557-9390


                                 DAVID S. COHEN, ESQ.
                                 MILBANK TWEED HADLEY & MCCLOY
                                 1850 K. ST., NW, STE. 1100
                                 WASHINGTON, DC  20006
                                 202-835-7517


                                 JERRY UZZI, ESQ.
                                 MILBANK TWEED HADLEY & MCCLOY
                                 26 LIBERTY ST.
                                 NEW YORK, NY  10005
                                 212-530-5670


FOR TOTAL E&P, USA:              HUGH KEENAN MURTAGH, ESQ.
                                 DAVID HAMMERMAN, ESQ.
                                 LATHAM & WATKINS, LLP
                                 885 THIRD AVE.
                                 NEW YORK, NY  10022
                                 212-906-1200


                                 RICHARD LEVY, ESQ.
                                 LATHAM & WATKINS, LLP
                                 330 NORTH WABASH AVE.
                                 SUITE 2800
                                 CHICAGO, IL  60611
                                 312-876-7700


FOR ANGELA DODD UNITED
STATES SECURITIES &
EXCHANGE COMMISSION:             ANGIE D. DODD, ESQ.
                                 SECURITIES & EXCHANGE
                                 COMMISSION
                                 175 W. JACKSON BLVD., STE. 900
                                 CHICAGO, IL  60604
                                 312-353-7400

4

                          (APPEARANCES CONTINUED):


FOR ANADARKO PETROLEUM
CORPORATION:                        ROBERT BRUNER, ESQ.
                                    NORTON ROSE FULBRIGHT, US, LLP
                                    1301 MCKINNEY ST., STE. 5100
                                    HOUSTON, TEXAS  77010
                                    713-651-5193


FOR W&T OFFSHORE AND
CONOCOPHILLIPS COMPANY:              PHILIP EISENBERG, ESQ.
                                    LOCKE LORD BISSELL & LIDDELL
                                    2200 ROSS AVE., STE. 2200
                                    DALLAS, TEXAS  75201
                                    214-740-8586


FOR AD HOC GROUP OF
SECOND LIEN NOTEHOLDER GROUP: MARTY L. BRIMMAGE, ESQ.
                                    AKIN GUMP STRAUSS HAUER & FELD
                                    1700 PACIFIC AVE., STE. 4100
                                    DALLAS, TEXAS  75201
                                    214-969-2885


                                    JAMES SAVIN, ESQ.
                                    AKIN GUMP STRAUSS HAUER & FELD
                                    1333 NEW HAMPSHIRE AVE., N.W.
                                    WASHINGTON, DC  20036
                                    202-887-4417


FOR WILMINGTON TRUST, NATIONAL
ASSOCIATION, INDENTURE
TRUSTEE:                             ANDREW GOLDMAN, ESQ.
                                    WILMER CUTLER, ET AL
                                    7 WORLD TRADE CENTER
                                    250 GREENWICH ST.
                                    NEW YORK, NY  10007
                                    212-230-8836

FOR THE SECURITIES
PLAINTIFFS:                          MICHAEL ETKIN, ESQ.
                                    LOWENSTEIN SANDLER
                                    ONE LOWENSTEIN DRIVE
                                    ROSELAND, NJ  07068
                                    973-597-2312

(APPEARANCES CONTINUED):


FOR THE SECURITIES
PLAINTIFFS:                     ANDREW ENTWISTLE, ESQ.
                                ENTWISTLE AND CAPPUCCI
                                299 PARK AVE., 20TH FL.
                                NEW YORK, NY  10171
                                212-894-7200


FOR CHEVRON U.S.A. INC.:        EDWARD L. RIPLEY, ESQ.
                                KING & SPALDING, LLP
                                1100 LOUISIANA, STE. 4000
                                HOUSTON, TEXAS  77002
                                713-276-7351


FOR U.S. BANK, NATIONAL
ASSOCIATION, AS SECOND
LIEN TRUSTEE:                   DAVID EDWARD LEMKE, ESQ.
                                WALLER LANSDEN, ET AL
                                511 UNION ST., STE 2100
                                PO BOX 198966
                                NASHVILLE, TN  37219-8966
                                615-850-8655


FOR AD HOC FIRST LIEN
GROUP:                          ALREDO R. PEREZ, ESQ.
                                CHRISTOPHER M. LOPEZ, ESQ.
                                PATRICK THOMPSON, ESQ.
                                WEIL GOTSHAL MANGES, LLP
                                700 LOUISIANA, STE. 1700
                                HOUSTON, TX  77002
                                713-546-5000


FOR WITTON PETROLEUM
SERVICES LIMITED:               JOHN F. HIGGINS, IV, ESQ.
                                PORTER HEDGES, LLP
                                1000 MAIN ST., STE 3600
                                HOUSTON, TEXAS  77002
                                713-226-6648

(APPEARANCES CONTINUED):


(APPEARING TELEPHONICALLY):


FOR ANADARKO PETROLEUM:                WILLIAM R. GREENDYKE, ESQ.
                                       NORTON ROSE FULBRIGHT, US, LLP
                                       1301 MCKINNEY ST., STE. 5100
                                       HOUSTON, TEXAS   77010
                                       713-651-5193


FOR W&T OFFSHORE AND
CONOCOPHILLIPS COMPANY:                BRADLEY C. KNAPP, ESQ.
                                       LOCKE LORD BISSELL & LIDDELL
                                       2200 ROSS AVE., STE. 2200
                                       DALLAS, TEXAS   75201
                                       214-740-8586

                                       RICK KUEBEL, ESQ.
                                       LOCKE LORD BISSELL & LIDDELL
                                       601 POYDRAS ST., STE.  2660
                                       NEW ORLEANS, LA   70130
                                       504-558-5100

FOR U.S. BANK NATIONAL
ASSOCIATION, AS SECOND
LIEN TRUSTEE:                          TYLER N. LAYNE, ESQ.
                                       WALLER LANSDEN DORTCH DAVIS
                                       511 UNION ST., STE. 2700
                                       NASHVILLE, TN   37219
                                       615-244-6380

FOR STATOIL GULF OF
MEXICO LLC:                            LAURA METZGER, ESQ.
                                       ORRICK HERRINGTON, ET AL
                                       51 WEST 52ND ST.
                                       NEW YORK, NY   10019
                                       212-506-5149

INDEX

| WITNESS: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| DAVID POWELL | | | | |
| By Mr. Aycock | 42 | . | 136 | . |
| By Mr. Cohen | . | 101 | . | . |
| By Mr. Higgins | . | 121 | . | 147 |
| | | | | |
| JOHN-PAUL HANSON | | | | |
| By Ms. Pepper | 155 | . | 181 | . |
| By Mr. Cohen | . | 161 | . | . |

| EXHIBITS: | Offered | Received |
|---|---|---|
| DEBTORS' EXHIBITS | | |
| Number DX74 | 59 | 59 |
| Number DX78 | 62 | 62 |
| Number DX81 | 64 | 64 |
| Number DX86 | 65 | 65 |
| Number DX87 & 88 | 69 | 69 |
| Number DX135 | 76 | 76 |
| Number DX138 | 49 | 50 |
| Number DX151 | 68 | 68 |
| Number DX153 | 73 | 73 |
| Number DX168 | 84 | 84 |
| Number DX175 | 261 | 261 |
| Number DX177 | 96 | 96 |
| Number DX178 | 98 | 98 |
| | | |
| WHITTON EXHIBIT 7 | 131 | 131 |

8

HOUSTON, TEXAS; WEDNESDAY, APRIL 4, 2018; 9:14 A.M.

THE COURT:  We'll go ahead and call the Cobalt International case.  It is 17-36709.

We will need new appearances today.  We'll need to redo the appearances because we have a new court reporter.  Actually, if there are more of you in the hall, we will go ahead and set up that alternative courtroom if we're going to fill up --

MR. FEINSTEIN:  No, there are not that many.

THE COURT:  -- but I don't think we'll need it.

MR. FEINSTEIN:  Good morning, Your Honor.  For the Record, Robert Feinstein, Pachulski Stang Ziehl and Jones, Counsel for the Official Committee.  My partner, Alan Kornfeld, is with me.

THE COURT:  Thank you, Mr. Feinstein.

MR. CLEMENT:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. CLEMENT:  For Cobalt, Zack Clement, Chad Husnick, Brad Weiland, Ben Winger, Laura Krucks, Gabor Balassa, Stacy Pepper, Jaime Aycock and Rachael Morgan.

THE COURT:  Thank you.

MS. THOMPSON:  Hi.  Rachel Thompson with Reed Smith, on behalf of Wells Fargo Bank, National Association as Indenture Trustee.

THE COURT:  Thank you.

MR. WARNER:  Good morning, Your Honor.

THE COURT:  Good morning, Mr. Warner.

MR. WARNER:  Michael Warner, Jim Walker of Cole Schotz; David Cohen, Jerry Uzzi of Milbank, on behalf of the Ad Hoc Group.

THE COURT:  Thank you.

MR. MURTAGH:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. MURTAGH:  Hugh Murtagh, Richard Levy and David Hammerman of Latham and Watkins, for Total E&P USA.

THE COURT:  Good morning.

MS. DODD:  Good morning, Your Honor.

THE COURT:  Good morning.

MS. DODD:  Angie Dodd with the Securities and Exchange Commission.

MR. BRUNER:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. BRUNER:  Bob Bruner, on behalf of Anadarko. I believe Bill Greendyke may also be on the phone.

THE COURT:  Thank you.

MR. EISENBERG:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. EISENBERG:  Philip Eisenberg, and on the phone my partners, Rick Kuebel and Brad Knapp, on behalf of

W&T Offshore, Inc. and ConocoPhillips Company.

THE COURT:  Thank you.

MR. EISENBERG:  Good morning.

MR. BRIMMAGE:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. BRIMMAGE:  Marty Brimmage with Akin Gump Strauss Hauer and Feld, here on behalf of the Second Lien Noteholder Group.  I'm also joined again today by my partner, James Savin.

THE COURT:  Thank you.

MR. GOLDMAN:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. GOLDMAN:  Andy Goldman from Wilmer Hale, on behalf of Wilmington Trust, the First Lien Indenture Trustee.

MR. ETKIN:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. ETKIN:  Michael Etkin, Lowenstein Sandler; and Andrew Entwistle, Entwistle and Cappucci, on behalf of the Securities Plaintiffs.

MR. RIPLEY:  Judge, good morning.

THE COURT:  Good morning.

MR. RIPLEY:  Ed Ripley with King and Spalding, on behalf of Chevron.

MR. LEMKE:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. LEMKE:  David Lemke with Waller Lansden, on behalf of U.S. Bank, the Second Lien Trustee.  And I believe I'm joined by my colleague, Tyler Layne, on the phone.

THE COURT:  Thank you.  Good morning.

MR. LEMKE:  Thank you.

MR. PEREZ:  Good morning, Your Honor.

THE COURT:  Good morning.

MR. PEREZ:  Alfredo Perez, Chris Lopez and Patrick Thompson for the First Lien Ad Hoc Group.

THE COURT:  All right.  If there's anybody on the phone that wishes to appear, please press five star or you may reserve your appearance.

(No audible response.)

THE COURT:  Good morning.

MS. METZGER:  Good morning, Your Honor. Laura Metzger, Orrick Herrington and Sutcliffe, on behalf of Statoil.

THE COURT:  Good morning.  All right.

Mr. Husnick, what do we have?

MR. HUSNICK:  Good morning, Your Honor.

THE COURT:  Is it --

MR. HUSNICK:  Chad Husnick from Kirkland and Ellis.

THE COURT:  Good morning.

MR. HUSNICK:  It is indeed.  Your Honor, I wanted to provide the Court a quick update on developments and decisions made overnight and what I think the timing is for the rest of today and hopefully this week.  Your Honor, the Second Lien Ad Hoc Group represented by Mr. Savin from Akin Gump has agreed to provide Whitton with the right to opt out of the settlement as was discussed with Your Honor on the Record yesterday afternoon.

So to summarize the terms of the agreement -- and I'm only focused on the sharing of the pot, there are some other terms that I won't get into detail on, they were summarized yesterday, but what would happen now with the opt-out right is: unsecured creditors of Cobalt, LP including Whitton will share *pro rata* in a pot of up to $23 million which will not be diluted or diminished by intercompany claims, second lien deficiency claims or adequate protection claims.  The Official Committee will get a seat on the Plan Administer Board in the full $23 million situation.

If Whitton opts out of the settlement, Whitton is exactly where it was before the settlement.  Other general unsecured creditors of Cobalt, LP will still get their *pro rata* share of up to $8 million, which was exactly what was discussed.  The Plan Administer Board however -- this was one change -- it will remain a one-person board under

those circumstances ostensively because the trade creditors are getting full payment in that circumstance so the Plan Administer Board would just be a second lien representative. And I'll let Mr. Feinstein respond to this.

Your Honor asked us -- so that's the deal as we envision it and we would like to move forward with it.  I'll let Whitton and the Committee kind of respond to that, but we are ready to go.

Your Honor asked us yesterday as well for sensitivities around the Whitton claim including the intercompany claim.  I think --

THE COURT:  Well, I think that matters a lot less if you've now changed the deal but you're --

MR. HUSNICK:  Okay.

THE COURT:  -- welcome to answer that though.

MR. HUSNICK:  I think it's helpful to highlight for Your Honor and we did that.  We went back and we created a diagram that shows sensitivities and we reached out to Whitton's Counsel to try and have a discussion about the numbers.  Unfortunately, there was no return call or messages.  So we are here today and I want to hand up to you, if I can, the chart that we prepared that shows the sensitivities.  I don't highlight what the Debtors think the answer is.  I'm simply showing you what we think the assumptions are.

THE COURT:  Thank you.  Is that available as well --

MR. HUSNICK:  Electronically?

THE COURT:  -- electronically?

MR. HUSNICK:  This might take a little bit of work.

Do we have it?  Yeah, let's do it.

(Pause/voices off record.)

MR. HUSNICK:  Can we email it to Your Honor?

(Voices off record.)

THE COURT:  This is exactly what I was trying to figure out so thank you for doing this.

(Pause/voices off record.)

MR. HUSNICK:  Mr. Thomas should be uploading it shortly.

THE COURT:  I think it would be helpful for everybody to look at it because I --

MR. HUSNICK:  And I agree.  And I'd like to just make a couple of observations about it.

THE COURT:  All right.

(Pause/voices off record.)

THE COURT:  I can have it scanned in if that's easier but.

MR. HUSNICK:  There we go.

THE COURT:  Okay.  Thank you.

(Pause/voices off record.)

THE COURT:  All right.  Thank you.

MR. HUSNICK:  Okay.  So, Your Honor, what we see here is -- it makes a couple of key assumptions.  Number one, up in the upper left-hand corner, that the assumed Sonangol proceeds are the full $500 million that were negotiated.  As Your Honor may remember, we have $150 million of that cash in escrow right now.

THE COURT:  Right.

MR. HUSNICK:  The second payment only comes in when we're ready to close on the rest of the settlement.  If that payment comes in, we would have the full 500 million.

What happens from there, Your Honor, is: approximately 65 percent of the equity in the Angolan subsidiaries as pledged as part of the prepetition agreements to the Second Liens and the First Liens, so there was an unencumbered -- prepetition unencumbered portion of 35 percent, approximately $165 million.  That amount then would assume that -- that's available if there's no adequate protection claims or anything of the like that would diminish that amount.

So what we did here is: we assumed, for sake of discussion, 77 million approximately of diminution.  That's just the cash burn.  So that number could go -- folks could argue that it's lower because cash burn may not be an

improper --

THE COURT:  Right.

MR. HUSNICK:  -- may not be directly tied.  Folks could argue that it's higher because it doesn't take into consideration any non-cash diminution that could be out there.  Suffice to say we made the assumption.

What you see on the right-hand side -- and I think this part is very important -- is that there's a $23 million pot so even in the worst case -- I'm going to say worst case, the highest claim amount settlement because it's not being diminished, there's actually 22.2 million that could be available for Whitton with .8 available only for other unsecured creditors.

However, as the -- I think -- I won't put words in the Committee's mouth, but the Debtor believes that the number is actually much, much lower than 225.  That's a litigable issue that'll be addressed, Your Honor, not as part of confirmation but in the future.

But then what we did is: we -- so what we see is the -- you know, under the settlement, they could get up to $22.2 million number.  I view that as kind of the ballgame.  So could they do better than that opting out?

So then we go down into the chart.  What we did is: we extrapolated across on the top line zero to 100 percent chance of the intercompany claim.  That's the

$6-1/2 billion intercompany claim from --

THE COURT:  Right.

MR. HUSNICK:  -- Cobalt, Inc. against Cobalt, LP. So we put a risk waiting on that.

On the left-hand side, we've ranged the size of the potential claim from five to 225 million, which is the full asserted amount.  It could actually be single-digit millions of potential exposure here.

Then we ran the sensitivity.  What you see highlighted, Your Honor, are the only circumstances under these sensitivities in which to potential recovery for Whitton would exceed the settlement amount, actually not all that many situations.  However, that's not for us to discuss today, it's just flagging for Your Honor kind of the world of possibilities.

I'll make two additional observations.  This chart does not account for a potential intercompany claim, it is not potential.  It exists on the books and records of Cobalt, LP against the Angolan block entities so it's actually the entity that sits below the entity where the cash is right now.  But you remember all rights were reserved as to that $500 million if it ultimately comes in. So there's a potential decrease in the amount of the 165. That all gets addressed in the intercompany claim litigation.

Number two, there's a potential -- as I mentioned earlier, potential increase or decrease in the adequate protection.  That's going to be a litigable issue.

So, Your Honor, hopefully this was helpful to you to set the stage.

THE COURT:  Tell me -- just I want to get a sense for one more thing.

If the balance of the Angola money doesn't come in, what does that do to these numbers?

MR. HUSNICK:  There isn't a line item on here for that but --

THE COURT:  Right.

MR. HUSNICK:  -- Whitton gets zero.

THE COURT:  Okay.

MR. HUSNICK:  And the reason is is because it's clear on the face of the Order -- Your Honor's Order approving the Order, it's clear on the face of the document.  Whitton's cash value claim only triggers if there's a transfer of the properties associated with and the leasehold interests and block interests associated with the Angolan assets.  If that never happens, no claim.

THE COURT:  Got it.  All right.

Does anybody else want to talk about that or ask any questions about it?  I just think it's useful to see and I'm happy that it's done.  It's precisely what I needed to

see.

(No audible response.).

THE COURT:  Okay.

MR. HUSNICK:  Okay.  So where do we go from here?  The Debtors are ready to proceed with the Confirmation Hearing this morning on the terms I've outlined.  As the Court is aware, we believe that it's critical that we confirm the Plan today or tomorrow and we fully intend to do that.  The reason is is because we intend to try and close all of the asset sales on Friday.  Two of them, as Your Honor has heard, have deadlines for Friday that we intend to hit, but we are prepared to close all of them.

I also would mention that there are employees -- there's still some employees at the company.  We've kept a crew around, but it's time for them to move on and they are planning to move on.  So we -- if we try to do the 363 Sale, it doesn't give them the certainty that they need to move on because it's just two of the assets so we're trying to balance those interests.  So we're ready to move forward and I have the full and strong commitment of the client and Second Liens to do so.

It is our strong, strong preference therefore to close these transactions under a confirmed plan rather as part of a 363 transaction.  This will ensure, in my opinion, that the parties here in this room will remain focused on

the task at hand as opposed to going home and doing nothing while we close 363 sales.  We can keep that 363 option in our back pocket to the extent necessary as we go through the day, but I just wanted you to know at the outset that it is our strong preference to try and push forward and get a confirmed plan.

As far as who is left objecting, we have, as we discussed yesterday, the SEC; Whitton, I expect; the Ad Hoc Unsecured Group, Mr. Uzzi's clients; and Chevron.

I would expect the following process for the rest of the day obviously subject to Your Honor's input, but we plan to put on our fourth and final witness, Mr. David Powell, the Chief Financial Officer for the Debtors.  After that, we can deal with a couple of the narrower confirmation objections including the SEC and Chevron, which I do not believe are evidentiary in nature. And then this afternoon we can finish with Mr. Hanson's testimony, had a little bit of direct left and then any cross.

Ideally, we could have closing arguments, Your Honor, in the afternoon so we could try and confirm as quickly as position.  I know I'm being a little presumptuous on that, but we'll address whatever we need to do to try --

THE COURT:  You're being very --

MR. HUSNICK:  -- and get to that possibility.

THE COURT:  You're being very presumptuous because other people may have witnesses and evidence.

MR. HUSNICK:  Understood.

THE COURT:  But that's up to them.  I'll let you present your case.  The way you want to present your case is fine.

MR. HUSNICK:  Yeah.  So, Your Honor, with that I will -- my talking points say I'll feed the podium with my partner but --

THE COURT:  But what I want to be sure of is --

MR. HUSNICK:  Yeah.

THE COURT:  -- I want to be really clear then because yesterday out of what the looks on you all's faces, my pretending I was a monkey-with-a-gun kind of guy up here has now devolved into what I believe to be an amended plan, that we are now only going to move forward on confirmation on a plan as amended.

And the Amended Plan has a -- the provisions that you've outlined with respect to the 23/8 million and the board seat and it allows Whitton to toggle into precisely the old Plan or take the option and in the new Plan and that is what would be litigated from this point forward; is that my understanding?

MR. HUSNICK:  That is correct.  That is the Plan we would propose to move forward with right now.

THE COURT:  All right.  Well, let me hear from the Second Lienholders and I also want to hear from the Committee that this is still their deal.

First of all, I appreciate your taking to heart what I said.

MR. SAVIN:  Of course.

THE COURT:  I do think otherwise we just weren't going to move ahead and I know that it seemed --

MR. SAVIN:  Absolutely.

THE COURT:  -- I was being awfully pushy, but otherwise we were just going to be at a dead end.  So I'm glad that people at least took that as -- if it was craziness, you were at least going to exceed to it so thank you.

(Laughter.)

MR. SAVIN:  Of course, Your Honor.  I think we agree, on behalf of the Second Lien Ad Hoc Group, with everything Mr. Husnick just said.  I just want to clarify one thing with respect to the opt-in and opt-out.  It is not an ongoing opt-in/opt-out.  As we understand it, when you confirm the Plan today, they can opt in or they can opt out.  It is not a they can in the future toggle back and forth.  They can either opt in to the statement -- and we're moving forward that way -- or they can opt out, but that is as of today or tomorrow whenever you confirm the Plan.

THE COURT:  Well, when will the settlement be distributed?

MR. SAVIN:  In terms of the documents, Your Honor, or the money?

THE COURT:  Well, in terms of when -- they don't get to go back and forth and --

MR. SAVIN:  Correct.

THE COURT:  -- it's your proposal, but it would seem to me that we're talking about a funding date that probably isn't Friday.

MR. SAVIN:  Friday.  No, I think it is Friday.

THE COURT:  You're actually going to pay all the unsecureds on Friday?

MR. SAVIN:  Well, there will be the reserve set up and whatever claims are allowed are allowed, what claims aren't aren't.  I mean --

THE COURT:  But is there a reason to not give them a couple weeks to pick under the tunnel?

MR. SAVIN:  Well, Your Honor --

THE COURT:  What's the rush on that?

MR. SAVIN:  Well we, on behalf of Second Liens, need to move forward with -- if we're going to start dealing with intercompany claims, you know, filing a motion, moving forward with our diminution in value --

THE COURT:  I know, but a couple of weeks

shouldn't hurt much and this --

MR. SAVIN:  Your Honor, I --

THE COURT:  I'm doing my best to preserve their ability to make --

MR. SAVIN:  Well, It is not what I talked --

THE COURT:  -- a rational decision and --

MR. SAVIN:  -- about with my clients, Your Honor, but if I could, with all due respect, ask Your Honor what Your Honor was thinking in terms of a time period because we had understood it --

THE COURT:  A couple weeks.

MR. SAVIN:  -- to be as of confirmation.

THE COURT:  Well, I had said the hearing would be on the 16th, if we had to continue the hearing, so I'm thinking the 16th.  They can toggle in, toggle out on the 16th.  I don't think it changes anything your client needs to do.  We won't -- we'll wait to schedule all the other stuff to where you don't need to do any discovery or spend any money in the meantime.  I want to be sure that --

MR. SAVIN:  Okay.  I will check with my clients, Your Honor.

THE COURT:  Thank you.  I just want to -- I'm worried about due process.  I'm also worried about just a public appearance.  I mean, I want to be sure --

MR. SAVIN:  Of course, Your Honor.

THE COURT: -- they have reasonable opportunity here both from a due process point of view and just from it's the right thing to do.

But I do think -- and I'll reiterate what I said yesterday -- that as a matter of law, that adding an option for someone cannot be adverse to them.

MR. SAVIN: We agree, Your Honor.

THE COURT: And that would probably be true even if the option had to be exercised immediately, and I got that. I'm not sure that that's a complexity that you won't have to deal with an appeal so I wouldn't worry about that question.

MR. SAVIN: Your Honor, I --

THE COURT: But I don't think it changes. I think if --

MR. SAVIN: I understand, Your Honor.

THE COURT: I think any option even one that's only open for five minutes is only an upside. It's not a downside. It's not a materially-adverse change. I just don't know if it's the prudent way that you want to be proceeding so think about it with your client.

MR. SAVIN: Absolutely.

THE COURT: Thank you.

MR. SAVIN: Thank you very much, Your Honor.

THE COURT: Mr. Feinstein?

MR. FEINSTEIN:  Thank you, Your Honor.  Before commenting on the settlement, I just wanted to make sure that there were other components to it that were omitted but they're still part of the deal.  I believe they are, which is that there's still $5 million going to the parent company, there's still Indenture Trustee fees being paid.  I assume that's all the case.

So let me address then what's been proposed and because we've spent the night trying to come up with solutions too.  And this is a viable solution but with really one important caveat, Your Honor.  As a -- the Creditors' Committee represents all unsecured creditors and it would be best if Whitton had the opportunity to process the -- what's being proposed in the way of a process for them meaning that they get the option and then with informed consent by some deadline, they can join the $23 million pot of they can fight the good fight.

We're fine with that but I don't -- the Committee -- I'm concerned, Your Honor, about the Committee forcing this regime on Whitton.  I'm not asking for them to make a choice opt in or opt out, but if the construct under the Plan now is: some unsecured creditors are going to get paid in full, 8 million in cash, and Whitton's going to have this treatment, I'd like Whitton to at least with informed consent agree to that construct including what is arguably

discrimination in favor of the 8 million who are getting paid in full regardless and Whitton is going to be left to its own devices and really can't be paid in full because they're either going to join the pot where there are other creditors competing with them or they're going to fight the good fight where they're not going to get paid in full either.  But, you know, that discrimination piece concerns the Committee because -- our responsibility is: we have a duty to all creditors.  And I don't want to force anything on Whitton when all they've -- the only sin they've committed is having a large disputed claim.  So if Whitton can buy into the process that's being proposed understanding that they'll have an opportunity to either litigate or opt in by a deadline, then the Committee would support this construct as a solution.

We have other solutions I won't go into on the Record as alternatives, but if Whitton can embrace the concept that 8 million is being paid to these other creditors paying them in full come hell or high water and that Whitton will end up with different treatment, that they're okay with that, then we're supportive of this approach.

THE COURT:  So I understand the deal to be slightly different than what you've described and I want to be sure that I understand it right.  There's a $23 million

pot, but the pot will never pay unsecureds more than 100 cents on the dollar depending upon what the allowed claims are.

MR. FEINSTEIN:  Right.

THE COURT:  Whitton can opt in or out of that pot.  Everybody else is in the pot.

MR. FEINSTEIN:  Right.

THE COURT:  I don't see how that potentially unfairly discriminates against Whitton.  It would if --

MR. FEINSTEIN:  I guess I would like to --

THE COURT:  -- there was only an $8 million pot.

MR. FEINSTEIN:  -- hear from Whitton.

THE COURT:  Well, I mean I just don't understand the argument that it would.  So if I understand the deal right, there's a pot and they can either go in the pot or they cannot go in the pot.  But if they go in the pot, it's not like other people get 100 cents and they get four. Everybody will get precisely the --

MR. FEINSTEIN:  That was --

THE COURT:  -- same percentage distribution.

MR. FEINSTEIN:  Correct, that was the baseline, right.

THE COURT:  So that's not unfair discrimination by any measure.

MR. FEINSTEIN:  And if they opt out --

THE COURT:  Giving someone an option --

MR. FEINSTEIN:  If they opt out --

THE COURT:  Well, if they opt out and lose, that was their informed choice.

MR. FEINSTEIN:  Exactly, Your Honor.  So I just -- again it would provide much more comfort to the Committee if Whitton would represent on the Record -- again they've just been presented with this and I know --

THE COURT:  Yeah.  I'm not going to put them in that position right now.  They're welcome to make some statement.

MR. FEINSTEIN:  I don't think they can because they heard about this --

THE COURT:  Right.

MR. FEINSTEIN:  -- this morning, they need to talk to their client.

THE COURT:  And I'm saying they're welcome to, they're welcome to not to.

MR. FEINSTEIN:  Right.

THE COURT:  I'm not going to put them on the spot and it --

MR. FEINSTEIN:  Right.

THE COURT:  -- isn't going to be my job to make you comfortable so.

MR. FEINSTEIN:  No, but I don't want a rear guard

attack by the -- against the Committee by Whitton that we supported something that they thought was improper, that's all.

THE COURT:  But I'm not putting Whitton in the position of having to declare their agreement or disagreement.  I appreciate it and the Record will show that you're soliciting their input.

MR. FEINSTEIN:  Okay.  Thank you.

THE COURT:  But the Plan that we have now, I mean, the Debtor gets to propose a plan it wants to propose.  It's now proposing this Plan, that I think that's what you bargained for yesterday and you can proceed do object or not object, but that's what the Debtor's proposing.

Mr. Higgins, I'm more than happy to hear from you.  I'm not intending to put you on the spot with --

MR. HIGGINS:  You're not, Your Honor.

THE COURT:  -- having to make the kind of statements that he wants you to make.

MR. HIGGINS:  And I appreciate the comments.  Very briefly just a couple of responses.  First of all, Your Honor, I understand the Sensitivity Analysis.  As you can imagine, we've been running similar analysis on our part.  We recognize that if we should -- if the opt-in -- when we see a draft of this proposal and the Court decides to approve it, we'll be given a reasonable opportunity to

opt in or opt out.  I understand if we go opt out, then my client's sort of lone wolf, going to go litigate until its heart's content or we'll settle.

A couple comments on the Sensitivity Analysis. We heard for the first time a couple of nights ago about this intercompany claim at the non-Debtor Cobalt affiliates. I do want to raise one issue, Your Honor, and it's material because we've now heard that the two Ls may have some claim to this intercompany claim that relates to the Angolan entities.  Never been mentioned, never been mentioned in a disclosure statement.  It's not taken into account in the Sensitivity Analysis numbers that are in the Disclosure Statement in the table that shows what could occur and what could happen to the clients.  It's never mentioned as a possible deduct to the unencumbered assets that would be available to us and the other general unsecured creditors.

And we think that's potentially a problem depending on the magnitude of this claim and at some point, somebody needs to tell us if the two Ls are going to really assert that claim or not because it materially impacts our decision as to whether or not to opt in or what we want to do.  And it wasn't disclosed.

I'll also say we pushed and got copies of the Waterfall Analyses that the Debtors ran that support the numbers in the Disclosure Statement.  It's one of our

proposed exhibits in this hearing.  And that is not mentioned in any those analyses and we've had those now for a couple of months.  So I'd really like to know if there's an additional deduct to this alleged $155 million of assets.

THE COURT:  Who will know that information and how would you like to learn it?

MR. HIGGINS:  Presumably the Debtors and the two Ls.  Those are the only two entities that could explain it and/or make a claim to it.

THE COURT:  So as I understand it, we're going to have the Debtors' CFO appear in a minute.

Is that a person who will know, do you know, or I guess you can find out if he knows or she knows?

MR. HIGGINS:  I don't know.

THE COURT:  Why don't you find out if --

MR. HIGGINS:  I'd rather not have to do it on the fly in cross-examination and miss something or not come to the question.  I think I'd rather the Court order the Debtors and the two Ls to tell us because I'd like to -- you know, frankly, Your Honor, my client to make a decision --

THE COURT:  To tell you what though?

MR. HIGGINS:  -- needs to make an informed decision.

THE COURT:  To tell you the merits of it or to tell you what their position is?

MR. HIGGINS:  I'm sorry, Your Honor?

THE COURT:  What do you want to know from them?

MR. HIGGINS:  As to whether or not somebody is asserting a claim to the $500 million.  That was never mentioned in the Settlement Motion.  It was always implied and/or included in the Waterfall Analysis that the full 500 was coming in and 35 percent of that was going to be available for unsecured creditors.

THE COURT:  Okay.

MR. HIGGINS:  If somebody's now going to play games and say, "Oh, wait.  We're asserting a claim on intercompany non-Debtor affiliate entities" over there and I don't know, is it a $50 million claim and they're going to try and take it off the top?  I'm going to be back before you in a month and a half from now saying, "Oh, it's not 155.  It's $10 million."  Well I think that's an important issue and, frankly, it should have been a disclosure statement issue.

Briefly, Your Honor, I'll reserve other comments. We appreciate the Court's comments on timing.  Obviously I'd like to have an opportunity to talk to my clients.  They're six hours ahead of us being in London right now so it's been very difficult to communicate.  That's part of the reason I didn't get back to Mr. Weiland last night, they were asleep. I think that's it, Your Honor.

THE COURT:  Do you need --

MR. HIGGINS:  As you've already noted, we haven't even seen a draft --

THE COURT:  Yeah.

MR. HIGGINS:  -- to this proposed modification.

THE COURT:  All right.  Do you need to talk to them now?  I don't know when --

MR. HIGGINS:  I had a conference call with --

THE COURT:  -- you heard this proposal.

MR. HIGGINS:  -- them this morning on the way in.

THE COURT:  Okay.

MR. HIGGINS:  I'm absolutely going to need to talk to them about this and where we're going.

THE COURT:  Do you have a copy of the Sensitivity Analysis?

MR. HIGGINS:  I do, Your Honor.

THE COURT:  Okay.

MR. HIGGINS:  And Mr. Weiland just emailed it to me.

THE COURT:  Okay.

MR. HIGGINS:  And so we're typing emails as you can imagine right now to try to get them up to-date and when appropriate, I'll --

THE COURT:  If you need us to take a break so that you can talk to your clients so that you can make an

informed decision on how to proceed, let me know.

MR. HIGGINS:  Okay.

THE COURT:  Thank you.  So what is the -- I'm sorry.

MR. UZZI:  Your Honor, for the Record, Gerard Uzzi of Milbank Tweed, on behalf of the Ad Hoc Unsecured Noteholders.  Just to be hopeful with planning, Your Honor, we, as we said before, will not be calling any affirmative witnesses so just to help people with the day.

But I did also want to respond to Mr. Husnick's desire to close on Friday.  We have objected to the waiver of the automatic stay pending appeal, to the extent Your Honor confirms the Plan.  With respect -- we understand the need for the 6th with respect to Heidelberg and Shenandoah.  We don't have an objection to those sales.  And I know Mr. Husnick wants to keep that in his back pocket, but I just thought it would be helpful, if necessary, to let the Court know and Mr. Husnick know our position at least with respect to the 6th and what they need to get done, Your Honor.

THE COURT:  Thank you, sir.

MR. HUSNICK:  A couple of things in response --

THE COURT:  Yeah.  When --

MR. HUSNICK:  -- and I'll be very brief.  Number one, in terms of the disclosure of intercompany claims,

et cetera, I would just point Counsel to the Debtors' Schedules and Statements that all the intercompany claims with itemized out including the receivable that the LP entity has from the Angolan block entity.  Whether -- I assume the Second Liens will assert the claim.

In terms of the Waterfall Analysis, it shouldn't be lost on anyone that the 500 million, there were all sorts of claims that have been mentioned -- not all sorts, but we've heard from Halliburton who, I think, filed something in response to the Settlement Motion.  We've heard, you know, from Whitton at first said that they had a claim to that cash.  I heard from the Securities -- or not Securities Plaintiffs, the former directors and officers who had indemnification claims as to that cash.

That's a non-Debtor entity and the cash -- pot of cash.  Your Honor has control over that pot of cash pursuant to the Settlement Order and no money's going anywhere until Your Honor decides what's going to happen with it.  But there are competing claims as to the cash and we have to make assumptions when we do various analyses that we put into documents and that's what we did.

We obviously are available to talk and we reached out last night.  We'll talk anytime.  I can leave during witness testimony if they want to talk to me now and, you know, I will make the witness available.  He can testify as

to any of these issues to the extent of his knowledge.

As far as Mr. Uzzi's commentary, I'm fully prepared to argue that this is the appropriate case where Your Honor can order either a waiver of the automatic stay pending appeal or, at a minimum, shortening that pending appeal sufficient to allow Mr. Uzzi to file a motion for a stay pending appeal and post the massive $500-plus million bond that will be necessary to stay approval of these cases.

I think the Record will be clear at the conclusion of this hearing that there is no alternative and the longer we take, the more we continue to burn money on paying employees to stay at the company and continuing to pay professional fees sitting around in this courtroom.  So quite frankly, we need to move forward on confirm and Your Honor has the full power under the statutes and the Code to waive that stay.

Last thing, I just want to make one comment on the Committee's trepidation.  What's good for the goose is good for the gander.  Yesterday the Second Liens -- I will not compare you to a monkey with a gun.  I think that was your analogy.  The Second Liens were --

THE COURT:  You won't be comparing it.  You'll just figure --

MR. HUSNICK:  -- put in a position to --

THE COURT:  Yeah.

MR. HUSNICK: -- say live to the deal. Today we should put the Committee in that exact same box, live to the deal, or we'll confirm the old Plan. That's -- I think that's the option they should be presented with, so thank you.

THE COURT: I don't even hear that we're going to need to do that.

MR. HUSNICK: I hope not.

THE COURT: I think that what I heard from Mr. Higgins without a commitment was -- the commitment at all from his was that --

MR. HUSNICK: Okay.

THE COURT: -- giving them a reasonable period of time to think about the toggle --

MR. HUSNICK: Okay. And the Debtors --

THE COURT: -- was something that --

MR. HUSNICK: -- are fine with two weeks.

THE COURT: -- he needs to talk to his client about, but I'm not getting just a real negative reaction from Mr. Higgins.

MR. HUSNICK: Okay.

THE COURT: Let's see where we end up --

MR. HUSNICK: Okay.

THE COURT: -- before we have to make any decisions like that.

Again I'm going to repeat that I don't believe there is unfair discrimination as a matter of law and I don't believe that a toggle is a material adverse change as a matter of law so long as it is an optional toggle that can preserve the old method.  It is fair for him to worry about what every one of his constituents might have to say but right now, we are proceeding on the Plan that you have proposed on an amended basis.

MR. HUSNICK:  Thank you, Your Honor.

MR. SPEAKER:  Your Honor, I was actually rising to deal with something completely different.  I have no need to respond to the colloquy.  I just wanted to put on the Record that the Committee's proceeding for the purposes of today's hearing and testimony under the same rules of engagement as yesterday, with Your Honor's permission, which is that we're not going to cross-examine witnesses, we're not going to put on our own witnesses but with a reservation of rights that if this deal, which I do support, falls apart that we can come back and deal with the cross-examination of witnesses that we're bypassing.

THE COURT:  No, that's exactly right.  The part that I'm not sure that I would let you come back on is if you decide to change your mind over exactly what was on the table like saying that the toggle isn't fair to Mr. Higgins' client, I don't know --

MR. SPEAKER:  Okay.

THE COURT:  -- that I would then let you go back and cross-examine because that was not the deal that was there.

MR. SPEAKER:  I understood.

THE COURT:  I mean, you may be in a position --

MR. SPEAKER:  Yeah.

THE COURT:  -- to talk me into doing that, but I'm not today right now saying that if you pull out, that you can then go back and examine those folks.

MR. SPEAKER:  Right.  No, we don't want to upset the apple cart, Your Honor.  And look, I'm confident that with the opportunity to talk to his client, that this gives Mr. Whitton's [sic] client what they want, that they will actually embrace this so I'm hopeful that during today's hearing, they come around.

THE COURT:  Okay.  I'm not sensing that we're heading to a crisis.  I don't know want to slight anybody.  We've got some substantial arguments as to whether we ought to confirm this Plan or not --

MR. SPEAKER:  Uh-huh.  Right.

THE COURT:  -- and we need to deal with those --

MR. SPEAKER:  Right.

THE COURT:  -- but getting you out of the --

MR. SPEAKER:  And I do appreciate Your Honor's --

THE COURT:  Yeah.  But getting you out of the --

MR. SPEAKER:  -- observations that this --

THE COURT:  Yeah.

MR. SPEAKER:  -- isn't discrimination.

THE COURT:  Yeah.

MR. SPEAKER:  That's actually quite helpful and comforting.

THE COURT:  But getting you out of the way is a big deal so.

MR. SPEAKER:  Thank you very much.

(Laughter.)

THE COURT:  All right.

(Voice off record.)

MR. HUSNICK:  Your Honor, with that --

THE COURT:  Well, I didn't hear it.

MR. HUSNICK:  Unless you have anything further, I think I'd ask that we begin with the witness testimony and I would see the podium to my partner, Jamie Aycock.

THE COURT:  That's fine.  I do have a 10:00 o'clock hearing that I believe to be very short.  I'd suggest we go ahead and proceed, but I'm just -- I'm telling everybody I'm going to call that --

MR. HUSNICK:  Okay.

THE COURT:  -- pretty close to 10:00 o'clock.

MR. HUSNICK:  Okay.  Thank you, Your Honor.

THE COURT:  Let me pull up my notes from yesterday.

Mr. Aycock, good morning.

MR. AYCOCK:  Thank you, Your Honor. Jamie Aycock, on behalf of the Debtors.  We call our next witness, David Powell, to the stand.

THE COURT:  Thank you.  Come on forward please, Mr. Powell.

MR. AYCOCK:  And we have some binders to pass up.

Would the Court like two copies or just one?

THE COURT:  Two please, one for him and one for me would be great.  Thank you.

Mr. Powell, good morning.  Would you raise your right hand please, sir?

(Witness sworn.)

THE COURT:  Thank you, Mr. Powell.

MR. AYCOCK:  Your Honor, may I approach the witness also?

THE COURT:  Yes, sir, please.

MR. AYCOCK:  Good morning, Mr. Powell.

THE WITNESS:  Good morning.

DIRECT EXAMINATION OF DAVID POWELL

BY MR. AYCOCK:

Q    Could you please introduce yourself to the Court?

A    David Powell.

Q      And what is your position with the Debtors?

A      I'm the Chief Financial Officer of Cobalt.

Q      And how long have you been the Chief Financial Officer?

A      I joined Cobalt in July of 2016.

Q      And can you explain what your role is as CFO?

A      Well, I'm responsible ultimately for all financial matters of the company.  That includes accounting, treasury, investor relations.  I'm also intimately involved with all strategy discussions.

Q      And what's been your role while the company -- since the company has filed its Petition for bankruptcy?

A      I'm sorry?

Q      Since the company has filed for bankruptcy, has your role changed at all?

A      No, my role has not changed.

Q      And have you been involved in that process?

A      Very involved.

Q      Okay.  Let's talk about your background.

Can you provide the Court a summary of your education?

A      Sure.  I'm from a small town in Kansas.  I went to college at William Jewell, which is in Kansas City.  I have an accounting degree.  I graduated *summa cum laude*.  Am a -- I have a CPA certificate from the State of Missouri.

Subsequently, I attended the Harvard Business School's Advanced Management Program about 10 years ago.

Q     And can you give us a summary of your professional experience?

A     Yes.  I worked one year for Deloitte.  I spent 27 years with Occidental Petroleum and increasingly more-important positions over time generally in finance.  About 10 years of that was internationally.  I lived in Argentina, Russia, Malaysia, Qatar.  At the end, I was Vice-President of Finance over all of the oil and gas U.S. operations.  I then moved to BHP Billiton, was there for 7-1/2 years and I was the CFO of their Oil and Gas Group, which is based here in Houston and quite large.  And then I came to Cobalt.

Q     And when was it that you came to Cobalt?

A     It was July 2016.

Q     Okay.  Let's talk about Cobalt's exchange transactions.

Can you give us just a high-level summary of what those exchange transactions were?

A     Yeah.  The purpose of the exchange was to raise $500 million of cash.  We did that through an agreement with existing lenders where they provided the 500 million as a first lien security and so they had liens against the majority of our assets.  In exchange, they got to take existing debt and move it from being unsecured and

DAVID POWELL - DIRECT BY MR. AYCOCK          45

convertible to a secured second lien note.  And they also gave us the flexibility to do follow-on exchanges.

Q    And when there was an exchange some notes for new notes, were there any other benefits to that exchange?

A    Well, the -- beyond just the cash, we had the unsecured notes were maturing, the majority of them in 2019 and we extended that maturity to 2023.  And we also got substantial discount on the principal.

Q    And about how much was that discount?

A    It -- well, ultimately through all of the exchanges, it was between three and $400 million.

Q    Okay.  And again what was the main reason that Cobalt entered into those exchange transactions?

A    We needed the additional 500 million to ensure we had adequate liquidity.  We had just found out that Sonangol was not going to close on our asset sale.  We had done a strategy session to determine what our best options were. We were going to remarket Angola and, if necessary, the GOM assets, but we did not want to do that in a fire sale process so we wanted to have the liquidity to ensure that we had the best option value in the marketing process.

Q    Okay.  When you talk about liquidity concerns, were those for the parent company, Cobalt International Energy, Inc., or were those also concerns for other entities?

A    Well, from a cash management perspective, we always

look at the entire company.  We do not look at it asset by asset.

Q      And why is that?

A      Because it's much more efficient to raise capital at the parent level and we can maximize value to our constituents by investing in what has the highest rate of return and so all of the companies benefit from that collective effort of cash management.

Q      And are there other examples you can point to of ways that Cobalt makes decisions on behalf of the entire enterprise as opposed to on an entity-by-entity basis?

A      Well, our management structure for the most part is geared towards the entire company.  The Board of Directors is obviously focused on the entire company.  All decision processes are to maximize the value to the company in our investment decisions and other things.

Q      And when the company, either Management or the Board, reviews financial performance, do you look at that broken down by entity?

A      No, we don't.  It's always viewed as the financial results of the entire company.

Q      And what about decisions related to employment?

A      Most all employees are at the parent level and those decisions are made on a Cobalt level.  All entities -- well, to the benefit of all entities.

Q     Okay.  And how do Cobalt entities access capital markets?

A     Well, the company was originally private equity funded company.  It subsequently had an initial public offering.  I believe there were three -- this was all before my time, but there were three separate stock offerings and then two convertible debt offerings.  The convertible debt when I arrived was just slightly under $2.7 billion.

Q     And so which Cobalt entities then accessed the capital markets?

A     The parent company.

Q     And have the subsidiaries done that separately on their own?

A     Not -- in one instance with Heidelberg, there had been a loan facility that was put into place, determined subsequently to be extremely expensive and they opted out of that program.  And since then, all financing has been done at the parent level.

Q     Okay.  Let's talk about Cobalt's intercompany obligations.

        Are you familiar with how Cobalt accounts for its intercompany obligations?

A     I am.

Q     I'd like to pull up on the screen -- we have a native Excel file, DX138, and that's not in the binder.

A     Okay.

Q     I will pull it up on the screen.  It's easier to manipulate the Excel file.

MR. AYCOCK:  May I approach, Your Honor?

THE COURT:  Yes, sir.  And actually while we're getting that file, I'll call my 10:00 o'clock hearing.  If everybody can just stay where they are?  If you want -- I don't think this hearing is going to take very long.

MR. AYCOCK:  Yes, Your Honor.

THE COURT:  We'll see if the people here at 10:00 o'clock can come on.

(Recess taken from 10:00 a.m. to 10:10 a.m.)

THE COURT:  I'm sorry about the interruption.

MR. AYCOCK:  May I proceed, Your Honor?

THE COURT:  Yes, sir, please.

MR. AYCOCK:  Okay.

(Witness previously sworn.)

MR. AYCOCK:  So I'm going to turn your attention to what's been marked as "DX138."  It's on the screen.

DIRECT EXAMINATION OF DAVID POWELL (RESUMED)
BY MR. AYCOCK:

Q     Do you recognize this document?

A     Yes.  It's a spreadsheet that accounts for the intercompany balance that's been prepared by my Accounting Department.

Q      And did you direct your Accounting Department to prepare this document?

A      Yes, I did.

Q      And where did the information that's in this spreadsheet come from exactly?

A      It comes from our books and records, the General Ledger.

MR. AYCOCK:  Your Honor, I'd offer DX138 into evidence.

MR. HIGGINS:  Objection on relevance grounds, Your Honor.

MR. AYCOCK:  This is directly relevant to Whitton's claim, Your Honor.  This is the accounts that show the intercompany obligations that the company has.

THE COURT:  We're not here on Whitton's claim.

What else is it related to?

MR. AYCOCK:  I believe that other parties are contesting the intercompany obligations as well.  If that's not the case, then we can avoid --

MR. HUSNICK:  Your Honor, the trial on the intercompany claims is not before the Court today.  This is an 1129 confirmation hearing.

MR. AYCOCK:  Your Honor, this is also relevant to our Waterfall Analysis.

THE COURT:  Mr. Higgins?

MR. HIGGINS:  I'm not sure what waterfall analysis he's referring to, Your Honor.

THE COURT:  I'm admitting it for the limited purpose of confirmation.

(Debtors' Exhibit Number DX138 received in evidence.)

THE COURT:  It is not admitted for any subsequent dispute over the actual amount of the intercompany receivables.

MR. HIGGINS:  Thank you, Your Honor.

THE COURT:  That will be considered on a fresh basis.  Thank you.

MR. AYCOCK:  Thank you, Your Honor.  Okay.

BY MR. AYCOCK:

Q    Can you describe -- well first, how would you describe these obligations?

A    Well, the parent company would go out and get the financing that we talked about and we have a series of subsidiary companies.  There's a company called "LP" that generally manages -- Cobalt, LP that manages our cash and so as the funds are transferred down to the respective entity, we record an intercompany, which is a receivable on the company providing that money and a payable on behalf of the company that is receiving that money.

Q    Okay.  And can you describe at a high level what's on this first tab of the spreadsheet titled "Pivot"?

A     Yes.  If you look down the left column, those represent different companies of Cobalt.  I couldn't tell you company by company the number, but the 100 companies are U.S. companies and, of course, the parent company's at the top.  And the 200 companies are African companies principally Angola but there were some other entities.  And the 300 companies were when we were looking at Mexico.  So in its simplest form, you can see there's a balance on Row 6 of -- a credit balance of 6,048,000,000 and just above is the other company.  One is treating it as a receivable, the other is treating it as payable and it's just the way the intercompanies worked.

Q     Okay.  And let's turn to the third tab of the spreadsheet that's titled "One."

          THE COURT:  Just to make sure I understand how this has worked, can we go back?  Just I want to be sure I've got it.

          If we were to total B20 to M20, would we get zero?

          THE WITNESS:  B20 -- I'm sorry, I don't always look at the spreadsheets in that way.  The --

          THE COURT:  But if we totaled the grand total line, would we get zero?

          THE WITNESS:  Yes.

          THE COURT:  Okay.

THE WITNESS:  Yeah.

THE COURT:  Thanks.

MR. AYCOCK:  Okay.

BY MR. AYCOCK:

Q     So if we can turn to the one that's Tab 1, what does the 1 represent here?

A     That's the parent company.

Q     And what is depicted here on Tab 1?

A     It is a direct extract or rather mind-bending but -- of the entire General Ledger activity.  Each transaction where there's a movement is recorded in the General Ledger and this is just an extract of that General Ledger.

Q     Okay.  And so when the -- are the -- when the money is transferred from one entity to another, is that intended to be a permanent transfer?

A     No.  As an oil and gas company, we make investments in exploration with the intent of ultimately developing that. As a consequence, we anticipate that being returned to the parent company over time.  That's why we treat it as kind of a payable and -- a receivable to the parent and a payable by the entities that get that money.  If we were Coca-Cola or something like that and we opened a branch in another country, we might actually fund it with equity but that's because they have a permanent long-term business where in the oil and gas sector, it's a rather defined period of time

until the reserves run out and so you want all that money to be returned with time.

Q      Okay.  Let's turn back to the first tab, Pivot.  Okay. And we want to take one example here.  So let's take the number that's in Cell B20, the negative $6 billion number.

A      Yes.

Q      What does that $6 billion represent there?

A      That's the summation of all of intercompany balances that -- or the money that we've raised over time and distributed to various businesses.

Q      And is that for a particular entity then?

A      No, it's for the entire company.  Each of the entities are the ones that go across the top.

Q      And is -- you said that the 1 represents the parent company; is that right?

A      Yes.

Q      And so is there a number here that represents the amount that was -- that is owed to that is a payable to the parent company?

A      Yeah.  Coming back to what I referred to before, in the simplest form, all funds were, you know, raised at the Cobalt International level and that's the 6,048,000,000 and that's then taken down to the LP company and its distributed out to the others.  So in the initial instance, you've have a receivable by the parent company and a payable by LP.

When the LP distributed out, they would have the same kind of transaction.

Q     And that 6,048,000,000, you're referring to the -- what's in Cell B2 -- B6, I'm sorry.

A     Yeah.

Q     Okay.  And can you explain why that number is so high?

A     Well, the company raised significant amounts of capital over time.  We had 2.7 billion of convertible debt. We raised another 500 million after I joined the company. And then there was several public offerings where funds were raised.  And so those were then distributed out to various entities --

Q     Okay.

A     -- within the umbrella.

Q     And other than the accounting records that this information is drawn from, is there any other documentation like intercompany agreements or promissory notes or anything like that that has to do with the terms of these recorded obligations?

A     None that I'm aware of.

Q     And in your experience, is that unusual?

A     No, it's quite common.  Like I -- there's kind of three ways to fund a company and this is one way.

Q     Okay.  Let's turn back to what was done to address the liquidity concerns that you mentioned earlier.  Okay.

THE COURT:  Can we go back?

MR. AYCOCK:  Yes, Your Honor.

THE COURT:  Again I just want to make sure I follow this.

The money was raised by Company 1 or by Company 100?

THE WITNESS:  One.

THE COURT:  The label shows that payables are shown in parentheses and receivables are not and the signs look reversed to me on here.  I want to be sure that the label's wrong and not my understanding.

Is that right or am I misunderstanding?

THE WITNESS:  The debits would be without brackets and the credits with brackets.

MR. AYCOCK:  And so the money --

THE COURT:  Company 1 is the --

MR. AYCOCK:  -- would have gone to LP.

THE COURT:  Company 1 is the first --

THE WITNESS:  Yes.

THE COURT:  -- column or the first row?

THE WITNESS:  It's the row.

THE COURT:  And what's the 1100.001, that column?

THE WITNESS:  That then ties out to the companies down below so staying with the simple view of the very first two numbers of Row 5, 1100 -- 100.  That 100 is designating

that that's to Company 100.  That's why it's an equal balance.

THE COURT:  I'm not --

THE WITNESS:  The 6,048,000,000 --

THE COURT:  The negative 6048 represents a payable by what company?

THE WITNESS:  Company 100.  And I believe from memory that is -- Cobalt, LP so --

THE COURT:  Right.  So what is --

THE WITNESS:  And at the Company 1 level, it's a receivable and that's why it's a debit balance.

THE COURT:  So I'm not asking my question well at all.  I'm going to ask it again, if I can figure out how to do this.

What is that column, (indicating)?

THE WITNESS:  Those are the other balances on like Company 102, 203, 204 so anything that's a 100 company is a U.S. asset.  Anything that's a 200 is an African asset company.

THE COURT:  Right.  But why is it in that column?  I understand what the rows are.  What's that column?

THE WITNESS:  That column is just the -- you know, the total funds that were raised.

MR. AYCOCK:  I think if I ask a couple of questions it might clarify, Your Honor.

THE COURT:  Okay.  Because I'm not -- I'm lost as to the column.

BY MR. AYCOCK:

Q     Is the first column -- does that represent each company?

A     Yes, each balance.

Q     And then each subsequent column has to do with the account balance with respect to the other companies?

A     That's correct.

THE COURT:  I'm not understanding.

MR. AYCOCK:  So, for example, in -- if you look at B6 that we've been focused on, that would be the amount that Company 100 owes to Company 1.

THE WITNESS:  That's correct.  Oh, I'm sorry, that's correct, Your Honor.

BY MR. AYCOCK:

Q     And we can see that's why they're all negative numbers then in Column B because each of the entities that has a balance owes to Company 1, the parent company; is that right?

A     That is correct.  And then as you go down, as an employee, if you go over to the next column, that's the subsidiary immediately below Cobalt International.  It's generally where most of our funds are maintained.  If you go down, I believe from memory, that the Company 205 is an

Angola company and you can see that's where we made an in excess of $2 billion investment in Angola.

THE COURT:  All right.

MR. AYCOCK:  Does that clarify it for Your Honor? I feel like there still may be some confusion.

THE COURT:  No, I'm there.

THE WITNESS:  And the only other thing I would add is: in Company LP, that's the Column C, they actually directly own the GOM assets so there's no further distribution down.

MR. AYCOCK:  Are there any more questions about the spreadsheet, Your Honor, before we move on?

THE COURT:  I think I'm okay.  Thank you.

MR. AYCOCK:  Thank you.  Okay.  Let's turn back then to what was done to address the liquidity concerns that you talked about before.

BY MR. AYCOCK:

Q    Can you turn to Exhibit Dx74 in your binder?

MR. AYCOCK:  And if we can pull that up on the screen?

THE WITNESS:  Yes.

MR. AYCOCK:  Okay.

BY MR. AYCOCK:

Q    And then if we can turn to the second page?

Do you recognize this document?

A       Yes.  It was the Agenda of the Board Meeting.  It was actually the very first Board Meeting I attended.

MR. AYCOCK:  And, Your Honor, we move DX74 into evidence.

THE COURT:  Any objection to the admission of the Board Meeting Minutes?

MR. SPEAKER:  No objection, Your Honor.

THE COURT:  All right.  74 is admitted.

(Debtors' Exhibit Number DX74 received in evidence.)

MR. AYCOCK:  Okay.

BY MR. AYCOCK:

Q       Now can you please turn to Page 97?

A       I'm there.

Q       And what is on this page?

A       This is a letter from our CEO, Tim Cutt, to the Board of Directors.  It's just identifying the strategy project that we had initiated when -- Tim Cutt and I joined at relatively the same time.  We set up a strategy team to look at the various options that Cobalt had especially in light of the Sonangol sale not -- likely not closing, which we then found out, and it was just addressing some of the objectives to remedy any liquidity issues that we may have.

Q       And did Cobalt take any actions to address the issues that were raised in this letter?

A       Yes.  We initiated a review of the various investment

banks.  We engaged with Goldman Sachs as a strategic advisor and Lazard as a financing advisor and they looked at various options with us as to how to improve our liquidity position. Plus also this strategy around marketing of assets.

Q     And what options did you learn were available?

A     Well, there were a variety of options.  We could have tried to issue equity in exchange for debt.  Our stock price was quite low so that was not a very likely successful opportunity.  But Lazard was very good at coming up with a strategy to work with our existing debt holders to raise an additional 500 million through an exchange offer.

Q     And can you explain why is it that Cobalt -- why exactly did Cobalt need cash at that time?

A     Yeah.  As I explained earlier, the Sonangol sale had not happened.  We had, as a corporation, anticipated getting close to $2 billion from that.  Without that, we had to look at other options.  The principle initial option was the sale of Angola.  We knew that would take time.  The company wanted to ensure we didn't have a fire sale and we therefore had several wells that we were obligated to drill to keep those assets in the Gulf of Mexico so we felt like 500 million was the right amount of money to ensure that we could do all of that and maximize the value from our assets.

Q     And other than the $500 million in cash, were there other important benefits that Cobalt was hoping to get in

the exchange transactions?

A     Yes.  We were hoping that we could extend the maturities, which we had a debt maturity in 2019 that was $1.3 billion.  We are also looking to try to find a way to maybe get some discount.  Lazard explained to us that we could potentially get the additional cash on pretty favorable terms and those were some of the principle objectives.

Q     And did you anticipate that there would be follow-on exchange transactions after the first one?

A     Yes.  In fact, our debt holders -- or the firms that we did the exchange with built that into the indenture. Lazard was helpful with that.  They gave us a $350 million basket to do follow-on exchanges.

Q     So for the first exchange transaction, did the company just negotiate with a single group of bondholders?

A     No.  What happened was: there was great deal of interest from our bondholders across the board and I talked frequently with all of our major debt holders and they sort of formed two groups.  We called them internally the 2019 Group" and the "2024 Group."  Both groups had crossover holdings, but the 2019 Group had a majority of 2019 bonds and the 2024 Group had a majority of 2024 debt.

Q     Okay.  And so you negotiated with both of those groups.

A      Yes.

Q      Okay.  Could you turn to Exhibit DX78 in your binder?

A      I'm there.

Q      Okay.  And if you look at the second page, I think that'll help.

        Do you recognize this document?

A      Yes.  It's the Minutes from the October 27th, 2016 Board Meeting.

        MR. AYCOCK:  Your Honor, we move DX78 into evidence.

        THE COURT:  Any objections?

    (No audible response.)

        THE COURT:  Seventy-eight is admitted.

    (Debtors' Exhibit Number DX78 received in evidence.)

        MR. AYCOCK:  Okay.

BY MR. AYCOCK:

Q      If you could turn to Page 4 of 6?

        And can you look at the section that's titled "Finance Update with External Advisors"?

A      Yes.

Q      Okay.  What does these Minutes say about the Finance Update?

A      Well, Mr. Kurtz had -- representative from Lazard and he was coordinating the review of our different options and he was basically updating the Board that we had both a 2019

DAVID POWELL - DIRECT BY MR. AYCOCK          63

group and a 2024 group that had formed and the 2019 Group was pushing to not have that competition.  I mean, they wanted to have a single negotiation with them.  And he was presenting that to the Board and the Board basically said continue to negotiate with -- do not just go with the 2019 Group.

Q     And did there come a time when the Board -- or when Cobalt only negotiated with one group?

A     Not until the end.

Q     Okay.  And why was -- what was the reason for that?

A     The competitive tension between the two groups.  It actually worked to the favor of the company.  We were able to have better terms for that reason and we could evaluate the different options of was it better to do 2019 or 2024 debt?

Q     Okay.  Can you turn to DX81 in your binder?

A     I'm there.

Q     Okay.  And if you look at Page 2, do you recognize this document?

A     Yes.  It's the Minutes of the November 4th, 2016 Board Meeting.

          MR. AYCOCK:  Your Honor, we request to move Exhibit DX81 into evidence.

          THE COURT:  Any objection to admission of the November 4th, 2016 Board Minutes?

(No audible response.)

THE COURT:  All right.  It's admitted.

(Debtors' Exhibit Number DX81 received in evidence.)

MR. AYCOCK:  Okay.

BY MR. AYCOCK:

Q    Can you turn to --

THE COURT:  That's Exhibit 81 is admitted.

BY MR. AYCOCK:

Q    Can you turn to the last page of the document, Page 3 of 3?

A    Yes.

Q    And can you look at the last full -- or sorry -- the first full paragraph on that page?

A    Yes.

Q    Okay.  What do these Minutes say about the continued negotiations with the group?

A    It -- they simply highlighted that we can -- we're continuing to negotiate with the two groups to come up with the most favorable deal possible for the company.

Q    And ultimately which group was selected for the exchange transaction?

A    Ultimately it was the 2019 Group.  Towards the end, we -- the 2024 Group backed out because they actually couldn't come up with the 500 million.

Q    And could you now turn to Exhibit DX86?

A     Yes, I'm there.

Q     Okay.  And do you recognize this document?

A     Yes, I do.

Q     What is this?

A     This is the Exchange Agreement for the transaction.

Q     For the first exchange transaction.

A     Yes, that's correct.

Q     And when did this take place?

A     This was December 6th, 2016.

          MR. AYCOCK:  Your Honor, we move DX86 into evidence.

          THE COURT:  Any objection to admitting the exchange transaction?

          MR. SPEAKER:  No, Your Honor.

          THE COURT:  It's admitted, 86 is admitted.

     (Debtors' Exhibit Number DX86 received in evidence.)

BY MR. AYCOCK:

Q     And can you tell me, who was the Agreement entered into with?

A     It was Cobalt entering into the Agreement with the large hedge funds that owned our debt to do the exchange, the group that we call the "2019 Group."

Q     Okay.  And can you turn to Page 49 of 100?

A     Yes.

Q     This is Schedule I.

What's listed here on Schedule I?

A     These were the firms that participated in the initial exchange.

Q     And what are these entities?

A     These are large hedge funds.  You can see going down the left side and then the amount of debt that they were exchanging.  Most of these hedge funds we would talk to on a quarterly basis and we were pretty familiar with the group.

Q     And did you personally interact with them?

A     Most definitely.

Q     And you mentioned that they're large hedge funds.

How did you know that they were large hedge funds?

A     Part of my role as -- over investor relations, we would monitor who owned our debt.  Because these were convertible bonds, they had to do SEC filings on a quarterly basis.  We would update the Board on who owned our debt.  Most of these people would reach out to me to -- after the Earnings Report to get a little additional color, so we knew -- we were quite familiar with the group.

Q     And you mentioned SEC filings.

Did you actually review SEC filings by these entities?

A     Yes, we did.  I mean, we -- to monitor who owned our debt.

Q       Can you turn to DX181?  I'm sorry, 151.

A       I'm there.

Q       And do you recognize this document?

A       Yes.  These are the Disclosure Statements from the firms identifying their holdings.

Q       And do you have an understanding about whether these funds are required to submit these kinds of documents to the SEC?

A       They are.  And as I mentioned, it's required because they were equity-linked debt, convertible.

Q       And do you consider these documents trustworthy?

A       Yes, I do.

Q       And are they something that you rely on in your capacity as CFO of Cobalt?

A       Most definitely.

Q       And again, what's the reason for relying on these documents?

A       To ensure that we know who our debt holders are.  And, you know, if there's been any large changes in those holdings, we try to determine what's the result of it.

        MR. AYCOCK:  Your Honor, we'd like to move DX151 into evidence.

        THE COURT:  Any objection?

        MR. SPEAKER:  No objection, Your Honor.

        THE COURT:  151 is admitted.

(Debtors' Exhibit Number DX151 received in evidence.)

MR. AYCOCK:  Okay.

BY MR. AYCOCK:

Q     Could you turn to Page 15 of 31?

A     I'm there.

Q     Okay.  And can you look down toward the bottom of the page where it's Section 7(b)(1), private fund reporting?

A     I'm there.

Q     Okay.  And then if you look a little further down where it's 1(a), name of a private fund?

A     Yes.

Q     And what does that say there?

A     That's Southpaw Credit Opportunity Master Fund, LP.

Q     And are you familiar with this entity?

A     Yes, I would meet with their representatives generally on a quarterly basis.

Q     And was this entity one of the parties in the first exchange transaction?

A     Yes, it was.

Q     Okay.  And now can you turn to Page 18 of 31?

A     Yes.

Q     And can you take a look down at Item 11?  I'm sorry, it's a the very top, current gross asset value of the private fund?

A     Yeah, I'm there.

Q     And what does that say?

A     The assets are just slightly below $1.7 billion.

Q     And is that consistent with your understanding of the size of the fund at the time --

A     Yes.

Q     -- you entered into the exchange transaction?

A     It is.

Q     Okay.  And now can you turn to DX87 and 88?  Kind of toggle between those a little bit.

A     I'm sorry, DX87?

Q     Yes, 87 and then the next one, 88.

A     Yes.

Q     And do you recognize these documents?

A     Yeah, these were the Loan Agreements, the indentures for both the First Liens and the Second Liens.

MR. AYCOCK:  Your Honor, we offer DX87 and 88 into evidence.

THE COURT:  Any objections?

(No audible response.)

THE COURT:  Eighty-seven and 88 are admitted.

(Debtors' Exhibit Number DX87 and DX88 received in evidence.)

MR. AYCOCK:  Okay.  Let's talk about the details of the first exchange transaction.

BY MR. AYCOCK:

Q      Can you just summarize, what were the main terms of that transaction?

A      The -- as I said earlier, the objective was to raise $500 million so the agreement was that for the parties that put in that money, they could exchange all of their Cobalt unsecured debt for Cobalt secured debt.  The First Liens were the new cash, the 500 million.  The Second Liens were the notes that were exchanged with the convertible debt holders and they moved up to being secured.

Q      And was there a change in the maturity date for notes?

A      Yes.  The notes that were exchanged, the majority of them with 2019 debt.  And the second lien debt had a maturity of 2023.

Q      And were there -- what did Cobalt give up as part of the transaction?

A      What we gave up was the security in the company's assets.

Q      Okay.  So looking at Exhibit 87, can you turn to Page 110 of 161?

A      I'm there.

Q      Okay.  And can you take a look at where it says, "Article X, Guarantees"?

A      Yes.

Q      And just at a high level, can you explain what this provision provides?

A     The objective there was to give the security interests to the debt holders in the company's primary assets.

Q     And so prior to this transaction, did the Cobalt subsidiaries -- did they guarantee any of the existing notes?

A     No, they didn't.

Q     And after this transaction, did they guarantee notes?

A     Yes, they did.

Q     And can you explain why did it make sense for the subsidiaries to provide a guarantee?

A     If you go back to the beginning of my testimony, we talked about cash management was for the entire company and it was to the benefit of all parts of the company.  We didn't look at cash as just at that particular company level.  We looked at it in aggregate.  So what was good for the company was to raise the cash to give the security interest and it was beneficial to all parts of the company to have that --

Q     And what --

A     -- additional flexibility.

Q     Sorry.  And were there any direct benefits to those subsidiaries?

A     All -- they had the ability to utilize the cash that the company had.

Q     Okay.  And now can you turn to Page 112 of 161?  And

can you look near the top of the page where it says,

"Section 10.01, Limitation on Guarantor Liability"?

A     Yes.

Q     Okay.  And at a high level, what does this provision

provide?

A     Well, I'm not a lawyer first, but my understanding was

we wanted to ensure that the company didn't run into any

fraudulent conveyance issues, so we put in certain

limitations on the guarantees.

Q     So each subsidiary wasn't necessarily guaranteeing the

entire debt.

A     That's correct.

Q     Okay.  So let's turn to the follow-on exchange

transactions that Cobalt entered into.  You said that Cobalt

contemplated there'd be additional exchange transactions.

Who did you enter into the next exchange

transaction with?

A     We entered three.  The first exchange was with

Whitebox and Hybridge.

Q     And what are those entities?

A     They were entities that were in the 2024 Group.  As

I'd mentioned, I talked with all the lenders frequently.

They were very focused on doing an exchange.  They proposed

very good terms on the exchange.  We were also focused on

not having investment banker fees, which could be quite

expensive, so we did that direct negotiation in that case.

Q    Okay.  Could you turn to DX153 in your binder?

A    I'm there.

Q    And do you recognize this document?

A    It's the Whitebox filings that we talked about before with the SEC.

Q    Okay.  And so this similarly then would have been submitted because the entity had a duty to report to the SEC?

A    That's correct, as it relates to the convertible debt. The secured debt that didn't have an equity link, they actually don't have to file that.

         MR. AYCOCK:  Your Honor, we move DX153 into evidence.

         THE COURT:  Any objections?

    (No audible response.)

         THE COURT:  153 is admitted.

    (Debtors' Exhibit Number DX153 received in evidence.)

         MR. AYCOCK:  Okay.

BY MR. AYCOCK:

Q    Can you turn to Page 31 of 128?

A    I'm there.

Q    And again looking at 1(a), it's about the middle of the page.

A    Yes.

Q      Where it says, "Name of the private fund."

A      Yes.

Q      And what does that say?

A      It's Whitebox -- I probably can't pronounce it perfectly -- Asymmetric Partners.

Q      And was this Whitebox entity a party to the first exchange -- or the second exchange transaction?

A      Yes.

Q      And can you turn then to Page 33 of 128?

A      I'm there.

Q      And if you can look at the same number, Item 11, current gross asset value of the private funds?  It's towards the bottom of the page.

A      Yes.

Q      And what does that say?

A      It's just slightly under 2.4 billion.

Q      And is this consistent with your understanding of the size of the fund around the time when you entered into the exchange transaction with Whitebox?

A      It is.

Q      And when was it that Cobalt entered into that transaction?

A      From memory, it was I believe late January.  It might have been February, but I think it was late January.

Q      Of which year?

A      Of 2017.

Q      Thank you.  And how did you come to enter into the transaction then with Hybridge and Whitebox?

A      As I mentioned earlier, they were in the group that was unsuccessful.  They were very focused on trying to move up into the secured debt and they offered very, very favorable terms and, as I mentioned, we didn't have to have investment banker fees, which we were trying to avoid, because in the aggregate we -- it was going to be three or $4 million and that would have been cash.

Q      And after this exchange transaction, was there another exchange transaction?

A      There were two more.

Q      And who did you enter into the next exchange transaction with?

A      That was with Cyrus.  They were one of our largest debt holders.

Q      And what is Cyrus?

A      It's a large hedge fund.

Q      Can you turn to DX135?

       Do you recognize this document?

A      Yes.  It's the SEC filing for Cyrus.

       MR. AYCOCK:  Your Honor, we move DX135 into evidence.

       THE COURT:  Any objections?

(No audible response.)

THE COURT:  135 is admitted.

(Debtors' Exhibit Number DX135 received in evidence.)

BY MR. AYCOCK:

Q    Can you turn to Page 95 of 130?

A    I'm there.

Q    Okay.  And again if you could look at the box for the name of the private fund, 1(a); what does it say there?

A    That's Cyrus Opportunities Master Fund II.

Q    And was this Cyrus entity a party to the exchange transaction that you just talked about?

A    It was.

Q    And can you turn to Page 97 of 130 and look at Item 11?

And what is the amount that's listed for Item 11?

A    It's just slight under $2.8 billion.

Q    And is this consistent with your understanding of the size of this fund at the time you entered into the transaction?

A    It is.

Q    And how did you come to enter into the transaction with Cyrus?

A    Cyrus, as I mentioned, is a very major holder of our debt.  We spoke frequently.  In fact, almost -- quite a large number of our investors were trying to participate in

that follow-on basket.  Cyrus, being one of the largest, made it easier to have a company-to-company negotiation and that's what we did.

Q     And as part of that transaction, did you exchange 2024 notes that were existing for now 2023 notes?

A     That's correct, and we got a substantial amount of discount in doing that.

Q     And is that the reason that you were willing to agree to an earlier maturity date?

A     Yes.  Well, we -- as time proceeded, we began to think more about is there an opportunity to sell the entire company.  The debt level of the company was obviously high. We were trying to capture as much discount as possible to make us look more attractive to a potential buyer.

Q     And who did you enter into the next exchange transaction with?

A     From memory, it was Hutchin Hill.

Q     And what is Hutchin Hill?

A     It's a large hedge fund.

Q     And when did Cobalt enter into that transaction?

A     From memory, I believe it was April of 2017.  It might have been May.  No, I think it was May of 2017.

Q     And has Cobalt entered into any other exchange transactions since then?

A     No.  What happened is: we utilized the entire basket

with Hutchin Hill, the remainder of that 350 million, and once again got very favorable terms on the exchange from them.

Q    And can you describe what was the impact of the exchange transactions on the interest rate that Cobalt had to pay on its notes?

A    The notes were higher interest, but to really look at it in its totality, one has to look at how much discount we got.  And towards the end of these exchanges, we were getting a substantial discount so that the cash interest on some of the final trades barely moved up even though it was a 7-3/4 percent interest rate versus a 3-1/8.  There was so much discount.

Q    Okay.  And you mentioned that as part of the Cobalt exchange transactions, that you obtained $500 million.

What did Cobalt actually do with that $500 million?

A    What -- when we initiated the program or the exchanges, we knew that in the next 12 months we had three major wells that were being drilled in the Gulf of Mexico. These were wells that were required.  If we didn't drill them, we would have lost those assets so that there was significant value opportunity there.  The -- so those wells were drilled in late 2016 through till the end of June 2017. So it was the objective to keep the leases.  Otherwise we'd

lose tremendous value.  And secondly, we knew we were marketing the assets, that information from those wells was extremely important in kind of de-risking those discoveries so that a buyer could hopefully pay the maximum price possible.

Q     Okay.  You just said that if you didn't drill, you might lose the assets.

Can you explain what you meant by that?

A     Yeah.  In the Gulf of Mexico, the initial exploration lease term is 10 years.  All three of our major discoveries were at the end of that period so the Rules at the time were you had to continuously drill every six months or you file for what is called an "SOP," which is Suspension of Production.  And we weren't able to do an SOP yet because we didn't have enough data and in all three cases, we felt like that additional well would potentially allow us to file for an SOP.

Q     You've heard in this case that there have been some objections that Cobalt subsidiaries didn't get -- give -- didn't get as much as they gave up as part of these exchange transactions.

What's your response to that?

A     Oh, I totally disagree with that.  The benefit was to all of the companies and assets within Cobalt because we managed as a single financial system, single cash management

system.  Even if a subsidiary didn't immediately need money, they had the benefit of knowing that if an emergency came up or if there was an issue, that they had funds to take care of any problems.

Q     And do you have any familiarity with the fact that disinterested directors investigated possible claims for those exchange transactions?

A     Yes, I'm familiar that they did.

Q     And were you interviewed as part of that investigation?

A     About the exchange, yes.

Q     Okay.  I'd like to talk about the Registration Rights Agreement that Cobalt has.

Can you turn to DX168?  I'm sorry, 161.

A     Oh, okay.

Q     And do you recognize this document?

A     Yes, I do.

Q     And what is this?

A     This was the Registration Rights Agreement with the initial IPO of the company.  It's between Cobalt and the equity sponsors.

Q     Okay.

MR. AYCOCK:  Your Honor, we move Exhibit DX161 into evidence.

THE COURT:  Any objections?

(No audible response.)

THE COURT:  All right.  When you get to break point, I've got to give my staff a break at some point so let me know.

MR. AYCOCK:  Now is a good time, Your Honor, before I start with this topic.

THE COURT:  Is it?  Okay.  Let's take a 10-minute break and we'll come back at 11:02.  Thank you.

MR. AYCOCK:  Thank you.

(Recess taken from 10:52 a.m. to 11:03 a.m.)

THE COURT:  And we won't take a break until 2:00.

MR. AYCOCK:  Okay.

THE COURT:  Go ahead.

(Witness previously sworn.)

DIRECT EXAMINATION OF DAVID POWELL (RESUMED)

BY MR. AYCOCK:

Q    Okay.  So we're looking at DX161; do you still have that in front of you?

A    Yes, I do.

Q    And can you turn to Page 4 of 33?  And can you read the definition --

A    Apologies.

Q     -- I'm sorry.

A    The numbers --

Q    I think this copy may not have those  --

A      -- where --

Q      -- same numbers.  If you look at --

THE COURT:  It's also on the screen if that makes it any easier for you.  The one right in front of you.  No, right, right.

THE WITNESS:  Oh, I'm sorry.

THE COURT:  Yeah, it's our teaser.  You're welcome to -- some people prefer the print, whichever is easier for you.

THE WITNESS:  I can use the screen.  Thank you.

MR. AYCOCK:  And --

THE COURT:  And you can turn that if it's in an awkward position.

THE WITNESS:  Thank you.

Q      If you look at the -- and we can blow out the definition of "Company."

And can you read that definition of company?

A      "Company" means Cobalt International Energy, Inc.  Any subsidiary of Cobalt International Energy, Inc. and any successor to Cobalt International Energy, Inc.

Q      And can you turn to -- we'll turn to the next page and if you blow out the definition for "Holder" and can you read that definition of holder or holders?

A      "Holder or holders means the GSCP entities, the first reserve entities, the C/R entities, the Kern entities,

management or any transferee of registerable securities to whom any person who is a party to this Agreement shall sign any rights hereunder in accordance with Section 4.5."

Q    Okay.  And what are these holders?

A    These were the original equity sponsors of the company, the private equity.

Q    Okay.  And can you turn to Page -- it's 20 of 43 and Section 2.9(a) toward the bottom.  I think it's Page 18 in your binder if you wanted to look at the binder.

A    Okay.  Yeah.  What page in the binder?

Q    18.

A    Okay.  I'm there.

Q    Okay.  And do you see that Section 2.9 indemnification Subsection (a)?

A    Yes.

Q    And do you have an understanding about whether this provision applies to the holders?

A    I'm not an attorney but it's my understanding it does.

Q    Okay.  And can you look then at the beginning, the top of the next page?

        Do you understand that this also covers directors, officers, fiduciaries, employees, stockholders, members or general and limited partners of those holders?

A    Yes.

Q    Okay.  And can you turn now to DX168?

A    I'm there.

Q    And do you recognize this document?

A    Yes, it's a letter from Wachtell Lipton to Cobalt addressing the indemnification matter on behalf of the equity sponsors.

MR. AYCOCK:  Your Honor, we move DX168 into evidence.

THE COURT:  Any objections?

(No audible response.)

THE COURT:  168 is admitted.

(Debtors' Exhibit Number DX168 received in evidence.)

MR. AYCOCK:  Okay.

BY MR. AYCOCK:

Q    And can you look at the second paragraph of the letter that starts "My letter"?

A    Yes.

Q    And can you read that first sentence?

A    "My letter to David Sterling, outside Counsel to Cobalt International Energy, Inc., Cobalt Energy, dated January 12th, 2015, that January 2015 letter, George Conway of my firm provided formal notification pursuant to Section 2.9(d) of the Registration Rights Agreement, the Agreement, between and among the sponsors and Cobalt Energy dated as of December 15th, 2009, of the sponsor's intention to seek

indemnity pursuant to Section 2.9(a) of the Agreement in connection with the securities litigation."

Q    And do you have an understanding about whether Cobalt had been honoring that demand for indemnity that came in 2015?

A    We had been.

Q    And had Cobalt been paying anything with respect to that demand?

A    We had been, yes.

Q    What is it that Cobalt was paying?

A    We were paying all of the legal fees on their behalf.

Q    And so if Cobalt had already been paying on that demand, can you explain why the sponsors sent this letter in February of 2018 asking for indemnity?

A    Well, I'm not an attorney so I -- but the -- they were further in the letter seeking to apply that on the proceeds on the -- in the Angola sale.

Q    And do you have any understanding then about which entities they were seeking indemnity from?

A    They were co-owners, Angola Limited.

Q    And why was it significant that they were now seeking indemnity from the Angolan subsidiaries?

A    Because it was a non-Debtor.

Q    And why is that significant?

A    It -- the funds were open to being claimed is my

understanding.

Q    And do you have any understanding of the strength of their claim for indemnity in this letter?

A    I'm not an attorney but my understanding is it's from discussions with experts that they felt like it was a valid claim.

Q    Do you have any understanding about what will happen to this demand for indemnity if the releases are granted as part of the confirmation plan?

A    "I'm probably not the best person to be talking to that, I mean, I believe that they are waiving that right but I'm not close to those Agreements.

Q    Okay.  So you don't know the details but you understand they're giving up their right to indemnity --

A    Right.

Q    -- for the release?

A    That's correct.

Q    Okay.  So now I'd like to talk to you about offers to purchase the company.

     Are you aware of an offer to purchase the company by Total?

     THE COURT:  Can I just get some clarification maybe from you and not from him?

     Is that in exchange for the release by the company of claims against the equity sponsors or is it an exchange

for one of the other releases or exculpations?  What's the trade in the documents?

MR. AYCOCK:  One moment, Your Honor.

THE COURT:  If you don't know, that's okay.  I thought it --

MR. WEILAND:  Your Honor, if I can address that. The latest version of the Plan makes clear that the release of that indemnification claim asserted against it on Debtors' subsidiaries is released conditional on the sponsor entities being released of claims that could be asserted against them by the Debtors, namely the --

THE COURT:  By the Debtors not --

MR. WEILAND:  -- derivative, the derivative law suits.

THE COURT:  -- but not by the securities Plaintiffs.

MR. WEILAND:  No, no, no, that is not a third party release issue.  That is just an issue as between sponsors and --

THE COURT:  That's what I was looking for clarification on.  Thank you.

MR. WEILAND:  Yes, Your Honor.

BY MR. AYCOCK:

Q    Are you aware of an offer to purchase Cobalt by Total in 2017?

A    I am.  There were actually two different offers.

Q    And how are you familiar with those two offers?

A    I was -- as mentioned before being Chief Financial Officer, I was always involved in may strategy discussions, anything major with the company, in fact, I travel to Paris and I think it was late January of 2017, with Tim Cutt and an offer was made at that time.

Q    And was that January offer the first of those two offers?

A    It was.

Q    And when was the second offer made?

A    In May.

Q    And can you -- did you analyze those offers?

A    Most definitely and we had both financial and legal advisors review both in detail.

Q    Okay.  So let's talk about the first offer.

     What assets was that offer made to purchase?

A    It was made to purchase the entire company.  It was a transaction that was proposed to provide $1.30 a share for the stock but it would involve a significant discount to the debt holders.  And then working with all of our debt holders, we had the belief that that offer was not -- would never be accepted by the debt holders because equity was -- would be getting money.

Q    And did that offer, did that include Cobalt Angolan

DAVID POWELL - DIRECT BY MR. AYCOCK                89

assets as well?

A     Yes, it was the entire company.

Q     Okay.  And then the second offer, can you describe?

What were the terms of that offer?

A     In May they made an offer that was for $1 billion for all of the assets of Cobalt.  It was a stalking horse offer to take the company into bankruptcy.

Q     And would that offer also have included the companies Angolan assets?

A     It was all of the assets of the company.

Q     And how much did Cobalt ultimately settle its claim with Sonangol for it's over -- it's Angolan assets for?

A     The Agreement is for $500 million.

Q     And can you compare the Total offers in 2017 to the total sale price from the auction that recently took place?

A     In its simplistic form, you just take the 500 million for Angola and you add the 578 million from the auction. We're selling some inventory for a couple of million so the total is about a billion, eighty million.

Q     Would Cobalt had been better off if it had accepted Total's offers and either Total -- either of Total's offers in 2017?

A     No, we don't believe the offer -- the first offer was a viable offer at all.  And the second offer, they're roughly similar.  It was for a billion and as I mentioned, we

achieved a billion, eighty million through the Angola sale and the GAM sales.

Q    Okay.  Let's talk about the liquidation analysis that's in the disclosure statement.

First, are you familiar with the disclosure statement in this case?

A    Yes, I am.

Q    And did you sign the disclosure statement?

A    Yes, I did.

Q    First, does Cobalt believe that the recoveries that are expected to be available to the holders of the allowed claims in this case -- under the Plan will be greater than their recoveries if this were in a chapter 7?

A    We believe that it would be greater than a chapter 7 due to the expenses and additional process time and --

Q    So the recoveries for creditors would be greater in the chapter 11 than if this were in a chapter 7?

A    That is correct.  We also have fears that assets could be in a chapter 7 because of the time.  We could actually lose of the GAM assets which would be detrimental to the Estate, to our Debtors.

Q    And can you explain why and that's the case?

A    AS we discussed earlier, there's a certain requirement for retaining the leases that we have discoveries on.  Right now, due to our financial condition, it's very difficult to

do an SOP, suspension of production, because we don't have the financial viability to demonstrate that we qualify for that and so if it was extended we would have to drill a well which would be a significant amount of money and potentially would not be approved to do that and we'd lose -- and I'm referring to North Platt. We'd lose North Platt which was sort of our crown jewel asset. Anchor, there is an SOP on, I believe and then, you know, the other assets. I, you know, it's really the North Platt that's -- would be at risk.

Q    And why are those concerns if, for example, this were converted to a chapter 7?

A    It would be -- result in lower proceeds to the company's Estate.

Q    But why would you be concerned that you might lose the assets if this proceeding were converted to a chapter 7?

A    Because of the time requirement and --

Q    And why is the -- why would the timing be of concern in a chapter 7 as opposed to the chapter 11 proceeding?

A    We'd have to restart the marketing and it would take a substantial amount of effort to do that and the -- at North Platt, as I mentioned, the crown jewel, we'd have to have a well initiate by June and/or marketing -- there would be new parties involved with the marketing. They'd have to learn the assets. It would be a very difficult thing. And then I

didn't mention it earlier, but Shenandoah also has a deadline here very shortly and we are risk of losing that.

Q    And do you have at least some understanding of the Asset Purchase Agreements?

A    Yes.

Q    For those properties.

A    Yes.  Oh, and there's also the buyers, if there were a change to chapter 7 would have the ability to opt out.

Q    So the buyers don't have to go forward if this were converted into a chapter 7.

A    That is my understanding.

Q    And your concern then would be that if this were converted to a chapter 7 the buyers could pull out and that would affect the sales price?

A    And that we -- it affects the sale price and it -- and the whole timing around potentially liquidating our assets. And to do -- result in us losing the assets for no value.

Q    And can you compare what your expectation is of the cost of being in chapter 11 versus if you were in chapter 7?

A    Well, chapter 11 the costs, you know, we could wind up pretty quickly, I mean, as we saw yesterday, we had a quite a large gathering of people that were paying for almost everyone in this room, the other room, on the phone and their support staff so if that process continued on, there would be less, significant less money available.

Q    And are there other costs associated with a chapter 7 that you would be concerned about having to pay as well?

A    Well, the administrator fees are, I believe, a little higher.  I'm not an expert on that but the whole process would involve a significant amount of cost and we'd have to establish what to do on the employee front.

Q    I'm sorry, what was that?

A    And we'd have to establish what to do on the employee front.

Q    And why would that be a concern?

A    To run another auction or liquidation, you have to have people to show the assets, they have to be familiar with the assets.  We've been doing that effectively for two-plus years.

            MR. AYCOCK:  One moment, Your Honor.

BY MR. AYCOCK:

Q    Okay.  So is it your understanding then that the creditors are more likely to recover more in chapter 11 proceeding in the ranges that are described in this Plan than if this were converted to a chapter 7?

A    Yes, we -- probably significantly more in chapter 11.

Q    And can you just summarize the reason for that?

A    The primary reasons are: we may lose the assets, thus, not getting any proceeds; we would be paying significantly more in administrative fees related to the advisors

involved; and then just the burn rate of the additional time.  And we could -- as I said, the biggest risk is: we'd just lose the assets for no value.

Q    Okay.  Let's just talk briefly before we finish about the work that's gone into these chapter 11 proceedings.

About how much of your time over the last three months have been spent on these chapter 11 cases?

A    The vast majority.

Q    And I know this is the first time that you're testifying here in this court, but about how many times have you been prepared to testify either in a deposition or for a hearing?

A    Probably four or five times at least.

Q    And who else at the company has spent time and effort on these chapter 11 proceedings?

A    Certainly Tim Cutt, our chief executive officer. Really, the whole leadership team has spent a significant amounts of time on this and then when you get into the staff of the organization, the bulk of what's happened over the last two months is what the entire organization is working on.

Q    And what about the efforts of the Board of Directors?

A    There's been extensive efforts by the Board of Directors.  They've been meeting as often as weekly which they've been putting a huge effort into this process.

Q     Okay.

          MR. AYCOCK:  And, Your Honor, before I pass the witness, we actually have two Declarations that we'd like to submit to the Court that we think will save time.  One is a business records Declaration that's been -- that has been served and we would like to offer that up to the Court.  And I have copies if others would like it.  We circulated it to others last night.

          THE COURT:  Thank you.

     (Pause in the proceedings.)

          MR. AYCOCK:  And so, Your Honor, we would offer this Declaration into evidence.

          THE COURT:  Any objection to the business records Declaration?  Any --

     (No audible response.)

          MR. AYCOCK:  And, Your Honor, then we would -- we also request to move into evidence --

          THE COURT:  Well, let's get the Declaration entered and on first before you go beyond --

          MR. AYCOCK:  Oh, I'm sorry about --

          MR. SPEAKER:  No, I was just going to say we --

          MR. AYCOCK:  I'm sorry.

          MR. SPEAKER:  -- had no problem with the Declaration which we understood to be a business records declaration nor with the exhibits referenced therein.

THE COURT:  Thank you.  I'm going to just label this as 177 so that we have a record of it.

177 is admitted.

(Debtors' Exhibit Number 177 received in evidence.)

THE COURT:  Okay.  Now, you're going to offer each of the referenced exhibit numbers within 177?

MR. AYCOCK:  Yes, Your Honor.

THE COURT:  And is there any objection by any party to the admission of all of the referenced exhibits in 177?

(No audible response.)

THE COURT:  Okay.  Some of these having previously been admitted, we'll now admit the balance of whatever is listed in 177 without objection.

(Debtors' Exhibit Number 177, the remainder, received in evidence.)

MR. AYCOCK:  Thank you, Your Honor.

THE COURT:  Thank you.

MR. AYCOCK:  And we then have a second Declaration that we'd like to submit, Your Honor, and this relates to factors under Chapter 1129.

THE COURT:  So we're going to label this as -- Declaration as 178.

Is there any objection to the 1120 Dec?

MR. SPEAKER:  Your Honor, could we just have a

moment with it?

THE COURT:  Sure.

(Counsel confer/Voices off the Record.)

THE COURT:  So that everybody that's reviewing this understands, if it is admitted, it is admitted as testimony and not as to -- it does not constitute the declaration of the testimony is accurate, right?  It's just the testimony.

MR. AYCOCK:  Yeah, right.

THE COURT:  So, for example, I'm not finding that's it a feasible plan by admitting it.

MR. AYCOCK:  Yes.

THE COURT:  He's testifying it's a feasible plan.

MR. AYCOCK:  That's right.

THE COURT:  Yeah.

MR. AYCOCK:  And, Your Honor, he could be crossed -- cross-examined.

THE COURT:  Sure.  I just want everybody to understand --

MR. AYCOCK:  We're just looking to save time.

THE COURT:  -- that if we admit it what we're doing and that's all that I --

MR. AYCOCK:  That's right.

THE COURT:  -- anticipate we're doing.

MR. AYCOCK:  Yeah.

THE COURT:  Okay.  Any objections to 178?

MR. SPEAKER:  No, Your Honor.

MR. COHEN:  We have no problem with this Declaration, which is I believe on the Docket.  It's in 32 being admitted but we will cross the witness on that.

THE COURT:  Okay.  178 is admitted as part of the direct examination.

(Debtors' Exhibit Number 178 received in evidence.)

THE COURT:  And so any examination of the witness will include the right to examine not only with respect to his direct testimony but also either of his Declarations.

MR. AYCOCK:  Thank you, Your Honor.

THE COURT:  It's admitted.

MR. AYCOCK:  I have one last item.  We'd like to request to admit Debtors' Exhibit 175 which is a Rule 1006 summary of Debtors' Exhibit 155 which has already been admitted.

MR. SPEAKER:  Which exhibit is it?

MR. AYCOCK:  It's Exhibit 175.  You can pull that up on the screen I believe.

MR. COHEN:  Yeah, that'd be great.

MR. AYCOCK:  175.

THE COURT:  Okay.

MR. COHEN:  What is that?

MR. AYCOCK:  This is a Rule 1006 summary of

Exhibit -- Debtors' Exhibit 155 which is the -- it's a group exhibit, invoice materials from Cobalt.  So this is just a summary of invoices.

MR. COHEN:  Your Honor, can we reserve on that one and get back to the Court after a break?

THE COURT:  After lunch we'll decide whether to admit 175.  The witness, however, can be examined on 175 given the conditional admission.  Okay?

MR. AYCOCK:  And with that, I pass the witness.

THE COURT:  Thank you.

MR. AYCOCK:  Thank you, Your Honor.

THE COURT:  Are there any proponents of confirmation that has any questions for the witness?

(No audible response.)

THE COURT:  All right.  Any opponents?

MR. COHEN:  Good morning, Your Honor.

David Cohen, Milbank Tweed on behalf of the Ad Hoc Group of Unsecured Creditors.

THE COURT:  Good morning, Mr. Cohen.

MR. COHEN:  We have a couple of binders.

THE COURT:  So, Mr. Cohen, I've ended up with a lunch appointment so at noon, we'll need to break so but we'll come back and let you finish his exam.

MR. COHEN:  That'll be fine.

THE COURT:  You take all the time you need, I'm

just sort of giving you a schedule.

MR. COHEN:  Can I have a couple of minutes to set up?  I think I need some big binders to put in front of the witness.

THE COURT:  Sure.

MR. COHEN:  Thank you.  May I approach?

THE COURT:  Sure.  Which binders do I need to pull that I've got up here?

MR. SPEAKER:  Try white binders with 1 of 2.

THE COURT:  Got it.

MR. SPEAKER:  And 2 of 2 on them.

THE COURT:  So the witness will need those and then --

THE WITNESS:  Oh.

MR. COHEN:  If you'd like I can --

THE COURT:  I think mine are here I guess.

(Pause/voices off record.)

THE COURT:  Mr. Cohen, do you all -- are you all going to broadcast any exhibits or not?

MR. COHEN:  I don't believe so with this witness, no.

(Pause/voices off record.)

Mr. Powell, are you all set?

THE WITNESS:  Yes.

MR. COHEN:  Do you need a bottle of water or

anything?

THE WITNESS:  Oh, I'm fine.  Thank you.

MR. COHEN:  All right.  Mr. Powell, I'm David Cohen.  I'm with the law firm of Milbank Tweed Hadley and McCloy and as you know, I represent the Ad Hoc Group of Unsecured Noteholders.

CROSS-EXAMINATION OF DAVID POWELL

BY MR. COHEN:

Q     You will recall with met on March 21st in the Debtors' offices here in Houston.  You were kind enough to agree to an interview; do you recall that?

A     Yes, I do.

Q     All right.  Before we move to the new set of binders, let's go to the Debtors' set, which is the spiral copy, and I'd like you to turn to Tab 78, which is DX78.

And I believe you were testifying about Page 3 of this document, which at the bottom says, "Debtors' Exhibit 78, Page 4 of 6."  Do you see that?

A     Yes.

Q     And you were talking at negotiations with the two noteholder groups; do you recall that?

A     Yes.

Q     And you used the word in the concept of creating competitive tension in connection with those negotiations; do you recall that?

A      Yes.

Q      Did you believe competitive tension to be a good thing in those negotiations?

A      What we wanted was to get the best terms possible for Cobalt so having two parties vying for that, we believed, gave the best outcome for the company.

Q      So competitive tension in trying to --

A      Better --

Q      Please let me finish my question before you begin your answer.

Achieving competitive tension is a way to achieve the maximum value for Cobalt, correct?

A      Yes.

Q      And that was true with respect to these negotiations with the noteholder groups, right?

A      Yes.

Q      And it would have been true in connection with the auction of the Debtors' assets as well, correct?

A      Yes.

Q      So competitive tension is good, right?

A      Yes.

Q      You also during your direct testimony described North Platte as the Debtors' crown jewel; do you recall that?

A      Yes.

Q      Why did you believe North Platte to be the Debtors'

crown jewel?

A    If you look at our Gulf of Mexico properties, the North Platte field we own 60 percent of and we -- and publically disclosed that we had roughly 500 million barrels in the Gulf of Mexico net to Cobalt and approximately 300 million of those barrels were North Platte.  The other 200 million were split between the other assets.  We own 60 percent of North Platte.

Q    During 2017, as the CFO of Cobalt, did you in your mind a value as to what the crown jewel of Cobalt was -- what it was worth?

A    We did -- valuations can be done in multiple ways.  The best way is: comparable sales.  In meeting with all of the debt holders of the company, one of the first things they always said it'd be great to have comparable sales in the Gulf of Mexico and we always agreed with them.  There were no good comparable sales.  So the other two ways to look at value is on an economic present value basis and we certainly ran economics and depending on what oil price you use and what assumptions you make, you can come to significantly different values.  And then the third way that we looked at value -- and we made it as part of our public statements -- was that the industry has publications out there where it's -- you know, firms will identify how much it has cost to find and fully appraise barrels of oil

reserves in the Gulf of Mexico and so we talked about, you know, most companies were in the five to $10 per barrel range so -- but that is not a valuation.  That is just what these companies are spending.  Ultimately valuation is the best is, you know, competitive sale.

Q    All right.  And I understand the comparables are the best way to look at this, but as CFO as part of the Management Team, you need to have a sense of the value of the crown jewel in order to run the business, don't you?

A    Most definitely.  I looked at in the manner that I just described.

Q    Okay.  And looking in the manner you just described in 2017, what value did you, as the Chief Financial Officer of the Debtors, put on the company or on the North Platte asset rather?

A    The value -- the question you asked, can I -- are you saying the value in a sale or the value as a holder because those are two different things?

Q    Okay. Let's make it more concrete.  You testified after the break about two transactions that were proposed by Total.

One was a stock acquisition and the other was an asset purchase, right?

A    That's correct.

Q    All right.  In the context of the asset purchase offer

by Total, what value did the company have in determining whether the asset purchase offer was appropriate to consider and/or accept, what value did you put on North Platte?

A     I don't recall the precise value, and the evaluation was -- there were several things that went into evaluating the billion-dollar proposal and -- but we were in the middle of a marketing process.  We were drilling a well.  There were certain factors that would change that value and we didn't believe it was the optimum time to, you know, strike a deal.  I mean, Total had proprietary information that the market didn't so there were a number of factors that came into that.  We were getting data literally every day on the well that was being drilled and that would impact how one would value North Platte.  That was the well that completed in June.

Q     Let's talk about that and I think this was the May proposal, which was the asset purchase proposal, right?

A     That's correct.

Q     And Total actually proposed that as a stalking horse proposal; isn't that right?

A     That's correct.  That's what I said initially.

Q     And you understand a stalking horse proposal to be a concept used in a bankruptcy auction to set a floor play price, correct?

A     That is my understanding.  I'm certainly not an

expert.

Q     But --

A     That's my understanding.

Q     Right.  So when Cobalt received this $1 billion offer as a stalking horse proposal, you understood that to be a floor price at an auction in a bankruptcy, correct?

A     Correct.

Q     And, in fact, what Total actually was offering was to pay Cobalt $1 billion for its assets plus allowing Cobalt to keep all the cash on its books, right?

A     That's correct.

Q     And do you recall how much cash Cobalt had on its books at or around May 2017?

A     I do not.  I'd need to get the data.  I believe it was in the six to 700 -- $600 million range, but I'm not certain.

Q     Okay.

A     I'd have to --

Q     I could show you one of the Qs that were filed around that time.

        You would have been involved in preparing that, right?

A     Oh, definitely, yeah.

Q     But it doesn't need to be precise.

        In terms of orders of magnitude, you would say

six or $700 million in cash?

A      That is my memory.

Q      Okay.  So actually --

A      I'd prefer to pull the actual data, yes.

Q      Okay.  So actually the value in terms of May 2017 Total proposal was 1.6 or $1.7 billion asset purchase proposal, right?

A      I'd have to clarify that.  The stalking horse and the process time would have taken several months.  This was when we were spending significant amounts of money so by the end of that process, we would have burned through all the capital expenditures before we got the billion before anything could close and then after the drilling was done, our spending dropped down to a pretty low level.

Q      So it would have been somewhere in excess of a billion dollars but maybe less than 1.6 or 1.7 billion as a --

A      That's --

Q      -- stalking horse floor price in a bankruptcy, right?

A      That's correct.

Q      Okay.  And you personally were involved in Management's discussion and analysis around whether that was an appropriate offer to accept or not, weren't you?

A      That's correct.

Q      And you were part of the team that advised the Board in that effort, right?

A      That's correct.

Q      And the Board took that offer seriously, didn't it?

A      Most definitely.

Q      And it met several times as a board to consider the offer, right?

A      That's correct.

Q      And it engaged its legal advisors and its financial advisors to study that offer, right?

A      That's correct.

Q      And it determined at the end of that process not to accept the offer, right?

A      That is correct.

Q      And that's because the drilling that was going on left too many question marks, correct?

A      That is correct.  That's part of it, yes.

Q      The other part of it was that Management and the Board considered the offer to be insufficient in terms of the recognition of value for Cobalt's assets, right?

A      That's partially correct.

Q      Okay.  And we'll get to this in more detail.

       When Total made its offer to purchase the assets of Cobalt in May of 2017, if it had -- that offer had been accepted as -- assumed it had been the stalking horse, that it had been the successful bidder and acquired all of Cobalt's assets, with respect to the North Platte property,

Total would have owned 100 percent of North Platte; isn't that right?

A     That's correct.

Q     And that's because it owned 40 percent and Cobalt owned 60 percent, right?

A     That is correct.

Q     And so as a result of owning 100 percent of North Platte, that would have made Total an outlier in terms of Gulf of Mexico operators?

A     It would be unusual.

Q     All right.

THE COURT:  I'm sorry, I just didn't hear your answer.

It would be what?

THE WITNESS:  Unusual.

MR. COHEN:  But there's --

THE WITNESS:  Not normal.

MR. COHEN:  I'm sorry?

THE WITNESS:  Not normal.

MR. COHEN:  Okay.

BY MR. COHEN:

Q     But there certainly would have been nothing to prevent Total on the day after it acquired 100 percent of North Platte from going out and selling whatever percentage it wanted to to somebody else, right?

A      That's correct.

Q      And even though Total, by virtue of owning more than 50 percent of North Platte, would have had the right to be the operator just as Cobalt had the right to be operator by virtue of owning more than 50 percent.

There was no obligation that Total would be the operator, was it -- was there?

A      I'm sorry, I don't understand the question.

Q      That if Total acquired more than 50 percent of the ownership interest in North Platte and by virtue of that obtained the right to be the operator, just because it had the right to be the operator, there was no obligation that it, in fact, had to be the operator, right?

A      I'm not an expert on the Joint Operating Agreement. That would -- we'd have to have one of our lawyers review that.  I couldn't answer that.

Q      Well, we're not talking about a joint operating agreement in this situation where Cobalt -- or Total rather owned 100 percent of North Platte, right?

A      Can I -- are you asking were they obligated to be an operator if they owned the 100 percent?

Q      Right.  There's nothing that could have prevented them from hiring somebody to be the operator.

A      There's no reason that I'm aware of.

Q      All right.  At the time that Total made its stalking

horse bid in May of 2017, which financial advisors had Cobalt lined up?

A     Goldman Sachs was our strategic advisor, as I mentioned earlier in the morning.  They were involved in that review.

Q     All right.  And Houlihan Lokey at some point began working with Cobalt as well, right?

A     Right.

Q     And I believe they were formally retained in September but they began working in the summer of 2017; isn't that right?

A     We had discussions, no what I would call "work" that they were doing for us.

Q     Okay.  But were those discussions revolved around helping Houlihan come up to speed on the Cobalt situation?

A     Yeah.  I mean, we were in discussions.  They wanted to represent us.  Goldman Sachs was withdrawing and so we engaged Houlihan, who quite frankly many of the debt holders that he represent were recommending at the time that we use Houlihan.

THE COURT:  Mr. Powell, could I get you to pull that microphone maybe six or eight inches closer?

THE WITNESS:  Oh.  Okay.

THE COURT:  Thank you.

THE WITNESS:  I'm sorry, Your Honor.

MR. COHEN:  I believe you said Goldman Sachs was withdrawing.

BY MR. COHEN:

Q     Is the reason Goldman Sachs was withdrawing because they didn't have sufficient restructuring expertise?

A     Well, I'm not a lawyer.  I think they were concerned about conflicts of -- due to their various levels of involvement with the company.

Q     All right.  And certainly as Goldman was leaving the engagement and Houlihan was ramping to begin the engagement, you wanted Houlihan to get the maximum benefit of what Goldman had learned in the prior months, right?

A     Yes.

Q     So certainly one of the things that would have been important for Cobalt and Goldman to tell Houlihan about was this billion-dollar-plus stalking horse bid from Total just a couple 90 -- 60 -- 80 days earlier, right?

A     Yes.

Q     And you would agree that that would be a pretty good indicator of value if someone's coming in and saying, "I'll write you a check for a billion dollars to be a stalking horse plus to get to keep whatever hundreds of millions dollars of cash are still on your books," right?

A     It's certainly an indicator.

Q     It's a pretty good indicator, isn't it?

A      Well, it wasn't an auction so we -- if there was -- we talked about competitive tension before.  There wasn't competitive tension in that number.

Q      But as a stalking horse, it was a floor not a ceiling, right?

A      Correct.

Q      Okay.  So where you're resisting me on saying it may not be a great indicator of value, it's not capturing the upside from whatever that one billion plus hundreds of millions of cash is, right?

A      That's correct.

Q      Okay.  Now one of the other things that you testified to this morning was talking about some sort of time periods expiring and things have to be done within a certain period of time; do you recall that?

A      Yes.

Q      And with respect to North Platte, what were you talking about?

A      North Platte, the well that I refer to earlier was finished in 2017 towards the end of June.  To maintain the lease, you either have to drill within 12 months -- the rules changed.  It used to be six months and in that period of time, the Government relaxed the Rules a little bit and it went from drilling every six months to drilling every 12 months.  So we were always very cognizant of the time

requirements and so we had to either drill a well by June of 2018 or file for what's called an "SOP" or suspension of production.  And you have to -- and that's sort of a preliminary high-level plan of development.

Q    Now when the tests that were done, the test well, the initial drilling in June of '17 was completed, the company, Cobalt, remained very optimistic on the value of North Platte, right?

A    We were quite happy with the field.  The value -- because there was no comparables, it was very difficult to assess what value we would get so we were optimistic, but we couldn't say what we thought we'd get.

Q    Okay.  But as we discussed before, comparables are the best, but if you don't have comparables because there haven't been transactions, you still need to come up with values to run your business, right?

A    That's correct.

Q    All right.  And so in June of 2017, when Cobalt got the results from the test drilling, it didn't think, "Wow!  We really should have taken the billion plus from Total a month ago because this is a disaster."

      That wasn't the sentiment at all, was it?

A    The well finished in June.  There was data coming all the time.  We actually had two side tracks where they go down and go out so at different points of time, there was a

potentially much larger field, but we didn't know.  So that knowledge base changed over time and it wasn't until we were totally finished with the well that we ultimately came back to the field being about the same size as our original estimates.

Q    And your original estimates are those estimates that Cobalt relied on in determining that the stalking horse bid of a billion plus whatever hundred million were -- in cash was available was insufficient consideration, right?

A    That's correct.

MR. COHEN:  Your Honor, I'm sensitive to your noon hard stop and we're about to move into a different area.

Do you want to continue to --

THE COURT:  That's up to you.  What I don't want to do is to interrupt the flow of your stuff so if you want to take a break --

MR. COHEN:  So I think it makes sense here because it doesn't --

THE COURT:  Okay.

MR. COHEN:  -- something like we're time constrained right now.

THE COURT:  That's fine.  We'll see you at 2:00 o'clock.

MR. COHEN:  Thank you, Your Honor.

THE COURT:  Thank you.

(Recess taken from 11:52 a.m. to 1:56 p.m.)

THE COURT:  All right.  Mr. Cohen, let's go ahead, please.

CROSS-EXAMINATION OF DAVID POWELL (RESUMED)

BY MR. COHEN:

Q    Good afternoon, Mr. Powell.

A    Good afternoon.

Q    I think before we broke for lunch, we were about to move to a new topic.  And I'd like to know if you recall testifying about a June deadline in this case.  Do you recall that testimony generally?

A    Yes, regarding North Plat.

Q    Right, with regard to North Plat.  What is that June deadline?

A    As I said earlier, by the regulatory authorities, BSEE, you're required to do one of two things once a lease has expired, and you've got a discovery.  You have to keep drilling, and so you're obligated to drill currently it's every 12 months.  And there's a lot of preparation time that goes into that and materials and various things, people that you have to have arranged.  Or the alternative is what is called an SOP, a suspension of production.  If you have enough data on a field, you can file for an SOP, which is sort of a preliminary document related to development of the

field.

What I had said earlier was that because of our financial condition, it was the company's belief that we would need be approved for an SOP at this point because you have to demonstrate financial viability.

Q    But it's not the case, is it, that if the Court were to refuse to approve the sale or the plan of reorganization, that the value of North Plat would be lost forever to the company; is it?

A    Well, you have to do one of those two things or the lease expires, so.

Q    Well, and the company has a plan, a contingency plan in place as to what it intends to do if the Court does not approve the sale or the plan of reorganization; isn't that right?

A    Effectively, yes.  We had a well-planned and, you know, that is a way to -- to keep the -- the lease, yes.

Q    All right.  Would you turn to Exhibit 41 in your binder?

A    In my binder?

Q    Yeah.  The two huge binders unfortunately --

A    Oh.  But you've --

Q    -- that we've burdened you with.

A    -- you've given me four.  Which binder is it in?

MR. COHEN:  If I may approach, Your Honor?

THE COURT:  Yes, sir.

THE WITNESS:  You said 41?

MR. COHEN:  Volume 3.

THE WITNESS:  3, okay.  41?

MR. COHEN:  Yeah, 41.

(Pause in the proceedings.)

MR. COHEN:  May I approach, Your Honor?

THE COURT:  Yes, sir.

(Pause in the proceedings.)

MR. COHEN:  All right.  Your Honor, it's actually Tab 40.

THE COURT:  All right.

MR. COHEN:  And Tab 40 is the order approving the disclosure statement.

THE COURT:  Right.

BY MR. COHEN:

Q    And what I'd actually like you to do is turn to the actual disclosure statement at page 27.  It's an attachment. It's having a chart at the top and then start with the Gulf of Mexico assets.  Are we on the same page?

A    I'm sorry.  I was looking at the document.

Q    At the top it has a chart that says --

A    Yes.

Q    -- "Debtors and NonDebtors" --

A    Yes.

Q    -- and then the Gulf of Mexico assets.  And under North Plat, I'd like to direct your attention six sentences up from the bottom, and the disclosure statement reads -- are you with me?  "In the event the SOP is not approved by BSEE," do you see that?

A    Yes.

Q    "A unit saving drilling operating will need to commence by June 2018.  Therefore, as a contingency, the operators in the planning stages of an additional well, North Plat 5, as the unit saving operation."  Do you see that?

A    Yes.

Q    And that's a true statement, right?

A    That is true.

Q    And that remains true as you sit here today, right?

A    Yes.  But with the state of the company right now, we're having employees leave and it's becoming more and more difficult to seriously think that we could drill that well.

Q    Does it remain a true statement today?

A    I'm not an expert on drilling.  I think we still have the people necessary, but it's not a guarantee that we could be able to do that.

Q    All right.  Would you turn to the next page of that same document?  And I won't read it into the record because the disclosure statement's already part of the record, but I'd like you to take a moment to look at the first two

paragraphs at the top of the page which appear to describe what that drilling operation is.  Is that a fair characterization of those paragraphs?

A    I'd like to read them, but --

Q    Sure.  Take your time, please.

        (Pause in the proceedings.)

            THE WITNESS:  I -- I finished.

BY MR. COHEN:

Q    As you sit here today, do these two paragraphs represent obviously in summary form the company's current contingency plan to drill in North Plat?

A    They represent our contingency plan.  There are risks, as I said, around people and such, but that is our -- that -- our plan has always been to protect the value of those assets.

Q    That's right.  And the company continues to have the contingency plan to protect the value of the asset, right?

A    It does, although it continues to get more difficult as people leave the company.

Q    As you sit here today, the statements in the disclosure statement remain true and accurate; don't they?

A    I believe so.

Q    So if someone were to suggest that if the joint bid were not proof, the value of North Plat would be lost forever, that that would be a wrong statement, right?

A    We would have to be approved by the regulator to drill. So we would have to demonstrate we maintained that ability. We are trying, but it's not a guarantee.

MR. COHEN:  I pass the witness, Your Honor.

THE COURT:  Thank you.

MR. COHEN:  Thank you, Mr. Powell.

THE COURT:  Are there any other opponents of confirmation that have any questions for the witness?

All right.  Any Redirect?

MR. HIGGINS:  Just me, Your Honor.

THE COURT:  I'm sorry.  Mr. Higgins, go ahead.

MR. HIGGINS:  One second, Your Honor.  We're trying to make notes on that.

(Pause in the proceedings.)

CROSS-EXAMINATION OF DAVID POWELL

BY MR. HIGGINS:

Q    Good afternoon, Mr. Powell.

A    Good afternoon.

Q    My name's John Higgins, and I represent Whitton Petroleum.  You were in the courtroom before the lunch break when there was a discussion on the --

THE COURT:  Mr. Higgins, could you pull the microphone more towards you?  Thank you.

BY MR. HIGGINS:

Q    You were in the courtroom when there was a discussion

before the lunch break about certain intercompany claims of the non-Debtor affiliates, correct?

A    Yes.

Q    And the Sonangol contract is actually with CEI Angola Limited, correct?

A    That is my understanding.

Q    And below CEI Angola Limited are the two CEO Block 920 and 21 entities, correct?

A    I was just looking at the chart.  Let me -- yes.

Q    And the settlement agreement that was approved by the Court was between CEI Angola, CEI Angola block 9, Block 20, and Block 21 and then Sonangol as the counterparty, correct?

A    I'd have to see the settlement agreement.  I -- I don't remember off the top of my head.

Q    Well, do you remember that the Debtor in this Court requested approval of the non-Debtors to enter into that settlement?

A    That sounds correct.

Q    And under the terms of the settlement, Sonangol has already paid $150 million?

A    They did.

Q    And the $150 million is on deposit in the U.S. bank account?

A    It's -- it's in a U.S. account, yes.

Q    And hopefully Sonangol will make the remaining payment,

which is -- well, not approximately, it's $350 million, correct?

A    That's correct.

Q    And you heard a little bit of discussion earlier this morning about the possibility of certain intercompany claims between the Angolan entities.

A    Yes.

Q    Do you maintain the books and records for the Angolan entities?

A    We maintain those books.  My accounting department does that.

Q    Are those claims accounted for in the same manner in which you described in referring to the Excel worksheet that you were asked about on direct examination?

A    Yes.

Q    Counsel came to the podium and mentioned that the intercompany claims of the non-Debtor Angolan entities were disclosed because they were on the schedules of assets and liabilities.  Did you hear that?

A    I don't recall hearing that.

Q    When Mr. Husnick walked to the podium and said it was disclosed?

A    I believe so.  I didn't hear the specifics.  I was sitting pretty far back.

Q    And, in fact, you did not file schedules of assets and

liabilities for the non-Debtor affiliates; did you?

A    I -- I don't recall.

Q    Did you oversee the preparation of the schedules in this case?

A    Anything out of that would have come from the finance department.  I just -- I don't -- there's been a lot of documents prepared, a lot of lawyers involved, and I just don't recall.

Q    And for the record, you didn't file any schedules for the non-Debtor Angolan entities; did you?

A    I --

Q    They're not U.S. Debtors here?

A    I'm saying I don't know for sure.

Q    You know they're not Debtors before the Court, correct?

A    Well, they're non-Debtor entities.

Q    You're not filing monthly operating reports for them?

A    No.

Q    In fact, to your knowledge, has there ever been any mention in this bankruptcy case of the disclosure of the intercompany claims in between the non-Debtor Angolan entities?

A    I believe, if we've got the disclosure statement, there was a footnote that made reference to the intercompany and the impact it would have on the waterfall.

Q    Correct.  And when you say intercompany, you're

referring to the $6 billion intercompany claim between Inc. and LP, correct?

A    Well, it's -- it's all part of the same structure.  As you saw that spreadsheet, there's a cascading of -- if intercompany balances.  And -- and so Angola funding would have been part of that 6 billion.

Q    Right.  But the intercompany disclosure in the -- or the -- strike that.  The disclosure or statements in the disclosure statement only mention the intercompany claim between L, Inc., and LP because it was going to dilute the recovery to the general unsecured creditors at the LP level, correct?

A    I'd want to look at that portion of the disclosure statement.

MR. HIGGINS:  Your Honor, I can either hand him my copy or if the Court can blow up Docket Number 562, it might speed things along.

(Pause in the proceedings.)

THE COURT:  What page do you want to go to?

MR. HIGGINS:  Page 7, Your Honor.  I believe it's -- yes.

THE COURT:  Page 7 of the DS, not page 7 of the ECF document.

MR. HIGGINS:  562, disclosure statement.

THE COURT:  Right.  Page 7, though, is a blank

page.  Do you mean page 7 of the DS itself?  I think so.
Let's get down there.  Is this what you want?

MR. HIGGINS:  Yes, Your Honor.

THE COURT:  Okay.

MR. HIGGINS:  Looking down at Class 5.

THE WITNESS:  Footnote 9.

THE COURT:  Is that where you want to be?

MR. HIGGINS:  Yes, Your Honor.

THE COURT:  Okay.

BY MR. HIGGINS:

Q    This is the Debtor's disclosure statement, which you read before it was filed, correct?

A    Yes.  Definitely correct.

Q    And you assisted in the preparation of this document?

A    Yes.

Q    And the numbers came from you and your accounting department?

A    That's correct.

Q    Take a look at Class 5, subsidiary general unsecured claims.  Do you see any mention of non-Debtor affiliate Angolan claims --

A    What I was --

Q    -- intercompany claims?

A    -- was referring to was footnote 9.  And because it gives the range of the -- you know, what the unsecured

claims could get.  And in footnote 9, it says it "assumes certain intercompany claims are allowed pursuant to the plan" -- I'm sorry.  I'm reading the wrong one.  Oh, no. That's right -- "make whole premium on higher end of potential range.  Nonpayment of remaining amounts due pursuant to Sonangol settlement and non-encumbered expiration leases."

And then in the next statement, it says, "Assumes certain intercompany claims are not allowed pursuant to the plan, make whole premium on lower end potential range. Payment of remaining amounts due pursuant to Sonangol settlement and certain encumbered expiration leases as asserted by the Committee."

Because the Sonangol payment is in the non-Debtors, I -- I think what -- and I'm not a lawyer, so I would --

Q    Yeah.  I'm going to ask you do you understand?

A    -- I would -- I would be understanding that that is including the intercompany claims from those entities --

Q    All right.  Let's talk that through for a second.

A    -- as a range.  I'm not -- I'm not saying ---

Q    We're dealing with the general unsecured claims LP, correct?  That's what Class 5 represents?

A    Yes.

Q    Right?

A    Yes.

Q    And this footnote has nothing to do with an intercompany claim coming up against LP and diluting the recovery at LP; does it?  It only has to do with the $6 billion intercompany claim from Inc. down against LP, correct?

A    I would have to have one of our attorneys walk me through that because I'm -- I'm not as familiar with the -- the intent there.

Q    Do you see any reference to non-Debtor affiliate claims here?

A    I see no mention.

Q    Are you aware of any discussion in the disclosure statement about -- any place in the disclosure statement of a discussion that a portion of the Sonangol $500 million of sales proceeds may dilute the recovery to the unsecured creditors at the LP level?

A    I don't recall it.

Q    Do you see -- what's the projected recovery under the plan in Class 5?

A    It's a range of .8 percent to 60.4 percent dependent upon things like do we actually get the $350 million as the second payment from Sonangol and the -- and whether the intercompany balances are upheld or not upheld.  So it's -- it's quite a large range.

Q    Correct.  And would you turn to the exhibit binder that

I've just handed you?

A    Yes.

Q    And turn to Tab 7, what's been marked as "Whitton Exhibit 7".

A    Yes.

MR. HIGGINS:  Your Honor, at this time we'd offer Whitton Exhibit 7.

THE COURT:  Any objection to Whitton 7? Mr. Brimmage?

BY MR. HIGGINS:

Q    Would you turn to --

THE COURT:  Hold on.

MR. HIGGINS:  I'm sorry.

THE COURT:  He was coming forward.  I don't know if that's to make an objection.

MR. BRIMMAGE:  Your Honor, if I can just have a second.  I don't know where it came from.  I'm just trying to find out --

MR. HIGGINS:  Oh, I'm sorry, Your Honor.  It was produced by the Debtors to us.

MR. BRIMMAGE:  Okay.  If I can just have a second.

(Pause in the proceedings.)

MR. AYCOCK:  Your Honor, we object; hearsay.

THE COURT:  Pardon me.

MR. AYCOCK:  Objection; hearsay.

MR. HIGGINS:  Document produced by the Debtors.

THE COURT:  Well, produced by them and created by them are two different things.  The mere fact it was produced by them doesn't remove it from the hearsay rule.  So why don't you prove up why it's admissible.  So far all you've done is offered it, but production alone doesn't take it out of hearsay.  If they wrote it, it's going to take it out of hearsay, so we'll see where you go with it.  I don't know who wrote it.

BY MR. HIGGINS:

Q    Did you see this document prior to today?

A    I've seen documents like this.  I don't recall if I've seen this one.

Q    Did you assist in the preparation of the documents that backed up the calculation set forth in the disclosure statement which show a range of recovery to the general unsecured creditors of LP of .8 percent to 60.4 percent?

A    I spoke with the -- the folks from Houlihan who did most of these calculations at the time of the disclosure statement.  Obviously, it's a quite large document and I don't recall everything as far as background and discussions at the time.

Q    Did --

MR. AYCOCK:  Your Honor, if I may?  We withdraw the objection.

THE COURT:  Okay.  Any other objections?

MR. HIGGINS:  Thank you.

THE COURT:  We'll admit 7.

(Whitton Exhibit 7 received in evidence.)

BY MR. HIGGINS:

Q    Would you turn to page number -- it's numbered 404.  I think there's a summary page, and then it's really the fifth page in Exhibit 7.

A    I'm there.

Q    And if you look down to the line item identified as LP, do you see recovery percentage?

A    Yes.

Q    Do you see the low number?

A    Yes.

Q    What is that for the record?

A    That's based upon the calculations above I believe.

Q    Which is the 0.8 percent?

A    Yes.

Q    And the 0.8 percent is the low recovery range set forth in the disclosure statement?

A    Yes.  I believe so.

Q    It's on the screen in front of you there, so you don't have to flip.

A    Oh.  Thank you.  Yeah, thank you.  Yes.

Q    And then if you go to the alternative version which is

the last page behind the tab, page 404 of the alternative version, and do you see on the far right-hand side for LP general unsecured creditors recovery percentage?

A     Yes.

Q     On the far right side, what is that percentage?

A     That's the 60.4 percent that the disclosure --

Q     And that's the --

A     -- statement is.

Q     And that matches the amount set forth in the disclosure statement?

A     That's right.

Q     And now if you'll go back to the first page of Whitton Exhibit 7, you'll see --

A     I'm sorry.  The first page being?

Q     This summary sheet.

A     Of the tab?

Q     First one after the tab, correct.

A     Yes, sir.

Q     You see on the top right-hand side, LP unsecured claim proportions?

A     Yes.

Q     And do you see the intercompany payable to Inc.?

A     Yes.

Q     And to be clear, this is a waterfall analysis for the recovery of subsidiary general unsecured claims Class 5,

correct?

A    Yes.

Q    And the intercompany claim referenced in this waterfall analysis is an intercompany claim by Inc. against LP, correct?

A    That -- well, that's the balance between the two, yes.

Q    And then when you go down to the bottom left-hand corner of that same page, for illustrative cash and as of April 2018; do you see that?

A    Yes.

Q    And the Sonangol proceeds payment 1 of $150 million; do you see that?

A    Yes.

Q    And then you move to the right-hand side for unencumbered LP subsidiary equity value box; do you see that?

A    Yes, I do.

Q    Total Sonangol proceeds low case 144.6; do you see that?

A    I do.

Q    And 494.6, do you see the high?

A    Yes, I do.

Q    That's in millions, correct?

A    That's correct.

Q    So that assumes under scenario 1 that Sonangol makes

the 150 and fails to make the $350 million payment, correct?

A    That is correct.

Q    And then the high assumes that we receive -- the Debtors receive the second payment?

A    That's correct.

Q    And the deduction of both the low and high calculations is $5.4 million, correct?

A    Yes.

Q    And the $5.4 million deduction represents the Debtor's best estimate of what has been referred to as some miscellaneous trade creditors.  I think somebody mentioned Haliburton or some other general unsecured creditor that might be exist at the non-Debtor Angolan entities that may have to be satisfied before proceeds, the balance could be upstream to LP for distribution to creditors of this estate, correct?

A    I believe that's correct.

Q    And there's no mention in the disclosure statement or this document of any claim among the non-Debtor Angolan entities to some intercompany claim of which the two -- the second lienholders might receive a distribution; is there?

A    The 6 billion, you know, is -- is up above so, in effect, it does include what had been ultimately transferred down to the non-Debtor Angolan company.  So I don't know if I'm answering your question --

Q    No, you're not.

A    -- because I think it's embedded in that.

Q    Okay.  The 6 billion is money that was downstreamed from Inc. to LP, correct?

A    Correct.

Q    And then at various times money may have been downstreamed from LP to the various other affiliates, correct?

A    And that's correct.

Q    What we've heard over the last couple of days is there may be claims due to and due from among the non-Debtor affiliates.

A    That's correct.

Q    And that there may be a claim by the second lienholders to one of those intercompany claims at a non-Debtor affiliate?

A    Correct.

Q    That's not -- if that's correct and that position is correct, that would dilute the recovery to LP of the Sonangol proceeds, correct?

A    That's correct.

Q    Okay.  That's not disclosed in this waterfall analysis or in the disclosure statement; is it?

A    I don't believe so.

        MR. HIGGINS:  No further questions, Your Honor.

THE COURT:  Thank you.  Mr. Aycock?

REDIRECT EXAMINATION OF DAVID POWELL

BY MR. AYCOCK:

Q    Okay.  First, Mr. Powell, let's talk about the sale of Cobalt.  Are you aware of any reason that Cobalt would be willing to accept a sales price lower than what it could get?

A    Absolutely no reason to do that.

Q    And was your goal as part of the auction process to maximize the value of the sale?

A    Absolutely.

Q    And were you disappointed though in the auction results?

A    Very much so.

Q    And why is that?

A    We had hoped that there would have been more competition than occurred, and we had hoped for a price that was higher because these are, quite frankly, quite attractive assets.  You know, unfortunately, there's a limited group of buyers for them, and so our companies chose not to enter the auction.

Q    And were you surprised by the auction results then?

A    Yeah.  I -- well, I was hopeful for a better price.  I don't know what I really expected because it came back to the earlier discussion that, you know, there was no

comparables.  There's no liquidity in the markets.  So to say surprised, I'm not sure I could say I was surprised.  Disappointed though.

Q    And do you have a sense of how many entities were realistic buyers?

A    I think at the end of the day, it was just Statoil and Total.

Q    And so going into the auction, though, did you before the auction actually took place and when you were marketing the assets, did you have a sense of the broader possibilities for who might be realistic buyers?

A    Well, we could see the activity in the data room, so we knew who was spending a lot of time doing analysis.  There were certain companies that we would have expected to be aggressively analyzing the assets that it became apparent they were not.

Q    And do you have an understanding of why they were not?

A    Yeah.  There were three super majors that you would have thought would have been at the auction.  Two sort of opted out because I think -- and this is my opinion -- that they were selling their own assets and -- and were more focused on cleaning up their own balance sheet.  And so they were not actively looking at the Gulf of Mexico.  And then the third company, you know, didn't see enough potential for things beyond North Plat, and it's a very large company.

And it's going to require new technology to develop, technology that can be developed but to put that much effort into this, I think, the third company that opted out, it was because of not enough upside for them.  It was a nice field, but they would have wanted to have the potential of other developments like North Plat and they didn't see those.

Q    And today, are you aware of any other options for a sale than the results of the auction?

A     No.  Those three I'm pretty certain under any circumstance wouldn't come back.  So I'm not aware of any party that realistically would enter that didn't enter the auction before.

Q    And if this plan is not confirmed and the sale is not allowed to go forward, do you have any reason to believe that that would change?

A    Could you -- could you repeat that?

Q    Do you have any reason to believe that it would change and that there would be new offers on the table?

A     No.  I have no reason to believe that there would be no offers.  And quite frankly, it would probably be hard to get the enthusiasm up in the industry because there wasn't much during the auction.

Q    Okay.  You mentioned the contingency well plan if the plan's not confirmed?

A    Yes.

Q    What would it take for Cobalt to actually be able to drill this well?

A    Well, it's got to be approved by the regulator, so that's not a guarantee.  They may be concerned about our financial condition and in a post-Macondo world, you know, things could be less helpful to a company like Cobalt from the regulator.  So we'd have to do that.  We'd have to maintain all of the drilling staff that are highly competent but also highly in demand by other companies and they know that Cobalt is unlikely to move forward, so they've been out looking for jobs.  And so there's -- there's some issues there that would make it very risky to try to drill the well and/or remarket the assets.

Q    So is it reasonable to just assume that Cobalt would be able to timely drill the well?

A    There's no reason in my mind to assume.  We -- we are trying to maintain the capacity, but it's -- it's -- with each passing day, it's becoming more risky.

Q    I'm going to turn to the Sonangol settlement funds.  You understand that -- do you have any understanding about the $500 million from that settlement where it's located and where it's going to be located?

A    It's in a bank account, I believe from memory, you know, at the kind of Cobalt International Energy Angola Limited, but it's out -- it was never in Angola, and it's --

it's a U.S. account.

Q    And do you understand that that's not -- those funds aren't to be used until further order of this Court?

A    Definitely.  Yeah.

Q    And is it your understanding that the confirmation of this plan won't affect that in any way?

A    That's my understanding.

Q    Okay.  So now let's talk about the intercompany claims by Cobalt International Energy, LP against the Angolan Cobalt entities.

A    Yes.

Q    So --

THE COURT:  Let me back up for a minute.  If Whitton opts in as opposed to opting out, why wouldn't the funds then be released by virtue of confirmation of the plan?  Doesn't that then mean there's no longer a dispute over what to do with those funds or am I missing something?  If Whitton opts out, there's a dispute over what to do about the funds because they're having --

MR. WEILAND:  Correct.

THE COURT:  -- claims to them.  But if Whitton opts in to the new concept --

MR. WEILAND:  We'd still have to come --

THE COURT:  -- wouldn't those funds --

MR. WEILAND:  -- we'd still have to come back to

Your Honor because there are a number of like Haliburton has asserted a claim against that pot at the non-Debtor. Halliburton and there might be one other smaller vendor that had asserted we had a claim against the block entities and --

THE COURT:  Okay.

MR. WEILAND:  -- don't distribute that money without --

THE COURT:  So confirmation would affect how much could be distributed maybe, but it wouldn't authorize the distribution?

MR. WEILAND:  Correct.

THE COURT:  Okay.

MR. WEILAND:  We are not allowed to do anything with --

THE COURT:  Got it.

MR. WEILAND:  -- that 150 without further orders.

THE COURT:  I just want to be sure I followed what we're doing

MR. WEILAND:  Correct.

THE COURT:  Thank you.

BY MR. AYCOCK:

Q    Okay.  So let's talk about the intercompany claims by the LP entity against the Angolan entities.

A    Yes.

Q    So I think you testified that you didn't see this disclosed in the disclosure statement; is that right?

A    What I was trying to say is the -- repeat the entities so I'm answering it right.

Q    So we've put on the screen the disclosure statement, the chart showing each class, and you were asked about the footnotes.  Do you remember that?

A    Yes.

Q    Okay.  And you were asked whether the two-point something billion dollar claim from the LP against the Angolan entities, whether you saw that being accounted for; is that right?

A    That's correct.

Q    Okay.  And is it right that you didn't see it specifically there?

A    No.  I did not.

Q    Okay.  You've signed a number of documents providing disclosure in this case, right?

A    Yes.  Extremely large documents.

MR. AYCOCK:  If I can -- can I use the ELMO, Your Honor?

THE COURT:  Yeah.  People on the phone won't be able to see it, but you can use it.

MR. AYCOCK:  Okay.

THE COURT:  You got to learn how to turn it on.

MR. AYCOCK:  What's that?

THE COURT:  You have to learn how to turn it on, and I don't know if I know how.

MR. AYCOCK:  It's been a while.

THE COURT:  But you can try.

(Pause in the proceedings.)

BY MR. AYCOCK:

Q    So I have here on the screen, it's docket 335, the front page of that.  Do you recall reviewing global notes methodology and specific disclosures regarding the Debtor's schedules of assets and liabilities and the statements of financial affairs?

A    Yes.

Q    Okay.  And I believe that's your signature; is that right?

A    Yes.

Q    And does this chart here look familiar to you that was attached to this document?  This is --

A    Yes.

Q    -- page 45 of 152, docket 335,

A    Yeah.  I didn't recall that was there, but yes.

Q    Okay.  And you'll see down here at the bottom of the page, it has Exhibit W-1.  Does that refresh your recollection --

A    Yes.

Q     -- about when you last saw this document?

A     Yes.

Q     And when was it that you last saw the document?

A     During my deposition.

Q     And who asked you about this document in your deposition?

A     The -- I don't actually recall which parties.

Q     Do you remember who the attorney represents that asked you the questions about this document?

A     I think it was the Unsecured Ad Hoc Committee, I think.

Q     Do you remember being asked questions by W-1 referring to Whitton?

A     Oh.  And also, Whitton, yeah, you're definitely refreshing my memory now.  Towards the end of the deposition, Whitton presented that.

Q     And this is something that was disclosed in this case about intercompany claims?

A     Right.

Q     And can you look at the first few lines here.  Let's take actually the second line where it says "intercompany receivable from CIE Angola Block 21, Limited."

A     Yes.

Q     And what's the amount here for the value?

A     It's a little under 2.3 billion.

Q     And how does this figure relate to the intercompany

claims that Counsel for Whitton was asking you about on your

cross-examination?

A    Well, it's -- it's -- ultimately those claims go all

the way up to the parent company, but the -- but this is

definitely indicating the intercompany balance was disclosed

between Block 21 and the parent company would be Cobalt

Energy Angola Limited and then going up the chain.

Q    And then I want to turn your attention back to the

disclosure statement.

          THE COURT:  I've still got that up.

          MR. AYCOCK:  The disclosure statement's still on

the screen.

          THE COURT:  I can put it there.

BY MR. AYCOCK:

Q    And if we can turn to we're looking at Class 5 on

page 7.

     (Pause for telephone conference operator)

BY MR. AYCOCK:

Q    Okay.  So for Class 5 if we look at the projected

amount of claims, how much is that?

A    It's 7.8 million.

Q    And --

A    And a range --

Q    -- to the right of that is the projected recovery which

gives a range, right?

A     The .8 percent to 60.4 percent.

Q     And, in general, how was the percentage calculated?

A     It was -- I mean the two big swing factors was whether that intercompany balance was, you know, upheld and whether we collect the 350 million from Sonangol.

Q     Okay.  So those are the contingencies, but just in terms of how you get to the percentage, is that just the total -- the projected amount of the claims here, the 7.8 million, divided by the total dollar value of claims?

A     Definitely, yes.

Q     So if we were to add -- so we've got the numerator as the 7.8 million and denominator is the total amount.  If you add the $2 billion that we were discussing, do you have any sense of how much that -- you're a numbers guy -- how much does that change the .8 percent?

        MR. HIGGINS:  Objection, Your Honor.  It misstates the evidence.  This is an account receivable at the LP level, not an account payable.  It wouldn't increase the amount.

        MR. AYCOCK:  I think that's not my question.

        THE COURT:  I'll let you deal with that in cross.

        MR. HIGGINS:  Thank you, Your Honor.

BY MR. AYCOCK:

Q     So if the $2 billion were accounted for here, about how much would that change the .8 percent?

A    Dramatically.  Well, as far as the claims versus the 7.8.

Q    So the overall percentage, 7.8 million is -- you get to the .8 percent because it's a very large denominator, right?

A    Right.  Right.

Q    So if it's already very large and we add another $2 billion, does it change it that much?

A    No.  In that case -- I understand your question now -- it's not going to be substantial.  It's substantial in the change.

Q    And so it's not going to be a material difference?

A    No.

        MR. AYCOCK:  Nothing further, Your Honor.

        THE COURT:  Thank you.  Any further examination of Mr. Powell?

        MR. HIGGINS:  Briefly, Mr. Powell.

        THE COURT:  Are you going to go back to that document?

        MR. HIGGINS:  Yes.

            RECROSS-EXAMINATION OF DAVID POWELL

BY MR. HIGGINS:

Q    Just to clarify, Mr. Powell, this is the page 45 of 152 of the LP schedules of assets and liabilities, correct?

A    That's correct.

Q    And this is showing gross total amount of approximately

$2.4 billion of claims, correct?

A    That's correct.

Q    And it is an intercompany receivable from the various non-Debtor entities to LP, correct?

A    That's how the intercompany works.

Q    So if I were to see this on the books and records of the company, I would see this is on the LP books and AR, account receivable?

A    That's correct.

Q    And on the Angolan books, I'd see an account payable?

A    That is correct.

Q    So if the Angolan entities were to repay the $2.4 billion owed or whatever has been downstreamed, it would significantly improve the distribution to the unsecured creditors at the LP level, correct?

A    Theoretically.

Q    And where are the proceeds being received from the settlement of the Sonangol settlement?

A    I actually would have to look back at the settlement agreement, but I believe they're coming into an account that we set up for Cobalt International Energy Angola Limited.

THE COURT:  Mr. Higgins, I need you to help me out because I'm confused about something.  I thought the argument had to do with whether the second lienholders would be able to as a result of their pledges grab the money

before it flowed up as equity.  And if that's the issue --

MR. HIGGINS:  Or that --

THE COURT:  -- then I'm not sure why this matters because the problem is it takes out of subsidiary available funds and gives it to the second lienholders.  And, therefore, I'm missing almost everybody's point.  And so if you could help me --

MR. HIGGINS:  Sure, Your Honor.

THE COURT:  -- it would be helpful.

MR. HIGGINS:  A couple of days ago we were informed that the recoveries might be further diluted.  Let me back up, that the $500 million --

THE COURT:  Could be further diluted?

MR. HIGGINS:  One, we've always sort of started with a 65/35 split.  And in looking at the various waterfall analyses and probabilities of success, we tried to figure out what the recovery would be to Whitton, for example.

THE COURT:  Right.

MR. HIGGINS:  We were informed that there may be intercompany claims --

THE COURT:  Right.

MR. HIGGINS:  And that's where --

THE COURT:  So if it flows up at equity, then the second lienholders don't have a lien, but if it flows up as a debt recovery, then the second lienholders do have a lien.

So it's dilutative of what would flow up as equity if instead it flows up as debt and has a lien, I think.

MR. HIGGINS:  But that's never been disclosed to us.

THE COURT:  Well, other than whether this was a disclosure and as to whether it is or not is a different question, but.

MR. HIGGINS:  Right.  And certainly --

THE COURT:  But the math isn't --

MR. HIGGINS:  But to what extent -- to what extent.

THE COURT:  Nobody's math is making sense to me because we're talking about a --

MR. HIGGINS:  And is it a $2.4 billion receivable? Is it going to be 306,000 or 309,000 -- $309,000 account receivable?  Are they intending to -- and then we'd also --

THE COURT:  You're wanting to ask all these questions.  It's just going into the numerator/denominator wasn't making any sense to me in terms of what the argument that the parties were having is.

MR. HIGGINS:  No.  It was just trying to figure out --

THE COURT:  Okay.

MR. HIGGINS:  -- and it's very important, Your Honor, when faced with a choice of opting in and opting out

and not knowing --

THE COURT:  I understand why you want to know.

MR. HIGGINS:  -- how much we would win.

THE COURT:  I'm not trying to stop you from asking questions.  I'm trying to tell you that at least my understanding of what both you and Mr. Aycock were referring to is numerators and denominators isn't the issue.

MR. HIGGINS:  That's correct.

THE COURT:  That the issue is it could dilute the free flow-up into an encumbered flow-up.

MR. HIGGINS:  That's the only point, Your Honor.

THE COURT:  And that it's not -- I understand your disclosure issue, but beyond that, it's not a numerator/denominator issue I don't think, and that means I'm asking you because I don't understand what you or Mr. Aycock are doing.

MR. HIGGINS:  Well, it will eventually turn into a numerator/denominator, but you've got to start with --

THE COURT:  Eventually, but not the way that y'all are talking about it.

MR. HIGGINS:  Correct.

THE COURT:  Okay.

MR. HIGGINS:  Thank you, Your Honor.  No further questions.  Thank you, Mr. Powell.

THE COURT:  Thank you.  Mr. Powell?

MR. AYCOCK:  Nothing further, Your Honor.

THE COURT:  Okay.  Thank you.

Mr. Powell, if the plan were to be confirmed and if we were to authorize the April 6th closings to occur on April 6th but the later closings to occur on April 13, so in other words, a one-week additional delay to allow parties to file an appeal if we confirm, what is the cost of that additional week if we delay -- we advance the April 20th closings to April 13th but not all the way to April the 6th?

THE WITNESS:  There's two components to that, Your Honor.  One is their G&A costs.  That's not a substantial amount at this point.

THE COURT:  And I'm not looking for a precise number.  But I don't have a sense of whether we're talking about $250,000 or about, you know, $2 million.

THE WITNESS:  Well, I think the additional -- well, looking at the room and the number of attorneys that are --

THE COURT:  I'm sorry.  Not -- forget all the professionals just for a minute.  I know that they're heavy in your mind, but let's talk about the -- you were talking about the employees of the company and all that stuff.

THE WITNESS:  Right.

THE COURT:  Yeah.  So how much are we going to spend out of the company level if we have to keep things

DAVID POWELL - RECROSS BY MR. HIGGINS                153

another week?

THE WITNESS:  Four or five hundred thousand dollars I think.

THE COURT:  Okay.  And what -- I understand professional costs.  And then what other costs besides professional costs?

THE WITNESS:  That's pretty much it because rent and that would -- is already kind of paid for for that period of time.

THE COURT:  Okay.

MR. AYCOCK:  Your Honor, if I may?  Are you continued to pay interest on the first lien debt?

THE WITNESS:  Yes, we are.  I was going to also point that out.

MR. AYCOCK:  And about how much would that be; do you have any idea?

THE WITNESS:  It's 11 percent times 500 million, 500 and -- or 55 million divided by 50, so that would be about another million.

THE COURT:  And as to that million and a half dollars, the way the plan functions, whose ox gets gored?

THE WITNESS:  I think the second liens.

THE COURT:  Okay.  All right.  Thank you.

MR. AYCOCK:  Thank you, Your Honor.  Nothing further, and may the witness be excused?

THE COURT:  Yes.  Thank you, sir.

THE WITNESS:  Thank you, Your Honor.

(Witness excused.)

THE COURT:  All right.  So we're going to recall our 2:00 witness, right, Ms. Pepper?

(Pause in the proceedings.)

MS. PEPPER:  Thank you, Your Honor.  The Debtors recall to the stand Mr. John-Paul Hanson.

THE COURT:  Thank you.

(Witness summoned.)

THE COURT:  So for the court reporter, this is a recall of John-Paul Hanson from yesterday.

So that others can prepare, is this your last witness and then you rest or do you have more witnesses?

MS. PEPPER:  This is our last witness, and then we will rest.

THE COURT:  All right.  And while Mr. Hanson's coming in, is anyone else planning to call any witnesses at the hearing or will this be the close of the -- come on up, Mr. Hanson -- or will this be the close of the testimony or record?  I understand people may still offer exhibits and things like that, but will that be it?

Okay.  Mr. Hanson, you get to close out the hearing.  You remain under --

MR. HANSON:  What fun.

THE COURT:  You remain under oath from yesterday. Thank you.

(Witness previously sworn.)

DIRECT EXAMINATION OF JOHN-PAUL HANSON (CONT'D)

BY MS. PEPPER:

Q    Okay.  Mr. Hanson, welcome back to the stand.

A    Thank you.

Q    So turning back to where we left off yesterday, as financial advisor to the company, did you have an opportunity to do a cash utilization calculation from the date of the Debtor's Chapter 11 petition?

A    Yes, utilizing the company's information and -- and internal forecasts.

Q    I'd like to turn your attention to Debtor's Exhibit 144.

THE COURT:  Your Honor, may I approach the witness?

THE COURT:  Yes, although he's got it on the screen now as well.

MS. PEPPER:  Oh.

THE COURT:  Whichever you prefer.

MS. PEPPER:  I brought additional copies if other people don't have it.

THE COURT:  Thank you.

BY MS. PEPPER:

Q    So turning to page 4 of Debtor's Exhibit 144, do you recognize this as the cash utilization calculation that you performed for the Debtors?

A    Yes, I do.

Q    Starting with net receipts, can you explain why you included Heidelberg inflows as part of that calculation?

A    Heidelberg inflows represent the cash received in exchange for producing and selling the production of oil and natural gas from the Heidelberg field.

Q    And what does interest income represent on the line below that?

A    Interest received for cash in bank accounts.

Q    I believe you may have answered this yesterday, but could you remind the Court why Sonangol is not included in that receipts?

A    The Sonangol settlement is, in effect, a sale of the asset.  And it's a -- it's a settlement around the arbitration and a release of the leases back to -- to Angolan ultimately to Sonangol.  And so we treated that as an asset sale.

Q    Turning to net operating disbursements, what does G&A include?

A    The general administrative expenses, the operating expenses of the business.

Q    Can you give a couple of examples of what that

includes?

A    Rent, utilities, payroll for office personnel, et cetera.

Q    This states that it also includes severance.  Is that consistent with your -- how you performed the calculation?

A    That's correct, consistent with the information provided by the company.

Q    And what is capital expenditures meant to encompass on the line below?

A    It reflects on a net basis the outflows or expenditures of capital for development projects around the development fields as well as on a net basis, the inflows from joint interest billings where Cobalt is the recipient from other working interest partners.

Q    In what context is Cobalt the recipient of joint interest billing from other working interest partners?

A    The North Plat Field where Cobalt is the operator.

Q    Turning to Chapter 11 fees and interest, could you please tell the Court what's encompassed in restructuring professional fees?

A    Estimated legal and financial advisor, professional fees on a monthly basis forecasted.

Q    And what's interest on the line below that intended to encompass?

A    Payment -- current payment of the first lien note's

interest.

Q    Looking at the line that says, "plus beginning cash," what was the beginning cash on the date on the date of the Petition for Chapter 11 protection?

A    453.2 million approximately.

Q    And what is the cash balance for your projected plan effective date?

A    376.6 million.

Q    So, what is the difference between the two?

A    It's the net outflow, 76.6 million.

Q    You estimate net cash flow in the month ending April 30th as an outflow of 50.7 million.  Are the inputs of that calculation tied to a calendar date?

A    They are.  There are payments that occur throughout the month, and so it does depend on where in the month those payments occur.

Q    Are most of the inputs of that calculation tied to a calendar date or to the estimated plan effective date?

A    The largest payments, the single largest payments, for instance the restructuring, professional fees, are tied to the effective date as there are closing payments and the like.

Q    So if the estimated plan effective date were to move earlier, what do you estimate the change would be to your calculation?  I'm not looking for a dollar value, but how

would it impact your calculation of outflow if the estimated effective date were to move earlier in the month?

A    Well, there are a number of moving parts to that question.  It would lessen the burn of cash because there would be certain payments, payroll for instance and rent, et cetera, that would likely not need to be paid, or at least would not be reflected in this forecast.  And so depending on the calendar there may be a reduction in that $76.6 million burn.

Q    Do you have any insight into -- or are you able to tell the Court what you estimate the outflow would be if we assume, for example, an April 6, 2018 plan effective date?

A    I don't know.  It's based on the company's information. I would have to actually look at the inputs.  Like I said, my estimate is that it would be less than the 76.6, but I couldn't tell you by what magnitude.

Q    Okay.  I'd like to turn back to something we were discussing yesterday.  I was asking you questions about whether or not you performed evaluation on the Gulf of Mexico assets as part of the Debtor's sale process.

Since becoming advisor to the company in 2017, have you ever attempted to value the Debtor's assets in formal valuation?

A    No, I have not.

Q    Why not?

A    Because a valuation exercise is a theoretical exercise. As I mentioned yesterday, it's an attempt to approximate what would be fair market value in a going concern sale of the assets.  Given that we were already in a sale process and continuing post Petition, reinvigorating but continuing that pre-petition sale process and there wasn't another alternative to compare it to, it made much more sense to see what the market would bear on a fair value basis as opposed to doing a theoretical exercise without sufficient support.

Q    Okay.  I'd like now to turn back to the first of the demonstratives that you had prepared to accompany your testimony yesterday.  So that's the one entitled sales process overview.

        MS. PEPPER:  Excuse me, Your Honor, one second.

        Could you please turn to the Debtor's demonstratives for Mr. Hanson, the first one entitled sales profits overview?

        Oh, I think we have to turn the JoinMe back on maybe?

        THE COURT:  What's that?

        THE WITNESS:  No.

BY MS. PEPPER:

Q    So just to recap the Debtor's marketing process.  How many teasers did Houlihan Lokey send out?

A    54.

THE COURT:  So we did this pretty extensively yesterday, right?  I remember.

MS. PEPPER: I would, with the Court's leave, like to make sure that the numbers are actually testified to.

THE COURT:  I thought they were, but go ahead.

MS. PEPPER:  Okay.

BY MS. PEPPER:

Q    How many NDA's were signed and accessed -- how many potential buyers were under NDA and accessed the BDR/

A    24.

Q    And how many on-site meetings did you attend?

A    19.

Q    And how many bids did you receive?

A    8 total across the Gulf of Mexico assets.

MS. PEPPER:  Your Honor, we'll pass the witness.

THE COURT:  Thank you, Ms. Pepper.

Any further questions by anyone that advocates confirmation?

(No audible response.)

THE COURT:  All right.  Any opponents to confirmation have any questions?

CROSS-EXAMINATION OF JOHN-PAUL HANSON

BY MR. COHEN:

Q    Good afternoon, Mr. Hanson.

A    Hello, Mr. Cohen.

Q    We met on March 23rd at the Debtor's offices in New York, right?

A    Kirkland & Ellis' offices.

Q    I'm sorry.  The Debtor's Counsel's offices in New York. And you agreed to submit to an interview that day.  That was the circumstances of that meeting, right?

A    Correct.

Q    All right.  Can we keep up the slide, the sales process overview.  When you were testifying about this slide yesterday, you were talking about Houlihan's position in the market and resources that you, in particular brought to bear.  And I believe you mentioned the depth and extensive nature of contacts within the industry.  Is that right?

A    That's correct.

Q    And you mentioned both financial and strategic buyers. Do you recall that?

A    Yes, I do.

Q    And would it be fair to say a strategic buyer is a competitor company in other oil company that's either in the Gulf of Mexico or considering the Gulf of Mexico.  Is that what you consider to be a strategic?

A    An operating company as opposed to a manager of cash or assets.

Q    And the manager of cash or assets would be a financial --

A    Correct.

Q    -- investor, right?

A    Correct.

Q    And you're also familiar with my client group, the Ad Hoc Committee of Unsecured Creditors, right?

A    Yes, I am.

Q    Would you consider them to be strategic or financial participants in this industry?

A    I assume financial, but I don't know exactly who makes up the entirety of your Ad Hoc Committee.

Q    But if they were interested in making an investment as opposed to -- a financial investment as opposed to running the business, that would be a line of demarcation there, right?

A    If they are all money managers then they would be financial as opposed to strategic, if that's what you're asking.

Q    And you have contacts on both sides?

A    Correct.

Q    Now, with respect to the 54 potential buyers contacted, roughly what percentage of those were strategic versus financial?

A    I don't know the exact breakdown.

Q    I'm not asking for an exact break -- let me finish my question, please.  I'm not asking for an exact breakdown,

I'm asking for an order of magnitude.

A    I don't know.  I would have to reference the detail behind the 54.

Q    And do you know where the detail behind the 54 is located?  Where I could find that?

A    I don't know where you could find it.  I know where I could find it.

Q    And where would you look to find that?

A    Well, I would start with my team and my iPad and my network server.

Q    So you would send someone an email and have them gather that for you, right?

A    Yeah.  Or there's a good chance it's on my personal iPad, yes.

Q    Okay.  How about with respect to the teasers that were sent out.  How many of those, in terms of orders of magnitude and percentages, were to financial investors versus strategics?

A    Once again, I don't know as we sit here right now. Without having the information directly in front of me, I'm not going to make that approximation.

Q    Okay.  How about of the 24 potential buyers who signed NDAs?  What rough percentage of those were financial versus strategic?

A    I don't know -- other than the second liens I don't

know that there are any financials that entered under and NDA, but I would have to check.  I'm not giving you an answer because I'm not 100 percent certain of that.  But I'm not, off the top of my head, aware of financial parties that entered an NDA other than the second liens.

Q    Okay.

A    And when I say the second liens, I do mean the principals there.

Q    Understood.  Understood.

A    All right.

Q    How about with respect to the 19 on-site meetings.  Did anybody on the financial side attend an on-site meeting?

A    I would have to confirm.  I'm not aware of any financial party, but I would have to confirm that.

Q    Okay.  So as you sit here today, the best of your knowledge, all 19 were strategic?

A    Yes.

Q    Okay.  And moving back up one, as you sit here today, to the best of your knowledge, other than the second lien group, all of the potential buyers who signed an NDA were strategics, right?

A    I would have to confirm otherwise, yes.

Q    Okay.

THE COURT:  Is it the second lien group or the second lien participants?

THE WITNESS:  There were holders of second lien. There were actual principal investors in the second liens, who entered into an NDA individually.

THE COURT:  So when you're talking that you said the second lien holders were counted in the 24, is the maximum of that one or is the maximum of that more than one?

THE WITNESS:  That's a very good question, Your Honor.  I included them collectively to the extent that they were expecting to make a credit bid.  They needed to act in excess of a majority in order to credit bid, right?  So.

THE COURT:  Thank you.

BY MR. COHEN:

Q    You testified yesterday that one of your roles as a financial advisor and banker to the Debtors or pre-petition to Cobalt, was to try and partner resources.  Do you recall that testimony?

A    Where it made sense and where parties indicated that they were -- had strengths and weaknesses that would be better matched with a partner.

Q    Okay.  In this specific engagement can you identify any resources that you were able to partner to bring in to this sales process, the sales and marketing process?

A    We did not -- to be clear, we did not partner anyone together.  We facilitated conversations where parties had indicated that they would be open to.  But all of those

parties were under an NDA, the principals, the investors,

the acquirers were under an NDA.

Q    Okay.  So to make sure I understand how your process

worked, you first sent out teasers, you contacted buyers and

then you got a universe of people to sign an NDA, right?

A    We solicited interest via the teaser and anyone that

demonstrated interest and was willing to sign an NDA, we

allowed them to enter into an NDA, yes.

Q    Okay.  And with respect to the universe of 24 potential

buyers, members of the second lien being the financial

participants in that group, how many groups were you able to

partner together?

A    Well, to be clear.  Once again, I did not proactively

partner people together.  Where there were strengths and

weaknesses identified, a party that was only willing to be a

non-op acquirer, a non-operated working interest acquirer,

and there was a party who was willing to be an operated

working interest owner or investor, and yet there was a

difference in maybe capital or risk exposure, through

dialogue with those parties I determined whether or not it

made sense for those parties to have a conversation.

    I did not physically partner anyone together.  I did

not put people together.  If it made sense -- there are two

parties, for instance, who were under NDA, I'm not going to

name them by name, but they do have another project in

common in the deep water Gulf of Mexico.  One is a well-capitalized strategic, the other is a less than well-capitalized strategic, but is an operator.  The more well-capitalized strategic is not an operator.  They already have a project in common.  I was talking with each of them separately.  I brought up, by chance, would you, since you're already operating in another project together, would it make sense not together but each individually.

Q   Let me interrupt if I could, because I think you're answering a lot of questions I haven't yet asked and there's a lot in there I'd like to unpack.

A   Well, I want to make it abundantly clear, I did not partner anybody together.  I did not marry anybody up.  I identified where there were strengths and weaknesses and had separate dialogue with parties.  Either they requested of -- through Houlihan, the Debtors to allow them to talk, or it made sense through my dialogue for them to maybe talk.

Q   Well, let me make sure I understand that.  Because if what you're saying is that your partnering effort, as you used that term yesterday, was limited to identifying where there would be strengths and weaknesses.  What did you do with that information after you did that analysis?  If you didn't bring the strengths and the weaknesses together, once you identified it what did you do with it?

A   That's -- sorry.  I realize that I was talking a lot,

but that's what I was describing.  Right?  I had dialogue with each of the parties individually and said, you're not going to be an operating working interest owner.  We have operated working interests at North Platte.  You have a lot of capital.  There's an operator who is interested in North Platte, but doesn't have as much capital.  Would you be -- would it make sense maybe for you guys to have a conversation.

Q    Okay.  I think --

A    And since they -- for instance, those two parties not named are already in another project and they were both under NDA, I raised the prospect that maybe it made sense for them to talk.

Q    All right.  I think I understand now.  With respect to any of the strategic potential purchasers, were any of them capital constrained?

A    Yes.

Q    And with respect to those that were capital constrained, did you facilitate any conversations among those people and the financial participants?

A    No.

Q    Okay.  Did you suggest to them who might be financial participants interested in investing in these types of assets?

A    Not unless they were under an NDA.

Q    The other thing that you testified to was operators versus non-operators.  And yesterday you made mention of the fact that because Cobalt owns 60 percent of North Platte, it was the operator.  Do you recall that?

A    That's how the joint operating agreement works.

Q    And typically if you own more than 50 percent the entity that owns more than 50 percent has the right to be the operator, right?

A    The right to be the operator or otherwise designate an operator.

Q    But it doesn't have the obligation to be the operator, does it?

A    Somebody has to operate the field.

Q    But they could certainly go out and hire somebody to do it on their behalf, couldn't they?

A    There is the possibility of potentially finding a contract operator, but it would have to be somebody who's already approved and licensed by BOEM and BSEE.

Q    And there is a universe of participants in this industry that are approved and licensed by BSEE, right?

A    Yeah, yes.  But it's not like they're just sitting on the bench waiting to be tapped.

Q    Okay.  But it is possible that an entity could acquire more than a 50 percent interest in a find like North Platte and hire an operator, couldn't they?

A    It's possible.  I wouldn't say it's impossible, no.

Q    And the Cobalt unit that you were trying to sell, this 60 percent interest, there was no requirement that someone bid for the -- that a bidder or collection of bidders in a joint bid, bid for the entire 60 percent, was there?

A    Well, the entire 60 percent was for sale.

Q    I understand that.  My question's --

A    An individual --

Q    My question's different.  Did one bidder have to buy or bid for the entire 60 percent?

A    No.

Q    So if somebody wanted to own 20 percent, wanted to make sure they were never going to be the operator, they could have bid for 20 percent, right?

A    They certainly could have.  They likely would have wanted to understand who was going to bid the -- buy the other 40 percent, otherwise why take the time and effort to bid for the 20 percent.

Q    And part of that, you're leading into my next question. When you testified yesterday about Statoil wanting to talk to Total, it is Statoil wanted to have an understanding of who they were going to be investing with, right?

A    Well, Total already owns the 40 percent, right?  The 40 percent that Cobalt doesn't own, Total already owns.

Q    Right.  But your understanding of the reason that

Statoil initiated those conversations, is they were going to -- if they bid and were the successful bidder, were going to be a co-owner with Total, right?

A    Anybody who acquired the 60 percent that Cobalt owned would be a partner with Total, not just Statoil.

Q    And it would make sense for whoever that person was, to want to have a conversation with and get an understanding of what their co-owners view of North Platte was.  Isn't that right?

A    Yes.  Unless they were intending to be an operator, at which point they are -- not only do they have rights of operatorship, they have rights to propose the budget and development plan.  They ultimately have to work it would with  the non-operated partner, but they're much more in the driver's seat, so to speak.

Q    But in general if you're going into an investment like this with another entity, it would make sense for you to want to have a conversation with that entity before you became a co-owner.  Wouldn't you agree with that?

A    It could make sense.  Depends on different parties' appetites and investment strategy.

Q    All right.  Well, when Statoil approached you about having a conversation with Total, you didn't know whether Statoil was going to bid for 20 percent or 40 percent or 60 percent, did you?

A        I did not.

Q        And you certainly didn't know, at the time Statoil first asked you if it could have a conversation with Total, that it was planning on doing a joint bid with Total, did you?

A        I don't know exactly when the joint bid concept entered the conversation.  But originally the request was one more of a technical conversation because Statoil, as I mentioned, is a non-operating working interest owner.  So they needed to understand if they were going to acquire -- even if they acquired the 60 percent, they may designate Total as the operator.  So they needed to start with a technical conversation.  They weren't going to be the operator, so they weren't going to be proposing the budget and the development plan, et cetera.

Q        But as you just testified, because Total only owned 40 percent, there was no guarantee that Total was going to say, we only own 40 percent but of course we will be the operator.  They could have sat on the sideline, right?

A        Correct.  And that's part of the reason why it made sense for them to have a conversation of a technical nature.

Q        All right.  And wouldn't that conversation have made sense from anybody who was looking at this investment, be it a strategic or a financial?

A        As I mentioned, potentially.  Depends on different

investment strategies and appetites.

Q   Do you know whether my client group asked Houlihan whether it, in this marketing period, could have conversations with Total?

A   I never got that request from your client group.

Q   Did it come through --

A   I got the request from the -- not through the advisors, from the advisors.  And even though we had multiple conversations over time about your clients potentially entering an NDA, your clients didn't until after the auction.

Q   Let's break that down.  Did Mr. Uzzi, on behalf of our client group, ask you whether our clients could have conversations with Total about the North Platte asset?

A   I don't believe Mr. Uzzi asked me that question.  I believe that there was a question from Mr. Karn Chopra of Centerview, who is the investment banker to the Ad Hoc noteholders, if Centerview could have a conversation with the potential buyers.  Your clients were under NDA.  There wouldn't have been a conversation to be had with parties who were under an NDA.

Q   And of course that request was granted, right?

A   Not banker to -- banker of Ad Hoc noteholder to parties under an NDA.  No, it was not granted.

Q   Why not?

A     That would have created a very awkward conversation for a banker to a creditor group not -- with no principals that are under NDA with no ability to discuss a potential transaction having a conversation with bidders.  From my perspective it could scare off bidders.  I don't know what the banker wanted to talk about.

Q     Well, wouldn't it only have the potential to scare off bidders if you made that widely known at that meeting?

A     No.  I don't know what the banker was going to say.  It might scare off that individual bidder, not broadly.  I had no idea what a banker who has no capital to provide and no clients who are under NDA to bring into the conversation, what kind of conversation they're going to have.

Q     And that's one of the reasons -- without knowing what sort of conversation and what the parameters of a conversation would be, that's one of the reasons you asked to chaperone the Statoil meeting with Total, isn't it?

A     Well, to be clear, both Total Statoil were under an NDA.

Q     I understand that.  I asked you a different question.

A     Can you repeat that then?

Q     My question is, to understand exactly what the parameters of the conversation were going to be was one of the reasons that you asked to chaperone the meeting between Statoil and Total?

A      That's correct.

Q      Looking again at your sales process overview.  You testified yesterday that you expected -- that your expectation at the end of your marketing process, that with respect to bids coming in, that it will be either in the low double digits or the high single digits.  Do you recall that testimony?

A      On a collective basis, yes.

Q      Okay.  So when you got eight bids total, that met your expectations of high single digits, low double digits?

A      I think I furthered that testimony by saying, I expected, based on the conversations, to have multiple bids for each asset.  So however that would work out from a math perspective, we'd have to see whether that was low double digits wherever.  But I expected more bids and I expected multiple bids for each asset.

Q      With respect to North Platte going into the auction.  Because you hadn't done a valuation you had no expectation as to what the value would come in, did you?

A      I did not.

Q      All right.  And you testified that although Houlihan was formally engaged in September, you started doing work some weeks earlier, is that right?

A      Well, what I testified to is that we started having conversations with the Debtors several weeks earlier.

Q    All right.  And you testified that it wasn't as though Houlihan started from ground zero, there was a handoff process from Goldman over to Houlihan, is that right?

A    That's correct.

Q    And Goldman described the period and the analysis and the evaluation that it did prior to Houlihan being engaged in September, right?

A    Correct.  Although I have no idea whether there was an entire handoff of information.

Q    Was there anything that you asked Goldman about that they refused to tell you?

A    I don't work at Goldman Sachs, so I don't know what they did or did not share with me.

Q    Was there anything that you asked Goldman that Goldman said to you, we're not sharing that information with you?

A    Not off of the top of my head.  But nothing that I recall.

Q    Would you turn to, if you could --

        MR. COHEN:  If I can indulge the Debtors to pull up the page, illustrative assets, sale proceeds comparison, on your demonstratives?  I think it's -- yeah, this one.

BY MR. COHEN:

Q    Do you have that page in mind?

A    I've got it in front of me, yeah.

Q    Terrific, even better.  What you're comparing here is

an asset sale versus a loss of the North Platte asset and the Shenandoah assets.  Is that a fair characterization of this slide?

A    Yes.  But as mentioned yesterday, this goes in coordination with the previous slide in terms of what happens if the sales don't close and the leases at North Platte and Shenandoah are lost.  And therefore Cobalt no longer has rights to those assets to sell them.

Q    Is that your understanding of what happens if the sales don't go through as planned?

A    As mentioned yesterday, it's really at BOEM's discretion, it's not at Cobalt's discretion.  There's an expiration of the lease.  BOEM has rights to take the lease back.

Q    Do you know whether Cobalt has a contingency plan in the event that the sale of North Platte is not approved by the Bankruptcy Court?

A    Cobalt has a development plan, which it has shared with bidders and had been pursuing.  It requires capital to actually pursue that development plan.

Q    Do you know whether Cobalt, if this Court does not approve the sale, has the capital to pursue that development plan?

A    Not to its full extent, no.

Q    When you say "not to its full extent," what do you

mean?

A    These assets require approximately $6 billion in capital to bring the first oil to full development.

Q    And over what period of time is that capital needed?

A    It really depends on the lease. North Plate is 2023, for instance. So over the next five years.

Q    Okay. How about over the next 12 months? Say, pick something relatively near term. Has Houlihan done any financial analysis to determine whether Cobalt has sufficient capital to pursue a drilling plan in North Platte in the event that the sale is not approved?

A    It does not have enough -- Cobalt does not have enough Capital to bring North Platte to full production.

Q    And --

A    So could Cobalt go drill a well? Yes. Would that result in a lease-preserving activity? Yes. But that does not actually result in the production of oil. It does not turn into revenues because the infrastructure isn't there. There's no way to actually produce the oil and get it to market.

Q    And that process of producing the oil and getting it to market, is a process whether it's Cobalt that's doing the drilling or the joint ownership of Total and Statoil who's doing the drilling and bringing the oil to market, a process that will take several years, won't it?

A    That is a process that will take several years, yes.

Q    Okay.  And so that --

A    And several billions of dollars of capital.

Q    Understood.  But the time aspect of it, the fact that it will take several years, is not something that is unique to Cobalt, is it?

A    Sorry.  You lost me on the question.

Q    My original question to you was, does Cobalt have the cash that if the Court denied the sale that it could engage in drilling so as to preserve the value of the lease and execute on its contingency plan over the next 12 months. Let's start there.

A    It could drill a will to save the lease.

Q    And you also testified that --

A    But --

Q    Let me finish.  I'm asking the questions.  You also testified that it would take several billion dollars to actually fully implement the plan and bring the oil to market, right?

A    Correct.

Q    And that process will take several years, correct?

A    For North Platte, correct.

Q    For North Platte.  And that process will take several years and several billion dollar irrespective of whether it's Cobalt or the interest is sold and it's some

combination of Statoil and Total, right?

A    Correct when you're looking at the assets themselves.

          MR. COHEN:  All right, thank you.  I have no further questions.

          THE COURT:  Thank you.

          Ms. Pepper.  Or, sorry.  Is there any other opponent confirmation that has questions?

          All right.  Ms. Pepper.

          REDIRECT EXAMINATION OF JOHN-PAUL HANSON

BY MS. PEPPER:

Q    I just have a couple of follow-up questions for you. Do you know if the Ad Hoc Committee's constituents had an opportunity to participate in the Debtor's sale process?

A    The Ad Hoc unsecured noteholders

Q    Yes.

A    Yes, they did.

Q    Did you have conversations with their financial advisors during the sale process?

A    Yes.

Q    What information, if any, did you make available to either the financial advisors or to the members of the Ad Hocs?

A    Well, the financial advisors to the Ad Hoc Unsecured Noteholders Committee, they were under an NDA.  They have full access to the buyer; virtual data room; they had access

on the marketing materials; they had meetings with management, et cetera.

Q    And why did you draw a distinction between the financial advisors and the member of the Ad Hoc Unsecured Noteholders Committee?

A    Well, the biggest distinction is the advisors were under NDA and the principals were not.

Q    Did the principals know that an NDA -- did you communicate to the principals that an NDA would be required for them to have access to all of the information you were making available to the financial advisors?

A    Yes.  And to my recollection we actually shared drafts of an NDA.

Q    When, if ever, did the Ad Hoc members exercise their option to go under NDA?

A    Not until after the auction was completed.

Q    Did the Ad Hoc members have an opportunity to participate in the auction if they wanted one?

A    If they wanted they could've executed the NDA and we would have had conversations with them just like we did other bidders in the second liens, et cetera.

Q    Did they submit a bid?

A    No, they did not.

Q    Since the auction, have you received any offer that would improve the outcome of the Debtor's sale process?

A     No, we have not.

Q     In your role as financial advisor to the company, have you recommended that Cobalt go out and drill a well on North Platte?

A     No, I have not.

Q     Do you know why Cobalt hasn't just gone out to drill a well?

A     While it would save the lease from a timing perspective, I don't know exactly why but I can imagine that it's probably not the most prudent use of cash, which is a good asset of the company at this point.

Q     Is it a recommendation that you would make that they go do that?

A     I would not make that recommendation unless there was no other -- absolutely no other alternative and they were at risk of losing the asset.

Q     And why is that?

A     Because I don't believe that it's a good, prudent use of a cash, which is an asset of the company.

Q     And as it currently stands -- well, actually, you know what, I'll leave it alone.

        MS. PEPPER:  I don't have any further questions.

        THE COURT:  Thank you.  Anything further?

        MR. COHEN:  No, Your Honor.

        THE COURT:  Mr. Hanson, you can step down, sir.

Thank you.

THE WITNESS:  Thank you, Your Honor.

(Witness excused.)

THE COURT:  Does the Debtor rest its case?

MS. PEPPER:  We do.

THE COURT:  Debtor rests.  Who else wishes to present a case in support of confirmation?

(No audible response.)

THE COURT:  All right.  Who wishes to introduce any evidence beyond what's already come into the Record in opposition to confirmation?

(No audible response.)

THE COURT:  I'm going to show the evidentiary record is closed unless somebody tells me a reason not to do that.

(No audible response.)

MR. COHEN:  And, Your Honor, we rest.

THE COURT:  Okay.  Evidentiary record is closed.

How much time does the Debtor request for closing -- I'm sorry.  We need to move to our other issues.  We need to go to the Chevron and Anadarko SEC kind of issues before we go to closing argument.

MR. WEILAND:  Happy to do it in that fashion or just do it all in closing argument.  I wasn't sure how this was going to shake out, timing wise.

THE COURT:  I think I would rather take the --

MR. WEILAND:  The discrete issues?

THE COURT:  -- the discrete issues discreetly and then deal with the bigger picture of whether we ought to confirm or not later.

MR. WEILAND:  Perfectly fine with me.

THE COURT:  Can we just take a ten-minute afternoon break and then we'll come back and we'll take up the discreet issues?  Can we prepare it that?

MR. WEILAND:  Sounds good.

THE COURT:  All right.  We will come back at ten minutes to 4:00.

(Recess taken from 3:39 p.m. to 3:50 p.m.)

THE COURT:  I may have lost the call.  Let me see.

UNIDENTIFIED SPEAKER:  I think you did.

THE COURT:  I did lose it?

UNIDENTIFIED SPEAKER:  You did.

(Call placed.)

THE COURT:  Are we ready to proceed?  Do you need some more time?

MR. WEILAND:  No, no.  I was just trying to understand what's left open.  I get it, Your Honor.  So, Your Honor, I think we recommend we begin with the SEC.  I heard that there might be some work being done on Chevron so it probably makes sense to do the SEC argument first and

then turn to Chevron if it's still open at that time.  And then we can go to others.

So, I don't know, Your Honor, if you want to hear from me first or we should hear probably from the SEC about what's left open at this point in time, given the modifications to the plan.

THE COURT:  That's fine.

MS. DOUG:  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

MS. DOUG:  This is Angie Doug with the Securities and Exchange Commission.  I think actually what's left open on the SEC's objection is the entire objection.  I don't think that the new deal really alters what the SEC has to say about the third-party releases.

I do think that I misunderstood what you asked me yesterday afternoon and I wanted to start with that.  I thought you were referring only to the noteholders' claims. I didn't realize you were talking about the whole body of all voting creditors.  So I thought it might be best if I started with what the SEC would like to see, what we want, and then I can kind of back into the law and our reasonings for that.

I think I should start out with only those releasing parties who did not receive -- so any releasing party that did not receive consideration from the released

parties should not be bound by the releases.  And that would be the public shareholders who received nothing under the plan and are deemed to reject.

In addition, any party that did not affirmatively and individually consent to the releases separate and apart from their voting on the plan would also not be bound by the releases within the SEC's opinion.  That would be any party that was deemed to accept but did not have any opportunity to complete an opt, some sort of opt election.

THE COURT:  So why wouldn't everyone have had an opportunity to elect, to opt out?  I understand you think opt out might not be the right way but I want to make a distinction between opportunity and opt in/opt out.

Part of your objection implied that there was a group -- and this was what I was trying to ask yesterday -- that didn't have the ability to opt out.  And I want to understand that better.  Maybe I misunderstood that.

MS. DOUG:  It was my understanding -- I thought there was a group and I could be mistaken, a group that was deemed to accept.  Not necessarily even a group of public investors that were deemed to accept but did not have an opportunity to opt out of the releases.  I could be mistaken and I'll let the Debtors -- the Debtors can address that when they come up.

THE COURT:  Okay.  Explain to me then, in terms of

opt in/opt out, why is opt in/opt out okay in a class action suit but not okay in a bankruptcy cases?

MS. DOUG:  You mean an opt out versus an opt in?

THE COURT:  Well, we allow opt out to work in class action suits, pretty common.  I think it's probably pretty common even in shareholder derivative suits.

Why is it -- and I may be wrong about that and you would know that a lot better than I do.  But if I'm right about that why is it okay that in a shareholder derivative suit -- and I get the consideration argument which is a different argument.  But in a shareholder derivative suit if there's consideration that's going to the shareholders it seems that it's okay to have people bound unless they opt out.

If in a bankruptcy case if there's consideration that goes to the releasing parties why is it not similarly okay?  And my premise may be wrong.  Then you're up for the challenge of premise.

MS. DOUG:  I actually think if you read my objection carefully I haven't really put a lot of money on the opt in/opt out argument because we are in the Fifth Circuit and I do recognize that it is the practice in the Southern District of Texas to allow for opt outs and not necessarily require opt ins.  That doesn't mean that that's the SEC's policy throughout the country and when we have a

nationwide practice and we're dealing with different circuits. I did try to tailor my objection --

THE COURT: I have zero problem that it's in there if you don't want to pursue it today. But if you want to pursue it today I need to understand it. And I got it that that was your most important argument but it was there. And if you would prefer to move to your others which -- some of which are very concerning to me -- that's fine. But if you want to deal with opt out rights, that's my question. If you don't want to deal with them it's fine and we'll move to other things.

MS. DOUG: So one of the issues with opt in/opt out, especially when you're dealing with public shareholders who are widely held, you don't necessarily know if one, they're received the opt out elections; and two, if they understand it. You've a lot of unsophisticated shareholders and investors who may receive an opt out and not understand it's import.

THE COURT: But the principal distinction between that and the class action is what? Between that and a bankruptcy case in that exact same scenario in a class action. I don't see the principal distinction and that's why I'm asking.

And maybe it would be more helpful if I made him tell me how he can get a release from somebody without

giving them any consideration.  Because I didn't understand their response to that.

MS. DOUG:  Yeah, I -- frankly I didn't --

THE COURT:  If that's your more important argument we can start with that one and let him go to that and I'll get you back up here.

MS. DOUG:  So that is my main argument.  And that kind of goes to the crux especially of parties they're deemed to reject is a recognition that they're receiving nothing under the plan even in -- on behalf of their claims.  And put aside the fact they haven't even received anything on behalf of their claims, they're clearly not receiving anything in exchange for their release.

So the Fifth Circuit has been very strong in its prohibition against non-consensual releases.  In order to -- in the SEC's opinion, in order to effectuate a release that is legal and appropriate within a bankruptcy in the Fifth Circuit it has to be done as a settlement of claims.

A settlement of claims requires two things.  One, that the party who is being asked to give up its rights, or whatever, enter into the agreement, received consideration from the party that's benefitting from that agreement.  In this case the Debtors would have to show that the released parties -- the officers, the directors, the, you know, Goldman Sachs -- have all made a contribution that flows to

the releasing parties.  That would be the shareholders --

THE COURT:  Well, forget the shareholders for a minute because that goes to the consideration question.

MS. DOUG:  Right.  That's --

THE COURT:  Let's talk about somebody that might get a distribution and somebody that might not get a distribution.  We don't know yet and so they're not deemed rejecting.  So if we have a non-deemed rejecting party and what occurred is that by giving the releases -- and I'm talking about this theoretically, not the evidence necessarily in this case.  But if by giving these releases you maximize the probability that those people will get something -- whether it ends up working or not is a different question -- that does seem to be consideration to me.  But I don't understand what the consideration argument is unless it is that you don't need any if you have a deemed rejecting one.

And so I'm at least starting the hearing wanting to hear why they can get a release from somebody that is getting nothing under the plan.  But if someone is given the opportunity to get something, and it depends on, you know, what all comes in and there's a waterfall, I'm not sure that I understand your argument.  Because I don't think that we can wait until the end to do it.  You have to look at it theoretically on whether or not they can benefit, right?

MS. DOUG:  So the way that the SEC looks at it is are you receiving that distribution on behalf of your claims against the Debtor or are you receiving a distribution on behalf of the rights that you are giving up against the third parties.

THE COURT:  Well but what if the distributions you're getting on your claims is greater because you're giving up the rights against third parties?

MS. DOUG:  I still think that that contribution needs to be coming from those parties that are receiving the benefit of those releases.  It's a contract between the class that's giving up those claims or the individuals hopefully because they're having opt election, and the parties that are receiving the benefit -- the officers, the directors, the lenders -- whoever is the released party.

So there has to be some sort of contribution that flows from those release parties to the releasing parties separate and apart from a distribution.  It may increase the distribution that they get but you have to -- I think you have to look at them separately.  What is the Debtor required to give under whatever the analysis is.  You know, that's part of confirming the plan.  What is the Debtor required to give that class of creditors on behalf of their claims.

And then what, in addition -- because non-Debtor

third party releases are an extra add-on -- what in addition would those released parties give?

THE COURT:  So in this particular case -- I'll take one example, which is the Second Lien Holders.  The evidence right now is that the Second Lien Holders are giving up some funds to which they would otherwise be entitled in order to give unsecured creditors a higher distribution than they would get if the secured lien holders did not give up those rights.  Assume with me that that's the conclusion that I reach.

Does that mean that the Second Lien Holders are entitled to get a release because they gave up something that they weren't required to give up as a matter of law so they can then get a release?

MS. DOUG:  I certainly think that the Second Lien Noteholders could make a colorable argument that yes, they made additional contribution.  That doesn't mean that their contribution should go to release all of the release parties.

THE COURT:  No, no, I've got that.  I'm just trying to understand.  You agree that in theory it can come in the form of a distribution on the claim.  It's just that distribution on the claim has to have been enhanced by the conduct of the party that is getting the release.

MS. DOUG:  I know this sounds a little like

picking at it but I would actually --

THE COURT:  No, pick at it.  No, I want you to pick at it because this is a hard question.

MS. DOUG:  Yeah.  I would actually say that that's not really a distribution on their claim.  It's a contribution from the Second Lien Holders.  I mean, let's just play like let's pretend that everybody -- no one has any other arguments about this, because I don't want to give up anything that I might be able --

THE COURT:  No, I got it.

MS. DOUG:  But let's say that it's the case.  I wouldn't say that it's a distribution from the Debtors.  I would say it is contribution that if I was the Second Lien Noteholders and I wanted a release I would say it's a contribution on behalf of --

THE COURT:  Yeah, but the problem with that is a Supreme Court decision that says that we're not going to bypass folks.  So if we're not going to bypass but whence you can't bypass any longer, right?

MS. DOUG:  Right.

THE COURT:  So it does all have to come as a distribution on the claim but it's a distribution on the claim that would not have occurred without the contribution from the Second Lien Holders.  And I can't say it's not a contribution on the claim because that can't exist anymore,

right?  Because we can't skip around on the ordering of priorities.  And we're not in this case skipping around the order of priorities.  But it means it all has to come through the estate I think is the practical consequence of that Supreme Court decision.

All right.  I think I got the argument and I'm not trying to pick at it one way or the other.  I think I'm going to interrupt your argument for a minute because I want to understand why the Debtor believes, under the law, that you're wrong that an individual that gets no consideration can still be getting a release.  Let me hear their response.

MS. DOUG:  Honestly, Your Honor, I don't know why that is.  The one thing that they've --

THE COURT:  Yeah, but they do.  I mean --

MS. DOUG:  The one thing that they've cited back to me is a lot of cases that are pending or have been confirmed in the Southern District of Texas where similar release provisions have been allowed --

THE COURT:  As I said before, I don't care about those.  What I care about is somebody that's giving a reasoned opinion for it.  And the fact that we do things without objections, unless there is a reason why we determine that we can do it, doesn't control what I'm going to do.  And I've said before, giving me a string cite that, you know, even I did something in another case much less

that Judge Jones did something or that a judge in New York or Delaware did something, is really irrelevant to my decision.  I don't care what people did.  I want to understand the legal principal behind it and I want the Debtors to tell me legally how they can get a third-party release from somebody that's getting nothing under a plan. And that is your fundamental argument, frankly.  Everything else is almost a spinoff of that argument if you think about it.

MS. DOUG:  That is true.

THE COURT:  So let me hear --

MS. DOUG:  Do you want to let me let them --

THE COURT:  Let me hear their answer --

MS. DOUG:  Okay.

THE COURT:  -- and then I'm going to give you a chance to respond to their answer.

MR. HUSNICK:  Your Honor, my answer is I think the premise is flawed.  There is consideration flowing from each released party to each releasing party back and forth because these are mutual releases.

THE COURT:  All right.  So let's take a shareholder that bought shares on the Stock Exchange.  What are they getting released from?

MR. HUSNICK:  He or she may -- there may be a potential cause of action against that person related to the

number of things that happened in the Chapter 11 cases.  I'm not saying that these claims are incredibly valuable.  I also don't think claims going back the other way -- or, I'm sorry  -- coming back towards the Debtors are all that valuable.

But, you know, consideration can be a peppercorn.  And if you give notice to a party that if you don't take action you will be given a release that party has an opportunity -- it goes back to the fundamental of consent.

There is consideration.  Somebody may say I don't know how much it is, or what it is, or -- but there is consideration because they are getting a release back from all these third parties for anything related to the case.

But the reason I think it's so important to restructuring as a whole is because when you do a negotiation in a case, if all you're doing is signing up, the doing a plan, and only that party who walked in and stood at the counter and argued with you is the only party who is going to be bound to this kind of stuff, then there's always risk that some third party comes in after the fact and asserts a claim against these parties and they're not getting the closure that they bargained for.

THE COURT:  Yeah.  I'm not suggesting that I go anywhere near as far as the SEC wants me to go.  If a party makes a contribution to a reorganization effort and if that

contribution results in a benefit to a releasing and released party, I at least start the hearing believing that to be adequate.

My concern about her argument, or the SEC's argument -- I don't mean to personalize this to people -- is they're telling me I think with some pretty good case law that I can't do a no-consideration release.  And to tell me that you're releasing people from something when you have just zero belief that that has value to it --

MR. HUSNICK:  I don't have zero belief.  I've been in cases where publicly -- public case where equity holders come in and they may be disgruntled equity holders, file letters asserting a variety of claims against Debtors.  Now do I think at the end of the day that that's the type of claim that's going to withstand scrutiny?

THE COURT:  I'm talking the other way.

MR. HUSNICK:  But likewise I don't think -- I'm with you.  But I mean, if you're going to give a release or get a release then you have to give something in exchange.  And it's the counter-release.  That's why the mutual release is so important.

THE COURT:  I don't understand, in the absence of any, even a scintilla of evidence, that there is a claim against the Debtor against a public shareholder, how I can conclude that there is any consideration by giving an empty

release to them.

MR. HUSNICK:  You're also assuming though that a public shareholder is the only type of shareholder.  There are other groups of shareholders.  You start to slice the salami pretty thin because there are large shareholders, former shareholders of this company before it went public; then there are large shareholders after it went public that continue, the sponsors continued to own chunks of the equity, even though it was publically traded.  So if you just carve out bunches of people and say well that party, there might not be a claim against that party.

I actually disagree.  There could be a chunk of people who are acting in concert with something around the company, an action that they took, and there may be a claim against those folks.

I don't know of one standing here right in front of Your Honor but --

THE COURT:  But the release -- no.  The release against the company, that's easy.  That's the discharge.  I guess there's no discharge here.

MR. HUSNICK:  There's no discharge here.  But it's also a release of --

THE COURT:  But there's nothing -- the reason there's no discharge is there's nothing left.  So a suit against the company is worthless.  They're not going to get

a distribution.  They didn't file a claim.

MR. HUSNICK:  But that goes back to the -- any third-party release provision is really not about the Debtor as much as it is about all the other third parties.  So lender liability.  Does an equity holder bring an action against the lenders for lender liability or does the lender say that the equity holders took action that --

THE COURT:  I don't have a problem converting, I don't think -- and I want to hear the SEC's answer -- converting the third-party releases into a channeling injunction to enforce the fact that the Debtor is going to give a release to those parties and that nobody can bring a claim that really is the Debtor's, it's been released.  So anyone that has some claim arising out of the company to channel it here, to be sure that those are effective releases, that to me is a horse of a different color.  Because you're telling me these are going to be fake claims in the sense that they're going to be asserting the Debtors' claims.

Absolutely if the Debtor gives any release -- which the SEC isn't challenging the releases between the Debtor and these parties; it's the third party to third party.  If the third party to third party were asserting property to the estate claims I don't think I have an issue and I don't know if the SEC has a --

MR. HUSNICK:  Well, those are released by virtue of the derivative, the Debtor release.  So I'm actually not concerned about a party asserting a claim on behalf of the Debtor or trying to step into the shoes because those are already released.

What I'm talking about is equity holder asserting a claim against a third party that's involved in this case.  And, you know, you may -- coming back to whether or not a claim that could be asserted back against them is able to -- I certainly think there are claims that could be pled against certain of these parties, including equity holders.  And whether ultimately there would be a prevailing claim.

But it doesn't have to be that there's some identifiable claim standing here today.  If we did that then there would have to be a record for each and every single released party of what claim against each individual equity holder.

THE COURT:  I think you can deal with it on a general basis.  Is there case law that supports your position?  And I don't mean by case law that somebody has done it before.  I mean, is there a reason --

MR. HUSNICK;  Look, I can -- there are cases that have approved these objections over -- I'm sorry -- approved these types of releases over the objection of --

THE COURT:  Is there a reasoned opinion that says

why?

MR. HUSNICK:  I would have to get back to Your Honor on exactly why.  But, I mean, look, I would go back to the fundamentals of, you know, contract law and build that back up in terms of, you know -- all the cases focus on is there a -- is it a consensual third-party release.  Meaning did they have an opportunity to look at it and agree.

If I took away that consensual nature of it then certainly in this circuit it's dead on arrival.  And that's what I think is such a critical aspect to this because --

THE COURT:  No, but her argument is different than that.  She's making argument that without consideration you also can't have a release in this circuit.

MR. HUSNICK:  But then I have to go through on every individual basis.  And I actually do believe that me releasing a --

THE COURT:  I actually don't think you do.  I mean, for example, the entire class of unsecured creditors, the entire class, has a benefit under the plan.  So anyone that's a member of that class has -- not under her view of consideration but maybe under my view of consideration -- consideration for the release because of the additional contributions that's come in.

And we do need to go through and analyze -- or I need to go through and analyze release-party-by-release

party, the contributions. So you've got a pretty extensive evidentiary record on what everybody did that's uncontested.

So with an uncontested evidentiary record I guess I need to think about it. But you've really built up that record pretty well, I think.

MR. HUSNICK: And I agree.

THE COURT: I'm talking -- you know.

MR. HUSNICK: And we would do that but the --

THE COURT: So that works for the whole unsecured creditor class. I think all that we're talking about here are the public shareholders. They're important; they're getting nothing. So how if they're getting nothing under the plan, other than a mutual release or have no evidence of any value, can I do it under the case law?

MR. HUSNICK: I'm not aware of a single case that says that giving a release back is not consideration. I just -- there are cases that say if you give them nothing, if I just take a third-party release from them but I don't give them back, that's a failure of consideration.

But the fact that they're getting something out of this and they can make a decision, it fundamentally comes back to a party can make a decision that that's not enough. I don't have any valid claims against me and I want to reserve the right to sue that person. And the release is tailored to this Debtor and events around this Debtor. It's

204

all designed to bring closure to situations.

THE COURT:  Is there anyone that's getting a release that isn't getting a full release?

MR. HUSNICK:  No.

THE COURT:  So we've got some disclosure --

MR. HUSNICK:  I want to make sure I hear your question.

THE COURT:  Yeah, you've got some disclosure people who you might sue.  So anybody you might sue isn't giving a release?

MR. HUSNICK:  Is there anyone who's getting a release and not getting it?

THE COURT:  Right.  You are reserving the right to sue some people, right?

MR. HUSNICK:  Correct.  There are some --

THE COURT:  So those people aren't getting releases.

MR. HUSNICK:  To the extent that it doesn't override the releases.  There's a carve-out in the retained causes of action that it cannot override the release provisions.  So it --

THE COURT:  I don't understand.  You're giving them a full release of everything, right?

MR. HUSNICK:  Correct.  But What I'm saying is the retained causes of action list says that it does not

override the release provision.  So if they're getting a release they're out.

THE COURT:  Just to be sure I understand this, if you have a fraudulent conveyance claim against a company for a million dollars and they have filed a $5 proof of claim in the case, $5 only, and you have a million claim against them, you're releasing your million dollar claim in exchange for them releasing you?

MR. HUSNICK:  That is correct.  That is correct.  That is why when we work with the committees, and we do -- this plan is actually very specific that avoidance actions are being released.  And people will jump up and tell me if I'm getting that wrong but this plan is very -- I'm looking at Mr. Feinstein because I believe it was a point we negotiated which is that avoidance actions are being released so that there isn't -- you know, in some cases avoidance actions are not released.  They're like preference actions and they're expressly reserved.

THE COURT:  So, if someone breached a contract to you and they are a public shareholder in the case, and you don't even know that they are --

MR. HUSNICK:  If the contract is assumed under the plan the lead-in to the releases says except as otherwise provided.  So they would not be --

THE COURT:  Not an assumed contract.  Let's just

say a contract that they're not performing under and they owe you money.  If they owe you money and they happen to have one share that they bought in 2014, you're no longer going to collect that money from them because you're giving them a release?

MR. HUSNICK:  If they -- if I'm owed money under a contract, I would have -- we would have done the diligence and known that we were owed money.  And we would've expressly carved that situation out.

THE COURT:  So they're not getting a release?

MR. HUSNICK:  They are -- no, if that was the case.  But here I'm not aware of any situations where we're carving folks out in that fashion.

THE COURT:  I'm not trying to be difficult, but I'm not fulling understanding that.  I want to just take an example which could hypothetically exist out there, whether you know of it or don't know of it, where someone owes the Debtor a million dollars arising out of a contract.  And they own one share of stock in the Debtor.  Are you giving up your claim for a million dollars?

MR. HUSNICK:  No, it actually says in their capacity as such for each of these individual things.  So if they are a lender, if they are an equity holder then they're released in their capacity as an equity holder.  So it's narrowly -- each of the released parties have --

THE COURT:  What does it mean to release someone in their capacity as an equity holder?

MR. HUSNICK:  Well, if you have a claim against that party in their capacity as an equity holder then it's really  -- for example, Goldman Sachs, hypothetically, or U.S. Bank or Chase Bank.  They're all over the planet on various contracts.  And in theory if I released -- if the Debtor, or not the Debtor -- a third party released a claim was bound through the third-party release, releasing claims against Chase Bank, they may have their own personal mortgage with Chase Bank.  That doesn't mean that they're releasing claims against Chase Bank under their own mortgage.  That's a completely -- because Chase Bank, in its capacity as a -- again, making -- assuming Chase Bank was a lender the Debtor.  In its capacity as a lender to the Debtor that's what gave rise to the third-party release.

So they do need to be -- they are tailored in a way that doesn't just broad swath through release everything.  And that's why, when we structure these in the plan, we do it with a goal of trying to bring closure to this situation and for the benefit of everyone.

Now if I were in another circuit I would be trying to argue that I could do that on a non-consensual basis certainly for those who put in material consideration here. I completely agree with you.  But when it's agreed to by a

consensus and if the opt-out structure works, which it does with class action lawsuits, I agree with you, then necessarily, as long as they're getting a release in return and they're consenting, but not opting out, then they have consideration.

THE COURT:  Okay.  What's your legal argument that the mutual release isn't sufficient consideration?

MS. DOUG:  I don't think the mutual -- I don't have any case law on that.  I don't know that there is any case law on that in any circuit.

THE COURT:  What's the theoretical argument that that -- if we assume that opt-out provisions work --

MS. DOUG:  Okay.  Well, just put that aside for --

THE COURT:  Actually, let's not even do that. Let's assume somebody for no consideration, other than the mutual release, opts in, shareholder opts in.  And the only thing they're getting for it is a release of them and then they release the third parties.  The consideration is the same whether it's opt in or opt out.  Is that adequate consideration?  So they said yes but, you know, the contract still needs to have consideration, it's mutual.  His argument is that's good enough.

MS. DOUG:  So I would suggest that if you were opting in you were sitting down and thinking about exactly what it is, what claims you have potentially against the

Debtor, what claims potentially they have against you.  Are those equal; is it in your best interest?

And I don't think that's consideration but I think part of it is.  When you do have an opt in you can assume that the releasing party has thought more thoroughly about it and that the --

THE COURT:  Sure.  I mean, there's a difference between opt in and opt out but that's not really the legal question.  So let's assume they sign it and they opt in.  And then later on they decide they want to go ahead and sue somebody.  And that person defends and says, "No, you gave me a release."  And they say, "Yeah, but there was no consideration."  So who wins that battle?  His argument is that the consideration -- the mutual release is in and of itself by definition adequate consideration.

Is he right that if somebody opts in and they do an opt-in exchange of mutual releases that that is definitionally adequate?

MS. DOUG:  I think that the consideration that you need to be given -- and I'll use Mr. Husnick's own phrase -- should be material.  And whether or not the Debtors are giving a release to equity holders, whether or not that's material consideration, I don't think that that's worth the release they're giving back.  But I don't --

THE COURT:  But what if it is worth it?  Let's

assume that no one needs a release because of anything they've done wrong; we need the release because of stopping the fight and just all we're going to do is save both sides legal fees.  Why isn't that equivalent?

MS. DOUG:  The public shareholders have made that determination individually that they wanted to --

THE COURT:  They checked the box yes, I want to give a release.  Can they then later --

MS. DOUG:  I think this is one of the reasons --

THE COURT:  Can they later defend it by saying there wasn't adequate consideration?

MS. DOUG:  I would say probably yes.  I think this is one of the reasons that you have the consideration requirement is because when you are dealing with public shareholders they're not sophisticated.  They are mom and pops.  I mean, there are bigger shareholders here and I hope that they sat down and they really -- you know, they worked with their professionals, they decided whether they wanted to opt out or not.  But a lot of these people, I mean, I use the litmus test.  Like would your average small-town doctor read this really -- sit down and think about what he or she was giving up.  You know, somebody who is well educated, who handles their own portfolio, small as it may be, will they understand this.  I just don't think they get the import of it and I think that's why it is especially important to have

both consideration and consent.

THE COURT:  So let's assume that -- I really do want to divide up the consent and the consideration because they are different legal questions.  So in my example somebody consents.  The consideration is the mutual releases.  Two years later there's a lawsuit and they're trying to get out of their mutual release because they say a mutual release wasn't sufficient consideration.  Who wins that as a matter of law?

MS. DOUG:  I would say the releasing party and I would hope that that would've been determined at confirmation.  But whether or not that was sufficient consideration because the consent issue is --

THE COURT:  It's separated from consent.

MS. DOUG:  Right.  The consent issue is separate.  And so hopefully at confirmation one of the things that the Court is doing as part of the, you know, determining whether the plan is confirmable, fair, equitable, meets all the requirements of the Bankruptcy Code, is that there is a consideration for these releases.  And so --

THE COURT:  So right now what I have is in the evidentiary record -- unless you or somebody else points me to something different -- an uncontested, unquestioned complete and thorough investigation of whether anybody ever did anything wrong.  And conclusions reached by something

like four major law firms, some really credible independent directors that no one did anything wrong. So by giving the release no one is giving up anything. That's the evidence I've got in front of me, uncontested.

So if they're releasing something that is valueless or worth a peppercorn, and getting a release worth an equal peppercorn, should I then find it's adequate consideration because it's peppercorn for peppercorn? And that is his argument.

And I realize there were mutual releases, my fault. But why isn't that sufficient, given the overwhelming evidentiary record?

MS. DOUG: So here I think there is some indication that there may be colorable claims based on securities laws that shareholders may have. There's a pending --

THE COURT: Great. Show me that in the evidentiary record. I want it in the record.

MS. DOUG: There's a pending class action.

THE COURT: Well, that doesn't mean anything. Somebody made allegations. So I don't have it in the -- I have nothing in the record that says that there is any merit to those allegations, nothing. People could've introduced that into the record and no one did. All that got introduced was they were meritless. So what am I supposed

to do with that?  That is my record.

MS. DOUG:  I guess I go back to the material consideration that shareholders are being given is so minor that whatever claims that the third parties may have against shareholders of this company, I mean, those are less colorable than potential claims.

And actually this is one instance I did want to bring up because I know that one of the things that was at least raised in the Debtor's pleadings is that the SEC's termination letter somehow exonerated the Debtors from wrongdoing.  And I want to make clear that I've told the Debtors repeatedly, and I included this in my pleading --

THE COURT:  I don't that exonerates them from wrongdoing, no.

MS. DOUG:  Okay.  I just want to make that -- I think it's important --

THE COURT:  That's not an exoneration.  It's evidence though that you're not prosecuting them at that point.  That's about it.

MS. DOUG:  And it could be for workload reasons, it could be for any number of reasons.  So I just want to make that clear.

THE COURT:  And you'll notice when I went through my litany of reasons it didn't include the fact that -- so let's go back to the difference between an opt out class

action public shareholder lawsuit and an opt out bankruptcy shareholder release.  What is the difference in terms of those two as a matter of principle?

MS. DOUG:  So one thing that comes to mind is that when you have a class action and you have an opt out releases you are being represented by your class Counsel, right?  No one is representing the shareholders in this case.  The only person who has raised issues on behalf of the shareholders is the SEC and we're doing it as a special advisor to the Court.  So that's a huge reason why they may be allowed to be opt out because the class Counsel has supposedly advised their class members.  They've had -- you know, they're acting on their behalf.  They're well represented.

Here shareholders are not represented in any way. So I think that is probably the main difference.

THE COURT:  Okay.  So I've interrupted you a lot and I know --

MS. DOUG:  No, I like that part.

THE COURT:  -- and I now want you -- I want you to be able to give your complete argument.  So if you have more that you want to talk about, go ahead.

MS. DOUG:  Just a second.  Let me make sure I've said everything I wanted to say.

THE COURT:  Sure.

MS. DOUG:  I mean, one of the points I did want to make -- and this is an important point from the SEC standpoint -- is that we do look at these releases and exculpation clauses through the lens of public investors. And we recognize that the Debtors chose to reap the benefits of, you know, issuing securities to the investing public.

And here, what I hear from them is not we want to protect the shareholders who provided us with capital and other funding, but we want to take away rights that in another instance they would retain.  Like, for example, in Chapter 7 they would retain their rights to the non-Debtor third party claims that they are potentially giving up here.

THE COURT:  What do these releases do to the securities Plaintiffs?  I think we dealt with that in an earlier hearing but I want to remember it more clearly. I think we preserved their rights if the class was certified, right?

MS. DOUG:  Right.  And I was really happy to see that.  Now you have to keep in mind the class is fairly narrow.  The class is from 2011 to 2014.  It is more likely that in the interim between 2014 and today the majority of shareholders have changed over so they wouldn't be covered by the securities Plaintiffs' opt out.  They're most likely held by completely new shareholders upon the estate than would've been opted out.  And I was delighted that the class

Plaintiffs fought for that and that they opted those people out.

And it does protect a small portion of them but there's going to be a lot more of the majority shareholders will not be covered by that opt out.

And then I think I did want to just raise that we did raise the argument that the plan, especially with regard to public shareholders, doesn't meet the best interest test. Because under Chapter 7 these shareholders would retain their rights to go after third parties. Here they're giving them up and so therefore their treatment is lesser in the 11 than it would be in the 7.

And I think finally -- I did make my point about the SEC's termination letter. And we did have additional concerns -- oh, and I did want to just point out that the number of opt outs that were received was only 410 opt outs, from what I can tell from the voting tabulation. There's 900 beneficial holders of unsecured notes in this case and there's thousands -- it's a very widely held public shareholder base. So I think only about less than 250 public shareholders opted out of the leases.

And this kind of underscores to me the concerns that the SEC has about unsophisticated investors not understanding the import of the opt out notices or not receiving those opt out notices because shareholders, you

know, they change ownership all the time.  They may not have the correct addresses.  These have to be individually filled out by the individual beneficial holders.  It may not have even -- if it's held in a street name it may not even reach them by now.  Sometimes that happens.

And finally we did raise issues with regard to the exculpation clause.  The SEC views the exculpation clause as kind of a secondary release.  It's not limited in the way that *Pacific Lumber* and -- sorry I'm totally spacy on the other case name -- limits it to the fiduciary, the committees, the kind of professionals that have helped put the plan together.  It's very broad.  There's none of the kind of consent and consideration safeguards that you see around releases.  I see it as another third-party release.  And I think --

THE COURT:  On the exculpation clauses, they are by the Debtor, right?

MS. DOUG:  The exculpation clauses are given -- the exculpating parties include shareholders, because they are the Debtors' shareholders.  It's a pretty --

THE COURT:  But these are claims owned by the Debtor that are then being exculpated, right?

MS. DOUG:  It's not limited in that way.

THE COURT:  Well, they are third-party releases, that's one issue.

MS. DOUG: Right.

THE COURT: But the exculpation itself is of actions arising under the estate.

MS. DOUG: In connection with the estate but there are claims that could be brought against third parties. You know, if somebody committed fraud, you know, during the commencement of the case. The way the exculpation clause is written it's very broad. Well, actually, I'm sorry. No, not fraud, negligence, because it does contain a wilful --

THE COURT: But that's negligence to the estate, right?

MS. DOUG: If they want to narrow it to derivative claims, the exculpation clause -- the exculpation clause only covers those claims that could be brought by the Debtor, I have a lot less concern about the exculpation clause. That's not exactly how I read it.

THE COURT: Well, I know that there's separately third-party releases.

MS. DOUG: Yes. Oh, yes, there's two separate --

THE COURT: Yes, so we have third-party releases we have to confront. But I thought exculpation was, in fact, derivative exculpation. And let me hear from the Debtor if I am --

MS. DOUG: If the Debtors can verify that it is derivative exculpation, because we have not taken an issue

with the derivative, the Debtors' releases.  So if these are purely derivative claims that only the Debtor could bring or they could brought derivatively by other parties against their claims then I don't know that I have that big of an issue with it.

THE COURT:  Let me hear from the Debtor what the function of the exculpation clause is, if you have the third-party releases.  Because essentially the only function would be derivative at that point.  Am I missing something on that?

MR. HUSNICK:  Yes, Your Honor.

THE COURT:  Okay.

MR. HUSNICK:  That the exculpation, it really is a different beast.  Exculpation is really a finding by the Court that case fiduciaries acted in good faith and are therefore not liability for act -- or not liable as a finding for actions that were taken in good faith and that did not amount to gross negligence or wilful misconduct.

It's about the actions of case fiduciaries.  That's -- and there's been a lot of debate in the case law over the breadth of exculpation.  Five years ago or 10 years ago, when I first started practicing, exculpations were -- covered everybody and their brother.  And courts have slowly narrowed them down to cover estate fiduciaries.

And it's derivative of 1125(e) and the good faith

finding under Section 1129 (a)(3) of the Bankruptcy Code. Because if the Bankruptcy Court finds that the plan was proposed in good faith and the fiduciaries who proposed that plan on behalf -- or assisted the Debtor in proposing that plan acted in good faith by derivation, then the exculpation, a finding by the Court that those parties should not be sued for anything short of gross negligence and willful misconduct necessarily flows from that good faith finding.

So we don't believe and don't treat -- and I disagree with the SEC on this -- that an exculpation is a release, per se. It's not. It's a finding by the Court that the parties who are getting exculpated -- it's exculpated by the Court, really. It's not exculpated by a Debtor or exculpated by a third party. It's the Court issuing a finding of fact that they acted in good faith, compliant with the law, and therefore should not be liable for anything that they took -- any action that they took in connection with the restructuring and the sale process in this case.

So that's the distinction I draw and that's what's been developed in the case law. It began --

THE COURT: But what I guess what I'm having a little difficulty following is if all of the actions taken were directed at the estate so a third-party suit would, in

fact, be derivative of the estate.

MR. HUSNICK:  So hypothetically if -- yeah, I'm with you.  I'm with you.  That's why it's tied to fiduciaries because it would be -- but it's not necessarily an estate cause of action.  It probably would be in most circumstances because it would be a third-party lender, for example, or a equity holder asserting a cause of action against the fiduciary for actions that the fiduciary took in carrying out the case.  It's a bit different than the -- it can in some ways be overlapping with the Debtor release.  But it's a different beast because it's a finding by the Court.  That's why they're both --

THE COURT:  But the finding by the Court that people acted in good faith is a finding only; it's not an injunction.  So the finding is clearly something that I have to consider and must make if it's an appropriate finding.  I don't --

MR. HUSNICK:  This builds on that, admittedly.  It builds on that.

THE COURT:  I don't have an issue with that.  I don't have an issue with the Debtor giving releases for everything.  Tell me what I'm doing that's more than a finding that the professionals acted in good faith and given a release by the Debtor.

MR. HUSNICK:  If the professional acted in good

faith and not with gross negligence or wilfulness conduct -- and it's the directors, officers, et cetera -- then that party and some third party should not be able to bring a cause of action the party.  And why?  Because that's the genesis of what 1125(e) says, which is when you're in prosecution of a plan and solicitation of the plan you cannot be held liable for that.

THE COURT:  But it seems to me that if I combined a good faith finding with a finding that having acted in good faith that any actions against those professionals are exclusively property of the estate and that the estate can give a release, then I've accomplished what you're asking for all within what I should be doing.  I'm trying to follow what more than that you're looking for.

MR. HUSNICK:  There is an overlap between Debtor releases, releases of Debtors' derivative claims and exculpation.  But if any third party were able to come up with a direct cause of action, that they believed they were directly harmed -- and there are arguments that I've seen that it's not solely derivative of the Debtor -- then for a fiduciary who was acting during the restructuring in the interest of the estate, while that claim may not be derivative that claim should still be released to the extent that it was done by a fiduciary in his or her fiduciary capacity.

223

THE COURT:  Let me ask the SEC.  What are you worried about?  So, let's take Mr. Husnick.  No, let's take Mr. Husnick, and somebody wants to sue Mr. Husnick for what he did in the case.  And I've already found -- let's assume that I find that he acted in good faith throughout the case and did not engage in gross negligence or wilful misconduct.  Tell me again your exculpatory concerns.

I mean I'm not going to have some third party walk in and sue a Debtor's lawyer if I've already found they acted in good faith in representing the Debtor.  And I don't think anyone would expect that to occur.  So where is the concern?

MS. DOUG:  So there is already a safe harbor in the Bankruptcy Code, Section 1125(e).  And that provides a limited safe harbor to non-Debtors.  With respect to the issuance of securities under a plan the exculpation clause goes beyond that.

THE COURT:  Well beyond that, sure.

MS. DOUG:  Yeah, well beyond that.

THE COURT:  Sure.

MS. DOUG:  It would encompass --

THE COURT:  Let's assume that he gets sued because he didn't manage the sale process, the auction process correctly, which is sort of an allegation today, right?  But then I find that he did manage it properly and acted in good

faith and not with gross negligence.  Can a third party sue him because he managed the sale process badly?

MS. DOUG:  I think that would be his defense in that case.  It wouldn't -- the exculpation would bar the party from even bringing that action even though -- let's say it's not a -- for some reason it's not a derivative claim, it's a direct claim that, say, a shareholder had against Mr. Hughes [sic].

THE COURT:  What is the direct claim?

MS. DOUG:  There are, from my understanding with speaking with enforcement attorneys -- I am not an enforcement attorney, I'm a bankruptcy attorney -- there can be claims based on strict liability or simple negligence that would exceed the 1125(e) safe harbor that the exculpation clause would allow -- would bar parties from brining.  I'm not an expert in those.

THE COURT:  Yes, but I'm trying to even understand theoretically what we're talking about that's the concern.

MS. DOUG:  So if you look at the list of -- yeah, I pulled it up.  The exculpated parties include the Debtors, the plan administrators, the committees, official committees and all of their officers, directors, principals, employees, consultants.  So I guess I could see a scenario where --

THE COURT:  So, let's take Mr. -- let's go back and take Mr. Husnick again for an example.

MS. DOUG:  Like Mr. Hughes [sic] has a loose cannon in his -- I don't know.  I'm going to just spoof all this because he has a loose cannon employee who does something, you know, that creates liability.

THE COURT:  Like what though?

MS. DOUG:  I'm not sure.  I can't -- I'm sorry, I just can't -- I can't think off the top of my head.

THE COURT:  I think if there's a legitimate third-party claim out there I'm worried about it.  But if all that I'm really doing is saying that whatever the professionals did is really for the estate and I'm just not going to have them attacked willy-nilly because every -- they worked for the estate; they didn't work for anybody else.  Then --

MS. DOUG:  But why foreclose those legitimate third-party claims just because I can't think of them right now.  I mean --

THE COURT:  Well, it's not because you can't think of them right now.  I mean, I'm trying to think of them too.

MS. DOUG:  But I would hate to foreclose something that is a legitimate non-derivative claim that could be brought against one of these exculpated parties when it's fairly easy to narrow it to what the Bankruptcy Code allows.  Just exculpate the derivative claims or keep it to 1125(e).  I mean, there's a pretty simple fix to this that's not going to really change the supposed intent of the exculpation.

If the intent is to provide finality for things that were done in good faith on behalf of the Debtor that were really derivative then say that in the exculpation clause.  Limit it to derivative claims.

THE COURT:  Can I find that all claims are derivative claims --

MS. DOUG:  I don't --

THE COURT:  -- and does that then solve the problem?

MS. DOUG:  That doesn't sound right because there may not be.  And if that's a legitimate non --

THE COURT:  Well, that's what I'm trying to figure out is what's a non-derivative claim for what the bankruptcy attorney did in the case?

MS. DOUG:  I mean, certainly that would act as a defense.  And I -- I mean --

THE COURT:  Well, I understand it could act as a defense but that doesn't do people a whole lot of good.

MS. DOUG:  I mean that's -- I don't want to foreclose the defense.  Can I just raise one more issue that I did forget when I was going through my notes?

THE COURT:  Absolutely.

MS. DOUG:  First, the reason you don't see the SEC as much in these cases is because we used to try to informally work out these release provisions.  But we're

seeing a push towards broader release provisions with more onerous kinds of consent when there is even consent.

So the first thing I always do is ask if they're willing to carve out for really egregious behaviors -- wilful misconduct, actual fraud, gross negligence -- which is exactly what I did here.  And Debtors dug in so that the release -- and I just want to highlight this.  The release, the third-party release, as it stands, would release any wilful misconduct on the part of any of the released parties, any actual fraud including securities fraud, and any gross negligence.

So that -- although that carve-out exists in the exculpation clause it does not exist in the third-party release.  So I did just want to mention that.  And I think that's it.  Thank you.

MR. HUSNICK:  I would like to just respond to a couple of things that were said because I think they're really important.

I'm actually in a matter right now that's developing on the East Coast of the United States in which claims are being alleged that professionals took actions and those actions could give rise to potential liability, direct liability in the case.

And if that type of plan -- and I don't want to get into the specifics of it.  But suffice it to say I've

seen it asserted and it's fully within Your Honor's jurisdiction to make a finding that based on the record here today of what the Debtor did, what the Debtors' professionals did, what the committee did and what the committee's professionals did, was completely in line and completely appropriate and done in good faith.  And the logical extension of that, based on 1125(e), it says:  Shall not be liable for, is not liable on account of such action.

And it's -- oh, I can't give you a page cite because I'm looking at a different version of the Code.  But suffice to say, that's why --

THE COURT:  It shall not be liable on account of such solicitation or participation, but it's not for everything that might occur in the case.

MR. HUSNICK:  In the process.  That's why it's tailored to the process.

THE COURT:  But not for everything in the case, no.

MR. HUSNICK:  Pardon me?

THE COURT:  Not for everything in the case.

MR. HUSNICK:  I agree with you.  That's why it's not just 1125(e); it's a broader finding that you're getting in connection with 1129(a)(3) and 1125(e) that the Debtor, all of its professionals -- and that's why it's limited to fiduciaries.

And I am happy to extend that there's a concern that somehow the language or the breadth of the language is too broad to pick up non-fiduciaries. I'm happy to put into the language that says, you know, to the extent acting in a fiduciary capacity for the Debtors, for the committee. That's fine with me. But it's entirely appropriate.

THE COURT: If the exculpation is limited to what was done in the capacity as fiduciaries to the estate or to the committee or to -- I guess that's all we have here -- I really don't understand the problem. And I doubt that the SEC has a problem with that. That's a major issue. It's the breadth of it that was the problem. If you limit it to in their capacity as fiduciaries.

MR. HUSNICK: To the individuals, the breadth in their capacity as fiduciaries? I want to make sure we're on the same page. There's a list of parties who are being exculpated. If you're finding that, you know, Chad Husnick, in his capacity as an advisor to the Debtors --

THE COURT: Acted in good faith.

MR. HUSNICK: -- is exculpated --

THE COURT: Acted in good faith and is exculpated from everything that he did in his capacity as a fiduciary to the estate. Is that what you're asking me for?

MR. HUSNICK: That's exactly right.

THE COURT: I don't think the SEC has a problem

with that; is that right?  That's the limitation.

MR. HUSNICK:  I don't understand what the difference is because we must be ships passing in the night because --

MS. DOUG:  Let me --

MR. HUSNICK:  If there's a third party who is asserting their claim against me the SEC has said that whether I was acting in my fiduciary capacity or not --

THE COURT:  Let me hear that.  I was hearing a concern that it might be because they were releasing from things you were doing not in your capacity as a fiduciary.  In your capacity as a fiduciary your liability is a hundred percent derivative.  So let me hear from the SEC if that limitation is a major limitation.

MR. DOUG:  It's my understanding if he's acting as a fiduciary that would be a derivative claim, right?

THE COURT:  Right.  And you're happy having all of those go away and be barred, right?

MR. FEINSTEIN:  Your Honor, may I be heard?

THE COURT:  Yeah.  What am I missing here?

MR. FEINSTEIN:  So, I just want to -- for the record, Robert Feinstein.  So there's a definition of exculpated parties in paragraph 58 of the plan.  And it does say in their capacity as such.  So I think that's already circumscribed in the plan.

But the exculpation language in the plan, it's on page 40, is more than a finding, in my view, because it talks about the exculpated parties being released from anything in connection with the case.

And I also think -- and this important as committee Counsel -- that this goes beyond derivative claims of the estate. I mean, for example, if a creditor --

THE COURT: You're correct.

MR. FEINSTEIN: -- attacked the Creditors Committee professionals --

THE COURT: You're correct. It goes also. I agree with that.

MR. FEINSTEIN: -- for what they did in this case we should be exculpated. We shouldn't be a pinata for anybody who wants to attack the professionals in a bankruptcy case regardless of whether it's direct or derivative.

THE COURT: Well, and the Fifth Circuit has specifically authorized those kinds of exculpation clauses to committee Counsel, I think.

MS. DOUG: Right.

MR. FEINSTEIN: Because we're fiduciaries and so are the Debtors and their professionals. So, I mean, this has been practiced since I've been practicing and I've been doing it a long time. This is a C-change.

THE COURT:  So the committee is one thing.  I think the estate is a different thing.  But for the estate, if we're limiting it to what they've done in their capacity as fiduciaries, those are all owned by the estate and they can all be --

MR. FEINSTEIN:  I'm not sure I agree with that, Your Honor.  I mean, as committee Counsel we're defined as an exculpated party acting in our capacity as such.  Whatever I do outside of wearing my committee Counsel hat is uncovered.

THE COURT:  Right.

MR. FEINSTEIN:  But wearing my committee hat I should be protected from claims by third parties.

THE COURT:  No, I'm agreeing with that.

MR. FEINSTEIN:  And I don't know if those claims are necessarily derivative.  A creditor says --

THE COURT:  I'm accepting that if you did in --

MR. FEINSTEIN:  -- you're a fiduciary to all creditors, you did something wrong.

THE COURT:  I'm accepting that if you did it in your capacity as the fiduciary it doesn't matter the nature or how the claim is styled.

MR. FEINSTEIN:  Then we're in agreement.

THE COURT:  No, I understand.  I think the SEC is -- let me hear, but doesn't that resolve an awful lot of

your worries?

MS. DOUG:  Your Honor, committees are a different animal than --

THE COURT:  But the Debtor --

MS. DOUG:  -- the Debtor, right.

THE COURT:  -- if Mr. Husnick, again the person I'm picking on, is sued for his actions in his capacity as a fiduciary --

MS. DOUG:  To the Debtor, right.

THE COURT:  -- in his capacity as a fiduciary --

MS. DOUG:  Because that would leave out then the committee with --

THE COURT:  In his capacity as a fiduciary to the Debtor you agree that that suit shouldn't happen, right?

MS. DOUG:  I believe that would be all -- that would encompass only derivative claims and therefore that would be appropriately within the kind of the Debtor's --

THE COURT:  Yeah.  But I'll give the example that nobody else is willing to give.  You know, you get somebody that sues him and says that he was, in his capacity as a fiduciary, colluded with the committee to injure a committee member.  And so he gets a full exculpation.  He was acting in his capacity as a fiduciary to the estate but the allegation is that in that capacity he ganged up with Mr. Feinstein and hurt some creditor.  As long as he was

acting in a fiduciary capacity and I find he acted throughout the case in good faith he shouldn't be sued for that, right?

MS. DOUG:  I think I can't go there.

THE COURT:  Okay.  I think if you will include that language I'm fine with the exculpation.

MR. HUSNICK:  Okay.  We will do so.  So let me circle back to the third-party releases.  Your Honor asked me for some case law to support my mutual release argument.  And I was doing some Westlaw while we were doing argument.  But I would point Your Honor to --

THE COURT:  Let me pull it up.

MR. HUSNICK:  Sure.  And just to be clear, these are like general -- I'm going to give you some Texas law.

THE COURT:  I'm asking for general principles.  No, I do agree, it's a general principle question in terms of --

MR. HUSNICK:  Yeah, and that's all.  I mean, it would be a Texas Supreme Court that says a mutual release of rights to parties is regarded as sufficient consideration for an agreement.  I think that's a very baseline principle.

THE COURT:  Just you want to give me the case and I will --

MR. HUSNICK:  Yeah, absolutely.  It's *Texas Gas Utilities versus* -- I can't read my own handwriting.

THE COURT:  And what's the cite on it?

MR. HUSNICK:  It's 460 S.W.2d 409, pin cite 414.

THE COURT:  I've got it.  Okay.

MR. HUSNICK:  That's not matching up to mine. Hold on one second.  There it is.  Head notes 5 and 6, the mutual release of rights of parties is regarded as sufficient consideration.

THE COURT:  Okay.  We've got to change EROs. Let's take a 10-minute break.

MR. HUSNICK:  Okay.

THE COURT:  I'll come back.

COURTROOM DEPUTY:  All rise.

(Recess taken from 4:56 p.m. to 5:07 p.m.)

COURT SECURITY OFFICER:  All rise.

THE COURT:  Please be seated.  Mr. Husnick.

MR. HUSNICK:  Your Honor, so I was just saying is it's a fairly well settled principle law, certainly under Texas law, that mutual releases can serve as sufficient consideration.  A similar quote can be found in the *Jaff*, J-A-F-F, *v Cal-Maine Foods, Inc.* case.  That's 774 F.2d 1314.  That's the 5th Circuit from 1985.

THE COURT:  Where do all --

MR. HUSNICK:  It says, Even if -- I don't have a pen cite on this one, the quote is, "Even if the claims released were doubtful, their release was nevertheless

sufficient consideration."

THE COURT: So can I put some language on the screen and ask whether --

MR. HUSNICK: Sure.

THE COURT:  -- the parties and the SEC believe that, given the argument, this language is appropriate.

MR. HUSNICK: Sure.

THE COURT: I haven't written it yet, so give me a minute.

(Pause in the proceedings.)

THE COURT: This is along with the changes that you've talked about in terms of the fiduciary language, this is in addition to what we've already discussed.

MR. HUSNICK: This would be on the third-party release. Right?

THE COURT: This is going to be for everything. You'll see it in a second, but I'm not talking -- this will not take away anything we've already talked about.

MR. HUSNICK: Okay.

THE COURT: This is in addition to it.

(Pause in the proceedings.)

THE COURT: I don't think I can grant more than what the 5th Circuit allows. I think --

MR. HUSNICK: I agree.

THE COURT:  -- this is within what the 5th

Circuit allows.

MR. HUSNICK: I agree. But what this --

THE COURT: And I'm going to be the ultimate --

MR. HUSNICK: -- language does is --

THE COURT: -- arbiter of whether it does.

MR. HUSNICK: -- what this language does is punts the determination that what we're requesting does, in fact, comply.

THE COURT: I find it complies, but if somebody wants to come and argue to the contrary. I wouldn't do --

MR. HUSNICK: They should have to do that --

THE COURT: -- this if I didn't have to.

MR. HUSNICK: -- to an Appellate Court though.

THE COURT: Well --

MR. HUSNICK: That's my -- if they believe that Your Honor is wrong today, then they should have to file an appeal. And if they don't file that appeal, then they should be bound by it. This is the *Republic Supply* line of cases.

THE COURT: I understand that, and if that's really what you want. I do think that what we're doing -- what you're proposing that we do may work. I think you're trying to create some new law.

MR. HUSNICK: I believe that is the correct law. Your Honor --

THE COURT:  I think that --

MR. HUSNICK:   -- I believe it is the correct law.

THE COURT:   -- if you all want to take that chance, I think the SEC's going to appeal you --

MR. HUSNICK:  I --

THE COURT:   -- and I'm trying to save you that problem.  But I think you're entitled to a determination from me that it does -- I think it does.  I wouldn't do this if I didn't think it does.  I am postponing the challenge to a later time so that the person will have to assert it and not the SEC.  The SEC is getting exactly what they want, which is we're limited to what the 5th Circuit says.

MR. HUSNICK:  Yeah, the issue I have, Your Honor, is somebody who, and this isn't limited to someone sitting in the courtroom today who could have come up and said, This exculpation, or this release shouldn't be enforceable.  Now I think there would be some serious *res judicata* arguments from Your Honor, but this language is not limited in that fashion.  I am very concerned that we're creating a situation where we end up back in front of Your Honor re-litigating the merits of this and then they appeal from that and there's no finale to the point.

THE COURT:  I'm going to let you --

MR. HUSNICK:  I'm happy to chat with my client about it in between -- why don't we -- if it's okay with

you --

THE COURT:  Can we hear from the SEC?

MR. HUSNICK:  Okay.

THE COURT:  Does that solve your problems?

MS. DODD:  I don't know, Your Honor.  The SEC has taken positions in the past that often were seen on plans and disclosure statements, especially those that release willful misconduct and actual fraud, that have a phrase in it that says something like, To the extent allowed by applicable law.  And we have taken positions that that puts that off to another day.

I think here I don't think that there's consideration or there's been consent.  You know, you did ask about that class action thing.  Another reason why that kind of consent is more appropriate is class actions is because they have a much more robust process to reach out to their class members.  They are bound by Rule 23, they work with class claims agents.  So it's not the same thing as in bankruptcy.  So I -- honestly I don't know, do you want more briefing on whether or not a --

THE COURT:  No.

MS. DODD:  -- mutual -- I'd be happy to provide -- since it's the first time I kind of stood up -- standing, I'd be happy to provide --

THE COURT:  The problem is I need to make a

decision in the next 24 hours whether I'm going to confirm this plan or not.  So I'm not going to do additional briefing.  I'm just going to have to decide, and --

MS. DODD:  The case that the Debtors raised right before you took the break, I mean I had just a quick --

THE COURT:  Right.

MS. DODD:  -- chance to look at it.  It looked like the claims that -- the release of potential claims were more comparable, they weren't, you know, they weren't as disparate as they could potentially be here where I cannot honestly think of a claim that the Debtors could have, or the non-Debtor parties could have against --

THE COURT:  So I think that's --

MS. DODD:  -- equity holders.

THE COURT:  -- a good exercise in one sense but in terms of an evidentiary record, the evidentiary record's the opposite of what you're describing.  I have a complete and thorough evidentiary record that the shareholders, the public shareholders have no claims.  I have no evidentiary record as to whether there are claims against them.  So, in fact, in deciding on an evidentiary record, if there is disproportion, it's disproportioned.  And then I have something I can estimate close to zero based on the evidentiary record, which is uncontested, versus no record at all.

But it's possible that the Debtors have claims against people they are releasing.  It's a strange situation.  But I have to live with the evidence that I've got, and isn't the evidence that you're describing.  Those people have no claim under this evidence.  Unless you can point me to something in the record I missed.  But the allegations in the complaint don't go anywhere.

MS. DODD:  Those aren't the only allegations that are being released.

THE COURT:  Well, I understand that, but the evidence I have is overwhelming that there are no claims.  Right?  I mean you heard all these witnesses get up here, we investigated them, hired law firms, we did all that, we got all these reports.  The only conclusion to come to from that evidence is there are no claims period, that what we're really doing is stopping there from being frivolous lawsuits.  And I don't have anything going the other direction.  And there could have been evidence on all of that, but there isn't.

So I have a null set in terms of whether there are claims against the public shareholders.  I can certainly imagine some, there could be a suit against the public shareholder for the receipt of the dividends that was a fraudulent conveyance.  I don't have any evidence to inform me as to when those dividends occurred.  So I don't know if

such a lawsuit might even theoretically exist, but I can come up with examples if you want.  But in terms of claims against all of these people by the public shareholders, I have an uncontested evidentiary record that there are none.

So in terms of the mutuality consideration, I mean I think it's pretty easy to bind the Debtor here, but it -- I just reject the theory that I should be leaving the record.  That's why I'm -- you know, that's why I've spent two days taking evidence.  So if this doesn't work for the SEC, and it doesn't work for the Debtor, then I'll just deal with the order as it is and let people go and appeal it.  I am a little surprised it doesn't work.

MR. HUSNICK:  I have one point to make on that, Your Honor.  There will not be an appeal from this order from the SEC because the SEC is prohibited from appealing under 1109(a) of the Bankruptcy Code.  It says, the Securities & Exchange Commission may raise and may appear and be heard on any issue in a case under this Chapter, but the Securities and Exchange Commission may not appeal from any judgment, order or decree entered in the case.  So there will not be an appeal from the SEC.

THE COURT:  Okay.

MR. HUSNICK:  And no other economic party-in-interest sitting in here today.  Everybody receiving notice has objected.  So I would -- I understand the language but I

do not believe we should keep that language in there.

THE COURT:  Okay.  The Court has previously in other cases ordered the appointment of an Equity Security Holders Committee when there were, you know, a lot of releases demanded of the equity -- different situation -- when there were unilateral releases demanded or to be obtained from equity s security holders but no consideration back to the equity security holders.  No equity security holder, nor the SEC ever requested that we appoint an Equity Security Holders Committee in this case.

That's the remedy in the statute for Counsel.  If someone shows up and says, You're demanding a release, and it's not fair, and I previously under that exactly circumstance ordered the appointment of an Equity Security Holders Committee, I think to people's great disappointment.  But I did it.  But that's the remedy.

And I had the opportunity to have Counsel, the absence of Counsel is not the Debtor's fault nor mine, I find that this is the equivalent in terms of opting out, it's the equivalent of a class action opt out and that opting out in the 5th Circuit is, in fact, allowed particularly in light of recent Supreme Court decisions that say that one can implicitly consent to matters that are going on before the Bankruptcy Court.  So insofar as opt in or opt out, I find that opt out works.

As to the releases, I think that a unilateral release -- I accepted the SEC's argument, as you know, at face value, not realizing it was a mutual release. The mutual release argument I think carries the day given the evidentiary record. And I have to decide on the evidence. The evidence before me is that the public shareholders have no claims that they can assert. I have allowed every party to introduce every piece of evidence that they wanted to in that regard. No one chose to introduce any evidence that the public shareholders had any bonafide claims. So I have an uncontested record that there are no claims by the public shareholders. None.

I have no evidence as to what claims there are against the public shareholders, but as I've indicated, one can imagine some. But I don't know if the imagination is accurate or not. I simply find that this is, in effect, the proverbial peppercorn-for-peppercorn and that that is adequate consideration for the release, given its mutuality. So people who opted out are out, people who did not opt out are in.

And I find adequate consideration with respect to the exculpation. The exculpation can only occur for actions that are taken in the capacity as a fiduciary to the relevant constituency, including both the Committee and the estate. And I'm going to require that the language in the

proposed order include such language that makes it unambiguous that we are not releasing any of those parties for any actions that they took not in their capacities as fiduciaries to the respective constituencies. I know that people are telling me that language is there, but I want it to be unambiguously there.

That's my ruling on the SEC dispute. Let's go to the next dispute.

MR. HUSNICK: Thank you, Your Honor.

THE COURT: And I know you've got a plane to catch.

MS. DODD: Can I be excused, Your Honor?

THE COURT: Yeah, if you also -- if you need to make any record, go ahead and then I'll let you go.

MS. DODD: No, I just want to be excused.

THE COURT: Okay.

MS. DODD: Thank you.

THE COURT: Thank you.

MR. HUSNICK: Your Honor, I think the Chevron parties are still -- are they still talking?

UNIDENTIFIED SPEAKER: Yeah.

MR. HUSNICK: They've asked for additional time. It may make sense to dive into closing argument on the bulk of the rest of the stuff, unless the securities law plaintiffs -- anything --

UNIDENTIFIED SPEAKER:  Yeah, I think we need to --

MR. HUSNICK:  You want to address that one?

UNIDENTIFIED SPEAKER:  We can address that --

MR. HUSNICK:  Okay.  Let's address that one.

UNIDENTIFIED SPEAKER:   -- in closing arguments, sorry.

MR. HUSNICK:  Okay.  Thank you.

MR. ENTWISTLE:  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

MR. ENTWISTLE:  Andrew Entwistle with Entwistle and Cappucchi for the securities law plaintiffs.

THE COURT:  Yes, sir.

MR. ENTWISTLE:  A couple of brief clarifications and then a very, what I hope will be a very brief argument. For clarification purposes the observations that you just made with regard to the record were with regard to the derivative claims.  Obviously the securities plaintiffs having opt out of the releases didn't make any evidentiary record with regard to the merit or lack of merit of their claims.  And as Your Honor knows from our prior hearing, we have at least two decisions in the District Court already that rejected motions to dismiss on those claims.

THE COURT:  So to make it very clear, you had no incentive to put on any evidence, you were not a party that was situated where it would have allowed you to put on

evidence because you had opted out.  My findings are within this evidentiary record, they do not serve in any way to collaterally estop or bar you from asserting those claims because I would not have allowed you to present such evidence.

MR. ENTWISTLE:  I appreciate that, Your Honor. And you understood exactly where I was going with that clarification.  We had several objections in our objection to the plan, which was Document Number 638.  They've all been resolved with the Debtor and are -- those resolutions are memorialized in the current confirmation order, save one.  The one that is not resolved is the preservation of the claims of the securities plaintiffs and the certified class against Cobalt to the extent of the insurance coverage, and only to that extent.

In the current pan under Article 6, Paragraph I(2), claims --

THE COURT:  Hold on.  What's the ECF of the plan?

MR. ENTWISTLE:  We're looking at Document 747, this is the version of the plan that was filed on the 3rd of April.

THE COURT:  Hold on.

(Pause in the proceedings.)

THE COURT:  And what section do you want me to go to?

MR. ENTWISTLE:  I was looking at Article 6, Paragraph I-2, claims payable by third parties.

THE COURT:  Let's see --

(Pause in the proceedings.)

THE COURT:  Is this the section that --

MR. ENTWISTLE:  That's correct --

THE COURT:   -- you're looking at?

MR. ENTWISTLE:   -- Your Honor.

THE COURT:  Okay.  Go ahead.

MR. ENTWISTLE:  And so under this section obviously allowed claims that are susceptible to insurance can be paid by that basis.  So in other words, if there's an allowed claim.  Under the plan of course all 510(b) claims, which would include the claims of the class, and we did file a claim, would be cancelled under the existing plan.

And so therefore -- and that's automatic obviously because we're not getting a distribution -- all we're asking here is that to the extent that that can be preserved to the extent of the insurance only, if any, nothing more or less. We understand that we're subordinated, but after all, there's no discharge here under this liquidating plan.  As you've already observed on a number of occasions over the last two days, we're not otherwise getting a distribution for all the obvious reasons.  We understand the general notion that the claim could be cancelled, but we believe

strongly, as you know, that there is insurance coverage that is responsive to our --

THE COURT:  Right.

MR. ENTWISTLE:   -- claims in the securities case, coverage litigation is ongoing, and you've seen --

THE COURT:  I'm trying to understand, what's the language in here that's bothering you?

MR. ENTWISTLE:  No, the -- it's sort of an inconsistency.  In other words, under Article -- under the plan, and I'm sorry, I think it's Article 3 -- under Article 3, Paragraph 7 the class 7 claims, the 510(b) claims are cancelled --

THE COURT:  Okay.  Hold on.

MR. ENTWISTLE:   -- outright.

(Pause in the proceedings.)

THE COURT:  Is it this section?  Which section again?  I'm in Section --

MR. ENTWISTLE:  Article 3 --

THE COURT:  Subsection what?

MR. ENTWISTLE:   -- Subsection 7.

THE COURT:  Seven.  Okay.

(Pause in the proceedings.)

MR. ENTWISTLE:  So this subsection under Sub B cancels without any distribution as you would expect all 510(b) claims because they're subordinated.

250

THE COURT:  So you want to say --

MR. ENTWISTLE:  We understand that.

THE COURT:   -- you want to add a previous -- you want to put something in the confirmation order that says that class -- that the provision of 7(B) is subject to the provision of the earlier provision that we read and that the earlier provision would control.  Right?

MR. ENTWISTLE:  Right.  Or to put it another way, the claims of the securities plaintiffs and certified class against Cobalt are preserved to the extent of available insurance coverage.  Very, very simple statement.  I suppose we could make it for all --

THE COURT:  Yeah.

MR. ENTWISTLE:   -- all 510(b) claims, but as far as I know, we're the only opt out and it's the only claim that we find.

THE COURT:  Well, what's the problem of adding some language to the confirmation order that makes it clear that the claim is allowed to the extent of insurance proceeds and otherwise is not allowed?

MR. WEILAND:  Is that a question for us, Your Honor?  I don't have a problem with that change, and I am happy to say that we were able to work out some of Mr. Entwistle's --

MR. OKIN:  Okay.

MR. WEILAND:   -- other objections.  What had been proposed here and what we do have a problem with is specific tailored language saying all claims against the Debtor are preserved with a path to the insurance coverage.  We just think that's inconsistent with the notion that Cobalt is supposedly being dismissed from the securities litigation. A motion was filed after our hearing on the stay extension back in --

THE COURT:  Right.

MR. WEILAND:   -- early January, that motion has been noticed out with no objections, it hasn't been re-urged.

THE COURT:  Let me get back to the section we were at before, what was that first section that you -- the heading that read to me?

MR. ENTWISTLE:  The first section, Your Honor, was Article 6, Paragraph -- or Section I(2).

THE COURT:  And it's called third party --

MR. ENTWISTLE:  It was claims payable by third parties.

THE COURT:  Okay.

(Pause in the proceedings.)

MR. ENTWISTLE:  And the issue here is we can't --

THE COURT:  So and the language you want to add to the confirmation order reads how?

MR. ENTWISTLE:  All we want to say is that the claims of the securities plaintiffs and the certified class against Cobalt are -- or the Debtor here -- are preserved to the extent of available insurance coverage.

THE COURT:  Can we say are preserved, but are governed by Paragraph, and then reference this paragraph right here?

MR. ENTWISTLE:  As long as we say that they are preserved and will otherwise be governed by this paragraph, we could do that.

THE COURT:  Or preserved, the payment of them is governed by this paragraph.

MR. ENTWISTLE:  Exactly.  We could say they're preserved and payment is governed by this paragraph.

THE COURT:  Does that work for the Debtor?

MR. WEILAND:  I think if we -- not to over-complicate it, Your Honor, but I think if we also reference Article 2(B)(7) in the -- or, sorry, 3(B)(7), the treatment section.

THE COURT:  Oh, but the claims --

MR. WEILAND:  Just making clear that the --

THE COURT:   -- but 3(B)(7) says that the claim isn't allowed and I don't think that is your deal.  The claim is allowed, they can only pay to the extent of applicable insurance proceeds.

MR. WEILAND:  Well, I don't think we're allowing any claim today, Your Honor.

THE COURT:  It's allowed to the extent that there is a judgment that --

MR. WEILAND:  But to the extent that there is a judgment or verdict.

THE COURT:  But that's inconsistent with what this says.  That's the problem with it.  So --

MR. WEILAND:  Well, I think the --

THE COURT:  This says that it's a 510(b) claim, that it's cancelled.  That he can't afford.

MR. WEILAND:  I understand that, Your Honor.  I think as long as we make clear, and we can do it in the other section, and do it without a cross-reference that the claim can be preserved but the preservation and the reference to, you know, Article 6 does not entitle them to any distribution from the Debtor.

THE COURT:  Right.  They're --

MR. WEILAND:  It's still a Section 510(b) claim --

THE COURT:   -- they cannot --

MR. WEILAND:   -- yes.

THE COURT:   -- they have an allowed claim but it is payable solely to the extent authorized by the third-party payable claim provision.

MR. WEILAND:  Sure, Your Honor.  I can't have an

objection to that.

THE COURT:  Okay.

MR. ENTWISTLE:  That's fine, Your Honor.

THE COURT:  Yeah, let me let you all work through the precise language.  I'm doing a bad job trying to dictate it.  But that's what it needs to say.  I'm not going to make him live with the risk of what Paragraph 7(B) says, I think that could adversely affect his lawsuit and I'm not prepared to do that.  So --

MR. WEILAND:  Understood, Your Honor.

THE COURT:   -- but the language we're talking about, you all clean it up and it works, we'll do it.

MR. ENTWISTLE:  Okay.

THE COURT:  I'll sustain your objection.

MR. ENTWISTLE:  Thank you, Your Honor.

THE COURT:  Thank you.

MR. WEILAND:  We'll do that.  Thank you, Your Honor.

THE COURT:  Thank you.  Okay.  So what do we have next?

MR. WEILAND:  It's the pending Chevron objection, Your Honor, which I think is a more narrow parochial objection, and then it's closing arguments on confirmation in general including the opposition from Whitton and Ad Hoc Committee.

THE COURT: Right. And can we get Chevron resolved right now or -- what's the Chevron problem?

MR. WEILAND: They are discussing language with Counsel to the purchasers right now in the hall, Your Honor. They have not yet been able to reach an agreement today. I think that they've been close for some time, but I don't want to upset that process. But if you give me a 30 second recess, I can poke my head out and see where they are.

THE COURT: Go ahead.

MR. WEILAND: Okay. Excuse me, Your Honor.

(Pause in the proceedings.)

MS. CRAVENS: Hi, Annalisa Cravens for the Record. Counsel is trying to speak up on the phone on behalf of the underwriter defendants in the securities litigation to preserve their claims, but she's unable to get through on the phone.

THE COURT: Have they pressed five star on the phone? If you're trying to speak --

MS. CRAVENS: She's doing it right now.

THE COURT:  -- on the phone, you need to press five star. Yes, who do I have on the telephone?

MS. LANZ: Good afternoon, Your Honor. This is Julie Lanz of Skadden Arps and we represent the underwriters in the securities litigation.

THE COURT: Thank you. Would --

MS. LANZ:  We all have --

THE COURT:   -- you spell your last name for me, please?

MS. LANZ:  Of course.  L-A-N-Z.

THE COURT:  Thank you.  Go ahead, please.

MS. LANZ:  We represent the underwriters in the securities litigation and we have also filed an opt out releases and have claims that will likely be designated as 510(b), although we've revoked our right to argue that question.  We would just ask that if the securities plaintiffs' 510(b) claims are preserved to the extent of available insurance coverage as was just described in court, that our claims would be similarly preserved to the same extent of any insurance coverage.

THE COURT:  I'm sorry --

MS. LANZ:  We require exactly the same as the 510(b) --

THE COURT:  Tell me again your client's role in the litigation, because I'm not sure of it.

MS. LANZ:  We -- Skadden Arps represent the underwriters in the securities litigation.  So our parties were underwriters in connection with the offerings that are the subject of the securities litigation.

THE COURT:  All right.

MS. LANZ:  So we filed claims against the Debtors

in  connection with indemnity claims that we have against the Debtors in connection with the securities litigation. And it is certainly possible, although we have reserved the right to use this if it comes to that, that our claims will be designated as 510(b) claims as well.  So we would ask that to the extent that there is insurance coverage available for payment of claims that are designated as 510(b), that we just receive the same kind of carve out that the securities plaintiffs got with respect to their 510(b) claims.

THE COURT:  All right.  Let me hear from Mr. Entwistle and from the Debtor about that.  Any objections to a similar carve out?

MR. ENTWISTLE:  Your Honor, I can't speak to the Debtor, but the -- I have no idea what claims they're purporting to assert.  I heard earlier today that the two provisions that were added to the confirmation order, one for the sponsor defendants and one for the underwriters, were actually taking advantage of the releases that are in the agreement in exchange for giving up any claims against the Debtor, which would take them out of this category completely it seems to me.  But, you know, beyond that I don't have any other observations, but I'm sure the Debtors probably do.

THE COURT:  But your clients would have no

objection to the provision.  Right?

MR. ENTWISTLE:  Our clients don't believe that they have any right to the insurance here, Your Honor, as seems to be what's being asserted.  But -- and nor do they --

THE COURT:  Well, that's basically --

MR. ENTWISTLE:   -- have a claim that has been asserted, but other than that I don't have an objection.

THE COURT:  Thank you.  Let me hear from the Debtors.

MR. WEILAND:  Sure.  Thank you, Your Honor.  Just we're having a short briefing.  I understand the issue, I don't think we have an objection as long as we're clear frankly with respect to Mr. Entwistle's clients as well as the underwriters that this language does not constitute a finding or a conclusion by this Court that there is applicable insurance or that there are direct claims against that insurance or anything of the like.

THE COURT:  You can include all of that, but to the extent of available insurance coverage.

MR. WEILAND:  Yeah, to the extent that there is available -- an available policy that applies to whatever claim --

THE COURT:  Right.

MR. WEILAND:   -- there may be, we're not trying

to prejudice --

THE COURT:  And they can fight between themselves as to who gets the proceeds.  That's fine.

All right.  Ms. Lanz, it sounds like we're going to do that.

MS. LANZ:  Thank you.

MS. CRAVENS:  Thanks, Your Honor.

THE COURT:  I'll let you keep up with what the language looks like to be sure that you don't object to it once we get a final confirmation order drafted.

MR. WEILAND:  Yes, we could do that, Your Honor.  One more point just to put an even final point on it.  To the extent that the company has claims to insurance, this isn't assigning those claims over to anybody else either.

THE COURT:  Correct.

MR. WEILAND:  And the company's claims are assets of the estate that are frankly going to fund second lien recoveries under this plan.

THE COURT:  I agree with --

MR. WEILAND:  Not undoing any of that either.

THE COURT:   -- this language was not intended to take away of the Debtor's coverage.

MR. WEILAND:  Okay.  Thank you, Your Honor.

THE COURT:  Thank you.  Yes, sir?

MR. WEILAND:  Your Honor, I understand that

Chevron is still speaking with some of my team and some of the buyers' teams, they ask for more time and if that means that we proceed to closing and come back to Chevron, I think we could do that.

THE COURT:  All right.

MR. WEILAND:  Although I do see there are other parties coming up to speak.

THE COURT:  Thank you.

MR. LYNCH:  Just very briefly, Your Honor, while we're at it, I'm John Lynch from Wachtell Lipton Rosen & Katz on behalf of the private equity sponsors, other than Carlisle.  And we would just ask to be put under the same treatment that the securities plaintiffs and the underwriter defendants have just requested, subject to all the qualifications that have just been discussed on the record.

THE COURT:  I think everyone that is similarly situated that has claims that are covered by insurance will have the right to pursue claims, but only to the extent of insurance coverage, and otherwise will not have claims and we're not going to make any determination in the order as to the availability, priority or entitlement to those insurance claims.  So get your name on the list with him and --

MR. LYNCH:  Thanks so much, Your Honor.

THE COURT:   -- watch for the language.  Thank you.

MR. LYNCH:  Appreciate it.

THE COURT:  But I agree it ought to be the same.

MR. LYNCH:  Thank you.

THE COURT:  All right.

MR. WEILAND:  Okay.  Thank you, Your Honor.

THE COURT:  Thank you.  Okay.  Everybody ready to proceed to closing arguments subject to the Chevron arrangement?

MR. BALASSA:  Debtors are prepared, Your Honor.

THE COURT:  All right.

MR. BALASSA:  Before I begin, Judge, before the close of our evidence, or the close of our case, we had offered Debtor's Exhibit 175 that was a compilation exhibit --

THE COURT:  Correct.

MR. BALASSA:   -- and Your Honor gave some parties an opportunity to review and to voice their objection after lunch if they had one.  I didn't hear an objection, but I'd like the clarity of record to know whether that exhibit has been admitted.

THE COURT:  I agree.

UNIDENTIFIED SPEAKER:  We have no objection.

THE COURT:  175 is admitted.  Thank you.

    (Debtor Exhibit 175 received in evidence.)

MR. BALASSA:  Your Honor, I do have some slides to

present to the Court. I'm being signaled that we need to flip over control --

THE COURT: Okay.

MR. BALASSA: -- to my colleague. Thank you.

Before I start, I want to express my appreciation to the Court for the Court's patience with us in presenting evidence. We've heard Your Honor's comments already about some observations you made about the evidence, and we were debating how much to present here in closing and decided that given that there are objections that have been made by Whitton and by the Ad Hoc Committee, that it was important to synthesize the evidence that's been presented into closing argument. So with Your Honor's indulgence I'll proceed.

THE COURT: Yeah, could I ask whether the PowerPoint is also printable?

MR. BALASSA: It is printable and printed, so we'll hand that up.

(Pause in the proceedings.)

THE COURT: Thank you.

MR. BALASSA: Your Honor, the -- may I proceed?

THE COURT: Please do.

MR. BALASSA: The Debtor's proposed plan would provide for releases as part of a multi-party compromise here that involves, as the Court well knows, the Creditors

Committee, the second liens, and it also involves consideration being provided by each and every one of the release parties with respect to these claims.

I won't dwell on the legal standard that Your Honor is well aware of, except to note our perspective and our view of the evidence.  This provides a context for our view of the evidence that is whether the settlement result falls beneath the lowest point in the range of reasonableness.  We believe the evidence shows that the work the independent, or disinterested directors did and the record evidence that we provide separate and apart from their assessment, both of those provide the Court with ample opportunity to assess and conclude that the result here is above the lowest end of the range of reasonableness and that the Debtor's reached an informed judgment in that regard.

The next slide, Judge, provides in a summary form what I'm going to attempt to cover in short order.

MR. UZZI:  Your Honor, may we -- I apologize for interrupting, I just want to be helpful here.  I just consulted with Whitton's Counsel, neither the Ad Hoc Committee nor Whitton is objecting to the release.  I mean I thumbed through this and this all has to do with the releases.  And if they want to go through closing, they can, but since Counsel had said, In light of our objections, they were going to do this.  I don't -- certainly don't need them

to walk through it, I'm not objecting to the releases.  And I'll let Mr. Higgins --

MR. HIGGINS:  We're in the same position, Your Honor.  We did opt out just for the record.  We reserve all those rights, but as far as this, we understand where the evidence is and so we're moving on.

MR. BALASSA:  The only --

THE COURT:  Thank you, Mr. Balassa.

MR. BALASSA:  Your Honor, the only question the Debtors -- that come to the Debtors' mind is whether this goes in some part to the good -- Court's consideration to good  faith with respect to proposing a plan.

MR. UZZI:  Again, Your Honor, just to be helpful, we're -- our good faith objection does not go to any of these issues.  I'm not going to raise that with respect to our objection.

UNIDENTIFIED SPEAKER:  And to be clear, Your Honor, I think the Committee was the one who objected to the releases.  The objections resolved by the contributions that are being made.  We had made a good faith argument but our objection's resolved.

THE COURT:  Mr. Higgins, are you going to allege that the releases are exculpations effective under the plan as proposed in good faith?

MR. HIGGINS:  No, Your Honor.

THE COURT:  I can take the win, Mr. Balassa.

(Laughter.)

MR. BALASSA:  I'll have a seat, Judge.  Thank you.

THE COURT:  Thank you.

(Pause in the proceedings.)

MR. HUSNICK:  So, Your Honor, if we could swap out to the presentation, for the other presentation.  I unfortunately only have one copy because I gave my other copy to my colleague to go make more copies.  But I will have more printed copies in a moment.

THE COURT:  I actually want them for tonight in case I don't make a decision from the bench and need to think about it overnight.  I was going to take the PowerPoints home, so there's no hurry on it.

MR. HUSNICK:  Okay.

THE COURT:  I may make a decision tonight from the bench, I don't know what all I'm going to hear, but I may need to --

MR. HUSNICK:  Okay.

THE COURT:   -- sleep on it and --

MR. HUSNICK:  I'm going to be --

THE COURT:   -- that would be helpful.

MR. HUSNICK:   -- persuasive, Your Honor.

(Pause in the proceedings.)

MR. HUSNICK:  Your Honor, I'd also like to thank

the Court and the Court staff for the opportunity to present our case here today.  I'm not going to go through 1129 item-by-item, suffice it to say the testimony of Mr. Powell we believe fully carried and provided sufficient evidence, both in the form of his written declaration and his oral testimony on each of the elements of 1129 necessary to satisfy confirmation.  There are some objections to that, and I'll address the objections on the relevant prongs rather than walk through each prong.

Your Honor, that takes me up to what do we have in terms of objections.  And a couple of these we've resolves along -- or dealt with along the way.  The Securities and Exchange Commission has obviously been dealt with, the securities law plaintiffs have been dealt with, and we'll deal with Chevron at the end.  So if you'll indulge me, I'll flip through a couple of slides that don't necessarily -- aren't live anymore.

But the first kind of category, how the objections break down, Your Honor, and it's into the following categories, good faith, best interest of creditors test, and the other two exculpation releases are resolved.  And then we'll address the waiver of the stay, which has been objected to by the Ad Hoc Committee and then we have already dealt with preservation of claims.

So let me start with --

THE COURT:  I'll just -- when you address the waiver for the stay, I mean I know I sort of telegraphed in my question, what I'm trying to figure out, if we confirm, is a fair opportunity to get a hearing before the District Court without unnecessary delay, and that's why I asked that question, because I think you know.  So you would -- the urgency is there.

MR. HUSNICK:  Yeah, I --

THE COURT:  But I need the urgency to be tempered by, if we confirm over objection not removing the ability of the District Court to review what I do altogether.  So think about that in terms of your argument.

MR. HUSNICK:  Okay.  Will do.  Thank you, Your Honor.

So let me start with the plan and the good faith standard.  Your Honor, the Ad Hoc Unsecured Group and Whitton have alleged that the Debtors have not proposed a plan in good faith, and this argument is predominantly coming from the Ad Hoc Unsecured Group.  The Debtors commence these Chapter 11 cases with a very simply goal in mind, and that was to complete the marketing and sale process that they commenced in late 2015 and to maximize value for stakeholders.

We have done just that.  Unfortunately the auction process did not yield sufficient proceeds to pay all

creditors in full, or to provide a meaningful recovery to unsecured creditors at Cobalt, Inc.  Prior to yesterday it was to provide no recovery to creditors at Cobalt, Inc.  But yesterday part of the Committee deal we were able to facilitate at least $5 million of proceedings going up to Cobalt, Inc.

However, the assertion -- or the issue with de minimis recoveries at Cobalt, Inc. has nothing to do with whether the plan was proposed in good faith under Section 1129(a)(3) or whether Total, Statoil, Navitas and W&T are considered good faith purchasers of the Debtors' assets under Section 363(m) of the Bankruptcy Code or 1123(a)(5).  I agree with Your Honor that 1129(a)(3) is focused on the proponent of the plan.  But we are seeking a finding from Your Honor that they are also good faith purchasers under 363(m) of the Bankruptcy Code.

On these points, Your Honor, that is as to good faith, the evidence in the record is clear and uncontroverted.  The Debtors commenced a strategic review of their assets in 2015 and retained Goldman Sachs to assist in the marketing process.  That yielded interest from Total early on in that process.  But Cobalt continued and determined, as you heard from Mr. Powell, determined to continue their marketing process, to complete the marketing process.

Importantly, the initial interests for Total was just that, they were initial interests. And they were not supported by definitive documentation, they were not supported by committed papers, they were just indications of interest. And those discussions continued throughout the marketing process.

On September 29, 2017 Cobalt, as we all know, hired Houlihan Lokey, and in particular Mr. -- oh, god, I'm blanking --

UNIDENTIFIED SPEAKER: Hanson.

MR. HUSNICK: Thank you. Oh, my lord, sorry, JP. I've been -- I haven't been sleeping.

Hired Houlihan Lokey and Mr. JP Hanson to conduct the sale process when Cobalt became concerned that the value that was being offered by potential purchasers, including Total, did not exceed the amount of the funded debt. So the first proposal they got, the 1.5 billion, was still not enough and it was coupled with a transaction -- you heard from Mr. Powell it was coupled with a transaction that made that execution of that deal would a triple Lindy.

You'd have had to do two exchange offers, maybe three exchange offers and somehow get a recovery to equity. So you're convincing your bond holders to take a discount while you're at the same time giving a recovery to their equity. The transaction was simply not executable and that

was before anybody did diligence on the other non-North Platt assets, because I know we're going to hear, Well, Total knew all about North Platt.  They do know a lot about North Platt, they're involved in the investment.  But that deal was unexecutable.

Separate transaction when they made their second proposal of around a billion dollars we heard.  Your Honor, when you run the math on that proposal, that proposal is less that what we have right now sitting in front of Your Honor.  And again, that would have required -- that was keyed up as a 363 sale process.  We do not believe, Your Honor, that that proposal warranted stalking horse protections, so that was why we did what we did.

In any event, Your Honor, we were continuing the marketing process.  Houlihan was retained, Your Honor, when the company determined that Chapter 11 was likely, that there was not an ability to find a purchaser through the out-of-court marketing process that was commenced by Goldman Sachs and completed by Houlihan Lokey to find a purchaser that was willing to pay enough money to satisfy the debt in full.  Again, prior to the bankruptcy Houlihan completed that analysis, 15 buyers showed up that conveyed that they were going to need the 363 process in order for them to submit a bid.

The Ad Hoc Group of -- I'm sorry, Your Honor, but

it's not moving.

THE COURT:  What do you need?

MR. HUSNICK:  I'm trying to go forward but it's not moving.  There we go.

As the evidence -- well, certainly Your Honor saw this demonstrative earlier and Mr. Hanson testified to the specific numbers included on this sheet.  But suffice it to say it was a very robust process that Houlihan Lokey ran with the assistance of management on behalf of the Debtors.  And they ran that process with the goal of maximizing value, and nobody was limited.  This is a Chapter 11.  I read articles all throughout yesterday as we were taking breaks and there would be an article every 10 minutes about what was going on in the case.  To say that these assets were available for sale is not an unknown fact.  And Houlihan was out there running a very robust process.

But as you heard from Mr. Hanson and you heard from Mr. Powell, these are unique assets.  These are assets that require huge capital investment.  And not just right now, but huge capital investment over the next few years in order to bring these assets to production.  That's not something that just any potential purchaser can do.  That's not something that a lot of financial purchasers just do.  But it is something that super majors and other folks who are already invested in this type of asset are willing to

do.  And, Your Honor, of course those efforts focuses on those types of purchasers, as they're the most likely purchasers.

It certainly wasn't exclusive.  And as you heard from Mr. Hanson, it certainly did not exclude the Ad Hoc Group of Unsecured Creditors from participating in the process.  We engaged with the professionals early and often. We had significant discussions with them about potential alternative proposals.  But there is no such thing.  There's no proposal.

Your Honor, we had a court -- or we held an auction pursuant to the Court-approved bidding procedures. And we exposed those assets through the auction to the competitive market forces.  There was, in fact, competitive bidding at the hearing, and, in fact, one of the creditor constituencies, the second lien, actually participated in the auction.  They went out, they formed an acquisition entity, they got licensed, they were ready to go.

Your Honor, the Ad Hoc Group didn't do that.  A higher bid has not materialized from the Ad Hoc Group or otherwise.  What we're left with, Your Honor, is a plea from an out-of-the-money stakeholder for denial of confirmation. But the Ad Hoc Group, they're not providing any evidence to support their assertion that denial of confirmation is going to lead to a higher or otherwise better offer for the

Debtors' assets.  Indeed, the only evidence on the likelihood of other higher or otherwise better offers was Mr. Powell's statement where he said that he had no reason to believe that there would be a higher or otherwise better offer if we somehow extended or restarted the sale process.

But Mr. Powell didn't stop there.  He went on to say that there was risk, that the existing bids could go down.  And there was risk to the assets if we took additional time to continue to market the assets.  Indeed, the evidentiary record, Your Honor, reflects that over -- after over two years of marketing these assets in some form or fashion, the same parties have expressed interest and the bids that have been accepted are the only bids available at this time.

So the Ad Hoc Unsecured Group is in effect asking this Court to deny confirmation with no backup, no backup bid on the table, no backup bid deal in the offing, no evidence as to how a termination will lead to a higher or otherwise better offer.  This type of approach is one that can only be adopted by and out-of-the-money stakeholder seeking to extend their option for a longer period of time.

And Your Honor cannot extend the option for an indefinite period of time while the collateral continues to melt.  Your Honor, we continue to burn cash by paying employees, we continue -- we would have to start, as you

heard from Mr. Powell and Mr. Hanson, investing in a well to continue to play this out.  Because every day counts between now and the time that the application for the SOP or the starting of that willing of the -- drilling of the well starts.  And you'll probably hear from the purchasers about the importance of timing here because of the regulatory considerations which you heard from the witnesses about.

The bottom line, Your Honor, is the Court should not permit the Ad Hoc Secured Group to play with the house's money.  The time has come, they had their opportunity, they did not show up with a bid.

Your Honor, there's also -- I just want to speak briefly about the testimony we heard from the four purchasers in support of -- sorry, this thing isn't moving, I'll let somebody back there keep up with me -- there's no evidence, Your Honor, of inappropriate collusion among the bidders.  In fact, the Ad Hoc Group agreed, and I think Your Honor held argument on the terms of that agreement, not to push forward with their initial allegations on collusion.

Your Honor, that was after the Ad Hoc Group conducted discovery, it was after the Ad Hoc Group filed a pleading in which they indicated that there may have been, and both the Debtors, the Committee, I'm sure, and the Ad Hoc Group reviewed the discovery and concluded there was zero evidence of collusion.  So it's not an accident, Your

Honor, that they dropped the collusion argument and are now simply faced on this last ditch good faith argument.

All of the purchasers, Statoil, Total, Navitas, and W&T Offshore offered testimony, whether it was oral or written, that they participated in the auction in good faith and at arm's length at all times during the sale process with the expectation of receiving a finding of good faith under Section 363(m) of the Bankruptcy Code.  I wanted to let you know exactly who testified on what, suffice it to say I think it was all in the record and is available either through declaration or proffer or oral testimony.

Your Honor, what it boils down to in the good faith argument is the Ad Hoc Group's attempt to question the validity of the auction process.  They cite vague notions of fairness and good faith.  But these assertions ring hollow when they have not -- they've agreed not to press their collusion argument and they've had a full and fair opportunity to participate in the Court-approved process, as well as to outside that Court-approved process work to facilitate a competing bid.  Neither of which did they do.

Second guessing the auction at this point does not change the fact that the marketing sale process is the best indication of value.  I chuckled to myself today as I was writing out my argument because most of the time I'm standing here telling Your Honor that the testimony of

Mr. Hanson or some other financial advisor is the best indicator of value and that we don't have to run a marketing process.

But here now I'm telling -- I'm standing here listening to a Committee -- or an Ad Hoc Group say, Well, that marketing process, forget that, Judge, let's do a desktop valuation.  I have not heard a situation where a desktop valuation is a more reliable source of valuation data than running a marketing process and exposing the asset to the free market.  That's exactly what we did.

Your Honor, at the end of the day I think this plan has been proposed in good faith, that the purchasers acted in good faith and are entitled to the good faith finding under Section 363(m).

That takes me to the best interest of creditors test, Your Honor.  There were a few arguments about the best interest of creditors test on whether the Debtor satisfied it.  And I think -- I just want to take one moment and see whether either Mr. Uzzi or Mr. -- god, I'm having a terrible day --

THE COURT:  Mr. Higgins.

MR. HUSNICK:   -- Higgins --

THE COURT:  Mr. Higgins.

MR. HUSNICK:   -- want to discuss this issue before I do any argument.

MR. UZZI:  Your Honor, we don't have a best interest of creditors objection.

MR. HIGGINS:  We don't either, Your Honor.

MR. HUSNICK:  Okay.

THE COURT:  All right.

MR. HUSNICK:  So I will skip that.  I believe that takes me, Your Honor, to the waiver of Bankruptcy Rule 3020 and 6004.  Your Honor heard from Mr. Powell about the fee burn -- or about the burn on SG&A which I think he estimated to be around $500,000 between -- you know, for a week extension.  And he also mentioned the interest accrual, which was I believe approximately one million, I think it's a little bit north of that, on the first lien debt, which the Debtors would have to pay to stay in.  We also know that there are two sales scheduled to close on Friday -- well, actually all four.

THE COURT:  No, there's no dispute --

MR. HUSNICK:  Yeah.

THE COURT:   -- whether we confirm or don't confirm that those two sales can happen.  So they don't really matter.

MR. HUSNICK:  So how much time do I think is appropriate, Your Honor?  Frankly I know Mr. Uzzi fairly well, not as well as some of my partners, but I know his firm very well and they are capable of filing papers.  If

they intend to file papers tomorrow on an emergency basis and --

THE COURT:  But they've got to get a hearing.

MR. HUSNICK:  I'm sure -- I'm assuming --

THE COURT:  I know people in this building too, you know, so.

MR. HUSNICK:   -- there's an emergency, Judge, but I don't know that we're closing immediately Friday morning, but I do know that there are employees who are standing by waiting, so I'd ask that that be a short as humanly possible.  There are some for example that are starting new jobs hopefully on Monday for them.  That is just a reality of where we stand.  If we delay, it kicks out other things. I do know and I don't want to speak out of school here --

THE COURT:  But, no, I really do need to hear this because getting a motion for stay before me I can control.

MR. HUSNICK:  Yeah.

THE COURT:  And I don't know -- Mr. Uzzi knows this, I actually grant those sometimes.  So it's not like I knee jerk reject them.  But that's not the concern I have because I could actually hear that tonight if I needed to. You know, my concern is I -- these guys are owed an awful lot of money, and I really don't believe that if they meet the standards for a stay pending appeal, that that should be obviated by a closing that takes it away.

And they ought to have the opportunity to tell somebody besides me whether they do in case I turn them down.  And that's what I'm worried about is giving them that chance to get to the District Judge should I reject it.  It's not like that these are minor creditors with a minor complaint.  They are major creditors owed a lot of money.

And you're going to have a difficult time telling me that I should allow a plan to go effective when the only real issue is money, and I don't mean to make light of money.

MR. HUSNICK:  I understand.

THE COURT:  But that's the only real issue.  It's not like somebody's going to die, it's not like the deals are going to go away if we wait into next week to give them a chance if we confirm to get to a different judge and tell them what errors I've made.  So that's why I want you to talk about the differences between, you know, Friday this week, Friday next week, Wednesday next week.  I want to know if there are, but if really what we're talking about is a million and a half dollars, and I don't mean to make light of a million and a half dollars, then you're going to have a difficult time --

MR. HUSNICK:  Well --

THE COURT:  I would tell you what I would probably do if we confirm is confirm, I'll allow you to close the

sales that are scheduled for Friday without a stay, and then just stay the North Platt sale --

MR. HUSNICK:  Yeah.

THE COURT:   -- so that that won't result in any sort of mootness of that, and allow the appeal to go up on that.

MR. HUSNICK:  Yeah, I -- so --

THE COURT:  Something like that.  I mean you all can work through it but --

MR. HUSNICK:  Yeah, the -- and I totally understand Your Honor's issues and I respect the due process concerns that folks get an opportunity to pursue appellate remedies.  I do think there's a couple of counterveilling considerations.  They may not carry the day, but I'll just --

THE COURT:  No, go ahead.

MR. HUSNICK:   -- lay them out there.  The employees here are very important, and they are hanging around and there may be some that we can say, It's time and we have confirmation and we can let them go.  But there is some level of uncertainty and there's certainly folks, you know, more senior at the company who we couldn't take the risk that things could get unwound in a short period of time.  So we have to keep them hanging around and that's -- it's frankly not -- we think it's unnecessary in light of

the issues that are faced on appeal because I think the standard here is clearly going to be a clearly erroneous standard which is going to be an incredibly high bar for these folks to satisfy and I don't want to get into the standard for a stay pending appeal.  But I think it's relevant to the question that's being asked of Your Honor, which is to allow the company to go forward on the plan.

But the second consideration is regulatory.  Every day that Total and Statoil are unable to close on the acquisition of North Platt, is one day that they take away from their attempt to go and get regulatory approval for --

THE COURT:  Yeah, but they agreed to wait till April 20th.

MR. HUSNICK:  To be clear, Your Honor, that was what we negotiated for the absolute drop dead date.

THE COURT:  And I'm talking about I want to hear why April 13 isn't a good day, so.  That's next Friday.

MR. HUSNICK:  Thank you.  As far as a week goes with the various constituencies at North Platt and Total, I do know a week matters.  Does it end the analysis?  No.  Does it add risk to it?  I can't say the risk is de minimis, I think --

THE COURT:  But they're obliged to close.  Right?

MR. HUSNICK:  They are obliged to close I believe, and Counsel can correct me if he disagrees with me, but I

believe they are obliged to close.

THE COURT:  Yeah, it isn't my job to look after their interests.

MR. HUSNICK:  We do need to have a final order, but, you know, I think that -- I understand the point.

Lastly, on this particular point, and I understand, you know, where you're headed on Friday.  I'd just say the sooner, the better on this.  We are -- I know we didn't discuss professional fees but there is burn, the longer this goes on, the worse it gets from a recovery for the second liens.  And it's unfair to the second liens to have to hang out.  But I do understand the statute and it's there for a reason.

The last thing I'll say is I'm not sure and I would ask that, you know, two things.  We're obviously going to ask for a bond if they are going to ask for a stay pending appeal.  And I would ask, you know, if Mr. Uzzi needed tonight to make his decision on whether he was going to appeal, that they let us know as soon as possible, so if they decide not to appeal, you know, that we don't have to continue to wait for a full week and a half.  And I -- I don't know, that might be something he'd be willing to give, but that is --

THE COURT:  Sure.

MR. HUSNICK:   -- one thing I would ask.

THE COURT:  Okay.  Thank you.

MR. LEVY:  Good afternoon, Your Honor.

THE COURT:  Good afternoon.

MR. LEVY:  Rick Levy of Latham & Watkins on behalf of Total.  I just wanted to elaborate on a few issues that were discussed with respect to the waiver of the stay.  Just to give you a better sense of what we think a very real and serious risk is on the regulatory approval prong.  Just to put this in perspective, it is true by the way that we have an outer date of April 20 by which -- and, you know, the confirmation order needs to be final and non-appealable.  That is one of the CPs.  There are other CPs as well and I'm not in a position to address whether they'll all be satisfied.

But you are, Your Honor is correct that we have an outer date for a final and non-appealable confirmation order by April 20.  And for what it's worth, when we agreed to that, that was in the context of working -- of having the ability to waive the final and non-appealable requirement so that we could close as soon as possible after the confirmation order was entered.  And we were assuming, I mean, you know, that that would occur immediately or shortly after the order was entered and not a week thereafter.

Putting that aside, just so you understand the regulatory time frame, and I'm not a regulatory lawyer but

I've spoken extensively with my client, that does this for a living, we need two levels of approval. We have to, first, after we close, be designated by BSEE as the operator. That -- there's no precise time but a very aggressive assumption is around 45 days to be designated as the operator. Only at that point when we get the order designating us as the operator can we then file the SOP with BOEM. And again, it's not, you know, a precise time frame by which we can get the SOP approved.

But even assuming -- again, optimistically we can do it in three weeks because it typically takes three to five weeks and we think under the circumstances we have a shot at getting it done in three weeks -- when you add the 45 days plus the 21 days marked against whenever we're allowed to close, you come -- if we can close, and we're intending to close on Friday just as with the other two sales, that would put us shortly before the June 17 expiration date for the North Platt lease.

And this issue, by the way, is really confined to North Platt. It's not with respect to the expo assets that were behind this rancor. It really is a North Platt issue. And so we're very concerned we're pushing it, you know, really to the edge here and so every day does count. And I realize, Your Honor, and, you know, I understand the reasons.

THE COURT:  Did you agree -- did you agree that if they get a stay that you'll unwind the deal?

MR. LEVY:  If they get a -- I don't know.

THE COURT:  I mean I --

MR. LEVY:  I don't know.  But --

THE COURT:   -- I guess I might consider --

MR. LEVY:   -- more importantly --

THE COURT:   -- letting you --

MR. LEVY:   --Your Honor --

THE COURT:   -- close so long as it can --

MR. LEVY:   -- remember there are --

THE COURT:   -- get unwound.

MR. LEVY:   -- but there are two parties here, so my client admittedly has a lot of skin in the game already.

THE COURT:  Yeah.

MR. LEVY:  You know, we're a 40, as you know a 40 percent working interest owner.  Statoil has no vested interest in this, and they're just -- and they can address it directly -- they're just as nervous if not more so because they don't have a stake right now.  They can walk, depending on the circumstances.

THE COURT:  Can you become the operator?

MR. LEVY:  Hmm?

THE COURT:  Can you begin -- if we confirm and the Debtor consents that you will be the operator whether the

sale occurs or not, can you begin your SOP efforts?

MR. LEVY:  I don't believe that's the case, but I'd  have to --

MR. HUSNICK:  Your Honor, that would be such a massive change.  Until that sale --

THE COURT:  That can't happen?

MR. HUSNICK:   -- is locked down, we couldn't --

THE COURT:  Okay.

MR. LEVY:  Yeah, I mean I'm told --

THE COURT:  Okay.

MR. LEVY:   -- that we have to close --

THE COURT:  Okay.

MR. LEVY:   -- and then it's, you know, 45 days.

THE COURT:  Yeah.  Okay.

MR. LEVY:  So it's a real issue, and I understand, you know, the need to give them maybe a little bit of time to seek a stay, but I think waiting an extra, you know, more than a week is just, under the circumstances, it really is putting this deal at risk.

THE COURT:  Okay.  Let me see what they have to say about it.

MR. LEVY:  Thank you.

MS. METZGER:  Good afternoon, Your Honor.  Laura Metzger from Orrick on behalf of Statoil.  I just wanted to reaffirm that time is of the essence for Statoil as well,

and Mr. Levy was correct in saying we're in a somewhat different position, having no vested interest in this asset other than the potential purchase contemplated hereby.  I think it's important to note we have two requirements in our AP right now.  One is that we have a final order that's acceptable to us before we close, and the other is that closing in any event occurs before April 20.  They're somewhat separate.

If Your Honor were inclined to shorten the 14-day period, the shorter the better for this process, and we'd be a supporter of that.  But the requirement that it be a final order and the requirement that it close by April 20, both of them are real hard requirements and we have no authorization to go further than that.

THE COURT:  I'm not looking to go further --

MS. METZGER:  That's good news.

THE COURT:   -- if we confirm.

MS. METZGER:  Thank you.

THE COURT:  Thank you.

Mr. Brimmage?

MR. BRIMMAGE:  Your Honor, let me start with I know it's not my time to close, but we're on this issue and I'm concerned if I wait the horse will have left the barn, and so I'd like to address the Court on the -- solely on the issue that you're talking about right now, if the Court

will --

THE COURT:  Go ahead.

MR. BRIMMAGE:  -- indulge me.  And, Your Honor, I think I have the answer.  That was levity, Your Honor.  And so here's the way I look at this, you're talking about -- the way I look at it you're talking about providing a stay, in essence without the movants, what would typically be the movants jumping through the appropriate hurdles to get a stay.

THE COURT:  Actually I'm not talking about that at all.  So maybe we better back up.

MR. BRIMMAGE:  Okay.

THE COURT:  The bankruptcy rules impose a stay.  I'm talking about not eliminating something that is granted by the bankruptcy rules.  They don't need to jump through a single hoop to get a 14-day stay, and that is built into the rules.  So I'm not talking about them having -- they don't have to meet any burden.  This side has to meet a burden to shorten the 14-days.  So let's be clear about what they've got to prove.  If they then want a longer stay, they've got a big burden.  But that first 14 days they're given under the rules.  Zero burden.

MR. BRIMMAGE:  Well, let's talk about where we are though --

THE COURT:  Okay.

MR. BRIMMAGE:   -- because I want to give the comfort -- the Court comfort that I don't think delaying this is appropriate under the circumstances.  And I think waiving the stay is absolutely appropriate.  Let's look at where we are and let's look at the record.  I don't think the Court has evidence from the objectors, the remaining objectors that the Debtors haven't met their burden.  I don't think there's any evidence.

THE COURT:  Well, they haven't made their argument yet.  Presumably they think they do.

MR. BRIMMAGE:  Well --

THE COURT:  And I may deny confirmation once I hear that well service is suing something and I --

MR. BRIMMAGE:  Well, and that's why I was hoping --

THE COURT:  I've got to say, having heard one side of the argument, I'll confirm, you know --

MR. BRIMMAGE:  Yeah.

THE COURT:   -- but it helps to hear the other side.

MR. BRIMMAGE:  And that's why I was hoping we would hear this towards the end.  But we're here so I want to --

THE COURT:  Yeah.

MR. BRIMMAGE:   -- I kind of want to address it

now.  Your Honor, I think there's -- I think there's a couple of things going on.  I think, and we'll see, I didn't hear any evidence that supported the objections that they have remaining.  And I understand the Court's desire to give them extra time to seek a stay or to have this appeal heard and so forth.  I get that.  But I think under the circumstances and the facts that you've heard, you've heard two things, two reasons not to do that, I think.  And I don't think you're going to hear that they put on evidence or even got evidence from the Debtor's witnesses that are going to support their objections.

There are two things at issue.  One is money, and I know you've said you're not as concerned about money.  And one is non-money issues.  Let me address both real quick.  The money issues Mr. Husnick went through with you, but I just want to be clear, it's about $4 million-ish a week.  You've got the professional fee burn, I talked to a couple of people, maybe a million and a half.  You've got the interest burn, a million one.  You've got the 500,000 G&A and other related things.  So you're approaching $4 million, not a million and a half.

That, while I know it's only money, is significant money, Your Honor.  And I just want to kind of highlight the money issue.  Where does the money come from?  The money comes from the second lien noteholders.  The second lien

noteholders who have participated in this case from the beginning with a consensual cash collateral order participated throughout the process, participated in confirmation, during confirmation, came to a deal with the UCC and maybe Whitton for another $23 million.  And now we're going to tack on -- and we've had evidence from Mr. Hanson about the cash burn during the case, and now we're looking at maybe another four million-ish, give or take.

THE COURT:  No we're not because here's 76, assumes we go to April 30.  So it's --

MR. BRIMMAGE:  Fair enough.

THE COURT:   -- it's all --

MR. BRIMMAGE:  Fair enough.

THE COURT:   -- it's, in fact, a lower cash burn than the 76 because we're going to --

MR. BRIMMAGE:  Than the 76, but where we are right now it's another four.  It's another four than whatever the cash burn is today, and I'm using four, Your Honor, it's give or take four.  I hope you understand that.  And so it's a give or take four from wherever we are today.  So that's real dollars.

Let's talk about the non-dollars.  You had evidence put on, testimony, that employees are leaving.  And I think that's undisputed, employees are leaving, and

including possibly next week.  So you've got that.  And then you just heard from Total all the other I think non-monetary costs to the estate reasons that there is risk in delay.  I don't know how to quantify the risk, Your Honor.  But risk is risk and under the circumstances I'm afraid it's too much risk.

I think if they want to delay, I think a bond would be appropriate.  But I think the bond could be significant because this case has been going on a long time.  I think --

THE COURT:  I'll take a bond argument when we have a motion --

MR. BRIMMAGE:  Okay.

THE COURT:   -- for a stay pending appeal.

MR. BRIMMAGE:  Fair enough.

THE COURT:  We're talking about shortening the rule and I'm not going to make them put up a bond for you to shorten a rule.  I just --

MR. BRIMMAGE:  Fair enough.

THE COURT:  That ain't happening.

MR. BRIMMAGE:  Fair enough.  Then let's talk about this, Your Honor.  I think any risk of closure at this point is not worth it.  I think the Debtors have met their burden.  I know you'll decide that, but from our standpoint they have.  I think they should be entitled to the waiver of the

stay.  I think this thing ought to go forward and go forward immediately.

All the evidence before the Court is that the marketing process was dead on.  Everybody's disappointed, including the second lien noteholders.  Everybody wanted more money but it produced what it produced.  Now we've got purchasers ready to go and we want to seal it.  Your Honor, I would respectfully request that the time for closure of this case is now.  Right now.

The process has worked, the Debtor and their financial advisors have worked very hard to bring maximum value to the estate, and I think the time to realize that value is now.  Any -- in my mind any time delay that adds risk to getting this deal done is simply just not worth taking given the stakes that are at issue.  So, Your Honor, the second lien noteholders would respectfully request that the Court grant the waiver of the stay as requested by the Debtors for all the reasons we've discussed.

THE COURT:  Thank you, Mr. Brimmage.

MR. BRIMMAGE:  Thank you.

THE COURT:  Any other proponents of confirmation?  All right.  Committee.

MR. FEINSTEIN:  Briefly, Your Honor.  For the record Robert Feinstein for the Committee.  So, Your Honor, this has been whirlwind of a case and obviously the plan

that's before you today is very different than the plan that was -- as initially filed.  And the disclosure statement that went out projected recovery for Class 5, the subsidiary general unsecured creditors, of between .8 percent and 60 percent as a result of the deal that was struck with the second liens and Whitton opting in, opting out.  It now appears that unsecured creditors are going share in 23 million if Whitton opts in, if Whitton opts out, the remain unsecured creditors are going to get paid 100 cents, which is a tremendous outcome.

If Whitton opts in, this is still far superior to what was projected in the disclosure statement, it depends upon how much Whitton's claim is, but if Whitton's claim is 15, everybody's getting 100 cents.  If their claim is double that, it's still a 50 cent case and so on and so on.  But, you know, we've done studies around the amount of that claim, we're comfortable that this is a very -- going to be a very robust recovery for unsecured creditors, even if Whitton opts in.

And then at the parent company --

THE COURT:  I was going to say for subsidiary unsecured creditors.

MR. FEINSTEIN:  Yes.  And at the parent the projection was zero, and we now have a $5 million recovery there.  So obviously, you know, things have changed, and

based on that the Committee now supports the plan.  I guess I'll, at the risk of stating the obvious, the settlement that's embedded to the amended plan is arm's length.  And this was a very contentious case behind the scenes.  I want to compliment my colleagues at Kirkland & Ellis and at Akin for heavily contested litigation but also an amicable settlement at the end of the day.  And based on that we support the plan and the sales embedded in it.  Thank you.

THE COURT:  Thank you.  Any other proponents?  All right.  Mr. Uzzi.

MR. UZZI:  Your Honor, without sounding like I'm admitting defeat, maybe it makes sense to work backwards since we were just talking about the --

THE COURT:  Whatever you want to do.

MR. UZZI:   -- the waiver.  First of all, I'm happy to let the Debtors know, or the Court know, if we decide not to take an appeal, to let them know so that they can close, to the extent that the accommodation is being made for us.  What I do think my clients are entitled to is an opportunity to review the actual findings that you make against the record and decide whether we think an appeal is warranted and viable.  One of the issues we do have is, you know, we were hoping to have a transcript of yesterday, even a rough, for today.  We won't even get a rough until tomorrow.  So there --

THE COURT: ABI doesn't have one up on their site already?

MR. UZZI: I don't think so -- oh --

THE COURT: I mean it's not official, but those are pretty good transcripts.

MR. UZZI: No, I don't think so actually.

THE COURT: I think they may.

MR. UZZI: They may. Okay. Well, we'll take a look at that, Your Honor.

THE COURT: They're now transcribing our stuff like by the end of the day almost, so.

MR. UZZI: ABI?

THE COURT: ABI is, yeah, just --

MR. UZZI: All right. That's --

THE COURT: Not to advertise for them because --

MR. UZZI: -- actually that's -- I've learned something today.

THE COURT: -- I think they charge you for it, but they've got --

MR. UZZI: That's not the issue. We'll take --

THE COURT: Yeah, they're doing --

MR. UZZI: -- a look at that, Your Honor.

THE COURT: -- they're doing real time digital transcriptions of it to the point that they're going to start broadcasting it into our courtroom live while we're

going.

MR. UZZI:  Really?

THE COURT:  But they've been available generally by the end of the day.  You might look at that.

MR. UZZI:  Oh, technology.  Well, obviously I am not nearly as technologically --

THE COURT:  Yeah, I don't --

MR. UZZI:  -- proficient as you, Your Honor.

THE COURT:  -- I have no idea what they charge for that so I don't want to --

MR. UZZI:  No, that's quite all right.

THE COURT:  But they're not official, I don't mean you can take an appeal off of them but you can certainly review things off of what they've got.

MR. UZZI:  We could at least make a decision.  And I'm not saying we even need the transcripts for the decision, Your Honor.

THE COURT:  How long do you need to decide whether you're going to appeal?

MR. UZZI:  I think honestly, Your Honor, 24 hours.

THE COURT:  Okay.

MR. UZZI:  Right.

THE COURT:  And then --

MR. UZZI:  And then the issue would be being able to get -- if we were going to appeal, then -- and I would be

happy live with that, you know, we would need a 24 hour time line to give them some notice of whether or not we intend to appeal, or at least if we --

THE COURT:  So --

MR. UZZI:  -- made the decision not to appeal.

THE COURT:  -- and do you agree that it would treat you fairly if it wouldn't be stayed if no one appealed within some time frame, and then if you appealed and the District Court were to not stay it, in other words you've completed a District Court process and let's assume that you completed a District Court process by the 11th.  If the District Court were to say no, at that point you've had your fair opportunity and I mean you're not going to get a 5th Circuit review by that point, so we could make it sort of a flexible --

MR. UZZI:  Yeah.

THE COURT:  -- shortening, it would go to the 13th.  But if you lose at the -- if you win at the District Court, we're done, or if you win before me, we're done.  But if you lose at both those levels --

MR. UZZI:  Yeah, because I'm not going to get before the --

THE COURT:  The 5th some time anyway.

MR. UZZI:  -- 5th Circuit --

THE COURT:  So it can be --

MR. UZZI: -- in time anyway, and I --

THE COURT: -- the 13th to be shortened down --

MR. UZZI: Yeah.

THE COURT: -- to when you get a decision.

MR. UZZI: Yeah, and we're not asking for the stay to stay in place just for the sake of causing pain.

THE COURT: I know. I know.

MR. UZZI: We just -- I just want to be able to consult with my client.

THE COURT: But I'm pretty firm that I think that you ought to have the right to figure out what you want to do and you ought to have the right to get at least one level above me, so.

MR. UZZI: Okay. Well, I appreciate that, Your Honor. I'm hoping they're the ones that are actually looking to appeal you, not me, but we'll --

THE COURT: I got it.

MR. UZZI: -- we'll see where we go with that.

THE COURT: I got it. I don't think it's appealable. Right? By them.

MR. UZZI: Denial of confirmation? I don't know. I've never had to deal with that issue actually, Your Honor.

THE COURT: I don't think they get to appeal. If I want to be safe I'll just deny it.

(Laughter.)

MR. UZZI:  I'll take a win now, Your Honor, and sit down too if I get that opportunity.  Your Honor, I wanted to -- you said something during the colloquy with the SEC that made me think about, you know, how to present my closing here, and to make sure that we're very focused on what our allegations are and what they aren't.  And you made a comment about potential claims against Mr. Husnick about suppose somebody claims he mismanaged the auction, which is essentially being -- what's being alleged here, or something to that effect.  And I just want to make clear --

THE COURT:  No, I did not mean in the colloquy that you were alleging any wrongdoing by Mr. Husnick.  And if I implied that, that was in error.

MR. UZZI:  No, I didn't think you implied wrongdoing, but I'm not even implying --

THE COURT:  Okay.

MR. UZZI:   -- mismanagement of the auction.

THE COURT:  Okay.

MR. UZZI:  All right.  What we're saying is, is that the auction results are not sufficient alone to justify the sale.  And Counsel for the second lien came up and said, While there's no evidence to support my objection, and that is my objection is that the evidence -- it is not my burden to put evidence on to disprove them.  It's their burden to put on sufficient evidence so that the Court is satisfied.

They can make the --

THE COURT:  But satisfied of what?  I mean everybody -- I think there's sort of a consensus that it was a disappointing auction result.  But what am I supposed to be satisfied of?  That it was a full and fair auction, or that it was a full and fair auction that produced an expected price?  What is the burden on that?

MR. UZZI:  Well, I think that, Your Honor, to -- let me attack it this way, let me attack it by -- so just when we get to good faith and, you know --

THE COURT:  Right.

MR. UZZI:   -- it does -- again, I think we're pretty clear, we're not talking about the conduct of the parties, we're not saying they didn't try really hard, we're not saying they didn't try to maximize value, we're not saying anything along that way.  But if you take the hypothetical, I'll take an absurd paradigm.  If the Debtors ran the auction and the bid was for one dollar, and then they came in and said, Well, you know, we ran the auction, these were all the results, and that's just the results of the auction.  We want to sell the asset.  And everybody would be saying that's the wrong answer.

And I think when we look at the Code we would look and, well, you've got to pick out which section of 1129, it would be 1129(a)(3).  It's really not -- that's not

furthering the purpose of the Bankruptcy Code.  And I don't believe Your Honor would have a problem saying, Well, gee, guys, right, a dollar?  Really?  Out of the auction?  That's not enough.  So now we have points on a continuum, now I get out of the absurd and if the asset is really worth the billion five, then $300 million for the asset, or 350, whatever the numbers are, is pretty absurd too.

And the cases, in fact, the case that Mr. Husnick used in his PowerPoint to rely -- that said you could -- you should rely on the auction.  The *Waterford Wedgewood* case, I have it with me here, it's actually a fraudulent conveyance case but I understand the proposition that he relies on it for.  The very -- right after the quote then there's a parenthetical that's with a cite to *Balaber-Strauss v Murphy* that says the absence of competitive bidding precludes presumption that reasonably equivalent value was received.

THE COURT:  So let me --

MR. UZZI:  So -- so --

THE COURT:   -- let me talk to you, let me talk about that --

MR. UZZI:  Yeah.  Okay.

THE COURT:   -- because there are two things that I've -- your side of the argument that I'm having difficulty overcoming.

MR. UZZI:  Okay.

THE COURT:  And let me just tell you what they are.  The second lienholders were the in the money holders.

MR. UZZI:  Yes.

THE COURT:  And they were bidding.

MR. UZZI:  Yes.

THE COURT:  And they decided to quit bidding.

MR. UZZI:  Yes.

THE COURT:  Which meant that they thought they were better off with the cash than the assets.  That is value indicative by a competitive bid.  Only two people, but they have the choice of the asset or the cash and they chose the cash.  Because they could have credit bid higher and gotten the asset, and they didn't.  And then they could have tried to resell it, and all that is meaningful just in terms of thinking about what happened.

The second thing I'm concerned about is where we are right now, and the evidence I believe, and you need to correct me on this, is that to get from here to another auction requires the Debtors to spend $110 million.  And that might fail.  But that's the cost of drilling another well to get to another auction.

And then I have no evidence that says whether spending the $110 million will be $110 million down the rat hole, so you would then get the same price.  Whether you would get a price plus $110 million or whether it depends on

the outcome of the drilling of that well.  But I just don't have any evidence about what happens if they do continue the process and say, Okay, we did our best, but we didn't get the result we wanted so let's invest $110 million to do it again.  I don't have anything before me that says that's a prudent decision, and I've got testimony from an advocate, and I have that that says it's an imprudent decision.  Where do I go with all of this?

MR. UZZI:  Well, so let me address it backwards.

THE COURT:  Yeah.

MR. UZZI:  All right.  And what you don't have is any evidence that this auction was otherwise reflective of fair value.  You would have to conclude that there was enough competition at the auction so that you did get to fair value.  And if you conclude that, then, okay, then the market has spoken.

THE COURT:  But by giving lots of people the opportunity to bid and only two parties really decide to bid, one of whom is going to bid under a 363 credit bid, the other's going to bid for cash, doesn't that give me --

MR. UZZI:  Well, the 363 credit --

THE COURT:   -- some measure --

MR. UZZI:   -- the problem with the credit bid --

THE COURT:  Right.

MR. UZZI:   -- is that as a credit bidder as you

get closer and closer to your par recovery, and they're getting over 90 cents here, then you look at the reward of going any higher.  And at that point, you -- and there's -- we've -- in our papers, Your Honor, where we cite to the case where there's a recognition that a credit bid is different, it's different than a cash bid because you're not putting cash up and if you have the --

THE COURT:  Well, it's different the other -- it's different the other direction.  You'll bid more on a credit bid than you would on a cash bid.  I don't think you have a case that says you would bid less.

MR. UZZI:  Until you reach a point where, you know, cash is king, so you have the opportunity to take cash rather than the asset that --

THE COURT:  Yeah, but if the asset's worth three billion and you can credit bid it for a billion two, why wouldn't you do that?  You would at least wait until somebody out-bid you at more than your debt.  I mean it seems to -- I don't understand the difference between 90 cents and 100 cents.  That 10 cents is still 10 cents.  So -- or 10 percent is still 10 percent.

I mean I don't understand why it's not -- it may not be a dispositive value indication, but you  have marketing and then you have -- we didn't just put Statoil and Total in a room and say, How much do you want to pay.

There was somebody there worrying about how much they were paying, the fulcrum creditor.

MR. UZZI:  I understand your point, Your Honor.  I still think that you have to conclude, and maybe Your Honor is going to conclude that that was sufficient competitive tension to lead to true price discovery.  I do --

THE COURT:  But what do I have that says it wasn't?  And I agree with you, the burden is on them, but --

MR. UZZI:  Right.

THE COURT:   -- but what do I have?

MR. UZZI:  Well, what I would have expected, Your Honor, and look, we were anticipating our crosses to be a lot broader and longer than they were.  I would have been expecting the type of analysis that was done to justify the releases and the robustness of that, of -- you know, we already -- we have in the record that there were prior offers that were made that were turned down because they didn't think they were sufficient offers.

We have a situation here where we have two directors that took the stand, neither one of them testified to what the board considered in accepting this bid.  We have actually no evidence in the record of a business judgment being made.  We have evidence of an auction, but we don't have anybody who had testified that said, Well you know what, we ran this auction, this is the right value for this.

THE COURT:  We don't have anybody saying it's the right value, but we have the CFO saying, If we don't take this and we take the only other alternative we have, which is to spend $110 million, that would be an imprudent comparative decision.  What do I do with that?

MR. UZZI:  I thought Mr. Hanson said that.

THE COURT:  Maybe it was Mr. Hanson.

MR. UZZI:  I think it was Mr. --

THE COURT:  You may be right, it was Hanson.

MR. UZZI:   -- I think it was Mr. Hanson that said that.

THE COURT:  You may very well be right about that.

MR. UZZI:  But we do have the CFO saying that the lease -- and, Your Honor, I get -- as I said in my opening, I get the importance of SOP.  So I don't --

THE COURT:  Right.

MR. UZZI:   -- want to down play that.  Right.  But you have the CFO also testifying that there is the drilling, I forget the technical term for it, but the drilling plan in place to preserve the lease.  And remember -- look, I get it, Your Honor, there's risks here.  There's risk.  There's risks if you deny confirmation of the plan, but there's also risk if you confirm the plan, or there's consequences of each one.

THE COURT:  There are.

MR. UZZI:  The consequence is my client gets absolutely nothing and, you know, we've participated in this case, and again, I said -- I promised I would say good things about Mr. Husnick, but they -- you know, we've participated in this case and they've been very helpful with us, and all in the anticipation that, gee, we thought we'd be arguing maybe that it wasn't good enough, it wasn't going to be somewhere here where we're standing and we're getting zero.

THE COURT:  Right.

MR. UZZI:  I think if they want to zero us out, the record has to be better, the record needs to say that, Gee, you deserve zero.  The record here is,  we ran an auction, there was no reserve price and we just took -- it just is what it is. We ran an auction, it is what it is, and we're moving on.  That's essentially the record.  I don't think that's a good enough record to give me a zero.  And, Your Honor, actually I can end right there.  I mean that's where we are.  Your Honor needs to decide, you know, if there is a sufficient record to make the findings that are necessary, you know, to confirm the plan.  Your Honor, we appreciate the time and the indulgence insanely.

THE COURT:  Thank you.

MR. UZZI:  Thank you.

THE COURT:  Mr. Higgins?

MR. HIGGINS:  Yes, Your Honor.  For the record John Higgins on behalf of Whitton.  And I'll be brief, Your Honor.  Just to clarify a couple of comments Mr. Husnick made, and the issue about good faith.  We had joined in the Unsecured Creditors Committee's objection, so I think that may be where part of the confusion is.  We had a few primary objections in our pleadings --

THE COURT:  Right.

MR. HIGGINS:  -- and most of those have been resolved.  Number one, we wanted to have the -- preserve the right to object to intercompany claim, that's been ticked off.  We've already had communications, we want to make sure we've got the right to objection to the diminution claim in the event we opt out, so it would have a direct impact on the recovery for unsecured creditors, or us.

But there's a couple of other points, Your Honor, I'd like to point out and raise.

THE COURT:  Have you all agreed on a toggle date? That's something we talked about on the record and I don't know that that got resolved in any way.

MR. HIGGINS:  It's been proposed to us I think, the two Ls ultimately agreed to the 16th, at least that's the draft I've seen of the plan, it hasn't been --
1xo

MR. HIGGINS:  -- proposed.

THE COURT: So we have a toggle date of the 16th.

MR. HIGGINS: Yes, Your Honor.

THE COURT: Okay.

MR. HIGGINS: And then the -- a couple of issues though, Your Honor. I just want you to pause and think about what our position at Whitton is at this point. You know, I've raised on the fly yesterday when I first heard about the settlement, the potential of unfair discrimination. We heard the tentative settlement, the two Ls were going to give up $23 million for a pot plan for the general unsecured creditors.

And just so Your Honor's aware, and you haven't seen this yet, but it's pretty clear from the proposal that the $8 million in the event we opt out is actually going to be coming from the unencumbered assets that would otherwise be available for unsecured creditors which means that the eight million is actually coming out of the pool of assets that would be available for Whitton in the event we prove up our claim and satisfy all the other issues. So it's actually diluting our recovery even further to give to other unsecured creditors who in that example would be getting 100 cents on the dollar.

THE COURT: No, it's not because your option is to get what you would have done without the proposal, and if you opt out, the amount that you'll end up getting awarded

by me will assume that this amendment to the plan did occur. So I'm not going to let that happen to you.

MR. HIGGINS:  I appreciate that, Your Honor. Whitton still feels like it's being put in sort of an impossible position.  We were not part of the negotiations of the 23 million.  We have been, in effect, capped, if we opt in, in our recovery.  It's a small pot based upon the amount my client believes its claim will ultimately be allowed at.  A very small distribution.  The waterfalls all show that if the plan were left alone and everybody were going after the assets so we could have a higher distribution, I understand Your Honor is trying to preserve that right for us.

But basically we're going to be forced to file -- fight alone the intercompany claim, the two L deficiency claim, diminution claim, we'll be -- now we're learning for the first time that we may have to fight about the 35 percent unencumbered funds that are the Sonegal settlement proceeds.  We don't even know what that amount is.  We don't know what claims will be asserted against those funds.

Apparently we're going to have to come back to this Court at some later date after confirmation, after we've opted in or out, and learn that other people, including people in this courtroom, may be asserting claim to those proceeds.  How is my client to vote intelligently

to accept or reject this new option without having that information?  It puts them in an untenable position, Your Honor.  We could spend all the money fighting intercompany claim, win, we could prove up a $225 million claim, win, and then find out that somehow that intercompany distribution -- that the two Ls are asserting a lien on that intercompany claim or something that we're not aware of at this point in time.  Have no information about, and that 35 percent suddenly becomes encumbered and there's no money available for us.

At that point how does my client turn and say, Oh, maybe I should have taken the 15 million.  But they should know that now, Your Honor.  In effect we're -- it's a disclosure issue.  And this was never disclosed to us until a couple of nights ago on a phone call.  No pleadings, no nothing.  And that's the problem we've got with it, Your Honor.  It was always represented in the entire case that there were only a few creditors at the Angola entities that would have to be satisfied and the rest of the Sonegal proceeds would come up to the LP level available for distribution, 65/35, to the general unsecureds and to the two Ls.  That's all I have, Your Honor.

THE COURT:  Thank you.  Mr. Eisenberg.

MR. EISENBERG:  Thank you.  And I don't want to add to any of the arguments, this is just a housekeeping

point.  I think I heard everybody say that there's no objection to a waiver for the 14-day stay with regard to the Heidelberg sale, the W&T, and to the Shenandoah sale that's been there.  I just wanted to make sure that that's on the record, everybody got a chance.  If there was some objection, that somebody would say something.  And --

THE COURT:  Yeah.  Does anyone object to authorizing the two sales with an April 6 deadline on April 6?

MR. UZZI:  We have no objection, Your Honor.

THE COURT:  Okay.  That's fine.

MR. EISENBERG:  Thank you, Your Honor.  I just wanted to make that clear on the record.

THE COURT:  I really don't want to add any drama to any of this, I think everybody knows that right now I'm leaning pretty heavily towards confirmation, just from the questions that I've asked.  I do want to sleep on it.  So I'm not going to confirm tonight.  I want to be sure I'm doing the right thing.

UNIDENTIFIED SPEAKER:  Thank you.

THE COURT:  I appreciate the arguments, I think they're wrong, but I'm not confident that I'm going to rule after a very long day in court without sleeping on it.  So you should prepare a proposed confirmation order and share it with everyone.  You know, I don't think you're wasting

your money because I'm telling you what I think I'm going to do. But I'm really going to think about it and we're going to come back at 1:30 tomorrow and I'll announce a final decision and then we'll go through an order, assuming that I confirm. It'll be easy if I don't.

MR. HUSNICK: What time did you say, Your Honor?

THE COURT: Would 1:30 work?

MR. HUSNICK: Is there any chance of doing it in the morning? I just have another obligation in the evening.

THE COURT: Yeah.

MR. HUSNICK: I apologize.

THE COURT: I can do it at 9:00.

MR. HUSNICK: At what time?

THE COURT: I can do it at 9:00.

MR. HUSNICK: Okay.

THE COURT: I'll be ready by 9:00.

MR. HUSNICK: I appreciate it. I apologize to impede on your time.

THE COURT: No. Is there anyone that wants to not be here at 9:00 and be on the phone, that's fine.

MR. HIGGINS: That further complicates things. Is there any way we could move it back a little bit so we can have an opportunity to talk amongst the parties. My clients are all asleep tonight.

THE COURT: Would 10:30 work for everybody?

MR. HUSNICK:  I don't believe in sleep anymore, so I'm available.

(Laughter.)

THE COURT:  Is 10:30 okay?  Again, we'll put -- assuming we confirm, which is --

MR. HUSNICK:  Understood.

THE COURT:   -- a current intent but not a ruling, we'll put the confirmation order up on the internet so that anyone will be able to object to it on the phone.  I'm not going to hear any more arguments tomorrow, other than maybe some announcement of some agreement that -- Mr. Higgins may be sort of pretending, I don't know if that's what that is is or not, and I'll just --

MR. HIGGINS:  Unfortunately not, Your Honor.

THE COURT:   -- unless I get some announcement about some change in the deal, I'm not going to hear any more arguments, I'm just going to announce whether I'm going to confirm or not.

MR. HUSNICK:  Yeah, and I'd just ask if there's anyone in the room who hasn't received the confirmation order, let us know, because we --

THE COURT:  Okay.

MR. HUSNICK:   -- we've been going back and forth on drafts with everybody.  I think you got it.  Right?  If you don't, we'll share it with you, but --

THE COURT:  Okay.  We're in adjournment then till 10:30 in the morning.  You can leave all your things here if you want.  There'll be no hearings prior to 10:30.  Thank you.

COURT SECURITY OFFICER:  All rise.

(Proceedings adjourned at 6:53 p.m.)

*  *  *  *  *

*I certify that the foregoing is a correct transcript to the best of my ability produced from the electronic sound recording of the proceedings in the above-entitled matter.*

*/S/ MARY D. HENRY*

*CERTIFIED BY THE AMERICAN ASSOCIATION OF*

*ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337*

*JUDICIAL TRANSCRIBERS OF TEXAS, LLC*

*JTT TRANSCRIPT #58447*

*DATE FILED:  APRIL 6, 2018*